BLAKE G. HALL, ESQ.
SAM L. ANGELL, ESQ.
HALL ANGELL & ASSOCIATES, LLP
1075 S Utah Avenue, Suite 150
Idaho Falls, Idaho 83402
Telephone (208) 522-3003
Fax (208) 621-3008
*ISB Nos. 2434 and 7012*
bgh@hasattorneys.com
sla@hasattorneys.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAKE L. SHEELER, an individual,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>BRIDGET MCARTHUR, an individual;<br>JEFFREY E. ELDRIDGE, an individual;<br>MARISA A. SALDANA, an individual;<br>ROGER SCHEI, an individual; and<br>CITY OF POCATELLO, a municipal<br>corporation;<br><br>　　　　　　　Defendants. | Case No. 4:22-cv-00313-AKB<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

COMES NOW Defendants, by and through counsel of record, HALL ANGELL & ASSOCIATES, LLP, and hereby submit their Memorandum in Support of Motion for Summary Judgment as follows:

**<u>INTRODUCTION</u>**

This case arises out of the shooting of Plaintiff Jake L. Sheeler ("Plaintiff") on September 25, 2020 by officers of the Pocatello Police Department. Plaintiff was on the run from the police at the time that he was shot. Plaintiff was a danger to other people around him, to the officers, and to himself. Plaintiff stole a Taurus Judge (a .45 caliber handgun) from a resident of

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 1

Pocatello, Kirk Hendricks. Plaintiff then threatened Mr. Hendricks, his wife Mary Hendricks, and their neighbor Mr. Richard Hernandez with the Taurus Judge before he fled. After fleeing from the Hendricks' home, Plaintiff eluded the police for several hours. Officers Eldridge and McArthur finally located Plaintiff as Plaintiff was heading towards the Outback Golf Course in Pocatello and gave him commands to surrender. Plaintiff ignored the commands that he was given and shouted "I gotta gun!" and "back up!" at Eldridge and McArthur. Plaintiff continued to travel away from McArthur and Eldridge, but after taking several steps Plaintiff planted his feet and thrust his fist towards them. Officers McArthur and Eldridge reacted to this threat to themselves and to others in the area by shooting Plaintiff. This shooting did not violate Plaintiff's Fourth Amendment rights and Eldridge, McArthur, and Saldana are all entitled to qualified immunity on Plaintiff's claims. Therefore, Plaintiff cannot maintain any of his claims against Eldridge, McArthur, and Saldana, and because he cannot maintain his claims against them he also cannot maintain his claims against Defendant Schei and the City of Pocatello.

## LEGAL STANDARD

In considering a motion for summary judgment, the Court may properly grant the motion when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. F.R.C.P. 56(a). The question for the district court is "whether, viewing the facts in the non-moving party's favor, summary judgment for the moving party is appropriate. *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017), *citing Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1207 (9th Cir. 2016). "Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact." *Id*.

**ARGUMENT**

**I.    PLAINTIFF'S FOURTH AMENDMENT RIGHTS WERE NOT VIOLATED.**

The Defendant officers' actions did not violate any of Plaintiff's constitutional rights.

When examining a Fourth Amendment claim involving allegations of excessive force, the Court

uses the three factors outlined by the Supreme Court in *Graham v. Connor*, 490 U.S. 386, 396–

97 (1989):

> First, we 'assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted.' *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010). Then, we evaluate the government's interests by assessing the severity of the crime; whether the suspect posed an immediate threat to the officers' or public's safety; and whether the suspect was resisting arrest or attempting to escape. *Id.* Finally, we 'balance the gravity of the intrusion on the individual against the government's need for that intrusion.' *Id.*

*Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018). To prevent the escape of a felony suspect, a

police officer may use deadly force only when it is necessary to prevent the escape and the officer

has probable cause to believe that the suspect poses a threat of serious harm, either to the officer

or others. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). In *Garner*, the defendant officers received a

report of a burglary at a home. When the officers arrived at the scene, one officer observed the

suspect running across the backyard. *Garner*, 471 U.S. at 3. The officer was able to see the

suspect's face and hands and was "reasonably sure" that the suspect was unarmed. *Id*. The officer

gave the suspect a command to stop and identified himself as police, but the suspect ignored him

and began climbing the fence to escape. *Id.* at 4. The officer then fatally shot the suspect. *Id*. The

Supreme Court held that the officer did not have probable cause to believe that the suspect "posed

any physical danger to himself or others" and therefore held that the statute in question was

"invalid insofar as it purported to give [the officer] the authority to act as he did." *Id*. at 21-22.

The facts in this case are similar to those in *Forrett v. Richardson*, 112 F.3d 416 (9th Cir.1997), overruled on other grounds by *Chroma Lighting v. GTE Prods. Corp*., 127 F.3d 1136 (9th Cir.1997), a case involving the use of deadly force against a fleeing suspect. In *Forrett*, the suspect, Mr. Forrett, committed a violent residential burglary. *Forrett*, 112 F.3d at 418. Forrett shot two of the burglary victims then fled the scene in a truck. *Id*. Officers investigating the call found the truck but neither Forrett nor the weapons were inside. *Id*. A few minutes later, a police officer saw Forrett walking in a nearby residential neighborhood. *Id*. Because Forrett matched the description of the suspect, the officer confronted Forrett. *Id*. Forrett fled into the residential area on foot. *Id*. Forrett eluded capture for almost an hour by running across yards and streets and jumping fences. *Id*. Forrett hid in a wooden shed for a few minutes, where he removed a layer of clothing in an attempt to change his appearance. *Id*. The officers chased Forrett into a yard bounded by a fence. *Id*. Forrett paused in the yard to look around. *Id*. The officers approached to within 20– 30 feet and shouted to Forrett to stop and surrender. *Id*. At trial, Forrett testified that at this point he was aware that the police were after him, that he was trying to get away and that he heard the officers shouting, though he could not discern what they were saying. *Forrett*, 112 F.3d at 418. As Forrett hesitated, two officers fired shots at him but did not hit him. *Id*. Forrett tried to climb a fence to escape from the officers and he was shot. *Id*.

After the shooting, the police found no guns either on Forrett or in the vicinity when he was captured. *Id*. The Ninth Circuit first found that Forrett posed a risk of serious harm and noted that the suspect need not be armed or pose an immediate threat to the officers or others at the time of the shooting. *Id*. at 420. The Ninth Circuit noted that the Supreme Court in *Tennessee v. Garner* identified specific situations in which a fleeing felony suspect may be deemed to pose a threat of serious harm to the officer or others:

Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.*, quoting *Garner*, 471 U.S. at 11–12.

In *Garner* the Supreme Court held that "[u]nder this test, it is not necessary that the suspect be armed or threaten the officer with a weapon." *Id*. The Ninth Circuit noted "[w]henever there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, if some warning has been given, where feasible." *Id*. Forrett had conceded at trial that the officers had probable cause to believe that he committed a crime involving the infliction of harm. *Id*. For this reason, the Ninth Circuit found that the officer defendants had probable cause to believe that Forrett posed a serious threat of harm to them or others. *Id*. Forrett also testified that he was consciously trying to evade arrest and that he knew the police were chasing him. *Id*.

The Ninth Circuit then considered the only remaining issue under *Garner*, which was whether the use of deadly force was necessary to prevent Forrett from escaping. *Id*. The inquiry is a factual one: "'Did a reasonable non-deadly alternative exist for apprehending the suspect?'" *Id*., *quoting Brower v. County of Inyo*, 884 F.2d 1316, 1318 (9th Cir.1989). The Ninth Circuit rejected Forrett's argument that a less drastic alternative would have been to wait and capture him by less deadly means. *Id*. "The defendants' decision to use deadly force 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id*., quoting *Graham*, 490 U.S. at 396. "Nothing in the record indicates that at the time of the shooting the defendants knew that their colleague was on the other side of the fence, or that other

officers had established a closed perimeter." *Id*. "Nor does the evidence show that the police had actually established an escape-proof cordon at the time Forrett was shot." *Id*.

It was undisputed that Forrett used every desperate means at his disposal to elude capture for almost an hour of hot pursuit. Based on Forrett's actions, the Ninth Circuit held:

> The only objectively reasonable conclusion to be drawn from this evidence is that if the defendants had not shot him, he would have continued taking whatever measures were necessary to avoid capture. The defendants therefore had probable cause to believe that Forrett was willing to use violent means to achieve his ends. The defendants knew that he was fleeing through a residential area where many of the neighborhood's residents and schoolchildren were in the vicinity. They also had probable cause to believe that he had recently invaded a home, tied up its occupants, shot one of them, and fled the scene by taking one occupant's truck, guns and ammunition. Adding these facts to his demonstrated willingness to take desperate measures, the defendants rightly concluded that it was highly possible that he would seize an opportunity to take an innocent bystander hostage. The use of deadly force was objectively reasonable under these circumstances. For the foregoing reasons, the only reasonable conclusion that could be drawn from the evidence when construed in the light most favorable to plaintiff was that the officers did not violate plaintiff's Fourth Amendment rights.

*Id*, internal citations omitted.

Here, the crimes committed by Plaintiff were serious felonies on the magnitude of the conduct in *Follett*. Plaintiff burglarized the Hendricks' home in Pocatello while the Hendricks were home. Plaintiff stole a Taurus Judge handgun from the Hendricks' garage and pointed that firearm at Mr. and Mrs. Hendricks. Plaintiff threatened Mr. Hendricks, stating "[s]ir, I don't want to shoot you but I will." *Deposition of Kirk Hendricks,* 12: 15-16. Plaintiff held Mr. Hendricks at gunpoint for "five to ten minutes." *Deposition of Kirk Hendricks,* 36:7. Once Plaintiff left the Hendricks' garage, he was pursued by Richard Hernandez. Plaintiff pointed the Judge at Mr. Hernandez and threatened Mr. Hernandez with it. Plaintiff told Mr. Hernandez "[d]on't" as Mr. Hernandez attempted to move closer to Plaintiff, which was a clear threat. *Deposition of Richard Hernandez,* 14:22 - 15:13. Plaintiff then fled the scene by jumping over a fence into another

backyard. *Deposition of Richard Hernandez*, 17: 1-11. Plaintiff thereby committed several serious felonies under Idaho law, including multiple counts of aggravated assault with a deadly weapon, burglary, and grand theft. *Deposition of Bridget McArthur*, 59:24-60:4. The first *Graham* factor weighs heavily in favor of the Defendant officers' use of deadly force to apprehend Plaintiff and end his crime spree and the ongoing threats of harm to members of the public.

The second factor to consider is whether Plaintiff "posed an immediate threat to the safety of officers or others." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031-2 (9th Cir. 2018). This is the most important factor in the analysis. *Id*. When McArthur and Eldridge confronted Plaintiff on the Outback Golf Range, they both knew that Plaintiff had been in possession of a firearm and used that firearm to threaten others. *Declaration of Bridget McArthur*, ¶ 4, 33; *Declaration of Jeffrey Eldridge*, ¶ 11, 40. As McArthur and Eldridge began heading north-west in the direction of the Red Lion Hotel, McArthur spotted Plaintiff emerging from a line of trees which flanked Pocatello Creek between the Red Lion Hotel and the Outback Golf Range. Plaintiff was heading east towards the Outback Golf Range. As McArthur and Eldridge ran towards Plaintiff, Plaintiff continued eastwards away from them parallel to the tree line towards the golf range. It was dark, and McArthur was required to illuminate Plaintiff with her flashlight. *Declaration of Bridget McArthur*, Exhibit A, 23:49 – 24:10.

Plaintiff eluded the police for a longer period than the plaintiff in *Forrett*, who was chased for only an hour. Like Forrett, Plaintiff also changed his clothing during the time that he was eluding capture. *Declaration of Jeffery Eldridge, ¶*10. Plaintiff also knew that the persons confronting him on the golf range were police, just as Forrett knew that the police were after him and giving commands. Plaintiff testified: "I knew that the jig was up. I knew that that was police, they found me, there ain't no running." *Deposition of Jake Sheeler*, *Vol. II*, 104: 9-11. Additionally,

just as the officers in *Forrett* knew that Forrett's flight was through a residential area, the Defendant officers knew that there were people on the Outback Golf Range to the east of them and at the Red Lion Hotel to the west, and also knew that Plaintiff had been fleeing through residential areas where residents were in the vicinity. *Declaration of Bridget McArthur*, ¶ 8; *Declaration of Jeffrey Eldridge*, ¶ 22; *Declaration of Marisa Saldana,* ¶ 13. The officers also knew that Plaintiff had committed serious crimes "involving the infliction or threatened infliction of serious physical harm."

    *Forrett* supports a finding that the Defendant officers' use of force was objectively reasonable. In *Forrett*, the plaintiff was shot as he attempted to climb a fence to escape. However, in light of the facts known to the officers and the high possibility that Forrett might have been able to take a hostage, the Ninth Circuit held that the use of deadly force was objectively reasonable. *Forrett*, 112 F.3d at 421. In this case, Plaintiff not only posed an immediate threat to the safety of members of the public on the Outback Golf Course but also posed an immediate threat to the safety of the Pocatello officers.

    When Eldridge and McArthur made contact with Plaintiff, they gave him commands in their lawful capacity as police officers. McArthur commanded Plaintiff: "Show me your hands!" *Declaration of Bridget McArthur*, ¶ 22; Exhibit A, 23:49 – 24:10. Eldridge shouted, "Don't move!" several times. Plaintiff said "I've gotta gun" and "back up," which prompted Eldridge to tell Plaintiff that "If you draw your gun, I will shoot you." *Declaration of Durand R. Begault, Ph. D.*, ¶ 13; *Declaration of Jeffery Eldridge*, ¶¶ 29, 32. Saldana commanded Plaintiff to get on the ground. *Declaration of Marisa Saldana*, ¶ 15; *Declaration of Bridget McArthur*, Exhibit A, 23:49 – 24:10.[1]

---

[1]  Officer Saldana was approximately 192 feet from Plaintiff at the time that Plaintiff was shot. *Declaration of Durand R. Begault, Ph.D.*, Exhibit A, p. 5. Defendants acknowledge that it is possible that Plaintiff did not hear Saldana's commands due to the distances involved. However, this possibility does not impact Defendants' analysis

Plaintiff did not follow any of the commands given to him. There is no other objective interpretation of the video. At no point did Plaintiff stop moving, get on the ground, or show the officers his hands. *Declaration of Bridget McArthur*, Exhibit A, 23:49 – 24:10.

Plaintiff claims that he was "walking back towards them [the officers]" at the time that he was shot. *Deposition of Jake Sheeler, Vol. II*, 104:20. Defendant McArthur's bodycam, however, belies this claim. The video clearly shows that Plaintiff was continuing in the same direction he had been travelling. At no point on the video does Plaintiff change course or attempt to move south towards Eldridge's and McArthur's positions. *Declaration of Bridget McArthur*, Exhibit A, 23:49 – 24:10. Even if the Court views the facts in the light most favorable to Plaintiff, the video objectively demonstrates that Plaintiff did not follow the commands that he later claimed to have heard. Plaintiff testified that he remembered "someone telling me to freeze, stop, put your hands up." *Deposition of Jake Sheeler, Vol. II*, 104:7-8. Even if the Court accepts Plaintiff's testimony of what he claimed he heard there is no indication from the video that Plaintiff complied with any commands. Plaintiff certainly did not freeze, did not stop, and did not put up his hands. Plaintiff was moving away from the officers all the way up until the moment of the shooting, which occurred after he squared up on Eldridge and McArthur. *Declaration of Bridget McArthur*, Exhibit A, 23:49 – 24:10.

Eldridge and McArthur heard Plaintiff state that he had a gun. The report of Durand Begault, Ph.D., objectively and undisputedly demonstrates that it was indeed Plaintiff stating "I gotta gun." *Declaration of Durand R. Begault, Ph. D.*, Exhibit A, p. 3. Dr. Begault has additionally demonstrated through acoustic analysis that Plaintiff is the person who said "back up," not any of

---

because the bodycam video objectively shows that Plaintiff failed to follow Eldridge and McArthur's commands, and both the bodycam and Plaintiff's testimony show that he was aware that the police were giving him commands.

the officers. *Declaration of Durand R. Begault, Ph. D.*, Exhibit A, p. 9. Plaintiff was threatening the officers at the time that he was shot. Plaintiff cannot point to any evidence that would show that the officers should have known that Plaintiff was no longer armed at the time that he was shot. Eldridge specifically denied that he was informed that Plaintiff could have been unarmed at the time that he encountered Plaintiff:

> Q. At any point did she say to you that Jake had commented about having lost his gun?
> **A. No.**
> Q. Did you ever hear that she said something to that effect to officers?
> **A. Quite a bit later. I mean, days later.**
> Q. Okay. And what -- first of all, how did you hear that days later?
> **A. I don't recall how I heard it. I found out that the -- he had said something later on. It may have been when I'd gotten back to work after administrative leave. I don't recall when.**
> Q. But in any event, that information was not conveyed to you prior to the shooting, correct?
> **A. No.**
> Q. Not correct?
> **A. No, it was not conveyed.**

*Deposition of Jeffrey Eldridge*, 19: 8-24. Plaintiff invaded another home during his flight from the police and sat in the garage. He testified that he laid the stolen Judge on a shelf in the garage. *Deposition of Jake Sheeler, Vol. II*, 102: 8-12. However, the owner of that home denied in her 911 call that she told the pursuing officers that Plaintiff might have lost a gun in her garage. *Declaration of Roger Schei*, Exhibit B. Therefore, there was no evidence to dispel Eldridge and McArthur's reasonable belief that Plaintiff was armed at the time that they encountered him near the golf range.

Finally, McArthur and Eldridge observed Plaintiff "square up" on them, and then pull "his right arm from the back of his waistband, pushing it forward towards the direction of Officer Eldridge and I." *Deposition of Bridget McArthur*, 105: 4-6. Eldridge testified that Plaintiff "pushed it [his right hand] out towards us." *Deposition of Jeffery Eldridge*, 53:13. Saldana testified "I saw Mr. Sheeler have his hand behind his back, and he put his arms forward in what I believe is a

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT -  10

shooting stance. When he did that -- I'm sorry -- I heard a gunshot, or what sounded like a gunshot, and he didn't move so I returned fire at him till he fell." *Deposition of Marisa Saldana*, 31: 8-13. The officers understood that Plaintiff had stolen three firearms and that Plaintiff had pointed a Judge at more than one citizen during the theft. Plaintiff told McArthur and Eldridge that he had a gun, did not follow commands, and three officers observed Plaintiff put his arms out towards themselves (or other officers, in Saldana's case), which objectively proves that Plaintiff "posed an immediate threat to the safety of officers or others" and therefore this factor weighs in favor of the Defendant officers' use of force. Here, there is more evidence than existed in *Forrett* to support a finding that the Defendants' use of deadly force was objectively reasonable.

The final factor, whether a suspect is resisting arrest or attempting to escape, also weighs in favor of the Defendant officers' use of force. Plaintiff had spent the afternoon and evening of September 25, 2020 fleeing from the police. When the police finally caught up to him, he did not follow the officers' commands and continued moving eastbound away from the officers up until he was shot. *Declaration of Bridget McArthur*, ¶¶ 24-31; *Declaration of Jeffrey Eldridge* ¶¶31-38. It was reasonable for both McArthur and Eldridge to believe that Plaintiff was not attempting to surrender and that he was continuing to flee. An analysis of the *Graham* factors as applied to this case conclusively demonstrates that the Defendant officers' use of force was reasonable under the circumstances and therefore, Plaintiff's Fourth Amendment rights were not violated.

## II.     THE DEFENDANT OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY.

The Defendant Officers are entitled to qualified immunity because Plaintiff's constitutional rights were not violated and because existing precedent did not place the officers' conduct beyond debate. The purpose of the doctrine of qualified immunity is to shield public officials "from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

To determine whether the right was clearly established, the Court considers relevant case law existing at the time, specifically case law from the Supreme Court and the Ninth Circuit. *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996). The inquiry of whether a right was clearly established "must be taken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A right is "clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Waid v. County of Lyon*, 87 F.4th 383, 388; (2023); *quoting Reichle v. Howards*, 566 U.S. 658, 664 (2012). "Clearly established law" should not be defined "at a high level of generality." *Ashcroft*, 563 U.S. at 742. When relying on case law to come to a determination on whether a right is clearly established for purposes of qualified immunity, the clearly established law must be "particularized" to the facts of the case. *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 552, (2017) (citing *Anderson*, 483 U.S. at 640). Where a case presents a unique set of facts and circumstances not addressed in particularity in existing case law, qualified immunity should be granted. *Id*. Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id*. (quoting *Anderson*, 483 U.S. at 639).

The United States Supreme Court addressed this very issue in *Kisela v. Hughes*, 138 S. Ct. 1148, 1150 (2018). In its decision, the Court reinforced the stringent standards for qualified

immunity as stated in *White* — that although "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S.Ct. at 1152 (quoting *White*, 137 S.Ct. at 551). Defendants have clearly demonstrated that each of the *Graham* factors weighed in favor of the Defendant officers' use of deadly force. Additionally, Eldridge, McArthur, and Saldana each possessed probable cause to believe that Plaintiff had committed serious felonies and posed a threat of serious harm either to themselves or to others. Because no constitutional violations occurred, the Defendant officers are entitled to qualified immunity and to summary judgment on Plaintiff's constitutional claims.

Additionally, Plaintiff's clearly established rights were not violated. Although the closest precedent to this case is *Forrett*, *Kisela* is also instructive. In *Kisela*, the officers responded to a report of a woman hacking a tree with a large knife. *Kisela*, 138 S. Ct. at 1153. When the officers arrived, the reporting party gave them a description of the woman. *Id*. The officers then saw a second woman standing in a nearby driveway, separated by them from a fence. The suspect emerged from the home holding the knife and moved to within a "few feet" of the second woman. *Id*. The officers issued at least two commands to drop the knife, which the suspect ignored, and one of the officers shot the suspect after she failed to obey the officers' commands. *Id*. at 1151. The Supreme Court held that this was "far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment." *Id*. at 1153.

Like *Kisela*, this is "far from an obvious case" in which the officers would have known that shooting Plaintiff to protect themselves and others would violate the Fourth Amendment. Plaintiff cannot point to any precedent that establishes that he could expect that officers would not

respond with deadly force if he refused to surrender, told them that he had a gun, and then punched his hand out towards them as though he did have a gun. Even if there was a dispute of fact over the commands given to Plaintiff, whether the officers told Plaintiff "Freeze" or "Show me your hands!" or "Get on the ground," existing precedent has not placed this question of claimed inconsistent commands beyond debate. In *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016), the Ninth Circuit recognized that the decedent had been given differing commands, and noted that "none of the officers provided a clear time line of when they switched from ordering Villegas to raise his arms to ordering him to drop the gun, or how long after that switch Villegas had to comply with the new command before Bennallack opened fire." *C.V.*, 823 F.3d at 1256. However, the Ninth Circuit still held that it was not clearly established in that situation that the use of deadly force in that situation would "constitute excessive force under the Fourth Amendment." *Id*. at 1257. As was the case in *C.V.*, no specific precedent in this case would have put the Defendant officers on notice that their conduct would violate Plaintiff's rights. Therefore, they are entitled to qualified immunity and subsequently are entitled to summary judgment on all of Plaintiff's constitutional claims.

## III.    THE CITY OF POCATELLO WAS NOT "DELIBERATELY INDIFFERENT" TO PLAINTIFF'S RIGHTS.

### a.    The City's policy did not cause any violation of Plaintiff's rights.

The City of Pocatello was not "deliberately indifferent" to Plaintiff's rights and cannot be held liable under any of the *Monell* theories alleged by Plaintiff. It is well-settled that a "municipality may not be held liable for a § 1983 violation under a theory of respondeat superior for the actions of its subordinates." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016); *see also Monell v. Department of Social Services of New York*, 436 U.S. 658, 694

(1978) (establishing that "a local government may not be sued under § 1983 for an injury

inflicted solely by its employees or agents.") To hold a municipality liable for actions taken by

its employees, a plaintiff must establish first pursuant to the Supreme Court's holding in *Monell*

that he was subjected to an "unconstitutional application of excessive force" and second that the

city's policy "caused the constitutional wrong." *Lowry v. City of San Diego*, 858 F.3d 1248, 1255

(9th Cir. 2017); *citing Chew v. Gates*, 27 F.3d 1432, 1439 (9th Cir. 1994). A plaintiff is required

to show an underlying constitutional violation to prevail on a *Monell* claim. *Lockett v. County of*

*Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020).

The Ninth Circuit has held that a plaintiff may "satisfy *Monell*'s policy requirement in

one of three ways." *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021). The first way

is that a municipality or other governmental entity may be held liable when it acts "pursuant to

an expressly adopted official policy." *Thomas v. County of Riverside*, 763 F.3d 1167, 1170 (9th

Cir. 2014). The Pocatello Police Department had a policy governing the use of deadly force

which was operative on September 25, 2020:

> **300.4 DEADLY FORCE APPLICATIONS**
> Use of deadly force is justified in the following circumstances:
> (a) An officer may use deadly force to protect him/herself or others from what he/she
> reasonably believes would be an imminent threat of death or serious bodily injury.
>
> (b) An officer may use deadly force to stop a fleeing subject when the officer has
> probable cause to believe that the person has committed, or intends to commit, a felony
> involving the infliction or threatened infliction of serious bodily injury or death, and the
> officer reasonably believes that there is an imminent risk of serious bodily injury or death
> to any other person if the subject is not immediately apprehended. Under such
> circumstances, a verbal warning should precede the use of deadly force, where feasible.

*Declaration of Roger Schei*, Exhibit A, pp. 39-40. This policy comports with federal case law on

the use of deadly force. *See Price v. Sery*, 513 F.3d 962, 971 (2008) ("Our case law requires that

a reasonable officer under the circumstances believe herself or others to face a threat of serious

physical harm before using deadly force.") McArthur, Eldridge, and Saldana acted in accordance with this policy on September 25, 2020, and because Plaintiff's constitutional rights were not violated, their actions were justified under both sections governing the use of deadly force.

Where the Defendant officers' actions comported with the City's expressly adopted official policy, and this policy was constitutional, Plaintiff cannot claim that the City's expressly adopted official policy was the cause of any violation of his constitutional rights. The City is therefore entitled to summary judgment on Plaintiff's claim that the City is liable to Plaintiff because of its official policy.

>   **b.      Plaintiff has failed to show any evidence that the City had a "longstanding policy or custom" that caused the alleged violation of his rights.**

The second way in which liability may attach is when there is evidence of a "longstanding policy or custom." *Gordon*, 6 F.4th at 973, *citing Thomas*, 763 F.3d at 1170. Some examples of "longstanding policy or custom" liability recognized by the Ninth Circuit are when a "public entity "fail[s] to implement procedural safeguards to prevent constitutional violations" or, sometimes, when it fails to train its employees adequately." *Gordon*, 6 F.4th at 973, *citing Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012).

The Supreme Court held in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) that "*Monell's* rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible." It is not enough, therefore, merely to claim that because the City had a training program for its police officers, that all mistakes or constitutional violations committed by those officers necessarily results in liability for the City. Instead, a plaintiff must show that the training

program is inadequate and that the inadequate training represented city policy. *See Harris*, 489 U.S. at 390.

A plaintiff must allege facts showing that the public entity "disregarded the known or obvious consequence that a particular omission in their training program would cause [municipal] employees to violate citizens' constitutional rights." *Flores v. County of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014), *quoting Connick v. Thompson,* 563 U.S. 51, 61 (2011). In most cases, "a pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train," since "without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62. "Generally, 'a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*.'" *Gordon*, F.4th at 974, *quoting City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985).

None of Plaintiff's alleged facts are sufficient to show that the City was deliberately indifferent. Plaintiff has not identified any "pattern of similar constitutional violations by untrained employees." To the contrary, all of the Defendant officers who discharged their firearms were POST certified by the State of Idaho, all of them were trained on Pocatello Police Department policies governing the use of force, and none of them had ever had use of force complaints previously brought against them. *Declaration of Roger Schei*, ¶¶ 6-12. Plaintiff, however, is attempting to hold the City liable under *Monell* without providing any evidence that the City's training programs caused his claimed injuries.

Further, the fact that no constitutional violation was committed by the Defendant officers in this case means that as a matter of law Plaintiff cannot establish that the City's training

program was inadequate. Without an underlying constitutional violation by the Defendant officers, Plaintiff cannot reach the question of whether the City should be liable for his injuries. Therefore, the City is entitled to summary judgment on Plaintiff's claim that a City "policy or custom" caused Plaintiff's injuries.

>   **c.    Plaintiff cannot establish that an unconstitutional action occurred, therefore, he cannot establish that Defendant Schei "ratified" any such action.**

The third way in which *Monell* liability can attach is when the plaintiff can prove that either 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Gordon*, F.4th at 974, *quoting Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)), *overruled on other grounds by Castro*, 833 F.3d at 1070). Ratification requires "knowledge of the alleged constitutional violation", and the plaintiff must also prove that "the policymaker approved of the subordinate's act." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).

McArthur, Eldridge, and Saldana were not officials with "final policy-making authority." Schei was the final policymaker for the Pocatello Police Department. *Declaration of Roger Schei*, ¶5; *Deposition of Roger Schei*, 22:16-23. Schei did not "ratify" any unconstitutional act for the simple reason that no unconstitutional act occurred. Plaintiff's behavior on September 25, 2020, gave the Defendant officers a reasonable belief that their lives and the lives of others were in danger and therefore the use of deadly force against Plaintiff was justified. Therefore, there was no unconstitutional act that could have been "ratified" by Schei and the City is entitled to summary judgment on Plaintiff's claim that Schei ratified the other Defendants' conduct.

**IV.    DEFENDANTS WERE NOT NEGLIGENT IN ARRESTING PLAINTIFF.**

> **a.  McArthur, Eldridge, and Saldana were not negligent in their arrest of Plaintiff.**

None of the Defendants acted negligently and the Court must find that no genuine dispute of material fact exists on Plaintiff's state law negligence claims. Plaintiff has really alleged two separate claims of negligence: one against McArthur, Eldridge, and Saldana for their actions during Plaintiff's arrest, and one claim of negligence against Schei and the City for negligent training and supervision.

The common-law elements of negligence are "(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *Haight v. Idaho Dep't of Transportation*, 163 Idaho 383, 390–91 (2018). Idaho law has established that the Defendant officers at all times had a duty not to "subject the person being arrested to any more force or restraint than is necessary." *Kessler v. Barowsky*, 129 Idaho 647, 654 (1997). Additionally, as an outgrowth of that duty, they had a duty in planning an arrest "to plan to use no more force than is necessary." *Id*. However, the evidence demonstrates that the Defendant officers always complied with this duty. McArthur and Eldridge were clearly identifiable as police and gave commands in their lawful capacity as police officers. They did not employ excessive force against Plaintiff at any point.

Plaintiff failed to comply with any of the officers' commands and acted as though he had a gun. Plaintiff told McArthur and Eldridge "I gotta gun," and both McArthur and Eldridge reasonably believed that Plaintiff was in possession of a gun. *Declaration of Durand R. Begault, Ph. D.*, ¶ 13. Finally, instead of surrendering, Plaintiff pushed his hand out towards McArthur

and Eldridge. *Deposition of Bridget McArthur*, 105: 4-6; *Deposition of Jeffery Eldridge*, 53:13.

Saldana observed Defendant put his arms out in a shooting stance. *Deposition of Marisa

Saldana*, 31: 8-13. These facts alone made the use of deadly force necessary, and the Defendant

officers did not breach the duty that they owed to Plaintiff. Therefore, the Defendant officers are

entitled to summary judgment on Plaintiff's claim of negligence.

> ### b.  Schei and the City were not negligent in their training, supervision, and/or control of McArthur, Eldridge, and Saldana.

While Idaho law permits claims of negligent supervision, the plaintiff is required to

"present evidence to raise a genuine issue of material fact concerning whether those who had the

duty to supervise should have reasonably anticipated that those subject to their supervision

would commit [a compensable tort]." *Hill v. County of Benewah*, Case No: 2:18-cv-00320-DCN,

2020 WL 1049905 at * 7 (D. Idaho Mar. 4, 2020); *citing Kessler*, 129 Idaho at 654. Plaintiff has

presented no evidence to show that Schei or anyone else at the City should reasonably have

anticipated that the Defendant officers would employ excessive force against anyone. The City's

training program was not negligent, and all the Defendant officers were trained on the use of

deadly force and the circumstances in which the use of deadly force is considered reasonable.

*Declaration of Roger Schei*, ¶¶ 6-8. Because Plaintiff has not shown any evidence that would

demonstrate a genuine issue of material fact on what Schei or the City should have reasonably

anticipated, Defendants Schei and the City of Pocatello are entitled to summary judgment on

Plaintiff's claim of negligence.

### CONCLUSION

Based on the foregoing, Defendants respectfully request that this Court grant summary

judgment in their favor, and that Plaintiff's Complaint be dismissed with prejudice in its entirety.

DATED: January 31, 2024.

/s/ Sam L. Angell
SAM L. ANGELL

## CERTIFICATE OF SERVICE

I hereby certify that I served a true copy of the foregoing document upon the following on January 31, 2024, by electronically filing with the Clerk of the Court using CM/ECF system with a Notice of Electronic Filing to the following persons:

Karra J. Porter, Esq.                    [X] CM/ECF
Jonathan T. Nish, Esq.
Stephen D. Kelson, Esq.
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
Email: Jonathan.Nish@chrisjen.com
Email: Karra.Porter@chrisjen.com
Email: stephen.kelson@chrisjen.com

/s/ Sam L. Angell
SAM L. ANGELL