Jonathan T. Nish #11338
  Jonathan.Nish@chrisjen.com
Karra J. Porter, #5223 (pro hac vice)
  Karra.Porter@chrisjen.com
Stephen D. Kelson, #8458 (pro hac vice)
  Steve.Kelson@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 323-5000
Facsimile:  (801) 355-3472
*Attorneys for Plaintiff Jake L. Sheeler*

## UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAKE L. SHEELER, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BRIDGET MCARTHUR, an individual; JEFFREY E. ELDRIDGE, an individual; MARISA A. SALDANA, an individual; ROGER SCHEI, an individual; and CITY OF POCATELLO, a municipal corporation;<br><br>Defendants. | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No.: 4:22-cv-00313-AKB<br><br>Judge Amanda K. Brailsford |

COMES NOW Plaintiff Jake L. Sheeler, by and through counsel of record, and hereby submits his Memorandum in Opposition to Defendants' Motion for Summary Judgment:

### INTRODUCTION

Pocatello police officers shot Jake Sheeler while he was unarmed, walking backwards with his hands in the air, surrendering. An officer's body cam confirms this (or, Defendants' expert says, is at least "ambiguous"). Defendants' Motion for Summary Judgment asserts that officers

did not violate the Fourth Amendment, that the individual defendants are qualifiedly immune, that there is no basis for a *Monell* claim against non-participants, and there was no negligence because shooting Jake Sheeler was reasonable.

A fundamental problem with Defendants' motion is that it hinges on Defendants' version of events. For example, it assumes that Sheeler made a threatening motion when there is ample evidence that he did not. *(See Pl. SDF* ¶¶ 14-20 (noting lack of support for this claim in body cam footage, conflicting testimony, and fact that Sheeler was unarmed).) The motion ignores or downplays other key facts altogether. For example, there is overwhelming evidence that Sheeler was walking backwards with his hands up or out (like a "scarecrow") immediately before he was shot. (*Id.* ¶¶ 15-20 (noting body cam footage, fact that Sheeler was shot in the left side/back and not in the front, Plaintiff's expert (Scott), Defendants' expert (Begault), and Sheeler's testimony)[1].) Plaintiff's police expert opines that the shooting was unreasonable and negligent. *(Id.* ¶ 10.)[2]

The Court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Sandoval v. Las Vegas Metro. Police Dep't,* 756 F.3d 1154, 1167 (9th Cir. 2014) (reversing summary judgment where trial court relied upon officers' version of events rather than the nonmoving party's version). The only exception is when the nonmoving party's version is "blatantly contradicted" by undisputed evidence such as video. *Scott v. Harris*, 550 U.S.

---

[1] The nonmoving party's own testimony is sufficient to create an issue of fact. *Bernal v. Sacramento County Sheriff's Department*, 73 F.4th 678, 695 (2023), *citing Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017).

[2] An expert witness's opinion about the reasonableness of force is relevant to the inquiry. *Longoria v. Pinal County*, 873 F.3d 699, 707 fn. 6 (9th Cir. 2017) (citations omitted) ("A rational jury can rely upon expert testimony in assessing whether the officers' use of force was unreasonable.").

372, 378 (2007). That is not the case here. *Rice v. Morehouse*, 989 F.3d 1112, 1123 (9th Cir. 2021) (where video does not clearly contradict it, plaintiff's account must be accepted).

## FACTUAL BACKGROUND

The factual background, including reasonable inferences therefrom, is set forth more fully (with record citations) in Plaintiff's Separate Statement of Material Facts in Dispute in Opposition to Defendants' Motion for Summary judgment (hereinafter *"Pl. SDF"*).

On September 25, 2020, at about 4:19 p.m., a Pocatello resident reported that he had found a man in his garage, that the man was holding the resident's gun and pointed it at the resident, that the man ("politely") threatened to shoot him, and that the resident pointed a gun at the man, who ran away. *(See Pl. SDF ¶¶ 1-3.)*

Officers reported to the scene but were soon advised that the subject had gotten into a vehicle and left the area. *(Pl. SDF ¶ 7.)* At about 5 p.m., images of what was believed to be the same subject in other locations were circulated. *(Id. ¶ 8.)* Defendants were advised that he had changed clothes several times, and was a young man named Jake Sheeler. *(Id. ¶¶ 8-9.)* Defendants were able to look up Sheeler, and do not claim he has any history of violence. *(Id. ¶ 9.)*

More than four hours passed between the underlying incident and when police encountered Sheeler that evening. *(Pl. SDF ¶¶ 10-11.)* This was not a hot pursuit. *(Id. ¶ 7.)* Nor did Pocatello request assistance from local Idaho State Police troopers. *(Id. ¶ 11.)*

During the interim, Pocatello PD did not engage in any planning with respect to Sheeler's anticipated arrest. For example, there was no planning with regard to communication, such as how to avoid giving simultaneous and conflicting commands and ensuring that the subject could hear them. *(Pl. SDF ¶¶ 10, 13.)* Plaintiff's police expert will testify that the lack of planning was

unreasonable and negligent. (*Id.* ¶ 10.) Before the shooting, Eldridge learned from a resident that Sheeler had reported losing his gun. (*Id.* ¶ 5.)

At 8:30 p.m., a state trooper happened to spot a figure that might be Sheeler in a field behind an Outback. (*Pl. SDF* ¶ 11.) He notified Pocatello PD, and Defendants (among others) reported to the scene. (*Id.* ¶¶ 11, 14.) At least five different officers began yelling simultaneous and conflicting commands toward Sheeler. None of them could tell what others were yelling, and they knew it was unlikely that Sheeler could, either. (*Id.* ¶ 14.) Some commands (*e.g.*, "Don't move") were mutually exclusive with others (*e.g.*, "Get on the ground"). (*Id.* ¶¶ 14, 15.)

Sheeler recognized from the sounds that police were on scene and "the jig was up." (*Pl. SDF* ¶ 15.) He was concerned that they would sic a dog on him, so he put his hands up to show that he was not resisting. (*Id.* ¶ 15.) Sheeler's hands were visible, and he had nothing that could be mistaken for a gun such as a cell phone. (*Id.* ¶ 15.)

Sheeler heard someone yell something like "walk backwards" (or "back up" or "something phonetically similar," according to Defendants' expert). So he turned around and walked backwards with his hands still in the air ("like a scarecrow"). (*Pl. SDF* ¶¶ 16-20.) Sheeler's left side was toward Defendant McArthur. His left-back was toward Defendant Eldridge. (*Id.* ¶ 20.)

A few seconds later, McArthur opened fire. (*Pl. SDF* ¶ 20.) McArthur did not issue a warning before she fired. (*Id.* ¶ 21.) Once McArthur began shooting, Eldridge and Saldana joined in, also without warning. (*Id.* ¶ 23.)[3] Altogether, the Defendant officers fired 15 shots. (*Id.*) Sheeler

---

[3] Eldridge claims to have issued a general warning to Sheeler earlier that, "If you draw your gun, I will shoot." Sheeler had not drawn a gun, and *ergo* this would not have warned Sheeler that Eldridge would shoot him if he did not draw a gun. (*See Pl. SDF* ¶¶ 19, 21.)

was struck five times. (*Id.*) Consistent with his backward-facing position, all of Sheeler's wounds were on the left and/or left-back side, none in the front. *(Id.*).

This was Pocatello's fourth police shooting since Defendant Schei became police chief 15 months earlier. (*Pl. SDF* ¶ 29.) PPD did not investigate it, gave officers preferential treatment afterward, and have ignored PPD policies requiring or recommending evaluations of departmental use of force and trends. (*Id.*) Indeed, Schei refuses to disclose the circumstances of shootings or which officers are involved. (*Id.* ¶ 30.) None of the Defendants were disciplined, and all believed that the shooting of Jake Sheeler was consistent with PPD policy. (*Id.* ¶ 31.)

I.   **A JURY COULD FIND THAT THE USE OF DEADLY FORCE AGAINST JAKE SHEELER VIOLATED THE FOURTH AMENDMENT.**

*Introduction*

Defendants' first argument is that, as a matter of law, no Fourth Amendment violation occurred. This argument depends upon the Court adopting Defendants' version of events, which the Court may not do. The Fourth Amendment's reasonableness standard "nearly always requires a jury to sift through disputed factual contentions, so summary judgment in an excessive-force case should be granted sparingly." *Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) (quotation marks cleaned up); *Tan Lam v. City of Los Banos*, 976 F.3d 986, 997 (9th Cir. 2020) ("because questions of reasonableness are not well-suited to precise legal determination, the property of a particular use of force is generally an issue for the jury").

The existence of fact issues is bolstered here by body cam footage. *E.g., Longoria v. Pinal County*, 873 F.3d 699, 706 (9th Cir. 2017) ("[the video] alone raises material questions of fact about the reasonableness of [the officer's] actions and the credibility of his post-hoc justification of his conduct."); *Zion v. County of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) ("[W]e may not

simply accept what may be a self-serving account by the police officer. This is especially so where there is contrary evidence"; interpretation of video was for jury).

*Evaluation of force from Plaintiff's point of view*

In assessing the use of force, courts consider the nature of the governmental intrusion (force), the need for the intrusion, and the balance between the two. *Andrews v. City of Henderson*, 35 F.4th 710, 715 (9th Cir. 2022).

### 1.      Nature and Quality of Intrusion

Deadly force is the highest level of Fourth Amendment interests because the subject has a fundamental interest in his own life, and because such force "frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016). Put simply, deadly force is the most extreme of governmental intrusions. *Aguirre*, 29 F.4th at 624, 628. Sheeler did not die, but he is permanently paralyzed. This factor weighs heavily in Sheeler's favor.

### 2.      Governmental Interests

The governmental interest in an officer's use of force is typically evaluated with consideration of three factors: "(1) how severe the crime at issue was; (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Andrews*, 35 F.4th at 716.

### a.      Severity of the Crime

With respect to severity of the crime, Defendants received pre-shooting reports that Sheeler had stolen a gun from a garage and pointed it at a resident as he was making his escape. Plaintiff does not deny that the reported facts (whether true or not) could implicate a serious crime.

The Ninth Circuit, however, distinguishes between an underlying crime that has ended versus a crime that is ongoing when the force is used. *See, e.g., Andrews*, 35 F.4th at 716-717, 719 (suspect accused of armed robbery earlier in the day was not engaged in any criminal conduct when force was used; "our precedent clearly establishing that a suspect's previous violent conduct does not justify non-trivial force where the suspect poses no immediate safety threat"); *S.R. Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019), *cert. denied* 141 S.Ct. 235 (2020) (same); *A.K.H.*, 837 F.3d at 1011 ("crime at issue" was domestic dispute "that had ended before the police became involved"); *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (force against armed domestic violence suspect was unreasonable where suspect was not near victim or engaged in criminal conduct at time of force); *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (domestic violence was serious crime, but suspect was not engaged in any crime when force was used).

When he was shot, Sheeler was not committing any crime. It had been more than four hours since he reportedly pointed a gun briefly at a resident and then ran away even after the resident pulled a gun on him. This subfactor is at most neutral or could tilt toward Sheeler.

          **b.**      **Immediate threat to safety**

The "most important" factor in assessing governmental interests is whether the subject posed an immediate threat when force was used. *Longoria*, 873 F.3d at 705, and cases cited. An officer's claim that he feared for his safety is not enough; "there must be objective factors to justify such a concern". *Bernal v. Sacramento County Sheriff's Dept.*, 73 F.4th 678, 696-699 (9th Cir. 2023) (affirming denial of qualified immunity where, under plaintiff's version of events, officers did not reasonably perceive threat).

This question is judged by "the danger a suspect poses *at the time force is applied*." *Andrews*, 35 F.4th at 717 (emphasis in original). Here, a jury could find that there was no immediate threat, that Defendants did not perceive an immediate threat, or that any claimed perception of a threat was unreasonable. Defendants say no one told them that Sheeler was unarmed, but Eldridge knew and, more fundamentally, officers are not allowed to simply assume that a subject is armed. *E.g. Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1177 (9th Cir. 2013) ("[N]ot knowing whether a suspect is armed is not the same as having reason to believe the suspect is actually armed."). That is especially so here, where at the time of the shooting it had been more than four hours since the underlying incident, and PPD had been told that the subject had gotten into a car, changed his clothes, tried to sell a gun (if it is assumed that this person reportedly matched Plaintiff's description), and had reported losing his gun.

Even if a jury were to find that Sheeler inexplicably said he had a gun (and not a more accurate denial of having a gun), it could conclude that this was a disclosure, not a threat. As Eldridge admits, Sheeler never threatened to shoot anyone. More fundamentally, the Ninth Circuit has repeatedly emphasized that officers cannot simply shoot a suspect even if he is *known* to be armed. *Hayes v. County of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013). The jury must still find that the subject made a threatening move. *Peck v. Montoya*, 51 F. 4th 877, 888 (9th Cir. 2022) (armed subject; "if the suspect doesn't reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him"); *George v. Morris*, 736 F.3d 829 (9th Cir. 2013) (summary judgment inappropriate where subject accused of threatening spouse earlier was standing on patio with gun pointed downward); *Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997) (immaterial that subject had engaged in shootout with law enforcement

the previous day when he made no threat or aggressive move toward the shooting officer or others); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (deadly force unreasonable where subject had a gun but was not pointing it at officers and not facing officers when they shot).

The Ninth Circuit stated this principle succinctly in *Longoria, supra*. "The most important question in this case is whether Rankin reasonably perceived that Longoria assumed a threatening or 'shooter's stance'," the court wrote in affirming a denial of summary judgment. "If he did, he was entitled to shoot; if he didn't, he wasn't." 873 F.3d at 706-07 (quotation marks cleaned up). In *Aguirre*, 29 F.4th at 628, the court identified as a "key disputed fact" whether the subject "was facing the officer and coming on the attack, as the officer contends, or whether Aguirre was turned away from the officer[.]" It is the same question here.

In this case, a jury could conclude that Defendants did not actually perceive that Jake Sheeler posed an imminent threat of harm. Such a finding is not only supported by the video, Sheeler's testimony, and Sheeler's expert witness, but also by the fact that officers have told inconsistent tales. "Summary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016). Defendants' credibility is in doubt. Apart from contradictions with the video and Sheeler's testimony, their own accounts have been inconsistent. For example, McArthur and Eldridge initially claimed that Sheeler had squared up on Eldridge. Two and a half years later (after Sheeler's complaint showed that it was literally impossible), Eldridge switched to a claim that Sheeler inexplicably squared up toward an empty space *between* McArthur and Eldridge. (*Pl. SDF* ¶ 27.) Juries may discount the account of officers who make inconsistent statements. *See, e.g.*, *Banks-Reed v. Mateu*, No. 19-17444, 2022 WL 486607, at *1 (9th Cir. Feb. 17, 2022)

(unpublished) (jury "had reason to doubt Mateu's credibility given inconsistent statements he had made about the shooting over the course of the case").

A jury could also infer that Sheeler did not make the alleged threatening move (squaring up) because he did not have a gun. *See, e.g., Longoria*, 873 F.3d at 708 ("A reasonable jury is far less likely to credit Rankin's perception of a 'shooter's stance' with the knowledge that Longoria did not have a gun."); *Cruz v. City of Anaheim*, 765 F.3d 1076, 79 (9th Cir. 2014) ("In this case, there's circumstantial evidence that could give a reasonable jury pause. Most obvious is the fact that Cruz didn't have a gun on him, so why would he have reached for his waistband? For him to make such a gesture when no gun is there makes no sense whatsoever.") (ellipse omitted).

A jury could further conclude that Defendants' claimed perception would have been unreasonable in any event. *See Longoria*, 873 F.3d at 707 ("many other facts [are] in dispute that are material to the determination of whether a reasonable officer would have perceived that Longoria posed any immediate threat"). Sheeler had nothing in his hands and was surrendering. Even Eldridge's current version of events does not help him: He says he saw Sheeler "punch out" with a "closed fist" (*Pl. SDF* ¶ 27) – a jury could find it unreasonable to claim that a fist posed an immediate threat of serious harm to someone dozens of feet away. Under Plaintiff's version of events, this subfactor strongly favors Sheeler.

### c.    Actively resisting arrest or fleeing.

This is a nonfactor (or wholly favors Sheeler). As noted repeatedly, Sheeler was walking backwards with his hands in the air surrendering. Even under Defendants' theory that Sheeler was not obeying (some portion of) commands, the Ninth Circuit has "long distinguished between passive and active resistance". *Rice*, 989 F.3d at 1124, and cases cited. Under settled Ninth Circuit

precedent, failing to immediately comply with commands (although Sheeler *was* complying) is nothing more than passive resistance that does not justify more than non-trivial force. *Id.* at 1125 ("Long before Rice's arrest, we clearly established one's right to be free from the application of non-trivial force for engaging in mere passive resistance."). *See also Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force); *Smith v. City of Hemet*, 394 F. 3d 689, 703 (9th Cir. 2005) (continually ignoring officer's instructions to remove hands from pockets was not active resistance); *Glenn v. Washington County*, 673 F.3d 846, 876 (9th Cir. 2011) (refusing to follow commands but not attacking or threatening anyone is not active resistance); *Bryan v. MacPherson*, 630 F.3d 805, 829-30 (9th Cir. 2010) (cursing and exiting vehicle despite being told to stay in car was not active resistance).

The jury can consider whether Defendants had reason to know that Sheeler could not make out specific commands. *See, e.g., Glenn*, 673 F.3d at 876 (not established that subject heard or understood the warning). Defendants knew – because they were experiencing it themselves – that so much simultaneous yelling made it virtually impossible to figure out what commands were being given. Indeed, Eldridge and McArthur said they did not know what each other was shouting – yet they were closer to each other than either was to Sheeler. They had to know that Sheeler couldn't tell either. The jury could further consider whether officers gave inconsistent commands. *See, e.g., CV by and through Villegas v. City of Anaheim*, 823 F.3d 1252 (9th Cir. 2016) (raising arms, including arm holding gun, could have been compliant with command to put hands up but not compliant with command to drop the gun). This subfactor strongly favors Sheeler.

### d.      Presence or absence of a warning

"[T]he giving of a warning or failure to do so is a factor to be considered in applying the *Graham* balancing test. Warnings should be given, when feasible, if the use of force may result in serious injury." *Deorle v. Rutherford*, 272 F. 3d 1272, 1284 (9th Cir. 2001). "A prior warning is all the more important where, as here, the use of lethal force is contemplated." *Nehad*, 929 F.3d at 1137–38. *See, e.g., Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013) ["[A]s we have recognized before, the absence of a warning of the imminent use of force, when giving such a warning is plausible, weighs in favor of finding a constitutional violation"); *Hayes*, 736 F.3d at 1234 ("[I]t is significant that Hayes was given no warning before the deputies shot him.").

As mentioned (*Pl. SDF* ¶ 21), McArthur (the first to fire) gave no warning. Saldana gave no warning. Eldridge claims to have yelled, "*If you draw your gun* I will shoot you." But he gave no warning that he would shoot if Sheeler did *not* draw a gun. This consideration weighs strongly in Sheeler's favor.

### e.    Less Intrusive Alternatives

The availability of less intrusive methods to subdue the subject is also relevant to the inquiry. *Bryan*, 630 F.3d at 813. There is "no conflict between the rule that an officer need not use the least intrusive means in apprehending a suspect and the concept that there are nonetheless circumstances in which an officer who does not use the least intrusive means might use a level of force that cannot be justified." *Id.* Plaintiff's police expert identified less intrusive means of taking Sheeler into custody that were not deployed, such as canines and collaboration with other agencies. (*Pl. SDF* ¶ 10.)[4] Under Plaintiff's version of events, this consideration weighs in Sheeler's favor.

---

[4] Plaintiffs' expert and Defendants' expert have differences of opinion as to the feasibility of other measures, but that is for the jury.

### 3.    Balancing of interests.

Every factor and subfactor weighs in Sheeler's favor (except possibly severity of crime, which is at most neutral). A jury could certainly find that the use of the most extreme force against Jake Sheeler was not warranted by the governmental interests. Indeed, it could find that the government had no justifiable interest in using *any* force against Sheeler. In sum, issues of fact exist as to the violation of Sheeler's Fourth Amendment rights.

In arguing otherwise, Defendants rely heavily on *Forrett v. Richardson*, 112 F.3d 416 (9th Cir. 1997). *Forrett* bears little resemblance to this case. In *Forrett*, officers knew that the subject had broken into a home, tied up the occupants and shot one in the neck at point blank range, stolen their truck, and taken with him several firearms and 250 rounds of ammunition. For an hour, police engaged in hot pursuit with helicopters and public announcements. The subject removed a layer of clothing at one point. Upon being trapped in a yard, he attempted to escape. Officers fired 7 or 8 shots but he ignored them and scaled a fence. The officers shot him through the fence.

Here, it was known that Sheeler had not harmed anyone, had run away when confronted, and there was no hot pursuit. Officers knew that Sheeler had not "removed a layer" of clothing because (they concluded) he went from pants to shorts and back to the same pants. Sheeler was not attempting to flee, had not scaled a fence, and was not in someone's yard.

The facts of this case are closer to those cited in Point II *infra*. Indeed, the Ninth Circuit precludes reliance on *Forrett* under the facts of this case. *Idaho v. Horiuchi*, 253 F.3d 359, 367 (9th Cir. 2001) ("under *[Tennessee v.] Garner*, as applied in *Forrett*, an officer may respond with deadly force to the attenuated threat presented by a fleeing suspect only if two conditions are met. First, there must be reasonable cause to believe that the suspect is dangerous and will escape to a

location where he will be able to cause physical harm to others.  And, second, the officers must identify themselves and give the suspect a chance to surrender…"); *see also Haugen v. Brosseau*, 339 F.3d 857, 864 (9th Cir. 2003) (citing *Forrett* for proposition that "deadly force was reasonable where a fleeing suspect had shot a victim in the course of a burglary," but noting that "the prior commission of even a violent crime does not always justify deadly force"), and cases cited.

A jury could find little cause to believe that Sheeler (who ran away when confronted by elderly civilians and had not harmed anyone) was dangerous. Indeed, a jury could find that PPD knew he had reported losing his gun before the shooting. There was no reason to believe he was going to escape to some nearby residence and harm someone (when he never had before). He was in an empty field, surrounded and surrendering. *Forrett* does not aid Defendants.

## II.  UNDER PLAINTIFF'S VERSION OF EVENTS, THE INDIVIDUAL DEFENDANTS VIOLATED CLEARLY ESTABLISHED LAW.

In arguing that the law was not clearly established, the question is not whether officers could shoot Jake Sheeler if he squared up and they reasonably thought he was threatening them with a gun. The question is whether they could shoot an unarmed subject who was complying with instructions, manifesting an intent to surrender, had his empty hands in the air, and was not actively resisting arrest. The Ninth Circuit has answered this same question under this same fact pattern many times: They could not. Examples of cases affirming the denial of qualified immunity under similar fact patterns that a jury could find include:

*Longoria,* 873 F.3d at 706-07: An unarmed subject surrounded by law enforcement was shot while in the process of surrendering – the exact fact scenario here. Qualified immunity was denied because the defendants' theory turned on whether the subject "assumed a threatening

or 'shooter's stance'" – again, the same issue here. *Longoria* alone is enough to preclude qualified immunity.

*Banks-Reed, supra* (2022 case, 2018 incident)[5]: The subject was on a public sidewalk engaged in a physical struggle for control of a gun. He raised one hand in an attempt to signal surrender. Qualified immunity was denied because it was clearly established that an officer cannot shoot someone who is trying to surrender, even if the subject is armed.

*Estate of Smith v. Holslag*, No. 21-55073, 2022 WL 1224001, at *1 (9th Cir. Apr. 26, 2022) (unpublished) and cases cited (2016 incident): The subject had been chased into a residential area but was standing and did not make a threatening gesture when he was shot. Qualified immunity was denied because, "[i]n this case, the jury needs to resolve only one key disputed factual question: did Holslag reasonably perceive that Smith reached towards the waistline or pockets of his cargo shorts in the moments leading up to the shooting? If so, then Holslag's shooting was reasonable, and he is therefore entitled to qualified immunity. If not, then Holslag's shooting was unreasonable, and he is therefore not entitled to qualified immunity. This binary framing of the key factual dispute mirrors the approach taken by our court in similar past cases." (*Id*.) That is the same inquiry here: did Sheeler make a threatening gesture before being shot?

*Lopez v. City of Riverside, No. 22-55723, 2023 WL 8433959 (9th Cir. Dec. 5, 2023)* (unpublished) (2022 incident but citing pre-2020 case law): Responding to a call, the officer confronted the subject and ordered him to remove his hand from his pocket. The subject initially disobeyed the order, but at the time he was shot, his hands were empty and raised.

---

[5] Some Ninth Circuit opinions do not state the date of the incident; in those cases, Plaintiff has checked the underlying District Court ruling for the date.

*Edmond v. Lockwood*, No. 22-55024, 2023 WL 2423340, at *1 (9th Cir. Mar. 9, 2023) (unpublished) (2019 incident): The subject was armed and running away through an apartment complex when he changed directions by 90 degrees. Qualified immunity was denied because a jury could find that he never reached for or held his gun prior to being shot.

*Estate of Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017): The subject was encountered next to an empty lot near three schools but with no one else nearby; the officer claimed there were houses nearby and he did not want to let the subject get near them. The subject was believed to be a teenager carrying an AK-47. After being ordered to "drop the gun," the subject started to rotate his body and ended up facing the officer, who shot him. Qualified immunity was denied because *George*, *Harris*, and *Curnow* clearly established that deadly force could not be used against a subject who did not threaten officers with a weapon (even presuming the subject is armed, as Defendants claim to have believed here).

*NEM v. City of Salinas*, 761 F. App'x 698, 699 (9th Cir. 2019) (unpublished): The subject attempted to break into a house and threatened the owner's dog with scissors. When officers arrived, however, he was on a sidewalk, walking away slowly, then turned toward officers in a normal manner. There were no civilians on that side of the street. An officer shot him. Qualified immunity was denied because, "[a]t the time of the shooting, it was clearly established that officers may not use deadly force against a person who is armed but cannot reasonably be perceived as taking any furtive, harrowing, or threatening actions. This is true even in circumstances in which the suspect has allegedly 'committed a violent crime in the immediate past'". (*Id.*)

Even if the Ninth Circuit had not addressed similar fact patterns before, the court has observed that some principles are so unambiguous, so entrenched, that no reasonable officer would

ever believe they could perform the act. "[A] violation is obvious enough to override the necessity of a specific factual analogue when it is almost *always* wrong for an officer in those circumstances to act as he did." *Rodriguez v. Swartz*, 899 F.3d 719, 733 (9th Cir. 2018) (emphasis in original).

This category of obvious clarity or settled law includes the use of deadly force on someone who does not pose an imminent threat. *See, e.g., Holslag* ("Few things in our case law are as clearly established as the principle than an officer may not seize an unarmed, nondangerous suspect by shooting him" in the absence of probable cause to believe that the suspect "poses a threat of serious physical harm, either to the officer or others"); *Longoria*, 873 F.3d at 709-10 ("While locating the outer contours of the Fourth Amendment may at times be a murky business, few things in our case law are as clearly established as the principle that an officer may not seize an unarmed, nondangerous suspect by shooting him dead"); *Aguirre*, 29 F.4th at 629 ("Deadly force is not justified where the suspect poses no immediate threat to the officer and no threat to others. Assuming that Aguirre posed no immediate to [the officer] or others at the time of his death, this 'general constitutional rule' applies 'with obvious clarity' here and renders [the officer]'s decision to shoot [the plaintiff] objectively unreasonable."); *Tan Lam*, 976 F.3d at 1000 (despite the subject having previously armed himself and threatened the officer, he "presented no objectively reasonable threat" at the time the officer deployed the force, and every police officer should know that it is objectively unreasonable to shoot in such a situation.") (cleaned up); *Sharp v. County of Orange*, 871 F.3d 901, 912 (9th Cir. 2017) ("Any reasonable officer would have known, even without a judicial decision to tell him so, that it was unlawful to kill someone – anyone – for no reason.") (cleaned up).

Case no.: 4:22-cv-00313-AKB
MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants do not argue for qualified immunity under Sheeler's version of events. As noted, a jury could find that Defendants shot Jake Sheeler when he was visibly in the act of surrendering. And when he was complying with one or more of the multitude of commands he was given. And when he visibly had nothing in his hands and was surrounded. And when he made no furtive movements and no reasonable officer would have perceived that he posed an imminent threat. Under any of these circumstances, the law clearly prohibited the use of deadly force. The underlying facts must be resolved before Defendants can seek qualified immunity.

## III.  A JURY SHOULD DECIDE PLAINTIFF'S *MONELL* CLAIMS.

Pocatello and Chief Schei can be liable for constitutional violations by PPD officers if the violation was caused by a policy, widespread practice, failure to train or supervise or ratification. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Defendants' motion argues that the City has a written policy prohibiting the use of force under circumstances other than as provided in the policy. The problem with Defendants' argument is that PPD and Chief Schei do not *follow* the city's policy. (*See Pl. SDF* ¶ 31.) In the 15 months between Schei becoming Chief and the time that Jake Sheeler was shot, Pocatello – a city of about 60,000 residents – experienced a police shooting on average every 3-4 months. Schei ignored PPD policies that were intended to moderate the use of force. (*Id.* ¶ 29.) For example, he ignored PPD's written policy – from that same manual cited by Defendants – requiring annual written reports of PPD officers' use of force. (*Id.* ¶ 31.) He protected officers after shootings, refusing to disclose the circumstances or the officers involved, giving them days to "process" their memories before being interviewed, not testing them, and not doing policy reviews of the shooting. (*Id.* ¶¶ 29, 30.)

A jury could conclude that this culture predating the Sheeler shooting are what led three of his officers to feel free to shoot an unarmed man who was surrendering and posed no threat. Notably, neither of the state troopers fired (even the one who was next to Saldana). A jury could find it was due to this established culture that Saldana called the troopers "cowards" for not firing, even after knowing that Sheeler was unarmed. (*Pl. SDF* ¶ 31.)

Further evidencing a culture of ratifying and emboldening police shootings is the fact that Defendants and other PPD officers felt comfortable making false statements and changing their stories with impunity. Numerous instances of these shifting accounts have been set forth, yet no one has been disciplined. A jury could infer from all of this that Pocatello and Chief Schei had a practice or *de facto* policy or practice of permitting officers to shoot civilians without ramification, which caused or contributed to the shooting of Jake Sheeler.

## IV.    A FACT ISSUE EXISTS AS TO WHETHER DEFENDANTS WERE NEGLIGENT.

In Idaho, the subject of an arrest may recover for negligent planning and execution of the arrest. *Kessler v. Barowsky*, 931 P.2d 641, 648-649 (Idaho 1997) (trial court incorrectly dismissed claims for negligently executing an arrest and negligence in failing to deploy, supervise, and control the officers who arrested the subject). "When making an arrest, a police officer must not subject the person being arrested to any more force than is necessary." *Id, citing Anderson v. Foster*, 73 Idaho 340, 345, 252 P.2d 199, 202 (1953). "It necessarily follows that in planning an arrest, a police officer has the duty to plan to use no more force than is necessary." *Id.*

The sole issue on this claim, then, is whether a jury could find that the arrest of Jake Sheeler was negligently planned or executed. It could, for the same surrounding circumstances from which it could find the shooting unreasonable. These include failing to plan for one officer to take

command, to avoid simultaneous and conflicting commands, to ensure that the subject could hear

a particular command, and to avoid shooting someone without reason. Plaintiff's police expert has

stated the opinion that Defendants negligently planned and executed the arrest of Jake Sheeler. (*Pl.*

*SDF* ¶ 10.) This testimony is, in itself, sufficient to demonstrate an issue of fact.

### OBJECTION TO PARAGRAPHS IN "DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE" WHICH DEFENDANTS HAVE NOT SHOWN TO HAVE BEEN CONVEYED TO THE OFFICERS BEFORE THE SHOOTING

The use of force is evaluated based on information (whether correct or incorrect) that was

observed by or conveyed to the officers at the time of the shooting. Accordingly, Plaintiff objects

to paragraphs in Defendants' statement of facts that are not accompanied by proof that the specific

information was conveyed or known to the officers before the shooting.  These paragraphs are: 2

through 5, 7 through 9, and 14 (second sentence).

### CONCLUSION

Defendants' motion for summary judgment hinges upon disputed facts. Accordingly,

Plaintiff respectfully requests that Defendants' motion for summary judgment be denied.

DATED this 21st day of February, 2024.

CHRISTENSEN & JENSEN, P.C.

*/s/ Karra J. Porter*

Jonathan T. Nish
Karra J. Porter
Stephen D. Kelson
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of February, 2024, I caused a true and correct copy of

the foregoing **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT** to be filed with the Clerk of the Court via the

CM/ECF system, which sent automatic notification to the following:

> BLAKE G. HALL, ESQ.
> SAM L. ANGELL, ESQ.
> HALL ANGELL & ASSOCIATES, LLP
> 1075 S Utah Avenue, Suite 150
> Idaho Falls, Idaho 83402
> Blake Hall - bgh@hasattorneys.com
> Sam Angell - sla@hasattorneys.com
> Justin Walter - jrw@hasattorneys.com
> *Attorneys for Defendants*

 						 */s/ Ashlee Mason*
 						Paralegal to Karra J. Porter