Jonathan T. Nish #11338
  Jonathan.Nish@chrisjen.com
Karra J. Porter, #5223 (pro hac vice)
  Karra.Porter@chrisjen.com
Stephen D. Kelson, #8458 (pro hac vice)
  Steve.Kelson@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 323-5000
Facsimile:  (801) 355-3472
*Attorneys for Plaintiff Jake L. Sheeler*

---

## UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAKE L. SHEELER, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BRIDGET MCARTHUR, an individual; JEFFREY E. ELDRIDGE, an individual; MARISA A. SALDANA, an individual; ROGER SCHEI, an individual; and CITY OF POCATELLO, a municipal corporation;<br><br>Defendants. | **DECLARATION OF KARRA J. PORTER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No.: 4:22-cv-00313-AKB<br><br>Judge Amanda K. Brailsford |

I, Karra J. Porter, declare as follows:

1.      I am an attorney for the Plaintiff. I am over the age of eighteen (18), have personal knowledge of the following, and I am competent to testify.

2.      I am an attorney licensed to practice before this Court, the Courts of the State of Utah, and within the Tenth Circuit Court of Appeals. I am appearing Pro Hac Vice in this action

as approved by this Court (ECF Doc. 14). The facts set forth herein are within my own personal knowledge or upon information and belief, where so indicated.

3.     Attached to this Declaration as Exhibit 1 is a true and correct copy of the deposition transcript of Tyler Anderson, taken on February 15, 2023.

4.     Attached to this Declaration as Exhibit 2 is a true and correct copy of the deposition transcript of Durand R. Begault, taken on January 4, 2024.

5.     Attached to this Declaration as Exhibit 3 is a true and correct copy of the deposition transcript of Jonathan Broyles, taken on January 23, 2024.

6.     Attached to this Declaration as Exhibit 4 is a true and correct copy of the deposition transcript of Cheyenne Clayter (née Fetchen), taken on June 12, 2023.

7.     Attached to this Declaration as Exhibits 5 and 6 are true and correct copies of the deposition transcript and deposition Exh. No. 4, Eastern Idaho Critical Incident Team interview of the deponent, of Defendant Jeffery E. Eldridge, taken on February 15, 2023.

8.     Attached to this Declaration as Exhibit 7 is a true and correct copy of the deposition transcript of Robert H. Friedman, M.D., taken on December 27, 2023.

9.     Attached to this Declaration as Exhibits 8 and 9 are true and correct copies of the deposition transcript and deposition Exh. No. 3, a handwritten note of the deponent, of Kirk Hendricks, taken on March 20, 2023.

10.     Attached to this Declaration as Exhibit 10 is a true and correct copy of the deposition transcript of Mary Hendricks, taken on March 20, 2023.

11.     Attached to this Declaration as Exhibit 11 is a true and correct copy of the deposition transcript of Richard Hernandez, taken on March 21, 2023.

Case No.: 4:22-cv-00313-AKB
DECLARATION OF KARRA J. PORTER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

12.    Attached to this Declaration as Exhibits 12 and 13 are true and correct copies of the deposition transcript and deposition Exh. No. 2, Eastern Idaho Critical Incident Team interview of the deponent, of Defendant Bridget McArthur, taken on February 15, 2023.

13.    Attached to this Declaration as Exhibit 14 is a true and correct copy of the deposition transcript of David Noyes, taken on June 12, 2023.

14.    Attached to this Declaration as Exhibit 15 is a true and correct copy of Detailed Incident Report of R. Olsen, 20-P19954 (or "Olsen Report"), Bates numbered DEFENDANTS 000276-00317.

15.    Attached to this Declaration as Exhibit 16 is a true and correct copy of the deposition transcript of Todd Orr, taken on June 12, 2023.

16.    Attached to this Declaration as Exhibits 17 and 18 are true and correct copies of the deposition transcript and deposition Exh. No. 6, Eastern Idaho Critical Incident Team interview of the deponent, of Defendant Marisa A. Saldana, taken on February 15, 2023.

17.    Attached to this Declaration as Exhibit 19 is a true and correct copy of the deposition transcript of Defendant Roger Schei, taken on February 16, 2023.

18.    Attached to this Declaration as Exhibit 20 is a true and correct copy of the deposition transcript of Plaintiff Jake Sheeler, Vol. II, taken on February 17, 2023.

19.    During the course of disclosures and discovery in this matter, Defendants produced the following documents:

Exhibit 21: PPD Emails, Bates numbered DEFENDANTS 000349-000357

Exhibit 22: McArthur's bodycam video, Bates numbered 3090 (video name: 'Bates Nos. 3090 rfa00833_20200926020832e0_01_000').

3

Exhibit 23: Pocatello Police Department ID Policy Manual, Bates numbered DEFENDANTS 000565-000638.

20.     Not attached, but referenced in the pleadings filed herewith, are the *Complaint and Jury Demand,* ECF No. 5, filed August 3, 2022, and the *Answer to Complaint and Demand for Jury Trial*, ECF No. 15, filed August 31, 2022.

I declare under the penalty of perjury under the law of the United States and the State of Idaho that the foregoing is true and correct.

DATED this 21st day of February, 2024.

CHRISTENSEN & JENSEN, P.C.


*/s/ Karra J. Porter*
Karra J. Porter
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of February, 2024, I caused a true and correct copy of the foregoing **DECLARATION OF KARRA J. PORTER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** to be filed with the Clerk of the Court via the CM/ECF system, which sent automatic notification to the following:

BLAKE G. HALL, ESQ.
SAM L. ANGELL, ESQ.
HALL ANGELL & ASSOCIATES, LLP
1075 S Utah Avenue, Suite 150
Idaho Falls, Idaho 83402
Blake Hall - bgh@hasattorneys.com
Sam Angell - sla@hasattorneys.com
Justin Walter - jrw@hasattorneys.com
*Attorneys for Defendants*

_/s/ Ashlee Mason_
Paralegal to Karra J. Porter

5

# Exhibit 1

UNITED STATES DISTRICT COURT

IN AND FOR THE STATE OF IDAHO

JAKE SHEELER, an individual,          )

                 Plaintiff,          ) Case No.

vs.                                   ) 4:22-cv-00313-

BRIDGET McArthur, an individual;      ) DCN

JEFFREY E. ELDRIDGE, an individual;   )

MARISA A. SALDANA, an individual;     )

ROGER SCHEI, an individual; and       )

CITY OF POCATELLO, a municipal        )

Corporation;                          )
                 Defendants.

DEPOSITION OF TYLER ANDERSON

February 15, 2023

REPORTED BY:

AMBER S. WILLIAMS, C.S.R. No. 1080

Notary public

```
 1           THE DEPOSITION OF TYLER ANDERSON was taken
 2    on behalf of the plaintiff at the Holiday Inn Express
 3    & Suites, 200 Via Venitio, Pocatello, Idaho,
 4    commencing at 2:05 p.m. on February 15, 2023, before
 5    Amber S. Williams, Certified Shorthand Reporter and
 6    Notary Public within and for the State of Idaho, in
 7    the above-entitled matter.
 8
 9                      APPEARANCES:
10    For Plaintiff:
11         CHRISTENSEN & JENSEN, PC
12         BY:  KARRA J. PORTER
13         BY:  ANNA P. CHRISTIANSEN
14         257 East 200 South, Suite 1100
15         Salt Lake City, Utah  84111
16         karra.porter@chrisjen.com
17         anna.christiansen@chrisjen.com
18    For Defendants:
19         HALL ANGELL & ASSOCIATES, LLP
20         BY:  SAM L. ANGELL
21         1075 South Utah Avenue, Suite 150
22         Idaho Falls, Idaho  83402
23         sla@hasattorneys.com
24
25
```

1                           I N D E X

2

3   TESTIMONY OF TYLER ANDERSON                    Page

4       Examination by Ms. Porter...................  4

5

6

7

8

9                       NO EXHIBITS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tyler Anderson - February 15, 2023                    4

```
 1                    TYLER ANDERSON,
 2    first duly sworn to tell the truth relating to said
 3    cause, testified as follows:
 4                        EXAMINATION
 5    BY MS. PORTER:
 6            Q.   Could you please state your name for the
 7    record.
 8            A.   Tyler Anderson.
 9            Q.   And we were introduced before we
10    started, so I'll just go right into my first
11    question.
12                 Have you ever had your deposition taken
13    before?
14            A.   No.
15            Q.   Have you ever testified in court?
16            A.   Yes.
17            Q.   Can you just give me a couple of random
18    examples of the types of things you've testified
19    about in court?
20            A.   Like, specific cases I've taken?  I
21    mean --
22            Q.   Types.
23            A.   Types?  DUIs, juvenile issues -- I'm
24    trying to think -- court orders, drug violations,
25    violent crimes.  I don't know.  Lots.
```

1                Q.   No, that's a good list.  On the times

2    that you've testified in court, have you always been

3    testifying about things that you observed as a fact

4    witness or, to your knowledge, have you ever

5    testified as an expert witness?

6                A.   I don't think I've ever been called as

7    an expert witness.

8                Q.   Okay.  Do you have some familiarity with

9    the shooting of Jake Sheeler?

10               A.   Yes.

11               Q.   And you were not one of the shooters,

12   correct?

13               A.   Correct.

14               Q.   You saw Jake Sheeler before he was shot;

15   is that correct?

16               A.   Briefly, yes.

17               Q.   And did you see a gun?

18               A.   So in the pictures I was given by the

19   citizen, yes, I saw a picture of Jake Sheeler in

20   possession of a handgun running from the incident

21   that we were originally called to.

22               Q.   And how long was that incident before he

23   was shot?

24               A.   That was about 4:18 p.m., and I honestly

25   don't know when the -- what time the shooting

1    actually happened.  I'm not sure, so -- a few hours.

2         Q.    If I represent that the shooting

3    occurred between 8 and 9 p.m., and -- would you say

4    it was roughly four hours between that incident

5    you're referring to and the shooting?

6         A.    Yeah, I agree with that.

7         Q.    All right.  Now, did you see Jake

8    Sheeler on scene before he was shot?

9         A.    Yes.

10        Q.    Did you see a gun at that time?

11        A.    No.  No, I didn't.

12        Q.    Did -- describe for me where you were

13   when you saw Jake Sheeler on scene.

14        A.    So I was in the -- I'm trying to --

15   southeast corner of the Red Lion parking lot, Red

16   Lion Hotel, about at least 50 yards away from him.

17   All I saw was him briefly through a space or a gap

18   between trees and brush really far away.

19        Q.    And what was he doing when you saw him?

20        A.    He was walking in the opposite direction

21   of me when I saw him.

22        Q.    Walking the opposite direction?

23        A.    So he was walking further east, away

24   from me.

25        Q.    Okay.  And you were west?

1          A.    Of his location, yes.

2          Q.    All right.  Thanks.  At the time that

3    you saw him on scene, were you aware that his name

4    was Jake Sheeler?

5          A.    Yes.

6          Q.    And how did you learn that?

7          A.    So with that picture that I received

8    from the citizen, I gave that to other officers who

9    were the responsible officers for the case, and they

10   disseminated that picture throughout the rest of the

11   department to know who we were looking for, and one

12   of the officers was able to identify him as Jake

13   Sheeler.

14         Q.    And then how was that conveyed to you?

15         A.    Via e-mail.

16         Q.    So were you reading department e-mails

17   during the day?

18         A.    Yeah.  I was on perimeter for quite some

19   time, and that was the best way we had to communicate

20   without everything being on the radio.

21         Q.    How did you learn that there was a

22   possible sighting of the subject in the vicinity of

23   the Red Lion?

24         A.    An ISP Trooper.  I don't know if he

25   contacted dispatch specifically or if I just

1   overheard him just scanning the area on my handheld

2   radio.  But he stated that he believed he was out

3   with the suspect behind the Red Lion on the south

4   side of the hotel.

5          Q.   So did the Idaho State trooper have

6   access to the same radio channel or frequency?

7          A.   They're able to, yeah, hop on and off as

8   they will and scan it, kind of like I said.  We scan

9   their radio as well.  So we can kind of hop on and

10  off.  I don't know if they were on it the entire time

11  or what or if they were just scanning.  I don't know.

12         Q.   Or if they were just sort of jumping in

13  and then out again?

14         A.   Right.

15         Q.   Okay.  Understood.  Did you interview

16  any witnesses prior -- well, let me strike that.

17              With respect to what the subject was

18  suspected of having done earlier that day, did you

19  interview any of the witnesses related to those

20  events?

21         A.   No, no.  I was just approached by a

22  citizen, like, "Hey, this guy ran through my yard,"

23  and he gave me a picture.

24         Q.   Did you have any awareness of what he

25  had been accused of doing earlier?

1        A.    Yes.

2        Q.    And was that through these e-mails?

3        A.    No.  That was the original call when we

4    were dispatched to it.

5        Q.    So you responded to the original call?

6        A.    Uh-huh.

7        MR. ANGELL:  That's a "yes"?

8        THE WITNESS:  Yes.  Sorry.  Sorry.  Yes, I

9    was.

10       Q.    (BY MS. PORTER):  And then I won't ask

11   you where the address was.  I'm sure that's in the

12   record.

13            But what do you recall about that

14   initial call?

15       A.    So dispatch had us respond.  It was a

16   1200 block of East Elm Street for a subject who had

17   stolen and pointed a gun at the victim and then had

18   left on foot.

19            So we got to the area.  I'm not sure who

20   told me where to go initially.  I don't know if it

21   was the responsible officer or just my sergeant that

22   was on, but we set up a perimeter.  I was just tasked

23   with helping with the perimeter at that time.  So I

24   went to a specific intersection and just held the

25   perimeter, hoping that we could hold him inside.

1          Q.   Did you personally speak to, you know,

2    the person he allegedly pointed a gun at?

3          A.   I did not, no.

4          Q.   Okay.  When you got to the scene of the

5    shooting, did you give any commands to Jake Sheeler?

6          A.   Yes.

7          Q.   And what commands did you give to Jake

8    Sheeler?

9          A.   In my report I said, "Police" or "Stop.

10   Police.  Get on the ground" -- I believe is what I

11   said.

12         Q.   And how many times did you give one or

13   more of those commands to Jake Sheeler?

14         A.   My report says multiple times, so -- I

15   don't know.  I'm not sure.  Multiple times.

16         Q.   You didn't have any sort of camera on

17   you at the time?

18         A.   No.  I don't think we had body-worn

19   cameras at that time.  Not yet.

20         Q.   Did you know whether other officers were

21   also giving Jake commands at the same time?

22         A.   I -- maybe other officers that were with

23   me.  I don't know.

24         Q.   Just generally were you aware of any

25   other officers who appeared to be giving commands to

1  Jake at the same time that you were?

2          A.   I don't recall.

3          Q.   Okay.  Did you search for a gun after

4  the shooting?

5          A.   I did, yeah.

6          Q.   Just describe that search for us

7  generally.

8          A.   So like I described before, there's a

9  huge wooded area, a creek and all that kind of stuff

10  on the south side of the hotel.  The trooper stated

11  that he saw the suspect walking eastbound towards the

12  interstate and then walked back -- or, westbound

13  towards the interstate and then walked back

14  eastbound, so I just searched everywhere in that

15  area.

16              In my report, I noted that I remembered

17  Sheeler's feet I think were muddy, so I assume that

18  he went through the creek over there.  So I just

19  searched a lot through the creek.  So that whole

20  wooded area is what I searched through and I did not

21  locate anything.

22          Q.   Did you also search the area

23  surrounding --

24          A.   Directly around him, yes, I did.

25          Q.   Okay.  And no gun around him?

```
1              A.   Not that I located, no.
2              Q.   Were you looking for anything else
3    besides a gun?
4              A.   Maybe footprints to indicate where he
5    was at, but --
6              Q.   Were you --
7              A.   I guess, like, what?
8              Q.   Well, like, for example, were you asked
9    to look to see if you could find a cell phone?
10             A.   Not that I recall.
11             Q.   Or a wallet?
12             A.   Not that I recall.
13             Q.   Okay.  Your assignment was to --
14             A.   Look for a weapon.
15             Q.   -- look for a gun?
16             A.   Uh-huh.
17             Q.   You were near Jake when he was on the
18   ground after the shooting, correct?
19             A.   Yes.  I walked up to him, yes.  I was
20   there helping render aid, yes.
21             Q.   Did you see any possessions of any kind
22   other than his clothing?
23             A.   Not that I recall.
24             Q.   Can you describe generally what you saw
25   with respect to Jake's wounds?
```

1        A.    I notated in my report where all the
2    wounds that I did see.  I don't even remember
3    where -- there were multiple.  I don't remember
4    exactly where they were at, though, so I just -- I
5    just noted that there are multiple wounds -- or,
6    gunshot wounds.
7        Q.    Okay.  Did you -- I think you said you
8    were rendering aid.  Were you attempting to in any
9    way physically provide aid to Jake?
10        A.    I was going to, but there was a lot of
11    hands there so I stayed out of the way and tried to
12    direct people.  So I assisted with getting the
13    ambulance there, telling younger officers to assist
14    here or whatever.  So I -- I don't think I went
15    hands-on with him ever.  I think we got a lot of
16    people there really fast.
17        Q.    Prior to the shooting, did you see any
18    civilians in the vicinity of Jake Sheeler?
19        A.    No.
20        Q.    Did you ever find a backpack in the
21    area?
22        A.    I did not.
23        Q.    Okay.  After the shooting did you speak
24    with any other officers about the shooting?
25        A.    I don't think so.  I don't recall.

1          Q.    What did you do to prepare for today's
2    deposition?
3          A.    Went over what I -- my report and I
4    spoke with the lawyers about --
5          Q.    No, that's okay.
6          A.    Just when to arrive.
7          Q.    You can just say there was contact with
8    an attorney.
9          A.    Okay.  Contact with an attorney.
10         Q.    I don't need to hear anything else.
11               Okay.  Did you watch any video related
12    to the shooting?
13         A.    No.
14         Q.    Did you listen to any audio related to
15    the shooting?
16         A.    I did not.  I don't think I have access
17    to that stuff.
18         Q.    Can you tell us the names of every law
19    enforcement officer that you recall seeing at the
20    scene of the shooting?
21         A.    Yes.
22         Q.    Okay.  I'm ready.
23         A.    So Corporal Eldridge, Officer McArthur,
24    Officer Saldana, I believe Officer Fetchen, at the
25    time Officer Clayter, was there.  I believe Corporal

1    Miller.  I can't specifically remember any other

2    names that were there.  I mean, like, at -- sorry --

3    at the scene, or --

4             Q.    Yeah.

5             A.    -- just -- okay.  At the scene itself?

6    Afterwards I believe I was directed by -- I don't

7    know what he was at the time, if he was a sergeant or

8    not a sergeant, Hancock, and Sergeant Lacey to assist

9    with the search and/or put up tape.  And then Officer

10   Bergmans was there, and he was assisting me with the

11   search.

12            Q.    That was the time to rob a bank in

13   Pocatello, wasn't it?

14            A.    Right.  It was very busy, yeah.

15            Q.    What about any state troopers?  Do you

16   remember seeing any of those there?

17            A.    I don't know their names very well.

18   There are -- like as I said before, there was one

19   that called and that's how I originally got to that

20   location.  I think there was two other state troopers

21   there, but I don't remember their names.

22            Q.    Are you familiar with the concept of a

23   "call comment" with respect to Pocatello PD?

24            A.    A "call comment"?  I believe I know what

25   you're talking about.

1          Q.    It's just the phrase that was --

2          A.    That was used.

3          Q.    -- used?  Yeah, so --

4          A.    I'm sure I know what they're saying.

5          Q.    What do you understand that to mean?

6          A.    So in Spillman, dispatch will put up a

7    call, and then you can go to another screen and look

8    at all the details about that call and you can put

9    comments on it.  So I guess that would be what they

10   were talking about.

11         Q.    As of September 25th, 2020, were you

12   able to access those comments while in the field?

13         A.    On that day was I able to access them?

14         Q.    Well, as of September 2020, was it

15   technologically feasible for you to access those

16   comments remotely?

17         A.    If I go back to my vehicle and look at

18   my laptop, yes.

19         Q.    Okay.  What was the process -- as of

20   September 2020, what would the process have been to

21   look at those on your laptop?

22         A.    So you have to be, obviously, in your

23   vehicle, and then, depending on what you have open,

24   you can click on that specific call and then it would

25   take you to another window and then there's just tabs

1    for comments and other information regarding the

2    call.

3              MS. PORTER:  Okay.  Unless Anna has 20 or 50

4    more questions, I don't know that I have any.  Let me

5    look.

6              Q.    (BY MS. PORTER):  Okay.  Prior to being

7    on scene where Jake was shot, you were generally

8    aware that there was a search for a subject ongoing,

9    correct?

10             A.    Yes.

11             Q.    On September 25th -- which I'll

12   represent is the day of the shooting, all right?

13             A.    Okay.

14             Q.    On September 25th, are you aware of any

15   planning efforts that were made with respect to who

16   would take charge if the subject were located?

17             A.    No.

18             Q.    On September 25, were you aware of any

19   planning that took place among Pocatello PD with

20   respect to how to execute an arrest of the subject?

21             A.    Other than prior training, no, we didn't

22   make a specific plan, I guess.

23             Q.    On September 25 are you aware of any

24   planning that took place intended to prevent law

25   enforcement officers from giving inconsistent

1    commands to the subject?

2            A.    No.

3            MS. PORTER:  We're out of here.

4            MR. ANGELL:  I don't have any questions.

5            MS. PORTER:  I have one more.

6            Q.    (BY MS. PORTER):  Earlier you mentioned

7    an Officer Fetchen and I thought a separate Officer

8    Clayter.  Are those the same person?

9            A.    Yes.

10           Q.    Okay.  And what's her first name?

11           A.    Cheyenne.

12           MS. PORTER:  Okay.  Thank you.

13              (Deposition concluded at 2:24 p.m.)

14                  (Signature requested.)

15

16

17

18

19

20

21

22

23

24

25

1      CERTIFICATE OF TYLER ANDERSON

2

3      I, TYLER ANDERSON, being first duly sworn,

4  depose and say:

5      That I am the witness named in the foregoing

6  deposition; that I have read said deposition and know

7  the contents thereof; that the questions contained

8  therein were propounded to me; and that the answers

9  contained therein are true and correct, except for

10  any changes that I may have listed on the Errata

11  Sheet attached hereto.

12      DATED this _____day of _____20_____.

13

14      CHANGED ON ERRATA SHEET   YES___NO___

15

16  _____

17  TYLER ANDERSON

18  SUBSCRIBED AND SWORN to before me this

19  _____day of _____20_____.

20

21

22

23  _____

24  NAME OF NOTARY PUBLIC
   RESIDING AT_____

25  MY COMMISSION EXPIRES_____

**ERRATA SHEET FOR TYLER ANDERSON**

Page_____Line_____Reason for Change

_____

Reads

_____

Should Read

_____

Page_____Line_____Reason for Change

_____

Reads

_____

Should Read

_____

Page_____Line_____Reason for Change

_____

Reads

_____

Should Read

_____

Page_____Line_____Reason for Change

_____

Reads

_____

Should Read

_____

Page_____Line_____Reason for Change

_____

Reads

_____

Should Read

_____

Page_____Line_____Reason for Change

_____

Reads

_____

Should Read

_____

Page_____Line_____Reason for Change

_____

Reads

_____

Should Read

_____


    SIGNATURE:_____

1                    REPORTER'S CERTIFICATE

2              I, Amber S. Williams, CSR NO. 1080,

3    Certified Shorthand Reporter, certify:

4              That the foregoing proceedings were taken

5    before me at the time and place therein set forth, at

6    which time the witness was put under oath by me.

7              That the testimony and all objections made

8    were recorded stenographically by me and transcribed

9    by me or under my direction.

10             That the foregoing is a true and correct

11   record of all testimony given, to the best of my

12   ability.

13             I further certify that I am not a relative

14   or employee of any attorney or party, nor am I

15   financially interested in the action.

16             IN WITNESS WHEREOF, I set my hand and seal

17   this 23rd day of February, 2023.

18

19

20             _____

21             AMBER S. WILLIAMS, CSR NO. 1080

22             Notary Public

23             Post Office Box 2636

24             Boise, Idaho  83701-2636

25   My commission expires June 1, 2027

## A

**able (4)**
7:12;8:7;16:12,13
**access (5)**
8:6;14:16;16:12,13,15
**accused (1)**
8:25
**actually (1)**
6:1
**address (1)**
9:11
**Afterwards (1)**
15:6
**again (1)**
8:13
**agree (1)**
6:6
**aid (3)**
12:20;13:8,9
**allegedly (1)**
10:2
**always (1)**
5:2
**ambulance (1)**
13:13
**among (1)**
17:19
**and/or (1)**
15:9
**ANDERSON (2)**
4:1,8
**ANGELL (2)**
9:7;18:4
**Anna (1)**
17:3
**appeared (1)**
10:25
**approached (1)**
8:21
**area (7)**
8:1;9:19;11:9,15,20,22;
13:21
**around (2)**
11:24,25
**arrest (1)**
17:20
**arrive (1)**
14:6
**assignment (1)**
12:13
**assist (2)**
13:13;15:8
**assisted (1)**
13:12
**assisting (1)**
15:10
**assume (1)**
11:17
**attempting (1)**
13:8
**attorney (2)**

## B

**14:8,9**
**audio (1)**
14:14
**aware (6)**
7:3;10:24;17:8,14,18,23
**awareness (1)**
8:24
**away (3)**
6:16,18,23

## B

**back (3)**
11:12,13;16:17
**backpack (1)**
13:20
**bank (1)**
15:12
**behind (1)**
8:3
**Bergmans (1)**
15:10
**besides (1)**
12:3
**best (1)**
7:19
**block (1)**
9:16
**body-worn (1)**
10:18
**Briefly (2)**
5:16;6:17
**brush (1)**
6:18
**busy (1)**
15:14

## C

**call (9)**
9:3,5,14;15:23,24;16:7,8,
24;17:2
**called (3)**
5:6,21;15:19
**camera (1)**
10:16
**cameras (1)**
10:19
**Can (8)**
4:17;8:9;12:24;14:7,18;
16:7,8,24
**case (1)**
7:9
**cases (1)**
4:20
**cause (1)**
4:3
**cell (1)**
12:9
**channel (1)**
8:6
**charge (1)**
17:16

**Cheyenne (1)**
18:11
**citizen (3)**
5:19;7:8;8:22
**civilians (1)**
13:18
**Clayter (2)**
14:25;18:8
**click (1)**
16:24
**clothing (1)**
12:22
**commands (6)**
10:5,7,13,21,25;18:1
**comment (2)**
15:23,24
**comments (4)**
16:9,12,16;17:1
**communicate (1)**
7:19
**concept (1)**
15:22
**concluded (1)**
18:13
**contact (2)**
14:7,9
**contacted (1)**
7:25
**conveyed (1)**
7:14
**corner (1)**
6:15
**Corporal (2)**
14:23,25
**couple (1)**
4:17
**court (4)**
4:15,19,24;5:2
**creek (3)**
11:9,18,19
**crimes (1)**
4:25

## D

**day (4)**
7:17;8:18;16:13;17:12
**department (2)**
7:11,16
**depending (1)**
16:23
**deposition (3)**
4:12;14:2;18:13
**describe (3)**
6:12;11:6;12:24
**described (1)**
11:8
**details (1)**
16:8
**direct (1)**
13:12
**directed (1)**
15:6

**direction (2)**
6:20,22
**Directly (1)**
11:24
**dispatch (3)**
7:25;9:15;16:6
**dispatched (1)**
9:4
**disseminated (1)**
7:10
**done (1)**
8:18
**drug (1)**
4:24
**DUIs (1)**
4:23
**duly (1)**
4:2
**during (1)**
7:17

## E

**earlier (3)**
8:18,25;18:6
**east (2)**
6:23;9:16
**eastbound (2)**
11:11,14
**efforts (1)**
17:15
**Eldridge (1)**
14:23
**Elm (1)**
9:16
**else (2)**
12:2;14:10
**e-mail (1)**
7:15
**e-mails (2)**
7:16;9:2
**enforcement (2)**
14:19;17:25
**entire (1)**
8:10
**even (1)**
13:2
**events (1)**
8:20
**everywhere (1)**
11:14
**exactly (1)**
13:4
**EXAMINATION (1)**
4:4
**example (1)**
12:8
**examples (1)**
4:18
**execute (1)**
17:20
**expert (2)**
5:5,7

## F

**fact (1)**
5:3
**familiar (1)**
15:22
**familiarity (1)**
5:8
**far (1)**
6:18
**fast (1)**
13:16
**feasible (1)**
16:15
**feet (1)**
11:17
**Fetchen (2)**
14:24;18:7
**few (1)**
6:1
**field (1)**
16:12
**find (2)**
12:9;13:20
**first (3)**
4:2,10;18:10
**follows (1)**
4:3
**foot (1)**
9:18
**footprints (1)**
12:4
**four (1)**
6:4
**frequency (1)**
8:6
**further (1)**
6:23

## G

**gap (1)**
6:17
**gave (2)**
7:8;8:23
**generally (4)**
10:24;11:7;12:24;17:7
**given (1)**
5:18
**giving (3)**
10:21,25;17:25
**good (1)**
5:1
**ground (2)**
10:10;12:18
**guess (3)**
12:7;16:9;17:22
**gun (8)**
5:17;6:10;9:17;10:2;11:3,
25;12:3,15
**gunshot (1)**
13:6

**guy (1)**
8:22

## H

**Hancock (1)**
15:8
**handgun (1)**
5:20
**handheld (1)**
8:1
**hands (1)**
13:11
**hands-on (1)**
13:15
**happened (1)**
6:1
**hear (1)**
14:10
**held (1)**
9:24
**helping (2)**
9:23;12:20
**Hey (1)**
8:22
**hold (1)**
9:25
**honestly (1)**
5:24
**hop (2)**
8:7,9
**hoping (1)**
9:25
**Hotel (3)**
6:16;8:4;11:10
**hours (2)**
6:1,4
**huge (1)**
11:9

## I

**Idaho (1)**
8:5
**identify (1)**
7:12
**incident (3)**
5:20,22;6:4
**inconsistent (1)**
17:25
**indicate (1)**
12:4
**information (1)**
17:1
**initial (1)**
9:14
**initially (1)**
9:20
**inside (1)**
9:25
**intended (1)**
17:24
**intersection (1)**

9:24
**interstate (2)**
11:12,13
**interview (2)**
8:15,19
**into (1)**
4:10
**introduced (1)**
4:9
**ISP (1)**
7:24
**issues (1)**
4:23

## J

**Jake (16)**
5:9,14,19;6:7,13;7:4,12;
10:5,7,13,22;11:1;12:17;
13:9,18;17:7
**Jake's (1)**
12:25
**jumping (1)**
8:12
**juvenile (1)**
4:23

## K

**kind (4)**
8:8,9;11:9;12:21
**knowledge (1)**
5:4

## L

**Lacey (1)**
15:8
**laptop (2)**
16:18,21
**law (2)**
14:18;17:24
**lawyers (1)**
14:4
**learn (2)**
7:6,21
**least (1)**
6:16
**left (1)**
9:18
**Lion (4)**
6:15,16;7:23;8:3
**list (1)**
5:1
**listen (1)**
14:14
**locate (1)**
11:21
**located (2)**
12:1;17:16
**location (2)**
7:1;15:20
**long (1)**

5:22
**look (7)**
12:9,14,15;16:7,17,21;
17:5
**looking (2)**
7:11;12:2
**lot (4)**
6:15;11:19;13:10,15
**Lots (1)**
4:25

## M

**many (1)**
10:12
**maybe (2)**
10:22;12:4
**McArthur (1)**
14:23
**mean (3)**
4:21;15:2;16:5
**mentioned (1)**
18:6
**Miller (1)**
15:1
**more (3)**
10:13;17:4;18:5
**muddy (1)**
11:17
**multiple (4)**
10:14,15;13:3,5

## N

**name (3)**
4:6;7:3;18:10
**names (4)**
14:18;15:2,17,21
**near (1)**
12:17
**need (1)**
14:10
**notated (1)**
13:1
**noted (2)**
11:16;13:5

## O

**observed (1)**
5:3
**obviously (1)**
16:22
**occurred (1)**
6:3
**off (2)**
8:7,10
**officer (9)**
9:21;14:19,23,24,24,25;
15:9;18:7,7
**officers (9)**
7:8,9,12;10:20,22,25;
13:13,24;17:25

**one (5)**
5:11;7:11;10:12;15:18;
18:5
**ongoing (1)**
17:8
**open (1)**
16:23
**opposite (2)**
6:20,22
**orders (1)**
4:24
**original (2)**
9:3,5
**originally (2)**
5:21;15:19
**out (4)**
8:2,13;13:11;18:3
**over (2)**
11:18;14:3
**overheard (1)**
8:1

**P**

**parking (1)**
6:15
**PD (2)**
15:23;17:19
**people (2)**
13:12,16
**perimeter (4)**
7:18;9:22,23,25
**person (2)**
10:2;18:8
**personally (1)**
10:1
**phone (1)**
12:9
**phrase (1)**
16:1
**physically (1)**
13:9
**picture (4)**
5:19;7:7,10;8:23
**pictures (1)**
5:18
**place (2)**
17:19,24
**plan (1)**
17:22
**planning (3)**
17:15,19,24
**please (1)**
4:6
**pm (3)**
5:24;6:3;18:13
**Pocatello (3)**
15:13,23;17:19
**pointed (2)**
9:17;10:2
**Police (2)**
10:9,10
**PORTER (8)**

**4:5**;9:10;17:3,6;18:3,5,6,
12
**possession (1)**
5:20
**possessions (1)**
12:21
**possible (1)**
7:22
**prepare (1)**
14:1
**prevent (1)**
17:24
**prior (4)**
8:16;13:17;17:6,21
**process (2)**
16:19,20
**provide (1)**
13:9
**put (3)**
15:9;16:6,8

**Q**

**quite (1)**
7:18

**R**

**radio (4)**
7:20;8:2,6,9
**ran (1)**
8:22
**random (1)**
4:17
**reading (1)**
7:16
**ready (1)**
14:22
**really (2)**
6:18;13:16
**recall (7)**
9:13;11:2;12:10,12,23;
13:25;14:19
**received (1)**
7:7
**record (2)**
4:7;9:12
**Red (4)**
6:15,15;7:23;8:3
**referring (1)**
6:5
**regarding (1)**
17:1
**related (3)**
8:19;14:11,14
**relating (1)**
4:2
**remember (5)**
13:2,3;15:1,16,21
**remembered (1)**
11:16
**remotely (1)**
16:16

**render (1)**
12:20
**rendering (1)**
13:8
**report (5)**
10:9,14;11:16;13:1;14:3
**represent (2)**
6:2;17:12
**requested (1)**
18:14
**respect (5)**
8:17;12:25;15:23;17:15,20
**respond (1)**
9:15
**responded (1)**
9:5
**responsible (2)**
7:9;9:21
**rest (1)**
7:10
**right (6)**
4:10;6:7;7:2;8:14;15:14;
17:12
**rob (1)**
15:12
**roughly (1)**
6:4
**running (1)**
5:20

**S**

**Saldana (1)**
14:24
**same (4)**
8:6;10:21;11:1;18:8
**saw (9)**
5:14,19;6:13,17,19,21;7:3;
11:11;12:24
**saying (1)**
16:4
**scan (2)**
8:8,8
**scanning (2)**
8:1,11
**scene (8)**
6:8,13;7:3;10:4;14:20;
15:3,5;17:7
**screen (1)**
16:7
**search (6)**
11:3,6,22;15:9,11;17:8
**searched (3)**
11:14,19,20
**seeing (2)**
14:19;15:16
**separate (1)**
18:7
**September (7)**
16:11,14,20;17:11,14,18,
23
**sergeant (4)**
9:21;15:7,8,8

**set (1)**
9:22
**Sheeler (11)**
5:9,14,19;6:8,13;7:4,13;
10:5,8,13;13:18
**Sheeler's (1)**
11:17
**shooters (1)**
5:11
**shooting (14)**
5:9,25;6:2,5;10:5;11:4;
12:18;13:17,23,24;14:12,15,
20;17:12
**shot (4)**
5:14,23;6:8;17:7
**side (2)**
8:4;11:10
**sighting (1)**
7:22
**Signature (1)**
18:14
**Sorry (3)**
9:8,8;15:2
**sort (2)**
8:12;10:16
**south (2)**
8:3;11:10
**southeast (1)**
6:15
**space (1)**
6:17
**speak (2)**
10:1;13:23
**specific (4)**
4:20;9:24;16:24;17:22
**specifically (2)**
7:25;15:1
**Spillman (1)**
16:6
**spoke (1)**
14:4
**started (1)**
4:10
**state (4)**
4:6;8:5;15:15,20
**stated (2)**
8:2;11:10
**stayed (1)**
13:11
**stolen (1)**
9:17
**Stop (1)**
10:9
**Street (1)**
9:16
**strike (1)**
8:16
**stuff (2)**
11:9;14:17
**subject (7)**
7:22;8:17;9:16;17:8,16,20;
18:1
**sure (5)**

6:1;9:11,19;10:15;16:4
**surrounding (1)**
  11:23
**suspect (2)**
  8:3;11:11
**suspected (1)**
  8:18
**sworn (1)**
  4:2

## T

**tabs (1)**
  16:25
**talking (2)**
  15:25;16:10
**tape (1)**
  15:9
**tasked (1)**
  9:22
**technologically (1)**
  16:15
**telling (1)**
  13:13
**testified (5)**
  4:3,15,18;5:2,5
**testifying (1)**
  5:3
**Thanks (1)**
  7:2
**though (1)**
  13:4
**thought (1)**
  18:7
**throughout (1)**
  7:10
**times (4)**
  5:1;10:12,14,15
**today's (1)**
  14:1
**told (1)**
  9:20
**took (2)**
  17:19,24
**towards (2)**
  11:11,13
**training (1)**
  17:21
**trees (1)**
  6:18
**tried (1)**
  13:11
**Trooper (3)**
  7:24;8:5;11:10
**troopers (2)**
  15:15,20
**truth (1)**
  4:2
**trying (2)**
  4:24;6:14
**two (1)**
  15:20
**TYLER (2)**

4:1,8
**types (3)**
  4:18,22,23

## U

**Understood (1)**
  8:15
**Unless (1)**
  17:3
**up (4)**
  9:22;12:19;15:9;16:6
**used (2)**
  16:2,3

## V

**vehicle (2)**
  16:17,23
**Via (1)**
  7:15
**vicinity (2)**
  7:22;13:18
**victim (1)**
  9:17
**video (1)**
  14:11
**violations (1)**
  4:24
**violent (1)**
  4:25

## W

**walked (3)**
  11:12,13;12:19
**walking (4)**
  6:20,22,23;11:11
**wallet (1)**
  12:11
**watch (1)**
  14:11
**way (3)**
  7:19;13:9,11
**weapon (1)**
  12:14
**west (1)**
  6:25
**westbound (1)**
  11:12
**what's (1)**
  18:10
**whole (1)**
  11:19
**window (1)**
  16:25
**without (1)**
  7:20
**witness (4)**
  5:4,5,7;9:8
**witnesses (2)**
  8:16,19
**wooded (2)**

11:9,20
**wounds (4)**
  12:25;13:2,5,6

## Y

**yard (1)**
  8:22
**yards (1)**
  6:16
**younger (1)**
  13:13

## 1

**1200 (1)**
  9:16

## 2

**2:24 (1)**
  18:13
**20 (1)**
  17:3
**2020 (3)**
  16:11,14,20
**25 (2)**
  17:18,23
**25th (3)**
  16:11;17:11,14

## 4

**4:18 (1)**
  5:24

## 5

**50 (2)**
  6:16;17:3

## 8

**8 (1)**
  6:3

## 9

**9 (1)**
  6:3

# Exhibit 2

```
 1                IN THE UNITED STATES COURT

 2                    DISTRICT OF IDAHO

 3

        JAKE L. SHEELER, an        )
 4      individual,                )
                                   )
 5           Plaintiff,            )   Zoom Deposition of:
                                   )
 6      vs.                        )   Durand R. Begault
                                   )
 7      BRIDGET MCARTHUR, an       )
        individual; JEFFREY E.     )   Case No.
 8      ELDRIDGE, an individual;   )   4:22-CV-00313-AKB
        MARISA A. SALDANA, an      )
 9      individual; ROGER SCHEI,   )   Judge Amanda K. Brailsford
        an individual; and CITY    )
10      OF POCATELLO, a            )
        municipal corporation,     )
11                                 )
             Defendants.           )

12

13

14

15            January 3, 2024 * 10:00 a.m.

16

17            Remote proceeding via Zoom

18

19

20

21

22

23

24         Reporter:  Diana Kent, RPR, CRR
25      Notary Public in and for the State of Utah

                                   Page 1
```

Durand R. Begault , Ph.D. - January 3, 2024

```
 1                    A P P E A R A N C E S
 2      FOR THE PLAINTIFF:
 3                 Karra J. Porter
                   CHRISTENSEN & JENSEN
 4                 Attorney at Law
                   257 East 200 South
 5                 Suite 1100
                   Salt Lake City, Utah 84111
 6                 Tel: (801) 323-5000
                   Fax: (801) 355-3472
 7                 karra.porter@chrisjen.com
 8      FOR THE DEFENDANT:
 9                 Sam L. Angell
                   HALL ANGELL & ASSOCIATES, LLP
10                 Attorney at Law
                   1075 South Utah Avenue
11                 Suite 150
                   Idaho Falls, Idaho  83402
12                 Tel: (208) 522-3003
                   sla@hasattorneys.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page  2

Durand R. Begault , Ph.D. - January 3, 2024

1                         I N D E X

2    DR. DURAND R. BEGAULT                            PAGE

3    Examination By Karra Porter                         4

4

5

6                      E X H I B I T S

7    NUMBER                  DESCRIPTION              PAGE

8    Exhibit 1     Rule 26 Report from Audio           14

                   Forensic Center

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page  3

Durand R. Begault , Ph.D. - January 3, 2024

```
1                    P R O C E E D I N G S

2

3                    Durand R. Begault,

4          called as a witness, being first duly sworn,

5              was examined and testified as follows:

6

7                         EXAMINATION

8       BY MS. PORTER:

9          Q.    Good morning, Dr. Begault.  Am I

10      pronouncing your last name correctly?

11         A.    Yes.

12         Q.    Okay.  No French thing there like "Tarjay"

13      or something?

14         A.    Well, if I'm with family in New Orleans

15      it's pronounced one way, if I'm in France it's

16      pronounced another way, and it's always been "Ba-gault"

17      here in California.

18         Q.    Okay.  Appreciate that.  I appreciate you

19      joining us this morning.  What I'm going to do is just

20      have you help me understand certain aspects of your

21      testimony a little bit in terms of elaboration from the

22      report.  You've obviously been through this process

23      many, many times, so I will kind of go ahead and cut to

24      the chase.  But first let me ask you, as I understand,

25      you have a Ph.D.?
```

Page 4

Durand R. Begault , Ph.D. - January 3, 2024

```
1              A.    I do.

2              Q.    And you got that in 1987?

3              A.    I did.

4              Q.    Can you generally discuss for us the

5      process you went through, just Reader's Digest version?

6              A.    Sure.  I originally started as a music

7      student back in the '70s and that's about the time

8      computers were coming into play with the production of

9      music, at the time it was big main frames and things of

10     that sort.  And as I went through my graduate degree,

11     it was clear I was not particularly good as a music

12     composer and I was far better at analyzing sound and

13     going through things such as, you know, human

14     perception research, which is eventually what my thesis

15     was about.  So that involved computer modeling of room

16     acoustics.  And the degree in computer audio was

17     through a research center at the University of

18     California San Diego.  So we were developing some of

19     the early methods to use analyses of digital audio.

20             Q.    Okay.  I think I'm sharing the witness's

21     report.  Do others see that?

22             A.    I see it.

23             Q.    That's my main accomplishment for the day

24     was actually managing to pull that off.  I am not the

25     tech person in the room, or even the county.  Let me
```

Page 5

Durand R. Begault , Ph.D. - January 3, 2024

1    start, I'm just going to basically go through certain

2    portions of your report.  First, do you recognize this

3    first page as the first page of your report, Doctor?

4        A.    I do.

5        Q.    Okay.  And I'll represent to you that we

6    will be going through each of the pages.  So if you see

7    anything in there that doesn't look like it's part of

8    your report, let me know.

9        A.    Very good.

10        Q.    Let me just start with some basic

11    questions about the section that you've labeled

12    "Materials Examined."  And I'm just scrolling up there

13    a little.  I'm going to skip Q1 because you get into

14    that quite a bit later.

15            Q2 was a dashcam recording.  Did you rely

16    on anything that you observed in the dashcam recording?

17        A.    No.  It was incredibly noisy.  I did not

18    find it useful for doing the analysis that I present in

19    the report.  So I included it here as one of the

20    materials I examined, but I did not find anything of

21    value in it.

22        Q.    Okay.

23        A.    I know that it was made contemporaneously

24    at some points with the body-worn camera, but that's

25    it.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

Durand R. Begault , Ph.D. - January 3, 2024

```
 1           Q.    Okay.  And you reviewed the Complaint

 2     filed in this case in 2022.  What was the purpose of

 3     reviewing the Complaint?

 4           A.    I believe to get a general idea of some of

 5     the assertations made in this matter.

 6           Q.    Okay.

 7           A.    It's something I do as a standard part of

 8     my procedure.

 9           Q.    Did you review any depositions that had

10     been taken in the case?

11           A.    I know I received some, and I may have

12     reviewed one or two.  I didn't really find them

13     particularly pertinent to my report, so I didn't

14     include them as one of the documents that I reviewed.

15           Q.    Okay.  Well, the dashcam recording wasn't

16     really pertinent and you listed that, so that's why I'm

17     trying to figure out what the line is of you listing

18     the things versus not.

19           A.    I can explain.

20           Q.    Pardon?

21           A.    I could explain, if you'd like.

22           Q.    Yeah.  What I want to know is whose

23     depositions did you review?

24           A.    I believe I reviewed depositions of one or

25     more of the officers, so that was probably McArthur and
```

Page 7

Durand R. Begault , Ph.D. - January 3, 2024

```
1    more than likely Officer Eldridge.  But that's all I

2    recall.  And again, I didn't list those as opposed to

3    the dashcam recording because, of course, my specialty

4    is analyzing audio and video materials.  And so I

5    thought it was applicable to list that as a materials

6    examined, because I examined those technically; whereas

7    the depositions, I looked at them maybe just to sort of

8    familiarize myself with the general outlines of the

9    case, but I didn't list them.  And, of course, there's

10   no mention of those depositions in the report.

11        Q.    Right.  Is it fair to say that you did not

12   incorporate any information from those depositions into

13   your analysis?

14        A.    I don't believe I did.

15        Q.    All right.  Now, you looked at what you've

16   listed as NE2, a document with the title "Enhancement

17   Notes," and did you incorporate anything from that

18   document into your analysis?

19        A.    No.  Not formally.  I believe that

20   document included a transcription of what Mr. Seikel -

21   if that's how you say it - said.  I didn't really

22   review it until after I was done with my own review.

23   Just to kind of confirm that I was more or less on the

24   same page.  But I did not really include that in my

25   report.  It's just one of those things I reviewed
```

Page 8

1    because I did transcribe some of the things that were

2    said, and so it seemed pertinent to include that.

3        Q.    And did you conclude that you were on the

4    "same page" as Mr. Seikel?

5        A.    Well, that's a strong statement.  Maybe I

6    should revise that a little bit.  I didn't see anything

7    in Mr. Seikel's document that contradicted anything

8    that I transcribed.

9        Q.    NE3, the EICITF Investigation Report, why

10   did you review that?

11       A.    Same reason as some of the depositions.  I

12   was just getting a sort of overall view of the case.

13   And it could be, I don't recall exactly, that the

14   Seikel documents of NE2 were incorporated as part of

15   NE3, but I don't recall exactly.  If I do recall

16   correctly, NE3 was a rather lengthy document that was a

17   compilation of multiple materials, and so I reviewed

18   that just to see if there was anything that would be of

19   particular relevance to some of the things I was going

20   to be writing about.

21       Q.    And did you find anything to be of

22   relevance to the things you were going to be writing

23   about, with respect to --

24       A.    I'm -- sorry.

25       Q.    Go ahead.

Page  9

Durand R. Begault , Ph.D. - January 3, 2024

```
 1            A.    My apologies.

 2            Q.    Go ahead.

 3            A.    No, not really.

 4            Q.    The only reason I'm asking this is I want

 5      to get a better understanding of the philosophy of when

 6      you included things in the materials examined and when

 7      you didn't, so I don't get any sort of surprises at

 8      trial.  So you didn't incorporate anything from let's

 9      say the EICITF Investigation Report, but you listed it

10      in the materials examined.  But that was not the

11      process you followed with respect to the depositions.

12      Can you help me understand a little better what went

13      into your thought process in which things you listed as

14      materials examined?

15            A.    Well, perhaps the numbering system would

16      be helpful.  This is something that's kind of quasi

17      derived from the FBI method from many years back.  "Q"

18      refers to questioned evidence.  So there were questions

19      about the body-worn camera recording, and there were

20      questions about the dashcam recording, Q2, if there was

21      anything relevant for analyzing the material on Q1.  So

22      those were my primary materials of focus.

23                  Whereas things listed as "NE" are the

24      documents that I have looked at and examined.  Of

25      those, the only one that really sticks out to me is
```

Page 10

Durand R. Begault , Ph.D. - January 3, 2024

1       something that's included in my report, other than

2       maybe the spelling of a name or something of that sort,

3       would be document NE4.  So I don't anticipate something

4       that's not listed here as being presented in trial as a

5       kind of surprise, as you mentioned.

6              Q.    And I didn't mean it would be intentional.

7       I just, you know, want to make sure.

8                    Are you aware of any other material that

9       you did, in fact, look at that is not listed under

10      "Materials Examined"?

11             A.    Yes.  Post writing this report, I reviewed

12      both a rebuttal report from Mr. Mecham and I also

13      reviewed a report or commentary from Mr. Jonathan

14      Broyles.

15             Q.    Anything else?

16             A.    Those are the two primary things that I've

17      reviewed since then.

18             Q.    Were there any secondary things that you

19      reviewed that you did not identify in the "Materials

20      Examined" section?

21             A.    No.

22             Q.    Okay.  By the way, since we will be

23      mentioning his name a number of times, just FYI it's

24      "Meekam."

25             A.    Mecham.  Okay.  Very good.  I will do my

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

Durand R. Begault , Ph.D. - January 3, 2024

```
 1      best.
 2             Q.    Okay.  And by the way, I did recognize --
 3      just coincidentally, I happen to be a CEO of a forensic
 4      DNA lab, in my off time.  So I did recognize the
 5      approach, I guess we'll say.
 6             All right.  Let me ask you a couple of
 7      quick questions about the exhibits, which we will go
 8      into a little bit more.  First, you've got Exhibit 1
 9      which is titled Exhibit 1 McArthur.  And as I
10      understand, that's an exhibit you created; is that
11      correct?
12             A.    That is correct.
13             Q.    Using unspecified software.  Is that
14      correct?
15             A.    I don't recall if I mentioned the specific
16      brand of the software.
17             Q.    Okay.
18             A.    I'm prepared today to talk about that, if
19      you'd like.
20             Q.    No.  It's too late.  I can't do anything
21      if you gave me that information today.
22             So you would agree, though, that you did
23      not identify the software in your report, correct?
24             A.    I believe what I said was, and we can turn
25      to that page, I actually have a hard copy that has not
```

Page 12

1    been written on, so I have a copy here.

2        Q.    Okay.

3        A.    And I think I could read to you from page

4    2 under the materials provided for this Rule 26 that I

5    used "professional nonlinear video and audio editing

6    software."

7        Q.    Okay.

8        A.    So it's my usual practice to refer to

9    these things generically as opposed to writing down the

10   specific name of the software used.

11       Q.    Okay.  You would agree that you did not

12   identify the particular software in your report,

13   correct?

14       A.    That's correct.  I don't do that in my

15   reports.  I usually provide that information in

16   deposition.

17       Q.    Well, it's too late for anybody to do

18   anything with it by then, sir.

19            MR. ANGELL:  Counsel, I'll just object to

20   the form; we can probably do without the argumentation.

21       Q.    Fair enough.  And I don't mean that in a

22   negative way, and I apologize for that.

23            Okay.  So at the time you wrote your

24   report, you did know the name and type or version of

25   the software you were using; is that a fair statement?

Page 13

Durand R. Begault , Ph.D. - January 3, 2024

```
1              A.    Yes.
2              Q.    Okay.  Let me just ask a few questions
3         about Exhibit 1.
4                    (EXHIBIT 1 WAS MARKED.)
5              Q.    It may help you -- as I understand it, you
6         focused on the -- here it is.  It's on page 2.  Let me
7         scoot down.  It's the section you were just referring
8         me to, the "Materials Provided."  So the first bullet
9         point -- and by the way, you're welcome to read entire
10        paragraphs or sentences.  If I focus on a few words, it
11        doesn't mean you have to limit yourself to that.  But I
12        am assuming that you reviewed your report before the
13        deposition; is that right?  Did you review your report
14        before this deposition.
15                   (Witness dropped off the Zoom meeting,
16                   and then reconnected.)
17             Q.    (By Ms. Porter)  The first part of the
18        question was a reminder I try to give witnesses that if
19        I'm focusing on just a few words in a sentence or
20        paragraph, of course you are free to read the entire
21        sentence, paragraph, page, whatever you need for
22        context.
23                   Did you review your report in anticipation
24        of this deposition?
25             A.    Yes, I did.
```

Page 14

Durand R. Begault , Ph.D. - January 3, 2024

```
1           Q.    Great.  That will make things faster.

2                 Let's turn to the first bullet point.  And

3      it states -- it's only one sentence, so I'll read it

4      for the record.  "The source material from the body

5      worn camera footage Q1 was edited to focus on the

6      approximate 14 second period just prior and including

7      the shooting, during which time Mr. Sheeler is both

8      visible and audible, and including commands which were

9      given by officers."

10                And just to clarify, I think, when I said

11     "approximate" I was referring to the tilde that you

12     have before the 14.  Do you see that?

13          A.    I do see it.

14          Q.    Okay.  I didn't want you to think I was

15     adding a word.

16          A.    No.  That's proper.  That's what the tilde

17     is for.

18          Q.    And why did you focus on the approximate

19     14 seconds prior to and including the shooting?

20          A.    I believe these are the periods of time

21     which are in some sort of controversy.  I believe this

22     is about the period of time where Mr. Sheeler becomes

23     visible in the body-worn camera of Ms. McArthur.

24     Officer McArthur, I should say.

25          Q.    Okay.  The last few words that I read, the
```

Page 15

Durand R. Begault , Ph.D. - January 3, 2024

1    final clause in that sentence says, "Including commands

2    which were given by officers."  And how many officers

3    were giving commands during that 14-second period?

4        A.    Well, I'm not certain of the number of

5    officers.  I do believe there was an assertation that

6    perhaps more than Officer Eldridge, whose commands I

7    could clearly hear, and Officer McArthur, whose

8    commands I could clearly hear.  I wasn't able to detect

9    any other commands on the McArthur recording.  And

10   based on an analysis that I present in here, they were

11   probably too distant to be picked up by the body-worn

12   camera.

13       Q.    And you're saying the original version of

14   the body cam, you could not hear commands from anyone

15   other than Eldridge and McArthur?

16       A.    In this 14-second period, approximate 14-

17   second period.

18       Q.    All right.  And we are talking about the

19   original source material, correct?  Not your edited

20   version.

21       A.    Yes.  Right.  We are talking about Q1.

22       Q.    Okay.  Did you attempt to determine

23   whether there were other officers giving commands

24   during that 14-second window?

25       A.    I listened.  One characteristic of the

Page 16

Durand R. Begault , Ph.D. - January 3, 2024

1    14-second period is that Ms. McArthur is shouting very

2    loudly, so that's obscuring most other signals that

3    could be detected in the background, particularly

4    speech signals.

5              However, in between her vocalizations,

6    there are some brief moments where it is possible to

7    hear sounds that are proximate to the body-worn camera,

8    and those sounds appeared to be Mr. Sheeler and Officer

9    Eldridge.  And that was confirmed through my acoustic

10   analysis.

11        Q.    Okay.  And apart from the body cam, did

12   you have a sample of Mr. Sheeler's voice?

13        A.    No, I don't have a sample of Mr. Sheeler's

14   voice.

15        Q.    Okay.  Apart from the body cam, did you

16   have a sample of Officer Eldridge's voice?

17        A.    No, I do not.

18        Q.    Apart from the body cam, did you have a

19   sample of anyone else's voice on the scene?

20        A.    No, I don't.

21        Q.    Okay.  Let's scoot to page 3 for a second.

22   It may obviate some of the questions on page 2.  Can

23   you see page 3?

24        A.    I can.

25        Q.    All right.  So I am looking at the very

Page 17

Durand R. Begault , Ph.D. - January 3, 2024

```
1    top, it references Exhibit X3.  Exhibit 3.
2         A.    Yes.
3         Q.    It says, "Exhibit X3 was produced by
4    repeating five times segments of speech extracted from
5    video Exhibit X1."  Does that mean you took a segment
6    and repeated it five times?
7         A.    Yes.
8         Q.    Okay.  I thought so.  I just wanted to be
9    sure.  All right.
10             Now, let's look at Table I.  Was Table I
11   created after you had done the enhancements to the
12   audio in Exhibit 1?
13        A.    Well, it was probably under development
14   through the whole process of analysis, but it was
15   finalized after I had done the enhancements.
16        Q.    And I guess what I'm wondering is the
17   conclusions or perceptions that are identified in Table
18   I, were those based on you listening to and/or watching
19   the enhanced version of the video or the original
20   version of the body cam?
21        A.    Well, as I just testified, both.
22             And by the way, you just reminded me of
23   something.  I do believe I recall in a general sense
24   from a deposition of Officer Eldridge or something in
25   that report, I'm just recalling now that he mentions
```

Page 18

Durand R. Begault , Ph.D. - January 3, 2024

```
1      that he was giving commands.  So I think I should point

2      that out, because that just occurred to me as part of

3      the process here.

4           Q.    And did you read in the other officers'

5      depositions to determine whether they said they were

6      giving commands?

7           A.    I don't recall exactly.  Like I say, I

8      didn't consider that, because I was looking at the

9      sounds that were proximate to the body-worn camera.

10          Q.    Okay.  Do you have a list somewhere of

11     everything that you were provided in this case?

12          A.    Everything that I was provided?  Probably,

13     yes.

14          Q.    Okay.  What would the name of that file

15     folder be, or however you organize things like that?

16          A.    Oh, I don't recall.  Probably a job number

17     or probably something listing when I received

18     materials.

19          Q.    Okay.  But you're not certain -- never

20     mind.  We'll figure it out.

21               Okay, Table I.  So under the heading

22     "Timing Analysis, Transcription," are you with me?

23          A.    No.  Where are you?

24          Q.    "Timing Analysis, Transcription."

25          A.    I'm sorry.  The subtitle.  Yes.  The
```

Page 19

```
 1        bold-faced subtitle.

 2             Q.    Correct.

 3             A.    Yes.

 4             Q.    Okay.  It states, "Table I indicates the

 5        timing of observations of Mr. Sheeler's travel

 6        direction and body positions from the video."  So as I

 7        understand it, are those things that you believe that

 8        you're seeing when you watch the video?

 9             A.    Yes.

10             Q.    What makes you more qualified than members

11        of the jury to watch the video and make observations

12        about travel direction and body positions?

13             A.    Only in the sense that I have notated the

14        timing associated with these things.  I imagine that a

15        juror, had they had the expertise to perform timing

16        analysis and to review individual frames and to be able

17        to then make observations of body direction in those

18        points where those things could be observed, then they

19        might also - in fact, I would suspect that they would -

20        make identical conclusions to the ones that I've made

21        here as far as the video event.

22             Q.    Well, they would make conclusions, anyway,

23        right?  And they are equally able to make conclusions,

24        except for the enhancement part and the timing table, I

25        guess.  Isn't that a true statement?
```

Page 20

1              MR. ANGELL:  Hang on.  Object to the form

2       of the question.

3              Go ahead and answer if you can.

4       A.    So can you repeat your question?  I just

5       wanted to make sure I understand it.

6       Q.    Let me rephrase it.

7              We know that you enhanced the video,

8       right?  And I'll assume that jurors wouldn't have --

9       most jurors wouldn't have that ability.  You mentioned

10      something about the timing.  Help me understand what

11      you did with respect to the timing that a juror

12      couldn't do in terms of following timestamps or

13      whatever.

14      A.    Certainly.  Well, that might be expressed

15      in a couple of ways.  But first we can express it in

16      terms of the exhibits themselves.  So I don't believe a

17      juror would be able to do the zoom-in or the very

18      slight enhancement to the exposure that I made.

19              And then secondarily I provided, in

20      Exhibit X1 a quarter speed version of the video, which

21      I think would be beyond the ability of a layperson.

22              And then also I provided, in the Exhibit

23      X2, individual frames.  And in both X1 and X2 there's a

24      timestamp associated with this data or visual images.

25      And I believe that that would be something that a

                                                    Page 21

1    layperson would not be able to do easily, is to

2    calculate out the data such as timing, or timing until

3    the first shot, for instance.  In other words, having

4    an understanding of how or what duration that these

5    particular events occur.

6                Finally, in doing my analysis, I'm trying

7    to do this in an objective manner, so I think that

8    jurors can be objective.  But of course jurors might be

9    swayed through statements that might otherwise be

10   thought of as a kind of confirmation bias.  So if we

11   tell somebody that, "Oh, a person is walking

12   backwards," right, then it's a little bit like looking

13   up in the clouds and telling somebody, "Hey, I see a

14   horse up in the clouds," when indeed it is truly a

15   noisy signal and it might be interpreted another way.

16   So from that perspective, I'm trying to provide

17   observations that might be less influenced by a

18   singular narrative such as "walking backwards."

19        Q.    Okay.  Other than supposed potential bias

20   or confirmation bias by the jury, let me focus in on

21   the earlier things you mentioned.  I mean, there's

22   nothing -- you don't have any bionic eyes or anything,

23   right?  You don't have better vision than members of

24   the jury, correct?

25        A.    Absolutely.  You're right.

                                                    Page 22

Durand R. Begault , Ph.D. - January 3, 2024

1        Q.    Okay.  So you say, "Well, jurors couldn't

2    zoom in."  But you could zoom in for the jury, right?

3        A.    Well, more accurately I can provide an

4    exhibit which has images that are consistently zoomed

5    in --

6        Q.    Yes.  And that --

7        A.    -- and prepared in such a way that they

8    can be reviewed easily.

9        Q.    Yes.  I'm sorry.  I didn't mean to

10    interrupt.

11        Once you have provided the jury with the

12    zoomed-in video, the jury is equally capable of making

13    so-called observations from what they are seeing,

14    correct?

15        A.    Absolutely.

16        MR. ANGELL:  Object to the form.  Calls

17    for speculation.

18        But go ahead and answer that if you can.

19        Q.    He did.  He said "absolutely."

20        A.    Well, wait.  Maybe we should have it on

21    record so that it's a complete sentence.  Can you

22    restate the question first and then I will try to

23    answer it for you.

24        MS. PORTER:  Court Reporter, could you

25    read the question, please.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

 1              (The record was read as follows:

 2              Question:  "Once you have provided the

 3          jury with the zoomed-in video, the jury is

 4          equally capable of making so-called observations

 5          from what they are seeing, correct?")

 6              MR. ANGELL:  And then the objection, and

 7      you can go ahead and answer.

 8          A.   Well, the jury is capable of making

 9      observations.  If you were to provide the jury with

10      only a limited set of images, for instance, they might

11      provide one kind of observation versus a complete set

12      of images, for instance.  So one has to answer that

13      question by considering the totality of information

14      that's available and the ability to review it in toto.

15          Q.   Okay.  But in terms of the exhibit that

16      you have produced, once shown the exhibit that you have

17      produced that you called X1, I believe, the jury is

18      equally capable of looking at what is happening in that

19      exhibit; isn't that a true statement?

20              MR. ANGELL:  Object to the form.  Calls

21      for speculation.

22              You can answer that if you can.

23          A.   I believe that the jury would need to not

24      only look at Exhibit X1, but they would also --

25          Q.   No, sir, I'm going to interrupt because my

                                          Page 24

Durand R. Begault , Ph.D. - January 3, 2024

```
 1        question is something different.  You need to answer my
 2        question.  Would you like the court reporter to repeat
 3        it?
 4              A.    Yes.
 5                    MR. ANGELL:  Counsel, I would just
 6        indicate that you're not allowing the witness to answer
 7        the question.  Though you may not like his answer, he
 8        is still allowed to answer the question.  He doesn't
 9        need to have it read back to him at this moment.
10                    MS. PORTER:  Well, except he wasn't
11        answering the question.  And you can swing back around
12        and ask him what he wanted to say.  But I'm entitled to
13        an answer to my specific question.
14                    MR. ANGELL:  I disagree, Counsel.
15                    MS. PORTER:  And I would ask the court
16        reporter to read it back.
17                    MR. ANGELL:  You need to allow him to
18        answer the question.  When you cut him off in the
19        middle and say, "You're not answering my question,"
20        what you mean is, "I don't like the answer you're
21        giving me, so I'm going to stop you and ask you to
22        start over again."  You have to allow him to answer the
23        question, and then you can ask a new question or repeat
24        it if you want.
25                    MS. PORTER:  No.  He doesn't like the
```

Page 25

1     question.  And therefore he is expounding on the

2     answer.  And we can always take it up with the judge if

3     it goes that far, which it is unlikely to.  I'm going

4     if ask the court reporter, if she can, to locate the

5     original question.

6                 MR. ANGELL:  Okay.  But I'm telling you

7     we're not going to do that again.  I'm not going to

8     have him sit for a deposition, be interrupted by you

9     during the answer to his questions so that you can

10    redirect the answer to the question.  I'm just telling

11    you, we're not going to do that.

12                MS. PORTER:  Court Reporter, can you

13    locate the original question?

14                (The record was read as follows:

15                Question:  "But in terms of the exhibit

16          that you have produced, once shown the exhibit

17          that you have produced that you called X1, I

18          believe, the jury is equally capable of looking

19          at what is happening in that exhibit; isn't that

20          a true statement?")

21          Q.    Can you please answer?

22          A.    No, because they would need to also

23    examine Exhibits X2 and X3 to be able to then

24    appreciate what's going on in X1.

25          Q.    Okay.  Once shown Exhibits 1, 2, and 3,

                                                    Page 26

1    the jury is equally able to look at those exhibits and

2    make their own observations, correct?

3         A.    That seems to be a fair statement.

4         Q.    Okay.  Thank you.  Let's go back -- we are

5    still on Table I.  Let me just make sure I understand

6    some of the column headings on Table I.  The left-hand

7    column, as I understand, is the timestamp as you placed

8    it on the edited video; is that correct?

9         A.    Yes.  I believe so, yes.  There is a

10   timestamp that refers to the segment that I extracted

11   and analyzed.

12        Q.    Right.  And then the next one seems

13   self-explanatory.  It's just frame numbers, correct?

14        A.    Yes.

15        Q.    Okay.  And then you have, "Time until

16   first shot."  So basically, for example, the first line

17   with data on it is 13.5 seconds until the first shot?

18        A.    I'm sorry.  The first shot occurs at 13.18

19   seconds.

20        Q.    Okay.  Help me understand what the 13.5 is

21   in the third column on the first line that has data in

22   it.  That's what I was asking.

23        A.    Oh, I see.  I'm sorry.  I was looking at

24   the wrong column.

25               Yes, that's the time until the first shot.

Page 27

Durand R. Begault , Ph.D. - January 3, 2024

1    Q.    Yeah, I'm just -- frankly the questions

2    are so obvious you probably figured I was looking

3    somewhere else.  I'm just getting the headings so that

4    we all are on the same page.

5              And then you say, "Video event," that's

6    another way of saying what you perceive you're seeing

7    in the video, correct?

8    A.    That's what I see.

9    Q.    Okay.  Now, "Transcription," is that a

10   complete transcription of everything that you heard

11   during that approximate 14-second period?

12   A.    No.

13   Q.    Okay.  So which portions -- do you have a

14   complete transcription that you did of that approximate

15   14-second period?

16   A.    I don't have a transcription of what

17   Officer McArthur was saying.  It was quite noisy.  And

18   as you can see, there's some indications there of

19   unintelligible.  I was focusing on a complete

20   transcription of what I could detect Mr. Sheeler and

21   Officer Eldridge saying, and so that's what's listed

22   under the column "Transcription."

23   Q.    Okay.  And we will get to this, but later

24   in your report you rendered an opinion that Mr. Sheeler

25   was "not obeying" the officer's commands.  Do you

Page 28

Durand R. Begault , Ph.D. - January 3, 2024

```
1    remember seeing that in your report, I think on page 8?
2         A.    Well, perhaps we should scroll to that so
3    I can see it in context.
4         Q.    We will get to it.
5               Did you make any effort to determine what
6    commands Officer McArthy [sic] was giving to
7    Mr. Sheeler?
8         A.    Officer McArthur?
9         Q.    Yes.
10        A.    What commands?  I don't recall exactly the
11   commands, but it was something like, "Drop it," or
12   something of that sort.  I don't recall exactly.
13        Q.    Okay.  Did you make any effort to
14   transcribe any of Officer McArthy's commands?
15        A.    You are talking about Officer McArthur,
16   right, the woman --
17        Q.    Oh, did I say "McArthy"?  I'm sorry.  I
18   apologize.  Let me rephrase it with the correct name.
19              Did you make any attempt to transcribe
20   what Officer McArthur said to Mr. Sheeler?
21        A.    No.  She was shouting at the top of her
22   lungs, it seemed to me.  That's a -- not a phrase of
23   art, but she was using a very raised voice level.  It's
24   difficult to hear exactly what she was saying, but they
25   sounded like police commands.  But I recall I think you
```

Page 29

1    could hear the words "drop it" or "drop the gun" or

2    something of that sort.  I don't recall.  But I did not

3    transcribe those.  I think that was really your

4    question.

5         Q.    Did you ever see a gun anywhere in the

6    video?

7         A.    No.  Nothing I could identify.  The video

8    is very noisy.  It's very blurry.

9         Q.    Okay.  Now, when Officer McArthur was

10   shouting at the top of her lungs, which I think is a

11   well understood phrase, was that at the same time that

12   you heard Officer Eldridge also giving commands?

13        A.    I will answer that, but first want to make

14   a correction.  I do believe I saw Officer Eldridge's

15   gun at some point, but I didn't see a gun necessarily

16   from Mr. Sheeler.  He was too far away in the distance.

17   So that's a correction to my prior answer.

18        Q.    And when you say --

19        A.    Now your question --

20        Q.    Sorry.  I'll come back to my question.

21   When you say he was too far in the distance, is it your

22   understanding that he did have a gun and you just

23   couldn't see it because he was too far away?

24        A.    You know, I don't recall exactly.  I heard

25   him say something like, "I've got a gun," so I

Page 30

Durand R. Begault , Ph.D. - January 3, 2024

1    transcribed that.  But the facts of the matter, I

2    didn't analyze that.

3          Q.    Okay.

4          A.    And so your original question was did I

5    see a gun, and I wanted to answer you accurately.  So

6    I'm just saying that at first I said, "No, I didn't see

7    a gun," and I was thinking about Mr. Sheeler.  And then

8    I gave an explanation that he is very far in the

9    distance of the photo sensor.

10          And I was able, though, because he is

11    closer in, I think I remember seeing a gun being held

12    by Officer Eldridge towards or at the moment of the

13    shooting or beforehand.  I don't recall exactly on that

14    one, but I wanted to answer you accurately.  So now we

15    can go on to your next question, if you want.

16          Q.    I'll ask it, and I will go ahead and reask

17    that one.  And I do appreciate the clarification on

18    that.

19          A.    Certainly.

20          Q.    Did you hear Officer McArthur shouting

21    commands at the same time that Officer Eldridge was

22    shouting commands?

23          A.    I believe the way I went about doing this

24    was I felt that when Officer McArthur was shouting, it

25    was difficult to hear anything else on the recording,

Page 31

Durand R. Begault , Ph.D. - January 3, 2024

1    so I was primarily focusing on intervals where she is

2    not shouting.  And those were the intervals that I was

3    able to transcribe.

4        Q.    At some point did you do something to --

5    I'm trying to remember how you worded it, but do

6    something to try to minimize the loudness of her voice,

7    Officer McArthur's?

8        A.    I did.  You mentioned that it was in the

9    report, and it would probably be good to reference

10   exactly the way I said it in the report and then follow

11   up on that.  So that would be -- stand by.

12       Q.    I'm going to guess you'll look at page 2,

13   third bullet point.

14       A.    Yes.  You've got it exactly.  That's what

15   I did.

16       Q.    Okay.  So let's go ahead and read that for

17   the record.  It states, "The audio portion of the video

18   was enhanced to reduce background noise and increase

19   the intelligibility of speech of Mr. Sheeler while

20   reducing the level of Officer McArthur's voice."

21       A.    Yes.

22       Q.    And once you did that --

23       A.    Yes.

24       Q.    I was just reading it for the record,

25   since we hadn't identified it.

Page 32

1              Once you performed that task, were you

2      able to determine whether Officer McArthur and Officer

3      Eldridge had been shouting commands at the same time?

4              A.    I think I answered that earlier, that I

5      was focusing on only those moments where I could

6      clearly hear Mr. Sheeler or Officer Eldridge.  This

7      third bullet, the enhancement "to reduce background

8      noise and increase intelligibility of speech" refers

9      actually to a minor spectral enhancement whereby the

10     frequencies below speech are removed.  So it's a kind

11     of filtering, if you will.  It's a very basic kind of

12     filtering.  Speech typically doesn't extend below 200

13     hertz, and this was an outdoor recording and there was

14     a fair amount of background noise.  So I believe what

15     the third bullet was referring to specifically there --

16     I apologize for that, I put you on mute.  So, "The

17     audio portion of the video was enhanced to reduce the

18     background noise," that's referring to the filtering I

19     was referring to there.  And then "reducing the level

20     of Officer McArthur's voice" was a process of

21     attenuating it relative to the intervals where she

22     wasn't talking or giving commands.

23              Q.    Oh, so it did not reduce the level of her

24     voice, then?

25              A.    No, it did.

                                                    Page 33

1        Q.    All right.  All right.  I'm sorry to be

2    dense on this, but you were talking about when she

3    wasn't speaking.  I guess what I want to know, in

4    layperson's terms, is were you able to reduce the level

5    when she was speaking so that you could hear Officer

6    Eldridge better?

7        A.    And the answer is that wasn't what I did

8    specifically.  I was mostly focusing -- if I recall

9    correctly, I wasn't reducing her to hear -- well, I

10   might have tried to reduce her without reducing

11   Mr. Eldridge, or Officer Eldridge.  But that's

12   difficult to do because of the overlap of speech

13   frequencies.  So again, when I was producing my report

14   and doing the transcription I was focusing on those

15   moments where Officer McArthur's voice was not masking

16   - and that's the technical term - the speech of other

17   talkers.

18       Q.    When you say you might have done that, do

19   you mean you might have and you just can't recall, or

20   you mean that's something additional you could have

21   done but you didn't?

22       A.    No, I don't mean the latter part.  I think

23   I meant the former part of what you said, if I

24   understand you correctly.

25       Q.    Okay.  So is there some documentation of

Page 34

Durand R. Begault , Ph.D. - January 3, 2024

1    that attempt?

2         A.    It's self-evident through the exhibit

3    itself.  And I'd be happy to relate to you exactly what

4    those specifics are, if they are of value to you.  But

5    they are very straightforward kinds of processes.

6         Q.    Let's look at -- go back to Table I.

7         A.    Excuse me.  I'm having a little problem

8    with my Zoom.  Okay.  There I've got it.  Give me one

9    moment to get my views here.  Okay.  Great.  I'm back.

10   Yes.  Go ahead.

11        Q.    Okay.  All right.  So I think we were

12   looking at the column that was labeled "Transcription."

13   Let me ask you this:  How did you decide which words to

14   include in the transcription and which ones not to?

15        A.    I included those where, as I just told

16   you, I was looking for those times where Officer

17   McArthur's voice wasn't masking the voice of

18   Mr. Sheeler or Officer Eldridge.  And then as you can

19   see, I did transcribe some things phonetically, because

20   I wasn't sure exactly what was being said.  And then in

21   some cases I just indicated that there was some

22   unintelligible statement.

23        Q.    Okay.  Did you include all of the words

24   that you either could hear or could tell had been

25   spoken, even if they were unintelligible, during the

Page 35

Durand R. Begault , Ph.D. - January 3, 2024

```
 1    periods when Officer McArthur was not masking the
 2    voices?
 3         A.    I believe I did.
 4         Q.    Okay.  All right.  Let me just ask you for
 5    a couple of elaborations in Table I.  So first, I think
 6    I know these abbreviations, I mean they say right
 7    there, "OE" equals Officer Eldridge, et cetera.  That
 8    was a nice key.  I appreciate it.
 9         A.    Actually the key is inaccurate because the
10    way I described it was to show "E" and "S" as opposed
11    to "OE" and "S," so my apologies for that.
12         Q.    Wait a minute.  I'm sorry to be dense.
13    You have "S" as Sheeler and "OE" as Officer Eldridge.
14    You didn't actually mention Officer McArthur, so I
15    don't think she is mentioned -- no, she is.  We will
16    get to that.  Never mind.
17              What is it that's off on this key?
18         A.    Oh, it just says "E" as opposed to "OE."
19    The key says "OE."  I should have written "OE" in the
20    transcription.
21         Q.    It looks like "OE."
22              Oh, I've got you.  You mean in the
23    transcription.  Okay.  Got it.
24              Okay, let's go to 6.7 - 7.2 and you have
25    the frame and how long before the shot.  And then you
```

Page 36

Durand R. Begault , Ph.D. - January 3, 2024

1    say, "One arm raised upwards diagonally."  Which arm?

2          A.    I don't recall.  I'd have to look at the

3    individual frames from X3.  It might have been the

4    right arm, might have been the left arm.  I don't

5    recall exactly.

6          Q.    Okay.

7          A.    It could have been -- and it might have

8    been even one or the other arm.  I'm not sure which

9    arm.  I didn't note that.

10          Q.    So it's not necessarily the same arm when

11    you say "one arm"?  Is that what you mean?

12          A.    The phrase has to be read literally.

13          Q.    "One arm."  Yeah, I was trying to -- was

14    there a reason you didn't mention which arm in a

15    particular line was raised diagonally?

16          A.    No, there was no particular reason.

17          Q.    Okay.  Just so that I can get a sense, I

18    realize this is not a video deposition, but can you

19    raise your arm to what you would characterize as

20    "upwards diagonally"?

21          A.    Well, if you want me to describe it

22    verbally for the transcript --

23          Q.    I want to see it, and then I'll ask you to

24    describe it.

25          A.    You want to see it?

Page 37

Durand R. Begault , Ph.D. - January 3, 2024

1          Q.    Yes.   Just so I can see what you're

2     talking about, because obviously it's not horizontal so

3     there must be something, some range.

4          A.    Well, I can only do that if you -- if we

5     clarify that you're not asking me to imitate the exact

6     angle that I saw Mr. Sheeler's arm at.  If that's what

7     you are trying to do, I would have to look at the video

8     image of Mr. Sheeler.  And even then, I would just be

9     doing an approximation, right?

10          But otherwise, if you're just asking me to

11     extend my arm upwards it could be this, could be this,

12     could be this.  You know?  I don't know.  But when I

13     saw Mr. Sheeler, it seemed to be up higher.  But maybe

14     not.  I haven't analyzed the specific angle, and it's

15     probably very noisy in the recording -- it is noisy in

16     the recording, I should say, to make a definite

17     determination of that.  So I'm not sure what the

18     purpose of your question is and I hope I answered it

19     correctly.

20          Q.    Well, you answered it.  So that's all I

21     wanted was to see kind of the range of how you would

22     describe "upwards diagonally."

23          A.    I mean, I have arthritis so it could be

24     also that my arm isn't able to do what somebody else's

25     arm might be able to do.

                                              Page 38

Durand R. Begault , Ph.D. - January 3, 2024

1     Q.    Oh, I apologize.  I hope you didn't injure

2     anything while you were showing that.

3          A.    I didn't injure anything, but I just

4     wanted to point that out.

5          Q.    Yeah, that's a fair statement.

6               Okay.  So now let's look at 7 -- well,

7     actually, I'm sorry, let's go back up a little bit in

8     Table I.  We have the -- so we've got the 0.8 and the

9     "Video Event" says, "Sheeler fully visible in frame,

10    walking towards Officer Eldridge."  And then the lines

11    below that are blank.  Can you explain what the blank

12    lines signify?

13         A.    Yes.  So as you can see, if you move to

14    the right, to the column called "Transcription," you

15    can see that I provided a transcription in connection

16    with those timings.  But I didn't provide a description

17    of the video event.

18         Q.    Why not?

19         A.    I guess I would have to know for each

20    specific instance we're talking about.  Probably what

21    is happening at 10.2 until the first shot is very

22    similar to what's happening at 10.8 prior to the first

23    shot as a Video Event.

24         Q.    And that's originally what I thought, was

25    that it was similar.  But then I noticed that you had

Page 39

```
 1    duplicate line entries on the lines starting with 6.7

 2    and 7.33.  So do you think it's like a ditto?  Do you

 3    think the 3.43 line and the 5.1 lines would basically

 4    be just sort of dittos of the 0.8 line?

 5         A.    Not necessarily.  I simply chose not to

 6    make any comment on what was happening in the video

 7    during those times.  I was rather commenting on what I

 8    heard.

 9         Q.    Okay.  All right.  Let's see.  Now I'm

10    continuing in the Video Event column in the line that

11    starts with 8.1.  It says, "Legs spread apart."  Do you

12    see that?

13         A.    I do.

14         Q.    Okay.  Now, what did you mean when you

15    stated, "Legs spread apart"?

16         A.    It's hard for me to elaborate on that much

17    more than it seemed like his legs were farther apart

18    than what would be associated with a walking stance.

19    Probably could be clarified if you'd like to look at

20    Exhibit X3 and look at the frame 243.

21         Q.    And do you consider yourself an expert on

22    gait analysis?

23         A.    I'm sorry, on date analysis?

24         Q.    Gait, G-A-I-T, analysis.

25         A.    Oh, gait analysis.  No, I do not consider
```

Page 40

1     myself a gait analysis expert, by any means.

2          Q.   Okay.  So when you are talking about

3     "spread apart," you're talking about width-wise?

4          A.   Yes.  It was an impression I got from

5     looking at that particular frame.

6          Q.   All right.  Then you -- so then the very

7     next frame, which is 8.27 -- so let me ask you this:

8     Is that basically 0.1 second or 0.17 seconds after the

9     previous frame?

10         A.   Right.  To correct your question, you said

11    "and then in the next frame," and it's not really the

12    next frame.  It's five frames later.

13         Q.   Oh, yeah, I do see that.  Okay.  But in

14    terms of the time -- and you're right, I will not use

15    the word "frame."  But in terms of the difference in

16    time, between the line that begins 8.1 and the line

17    that begins 8.27, are we talking 0.17 seconds?

18         A.   We are talking about 170 milliseconds.

19         Q.   All right.  So basically less than

20    two-tenths of a second, correct?

21         A.   That's correct.

22         Q.   Okay.  So when he continued walking

23    towards OE, in the line that says 8.27, was he like

24    waddling or something?  He was walking funny with his

25    legs spread out?  Is that what you're trying to convey?

                                        Page 41

Durand R. Begault , Ph.D. - January 3, 2024

```
 1              A.     My -- these are impressions I have from
 2       specific frames.  But to answer the question you just
 3       asked, I am not going to call it waddling at all.  But
 4       I think I used, in some part of my report -- let me
 5       state it so I can answer your question.  Stand by.
 6                     Yeah, on page 8, second paragraph, I
 7       stated that the movement of his legs, body, and arms
 8       seems to be inconsistent, erratic, or changing over
 9       time based on the available imagery.  That's what I
10       said in my report.
11              Q.     Yeah.  And --
12              A.     And I think this is an example of that.
13              Q.     Sorry.  We will get to page 8, so I
14       appreciate your pointing that out now.  Okay.
15                     Now let's -- at 9.23, which I think you've
16       indicated is frame 277, and 4.4, you state what under
17       Video Event?
18              A.     Do you want me to read what it says?
19              Q.     Yes.
20              A.     "Possible change in facing direction."
21       And there's a typo where I wrote "diraction."  I meant
22       to spell it as D-I-R-E-C-T-I-O-N.  My apology.
23              Q.     I don't care much about the typo, although
24       briefly when I saw it I thought it was potentially
25       "distraction" or something.  Whatever.
```

Page 42

Durand R. Begault , Ph.D. - January 3, 2024

1          But so that we have a clean record, the

2     Video Event at 9.23 states, "Possible change in facing

3     direction."  Correct?

4          A.    Yes.  With the last word spelled with an

5     "E" instead of an "A."

6          Q.    And I'm not hung up on the typo.  We all

7     make them.

8          All right.  Can you elaborate on what you

9     meant when you wrote that?

10          A.    Well, generally speaking it seems like he

11     is changing the direction he is walking.

12          Q.    Okay.  Now is he still moving in the

13     same -- moving the same direction and just facing a

14     different direction, or is he now diverging off and

15     walking somewhere else?

16          A.    It's very difficult to tell.  It's a very

17     noisy video.  Again, distance is difficult to determine

18     for an object that far away in the photo sensor lens.

19     So I believe this is a point -- whereas prior he might

20     be facing the right side of the frame or the general

21     vicinity, now here I'm not sure exactly where he was

22     looking but it seemed to be a change relative to the

23     frames before that.  And so I wrote, "Possible change

24     in facing direction," because again, there's a fair

25     amount of noise and blur in here.

Page 43

Durand R. Begault , Ph.D. - January 3, 2024

```
1          Q.    Okay.  Now, at 9.23, you wrote under Video
2    Event, "Begins walking sideways or backwards towards
3    Officer Eldridge, facing Officer McArthy."
4          A.    McArthur.
5          Q.    Why do I keep saying "McArthy"?  It's
6    because I know somebody named McArthy.  Let me clean up
7    the record on this.
8                At 9.73 under Video Event it states,
9    "Begins walking sideways or backwards towards Officer
10   Eldridge, facing Officer McArthur."  Is that correct?
11         A.    Yes.  Again, it's difficult to --
12         Q.    Hold on.  I haven't asked a question yet.
13   All I asked is whether I read it correctly.  I'll get
14   to the questions, okay?
15         A.    Oh, wait a minute.  I'm sorry.  Your
16   question was simply did you read that correctly?
17         Q.    Yes.  That's how I have been doing it.
18   I've been just establishing in the record what the
19   quote is, and then asking questions.  And I apologize
20   if I didn't make that clear.
21               That is what you wrote under Video Event,
22   correct?
23         A.    Correct.
24         Q.    And that was what you perceived when you
25   watched the enhanced video that you created, correct?
```

Page 44

Durand R. Begault , Ph.D. - January 3, 2024

1          A.    It is what I perceived by looking at

2     Exhibits X1 and X2.

3          Q.    Okay.  Now, at 10.87, you have under Video

4     Event -- what you wrote under Video Event is, "One

5     raised upwards diagonally."  Is that what you wrote

6     under Video Event?

7          A.    Yes, I did.

8          Q.    Okay.  Now, is that the same arm motion

9     that you had observed at line 6.7?

10               Let me rephrase the question.

11               At any time between lines 6.7 and 10.87,

12    had Mr. Sheeler not had one arm raised upwards

13    diagonally?

14         A.    Yeah.  I believe there was some moments

15    where one arm -- it was not raised up continuously, no.

16    No.  It was up sometimes, it was down sometimes, I

17    think, if I recall correctly.

18         Q.    And you made no attempt to document any of

19    those changes; for example, if it came down, when that

20    would have occurred.  Is that true?

21         A.    Well, that would have been impossible to

22    do thoroughly because, as I have mentioned before, the

23    video is very noisy.  At times the imagery is

24    completely obscured by flashlight.  There's a fair

25    amount of blur.  There's even motion blur because

Page 45

Durand R. Begault , Ph.D. - January 3, 2024

1    sometimes the motion of a person can be faster than the

2    frame rate, so that can cause blurring in the image.

3    So I did not note every moment where Mr. Sheeler's arm

4    was down.  That was the essence of your question.

5            Q.    And you did not note what you perceived

6    Mr. Sheeler was doing at the moment of the first shot,

7    correct?

8            A.    No.  What I can tell you, though, is --

9            Q.    Hold on.  Hold on, sir.  My question is

10   simple.  In this report, you did not note in this

11   report what Mr. Sheeler was doing at the time of the

12   first shot; is that correct?

13           A.    That is correct.  I believe at that

14   moment --

15           Q.    That's all my question is.  That's my

16   question, sir.  I just want to know if it's in your

17   report.  And let me direct you --

18           A.    Okay.  Well, question.  So just to make

19   sure I understood your question, I didn't note what

20   Mr. Sheeler was doing at the moment he was shot; is

21   that correct?

22           Q.    Right.

23           A.    At the moment he was shot.  That's fine.

24   Yes, that's true.  I did not note what Mr. Sheeler was

25   doing at the instant in which he was shot,

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

Durand R. Begault , Ph.D. - January 3, 2024

1    corresponding to frame number 408 or 13.18 seconds.

2        Q.    Okay.  All right.  Let's just take a quick

3    look at the next paragraph, the one that follows Table

4    I.  And just for the record, I'll read it.  Starting

5    around 9.23 seconds (4.4 seconds prior to the fires

6    shot), Exhibit X1 shows that Mr. Sheeler changes the

7    direction he is facing several times."

8            Now, let me stop there, and you are

9    welcome to read to yourself the rest of the paragraph

10   if you need.  But I want to ask what you meant when you

11   said "the direction he is facing."  Do you mean the

12   direction that his face is turned or do you mean the

13   direction that his body is turned?

14       A.    I don't believe Mr. Sheeler's face is

15   visible on this or in this video.  So when I use the

16   word "facing," I'm talking about my general impression

17   of his orientation of his body.

18       Q.    Okay.  Thank you.  Now, after that

19   semicolon, you state, "It is ambiguous if at any point

20   he is 'walking backwards' in the same direction he was

21   walking forward previously."  And when you say it is

22   ambiguous, are you saying that it would not be

23   unreasonable for a jury to conclude that at some point

24   he was walking backwards?

25       A.    I think what a trier of fact would want to

Page 47

Durand R. Begault , Ph.D. - January 3, 2024

```
 1      do is balance the likelihood of one explanation versus
 2      another.  So in this case, the word "ambiguity" infers
 3      the fact that there's equal likelihood for either
 4      explanation.
 5          Q.    So it's not necessarily unreasonable if a
 6      jury concludes that at some point he was walking
 7      backwards in the same direction he was walking forward
 8      previously; is that a fair statement?
 9          A.    You have not characterized my answer
10      previously properly.  What I was --
11          Q.    Well, are you --
12          A.    May I answer?
13          Q.    Yes.
14          A.    Okay.  So what a jury ought to conclude,
15      based on their vision -- not "ought to conclude."  I
16      believe a jury would conclude that it would be
17      ambiguous if he is walking backwards in the same
18      direction that he was walking forwards, as the sentence
19      says here.  So ambiguity, I would think, is what a jury
20      should conclude.
21              I can't go into the mind of the juror.  I
22      can only tell you what I have seen.  And I just gave
23      you an answer that says that it's equally -- it's
24      ambiguous, infers the fact that either explanation is
25      equally likely.  So a reasonable conclusion would be we
```

Page 48

Durand R. Begault , Ph.D. - January 3, 2024

1    can't tell.

2          Q.    You're saying it's 50/50 and no reasonable

3    juror could think it was 51 percent walking backwards?

4    Is that what you are telling me?

5                MR. ANGELL:  Objection.  That misstates

6    his testimony.

7                But go ahead and answer if you can.

8          Q.    I'm asking if that is the essence of your

9    testimony.

10         A.    Absolutely not.  My testimony is specific

11   towards - and, you know, we are talking about what we

12   have been discussing the last minute or two - is

13   specific about these sentences here.  And this has to

14   do with whether or not walking backwards was in the

15   same direction that he was walking forward previously.

16         Q.    While you were watching Exhibit 1, you

17   never saw Mr. Sheeler running, correct?

18         A.    I did not do a specific gait analysis of

19   his rate of speed.  Running is also, I guess, a kind of

20   ambiguous -- not ambiguous but, you know, it requires

21   some definition.  So I don't know.  I mean, if you're

22   saying something other than a normal walking speed,

23   that might be different for different people.  Again, I

24   didn't analyze how many -- you know, what was the

25   distance that he covered in what period of time.  I

Page 49

1    didn't do that analysis and then try to relate that to

2    let's say the average human walking speed versus a fast

3    walking speed versus a running speed.  It's -- you

4    know, so I can't answer your question, really.

5         Q.    Okay.  And you would not be qualified to

6    offer a gait analysis, correct?

7         A.    That's not necessarily true.  I can

8    analyze where in terms of timing based on references in

9    a video.  If I can estimate the distance that somebody

10   has traversed or an automobile or anything through

11   associating the position of an object in one frame to

12   another frame and then looking at the lapsed time, and

13   then based on maybe some assumptions about, you know,

14   the vector of travel, then one can relate that to

15   average speeds and be able to determine let's say in a

16   kind of crude way.  That's something I can do.  I have

17   looked at that sort of thing.

18        Q.    But you did not do any such analysis in

19   this case, correct?

20        A.    No, I did not.

21        Q.    Okay.  At any time while you were watching

22   Exhibit 1, did you notice -- well, actually, strike

23   that.

24             In any of the time that you've ever

25   watched video over your entire career, have you ever

Page 50

1    seen anybody's knees bend -- I'm trying to think how to

2    word this.  In all the videos you have ever watched,

3    knees only bend one way.  Is that something you've

4    observed?

5            A.    I'm having a hard time answering that

6    question.

7            Q.    Okay.

8            A.    I mean, do you want me to tell you why I'm

9    having a problem answering that question?

10           Q.    No.  If you are having a hard time

11   answering it, then it becomes immaterial.  So I'm going

12   to scoot down to page 4.

13           A.    Specifically I think your question was

14   more nuanced.  I think you were asking me in all the

15   videos I have ever seen, and then there was another

16   part to your question that made it difficult to answer.

17   So I just wanted to make that clear.

18           Q.    Okay.  And like I said, it's immaterial to

19   me why a person can't answer.

20           A.    I mean, yes.

21           Q.    Let's turn to page 4.

22           A.    Okay.

23           Q.    And let me see if there was a preface.

24   Okay.  Just so that you have a chance to look at the

25   preface.  It articulates how you are describing Figure

Page 51

Durand R. Begault , Ph.D. - January 3, 2024

1        1 at the bottom of page 3.  Do you see that?

2            A.    I do.

3            Q.    Okay.  I'm going to scoot down here and I

4        want to make sure the abbreviations are on the same

5        page.  What is the "HMS" lettering?

6            A.    That's hours, minutes, and seconds.

7            Q.    All right.  Like I said, some of these are

8        just obvious but -- and then the "FR" is frame?

9            A.    Yes.

10           Q.    Okay.  So if I'm reading Figure 1

11       correctly, you're showing -- let's see, how did you

12       call it?  You said on page 3, "Figure 1 summarizes a

13       portion of those video frames that show Mr. Sheeler's

14       arm raised up diagonally and an example of the spread

15       leg position, over a time period of about 7 to 5.5

16       seconds prior to the first shot."

17               So now let me go back.  And then you've

18       got the reference after that.  Let me go to this Figure

19       1 here.  Okay.  So we are looking -- for example, I'm

20       looking at frame 204, and I guess your figure 1 has

21       204, 205, 235, 236, 237, and 244.  Let me start at the

22       back one, first of all.  What do you perceive from

23       frame 244?  What do you believe that represents, in

24       your perception?

25           A.    In my perception I see a raised leg and I

                                                    Page 52

```
 1   see a raised arm.  And it appears to be one arm that's
 2   raised.
 3           Q.    Okay.  When you say a raised leg in 244?
 4           A.    No.  I said 204.  I think you said the top
 5   left, but you used different words.  So why don't you
 6   tell me which frame you're referring to and then I'll
 7   tell you what I perceive.
 8           Q.    I thought I said let's start at the bottom,
 9   but I'm brain dead half the time so I'm looking at 244.
10           A.    Oh, 244.
11           Q.    Yes.
12           A.    Okay.  We are looking at 244.
13           Q.    What is your perception of what you
14   perceive in frame 244?
15           A.    My perception of that is that it appears
16   that his legs are spread out.
17           Q.    And is he moving forward at that point?
18   Is he moving?
19           A.    Likely not.
20           Q.    Is he moving or standing?
21           A.    Likely not.  This might be part of what I
22   was talking about erratic movement.  There might have
23   been movement forward, there might -- it's impossible
24   to tell because we are talking about one-thirtieth of a
25   second here.  So we are taking a single clip and we can
```

Page 53

Durand R. Begault , Ph.D. - January 3, 2024

1    observe that his legs are spread, but you can't say

2    anything about what he's doing at this point.

3        Q.    And you can't tell which way his head is

4    facing; is that true?

5        A.    Well, if we look at 237, and you look at

6    the legs there and it does seem he is moving.  I guess

7    with the way the arm is and the way that the leg

8    appears to be bent, he is probably moving to the right

9    side of the image in more or less that direction,

10   although not in a straight line.  And then what's

11   happening here just a few seconds -- not seconds, but

12   I'd say 230 milliseconds later, his arm is still

13   raised.  I don't know what his head is doing, it's too

14   hard to tell because it's too blurry.  But obviously,

15   unlike the prior slides which seem to be a little more

16   consistent from, you know, the perspective of somebody

17   walking in a direction towards the right side of the

18   frame, he seems to be now possibly beginning to walk

19   forwards into the frame.  But again, it is hard to tell

20   a direction from a single image.  So all I know is that

21   I see his legs are spread and his arm is up.

22       Q.    But it is your understanding that he is

23   walking at that point; is that a fair statement?

24       A.    No, not necessarily.  I don't know.  I

25   mean, you'd have to look at the whole thing, you know.

Page 54

1    Walking, stopping, twirling, gesticulating.  It's

2    impossible to know from a single frame.

3         Q.    All right.  Let's look at frames 236 and

4    237.  Is it your perception that he only has one arm up

5    and not his right arm also?

6         A.    I don't see more than one arm that appears

7    to be raised.

8         Q.    So that is your perception, correct, that

9    he only has one arm up and that his right arm is not

10   either to the side or up?  Is that your testimony?

11        A.    Yeah.  My impression, from looking at this,

12   seems to be that there's a left arm that's raised.  You

13   can look back at 204 and 205 to give it some context.

14   But, you know, it's possible to, because this is so

15   blurry, to maybe say that it was the opposite arm

16   raised.  It does seem to be one arm that's raised,

17   though, that's for sure.

18        Q.    Do you see any ambiguity as to whether his

19   right arm or I guess I'm going to -- let me do this,

20   just to avoid left, right, front, back, things like

21   that.  With respect to 236, do you believe there is any

22   ambiguity as to whether both arms were in at least a

23   horizontal position?

24        A.    All I can see with frame 236 is it appears

25   the left arm is raised.

Page 55

1          Q.     And with 237 do you rule out any

2     possibility that he's got both arms at least horizontal

3     in 237?

4          A.     Well, if we take the composite 235, 236,

5     237, which all add up to a period of about a hundred

6     milliseconds, it seems likely that it would be the same

7     arm, and it would seem to be the same configuration.

8     And it appears to me that a left arm is up.

9          Q.     And what I'm asking you is whether you are

10    ruling out, one-hundred percent, that his right arm is

11    also in at least a horizontal position.  Are you ruling

12    it out one-hundred percent?

13         A.     And what do you mean by "a horizontal

14    position"?

15         Q.     At least horizontal to the shoulder, at

16    minimum.  I'm not necessarily saying up here, but at

17    least horizontal to the shoulder.  Are you ruling that

18    out in frames 236 and 237 one-hundred percent?

19         A.     It seems like that would be my best

20    estimate.  That would be the highest likelihood.

21    Because if you take a look at where the top of the

22    shoulder might be, particularly in 236 and 237, the

23    angle seems down relative to what you were trying to

24    show me with your arm raised.

25         Q.     Let me show you this one, then.  I have

                                               Page 56

Durand R. Begault , Ph.D. - January 3, 2024

 1     shown you another one.

 2          A.    You are a very miniature image on my Zoom

 3     screen because I have the exhibit up.

 4          Q.    Okay.

 5          A.    So let me bring you open so that now I can

 6     see what you are doing with your arm.

 7          Q.    Okay.

 8          A.    And then I'll try to --

 9          Q.    Before, I did it straight out like a

10     clothesline, and now I'm doing one where -- can you see

11     now where my arm goes downward from the shoulder but

12     the hand is still outward?

13          A.    No, I can't see that.  Hang on.  I've got

14     to change my view here, because your name is in front

15     of your hand in the way the Zoom is showing.

16          Q.    That's weird.  On mine it's the other

17     side.  What if I did this?  On mine it's the opposite,

18     but what if I did this?

19          A.    Now I can't see your hand.  So stand by.

20     Sorry.  I'm going to do my best here.  Side by side,

21     speaker.  I'm trying to blow it up.

22               Okay.  So now I've got you full size on my

23     screen.

24          Q.    Oh, that's not a good thing.  But all

25     right.  Initially, and I realize again this is not a

Page 57

1    video, but initially I was showing you what I kind of

2    characterized as a clothesline type thing, the entire

3    arm is straight out from the shoulder.  And you pointed

4    out, "Well, no, it seems to be more of a downward angle

5    than that," or whatever words you used.  And now I'm

6    showing you another angle that would be downward.  Are

7    you ruling out the possibility of the arm being at a

8    downward angle but the hand being out?

9         A.    I can't see the hand.  If you are talking

10   about what would be in the video view -- oh, there we

11   go.  That would be your hand.  I can't see his hand.

12   If you are referring to your right hand as we just saw

13   on the video there, yeah.  I can't see his hand.

14        Q.    Okay.  So you are ruling it out one-

15   hundred percent?  Is that what you're saying?

16        A.    I'm ruling out that somebody could see his

17   hand.

18        Q.    So you are saying no reasonable jury could

19   believe that they think his hand is out?  Is that what

20   you're saying?

21        A.    Based on these images, no.  A reasonable

22   person could only conclude that these are very noisy

23   images.

24        Q.    Okay.

25        A.    They would be able to reasonably conclude

Veritext Legal Solutions

calendar-utah@veritext.com 801-746-5080

Durand R. Begault , Ph.D. - January 3, 2024

1     that the left arm most likely is up, but that's about

2     it.

3          Q.    Okay.  All right.  Did you do any distance

4     calculations yourself in this case?

5          A.    Yes, I did.

6          Q.    Okay.  So maybe we will get to those.

7     Were you provided any distance calculations?

8          A.    Yes.  You know what?  I'm going to ask for

9     a restroom break.  May I take a break?  It's been an

10    hour and a half.

11         Q.    Of course.

12         A.    So can we come back to this in five

13    minutes?

14              MR. ANGELL:  Sounds great.  Let's take ten

15    and we will be back in ten minutes.  That will work.

16              (Break taken from 11:28 to 11:39 a.m.)

17         Q.    Let me go back and ask you something that

18    was -- let's see.  All right.  I have scrolled back to

19    Table I on page --

20         A.    Sorry.  Excuse me one moment.  Give me one

21    moment.  I have an issue with my audio.  Let me fix it.

22    Sorry.  You would think I would not have issues with my

23    audio, but I do.

24              Okay.  Perfect.  I'm back.  Sorry.  I

25    apologize.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

 1          Q.    Okay.  I just want to double check
 2     something.  I have scrolled back to page 3 of your
 3     report and I'm looking at Table I.  And there is a line
 4     that begins at timestamp 9.73.  Do you see that line?
 5          A.    Yes.
 6          Q.    Okay.  And we talked earlier that on that
 7     line you wrote, "Begins walking sideways or backwards
 8     towards Officer Eldridge, facing Officer McArthur."
 9     When you used "facing" in that phrase, did you mean
10     facing as in his head was facing Officer McArthur or
11     the body?
12          A.    The body.
13          Q.    Okay.
14          A.    We could look at frame 229, if you like.
15          Q.    Is it in your report?
16          A.    Yes.
17          Q.    Okay.  What page?  Help me.
18          A.    Well, no, I mention it here and it's part
19     of Exhibit X2.
20          Q.    Okay.
21          A.    The frames --
22          Q.    All right.
23          A.    I'm sorry.  I just meant to say that if
24     you wanted to have a very accurate answer to your
25     question, we could take a look at the frame itself and

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    we could see.  But I'm pretty certain that this is

2    consistent with what I answered earlier, which is it's

3    the position of the body.

4         Q.    Okay.  So you don't have a recollection,

5    absent going back and looking at the frame; is that a

6    fair statement?

7         A.    No.

8         Q.    Okay.

9         A.    I just corrected myself.  I didn't really

10   correct myself, I just clarified that when I use the

11   word "facing," you can't see his face specifically, so

12   it's contextual.  It appears that his body is facing in

13   the direction of Officer McArthur.

14        Q.    All right.  Thank you.  Was there a reason

15   that you did not include frame 292 or any frame between

16   292 and 326 -- actually, I may have misstated that.

17   Was there a reason you didn't include frame 292 or 293

18   in the images included in your report?

19        A.    Well, those images are part of my exhibit.

20        Q.    Right.  But the same is true of the other

21   images that are in your report, correct?

22        A.    Oh, that's correct.  However, there are

23   images in Exhibit X2 that are consistent with things

24   I'm saying.  I just didn't include them all because I

25   figured by including the exhibit, you know, if you

Page 61

Durand R. Begault , Ph.D. - January 3, 2024

1    needed other examples of, for instance -- well, other

2    examples, period, right?  For instance, different

3    positions of Mr. Sheeler, then, you know, there are

4    other things I could point you to.

5         Q.    Yeah.  I'm just wondering what your

6    thought process was in which images from the exhibit

7    you chose to include in the report and which images

8    from the exhibit you elected not to include in the

9    report.  Was there any particular thought process?

10        A.    Yes.  The thought process is this:  When I

11   include an exhibit, then that is, in essence,

12   appendices, if you will.  It is part of the report, and

13   it is mentioned as part of the report.  And for the

14   sake of making my point, I didn't feel it was necessary

15   to show every frame in the report itself, but one could

16   refer back to other examples where, for instance, it

17   documents different positions of Mr. Sheeler.

18        Q.    Did you include in your report any still

19   shots of Mr. Sheeler walking sideways or backwards

20   towards Officer Eldridge?

21        A.    Let me think.

22        Q.    You're welcome to leaf through your

23   eight-page report, if you would need to.

24        A.    Well, again, sometimes it's not clear

25   which direction he's moving, and I tried to show some

Page 62

1    of those things.  You know, we don't know if he is even

2    walking or if he is stationary.  For example, on page

3    4, frame 244, we had discussed earlier something that

4    was referred to as a sort of spread-legged position.

5    That doesn't necessarily seem to be walking, for

6    instance.  Also, if you would turn to page 8, you can

7    see some examples, like frame 380, where he could be

8    walking forwards, backwards, it's unclear.  Frame 279,

9    it's really difficult to tell what direction he's

10    moving there.  So yeah, so there's some examples there.

11    But I didn't compile a series of frames in the report

12    itself showing "backwards walking," quote/unquote.

13        Q.    Let's go to page 5 of your report.  There

14    is a subsection with the bold heading "Voice

15    Discrimination Analysis."  Let's see.  Okay.  In the

16    second paragraph you state, "Recording Q1 contains

17    multiple officers' voices and the voice of

18    Mr. Sheeler."  And as I understand it, you concluded

19    that it was the voice of Mr. Sheeler simply by doing

20    some mathematics or applying software, right?  Because

21    you did not have any audio to compare; is that right?

22        A.    I identified Mr. Sheeler and Officer

23    Eldridge and Officer McArthur based on their proximity

24    to the recording device.

25        Q.    All right.  Now, it says in -- again, in

1       the second paragraph, second sentence, "I asked counsel

2       to calculate distance at the shooting scene and provide

3       a diagram (see Figure 2)."  Was Figure 2 provided by

4       the defendant's counsel?

5              A.    Yes.  This is a portion of what was

6       provided to me.  So I cropped it to focus on the

7       positions of the officers.

8              Q.    Okay.  What all was provided to you by

9       counsel with respect to calculating distances at the

10      shooting scene?

11             A.    Well, I calculated the distances.  Let's

12      see.  I'm trying to recall -- no, there was a range

13      finder.  I think what happened was counsel had the

14      officers go to the site, position themselves in their

15      approximate locations.  I don't know exactly who stood

16      in for Mr. Sheeler.  But again, I think what occurred

17      was that a range finder was used once the positions

18      were taken, and the distances were provided to me.

19             Q.    Okay.  So you relied on the defendants'

20      representations about where they were standing at the

21      time of the shooting?

22             A.    Yes.  They went to the site and positioned

23      themselves, is my understanding.

24             Q.    Okay.  Let's go down here to Table II

25      again page 5.  Okay.  So the first column says

Page 64

1     "Officer."

2              Well, actually, let me back up.  I'm

3     sorry.  Did you compile this Table II or was it

4     provided to you?

5         A.    The distances were provided to me based on

6     the range finder measurements.

7         Q.    And then did you put them into this table

8     or did you, like, take a screen shot or whatever of a

9     table that was provided to you?

10        A.    I think what I did was -- I'm not

11     recalling exactly.  I think what I was provided was the

12     distance to Mr. Sheeler, and then I back-calculated the

13     distance to McArthur.  I think that's the way I did it.

14        Q.    And I apologize.  I didn't hear the word.

15     You did what calculation with respect to McArthur?

16        A.    I just calculated it based on the

17     distances that are given in the photo, right?  So one

18     can use programs to calculate the images, distance in

19     inches, and its equivalent distance in feet.  Like an

20     architectural drawing, an architectural tool.

21        Q.    You mentioned distances in the drawing.

22     Can you help me find distances in the drawing that

23     you're talking about?

24        A.    Sure.  So Officer Eldridge, you will see a

25     marker that is the farthest right blue dot and the word

Page 65

1      "Eldridge" is above it.  And there is a dot in the

2      center of that blue marker.  And so the distance, I

3      believe, was provided for Mr. Sheeler's position to

4      Officer Eldridge.  The yellow line there shows the

5      approximate path of travel.  Very approximate, right?

6      And basically these are the positions where Mr. Sheeler

7      was.  And I believe what occurred was the range finder

8      was used to get the distance to Officer Eldridge

9      standing where he was standing.  And, I'm sorry.  I

10     just gave you a long-winded answer and probably missed

11     your question.  So what was your specific question?

12          Q.   Yeah, the question was you referenced

13     distances I think you said either in the photo or the

14     drawing.  And I'm just not seeing any numbers in this

15     image, and I'm wondering what I might be missing.  I

16     see blue dots and a yellow line and I'm just not seeing

17     any measurements.  Am I missing something in my version

18     of the report?

19          A.   No, you're not missing something.  I

20     suppose I could have included, for this particular

21     image, the calculation of inches to feet, for instance.

22     I should have maybe put a scale in this.

23          Q.   Were you given a scale?

24          A.   No.  I provided -- I used software to

25     calculate the scale.

Page 66

1        Q.    Okay.  Now let's look at Table II.  It

2    says, first column, Officer Eldridge, it says distance

3    to Mr. Sheeler, 54 feet, distance to McArthur, 44 feet.

4    Those are based on the range finder information you

5    were given by the defendants?

6        A.    First column is.  I calculated the second

7    column.

8        Q.    Second line, Officer McArthur, distance to

9    Mr. Sheeler 81 feet, distance to McArthur, 81 feet.  Is

10   that a booboo?

11       A.    Yeah, it probably is.  How could McArthur

12   have a distance to -- let me see.  This would have been

13   the distance -- yeah, that's a booboo.

14       Q.    Okay.  The others, Orr, Saldana and Noyes,

15   you were given the information about their distance to

16   Sheeler and then you calculated their distance to

17   McArthur.  Am I reading that right?

18       A.    Yes.

19       Q.    Okay.  All right.  I get it.  Okay.  Let's

20   go to the text at the bottom of Table II.  Below Table

21   II, I mean.  Let's start with the first line.  "Based

22   on these measurements, the voices of Officers Orr,

23   Saldana, Noyes, and Anderson would be significantly

24   attenuated relative to the voices of Mr. Sheeler and

25   Officer Eldridge."  Would it affect your conclusions if

Page 67

1    you knew how loud they were shouting?

2        A.    Only if somebody were shouting through a

3    megaphone or something of that sort.  But what I was

4    able to discern from Officer Eldridge and Officer

5    McArthur was they were using their "command voice,"

6    which tends to be a raised voice.  So I was able to

7    eliminate McArthur because clearly she is the closest

8    to the microphone.  And again, I apologize for the

9    error in Table II.  That should say 0 for McArthur's

10   distance to McArthur.

11           But that left two male voices that are

12   proximate, right?  And then the fall-off with distance

13   would cause the other voices, if they were even

14   shouting, to be at a lower level.

15       Q.    Lower level than McArthur and Eldridge?

16       A.    Yes.  That's correct.

17       Q.    All right.  Now, let's see if I can tell

18   which sentence it is.  It appears to be the penultimate

19   sentence in that paragraph.  It begins, Officer

20   Eldridge is facing Mr. Sheeler."  Are you with me?

21       A.    No.  Oh, yes.  It begins, "Officer Eldridge

22   is facing Mr. Sheeler"?

23       Q.    Yes.

24       A.    Yes, I see that.

25       Q.    Okay.  Now, let me see if I can understand.

Page 68

Durand R. Begault , Ph.D. - January 3, 2024

```
 1      According to this image, McArthur, if McArthur is
 2      facing -- excuse me, let me withdraw that.  According
 3      to this image, Eldridge, if Eldridge is facing Sheeler,
 4      he is facing away from McArthur?  Is that what you
 5      concluded?
 6           A.   Well, roughly speaking.  I mean, it's not
 7      180 degrees off, but he is at an angle, yes.  So his
 8      voice is directed mostly towards Mr. Sheeler.
 9           Q.   All right.
10           A.   And McArthur, it seems to be directed
11      towards Mr. Sheeler.
12           Q.   Let's go back to that sentence we were
13      just looking at and I'll read it for the record.
14      "Officer Eldridge is facing Mr. Sheeler, thereby
15      attenuating the level of his voice, and Mr. Sheeler
16      appears to talk in the direction of Officers Eldridge
17      and McArthur, i.e., towards the body worn camera
18      microphone."
19                Can you elaborate on what you meant when
20      you said that he appears to talk in the direction of
21      Eldridge and McArthur, particularly considering that
22      they were not together?
23           A.   Well, it's a rough estimate of the
24      direction.  Let's put it this way:  He wasn't talking
25      towards Saldana, Orr, or Noyes, or towards Anderson.
```

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

Durand R. Begault , Ph.D. - January 3, 2024

1     He seems to be, particularly in the initial part of his

2     trajectory, in the direction towards Eldridge and

3     McArthur.  Maybe he was not speaking the exact

4     direction, but certainly not rearwards towards Saldana,

5     Orr, Noyes, or Anderson.

6          Q.    All right.  And when you say, "Mr. Sheeler

7     appears to talk in the direction," are you saying

8     visually appears to be talking in the direction, like

9     you can see his face turned toward them?

10         A.    It's based on a direction of his body in

11    the walking, or whatever he is doing.

12         Q.    Okay.

13         A.    "Walking" with quotes.

14         Q.    Let's go down to page 6 of your report.

15    Let's see, first paragraph, second line, there's a

16    reference to a phrase that you've used earlier in this

17    deposition which is Officer Eldridge's "command voice."

18    What do you mean by "command voice"?

19         A.    Based on experience in analyzing a number

20    of similar situations where officers are giving a

21    command, and having discussed with various police

22    officers, there is a training to use a very high raised

23    voice level to issue commands.

24         Q.    And did you hear the other officers also

25    using command voices when you were listening to the

Page 70

1    audio?

2           A.    I could not hear those voices.  They

3    seemed to be too far away, and many times obscured by

4    Officer McArthur.

5           Q.    Okay.  The fourth line, can you see my

6    cursor when I do that?

7           A.    I can.  But move it slowly, if you would.

8           Q.    I'm sorry.  Right here.  I put it at the

9    sentence that begins, "It is clear."  Do you see that?

10          A.    Yes.

11          Q.    Okay.  Now I'll move it.  I'm going to

12   read this into the record from the first paragraph on

13   page 6 of your report.  "It is clear that Mr. Sheeler's

14   utterance 'back up' (or something similar phonetically)

15   overlaps with the command '[--] ground' from Officer

16   Eldridge."  Let me ask you a few follow-up questions to

17   that.  You say "something similar phonetically."  What

18   alternatives did you consider that would be similar

19   phonetically?

20          A.    I didn't consider any other options.  My

21   best estimate of it was "back up."  But again, this is

22   a noisy recording, so that was my best estimate.  So

23   that's why I wrote "something similar phonetically."

24   But I didn't speculate about what other things it might

25   be.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

Durand R. Begault , Ph.D. - January 3, 2024

1          Q.    Okay.  Now, as I understand it, your
2    reference in this paragraph, Table I, timing at 7.57
3    and 7.8 seconds, all right?  I'm referring you to that.
4    Let me zip back one page or two pages, whatever, to the
5    table.  So if we go to the two you reference, 7.57 and
6    7.8, 7.57 is when you perceive that Mr. Sheeler said
7    something akin to "back up."  Correct?
8          A.    That's correct.
9          Q.    All right.  And then it is approximately
10   about a second and a half later that there is a
11   possible change in Mr. Sheeler's facing direction.
12         A.    That's what I wrote.
13         Q.    Okay.  All right.  Hang on one second.
14   I'm just grabbing this back, page 6.  Now, back to that
15   sentence we were looking at, and I'm going to cut out
16   the part about the "back up."  You say, "It is clear
17   that Mr. Sheeler's utterance ... overlaps with the
18   command ... from Officer Eldridge."  Did you follow
19   what I did there?
20         A.    You mean when I wrote "[--]" you used the
21   word "ellipse"?
22         Q.    Yes.  I was just using an ellipse to make
23   the sentence flow.  Let me just ask the question.  Did
24   it appear to you that Mr. Sheeler and Officer Eldridge
25   were talking over each other at that point in the

                                            Page 72

Durand R. Begault , Ph.D. - January 3, 2024

```
1     audio?
2          A.    Well, the only talking over I'm going to
3     talk about is as you can see in Figure 3 and Figure --
4     let me look at Figure 4.  Yeah, there's a little bit of
5     overlap in their voices as I talk about in Figures 3
6     and 4.
7          Q.    Was that the only place in the video that
8     you discerned overlap between Mr. Sheeler's voice and
9     someone else's voice?
10         A.    These are the two I noted.  I'm not
11    recalling any other ones at this point.
12         Q.    All right.  Let's zip down here to page 7.
13    So you are welcome to look at the first paragraph, the
14    second paragraph, and sub (1) if you want.  Do you
15    recall, though, that in those -- well, no, strike that.
16    Let me just go straight to sub (10).
17              Is it fair to say that in sub (1), you're
18    criticizing Mr. Mecham based on an assumption by you
19    that when Mr. Mecham said "walking in a left-to-right
20    direction," he meant Mr. Sheeler's body rather than how
21    you would see it on the screen?
22         A.    If I recall Mr. Mecham, if I am saying
23    that correctly, Mecham?
24         Q.    Mecham like "me come."
25         A.    Got it.  Great.  Well, I found Mr. Mecham's
```

Page 73

Durand R. Begault , Ph.D. - January 3, 2024

1    meaning to be as I wrote it here.  He wanted to clarify

2    in his rebuttal report that what he really meant was

3    his left-to-right direction referred to the image frame

4    and not the direction of Mr. Sheeler.  So it was

5    specifically to his report.  He clarifies that in his

6    rebuttal.

7          I do -- I took another look at that

8    sentence and if you read it literally you can't tell if

9    he is talking about specifically the image frame or if

10   he is talking about Mr. Sheeler.  However, I do think

11   it kind of just points out that --

12         Q.    Hold on.  You've answered the question.

13   Let me ask you this:  When -- okay.  In his report,

14   Mr. Mecham specifically stated that the left-to-right

15   reference was, quote, "With respect to the orientation

16   of the video."  Do you remember seeing that?

17         A.    Well, stand by.  I'll take a look at it.

18         Q.    Okay.

19         A.    Is this in the rebuttal report or the

20   original report?

21         Q.    The original report.

22         A.    Do you want to point me to the page?

23         Q.    Actually, I don't think I need to.  If it

24   said "with respect to the orientation to the video," do

25   you still maintain it was ambiguous as to whether he

                                                    Page 74

Durand R. Begault , Ph.D. - January 3, 2024

1     really meant with respect to Mr. Sheeler's body?

2         A.    I thought that the phrasing -- let's see.

3     Let me find, if you wouldn't mind, his rebuttal report

4     where he mentions this, and then I can answer your

5     question.

6             He wrote, "He was walking in a forward-

7     facing orientation in a left-to-right direction as seen

8     in the screen."

9         Q.    And then there's another reference.  No,

10    there's another reference you are omitting, sir, where

11    he references "with respect to the orientation of the

12    video."  So you can't leave one out, right?

13        A.    I'm reading his rebuttal report.  He says,

14    "This was actually made quite clear in bullet point

15    number 2 on page 3 of my report."  And now I'm reading

16    from page 4 of his rebuttal report.  "This section is

17    reproduced below, with the area of interest highlighted

18    with red text added for emphasis.  2, Mr. Sheeler was

19    first seen in the video as he was near the base of a

20    relatively large tree."  In red he wrote, "He was

21    walking in a forward-facing orientation in a left-to-

22    right direction as seen in the screen."

23        Q.    It's later, but let me withdraw the

24    question because I don't want to take up time and money

25    having you read from reports, because the wording is

Page 75

Durand R. Begault , Ph.D. - January 3, 2024

```
 1     there or it isn't.

 2              If Mr. Mecham was referring to left-to-

 3     right movement with respect to the orientation of the

 4     video, do you still have the same criticisms that you

 5     set forth in sub (1)?

 6         A.    Let me read my sub (1) here a minute.  So

 7     I accept Mr. Mecham's clarification of what he meant

 8     based on his response in the rebuttal report.  I'm

 9     happy with that.  However, I am, despite not making

10     that criticism since he has clarified it in his

11     rebuttal, I do maintain that, "Mr. Sheeler's movement

12     could be diagonal, moving increasingly distant from the

13     camera towards the shrubbery in the background, but

14     also sometimes in the opposite lateral direction."  So

15     I still maintain that.  I also maintain the second

16     paragraph under sub (1).

17         Q.    I only asked about sub (1), so we are good.

18         A.    And yeah, I'm saying most of sub (1) I am

19     fine with, and I accept Mr. Mecham's explanation that

20     he meant in a left-to-right direction as seen in the

21     screen in reference to the video.

22         Q.    Or with respect to the orientation of the

23     video, right?  If that's in there?

24         A.    Well, he writes in his rebuttal, "The

25     terminology of Mr. Sheeler moving in a left-to-right
```

Page 76

Durand R. Begault , Ph.D. - January 3, 2024

```
 1      direction in my report describes the direction that
 2      Mr. Sheeler was walking relative to the reference frame
 3      of the video."  I'm happy with that.  I'm happy to
 4      accept that's what Mr. Mecham intended to say.
 5              Q.    "Mecham," like "me come."  Okay?  "Mecham."
 6              THE WITNESS:  Court Reporter, is that an
 7      issue?
 8              Q.    Well, I think people's names ought to be
 9      pronounced correctly.
10              A.    I agree.
11              Q.    That's why I tried to make sure I was
12      pronouncing yours.  Just a courtesy.
13              A.    I appreciate that.  And I'll try to
14      remember "Mecham."  I'm really bad with names, myself.
15              Q.    Let's go to sub (2) that you just
16      referenced.  Sub (2) begins -- and for the record, let
17      me be clearer.  Let's go on page 7 of your report, sub
18      (2).  "During the time period 9.03 to 13.53 seconds, it
19      is obvious that Mr. Sheeler continually and
20      progressively minimizes his distance to Officer
21      Eldridge," and then I'm going to stop there for a
22      second.
23              Now, let's see.  Go back up to this image
24      here.  This is an image you've indicated that you
25      relied on.  Is Mr. Sheeler on a beeline to Eldridge in
```

Page 77

1    this image on page 5?  See the yellow line I'm

2    referring to?

3         A.    I explained earlier that that was my

4    approximation of -- well, using Mr. Mecham's way of

5    explaining it, from the left side of the image to the

6    right side of the image.  But this seems to be a good

7    approximation of the direction of travel of Mr. Sheeler

8    over the 14 seconds that I analyzed.  That's what the

9    yellow line is.  But a beeline --

10         Q.    Yes.  And that's not a beeline -- sorry.

11    That's not a beeline to Officer Eldridge, is it?

12         A.    No.  It's in the direction of Mr. Eldridge,

13    Officer Eldridge.

14         Q.    The general direction, right?  Not

15    directly toward him.  Would you agree with that?

16         A.    Yes.

17         Q.    Okay.

18         A.    Although, you know, again, that's an

19    approximation.  So maybe there was 200 milliseconds

20    where he was walking in a beeline towards him.  I'm not

21    certain.  It's hard to tell from the video.

22         Q.    Okay.  So when you say "maybe there was

23    200 milliseconds," are you just speculating?

24         A.    What I'm saying is that it's very

25    difficult to estimate distance from this video of

                                              Page 78

1    Mr. Sheeler.  So again, I would agree, based on what I

2    can tell, that he is not walking in a straight line,

3    that's for sure.

4        Q.    And not walking in a straight line towards

5    Officer Eldridge or McArthur, correct, according to

6    this image that you relied on?

7        A.    Correct.  In the general direction, though.

8    in the general direction.

9        Q.    Of Eldridge, but not McArthur, right?

10       A.    Well, it's the general direction of

11   McArthur, as well, if we are just looking at

12   everything, yeah.  In the general direction, if

13   "general direction" is described as an angle relative

14   to maybe, I don't know, 120 degrees or something.

15       Q.    But clearly the image that you relied on

16   that I'm showing you here on page 5, clearly Sheeler is

17   not making his way to McArthur.  Would you agree with

18   that?

19       A.    Well, there's one or two points where he

20   appears to have his body facing towards McArthur, but

21   again, it was difficult for me to tell.  I can't make

22   that yellow line -- I would never assert that that

23   yellow line shows the exact trajectory of his path.

24       Q.    You would agree, wouldn't you, that the

25   yellow line approximates Sheeler's movement from left

Durand R. Begault , Ph.D. - January 3, 2024

1    to right; is that correct?  Which is what it says under

2    the image, to help you out.

3            A.    Yeah.  In the image, yes, that shows a

4    movement from left to right in the imagery shown, yes.

5            Q.    Not just that.  Would you agree that the

6    description that you put under the image is accurate,

7    "Dashed yellow line approximates Sheeler's movement

8    from left to right."  Is that an accurate statement?

9            A.    Yes.

10           Q.    Okay.  All right.  We are almost done

11   here.  Let's go back to page 7, and we had stopped

12   midway through a sentence in paragraph 2.  I'm going to

13   slowly move my cursor to where I want to start up with

14   the word "while."  Do you see that?

15           A.    Yes.

16           Q.    Okay.  So you wrote, "While not obeying

17   the officer's commands to 'show hands' and 'get on the

18   ground.'"  Now, which officer's commands?

19           A.    That was Officer McArthur.  Yes.  Yes,

20   Officer McArthur.

21           Q.    Okay.  And what other commands were being

22   given to him at the same time?

23           A.    You mean during the same time period?

24           Q.    Yes.  During the same -- I'll say yes,

25   between 9.03 and 13.53, what other commands were given

Page 80

Durand R. Begault , Ph.D. - January 3, 2024

1    to Mr. Sheeler at the same time by any officer?

2         A.    Well, let me refer to my Table I, to 13.5

3    seconds.  I heard Officer Eldridge say, "I will shoot

4    you," at one point in there.  I think it was Officer

5    McArthur who I can clearly hear, though, because of the

6    fact her voice was raised during much of this and

7    masking a lot of what else was going on.

8         Q.    Is it a fair statement you don't know what

9    other commands, if any, were being given to Mr. Sheeler

10   by officers other than Eldridge and McArthur?

11        A.    That's correct.  I recall that in one of

12   these reports that multiple officers might have been

13   saying they were shouting things at him, but I was

14   focusing on what could be picked up by the body-worn

15   camera.

16        Q.    Now, when you said "not obeying the

17   officer's commands" you were limiting his supposed

18   obeying or not obeying to the commands given by one

19   officer; is that correct?

20        A.    Well, probably two, because I heard

21   Officer Eldridge say something about "ground."  I wrote

22   it as "unintelligible ground."  It was probably "get on

23   the ground" but -- because that's a typical command

24   that officers will say.  But I was only able to

25   unambiguously hear the word "ground," but something

Page 81

Durand R. Begault , Ph.D. - January 3, 2024

```
 1      comes before it in a command voice.  So that's one

 2      command Officer Eldridge said.

 3          Q.    And Officer McArthur also said not to

 4      move.  Do you remember hearing anything like that?

 5          A.    I don't recall those words, but it could

 6      certainly have happened.

 7          Q.    Okay.  If they did happen, you chose not

 8      to include them in your transcription, correct?

 9          A.    I testified earlier I didn't transcribe

10      Officer McArthur's audio.

11          Q.    If you were going to render an opinion

12      about whether Mr. Sheeler was disobeying officers, why

13      wouldn't you want to include all of the commands he was

14      being given at that time, if you are going to opine

15      about whether he is disobeying?

16          A.    Well, my sentence there literally says

17      that he did not obey the command of "show hands" and

18      "get on the ground."

19          Q.    Actually, I don't know if that's what it

20      says.  Let me look.  Right.  So is it your contention

21      that "show hands" and "get on the ground" were the same

22      officer?

23          A.    I think Officer McArthur, if I recall, has

24      words to that effect, if not literally those words.

25      But I think "get on the ground" is something she is
```

Page 82

1    saying.  Something about "show hands" may be a slight

2    variation on that, I'm pretty sure she says.  Officer

3    Eldridge shouts something like, "Get on the ground,

4    "but the word "ground" most audible.  And then again in

5    the command voice, you know, "I will shoot you."  So

6    those are the commands that I have highlighted in this

7    report.

8          Q.    And were you able, with your audio

9    analysis, to hear whether any officer told Jake Sheeler

10   not to move?

11         A.    You mean the literal words, "Do not move"?

12         Q.    "Don't move."  Contractions are our

13   friends.  Words "don't move" or something phonetically

14   similar.

15         A.    I don't recall.

16         Q.    Okay.  All right.  Let's go to the last

17   page here, page 8, and let me look.  Okay.  I want to

18   go to the second paragraph under sub (4).  All right?

19   Do you see where it starts "first"?

20         A.    Yes.

21         Q.    Okay.  I'm going to go to the second

22   sentence of that paragraph.  You wrote, "An analysis

23   that concludes only 'walking backwards' from the

24   available imagery eliminates other possible

25   interpretations that could arise from a more nuanced

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

Durand R. Begault , Ph.D. - January 3, 2024

1    analysis of biomechanical movement."  Do you see that

2    quote?

3            A.    Yes, I do.

4            Q.    Okay.  And you're not qualified to give

5    any analysis of biomechanical movement, correct?

6            A.    I can provide imagery and timing

7    information that corresponds to body movement.  But

8    when I think about a nuanced analysis of biomechanical

9    movement, then what I would be looking for, for

10   instance, in an expert report, is a comparison of

11   various possibilities to explain what could be seen,

12   particularly in a very noisy recording.

13           Q.    And were you given any biomechanical

14   analysis other than that of Mr. Mecham?

15           A.    No.  I didn't find Mr. Mecham's

16   biomechanical analysis anything more than just saying,

17   "I'm seeing him walking backwards."

18           Q.    Were you given any analysis relating to

19   biomechanics other than Mr. Mecham's report, regardless

20   of what criticisms you have about that?

21           A.    I have seen no what I would call

22   biomechanical reports like one might see in an accident

23   report or human factors report, something along those

24   lines, or something where physiology was connected to a

25   particular event.  I haven't seen any expert report

Page 84

1    that was asserted to be a biomechanical report, per se.

2        Q.    Okay.  So when your report references

3    "other possible interpretations that could arise,"

4    you're not aware of other specific interpretations that

5    have been put forth from a more nuanced analysis of

6    biomechanical movement; is that correct?

7        A.    I have seen no nuanced or detailed

8    biomechanical movement analysis.

9        Q.    Right.  So you're speculating as to

10    whether there might be a differing interpretation,

11    true?

12        A.    No, I'm not speculating that there could

13    be another interpretation.  If somebody were to analyze

14    it, maybe then, you know, each of these images that we

15    are referring to as, quote/unquote, "walking backwards"

16    or, quote/unquote, "legs spread," et cetera, maybe

17    there would be a more nuanced explanation for those

18    kinds of things.  Somebody might be able to talk about,

19    for instance, how fast can one walk backwards, you

20    know, things of that sort.

21        Q.    Let me --

22        A.    So it's again -- can I --

23        Q.    No, because none of the things you are

24    describing have been done in this case, to your

25    knowledge; is that a fair statement?

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1         A.    That's correct.

2         Q.    So you are speculating as to whether there

3    is one or more alternate interpretations that could

4    arise from a more nuanced analysis of biomechanical

5    movement; is that true in this case?

6              MR. ANGELL:  Object to the form.  Asked

7    and answered.

8              But go ahead and answer if you can.

9         A.    We simply don't know.

10        Q.    Okay.  I think we are going to take a

11   short break here.  Might be done.

12             (Break taken from 12:25 to 12:30 p.m.)

13        Q.    Earlier I asked about if the jury were

14   shown your audited -- or excuse me, your enhanced

15   video, they could see with their own eyes.  Do you

16   remember that line of questions?  I'm not going back

17   down that line of questions but do you generally

18   remember what I'm talking about?

19        A.    We had a discussion about that, yes.

20        Q.    Yes.  Let me ask you a similar question

21   with respect to audio.  You did some enhancements with

22   respect to the body cam audio, correct?

23        A.    I did.

24        Q.    So you're not any more qualified to listen

25   to that audio and conclude what's being said than the

                                              Page 86

Durand R. Begault , Ph.D. - January 3, 2024

```
 1      jury, correct?
 2           A.    Yes.  I don't have a golden ear, if that's
 3      what you're asking.  What I have transcribed, I think
 4      that a reasonable person who listens repeatedly and
 5      objectively should be able to hear the same thing.
 6           Q.    And you would say no alternatives; if the
 7      jury is reasonable they are only going to agree with
 8      what you hear?  Is that what you just told me?
 9           A.    That's not what I just told you.
10           Q.    Okay.  Do you believe that a reasonable
11      jury could hear something different than what you heard
12      by listening to the same enhanced audio?
13           A.    Well, I guess, again, I think I answered
14      you earlier that it's hard for me to go into the head
15      of a juror because I don't know differences between
16      jurors.  You know, there could be any number of factors
17      involved.  All I can say is that I think a reasonable
18      person would come to the same conclusion that I have,
19      given the repeated listening and, you know, in an
20      objective manner and hopefully free of bias.
21           Q.    Okay.  And by the way, you are not
22      suggesting that jurors are biased and unobjective, are
23      you?
24           A.    Oh, not at all.
25           Q.    Okay.
```

Page 87

Durand R. Begault , Ph.D. - January 3, 2024

1              A.    I think it's what could happen in a case,

2        though.  The way it is presented.

3              Q.    That the jury can become biased or

4        unobjective?

5              A.    I didn't say unobjective in the sense of

6        bias.  What I'm trying to say is this:  For instance,

7        you could have a situation where it's difficult to hear

8        what's being said, and so if -- well, I think I

9        presented this earlier like this --

10             Q.    Yeah.

11             A.    I said if there's a narrative presented,

12       for example, we have talked about this narrative of

13       walking backwards, I think that that's something that

14       needs the alternative interpretation to be given so

15       that a jury can properly weigh the situation.  Without

16       an opposing or let's say alternative explanation for

17       events, one cannot weigh two possible outcomes.

18             Q.    True.  But that's what an attorney can do,

19       right?  An attorney can play the enhanced audio and

20       say, "Hey, members of the jury, this is what we hear."

21       I mean, you don't offer anything special that an

22       attorney or just somebody listening themselves could

23       do, right?

24             MR. ANGELL:  Object to the form of the

25       question.  Misstates his testimony and calls for

                                                    Page 88

Durand R. Begault , Ph.D. - January 3, 2024

```
 1      speculation.

 2              Q.    Go ahead.

 3              A.    I'm trying to answer this because it

 4      sounds like you are trying to ask me questions about

 5      the psychology of jurors.

 6              Q.    No.  I'm asking your qualifications.  Are

 7      you a better -- I mean, do you have, in essence, a

 8      bionic ear?

 9              A.    No, I do not.  I do not have hearing

10      capabilities beyond what a jury should have.  If they

11      have normal hearing, if they have similar exposure to

12      the material, and if they are free of bias in the sense

13      of suggesting, you know, that one thing is said without

14      weighing the possibility of something else being said.

15              Q.    I don't have any further questions.

16              MR. ANGELL:  I don't, either.  So we can

17      go off the record.

18              (The deposition concluded at 12:37 p.m.)

19

20

21

22

23

24

25
```

Page 89

```
 1                    REPORTER'S CERTIFICATE
 2
      STATE OF UTAH                )
 3                                 )  ss.
      COUNTY OF SALT LAKE          )
 4
 5              I, Diana Kent, Registered Professional
      Reporter and Notary Public in and for the State of
 6    Utah, do hereby certify:
 7              That prior to being examined, the witness,
      Durand Begault, was by me duly sworn to tell the truth,
 8    the whole truth, and nothing but the truth;
 9              That said deposition was taken down by me
      in stenotype on January 3, 2024, at the place therein
10    named, and was thereafter transcribed and that a true
      and correct transcription of said testimony is set
11    forth in the preceding pages;
12              I further certify that, in accordance with
      Rule 30(e), a request having been made to review the
13    transcript, a reading copy was sent to the witness at
      DBegault@salter-inc.com to read and sign, and the
14    original transcript will be delivered to Attorney Karra
      Porter for safekeeping.
15
                I further certify that I am not kin or
16    otherwise associated with any of the parties to said
      cause of action and that I am not interested in the
17    outcome thereof.
18              WITNESS MY HAND AND OFFICIAL SEAL this
      10th day of January, 2024.
19
20
21
22
23
                              Diana Kent, RPR, CRR
24                            Notary Public
                              Residing in Salt Lake County
25
```

Page 90

# Exhibit 3

# In The Matter Of:

*SHEELER vs.*

*MCARTHUR, et al.*

---

*JONATHAN BROYLES*

*January 23, 2024*

---

*T&T Reporting, LLC*

*477 Shoup Avenue, Suite 105*

*Idaho Falls, Idaho 83402*

*(208) 529-5491*

Min-U-Script® with Word Index

1

1        UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF IDAHO

3

4   JAKE L. SHEELER, an individual,    )
                                       )
5                    Plaintiff,        ) Case No.
    vs.                                ) 4:22-cv-00313-AKB
6                                      )
    BRIDGET MCARTHUR, an individual;   )
7   JEFFREY E. ELDRIDGE, an            )
    individual; MARISA A. SALDANA,     )
8   an individual; ROGER SCHEI, an     )
    individual; and CITY OF            )
9   POCATELLO, a municipal             )
    corporation,                       )
10                                     )
                     Defendants.       )
11

12          DEPOSITION OF JONATHAN BROYLES

13        Tuesday, January 23, 2024, 9:00 a.m.

14

15

16

17          BE IT REMEMBERED that the deposition of
    Jonathan Broyles was taken by the attorney for the
    defendants by Zoom before Sandra D. Terrill, Court
18  Reporter and Notary Public, in and for the State of
    Idaho, in the above-entitled matter.

19

20

21

22

23

24

25

2

1                        A P P E A R A N C E S

2

   For the Defendants:
3              HALL ANGELL & ASSOCIATES, LLP
               BY:  JUSTIN R. WALTER
4              1075 Utah Avenue, Suite 150
               Idaho Falls, Idaho  83402
5              (208) 522-3003
               jrw@hasattorneys.com
6

7  For the Plaintiff:
               CHRISTENSEN & JENSEN, P.C.
8              BY:   STEPHEN KELSON
               257 East 200 South, Suite 1100
9              Salt Lake City, Utah  84111
               (801) 323-5000
10             stephen.kelson@chrisjen.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    E X A M I N A T I O N

2

3    JONATHAN BROYLES                                    Page

4       BY MR. WALTER................................    4

5

6

7

8

9
                        E X H I B I T S
10
     No.                                             Page
11
     Exhibit 1.       Curriculum Vitae for Jonathan ...   4
12                       C. Broyles
     Exhibit 2.       Report of Jonathan C. Broyles....   4
13   Exhibit 3.       Report of Durand R. Begault, ....   4
                       Ph.D.
14

15

16

17

18

19

20

21

22

23

24

25

JONATHAN BROYLES - January 23, 2024

4

1              (The deposition proceeded at 9:00 a.m.

2    as follows:)

3              (Exhibits 1 through 3 premarked.)

4                   Jonathan Broyles,

5    produced as a witness at the instance of the

6    defendants, having been first duly sworn, was

7    examined and testified as follows:

8

9                    EXAMINATION

10   BY MR. WALTER:

11        Q.   Mr. Broyles, would you state your full

12   name, please, and spell your last name?  I realize

13   it's up there, but just for the record's sake.

14        A.   Jonathan Carl Broyles.  Last name

15   B-r-o-y-l-e-s.

16        Q.   Mr. Broyles, have you ever been deposed

17   before?

18        A.   Yes.

19        Q.   How many times?

20        A.   I'm thinking once or twice.

21        Q.   Were those civil or criminal cases?

22        A.   One was civil.  I'm not -- I don't

23   recall what the other one was.

24        Q.   How long ago was that?

25        A.   It's been a few years now.

JONATHAN BROYLES - January 23, 2024

1          Q.    So you're probably familiar with the

2     procedure, but I'll go over it again briefly --

3          A.    Sure.

4          Q.    -- just for the record.

5               So one of the things that we need to do

6     is we need to make sure that we don't talk over each

7     other.  So please wait until I finish asking a

8     question to give your answer.  I will attempt to give

9     you the same courtesy, finishing your answer before

10    asking another question.

11              Please make sure that you give verbal

12    responses, especially here where we're over Zoom.

13    That's important for the court reporter.  Nodding or

14    shaking your head isn't going to transcribe well on

15    the record.  Neither is giving responses like uh-huh

16    or uh-uh.  So I need yes and/or no answers to

17    questions.

18              Finally, I do need you to answer all of

19    my questions.  I anticipate that Mr. Kelson will

20    probably object to some of the questions that I'm

21    going to ask you, but unless he specifically

22    instructs you not to answer, then I do need you to

23    answer the question that's been asked.  If you have

24    any -- if you need it asked again, I'm happy to do

25    that, or we can have the court reporter read it back

JONATHAN BROYLES - January 23, 2024

6

1    to you.

2              Do you have any questions for me about

3    the procedure before we get started?

4        A.    No, I don't.

5        Q.    Did you bring anything to this

6    deposition today?

7        A.    Yes, I did.  I brought copies of my CV,

8    my report, Dr. Begault's report, and copies of the

9    best practices from the Scientific Working Group on

10   Digital Evidence as they pertain to my report.

11       Q.    What did you review in preparation for

12   this deposition?

13       A.    I reviewed Dr. Begault's report.  I

14   believe it's the same report you provided in the

15   exhibits this morning.

16       Q.    Have you reviewed any materials -- any

17   additional materials aside from those cited in your

18   report?

19       A.    Yes, I've reviewed the videos and images

20   that were provided with the report.

21       Q.    So, Mr. Broyles, in this case what's

22   your understanding of your designated area of

23   expertise?

24       A.    Recorded evidence of media forensics.

25       Q.    Have you been retained in this matter as

7

1    an expert in evaluating audio evidence?

2         A.   Yes.

3         Q.   And what about video evidence?

4         A.   Yes.

5         Q.   And I'll ask you the same question with

6    regard to speech evidence.

7         A.   Yes.

8         Q.   Are you retained in this matter as an

9    expert in biometrics or any similar field?

10        A.   No.  Are you saying retained -- a matter

11   of this legal matter or prior?

12        Q.   This case.

13        A.   No.

14        Q.   Are you claiming to be an expert in the

15   admissibility of forensic work by other experts?

16        A.   I have a lot of experience writing

17   reports.  I'm not sure that I would be qualified as

18   an expert.

19        Q.   Have you ever testified previously with

20   regard to the admissibility of other experts' work?

21        A.   Testified, no.

22        Q.   Do you know Dr. Begault personally?

23        A.   I've known him only through the Audio

24   Engineering Society.  We have met from time to time

25   at their conferences.  That's all.

JONATHAN BROYLES - January 23, 2024

8

1          Q.   Are you familiar with any of his other

2    work in any other cases?

3          A.   One other audio case a long time ago.

4    That's been over five years.

5          Q.   All right.  If you'll give me just a

6    minute, Mr. Broyles, I'm going to attempt to share my

7    screen with you.

8          A.   Okay.

9          Q.   I'll have you look at Exhibit 1.  Just

10   for the record, this is going to be your CV.  I'd

11   like to walk through this with you.

12          MR. WALTER:  All right.  Is everybody able to

13   see this?

14          MR. KELSON:  Yes.

15          MR. WALTER:  Okay, good.  I'm glad to hear.

16          MR. KELSON:  Could you expand it though?  It

17   is rather small.

18          MR. WALTER:  I will see what I can do if

19   you'll give me just a second.  I'm working on it, but

20   I'm not sure that I can get it any bigger.  I can

21   increase the size.

22          MR. KELSON:  That's what I mean.

23          MR. WALTER:  That's about all I can do for

24   you.

25          MR. KELSON:  That's it.

JONATHAN BROYLES - January 23, 2024

9

1    Q.    BY MR. WALTER:  All right.  Now that

2    everybody can see this, Mr. Broyles, you're listed

3    here as the founder and managing partner of Automated

4    Dispatch Systems, LLC; is that correct?

5    A.    Well, no.  It's Automated Dispatch

6    Systems, LLC, doing business as Image And Sound

7    Forensics.

8    Q.    Okay.  Are there any other partners in

9    this LLC?

10   A.    No.

11   Q.    So you're also listed here as an expert

12   witness and forensic examiner of recorded evidence

13   and media forensics, correct?

14   A.    That is correct.

15   Q.    So do you make your living primarily as

16   an expert witness?

17   A.    Yes.

18   Q.    What kinds of audio/video forensics does

19   your firm engage in?

20   A.    Can you be more specific?  Because we

21   don't have any restrictions on the type of cases we

22   get.

23   Q.    Sure.  So if you look here under the

24   employment section, it says you're responsible for

25   overall operations to include audio, video, voice,

JONATHAN BROYLES - January 23, 2024

1   photographs, forensics, enhancement and

2   authentication services.

3            What kinds of forensic services does

4   your firm engage in?

5            A.   Well, if we get audio -- it can be civil

6   or criminal.  We get audio in that can be for

7   authentication purposes, for enhancement purposes,

8   and sound identification.  Same with video.  On voice

9   it would be voice comparison services.  Photographic

10  it would be authentication and enhancement.

11           Is that what you're looking for?

12           Q.   Yes.  I'm just trying to understand what

13  kind of work your firm does.

14           A.   Okay.

15           Q.   What is signal processing?  You see

16  listed here audio, video, voice signal processing

17  laboratory.  What kind of work do you do with regard

18  to that?

19           A.   That's essentially the type of equipment

20  we have here.  We can further examine the minutiae of

21  audio, video, voice, and image recordings.

22           Q.   And can you describe what is

23  post-incident photography?

24           A.   That may actually be a typo.  But

25  post-incident photography would refer to photography

JONATHAN BROYLES - January 23, 2024

1    that would be -- well, that would be -- fall under

2    imaging and photographs under the first line where we

3    get a photograph from a crime scene, let's say, that

4    needs to be enhanced, for example.

5           Q.   So if I'm understanding you correctly,

6    you engage in pretty similar work to what Dr. Begault

7    does; is that correct?

8           A.   Pretty much, except he specializes in

9    acoustics and I do not.

10          Q.   So let's go down here to the education

11   section.  I won't read all of these to you.  But it

12   looks like these are mostly conferences and symposia;

13   is that correct?

14          A.   That is correct.

15          Q.   Okay.  Are these conferences the primary

16   source of your expertise in audio and visual

17   forensics?

18          A.   No.  If you go down to the following

19   paragraphs, I've had specific training.

20          Q.   Which -- could you identify that

21   training for me?

22          A.   Sure.  Go back up to Enhanced Audio.  It

23   says, voice identification which deals with

24   biometrics and audio spectrographic comparison.  It

25   is forensic audio training.  And then it's, again,

JONATHAN BROYLES - January 23, 2024

12

1    advanced audio forensic training from Enhanced Audio

2    Incorporated.

3            Q.    Okay.  And what is Enhanced Audio

4    Incorporated?  Are they a training program or like a

5    -- what are they?

6            A.    They are a training company.  They

7    provide training services.

8            Q.    So are all these -- are these classes

9    and conferences that you've attended, are they some

10    sort of continuing education requirement?

11            A.    The conferences -- well, there are no

12    real requirements, but I keep -- I keep going -- I

13    keep my training up as best I can.

14            Q.    Mr. Broyles, what was your undergraduate

15    degree in?

16            A.    I do not have a degree, but I studied

17    computer science and electrical engineering.

18            Q.    And where did you study that?

19            A.    University of Colorado, Boulder.

20            Q.    And so are any of these courses here

21    listed in your education section, are any of them

22    eligible for college credit, or are any of them

23    offered through accredited institutions?

24            A.    The only ones that probably would be

25    would be if you scroll down to the University of

1  Colorado.

2          Q.   This one right here?

3          A.   Right.  Those are taken at the

4  University of Colorado's National Center for Media

5  Forensics.  And they may actually apply if I went and

6  took -- went to a degree program with the University

7  of Colorado, but I'm not certain of that.

8          Q.   So these ones here under the University

9  of Colorado section are the only ones offered through

10 a university?

11         A.   Right.

12         Q.   Now, Mr. Broyles, you cite a number of

13 cases in your CV.  Again, I won't go through all of

14 them, but I did want to ask:  Do you know how many of

15 these are trial testimony in court?

16         A.   Not right offhand.  That's not a

17 category that's marked.

18         Q.   Would you be able to give me an estimate

19 of how many of the cases are trial testimony?

20         A.   Most of these would be criminal.  I'm

21 going to guess about 80 to 90 percent criminal and

22 the rest civil.

23         Q.   And it looks like most of these are

24 based out of Colorado, correct?

25         A.   Recently, yes.  But prior it would be

JONATHAN BROYLES - January 23, 2024

**14**

1   outside of Colorado.

2            Q.   Mr. Broyles, I'm going to go on to --

3   I'm going to put Exhibit 2 up on the screen.  And

4   I'll zoom in a little bit on that.

5            So this is your report; is that correct?

6            A.   That appears to be correct.

7            Q.   Have you ever -- have you ever

8   criticized or reviewed any of Dr. Begault's work in

9   any prior cases?

10           A.   Yes, one prior.  That's how I have

11  familiarity with his work before, but that's been

12  over five years.

13           Q.   And what was that prior case about, do

14  you recall?

15           A.   That was -- if I recall, that was a --

16  no, I don't recall if it was civil or criminal.  I do

17  know it dealt with audio telephone recordings.

18           Q.   And were you hired in a similar capacity

19  as in this case to rebut Dr. Begault or were you

20  supporting his opinion?

21           A.   I would be rebutting in that case.

22           Q.   Do you recall the outcome of the case?

23           A.   No, I do not track outcomes.  I'm

24  supposed to be an independent third-party examiner.

25           Q.   So let's go through your report.  And

1    you made your comments on Dr. Begault's report in

2    red, correct?

3         A.    That is correct.

4         Q.    So if we go down to this first comment,

5    this is in reference to Dr. Begault's Exhibit Q1,

6    correct?

7         A.    Correct.

8         Q.    And Q1 was represented to you as a "Body

9    worn camera recording, 'Bridget McArthur body cam

10   footage.mp4,'" correct?

11        A.    Correct.

12        Q.    Did you ever actually review this

13   exhibit in addition to his report?

14        A.    I did review the video, yes.

15        Q.    All right.  Now you state here that

16   Dr. Begault fails best practices as -- and this is

17   your references to Dr. Begault here -- does not

18   provide nor indicate the collection of pertinent

19   information in regard to the recording device

20   manufacturer, make, model that made this recording,

21   Q1.

22             Now, what are the best practices that

23   you alleged Dr. Begault fails here?

24        A.    The best practice is when you receive

25   evidence is to find out everything you can about it.

JONATHAN BROYLES - January 23, 2024

16

1   How was it recorded.  The format recording.  All the

2   details of the recording, such as bit rate,

3   resolution, where it came from, who made the

4   recording, chain of custody.  All those things that

5   can impact knowing whether or not you actually got an

6   authentic recording.

7           Q.   What is the -- you list here in this

8   sentence that he doesn't provide nor indicate the

9   collection of pertinent information.  Is what you've

10  just referenced here, would that be the pertinent

11  information that you referred to?

12          A.   Yes.

13          Q.   Is there anything else that would fall

14  under the category of pertinent information that you

15  would need to have?

16          A.   Probably.  It easily can vary from case

17  to case depending on the materials being provided.

18          Q.   So then your next sentence you state

19  here that Dr. Begault doesn't indicate any effort to

20  request or obtain the original recording or direct

21  clone copy of the original recording.

22               What is a direct clone copy?

23          A.   A direct clone copy of the original

24  recording would be a copy such that the hash value of

25  the copy equals the hash value of the original.

JONATHAN BROYLES - January 23, 2024

1          Q.   So walk me through that a little bit.
2     What is a hash value?
3          A.   A hash value is a mathematical routine
4     that generates a unique value for a unique recording.
5     In that way then if you make a copy of a digital
6     recording, you can then verify that the copy is
7     accurate.  It hasn't changed in the process of being
8     copied.
9          Q.   Is it possible for a recording to change
10    as it's being copied such that it has a different
11    hash value?
12         A.   Absolutely.
13         Q.   What can cause that sort of thing?
14         A.   Computer error; a modified recording, a
15    recording that is not the original recording.  Those
16    are --
17         Q.   So does -- I apologize.  Go ahead.
18         A.   My mistake.
19              Those are the primary two.
20         Q.   So does any modification of the
21    recording, will that create a different hash value?
22         A.   Yes.  That's why it's valuable for
23    checking the authenticity -- or the integrity of the
24    copies.
25         Q.   And you talk about that a little bit in

JONATHAN BROYLES - January 23, 2024

18

1    your last sentence, that Dr. Begault, you claim he

2    does not provide any metadata nor the hash value.

3    What is the metadata for a recording?

4        A.    Metadata is -- in a digital recording is

5    the header -- or data record that can appear actually

6    just about anywhere in the recording depending on its

7    format that describes -- it can describe many things.

8    It can describe the manufacturer of the recording,

9    details of the recording such as bit rate or

10   resolution, date and time of the recording, and so

11   on.  A lot of things that can show up in the

12   metadata.

13       Q.    Do you need the metadata to determine if

14   a recording is a reliable copy?

15       A.    Yes.

16       Q.    Can you do it in the -- can you

17   determine -- is it possible to determine whether a

18   recording is reliable in the absence of the metadata

19   or the hash value?

20       A.    In digital recordings that would be a

21   potential problem because there could be a minor

22   change, like a word deleted, whereby you could listen

23   to one and listen to the other and they might sound

24   the same if it's a quick edit.  But the hash values

25   won't be the same.

JONATHAN BROYLES - January 23, 2024

1          Q.    Now, you mentioned that you reviewed the

2    exhibit listed as Q1, correct?

3          A.    Correct.

4          Q.    Do you have any reason to believe that

5    the exhibit listed as Q1 is unreliable?

6          A.    I have no idea because there's no hash

7    value here to confirm whether it's viable or not.

8          Q.    If Dr. Begault were to provide -- if

9    Dr. Begault had offered this information such as the

10   hash value or metadata in his deposition, would this

11   then become a reliable exhibit?

12         A.    If he had provided it before the expert

13   report deadline, yes.

14         Q.    All right.  Mr. Broyles, let's go down

15   to Exhibit Q2, which is a dash cam recording.  Did

16   you review this -- did you review this exhibit as

17   well?

18         A.    Yes, I did.

19         Q.    And if I'm understanding this

20   subparagraph correctly -- we won't go through them

21   sentence by sentence again.  But if I'm understanding

22   them correctly, you have the same complaints with

23   regards to the hash value and the metadata that you

24   have with Q1?

25         A.    That is correct.

JONATHAN BROYLES - January 23, 2024

20

1          Q.    So it's your opinion then that you're

2    not able to determine whether Exhibit Q2 is a

3    reliable recording?

4          A.    That is correct.

5          Q.    And then I'll ask the same question.   If

6    you were to receive the hash value and metadata for

7    Exhibit Q2, would you then consider it to be

8    reliable?

9          A.    If it had been provided before the

10   report's deadline.

11         Q.    The next comment, Mr. Broyles, is on

12   Exhibit X1, which was represented as "Video exhibit

13   'X1 McArthur mp4.'"  Did you review this exhibit as

14   part of your report?

15         A.    Yes, I did.

16         Q.    Now, you mention here that Dr. Begault

17   fails best practices by not providing any metadata

18   nor the hash value.  Are the best practice for this

19   exhibit the same as the best practices for the

20   Exhibits Q1 and Q2?

21         A.    Pretty much, yes.

22         Q.    Now, was it represented to you that

23   Exhibit X1 was an exhibit created by Dr. Begault?

24         A.    Looking at the notations, I believe it

25   was.

JONATHAN BROYLES - January 23, 2024

1          Q.   So are -- is it best practices for

2    experts to provide hash values for exhibits that they

3    essentially create themselves out of an original

4    recording?

5          A.   Absolutely.  That way you can -- anyone

6    who reviews the report and your materials later on

7    can verify they've got valid copies.

8          Q.   Now, you mention here -- I'll go down a

9    little bit, but -- that it's not possible to verify

10   if any of these provided documents, exhibits, and

11   recordings are indeed a reliable copy of the provided

12   documents.

13              Is there any way to determine aside from

14   the metadata and hash value whether an exhibit that

15   Dr. Begault has made himself is a reliable extract

16   from the original recording?

17          MR. KELSON:  Objection to the extent it calls

18   for speculation.

19          Q.   BY MR. WALTER:  Go ahead and answer,

20   Mr. Broyles, unless he tells you not to.

21          A.   Could you repeat the question?

22          Q.   Sure.  Is there any way to verify aside

23   from the metadata and the hash value whether an

24   exhibit that an expert has created himself is a

25   reliable copy -- was genuinely extracted from the

JONATHAN BROYLES - January 23, 2024

22

1   original copy?

2           MR. KELSON:  Same objection.

3           THE WITNESS:  It would not be possible to

4   determine reliability without the hash value.

5           Q.   BY MR. WALTER:  Now, if you'll go

6   down just a -- we'll go down just a little bit.  In

7   these paragraphs right here you say that --

8   essentially that Exhibit X1 cannot be relied upon

9   because Dr. Begault does not indicate what software

10  or equipment he used nor the import settings,

11  features or export settings used to create and export

12  the video.

13          Now, why does this make Exhibit X1

14  unreliable?

15          A.   Well, presumably if Dr. Begault is doing

16  scientific -- using scientific method in his results

17  in anything that he creates, then any other expert

18  should be able to, with his report, then replicate

19  what he did or verify his results.

20          But the problem here is that Dr. Begault

21  did not provide enough detail for that to happen.  In

22  other words, I don't know what software he used;

23  therefore, I can't replicate what he did.  Nor the

24  equipment he used; therefore, I can't do the same

25  process so I can't get to the same result.  I have no

JONATHAN BROYLES - January 23, 2024

23

1   way of knowing the exponent is actually a valid

2   result.

3       Q.   So kind of a similar -- I'll ask you a

4   similar question as to the other -- the Q1 and Q2

5   exhibits.  If Dr. Begault offered this information in

6   his deposition, would Exhibit X1 be considered

7   reliable?

8       MR. KELSON:  Objection to the extent it calls

9   for a legal conclusion.  Improper hypothetical.  Go

10  ahead and answer.

11      THE WITNESS:  Perhaps if it was provided

12  before the expert report deadline.

13      Q.   BY MR. WALTER:  Mr. Broyles, isn't it

14  true that anything created by an expert out of an

15  original recording -- so, for example, frames from a

16  video or a slowed-down portion of a video -- is by

17  definition not a copy of the original recording?

18      A.   That is absolutely true because it is

19  new work product.

20      Q.   Mr. Broyles, would you explain to me the

21  difference here between -- you say here that

22  Dr. Begault's process and results must be considered

23  subjective and not scientific.  Does this go back to

24  the ability to reproduce -- reproduce his results

25  that you mentioned earlier?

JONATHAN BROYLES - January 23, 2024

24

1          A.   Yes.  The --

2          Q.   And -- go ahead.  I apologize.

3          A.   The hallmark of a scientific method

4    report or result is that it can be independently

5    verified by someone else.

6          Q.   So are there any other differences that

7    you would say between subjective and scientific that

8    would apply to this report?

9          A.   No.

10         Q.   Are the -- what does SWGDE stand for?

11         A.   That is the Scientific Work Group on

12   Digital Evidence.

13         Q.   Are those -- are the SWGDE documents

14   scientific?

15         A.   Yes, they are.

16         Q.   Can you explain how those documents are

17   scientific?

18         A.   Well, they are in the manner that they

19   provide a framework for the integrity of digital

20   evidence.

21         Q.   How are the -- I know I'm going to get

22   the acronym wrong.  What is the SWGDE?  Is it an

23   institution or is it a training group?  What are

24   they?

25         A.   To help you, SWGDE is usually how it's

1    pronounced.

2             It's a nonprofit organization composed

3    of experts both in law enforcement and civil that

4    meets yearly to discuss the standards that the other

5    experts in their field will use.  The standards

6    supported by many forensic organizations and the --

7    internationally.

8         Q.   Can an opinion be relied upon that

9    doesn't follow SWGDE to the letter?

10        A.   Yes, if it can be verified or

11   replicated.

12        Q.   So these SWGDE guidelines are not

13   necessarily binding?

14        A.   They are only recommendations.  This is

15   true.  And they state that in their documentation.

16        Q.   And so they're not to be considered an

17   exhaustive -- they're not to be considered an

18   exhaustive:  This is the only scientific method to

19   create or preserve digital evidence, correct?

20        A.   That is correct because a lot of

21   agencies will have their own standard operating

22   procedures.

23        Q.   So if an agency does not follow the

24   SWGDE guidelines, how do you determine whether

25   they're creating reliable evidence?

26

1         A.    Well, you would have to look at their

2    process and see if there's an opportunity for the

3    digital evidence to be damaged or destroyed.  If

4    there is, then it's a problem.  If there's not, then

5    it's probably valid.

6         Q.    And what would constitute an opportunity

7    for digital evidence to be damaged or destroyed?

8         A.    Well, let's say an expert receives a

9    digital audio recorder, a mechanical device, and he

10   doesn't follow best practices, in other words, he

11   doesn't make an image of the recorded memory first,

12   preserve it.  If he didn't do that and then proceeds

13   to record exemplars, he would destroy evidence.

14        Q.    But if there is some process in there to

15   avoid the destruction of evidence, then it would be

16   reliable?

17        A.    Yes.

18        Q.    Mr. Broyles, are you a

19   best-practices-in-forensics expert?

20        A.    I have -- just about every forensic

21   class I've taken at the university has also trained

22   me in best practices.

23        Q.    Were you a member of any of the

24   committees that produced the SWGDE practices?

25        A.    No.  I've only -- since I'm a civilian,

1    at this point my only involvement will be in May as a

2    guest to provide input.

3           Q.   And what would you be providing input

4    on?

5           A.   I have no idea until the discussions

6    come up.

7           Q.   But it would be in creating these best

8    practices guidelines, correct?

9           A.   That is correct.

10          Q.   Is a SWGDE recommended practice an

11   industry standard?

12          A.   Yes.  It's supported by the Audio

13   Engineering Society, by the IAI, by a number of

14   forensic organizations.  So, yes, it's been well

15   received by the experts in this field.

16          Q.   If we go down a little bit I see you

17   have -- is it -- is my understanding correct that you

18   have similar complaints with Dr. Begault's Exhibit X3

19   as you did with Exhibit X1?

20          A.   Correct.

21          Q.   I guess my follow-up question on both

22   Exhibit X3 and Exhibit X1 is this:  What does it mean

23   to you -- I'll retract that question.

24               When you say that Dr. Begault's process

25   and results must be considered subjective and not

28

1    scientific, are you expressing any opinion on whether

2    they would be admissible in court?

3         A.   I'm not a lawyer so I'm not able to

4    answer that question.

5         Q.   Let's go down a little bit farther.  You

6    state here that Dr. Begault's Figure 2 cannot be

7    relied upon.  And I'm going to -- if I'm

8    understanding correctly, Figure 2 is this map here,

9    correct?

10        A.   That is correct.

11        Q.   Now, you state that Dr. Begault fails to

12   indicate some information, including the locations of

13   the talkers, the source of the map information, the

14   scale of the map shown, and the compass direction.

15   Why do you need the scale of the map and the compass

16   direction to determine Figure 2's reliability?

17        A.   The scale of the map would help another

18   expert be able to verify that the distances are

19   somewhat accurate.  The compass direction would help

20   orient the map to north, south, east, west.

21        Q.   Now, you say also that Figure 3 and

22   Figure 4 cannot be relied upon for several reasons.

23   Some of it is similar to your complaints about

24   Exhibit X2 and X1.  But you state here that

25   Dr. Begault does not explain the reasoning for

JONATHAN BROYLES - January 23, 2024

29

1    needing to use different software analysis tools for

2    generating speech spectrograms.

3                Is it customary to only use one software

4    analysis tool to generate a spectrogram?

5          A.    That's been my experience, yes.

6          Q.    Can an expert use more than one software

7    analysis tool?

8          A.    Oh, absolutely, but they need to say

9    what they're using.  He does not.

10         Q.    So simply the fact that he used two

11   different analysis tools would not necessarily make

12   the exhibit unreliable; is that correct?

13         A.    That's correct.

14         Q.    And then you mention here that

15   Dr. Begault doesn't indicate the settings used to

16   generate the spectrograms.

17                What is -- if you can explain some of

18   these terms to me here.  What is sweep bandwidth?

19         A.    Sweep bandwidth is a -- when the

20   spectrograph is generated, sweep bandwidth is the

21   frequency window or amplitude window of the frequency

22   sweep that determines the characteristic of the voice

23   spectrograph plot.

24         Q.    And what is amplitude scale and range?

25         A.    Amplitude scale and range in voice

JONATHAN BROYLES - January 23, 2024

1    spectrographs are the -- the range that the plot

2    covers; is it like from minus ten to zero dB?

3            Q.    And what -- I'm sorry, did you say DV or

4    dB?

5            A.    DB.  Decibels.

6            Q.    Okay.  And that's the standard unit of

7    measurement for sound; is that correct?

8            A.    That's correct.  DB in this case really

9    refers to dBV or zero dB equals one volt.

10           Q.    And what is the -- can you explain the

11   correlation of displayed gray and color scale to

12   amplitude to me?

13           A.    Yes.  Normally on a spectrograph --

14   voice spectrograph or any spectrograph plot you have

15   a scale on the right-hand side so that you can

16   correspond that this level of gray represents the

17   signal level at this dB.

18           Q.    And what --

19           A.    White might refer to zero dB.  Black

20   might refer to minus 90 dB, for instance.  That's so

21   the expert who reviews the spectrograph can say, oh,

22   okay, those signals are within this range.

23           Q.    And what is the start/stop time index?

24           A.    The spectrograph plot you have -- you

25   need to know what time your recording starts and the

31

1  time the recording stops because the spectrograph

2  would cover a specified period of time.

3         Q.   So that's just -- the start/stop time

4  index is just for use in --

5         A.   Well, it locates where the spectrograph

6  is in the recording.

7         Q.   So it's just for use in locating the --

8  determining where your spectrograph is in relation to

9  the remainder of the recording; is that correct?

10        A.   That's correct.

11        Q.   Okay.  Now, you mentioned down here that

12 Dr. Begault does not indicate any peer-reviewed

13 references to base his spectrograms or aural

14 comparisons/analysis upon.

15             But isn't it true that the use of

16 spectrograms for comparing speech sources is part of

17 any undergraduate program in phonetics?

18        A.   Yes, it is.

19        Q.   So would Dr. Begault need peer-reviewed

20 references just to use a spectrogram in comparing

21 speech sources?

22        A.   Potentially not.

23        Q.   Would he need them for aural comparisons

24 or analysis?

25        A.   What do you mean by aural?

1    Q.   The aural comparisons analysis that you
2    mentioned in this section here?
3    A.   Probably not, although on voice
4    spectrographs I tend to want to do that in my
5    reports.
6    Q.   So it is something -- you generally do
7    include peer-reviewed references, but the fact that
8    he did not does not necessarily mean that the use of
9    the spectrogram is invalid?
10   A.   That is correct.
11   Q.   So, Mr. Broyles, your report is, if I'm
12   understanding correctly, primarily a critique of the
13   investigation of the evidence by Dr. Begault,
14   correct?
15   A.   That is correct.
16   Q.   Did you do any of your own investigation
17   of materials that you reviewed?
18   A.   No, there wasn't enough time and I'm not
19   sure I was asked to do that.
20   Q.   So you didn't do -- you didn't do any of
21   your own spectrograms; you didn't analyze any of the
22   videos that you reviewed, nothing like that?
23   A.   That is correct.
24   Q.   From examining Dr. Begault's evidence,
25   do you have any disagreement with his opinions aside

JONATHAN BROYLES - January 23, 2024

33

1    from that you don't believe that you were provided

2    enough information to replicate his results?

3           A.    I'm unable to render any sort of opinion

4    there because I would have to examine or replicate

5    his work to have such an opinion.

6           Q.    Do you believe that Dr. Begault made any

7    errors in any of his analyses?

8           A.    Again, I do not know for the same

9    reason.

10          Q.    So if I'm understanding you correctly,

11   your only critique of Dr. Begault's reports have to

12   do with your opinions on what is scientific or

13   reliable?

14          A.    Correct.

15          Q.    Have you provided any of your own

16   methods or procedures that would -- that would make

17   the process scientific and reliable?

18          A.    No.

19          Q.    So you don't have any -- you're not

20   saying that Dr. Begault should have complied with the

21   SWGDE practices to be considered scientific?

22          A.    Well, they are recommendations so -- and

23   since we're both members of the AES, I would have

24   expected him to follow best practices.

25          Q.    So, Mr. Broyles, do you have the ability

1   to offer any opinion on what Mr. Sheeler or any other

2   person said in the body cam video?

3           A.   Without a full analysis, I do not have

4   an opinion.

5           Q.   Do you have any grounds from your report

6   to criticize Dr. Begault's opinions on Mr. Mecham's

7   report?

8           A.   No, again, I would have to do a full

9   analysis before I could form an opinion.

10          Q.   Did you review Mr. Mecham's report or

11   his rebuttal report to Dr. Begault?

12          A.   I believe I've read through it.

13          Q.   Do you believe that Mr. Mecham's report

14   was scientific?

15          MR. KELSON:  Objection.  Beyond the scope of

16   this expert and the expert's designation.

17          THE WITNESS:  I did not review his report.

18          Q.   BY MR. WALTER:  So you didn't review his

19   report with the same -- you didn't review his report

20   in the way that you reviewed Dr. Begault's report,

21   correct?

22          A.   That is correct.

23          Q.   Do you have any grounds from your report

24   to express an opinion on whether Mr. Sheeler is

25   walking backwards or not?

1           A.    Again, without a full analysis, I do not

2    know.

3           Q.    Do you have any grounds from your report

4    to express an opinion on whether Mr. Sheeler was or

5    was not following police commands?

6           A.    Without a full analysis, I would not be

7    able to render an opinion.

8           Q.    Do you have any grounds to criticize

9    Dr. Begault's report or his conclusions aside from

10   the claim that you were not provided with all of the

11   technical details in his report?

12          A.    Only those things listed in my report.

13          Q.    So your report concludes here that

14   Dr. Begault's report should not be relied upon.  Is

15   that your opinion in this case?

16          A.    Yes, it is.

17          Q.    Okay.  And you mention here that this --

18   finally, that this report does not include a full and

19   final statement of facts and opinions concerning

20   aforementioned forensic examinations and analyses.

21               Are there any other facts or opinions

22   that you've relied on that are not included in your

23   report?

24          A.    None that I'm aware of.

25          Q.    So is that statement there just a -- is

1  that kind of a reserving opinion statement if any --

2  if any research comes in or facts come in, you

3  reserve the right to revise your report?

4       A.   Potentially, but unfortunately in this

5  case the report deadline has passed.

6       Q.   Do you have any other opinions on

7  Dr. Begault's report aside from what is included in

8  this report here?

9       A.   No, I do not.

10      MR. WALTER:  Mr. Broyles, I don't believe I

11  have any other questions for you today.

12      THE WITNESS:  Okay.

13      THE REPORTER:  Stephen, do you have

14  questions?

15      MR. KELSON:  I don't believe I do.  Thank

16  you.

17      (The deposition concluded at 9:44 a.m.)

18

19

20

21

22

23

24

25

37

1                    REPORTER'S CERTIFICATE

2

3    STATE OF IDAHO              )
                                 )    ss.
4    COUNTY OF BONNEVILLE        )

5

6

7        I, Sandra D. Terrill, CSR, RPR, and Notary
     Public in and for the State of Idaho, do hereby
8    certify:
             That prior to being examined Jonathan Broyles,
9    the witness named in the foregoing deposition, was by
     me duly sworn to testify to the truth, the whole
10   truth, and nothing but the truth;
             That said deposition was taken down by me in
11   shorthand at the time and place therein named and
     thereafter reduced to typewriting under my direction,
12   and that the foregoing transcript contains a full,
     true, and verbatim record of said deposition.
13       I further certify that I have no interest in the
     event of the action.
14       WITNESS my hand and seal this 24th day of
     January 2024.

15

16

17

18

19

20                         Sandra D. Terrill
                           Idaho CSR No. 702,
21                         Notary Public in and for
                           the State of Idaho

22

23

24

25

# Exhibit 4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


JAKE SHEELER, an individual,          )

                   Plaintiff,          ) Case No.

vs.                                   ) 4:22-cv-00313-

BRIDGET MCARTHUR, an individual;      ) DCN

JEFFREY E. ELDRIDGE, an individual;   )

MARISA A. SALDANA, an individual;     )

ROGER SCHEI, an individual; and       )

CITY OF POCATELLO, a municipal        )

corporation;                          )

                 Defendants.          )




DEPOSITION OF OFFICER CHEYENNE CLAYTER (NÉE FETCHEN)

June 12, 2023




REPORTED BY:

AMBER S. WILLIAMS, C.S.R. No. 1080

Notary public

1          THE DEPOSITION OF OFFICER CHEYENNE CLAYTER

2     (NÉE FETCHEN) was taken on behalf of the plaintiff at

3     Pocatello City Hall, 911 North Seventh Avenue,

4     Pocatello, Idaho, commencing at 9:31 a.m. on

5     June 12, 2023, before Amber S. Williams, Certified

6     Shorthand Reporter and Notary Public within and for

7     the State of Idaho, in the above-entitled matter.

8

9                         APPEARANCES:

10    For Plaintiff:

11         CHRISTENSEN & JENSEN, PC

12         BY:  ANNA P. CHRISTIANSEN

13         BY:  JONATHAN T. NISH

14         257 East 200 South, Suite 1100

15         Salt Lake City, Utah  84111

16         anna.christiansen@chrisjen.com

17         jonathan.nish@chrisjen.com

18    For Defendants:

19         HALL ANGELL & ASSOCIATES, LLP

20         BY:  SAM L. ANGELL

21         1075 South Utah Avenue, Suite 150

22         Idaho Falls, Idaho  83402

23         sla@hasattorneys.com

24

25

```
1                    I N D E X

2

3    TESTIMONY OF OFFICER CHEYENNE CLAYTER          Page

4    (NÉE FETCHEN)

5      Examination by Ms. Christiansen..............   4

6

7

8

9                       EXHIBITS

10   Exhibit 14.   Pocatello Police Department......   9

11                 Detail Incident Report,

12                 12/02/20,

13                 Bates Nos. DEFENDANTS 000326 -

14                 DEFENDANTS 000347

15   Exhibit 15.   10/19/20 S. Kidwell..............   9

16                 Supplemental Report of

17                 Interview with Officer Cheyenne

18                 Fetchen,

19                 Bates Nos. DEFENDANTS 000127 -

20                 DEFENDANTS 000129

21   Exhibit 16.   Declaration of David............  30

22                 Noyes, Declaration of Todd Orr,

23                 Bates Nos. DEFENDANTS 005665 -

24                 DEFENDANTS 005669

25
```

1                OFFICER CHEYENNE CLAYTER (NÉE FETCHEN),

2      first duly sworn to tell the truth relating to said

3      cause, testified as follows:

4                          EXAMINATION

5      BY MS. CHRISTIANSEN:

6                Q.    Would you please state your full name

7      for the record.

8                A.    Cheyenne Marie Clayter.

9                Q.    And do you mind if I call you Cheyenne

10     today, or would you prefer to go by --

11               A.    No, that's fine.

12               Q.    We got introduced before we got started,

13     but my name is Anna Christiansen.  I'm representing

14     the plaintiff, Jake Sheeler, in this matter.

15               Have you ever had your deposition taken

16     before?

17               A.    No.

18               Q.    Have you ever given testimony in court

19     before?

20               A.    Yes.

21               Q.    Can you give me an example of the types

22     of cases that you've given testimony on just

23     generally.

24               A.    Just general?  I've been working for

25     almost 10 years, so a bunch of different kinds.

```
 1              Q.    All criminal cases?

 2              A.    Yes.

 3              Q.    Is it just DUIs?

 4              A.    I think I've only done one civil case

 5      involving a child custody.

 6              Q.    Okay.  On your criminal cases, can you

 7      give me an example of, like, the types of crime that

 8      you give testimony on?

 9              A.    Domestics, drugs, traffic, accidents,

10      DUIs.

11              Q.    Okay.  Have you ever given testimony as

12      an expert witness?

13              A.    No.

14              Q.    Do you understand what that means, "as

15      an expert witness"?

16              A.    Yes, I do.

17              Q.    So as we're going through the deposition

18      today, it's going to be very similar to what you've

19      done in court.  I'm assuming your attorney has

20      probably walked you through some of the rules of a

21      deposition, that we try and avoid talking over each

22      other or try to avoid having you give answers that

23      are "uh-huh," "huh-uh."  So if I press you for a yes

24      or a no, I hope you will forgive me; it's just so

25      that we'll have a clear written record.
```

1                   If you don't understand a question,
2     you're welcome to ask me to clarify.  It's not a big
3     deal.  If you do answer the question, I will assume
4     that you understand the question.
5                   Can you please tell me your current
6     employer.
7              A.   City of Pocatello.
8              Q.   And how long have you been working for
9     the City of Pocatello?
10             A.   Nine and a half years.
11             Q.   Nine and a half years?  When did you
12    complete POST?
13             A.   Before I started.  May of 2013.
14             Q.   Did you immediately go from POST in to
15    Pocatello?
16             A.   No.
17             Q.   Where did you go from there?
18             A.   Nowhere.  I was self-sponsored.
19             Q.   I don't know what that means.
20             A.   I was a self-sponsored student through
21    ISU for ISU POST, which is POST --
22             Q.   Okay.
23             A.   -- as if it were in Meridian, just a
24    little bit longer.  So I paid for it myself through
25    college and then took those two semesters and started

1    applying for jobs.  This is the only place I've

2    worked as a police officer.

3              Q.   How long was the gap between when you

4    completed POST and when you began working for

5    Pocatello?

6              A.   I was hired sometime in December and

7    started January 6th, 2014.

8              Q.   Okay.

9              A.   I did almost 100 hours here as practicum

10   with the Pocatello Police Department.

11             Q.   Was that before you were officially

12   brought on as an officer?

13             A.   Right.

14             Q.   Okay.  Is that a requirement you have to

15   complete so many practicum hours before you can --

16             A.   If you self-sponsor, you have to do

17   practicum hours.  I don't believe they require that

18   anymore because it's just different now.

19             Q.   Done away with that requirement?

20             A.   Well, they -- ISU's getting paid by

21   departments to do POST.  They're like an auxiliary

22   location.  I don't know.  I can't answer that.

23             Q.   Fair enough.  Do you have any particular

24   specialties?

25             A.   I'm a field training officer, law

1  enforcement phlebotomist, accident reconstructionist.

2  I used to be a drone pilot.  At the time of this

3  incident, I was a drone pilot.  I'm still licensed.

4          Q.    What was the first one you said?

5          A.    Field training officer.

6          Q.    What does that entail?

7          A.    Teaching officers how to do the basic

8  job.

9          Q.    Did you have to complete any special

10  certification in order to do that?

11          A.    I did.

12          Q.    What certification is that?

13          A.    You have to go to the Kaminsky School.

14  It's like a week-long school to learn how to teach

15  and grade.

16          Q.    When did you complete that training?

17          A.    I don't remember.  It's been a few

18  years.  I don't have my CV with me so I don't

19  remember.  I wasn't expecting to answer exactly when.

20          Q.    That's fair enough.  Tell me about

21  your -- so you have a special training to be a field

22  training officer.  Do you have any other special

23  certifications, qualifications?

24          A.    Yeah, I have a lot.  The major ones are

25  law enforcement phlebotomy, accident reconstruction

1    and drone pilot.

2              Q.    Those are all special certificates?

3              A.    Yeah.

4              Q.    For today's deposition, did you do

5    anything to prepare?

6              A.    I read my report and I read the report

7    for the original incident, my interview from the

8    investigators last week.

9              Q.    You read the -- hang on.  I've got some

10   documents here.

11                   (Exhibit 14 marked.)

12             Q.    (BY MS. CHRISTIANSEN):  This is the

13   complete Pocatello incident report, I believe.

14             A.    Is -- so we have two incident reports.

15             Q.    I believe your report starts -- if you

16   look at the bottom on Defendants 341, I believe

17   that's where your report starts.

18                   Is that what you reviewed for today?  Is

19   that one of the things you reviewed for today?

20             A.    Yes, it is.

21                   (Exhibit 15 marked.)

22             Q.    (BY MS. CHRISTIANSEN):  So you've just

23   been handed what we've marked as Deposition

24   Exhibit 15.  Is this also -- is this the summary of

25   your interview with the investigator that you said

1   you reviewed for today?

2           A.   Yes.

3           Q.   Did you review anything else for your

4   deposition today?

5           A.   So you provided me -- the report number

6   for the actual shooting portion, we created two LI's,

7   or law incident numbers.  I also reviewed the one

8   that was a lead-up to the shooting.  So that's -- I

9   have that LI if you don't.

10          Q.   Is that -- I don't want to enter this as

11  an exhibit, but is it Incident No. 20- --

12          A.   - -- 19954.

13          Q.   Correct.  Yeah.  Correct.  Okay.  So

14  we're talking about the same thing.

15               Was there anything else that you

16  reviewed for your deposition today?

17          A.   No.

18          Q.   Have you reviewed any body camera

19  footage?

20          A.   No.  I didn't have body camera.

21          Q.   Have you reviewed any audio recordings?

22          A.   No.

23          Q.   And I don't want to know any substance,

24  but did you speak with Sam in preparation for today?

25          A.   Yes.

1          Q.    You have some familiarity with the
2     shootings -- with the shooting of Jake Sheeler on
3     September 25th, 2020?
4          A.    Yes.
5          Q.    What was your rank at that time?
6          A.    Master patrolman.
7          Q.    What's your current rank?
8          A.    Same.
9          Q.    Were you one of the shooters on that
10    day?
11         A.    No.
12         Q.    Did you draw your firearm that day?
13         A.    Not during that particular portion of
14    the incident, but yes, I had drawn my firearm at some
15    point.
16         Q.    But not at the scene of the Outback Golf
17    Park?
18         A.    No.
19         Q.    Were you reprimanded or disciplined in
20    any way in relation to the events of September 25th,
21    2020?
22         A.    No.
23         Q.    Have you ever been reprimanded or
24    disciplined in relation to your work as a police
25    officer?

1        MR. ANGELL:  Hang on.  Object to the form of

2    the question, calls for confidential employee

3    matters.  Let me think for a second.  I'll probably

4    instruct the witness not to answer that question, but

5    if I could confer with her outside of the deposition

6    for a minute, we may be willing to weigh that

7    objection and answer.

8        MS. CHRISTIANSEN:  Go ahead and take a

9    moment.

10           (A recess was taken from 9:44 a.m. to

11    9:46 a.m.)

12        MR. ANGELL:  So, back on record, we'll

13    maintain the objection and not answer that question.

14        MS. CHRISTIANSEN:  What's the basis for that

15    objection?

16        MR. ANGELL:  Well, it's irrelevant for

17    starters.

18        MS. CHRISTIANSEN:  Is that your understanding

19    that's a proper objection under the federal rules?

20        MR. ANGELL:  Yes.  Second, it invades a

21    personnel matter.  She's not a named defendant in

22    this case, and so without court approval or under

23    some kind of other protective order, we are not going

24    to produce that information.

25        MS. CHRISTIANSEN:  Well, I'll note that it's

1  my understanding that relevance is not a proper
2  deposition objection under the federal rules, and a
3  public employee's disciplinary record is public
4  record and it is not confidential and there's no
5  basis for refusing to answer that question.
6          MR. ANGELL:  Okay.  I'm maintaining the
7  objection, though.
8          MS. CHRISTIANSEN:  Well, let's move along.
9          Q.  (BY MS. CHRISTIANSEN):  Looking at
10  Exhibit 14, the page Bates-marked Defendants 341, is
11  there where your report begins?
12          A.  Yes.
13          Q.  And so you said you reviewed this report
14  recently.  Was there anything that came to your
15  attention when you reviewed it that you would change
16  about this report?
17          A.  Can I compare it to this one?
18          Q.  Certainly.  I just -- the question is
19  limited to that report at this time.  I'm not asking
20  for a comparison; I'm just asking as a standalone.
21  You've already reviewed it, you said.  Did you --
22          A.  My recollection is -- sorry.  What was
23  the date of the incident again?  09/25?
24          Q.  September 25th, 2020.
25          A.  So I wrote this -- or, dictated it three

1   days after the incident and it would be my most

2   processed memory of the incident.  So no, I would not

3   change anything about it.

4           Q.   You said your "most processed"?  Is that

5   what you said?

6           A.   Yeah.

7           Q.   What do you --

8           A.   So after an incident happens --

9   right? -- everything is jumbled.  I had time to

10  relax, get off the adrenaline and remember more.  So

11  this is my most accurate report.  Exhibit 15 is right

12  after the incident.

13          Q.   So are you saying that you -- if there

14  were any slight differences between Exhibit 14 and

15  15, you would defer to Exhibit 14?

16          A.   Yes.

17          Q.   Okay.  I'm going to go through some of

18  the sentences of your report.  So you said you

19  prepared it three days after the incident.  Is that

20  noted on the page marked 341 where it says, "Dictated

21  09/28/2020 at 05:28 hours"?

22          A.   Yes.  That's the time I logged on to my

23  phone and set the time.

24          Q.   Is that military time, 5:28 a.m.?

25          A.   Yes.

1          Q.    That's a heck of a time to be dictating

2    a report.  Is that your normal hours that you would

3    work?

4          A.    I think I was just on -- I honestly

5    don't remember what shift I was on, swing or

6    nightshift.  I don't remember.

7          Q.    If you're on a shift and there's nothing

8    exciting going on, is that normal that you would sit

9    down and type up a report?

10          A.    Yeah.

11          Q.    Okay.  Okay.  Moving on to the next

12    page, Defendants 342, your report starts, "On

13    09/25/2020, at approximately 20:08 hours, I responded

14    to the area of 1700 Beth Street to assist officers

15    investigating the continuation of a previous incident

16    under Law Incident No. 20-P19954 in the area of Jean

17    Street and Lucille Avenue."

18               Is this a true statement?

19          A.    Yeah.

20          Q.    What's your recollection of what the

21    description of the suspect you were searching for --

22    that was a very long question.  Let me start that

23    again.

24               At the time that you joined this

25    investigation, what was your understanding of the

1   description of the suspect at that time?

2          A.    Are you talking about the beginning of

3   the day?

4          Q.    No.  At the -- so you're saying --

5          A.    Or do you mean at 20:08 hours?

6          Q.    That one.

7          A.    I don't recall a particular thing.  It

8   was reported to us that he changed clothes several

9   times.

10          Q.    Do you recall what the descriptions of

11   his clothing were?

12          A.    Dark clothing.

13          Q.    Even after he changed?

14          A.    I don't know.  I don't remember.  I

15   remember being told -- I just don't remember.

16          Q.    You just remember that he had changed

17   clothing at some point in time?

18          A.    Right.

19          Q.    For any other more-detailed descriptions

20   of his clothing, would you have to defer to the

21   e-mails -- the Spillman log?

22          A.    Yes.

23          Q.    What was your understanding of who was

24   in charge at the time that you rejoined this at

25   20:08?

```
 1              A.    Corporal Eldridge was directing people.
 2              Q.    How did you know who was in charge?
 3              A.    He was the one that asked for help.
 4              Q.    Okay.
 5              A.    Who's in charge can vary during an
 6       incident.
 7              Q.    What do you mean by "it can vary during
 8       an incident"?
 9              A.    One location, it could be one person;
10       one moment, it can change to the next person.
11              Q.    Can you tell me why that would -- so I
12       think it would make sense that you would have
13       different people in charge at different sites...
14              A.    Somebody could show up and have more
15       information, and now they would assume...
16              Q.    Assume command?
17              A.    Control, yeah.  If I don't have the
18       necessary information, if I'm asked by somebody to go
19       somewhere or do something who does have that
20       information, I assume they have somewhat of control
21       of the call, and that could be multiple people.
22              Q.    So does the team collectively defer to
23       whoever has the most information at that time?
24              A.    Yes.
25              Q.    Okay.  Is that part of a training
```

1   protocol?

2          A.    More practical, I guess.

3          Q.    Just on-the-job experience?

4          A.    Yes, knowing your team and how they

5   work.

6          Q.    What if it's not clear who has the most

7   information?

8          A.    It's not my job to question it.

9          Q.    You just defer to whoever is giving --

10         A.    If they've asked me to do something and

11  I'm not giving up, you know, safety or -- or

12  whatever, I would do whatever was asked of me.

13         Q.    Okay.  Looking at the second paragraph

14  of that same page, you said, "While doing this, an

15  Idaho State Police Trooper got on to the Pocatello

16  Police Department frequency and advised that he was

17  at the Red Lion Hotel."

18              Is that a true statement?

19         A.    Yeah.  I don't know who this was,

20  though.

21         Q.    Do you recall anything more that the

22  trooper reported other than, "I'm at the Red Lion

23  Hotel"?

24         A.    He said he had thermal imaging and that

25  he was looking at the hill towards where we were

1  above the -- it was Jean, in that general direction.

2        Q.   Is it normal that an ISP trooper will

3  jump into an investigation?

4        A.   Yes.

5        Q.   How does that -- I don't know anything

6  about how that works with, like, different agencies

7  working together.  Can --

8        A.   We have some kind of compact, or

9  whatever they're called, where we agree to help each

10 other and, if something serious is going on, we jump

11 in and offer that help.

12       Q.   So is it that there will be, like,

13 mutual scanning of each other's radiofrequencies and

14 just see what's going on?

15       A.   Yes.  Uh-huh.

16       Q.   If you need help or if ISP needs help,

17 do they reach out to somebody?

18       A.   Yes.  They can get on the radio traffic

19 channel or they can call into dispatch and request

20 said help.

21       Q.   Okay.  In this case do you know how the

22 ISP trooper came to be involved?

23       A.   I recall that he just got on our radio

24 channel and said that he was down at the Red Lion

25 with his thermal imaging.

1              Q.    Okay.  The last sentence of that same
2     paragraph says, "There was no further radio
3     communication from that ISP trooper."
4              Is that a true statement?
5              A.    Yes.
6              Q.    So you didn't -- after he advised that
7     he was going to check with we now know is Jake, that
8     person, you didn't hear any further from that
9     trooper --
10             A.    No.
11             Q.    -- on the radio?
12             A.    Uh-huh.
13             Q.    Did you hear any further from that
14    trooper otherwise?
15             A.    I don't remember which number he was,
16    who he was, so I don't -- I couldn't answer that.
17             Q.    Okay.  Once you have a -- an ISP trooper
18    that joins an investigation, how do you keep up
19    communication?
20             A.    They usually come to our channel if it's
21    needed.
22             Q.    Okay.
23             A.    Or we just direct communicate.
24             Q.    Direct communicate?  Talk to each other?
25             A.    Like we're doing now.

1          Q.    Okay.  Next paragraph, which is the

2    third paragraph down, "Available officers responded

3    to that area, and I responded to the southwest side

4    of the Red Lion Hotel."

5                That's a true statement?

6          A.    Yes.

7          Q.    Tell me all the officers that you

8    encountered at that -- at the Red Lion Hotel.

9          A.    From Pocatello Police, I remember

10   Officer Anderson -- T. Anderson, Officer Saldana.

11   There were state troopers that I couldn't name.

12         Q.    Okay.  So Anderson, Saldana, and how

13   many ISP troopers?

14         A.    I don't remember.

15         Q.    You don't remember?

16         A.    No.  I think it was around three or

17   less.

18         Q.    Do you have any understanding about how

19   many officers in total were responding to the Red

20   Lion Outback golf course area at that time?

21         A.    Probably anybody that was available.  I

22   don't know.  Just because --

23         Q.    You don't know total numbers?

24         A.    No.  I couldn't answer that for you.

25         Q.    Next paragraph, "I was flagged down by a

1    patron of the Red Lion Hotel that was trying to

2    report an incident that occurred earlier that day."

3              That's a true statement?

4        A.    Yes.

5        Q.    Did that hold you up for a moment, the

6    conversation with that --

7        A.    Probably no more than a minute.

8        Q.    Okay.  Were you able to monitor the

9    radio traffic while that was going on?  Like, were

10   you still able to hear?

11       A.    Yes.

12       Q.    Had you been monitoring this radio

13   traffic all day?

14       A.    Yes.

15       Q.    And monitoring your Spillman log?

16       A.    Did you say "Spillman"?

17       Q.    Yes.

18       A.    Yes.

19       Q.    And your e-mail?

20       A.    Not my e-mail as much.

21       Q.    So in the next paragraph, it says,

22   "Information was put out that the male was in the

23   treeline southeast of where I was standing."

24              That's a true statement?

25       A.    Yes.

```
 1            Q.   How was that information put out?
 2            A.   I think it was over radio.
 3            Q.   I'm sorry?
 4            A.   I believe it was over radio.
 5            Q.   Okay.  Next sentence, "I looked in that
 6   direction and then heard yelling."
 7                 Is that a true statement?
 8            A.   Yes.
 9            Q.   What kind of yelling did you hear?
10            A.   Commands.
11            Q.   Were you able to identify the voices?
12            A.    I could tell that they were voices I
13   knew, but I could not understand what they were.
14            Q.   You couldn't understand what the
15   commands were?
16            A.   No.
17            Q.   How many voices did you hear?
18            A.   At least two.
19            Q.   Next sentence, "I saw a male dozens of
20   yards away that appeared to be wearing gray clothes."
21                 True statement?
22            A.   I lost you.
23            Q.   342, I am one, two, three, four -- five
24   paragraphs down, last sentence of that paragraph.
25            A.   Okay.  Yes.
```

1        Q.    Could you see the male clearly?

2        A.    No.

3        Q.    You could not?

4        A.    I could see -- it was blurry because he

5   was very far away.  So could I tell you specific

6   things about him other than he was wearing gray and

7   male?  No.

8        Q.    Okay.  So in your -- in Exhibit 15 --

9   give me just a moment.

10            Where was the male at the time that you

11   observed -- that you first observed him that you're

12   referencing in this Paragraph 5 -- where was he

13   geographically?

14        A.    So the south side of Red Lion is all

15   parking lot.  That's where we were all at.  He was

16   directly east of there in a -- in the Outback field

17   through, like, a tree -- a break in the trees.  It

18   was kind of an archway almost.

19        Q.    So was he sort of on the Outback

20   property?  I mean, I'm not asking for a legal --

21   what -- whose property was he on; I'm just meaning,

22   from your observation would you say he was on the

23   golf park?

24        A.    Yeah.  He was quite far away.

25        Q.    Was the Outback Golf Park lit up?

1          A.    Yes.

2          Q.    So referencing Exhibit 15, you -- if you

3    look at Defendants 129, you were asked about the

4    lighting and if you were able to see, and you said,

5    "The driving range was lit up pretty well, but it was

6    very dark until the break in the trees."

7          A.    Right.

8          Q.    And you said he was on the other side of

9    the break in the trees?

10          A.    Yeah, so he was backlit.

11          Q.    He was backlit?

12          A.    To my direction, he was backlit.

13          Q.    So you couldn't necessarily see him very

14    clearly.  He was blurry --

15          A.    Correct.

16          Q.    -- is what you said?

17          Okay.  Jumping back to Defendants 342,

18    sixth paragraph, "Officers at the Red Lion Hotel ran

19    in that direction, and I heard Officer -- I heard PPD

20    Officer T. Anderson give the male commands to get

21    down on the ground."

22          True statement?

23          A.    To my recollection.

24          Q.    Did you hear anybody else give commands

25    at that time?

```
1          A.    There was other officers around me
2    yelling, but I couldn't tell you what they were
3    saying.
4          Q.    You don't have any idea what they
5    were --
6          A.    There was too many people.  Anderson was
7    closest to me, so I could hear what he said.
8          Q.    But you know that the other officers
9    that were on the Red Lion side of the field were also
10   giving commands?
11         A.    Yes.
12         Q.    Do you know what those commands were?
13         A.    No.
14         Q.    Were they shouting loud enough to be
15   heard?
16         A.    I don't know.
17         Q.    Were they shouting?
18         A.    Yes.
19         Q.    Next sentence of that paragraph, "I ran
20   east to the direction of the treeline, and the male
21   appeared to stay in the same area but turned in
22   different directions."
23               True statement?
24         A.    Yes.
25         Q.    What do you mean by "but turned in
```

1    different directions"?

2          A.    Like, he turned one way, turned the next

3    way.

4          Q.    Can I impose on you to stand up and

5    demonstrate for me what you mean?  And please narrate

6    for the record because it'll just be a written

7    record; we won't be able to capture what you're

8    doing.

9          A.    As if he turned towards the west and

10   then turned towards the south, a different direction.

11         Q.    Okay.

12         A.    So one second one direction, the next

13   second --

14         Q.    And those two directions were the west

15   and the south?

16         A.    Correct.

17         Q.    So if he was turned toward the west, was

18   he walking backward at any point in time?

19         A.    I couldn't tell you.  I don't know.

20   He --

21         Q.    Was he -- I'm sorry.  Finish.

22         A.    He was too far away from me to tell

23   exactly which way he was facing.

24         Q.    Was he walking at the time that you

25   observed him turning directions?

1          A.    For a couple of seconds, because he went

2    from the south tree more towards the north tree and

3    that archway of trees and stopped in the center,

4    turned two directions stopping I think facing south.

5          Q.    Okay.  So you observed him doing some

6    walking and then he stopped and stood?

7          A.    I think so.

8          Q.    Okay.  Next sentence, "From this

9    distance I could not clearly see if the male had any

10   items in his hands such as the firearm that had

11   reportedly been stolen by the male."

12               True statement?

13         A.    Yes.

14         Q.    Could you see his hands at all?

15         A.    I could tell where they were.

16         Q.    Where were his hands?

17         A.    Down low.

18         Q.    Did you see his hands move at all during

19   this time?

20         A.    I do recall him raising one of his arms

21   towards the south.

22         Q.    Toward the south?

23         A.    Yes.

24         Q.    Can you describe more about him raising

25   that arm toward the south with his fingers out?

1          A.   I can't tell you that.  I'm just -- arm
2    up.
3          Q.   Well, you -- you raised your arm with
4    your fingers out.
5          A.   Okay, arm up.  I don't -- I can't tell
6    you hands open, closed, fingers --
7          Q.   So you could not --
8          A.   Like I said, he was blurry.  I could
9    only see his arm raised, and I could tell where the
10   hands were simply because it's different than gray or
11   a darker color.
12         Q.   His hand -- what color were his hands?
13         A.   Caucasian.
14         Q.   White?
15         A.   Yes.
16         Q.   So you could see his hands and you could
17   see that he had raised -- I'm sorry -- you said his
18   right hand?
19         A.   I don't know if it was his right or left
20   hand.
21         Q.   He raised a hand to the south?
22         A.   Right.
23         Q.   Was he facing the south at that time?
24         A.   I would assume so based on body
25   mechanics.

1         Q.   Well --

2         A.   It would be awfully hard to raise your

3    hand that way behind you.

4         Q.   But you can raise your hand out to the

5    side, you could raise your hand in front -- yeah, he

6    could raise it -- he could go behind.  It can be

7    done.

8         A.   Sure.

9         Q.   So do you recall what direction he was

10   facing at the time that you observed his arm raised

11   out to the south?

12        A.   I feel like his front was facing the

13   south.

14        Q.   Okay.  Now, you were to the east,

15   correct?

16        A.   No, I was west of him.  He was east of

17   me.

18        Q.   You were -- he was east of you?

19        A.   Right.

20        Q.   Hang on.  I'm going to get a map here to

21   help me clarify this.

22             (Exhibit 16 marked.)

23        Q.   (BY MS. CHRISTIANSEN):  If you will,

24   flip to the third page of that.  And then using that

25   map -- so this is Defendants 5667.  Can you -- can

1    you mark for me where you were at on there?

2         A.   Can I just --

3         Q.   Yeah, go ahead and draw directly on

4    there.

5         A.   Do you know, is that part of the

6    building of the Red Lion?

7         Q.   I do not know.  I believe but do not

8    know that that's the outbuilding at the Red Lion

9    Hotel.

10        A.   What is this right here?  The Red Lion?

11        Q.   I don't know.

12        A.   So --

13        Q.   I could pull up a map of the -- I could

14   pull up a Google Earth map if that would be helpful.

15   I believe that's just pulled from Google Earth.

16        A.   When I was told that he was in the

17   treeline, I was over here.

18        Q.   I want to know where you were at at the

19   moment that you observed him with his arm out.

20        A.   And then maybe --

21        MR. ANGELL:  Hang on, Counsel.  She said,

22   "Over here" and just indicated off the map.

23             So you were further west off the map

24   when you were told?

25             Is that a "yes"?

1              THE WITNESS:  Yes.

2              MR. ANGELL:  Okay.  Now keep going.

3              Q.    (BY MS. CHRISTIANSEN):  And so that's

4    your location when you observed Jake with his arm

5    out?

6              A.    Approximately.  I couldn't tell you

7    exactly where, but I know it's at the edge of the

8    property.

9              MR. ANGELL:  Just to clarify, you've got two

10   X's there.  Will you circle the one where you were at

11   when you saw his arm go up?  Okay.  So there's an X

12   circled by that outbuilding; is that right?

13             THE WITNESS:  Yes.

14             MR. ANGELL:  I'm only being nit-picky with

15   that so we can get the record of it on the

16   transcript.  Thank you.

17             Q.    (BY MS. CHRISTIANSEN):  Okay.  So it

18   sounds like you said at times he was facing west and

19   at times he was facing south.  So there were times

20   when he was facing you?

21             A.    Yeah, I think so.

22             Q.    Did you ever see him turn around and

23   face east?

24             A.    I don't recall.

25             Q.    You don't recall?

1              A.    No, I don't recall.

2              Q.    Okay.  I believe your report describes

3    him as walking and standing.  Did you ever see Jake

4    run?

5              A.    I don't think so.

6              Q.    Okay.  But you ran?  Your report says

7    that you ran.  Is that a true statement?

8              A.    Yes, I ran from way over here.

9              Q.    We can probably put this aside.  I don't

10   think we're going to need that exhibit again.

11              There were various reports that

12   mentioned a backpack.  Did you observe Jake

13   wearing -- did he appear to be wearing a backpack

14   when you saw him?

15             A.    No.  I don't recall.

16             Q.    "No," you don't recall --

17             A.    I don't recall.

18             Q.    You don't recall?  Okay.

19              Second to last paragraph of 342,

20   "Officers continued to run in that direction and I

21   called out to be aware of crossfire."

22              True statement?

23             A.    Yes.

24             Q.    Do you recall what you said?

25             A.    "Watch out for crossfire."

1    Q. Something to that effect?

2    A. Something.

3    Q. Did you yell it?

4    A. Yes.

5    Q. Did anybody respond to you?

6    A. No.

7    Q. Did you hear any other statements from

8 other officers or from Jake?  Did you hear --

9    A. Other than the general yelling of

10 commands, no.

11    Q. Did your fellow officers continue to

12 yell commands?

13    A. Yeah, until the shots went.

14    Q. What commands did they yell?

15    A. What Anderson said, "Get down," I think.

16 And I don't recall what others said.

17    Q. You said earlier that you couldn't

18 understand -- I think you said you either couldn't

19 understand or couldn't hear them clearly -- what the

20 commands were.

21    A. No.  That's in reference to officers out

22 in the Outback that I heard yelling.

23    Q. Okay.

24    A. I couldn't tell you what they said.  The

25 people around me -- there was a lot of yelling.

1          Q.    What were they yelling?

2          A.    I know they were commands, but I don't

3    know what they said.

4          Q.    So you knew they were yelling commands?

5          A.    Correct.

6          Q.    Do you know -- other than Anderson's

7    command, do you have any recollection of any other

8    commands that were --

9          A.    No.

10          Q.    You don't recall what those commands

11    were?

12          A.    No.

13          Q.    You just know that they were commands?

14          A.    Correct.

15          Q.    Do you recall hearing anybody identify

16    themselves as police?

17          A.    I don't recall.

18          Q.    So in these last moments as you're

19    running toward Jake but before the shots were fired,

20    did you know how many officers were on the scene at

21    that time?

22          A.    In the total scene?

23          Q.    In the Outback Red Lion scene.

24          A.    I knew of the ones around me and had

25    sense of others that were up there on Jean and

1    Lucille --

2            Q.   On the street --

3            A.   -- area.

4            Q.   -- but did you have any sense of who was

5    down in the golf park area?

6            A.   No.

7            Q.   You had heard some officers yelling in

8    the field, correct?

9            A.   Yes.

10           Q.   But you didn't know how many?

11           A.   No.

12           Q.   Second sentence of the second to last

13   paragraph, "While running, I saw a flash in front of

14   me, however I could not tell where it came from."

15               True statement?

16           A.   Yes.

17           Q.   Did you -- was that flash a flashlight?

18   What was that flash?

19           A.   It didn't seem like a flashlight.

20           Q.   What did it seem like?

21           A.   It seemed like gunfire.

22           Q.   What did you -- who did you think was

23   shooting?

24               MR. ANGELL:  Object to the -- hang on.  I'm

25   just going to object to the form.  It calls for

1    speculation.
2              But go ahead and answer, if you know.
3         THE WITNESS:  I don't know.  I know now; I
4    didn't know then.
5         Q.   (BY MS. CHRISTIANSEN):  Did you at that
6    time have an assumption about who was shooting?
7         A.   No.
8         MR. ANGELL:  Same objection.
9         MS. CHRISTIANSEN:  She doesn't -- you're
10   objecting to whether or not she had an assumption
11   about who was shooting?
12        MR. ANGELL:  Correct.
13        MS. CHRISTIANSEN:  And what's the basis for
14   that objection?
15        MR. ANGELL:  It's an improper question and it
16   calls for speculation.
17        MS. CHRISTIANSEN:  How is it improper?
18        MR. ANGELL:  I'm not going to argue with you.
19        MS. CHRISTIANSEN:  I have -- I'd like an
20   opportunity to cure my question if I can.  I don't
21   understand how it's improper to ask her if she had an
22   assumption.
23        MR. ANGELL:  She can go ahead and answer the
24   question.
25        THE WITNESS:  No.  I don't know.

1        Q.    (BY MS. CHRISTIANSEN):  Okay.  Did you
2    hear gunshots at that point?
3        A.    Yes.
4        Q.    Do you recall how many gunshots you
5    heard?
6        A.    About a handful.
7        Q.    Okay.  Did you make any inference about
8    who was shooting at that time?
9        A.    When shots are fired, sometimes it's
10    officers and sometimes it's a suspect.  I couldn't
11    tell.
12        Q.    Did you make an inference?
13        A.    I would assume that we shot.
14        Q.    That who shot?  I'm sorry.
15        A.    Police.
16        Q.    Okay.  Did you make an inference about
17    why they were shooting?
18        A.    The report was for gun thefts and
19    threats where a gun had been used to rob so I
20    presumed it was because a firearm was seen and
21    threatened.
22        Q.    Okay.  But you didn't actually see
23    whether a -- you didn't actually see whether there
24    was a visible firearm, or threat of a firearm?
25        A.    All I saw was the arm go up --

1          Q.    Okay.

2          A.    -- and then the shots.

3          Q.    When you saw that arm go up, was it

4    straight out?  Was the elbow bent?

5          A.    More straight.

6          Q.    Was it perpendicular to the body?

7          A.    Yes.

8          Q.    Okay.  And you just saw one arm,

9    correct?  Not two arms?

10          A.    Yeah.

11          Q.    Are you aware that there was no firearm

12    that was found at the scene of the shooting on

13    September 25th, 2020?

14          A.    Following a full investigation, yes.

15          Q.    Okay.  Does it make sense to you why he

16    would stick his arm straight out in the manner that

17    you're saying you saw?

18          MR. ANGELL:  Hang on.  Object to the form,

19    calls for speculation.

20              You can answer that, if you know.

21          THE WITNESS:  Rephrase the question, please.

22          Q.    (BY MS. CHRISTIANSEN):  Does it make

23    sense to you why he would stick his arm out if he

24    didn't have a firearm on him?

25          MR. ANGELL:  Same objection.

```
 1                    Go ahead.
 2               THE WITNESS:  I can speculate why he would.
 3               Q.   (BY MS. CHRISTIANSEN):  What's that
 4     speculation?
 5               A.   That he was trying to make officers
 6     think that he had a gun.
 7               Q.   Did you at that point draw your firearm?
 8               A.   No.
 9               Q.   And you did not at any point draw your
10     firearm during this encounter, correct?
11               A.   No.
12               Q.   So when you heard the gunshots, it's
13     fair to say that you assumed it was police and not
14     the suspect that was shooting?
15               A.   I didn't -- I couldn't tell you at the
16     time if it was both or just one side.  I didn't know.
17               Q.   But you didn't draw your firearm?
18               A.   No, because of the distance.
19               Q.   Explain that a little more for me.
20               A.   All I had was a handgun.  It was greater
21     than a handgun distance.
22               Q.   But you were also running toward the
23     scene, correct?
24               A.   Yes.
25               Q.   But you did not draw your firearm as you
```

1   were approaching that scene?

2          A.   I'm not going to run with a handgun.  I

3   would run with a rifle.  I would not run with a

4   handgun in my hand.

5          Q.   Okay.  Did you -- were you able to see

6   Jake while he was being shot?

7          A.   I could only see Jake.

8          Q.   You could only see Jake?

9          A.   As far as out in the Outback area, I

10  could only see him.

11         Q.   What direction was he facing in that

12  moment that you saw him being shot?

13         A.   South.

14         Q.   He was facing south?  Okay.

15         MR. ANGELL:  Was that a "yes"?  You nodded

16  your head.

17         THE WITNESS:  Oh, I didn't realize it was

18  actually a question.  Yes, I only saw him facing

19  south at that moment.

20         Q.   (BY MS. CHRISTIANSEN):  Did he have his

21  arm out at that moment?

22         A.   Yes.

23         Q.   Did he change directions at all in that

24  moment?

25         A.   I don't recall.

1          Q.    Did you see him fall directly to the

2    ground?

3          A.    Yeah, I do recall that.

4          Q.    Prior to September 25th, 2020, had you

5    had any other dealings with Jake Sheeler?

6          A.    I don't think so.

7          Q.    Did you have any familiarity with him at

8    all before this date?

9          A.    I don't recall having any familiarity

10   with him.

11         Q.    Okay.  I am going to jump to

12   Defendants 343, third paragraph of your narrative.

13               "I assisted the ambulance personnel in

14   lifting Jake Sheeler onto the cot and then followed

15   them into the ambulance.  I maintained security at

16   the hospital along with PPD Officer Card, BSCO

17   Detective Cannon, and BSCO Taysom."

18         A.    Yes.

19         Q.    True statement?

20         A.    Yes.

21         Q.    Did you remain at the hospital for a

22   period of time?

23         A.    Yeah.

24         Q.    Do you recall how long you remained at

25   the hospital?

1          A.    Probably a couple of hours.  I don't

2   really -- I don't remember exactly.

3          Q.    Did you communicate with the hospital

4   staff about Jake at all?

5          A.    Probably about what I did for medical

6   aid specifically, and -- I don't recall anything else

7   after that -- the general understanding of what's

8   going on.

9          Q.    And what was that general understanding?

10         A.    He was a robbery suspect that we

11   encountered.

12         Q.    Okay.  Now, you don't -- I don't see

13   anywhere in your report where you say that Jake had

14   his arm out.  Can you point me to any place in your

15   report where you say he had his arm out?

16         A.    I don't have that.  I didn't note that

17   in my dictation.

18         Q.    And if you look at Exhibit 15, I also

19   don't see that you ever reported that you saw his arm

20   out in your interview.  In fact, I see the opposite,

21   that you said you couldn't tell what he was doing

22   with his hands.  And that's at the bottom of 128, the

23   last paragraph, second sentence.

24               Can you point me to anywhere in

25   Exhibit 15 where you reported that his arm was out?

1            A.    No.  If it's not there, it's not there.

2            Q.    When did you first remember that his arm

3    was out?

4            A.    I don't know.

5            Q.    It seems like a rather important detail.

6    Would you agree?

7            A.    Yeah.

8            Q.    What kind of training did you receive

9    about what to put in a police report?

10            A.    Put relevant information --

11            Q.    And how do you determine what --

12            A.    -- from our observations.

13            Q.    I'm sorry.  Say that again.

14            A.    In my observations.

15            Q.    How do you determine what of your

16    observations and what information is relevant?

17            A.    It's kind of hard to answer.  It's just

18    what's relevant to the investigation itself.  Outside

19    information such as just general chitchat or -- every

20    little part of the conversation doesn't get added,

21    you know, like --

22            Q.    Right.

23            A.    What I see -- what I do that pertains

24    would be added.

25            Q.    Okay.  Did you later hear from other

1   sources that Jake had had his arm out?

2          A.   No.   That is my recollection.

3          Q.   When did you first recall that?

4          A.   I don't recall.

5          Q.   You said --

6          A.   It was around this time, but...

7          Q.   You said that your best recollection

8   that you would defer to is this report?

9          A.   Right.  Because this is the most recent

10  report.

11         Q.   I actually think it's not the most

12  recent report after the shooting because the most

13  recent report was your interview.  But you said --

14  because that was --

15         A.   No.  That was -- I was interviewed on

16  the 25th.  So this report is referring to the 25th.

17  I wrote this report on the 28th.

18         Q.   Right.  So I guess it depends on what we

19  mean by recent in time to now or recent in time to

20  the shooting.  But the most recent -- the most

21  immediate report from my understanding after the

22  shooting was your interview, Exhibit 15.

23               But you have said that you would defer

24  to your written report as the most accurate

25  representation of what happened, correct?

1          A.    In written form, yes.

2          Q.    In written form?  Do you dispute

3   anything that's in your interview summary?

4          A.    I would just dispute that I recall him

5   raising his arm.

6          Q.    Why didn't you put it in your report --

7   in your written report?

8          A.    It's not for an intentional omission or

9   anything.  It's -- we have to dictate into a phone.

10  We can't remember every little thing I say -- and

11  this is a locked report so I was not allowed to

12  access it again.

13         Q.    Can you review --

14         A.    And I did my best to recall everything

15  in my dictation and give the most accurate

16  information.

17         Q.    Can you review the report before you

18  finalize it?

19         A.    Not on shootings.

20         Q.    Can you supplement a report?

21         A.    Yeah.

22         Q.    I'm sorry?  Can you supplement a report?

23         A.    Yes.

24         Q.    Did you submit a supplement?

25         A.    No.

1          Q.   So you've agreed that having his arm out
2    in important?
3          A.   Yes.
4          Q.   But it's not in your report.
5          MR. ANGELL:  Objection.  Argumentative.
6               And you've asked and answered.  Go ahead
7    and answer again.
8          THE WITNESS:  Would you restate the question?
9    I don't remember it.
10          Q.   (BY MS. CHRISTIANSEN):  You did not
11    report -- you did not include in your written report
12    a statement that Jake had an arm out.
13          A.   Correct.
14          Q.   And despite the fact you believe that's
15    important information, you did not include that
16    important information in your written report?
17          A.   I did not intentionally forget that,
18    though.
19          Q.   But you remember it now?
20          A.   Correct.
21          Q.   And you also in your interview did not
22    include that information in your interview, correct?
23          A.   Yes.
24          Q.   Okay.  And your position is "I didn't
25    remember it at the time"?

```
 1            A.    Right.

 2            Q.    But you remember it three years later?

 3            A.    Yes.

 4            Q.    Okay.  Have you talked with anybody

 5    about this incident since September 25th, 2020?

 6            A.    Yes.

 7            Q.    Who have you spoken with?

 8            A.    Lots of people.

 9            MR. ANGELL:  Hang on.  So that question could

10    include discussions, the way that it's worded, with

11    legal counsel.

12            Q.    (BY MS. CHRISTIANSEN):  Let's exclude

13    counsel from that question.

14                  Other than your legal counsel?

15            MR. ANGELL:  And that legal counsel would be

16    myself or counsel for the City of Pocatello or FOP,

17    if you've spoken to any of those.

18                  So with that qualifier, go ahead and

19    answer the question.

20            THE WITNESS:  I talked to a lot of people,

21    officers.

22            Q.    (BY MS. CHRISTIANSEN):  Who have you

23    spoken with?  Give me some names.  Let's get some

24    names rolling.

25            A.    People involved, people not involved.
```

 1              Q.    Well, we can start with Detective
 2     Sergeant K. Noah and it looks like Detective K.
 3     Sibbett.  Who else have you spoken with about this
 4     incident?
 5              A.    The shift that was on that night.
 6              Q.    I'm sorry.  The what?
 7              A.    The shift.  Like --
 8              Q.    The other --
 9              A.    -- our teams are shifts.
10              Q.    So the other officers that were on that
11     night?
12              A.    Uh-huh.
13              Q.    Who were those officers?
14              A.    You would have to -- I don't recall.
15     You would have to refer to the Spillman and whatnot.
16              Q.    Okay.  Anybody else?
17              A.    I don't know.  It's been a long time so
18     I don't know.  I talked about it a lot.
19              Q.    You talked about it a lot?
20              A.    Multiple people.
21              Q.    Then there should be a couple of names.
22              A.    I told you "the shift," at least.
23              Q.    Okay.  Anybody else?
24              A.    I don't know.  We've had debriefs on it,
25     whoever was there.

1          Q.    Who have you told that you saw his arm

2    out?

3          A.    I don't know.

4          Q.    Is this the first time that you've

5    stated you saw his arm out?

6          A.    No.

7          Q.    When did you first report to somebody

8    that you saw his arm out?

9          A.    I don't know.

10          Q.    You don't know when you began reporting

11    that recollection?

12          A.    No.

13          Q.    Is it in any other written report?

14          A.    No.  This is all the reports that are

15    available that I have done.

16          Q.    Can you tell me another person to whom

17    you've told that you observed his arm out?

18          A.    No, because I don't know exactly who I

19    told that information to specifically because there

20    was varying ways I've talked about this incident.

21          Q.    What do you mean?

22          A.    Like, as in the specific and not

23    specific, like, in general, like, that this happened,

24    you know.

25          Q.    Did somebody provide you with the

1    information that his arm was out?

2            A.    No.    That is my recollection, my memory.

3            Q.    Have you listened to other people's

4    reports of their own recollection of what happened?

5            A.    Yeah.

6            Q.    Who have you talked -- who has told you

7    what they observed about what happened?

8            A.    Well, I got to see the debrief of it.

9            Q.    What do you mean?

10           A.    We just talk about it.

11           Q.    I don't know what that means.    I'm not a

12   police officer or I don't know how a debrief --

13           A.    A debrief is where we all get together,

14   we talk about the incident, how we could have done

15   better, what we saw, what we did.

16           Q.    Is it a department -- everyone in the

17   department comes in and you debrief?    Everybody on

18   the shift comes in?

19           A.    No.    It's only those involved, and then

20   there's -- they also have done a department

21   debrief --

22           Q.    Okay.

23           A.    -- pretty sure for this one.

24           Q.    Who conducts the debrief?

25           A.    The supervisor.

1          Q.    Do you recall who that was in this case?

2          A.    I don't -- I don't recall.

3          Q.    Was it a supervisor that was on site

4     that night?

5          A.    I don't know.

6          Q.    Because it would have been -- there's

7     Corporal Eldridge, I believe a Corporal Miller.

8          A.    No, it wouldn't have been either one of

9     those.  It would have been, like, a lieutenant or

10    similar rank, so -- but I don't recall who it was.

11    There's been more than one that I've been to, so I

12    couldn't tell you who.  That might be documented

13    somewhere, but...

14         Q.    But you don't know?  You don't recall?

15         A.    I don't recall who it was that led that

16    meeting.

17         Q.    Was there a supervisor on site that

18    evening?

19         A.    There was multiple.

20         Q.    Who?

21         A.    Sergeant McClure, Sergeant Hancock.

22    There might have been -- oh, Sergeant Buck.

23         Q.    Sergeant Buck?

24         A.    Uh-huh.  I think so.

25         Q.    And those people all showed up after the

1   shooting, correct?

2          A.    Yes.

3          Q.    They were not there prior to shots being

4   fired?

5          A.    Not that I know of.

6          Q.    Looking at Exhibit 15, Defendants 129,

7   you made a statement in your interview where you said

8   you didn't feel threatened until after shots were

9   fired.

10          True statement?

11          A.    Yes.

12          Q.    Is that why you didn't pull your

13   firearm?

14          A.    No.  I didn't pull my firearm because of

15   the distance.

16          Q.    And I'm sorry.  "Because of the

17   distance," you answered that.

18          Can you explain for me -- you didn't

19   feel like you were threatened, but the last

20   paragraph -- the last sentence of that same

21   paragraph, you said you felt like your fellow

22   officers were in danger.

23          A.    Uh-huh.

24          Q.    Can you clarify for me why you didn't

25   feel threatened but you felt like someone else was in

1  danger?

2        A.   Because I was far away.  As far as I

3  could tell, they were closer.

4        Q.   And therefore, in danger because they

5  were in closer proximity?

6        A.   Correct.

7        Q.   You also said that -- you reported in

8  this interview that Jake had had time to surrender,

9  and several commands were given to him prior to shots

10  being fired.

11             True statement?

12        A.   Yes.

13        Q.   You only know that Jake was given the

14  command to get on the ground.  That's the only

15  command that you heard, correct?

16        A.   Yeah.

17        Q.   And you didn't hear any other commands?

18  Let me correct that.

19             You heard other commands, you just

20  couldn't understand what they were, correct?

21        A.   Right.

22        Q.   Okay.  How do you know that he wasn't

23  obeying commands?

24        A.   Because typically we tell people to get

25  on the ground, so -- he was not on the ground.

1          Q.    So that's your assumption is that,

2    because he wasn't getting on the ground, he wasn't

3    following commands?

4          A.    Yes.

5          Q.    But you didn't hear all of the commands

6    that were given to him?

7          A.    No.

8          Q.    Okay.  So it's purely an assumption on

9    your part based on typical practice --

10         A.    Yes.

11         Q.    -- that he wasn't following commands?

12         A.    Yes.

13         Q.    Okay.  Did you at any time identify

14   yourself as police?

15         A.    No, I don't think so.

16         Q.    Let me narrow that a little bit.  Did

17   you at -- at the scene of the Outback Golf Park/Red

18   Lion, when you entered that scene, did you at any

19   time identify yourself as police to Jake Sheeler?

20         A.    No, I don't think so.

21         Q.    Since September 25th, 2020, have you at

22   any time spoken with McArthur, Eldridge or Saldana

23   about the events of September 25th, 2020?

24         A.    Yes.

25         Q.    Can you tell me about those

1    conversations, please.  Let's start with when did you
2    first speak with one of them?
3            A.    Probably several months later.
4            Q.    Who -- which one of them did you speak
5    with?
6            A.    I've not had much discussion with
7    Eldridge.  I had talked to Saldana and McArthur.
8            Q.    Did you speak with them one on one?
9            A.    Yes.
10           Q.    What did you guys talk about?
11           A.    McArthur told me about where she was
12   coming from and where she went, and Saldana talked to
13   me about her thoughts on other officers.
14           Q.    What were her thoughts?
15           A.    That they were cowards.
16           Q.    Why?
17           A.    Because she didn't feel like they acted
18   appropriately by not pulling their guns.
19           Q.    What other officers was she referring
20   to?
21           A.    State police.
22           Q.    Okay.  So she felt everybody should have
23   pulled their firearms?
24           A.    Yes.
25           Q.    What were McArthur's feelings on the

1    event?

2           MR. ANGELL:  Object to the form.

3           Q.   (BY MS. CHRISTIANSEN):  Did McArthur

4    communicate any feelings -- that she had any feelings

5    about the event to you?

6           MR. ANGELL:  Object to the form.

7               Go ahead and answer, if you remember.

8           THE WITNESS:  She expressed a lot of

9    frustration with, like, admin response following it,

10   I guess, and having to debrief it.

11          Q.   (BY MS. CHRISTIANSEN):  Explain that a

12   little more for me.

13          A.   It was a traumatic incident so she

14   didn't necessarily want to talk about it.

15          Q.   And she was being made to talk about it?

16          A.   No.  She was being made to go to these

17   debriefs and have to hear about it.

18          Q.   And you said at the debriefs you talk

19   about what went well and what didn't go well?

20          A.   Uh-huh.  Yes.

21          Q.   And did she -- was she given feedback

22   that there were certain aspects that didn't go well?

23          A.   Not as far as the actual shooting

24   portion.  That's not for us to debrief on.  But,

25   like, tactics of perimeter and communication is

1    usually what comes up.

2         Q.   Okay.  So there was feedback that the

3    perimeter and communication was -- could have been

4    improved?

5         A.   The communication was the biggest.  I

6    don't remember --

7         Q.   What do you recall about that?

8         A.   -- saying anything -- just talking about

9    perimeter being a problem, so...

10        Q.   What do you recall about the

11   communication?

12        A.   A lot of supervisors in the fire giving

13   commands --

14        Q.   And --

15        A.   -- when they weren't there.

16        Q.   Say that again.

17        A.   Like, conflicting commands from

18   supervisors following --

19        Q.   Following the incident?

20        A.   Yes.

21        Q.   Okay.  But not leading up to the

22   shooting?

23        A.   No.  I feel like we worked pretty well

24   that day.

25        Q.   Was there any feedback about the

1  communication leading up to the shooting?

2          A.    Not that I recall.

3          Q.    Do you consider yourself friends with

4  either Saldana, McArthur or Eldridge?

5          A.    Just McArthur.

6          Q.    Does she talk to you about this

7  incident?

8          A.    It's been a long time.

9          Q.    Did she when the incident was more

10  recent?

11          A.    Yes, several months later.

12          Q.    What were her primary concerns in the

13  immediate -- when she began talking about it, what

14  were her primary concerns that she would talk to you

15  about?

16          A.    I don't recall discussing it at length

17  and getting deep into that with her.

18          Q.    What do you remember discussing about it

19  with her?

20          MR. ANGELL:  I'll just object to the form of

21  the question.  It calls for hearsay.

22              But go ahead and answer, if you

23  remember.

24          MS. CHRISTIANSEN:  Statement of a party --

25          THE WITNESS:  I don't recall her saying much

1    about the actual shooting.  You know, just what she

2    did leading up to it, our frustrations about the

3    admin -- or, the supervisors afterwards.  As far as

4    the actual shooting portion, I didn't ask questions

5    and she didn't offer them -- or, answers or anything

6    like that just because I knew how it upset her, so...

7              Q.   (BY MS. CHRISTIANSEN):  Let's go back a

8    little bit to how you first became involved in the

9    search for Jake.  Can you tell me when you first

10   became involved in the search?

11             A.   For that day or this --

12             Q.   For that day.

13             A.   Okay.  Like, the first 30 minutes of my

14   shift, I think.

15             Q.   Okay.  Were you dispatched there?  What

16   happened?

17             A.   I don't recall if I was dispatched or if

18   I was just in the area and help set up the perimeter.

19             Q.   When you arrived at -- still talking

20   about the beginning of your involvement for the day,

21   what -- where did you arrive at when you came on

22   scene to establish perimeter?

23             A.   One of the tree streets off of

24   Jefferson.  Can I refer to my report?

25             Q.   Yeah, go ahead.

```
1              A.   I went to 1000 East Walnut Street.
2              Q.   Okay.  What officers did you encounter
3    on Walnut Street at that time?
4              A.   Most of the communication was done
5    through radio on that one --
6              Q.   Oh, so --
7              A.   -- when we set a perimeter, and I don't
8    recall who was immediately around me.
9              Q.   Do you recall who was in charge at that
10   time?
11             A.   Corporal Miller had the most information
12   and was giving people commands so I would assume him.
13             Q.   How did you come -- wait.  Say that
14   again.  He was giving people information and
15   commands?
16             A.   Yeah.
17             Q.   And that was what formed your
18   understanding of who was in charge at that time?
19             A.   Yeah.
20             Q.   Was there any planning about how you
21   would go about arresting Jake?
22             A.   We would do a high-risk takedown type --
23   but as far as, like, planning ahead of time, no.
24   Just general training.
25             Q.   What's a high-risk takedown?
```

1          A.   It's where we know or assume that they

2  have a weapon and we have weapons drawn and -- low,

3  ready, and we give them commands to put them in a

4  prone position generally to place them in handcuffs.

5          Q.   Did you guys discuss that this was a

6  high-risk -- -- strike that.

7          Did you discuss with anybody or did

8  anyone tell you that this was a high-risk takedown?

9          A.   No.   They don't have to.   I just know

10  based on the level of crime reported.

11          Q.   So other than your inference based on

12  the facts of the case that this was a high-risk

13  takedown, was there any discussion with any of your

14  colleagues about how you would arrest Jake?

15          A.   No.

16          Q.   Was there any planning about how you

17  would go about arresting Jake?

18          A.   I don't think so, no.

19          Q.   When you arrived at the scene of the

20  golf park and the Red Lion Hotel, was there any

21  discussion at that point about how you would go about

22  arresting Jake?

23          A.   No.

24          Q.   Was there any planning with ISP?

25          A.   No.

```
 1            Q.    Any coordination at all with ISP?
 2            A.    Coordination we had with ISP was just
 3     checking the area with flashlights.
 4            Q.    Did you discuss that with them or did
 5     you guys just proceed with checking the area with
 6     flashlights?
 7            A.    We just did it.
 8            Q.    No talk needed, just went for it?
 9            A.    We all understand what to do.
10            Q.    Okay.  You had communicated -- or, the
11     ISP officer had communicated with you guys about
12     seeing somebody on the thermal imaging, correct?
13            A.    Yes.
14            Q.    And that was on the radio?
15            A.    Yes.
16            Q.    Was there any other communication from
17     the ISP officer to Pocatello officers other than that
18     radio communication?
19            A.    He described, you know, when we got
20     there where he had seen it -- like, physically, like,
21     pointing to where he had seen that, so we were
22     looking in the general direction that he had seen it.
23            Q.    And when he described it, that was in
24     person, correct?  That was just talking?
25            A.    Yes.
```

```
 1              Q.    Okay.  Did he -- did the ISP officer
 2    have any other means of communicating with you other
 3    than the radio and in person?
 4              A.    No.
 5              Q.    Are you a --
 6              A.    He could probably use the phone, but...
 7              Q.    Are you aware of any other means?
 8              A.    No.
 9              Q.    So radio, in person, or over the phone?
10              A.    I would assume, yeah.
11              Q.    Okay.  And I apologize, I think I may
12    have already asked this.  But as you arrived at the
13    Red Lion area, did you have any understanding of who
14    was in charge at that time?
15              A.    Corporal Eldridge was the officer at the
16    time.  He was the one setting up perimeter with other
17    officers so I would assume him.
18              Q.    You would assume?  Do you know?
19              A.    No.  I would -- it's just he's the one
20    who asked for help.  So I would defer to him to
21    answer if I needed to go someplace in particular, if
22    I wanted to ask him a question.
23              Q.    So because he was the person giving
24    commands, you assumed that he was the person in
25    charge of the --
```

1          A.    That moment, yes.

2          Q.    Okay.  When you spotted Jake, who was

3    supposed to give commands?

4          A.    Whoever was closest.

5          Q.    Do you know who that was?

6          A.    Or who could --

7          Q.    I beg your pardon?  I interrupted you.

8          A.    Or who could give commands.

9          Q.    Whoever was closest or who could give

10   commands?

11         A.    Yes.

12         Q.    What does that mean?

13         A.    If you feel like you can give them

14   commands, that person would give them commands.

15         Q.    Do you know who was closest to Jake at

16   the time that you saw him?

17         A.    No, I do not.

18         Q.    You did not give him any commands?

19         A.    I did not.

20         Q.    Okay.  Other -- is there any protocol

21   about who should be giving commands?

22         A.    One person.

23         Q.    The protocol is that one person gives

24   the command?

25         A.    Yes.

1          Q.    And is that protocol also that the
2    person nearest the subject is the person giving the
3    commands?
4          A.    So at -- let me say, at the time we did
5    not have that protocol.  It has become protocol.  So
6    it was just give commands.
7          Q.    Okay.  And we're talking about commands
8    to the suspect, not commands to other officers --
9          A.    Right.
10         Q.    -- correct?
11         A.    Although, that might -- also happens --
12         Q.    Do you know when that protocol was
13    established?
14         A.    Which one?
15         Q.    The protocol that the person nearest the
16    suspect gives the command.
17         A.    It's just a general practice, as they
18    can hear the best.
19         Q.    But you said it wasn't protocol at the
20    time of this incident.  But it is protocol now?
21         A.     No, it's always been protocol --
22    essentially like practice, not protocol, that the
23    person closest should give commands because it's the
24    easiest to understand for that person -- for the
25    suspect.

1          Q.    Then what did you mean when you said --

2          A.    So what I mean is now because we've had

3    our debrief and said "Let's practice now doing one

4    person giving commands to improve our police work."

5          Q.    So I guess I don't quite understand what

6    you meant when you said it wasn't protocol at the

7    time but then you kind of walked it back.

8          A.    Yeah.  I think "protocol" is a hard

9    word.

10         Q.    So is that a little too formal?

11         A.    Yeah, it's more of a practice.

12         Q.    It was sort of a practice at the time

13   that the person closest would give the commands; is

14   that fair?

15         A.    Typical, yeah.

16         Q.    Is that a more formalized rule now?

17         A.    No.  It's just -- the way we train and

18   practice is let's have -- let's try to have one

19   person giving commands, and whoever is closest or has

20   the best ability to -- maybe if I have a PA, it might

21   be better for me to give commands even though I'm a

22   little further back, right?  Does that make sense?

23         Q.    What's a PA?

24         A.    Like a bull horn.  I don't know what it

25   stands for.

1          Q.    So were you not formally trained -- were
2    you not trained on the procedure of the person
3    nearest the suspect gives commands prior to this
4    incident?
5          A.    When we do firearms training,
6    everybody's giving commands because we're all on the
7    line doing our scenario.  And between that and
8    heightened adrenaline, more than one people typically
9    give commands.
10         Q.    Okay.  But the -- but since this
11   incident happened, you have practiced?
12         A.    Yeah.  We've actively practiced to try
13   to limit to one person, one command.
14         Q.    Okay.  Do you know why you have been put
15   through this training on one person, one command?
16         A.    Because of historical incidents of
17   officer-involved shootings that leads to confusion.
18         Q.    Was it because of this incident?
19         A.    It could be a part of it.  I wasn't part
20   of that particular conversation, but...
21         Q.    But it's your inference that this --
22         A.    This --
23         Q.    -- that training --
24         A.    Other officers throughout the country,
25   the world, you know, that's typically something that

1   comes into question.

2        Q.   What other events are you aware of in

3   which officers have given -- multiple officers have

4   given commands to a suspect and it's created problems

5   in an arrest?

6        A.   I couldn't point you to any one --

7   specific one.  I don't know.

8        Q.   Are you aware of any other incidents in

9   which multiple officers were giving commands to one

10  suspect?

11       A.   It happens all the time.

12       Q.   Are you aware of any one specific

13  incident aside from this one?

14       A.   No.  I can't --

15       Q.   It's just your inference that it happens

16  all the time?

17       A.   Yes.

18       Q.   So when Jake was spotted and there were

19  multiple officers giving commands, whose commands was

20  he supposed to follow?

21       MR. ANGELL:  Object to the form.

22            Go ahead and answer, if you can.

23       THE WITNESS:  I would hope he would follow

24  the ones that he could see and hear the closest.  I

25  didn't give commands because I was too far away and I

1   didn't think I would be heard, so...

2          Q.   (BY MS. CHRISTIANSEN):  How is he to

3   know who is the closest or who is giving the -- let

4   me strike that.  Let me try that again.

5               There were people all around Jake,

6   correct?

7          A.   A very good distance from him where I

8   was at.

9          Q.   There were people on various sides of

10  Jake, correct?

11         A.    I can't answer to that because I could

12  only see me and the people at the Red Lion.  I could

13  not see anybody else so I can't answer where they

14  were to say if they were around him.

15         Q.   As you sit here today, you know that

16  there were multiple people around Jake on different

17  sides, correct?

18         A.   At least two sides, yes.

19         Q.   Should we get out -- let's get out that

20  map again.  I think that was Exhibit 16.  Okay.

21              So on this map we've got pinpoints for

22  various officers, correct?

23         A.   Uh-huh.

24         Q.   But these are not all the officers that

25  were on scene, correct?

1          A.    Yeah.

2          Q.    So just of these pinpoints that we do

3    have, you would characterize this as people on two

4    sides of Jake?

5          MR. ANGELL:  Hang on.  So I'm going to object

6    to the line of questioning.  This witness is not

7    disclosed as an expert.  She's testified that she

8    doesn't know where people are at, so I'm not going to

9    have her sit for hypothetical questions or questions

10   reviewing the scene as an expert.

11         MS. CHRISTIANSEN:  Okay.  Point well taken.

12         Q.   (BY MS. CHRISTIANSEN):  I'll return to

13   the line of questioning about there were multiple

14   commands.

15              As you understood it at that time, whose

16   command was Jake supposed to follow?

17         A.    The ones closest to him.

18         Q.    But you don't know what those commands

19   were?

20         A.    No.

21         Q.    Okay.

22         A.    Can you tell me what the distance is?

23         Q.    I cannot.  I don't know.  It might be in

24   your report, but I do not know.

25              Prior to September 25th of 2020, had you

1    received any training on how to plan and execute an

2    arrest with multiple officers involved?

3              A.    Yes, we train that.

4              Q.    Describe that training for me, please.

5              A.    What exactly do you want to know?

6    Because that's pretty broad.  There's multiple ways

7    to do it.

8              Q.    Tell me about it.  Tell me one way.

9              A.    If we're just dealing with a person and

10   no vehicles or buildings involved, again, on multiple

11   sides of the person, without having crossfire, one

12   person will give commands.  Depending on the

13   situation, someone might have less than full

14   munitions available, such as a Taser or a less lethal

15   shotgun, then there's what we call lethal coverage

16   which is a firearm of some sort, give commands to an

17   individual, which may or may not include them lifting

18   up their shirt, turning around, just get down on the

19   ground, arms out to your side, and then somebody

20   would go with a holstered gun and affect an arrest

21   with physical handcuffs.

22             Q.    Okay.  So in what you just described to

23   me, a person -- the command might be to lift their

24   shirt?

25             A.    Sometimes, yeah.

1          Q.    Okay.  So the command isn't always to

2    get on the ground?

3          A.    So it would not -- we wouldn't start

4    with, like, lift your shirt, right?  This is a

5    general takedown-type stuff.

6          Q.    What command would you start with?

7          A.    Can I just give you a specific if we

8    were encountering somebody we thought had a gun,

9    whether we saw one or not?

10         Q.    Sure.

11         A.    If we encountered somebody, we would ask

12   them -- if we highly suspected them to have a

13   firearm, we would have them stop with their hands up,

14   kneel, they may or may not have them turn around --

15   that's their preference -- and then get on the ground

16   belly down with their arms out, and an officer would

17   go up and handcuff them, search them.

18         Q.    Okay.

19         A.    Lift the shirt is typically trained in

20   vehicle stops.

21         Q.    Okay.

22         MS. CHRISTIANSEN:  I think I'm ready for the

23   break.

24              (A recess was taken from 11:10 a.m. to

25   11:19 a.m.)

1            MS. CHRISTIANSEN:  I've completed all of my

2   questions.

3            MR. ANGELL:  Okay.

4            MS. CHRISTIANSEN:  So, Sam?

5            MR. ANGELL:  I do not have any questions.

6             (Deposition concluded at 11:19 a.m.)

7                   (Signature requested.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATE OF OFFICER CHEYENNE CLAYTER (NÉE FETCHEN)

2

3         I, OFFICER CHEYENNE CLAYTER (NÉE FETCHEN), being

4    first duly sworn, depose and say:

5         That I am the witness named in the foregoing

6    deposition; that I have read said deposition and know

7    the contents thereof; that the questions contained

8    therein were propounded to me; and that the answers

9    contained therein are true and correct, except for

10   any changes that I may have listed on the Errata

11   Sheet attached hereto.

12             DATED this _____day of _____20_____.

13

14               CHANGED ON ERRATA SHEET   YES___NO___

15

16   _____
     OFFICER CHEYENNE CLAYTER (NÉE FETCHEN)
17

18        SUBSCRIBED AND SWORN to before me this

19   _____day of _____20_____.

20

21

22

23   _____
     NAME OF NOTARY PUBLIC
24   RESIDING AT_____

25        MY COMMISSION EXPIRES_____

1    **ERRATA SHEET FOR OFFICER CHEYENNE CLAYTER (NÉE FETCHEN)**

2    Page_____Line_____Reason for Change

3    Reads _____

4    Should Read _____

5    Page_____Line_____Reason for Change

6    Reads _____

7    Should Read _____

8    Page_____Line_____Reason for Change

9    Reads _____

10   Should Read _____

11   Page_____Line_____Reason for Change

12   Reads _____

13   Should Read _____

14   Page_____Line_____Reason for Change

15   Reads _____

16   Should Read _____

17   Page_____Line_____Reason for Change

18   Reads _____

19   Should Read _____

20   Page_____Line_____Reason for Change

21   Reads _____

22   Should Read _____

23   _____

24

25       SIGNATURE:_____

1                    REPORTER'S CERTIFICATE

2            I, Amber S. Williams, CSR NO. 1080,

3    Certified Shorthand Reporter, certify:

4            That the foregoing proceedings were taken

5    before me at the time and place therein set forth, at

6    which time the witness was put under oath by me.

7            That the testimony and all objections made

8    were recorded stenographically by me and transcribed

9    by me or under my direction.

10           That the foregoing is a true and correct

11   record of all testimony given, to the best of my

12   ability.

13           I further certify that I am not a relative

14   or employee of any attorney or party, nor am I

15   financially interested in the action.

16           IN WITNESS WHEREOF, I set my hand and seal

17   this 17th day of June, 2023.

18

19                    _Amber S. Williams_

20           _____

21           AMBER S. WILLIAMS, CSR NO. 1080

22           Notary Public

23           Post Office Box 2636

24           Boise, Idaho  83701-2636

25   My commission expires June 1, 2027

# Exhibit 5

1

UNITED STATES DISTRICT COURT

IN AND FOR THE STATE OF IDAHO

JAKE SHEELER, an individual,          )

                    Plaintiff,     ) Case No.

vs.                                   ) 4:22-cv-00313-

BRIDGET MCARTHUR, an individual;      ) DCN

JEFFREY E. ELDRIDGE, an individual;   )

MARISA A. SALDANA, an individual;     )

ROGER SCHEI, an individual; and       )

CITY OF POCATELLO, a municipal        )

Corporation;                          )
                    Defendants.

                                  )



DEPOSITION OF JEFFREY ELDRIDGE

February 15, 2023

REPORTED BY:

AMBER S. WILLIAMS, C.S.R. No. 1080

Notary public

1           THE DEPOSITION OF JEFFREY ELDRIDGE was taken

2   on behalf of the plaintiff at the Holiday Inn Express

3   & Suites, 200 Via Venitio, Pocatello, Idaho,

4   commencing at 11:36 a.m. on February 15, 2023, before

5   Amber S. Williams, Certified Shorthand Reporter and

6   Notary Public within and for the State of Idaho, in

7   the above-entitled matter.

8

9                        APPEARANCES:

10  For Plaintiff:

11       CHRISTENSEN & JENSEN, PC

12       BY:  KARRA J. PORTER

13       BY:  ANNA P. CHRISTIANSEN

14       257 East 200 South, Suite 1100

15       Salt Lake City, Utah  84111

16       karra.porter@chrisjen.com

17       anna.christiansen@chrisjen.com

18  For Defendants:

19       HALL ANGELL & ASSOCIATES, LLP

20       BY:  SAM L. ANGELL

21       1075 South Utah Avenue, Suite 150

22       Idaho Falls, Idaho  83402

23       sla@hasattorneys.com

24

25

1                          **I N D E X**

2

3    **TESTIMONY OF JEFFREY ELDRIDGE**                    **Page**

4       Examination by Ms. Porter....................  4

5

6

7

8

9                            **EXHIBITS**

10   Exhibit 2.    Eastern Idaho Critical Incident..  40

11                 Team Supplemental Report

12                 Form 18, Bates Nos. DEFENDANTS

13                 000162 - DEFENDANTS 000172

14   Exhibit 3.    Aerial View of Scene.............  38

15   Exhibit 4.    Eastern Idaho Critical Incident..   6

16                 Team Supplemental Report Form,

17                 Bates Nos. DEFENDANTS 000079 -

18                 DEFENDANTS 000091

19   Exhibit 5.    Eastern Idaho Critical Incident..  58

20                 Team Supplemental Report

21                 Form 34, Bates Nos. DEFENDANTS

22                 000348 - DEFENDANTS 000358

23

24

25

```
 1                    JEFFREY ELDRIDGE,
 2   first duly sworn to tell the truth relating to said
 3   cause, testified as follows:
 4                       EXAMINATION
 5   BY MS. PORTER:
 6           Q.   Could you please state your name for the
 7   record.
 8           A.   Jeffrey Eldridge.
 9           Q.   And we had introductions before we got
10   started.
11           A.   Yeah.
12           Q.   So let me start by asking whether you've
13   ever had your deposition taken before?
14           A.   I have not.
15           Q.   Have you ever testified in court before?
16           A.   Yes, ma'am.
17           Q.   Can you -- more than 100 times?
18           A.   It would be a guess to say how many.  I
19   don't know.
20           Q.   Okay.  Fair enough.  Can you just give
21   me a few examples of the types of cases where you
22   have testified in court?
23           A.   Traffic citations, DUIs, domestic
24   violence situations.  I can't remember anything else
25   off the top of my head.  I'm sure there's probably
```

1    something.

2          Q.    Sure.  With respect to the times that

3    you have testified in court, have those always been

4    with respect to things that you observed as a fact

5    witness or, to your knowledge, did you ever appear as

6    an expert witness?

7          A.    I have never been an expert witness.

8          Q.    What is your current employment?

9          A.    Pocatello Police Department.

10          Q.    And what is your position?

11          A.    I am a patrol sergeant.

12          Q.    When did you get your promotion from the

13    corporal position?

14          A.    May of 2022.

15          Q.    Did you have to apply for that in some

16    way?

17          A.    Yes, there was a testing process.

18          Q.    What did you do to prepare for today's

19    deposition?

20          A.    I reviewed my statement, spoke with my

21    attorney.

22          Q.    Did you review any other reports of any

23    other officers?

24          A.    No.

25          Q.    Did you review any body camera footage?

1          A.    No.

2          Q.    Did you review any sort of audio?

3          A.    No.

4          Q.    When you say you reviewed your

5    statement, let me show you something and ask if this

6    is what you're referring to.  I wish they would put

7    the name right at the top but they don't.

8                (Exhibit 4 marked.)

9          Q.    (BY MS. PORTER):  Do you recognize

10   what's been marked as Deposition Exhibit No. 4?  And

11   feel free to look at the entire document.

12         A.    It appears to be the -- the same

13   statement that I reviewed.  And that's just by

14   skimming through and not reading it word for word.

15         Q.    Did you understand Exhibit 4 to be a

16   summary of an interview that you gave to Zeb Graham

17   and others?

18         A.    Yes, ma'am.

19         Q.    So what I'm going to do is I'm not going

20   to rehash all the things that are in your statement,

21   okay?  I am going to ask you when you reviewed

22   Exhibit 4, did anything jump out at you as being

23   incorrect?

24         A.    Not that I recall.

25         Q.    So what I am going to do, though, is

1    just sort of ask you for some clarifications of

2    things that I didn't fully understand, okay?

3            A.    Okay.

4            Q.    So I'm going to -- do you see the

5    document numbers at the bottom of this Exhibit 4?

6    They start with Defendants 79 and they go through 91.

7            Do you see that?

8            A.    Yes, ma'am.

9            Q.    And then, just as an FYI, that means

10   that the defendants put those numbers on there and

11   produced it to us, which is basically your counsel,

12   your counsel's office.

13           Do you see that?

14           A.    Okay.

15           Q.    All right.  So let me just start asking

16   you random questions about your statement.

17           A lot of these you wouldn't necessarily

18   need to look at your statement but I want you to feel

19   comfortable.  I'm looking at page 80 in Exhibit 4,

20   and about four paragraphs down it mentions that you

21   were asked to describe the type of ammunition that

22   you had.  And I'll represent that that was asked at

23   the time of the shooting -- okay? -- of Jake Sheeler.

24           A.    Okay.

25           Q.    All right.  And you responded Speer Gold

1    147 grain; is that right?

2            A.    Yes, ma'am.

3            Q.    Was that standard issue?

4            A.    That is the department issue for 9mm,

5    yes.

6            Q.    And do you know if -- and I'm asking you

7    because Officer McArthur said we should ask you.    I

8    asked her what type of ammunition she had and she

9    said the standard issue, and I asked her for more

10   detail, because I had seen it in yours, and she said

11   you would have to -- she would defer to your

12   expertise.

13           A.    Okay.

14           Q.    To your knowledge, is that the same type

15   of ammunition that Officer McArthur would have had,

16   assuming she had standard issue?

17           A.    Yes.

18           Q.    The next paragraph makes a reference to

19   a handgun optic.

20           A.    On the same page?

21           Q.    Yeah.    I'm not actually going to ask you

22   anything about the paragraph.    I'm just going to ask

23   you what is a handgun optic?

24           A.    It is a sighting system that's mounted

25   to a handgun.

1          Q.    Okay.  So layperson here, so here comes
2    the question that you will think is really dorkily
3    worded.
4              When you say a sighting system, does it
5    have any sort of magnification?
6          A.    No, ma'am.
7          Q.    How does it help sight, I guess?
8          A.    So officers are taught to use iron
9    sights, and by "iron sights," that's the sights that
10   are equipped on the gun from the factory.  So the red
11   dot optic system is mounted to the gun, it is -- it's
12   a system that's easier to acquire that sight.  It has
13   a red dot in a window.  It's an electronic sight and
14   it's just an easier sight picture to acquire.
15         Q.    When you say a "red dot," you know, I
16   think of TV shows that are -- you know, you see a red
17   dot appearing on somebody's body.  Do you mean that,
18   with that sighting system, the dot would appear on
19   the subject?
20         A.    No.  It is projected onto the glass
21   window of the sight that's actually right on the
22   handgun.  They make these for multiple firearm
23   platforms; so they can go on rifles, shotguns, all
24   over.  But this particular one is mounted to a
25   handgun.  It's smaller than a lot of the rifle ones

1    and things like that.  But that dot is just projected

2    to the window of that sight allowing it to again be a

3    little bit easier to pick up that sight as well as

4    allowing the user to keep both eyes open, see more of

5    what's going on around them and just have a better

6    visual of the situation.

7            Q.   Did you also have any sort of a lighting

8    device that was attached to your handgun?

9            A.   Yes.  I had a weapon-mounted light

10   attached to the accessory rail on the bottom of the

11   front of the frame of the handgun.

12           Q.   And I think I remember seeing something

13   in your statement about perhaps that was not on.  Do

14   you remember whether it was on or not?

15           A.   No, I used the weapon-mounted light that

16   night.

17           Q.   Okay.  I apologize.  I may have

18   misremembered that.  So was it on the whole time?

19           A.   I don't recall.

20           Q.   At some point you had a flashlight that

21   you were holding in one of your hands; is that right?

22           A.   Yes, ma'am.

23           Q.   And then you -- it ended up on the

24   ground at some point?

25           A.   Yes, ma'am.

1          Q.    Were you using -- until your flashlight

2   ended up on the ground, were you using both a

3   flashlight and that lighting system that was part of

4   your handgun?

5          A.    No.  I used the flashlight up to the

6   point that I tried to put it away and dropped it and

7   then switched to a weapon-mounted light.

8          Q.    Do you happen to know the lumens on

9   either the flashlight that you dropped or the device

10  on your gun?

11         A.    I do not.

12         Q.    Is one brighter than the other, in your

13  experience?

14         A.    I think the handheld light would have

15  been brighter.

16         Q.    Can you describe the uniform that you

17  were wearing on the night of Jake Sheeler's shooting?

18         A.    It is the Pocatello Police Department

19  issued patrol uniform.  It consists of a -- it's made

20  by 5.11 Tactical Gear.  I can't remember the exact

21  name, but 5.11 is the manufacturer.  It's a pair of

22  blue cargo pants.  The shirt is also blue.  I had on

23  black duty boots, my duty belt, my soft body armor.

24  The patrol shirt has a badge on the upper-left chest,

25  my name across the right side of the upper chest.

1    The left shoulder is a Pocatello Police Department

2    patch in bright colors, and the right shoulder is an

3    American flag.

4            Q.    You said "blue."  Would you agree that

5    it was dark blue?

6            A.    Yes.

7            Q.    And what color was the belt that you

8    referred to?

9            A.    It's black.

10           Q.    Are you familiar with the phrase "call

11   comment"?

12           A.    No.  Not with what you're -- I don't

13   know what you're referring to.

14           Q.    Have you ever heard the phrase "call

15   comment" in connection with Pocatello Police

16   Department?

17           A.    I've heard that phrase, but I don't know

18   exactly what relation do you mean.

19           Q.    Well, I'm asking you if you've ever

20   heard the phrase.

21           A.    Yeah.

22           Q.    And have you had any understanding of

23   what that phrase means with respect to Pocatello

24   Police Department?

25           A.    My interpretation of "call comment"

1    would be something where someone would put -- a

2    dispatcher most likely would be putting some sort of

3    a comment, typing it from dispatch into the Spillman

4    program, and then it would come up -- I would have

5    the ability to open the comments and look at that.

6              I'm not sure if that's what you're

7    referring to or not.

8         Q.   Yeah, that's basically what we heard

9    from Officer McArthur.  I just wanted to ask you.

10             Okay.  Now, let's see.  When you first

11   heard about a suspect that needed to be located, were

12   you originally told that the suspect had a gray

13   hooded sweatshirt and dark pants?

14        A.   I believe so.

15        Q.   Later did the description change to a

16   dark green hooded sweatshirt?

17        A.   Without reviewing my report for sure --

18        Q.   Go ahead and look at it.  I'm not trying

19   to pull anything.  Take a look at page 81, last

20   incomplete paragraph, third line up.  But you can

21   look at anything.

22        A.   Yes, it did.

23        Q.   Later did it change to a gray and blue

24   jersey with dark shorts?

25        A.   Yes.

1          Q.    And then later did it change to a maroon
2    hooded sweatshirt?
3          A.    Yes.
4          Q.    And did you believe that all of those
5    descriptions were the same person?
6          A.    Yes.
7          Q.    So did you believe that he had gone
8    somewhere and changed his clothing?
9          A.    Or removed clothing.
10         Q.    Okay.  And on one on them he had shorts.
11   So what was your theory at the time about how he went
12   from dark pants to shorts and then back to dark
13   pants?
14         A.    I didn't have a theory.
15         Q.    At some point did you believe that he
16   had gotten into a vehicle and driven away?
17         A.    That was information that was broadcast
18   to me, yeah.
19         Q.    And did you believe the information that
20   was broadcast to you?
21         A.    I believed it as a possibility.
22         Q.    You don't automatically assume that
23   everything that's broadcast to you is 100 percent
24   accurate, do you?
25         A.    It depends on the information and the

1    situation.

2            Q.    At some point you spoke with a homeowner

3    that said that Jake Sheeler had pointed a gun at him,

4    correct?

5            A.    Yes.

6            Q.    And the homeowner also told you that,

7    when he confronted Jake, Jake ran off, correct?

8            A.    Eventually.

9            Q.    So your understanding was that Jake had

10   pointed a gun but had not fired it, correct?

11           A.    Yes.

12           Q.    Jake had pointed a gun but ran off?

13           A.    Eventually, yes.

14           Q.    Now, later you heard about someone

15   asking for a ride and offering to sell someone a

16   revolver.

17                 Do you remember that?

18           A.    Yes.

19           Q.    Do you have any way from this report or

20   otherwise of telling us when that occurred?

21           A.    I can't tell you the exact timeframe,

22   no.

23           Q.    Is there any document or record you can

24   think of that would help us reconstruct your

25   timetable?

1          A.    The -- possibly the Spillman call log or

2    the radio logs from that evening.

3          Q.    What's that last one that you said?

4          A.    Radio logs.

5          Q.    Oh, radio.  Okay.  And that -- in fact,

6    the radio is how you heard that someone was asking

7    for a ride and offering to sell a gun, right?

8          A.    Yes, from dispatch.

9          Q.    Did you later conclude that the suspect

10   might have gotten a ride from somebody?

11         A.    When I arrived, it was a possibility.

12         Q.    And you were told at some point by

13   someone who said that his neighbor might have had a

14   passenger in his vehicle.

15              Do you recall that?

16         A.    Yes.

17         Q.    And at that point did you believe that

18   that passenger might be the suspect?

19         A.    I believed it to be a possibility.  I

20   had no concrete evidence of it.

21         Q.    Okay.  If he had gotten a ride, did you

22   believe that it was possible that he had done so in

23   exchange for the gun?

24         A.    That didn't really cross my mind because

25   I didn't know anything about that at the time.  I

1  couldn't say he got in the vehicle or didn't.  So I

2  didn't.

3          Q.   You knew that he was offering to trade a

4  ride for a gun, right?

5          A.   Yes.

6          Q.   And you knew that there was a

7  possibility that he had gotten a ride, correct?

8          A.   At that point.

9          Q.   So you also knew there was a possibility

10  that he had traded the gun, correct?

11          A.   No.

12          Q.   All right.  How long was it between when

13  the suspect was last seen with a gun and when he was

14  shot?

15          A.   I -- I don't know.

16          Q.   Well, did you park at Horizon and Monte

17  Vista with your lights off for probably 15 to

18  20 minutes in between?

19          A.   Approximately, yeah.

20          Q.   And then you sat there and watched for a

21  while, correct?

22          A.   Yes.

23          Q.   Okay.  And those were all after the last

24  sighting, correct? -- pardon -- of the suspect with a

25  gun?

1          A.   It would have been the last sighting by
2    a witness, not by any officers.
3          Q.   Okay.  Are you aware of any officers who
4    saw Jake Sheeler with a gun on September 25th, 2020?
5          A.   In video and pictures, yeah.
6          Q.   Okay.  But those video and pictures had
7    been taken earlier in the day, correct?
8          A.   Yes.
9          Q.   So is there any way that you can
10   reconstruct how long between the last time that the
11   suspect was known to have a gun and when he was shot?
12         A.   Again, to configure a timeframe, we
13   would have to go through call logs and radio logs in
14   reference to that Spillman report and the -- any
15   radio traffic.
16         Q.   Okay.  At some point did you come upon a
17   female homeowner at 960 Lucille?
18         A.   Yeah.
19         Q.   Do you now know or did you know at the
20   time who that woman was?
21         A.   I do not know who she is.
22         Q.   Okay.  And what did she tell you?
23         A.   That the male that had been in her
24   garage ran and -- pointed northbound, and -- when
25   asked which way he went, and that was off of Lucille.

1    And then when asked which way he had went on Jean,

2    she said she thought he had turned.  I would have to

3    look at my report to tell you which way.  I don't

4    remember.

5            Q.    But it was something general about

6    directions, correct?

7            A.    It was general, yes.

8            Q.    At any point did she say to you that

9    Jake had commented about having lost his gun?

10           A.    No.

11           Q.    Did you ever hear that she said

12   something to that effect to officers?

13           A.    Quite a bit later.  I mean, days later.

14           Q.    Okay.  And what -- first of all, how did

15   you hear that days later?

16           A.    I don't recall how I heard it.  I found

17   out that the -- he had said something later on.  It

18   may have been when I'd gotten back to work after

19   administrative leave.  I don't recall when.

20           Q.    But in any event, that information was

21   not conveyed to you prior to the shooting, correct?

22           A.    No.

23           Q.    Not correct?

24           A.    No, it was not conveyed.

25           Q.    Okay.  Are you aware of any discussions

1    prior to the shooting about how the scene should be

2    handled if the suspect was located?

3         A.    I guess I don't necessarily understand

4    what you mean as far as "how the scene should be

5    handled."

6         Q.    Okay.  How about, for example, which

7    agency, if any, should be in charge of the location

8    if the suspect were located?

9         A.    There were no discussions about how to

10   handle that.

11        Q.    Were there any discussions prior to the

12   shooting of how to prevent different law enforcement

13   officers from giving different commands?

14        A.    No.

15        Q.    Did you hear other officers on scene

16   giving Jake Sheeler commands before the shooting?

17        A.    I could hear voices but not what they

18   were saying -- as far as what the other officers were

19   saying.

20        Q.    Now, you knew that Officer McArthur was

21   giving commands, correct?

22        A.    I could hear her, but I don't know what

23   she was saying.

24        Q.    But you knew they were commands, though,

25   didn't you?

1           A.   I would assume that they were commands.
2    I would not --
3           Q.   Did you do anything to make sure that
4    you and she did not give inconsistent commands?
5           A.   We were both focused on Mr. Sheeler at
6    the time and didn't have any discussions about that.
7           Q.   Did you have any -- did you make any
8    effort to ensure that you and other officers did not
9    give inconsistent commands?
10          A.   Like I said, I was focused on
11   Mr. Sheeler so I was not discussing or telling other
12   officers what to say.
13          MS. PORTER:  Could I hear my question back,
14   please.
15               (The record was read.)
16          Q.   (BY MS. PORTER):  Would that be a "no,"
17   you did not make any effort to make sure that you and
18   other officers did not give inconsistent commands?
19          A.   No, I don't agree.
20          Q.   Tell me what efforts you made to ensure
21   that you and other officers on scene did not give
22   inconsistent commands.
23          A.   I was working on my commands and what I
24   was giving to them.  We each have a different
25   perspective of what we're seeing, and therefore, I

1    was giving my commands.

2            Q.    And that's it?  That's the extent of

3    your effort?

4            A.    Yes, ma'am.

5            Q.    She has to have a "yes" or a "no."

6            Okay.  Let me ask you to clarify

7    something for me on page 85.  You can read any of it,

8    but the part that starts -- that I'm going to ask you

9    about starts -- let's see -- 12 lines from the bottom

10   of the last full paragraph.

11           In the middle of the sentence, it

12   begins, "Jeff stated he said something."

13           A.    Yes, I see where you're looking.

14           Q.    Okay.  I'm just going to ask a couple of

15   clarifications of that paragraph here.

16           "Jeff stated he said something to the

17   effect of 'If you draw your gun, I will shoot you.'"

18           Do you believe that you made a reference

19   to Jake drawing a gun at any time on September 25th

20   when you were giving him commands?

21           A.    In reference to that particular

22   sentence, I'm not sure I understand your question.

23           Q.    Okay.  Well, you know what?  I'll just

24   tell you and then I'll ask the question again,

25   because I'm fairly transparent about this stuff.

1              I can hear "I will shoot you" pretty

2    clearly on the audio.

3         A.    Okay.

4         Q.    What I can't hear is if you draw your

5    gun or anything like that.

6         A.    Okay.

7         Q.    So I'm asking whether or not -- I'm

8    asking now for your recollection.  Do you believe

9    that you said something to the effect of, "If you

10   draw your gun, I will shoot you"?

11        A.    I said, "If you draw your gun, I will

12   shoot you" after he said multiple times "I have a

13   gun."

14        Q.    Did he ever draw his gun?

15        A.    He made a threatening motion with his

16   arm and I took that as threat.

17        Q.    He didn't have a gun, right?

18        A.    Not to my knowledge at that point he had

19   a gun.

20        Q.    Yeah.  But what did the fact turn out to

21   be?

22        A.    It was my reasonable suspicion at that

23   time he had a gun.

24        Q.    I understand that.  What did the fact

25   turn out to be?  Did he have a gun or not?

1          A.    Not at that time.

2          Q.    Do you know whether any of your bullets

3    struck Jake Sheeler?

4          A.    I do not.

5          Q.    Why don't you know?

6          A.    Because that's not been given to me out

7    of the investigation.

8          Q.    Have you ever asked?

9          A.    No.

10         Q.    Do you want to know whether any of your

11   bullets struck Jake Sheeler?

12         A.    It's one of those things in use of force

13   that I had to fire and the threat stopped, and it's

14   not, in my opinion, important to determine that at

15   this point.

16         Q.    Has anyone ever told you that, if none

17   of your bullets struck Jake Sheeler, you might not

18   have to go through this lawsuit?

19         A.    No.

20         Q.    Do you believe that Pocatello Police

21   Department knows whether any of your bullets struck

22   Jake Sheeler?

23         MR. ANGELL:  Objection.  Calls for

24   speculation.

25              You can answer, if you know.

1            Q.    (BY MS. PORTER):   Go ahead.

2            A.    I don't know.

3            Q.    Your gun was taken after the shooting,

4    correct?

5            A.    It was taken as evidence that night.

6            Q.    By Pocatello PD or by whom?

7            A.    By investigators with the Eastern Idaho

8    Critical Incident Task Force.

9            Q.    And you were given it back at some

10   point?

11           A.    Several months later.

12           Q.    By whom?

13           A.    I can't remember if it was Captain or

14   Lieutenant at the time, but Collins.  I think he was

15   lieutenant at the time -- Lieutenant Collins.

16           Q.    And who was Lieutenant Collins with?

17           A.    Pocatello Police Department.

18           Q.    So the gun was taken by Eastern Idaho

19   and at some point it ended up with Pocatello PD and

20   then Pocatello PD gave it back to you?

21           A.    Yes.

22           Q.    All right.  Let's go back to this same

23   paragraph we were on.  The next sentence says, "Jeff

24   stated he told him" -- and the "him" is Jake

25   Sheeler -- "to get on the ground.  The whole time the

1    suspect is not complying with any of his commands."

2              Is that your testimony today that Jake

3    Sheeler did not comply with a single command of

4    yours?

5         A.   Yes.

6         Q.   From what you were observing, did Jake

7    Sheeler comply with the commands of any other

8    officer?

9         A.   No.

10        Q.   And do you know that or do you just

11   assume that?

12        A.   From my observations, he did not.

13        Q.   So what other commands was he being

14   given by other officers that he did not comply with?

15        A.   I think we already discussed this.  I

16   don't know exactly what they were saying.  I knew

17   what I was saying, and I was focused on Mr. Sheeler

18   and what he was saying.

19        Q.   If you don't know what commands Jake was

20   being given, how do you know they weren't being

21   complied with?

22        A.   He was not making any movement or change

23   of action that I would look at as an experienced

24   officer as being compliant.

25        Q.   Let's look at the next sentence.  "Jeff

1    stated he can hear Officer McArthur off to his left

2    and a little bit behind him.  He could hear it but

3    doesn't know what she was saying.  Jeff stated he

4    could hear her saying she was giving him commands and

5    he was not complying with anything they were telling

6    him to do."

7                What did you -- what generally did you

8    mean by that last sentence about hearing her saying

9    she was giving him commands and he was not complying

10   with anything they were telling him to do?

11         A.   I could hear her speaking in loud

12   command-presence voice, but I could not hear --

13   again, like I said, I could not hear what she was

14   saying because I was focused and Mr. Sheeler and

15   myself.

16         Q.   So you didn't hear Officer McArthur tell

17   Jake Sheeler to show her his hands?

18         A.   I did not hear that, not specifically.

19   I heard her -- again, heard her yelling.

20         Q.   So if you didn't hear what she was

21   specifically saying, you didn't have reason to

22   realize why Jake Sheeler would suddenly be moving one

23   of his hands.

24                Is that a fair statement?

25         MR. ANGELL:  Object to the form.

1            MS. PORTER:  You know, I would agree with

2    that.  I'm going to withdraw it.  It was worded

3    badly.

4            Q.   (BY MS. PORTER):  Let me try to ask it

5    in English, okay?

6                 If you had heard Officer McArthur say

7    "Show me your hands," would you have been expecting

8    movement by Jake Sheeler's hands?

9            A.   Possibly.

10           Q.   When you first started shouting

11   commands, you knew that Officer McArthur was already

12   communicating to Jake Sheeler, correct?

13           A.   Yes.  When we first saw him, she started

14   yelling towards him, yeah.

15           Q.   Why didn't you let her give the

16   commands?

17           A.   When we're involved in a rapidly

18   evolving situation, it -- we have to make decisions

19   on what we're seeing as an officer.

20           Q.   And what were you seeing that made you

21   decide not to let the commands continue to be coming

22   from just Officer McArthur?

23           A.   It's a decision that I made to give

24   commands.  I was a little bit closer than her, and I

25   just started giving commands.  That's it's.  It's

1   part of our training -- is to give these commands to

2   try and get that compliance.

3          Q.   And is part of your training to give

4   commands without knowing what other commands are

5   being given?

6          A.   Again, like I said, with a rapidly

7   evolving situation, I can't look at Officer McArthur

8   and tell her what to say or how to say it.  We need

9   to focus on the possible threat.

10         MS. PORTER:  Could you read my question back,

11   please.

12              (The record was read.)

13         Q.   (BY MS. PORTER):  I'm asking about your

14   training.

15         A.   Okay.

16         Q.   Were you trained to give commands

17   without knowing what other commands were being given

18   at the same time?

19         A.   No.

20         Q.   But that is what happened, correct?

21         A.   There were multiple commands given.

22         Q.   And you hadn't -- you did not know what

23   they were and had no way of knowing, correct?

24         A.   No.

25         Q.   It's not correct or --

```
 1              A.   No, I did not know at that time.
 2              Q.   Okay.  Had -- strike that.
 3                   To your knowledge, how many law
 4    enforcement were giving simultaneous commands to Jake
 5    Sheeler?
 6              A.   At that point I knew of me and Officer
 7    McArthur.
 8              Q.   Did you not hear Officer Orr?
 9              A.   I did not.
10              Q.   Officer Anderson?
11              A.   I did not.
12              Q.   Officer Saldana?
13              A.   I did not.
14              Q.   You didn't hear them saying anything?
15              A.   I did not hear them.
16              Q.   Just to be clear, you didn't hear any
17    sounds coming from them?
18              A.   I did not hear any of their voices at
19    all.
20              Q.   Did you know they were there?
21              A.   I did know officers were there.
22              Q.   How did you know that?
23              A.   Because as we came off the hill into the
24    Outback Golf Course, I had seen flashlights, I knew
25    that officers were over in that general area.  And
```

1  where they were at when I was giving commands to

2  Mr. Sheeler, I did not know.

3          Q.   What did you do to check your backstop

4  before you started shooting?

5          A.   Watched the surrounding area.

6          Q.   What was the backstop of -- well, no,

7  strike that.  Let's just finish this paragraph here

8  really quick.

9               Okay.  Then there's a sentence where we

10  were that says, "Jeff stated, like he said, a couple

11  of times said he has got a gun."

12               Then you state, "Jeff stated he

13  continued" -- oh, you know what?  I'm sorry.  I need

14  to go back.  I missed the first reference.  There's a

15  reference earlier in the paragraph to quartering.

16               Are you familiar with that word?

17          A.   Yes.

18          Q.   And what do you mean when you use that

19  word?

20          A.   You and I are straight on.  If we're

21  looking at each other, I'm at somewhat of a

22  quartering angle.

23          Q.   You were pointing at my associate?

24          A.   Yes.

25          Q.   So in other words, you're facing me but

1   you're looking at her, is that what you mean by --

2           A.   No, no.  Like, if you look at the front

3   of your body, we are facing -- we're at full value

4   facing each other.

5           Q.   You and I?

6           A.   Yes.

7           Q.   Are we quartering?

8           A.   No.

9           Q.   Okay.

10          A.   Our court reporter would be more of a

11  quartering angle from me.

12          Q.   Okay.

13          A.   Is what that's meant.

14          Q.   Okay.  Did -- let me skip down to --

15  let's see.  Looks like it is second to last sentence

16  in that same paragraph.

17               "Jeff stated, as he got to the end of

18  the trees, he was looking just over his optic on his

19  handgun and he saw the suspect square up with him."

20               Let me pause there.  What do you mean

21  when you say "square up"?

22          A.   Take a fighting stance.

23          Q.   Now, does "square up" mean that you're

24  facing me?

25          A.   Not necessarily.

1          Q.    Okay.  Was Jake facing you?

2          A.    Partially.  Not -- not a full value

3    facing, like you and I are now sitting across from

4    each other.  It was more of a -- still of a

5    quartering angle.

6          Q.    So he was not facing you when you say he

7    punched his hand out?

8          A.    Not directly straight on with me.  He

9    was facing in my direction but not a full value.

10         Q.    Okay.  You did start to shoot, though,

11   right?  He wasn't facing you square-on according to

12   what you've just described, but you started shooting,

13   correct?

14         A.    When his arm came out and punched

15   straight out towards me and I took it as a threat.  I

16   began firing.

17         Q.    Okay.  Now, please help me understand.

18   He's not facing you but his hand is?

19         A.    Part of his front -- part of his body

20   was facing towards me, and his arm came out in the

21   general direction of me and Officer McArthur.

22         Q.    Part of his body was facing you?

23         A.    Uh-huh.

24         Q.    All right.  Which part or parts was

25   facing you?

1            A.    It would have been his left shoulder.

2    Front body was quartered towards me.

3            Q.    Where was his face facing?

4            A.    Same direction.

5            Q.    Yeah, I'm just trying to figure out

6    why -- I'm sorry that I'm not savvy with your lingo.

7            Okay.  His face was facing your face?

8            A.    He was facing towards Officer McArthur

9    and I.

10           Q.    Were you standing next to each other?

11           A.    Not right next to each other, no.

12           Q.    So was his head going back and forth?

13   How is he facing both you and Sergeant McArthur at

14   the same time?

15           A.    We were in the same general direction.

16           Q.    Okay.  So was he going back and forth

17   with his face between the two of you?

18           A.    I don't know what his face was doing.

19           Q.    Did it appear to you that he was trying

20   to reconcile commands between you and Officer

21   McArthur?

22           MR. ANGELL:  Object to the form.  Calls for

23   speculation.

24           Do you know that?  Only answer that if

25   you know.

1          THE WITNESS:  I do not know.

2          Q.   (BY MS. PORTER):  Did it occur to you

3    that, if he's looking back and forth between you and

4    Officer McArthur, that he's attempting to process the

5    commands that he's being given by the two of you?

6          A.   As I said, I don't know if he was

7    looking back and forth at us or if he was looking

8    directly at one of us.

9          Q.   You don't know?  You mean right before

10   you shot him, you don't know where he was looking?

11         A.   He was facing quartering towards us, and

12   I was watching his hand and not his face.

13         Q.   Okay.  So his hand punched out directly

14   at you and his face might or might not be facing some

15   other direction?  Is that what you're telling me?

16         MR. ANGELL:  Object to the form.  Misstates

17   his testimony.

18         Q.   (BY MS. PORTER):  Go ahead.  Is that or

19   is that not what you're telling me?

20         A.   Okay.  Repeat the question for me.

21              (The record was read.)

22         THE WITNESS:  His face was facing towards us.

23   What exactly he was looking at, I have no idea.

24         Q.   (BY MS. PORTER):  Okay.  When you

25   started shooting at Jake Sheeler, do you know whether

1    he was facing you?

2           A.    Quartering angle, yes, he was.

3           Q.    So was he actually -- was his attention

4    focused somewhere between you and McArthur?  I'm

5    trying to figure out why you thought apparently that

6    he was going to start shooting at you if he wasn't

7    even looking at you.

8           MR. ANGELL:  Object to the form.  Misstates

9    his testimony.

10          Q.    (BY MS. PORTER):  Go ahead.

11          A.    He was quartering facing towards me.

12   His arm came out directly towards Officer McArthur

13   and I.  At the distance we were at, I could not say

14   that he was pointing directly at me or directly at

15   Officer McArthur.  I took his actions as a threat.

16   My suspicions were based on previous information that

17   he was armed, and I began firing.

18          Q.    Did it occur to you that he might be

19   putting his hand out there because McArthur had told

20   him to show it to her?

21          A.    No, it did not.

22          Q.    And actually -- I apologize.  You

23   already said you didn't know what she was telling

24   him, right?

25          A.    Uh-huh.

1          Q.    So you were far enough apart from her

2   that you couldn't hear what she was saying, but

3   you're saying that he was still managing to look at

4   both of you roughly at the same time; is that right?

5          MR. ANGELL:  Hang on.  No.  Object to the

6   form.  That's a gross misstatement of his testimony.

7               Answer that, if you can.

8          Q.   (BY MS. PORTER):  Go ahead, correct me.

9          A.    Okay.  You're going to have to repeat

10  what the question is.

11         Q.    Okay.  Let me break it down.  You were

12  far enough away from Officer McArthur that you could

13  not hear what she was saying.

14              Is that a correct statement?

15         A.    I was not focussed on what she was

16  saying.

17         Q.    So you could have listened to what

18  Officer McArthur was saying and did not?

19         A.    I was focused on Mr. Sheeler and what he

20  was saying.

21         Q.    And not at all on Officer McArthur?

22         A.    Not on what her actual commands and

23  words were.

24         Q.    Okay.  Approximately how far away from

25  you was Officer McArthur?

1          A.    I don't know.

2          Q.    Can you approximate?

3          A.    No.

4          Q.    Do you have any reason to believe that

5    the shell casings that were left after the shooting

6    were moved by anyone?

7          A.    No.

8          Q.    Okay.

9          THE WITNESS:  Before we continue, can I use

10   the restroom?

11         MS. PORTER:  Any time.

12              (A recess was taken from 12:23 p.m. to

13   12:33 p.m.)

14         Q.    (BY MS. PORTER):  Let me show you an

15   exhibit that we used with Officer McArthur and see if

16   it in any way would help me understand I guess where

17   Jake's 12:00 was, I suppose.

18              And first, let me indicate to you that

19   Officer McArthur said she would be moved somewhat

20   from where she's depicted on this, so -- in fairness.

21   What this is is just our attempt based on some of the

22   reports and measurements, things like that.  You can

23   ignore the feet.

24              But looking at Exhibit 3, does it appear

25   to generally reflect the positions of the parties as

1  you understand it?

2          A.    No.  I would -- I can only speak to

3  where -- I can approximate myself and Mr. Sheeler.  I

4  can't approximate where McArthur or Saldana exactly

5  were.

6          Q.    I'm not asking you to approximate where

7  they were exactly; I'm just asking you to approximate

8  where they were.

9              Can you do that?

10         A.    No.  I don't know where Saldana was

11 during this.

12         Q.    Now, you knew where McArthur was?

13         A.    She was behind me and to my left.

14         Q.    Okay.  Is that all you can tell us about

15 where McArthur was, compared to you?

16         A.    Uh-huh.  Yes.  Sorry.

17         Q.    All right.  So if we look at Exhibit 3,

18 can you tell us whether you believe it approximates

19 where you were in conjunction with Jake Sheeler?

20 Ignore the feet references, because those are our

21 calculations.

22         A.    Not exactly, no.

23         Q.    Okay.  And I'm not asking for something

24 exact; I'm asking for an approximation.

25         A.    No.

1          Q.   Okay.   Then let's turn to another

2   exhibit that we had where you did mark where you

3   thought you were.   All right.   Now I'm going show you

4   what's been marked as Exhibit 2, and you'll see

5   toward the back, there are some photos that have been

6   marked.

7          MR. ANGELL:   Yeah, if you flip towards the

8   back, there's a couple of pictures in there.

9          Q.   (BY MS. PORTER):   It's not going to be

10   page 169, because we already know that's the one that

11   she marked on.

12          Do you recognize --

13          MR. ANGELL:   Looking at 170, Counsel?   Is

14   that the one you're wanting to look it?

15          MS. PORTER:   I don't know which one of these

16   he's signed and marked so I just want him to tell me.

17          THE WITNESS:   That is my signature on --

18          Q.   (BY MS. PORTER):   On 170?

19          A.   On 170, yes.

20          Q.   All right.   Where is that signature?

21   Where is the signature?

22          A.   Right-hand column -- or, right-hand

23   side, top.

24          Q.   Do you mind just pointing it out to me

25   on either copy?

1          A.    Right here.

2          Q.    Okay.  Underneath the "9/30/20 14:35"?

3          A.    Uh-huh.  Yes.  And that's my initials

4    and badge number.

5          Q.    So was your interview on September 30th

6    of 2020?

7          A.    According to my statement, Exhibit 4, it

8    was.  It's been a long time to remember exact date.

9          Q.    Okay.  And do you know why your

10   statement was not taken until three and a half or

11   more days -- four and a half days after the shooting?

12         A.    That's standard procedure for interviews

13   through the critical incident.

14         Q.    What's standard procedure?

15         A.    To wait several sleep cycles to do the

16   interview.

17         Q.    Okay.  Do you know whether suspects in

18   other cases are given sleep cycles before they're

19   interviewed?

20         MR. ANGELL:  Object to the form.

21         THE WITNESS:  In most cases, no.

22         Q.    (BY MS. PORTER):  So do you believe that

23   you were treated more favorably as a police officer

24   than if it had been a non-police officer that shot

25   Jake Sheeler?

```
1              MR. ANGELL:  Object to the form.
2              THE WITNESS:  No.  This is -- this is
3       standard procedure, and -- they give you sleep cycles
4       before you come in.
5              Q.   (BY MS. PORTER):  When you say "standard
6       procedure," you mean for police officers that did the
7       shooting, right?
8              A.   For officers involved in critical
9       incidents, yeah.
10             Q.   All right.  So let's take a look at 170
11      which, by the way, is the form that we were given.
12      So it appears to say -- well, why don't you tell me
13      what it says?
14             This is all your handwriting, correct?
15             A.   It appears so, yes.
16             Q.   So tell me what these -- what these
17      markings mean on 170 -- each marking that you see
18      that you put on there.
19             A.   Starting at the top, it has a -- "S"
20      equals suspect, "M" equals me.  There's a north
21      indicator with an arrow and an "N."  It says, "Marked
22      by J. Eldridge."  It's kind of hard to read.  "09/30
23      of '20, 14:35," my initials, badge number, and below
24      that it says "Exhibit B."
25             Q.   Now, there's some other markings on this
```

```
 1  page.
 2        A.   Again, it's really hard to read this
 3  page.
 4        Q.   I know.  You realize we don't have an
 5  original of this.  This is what we were given.
 6             Do you see the other markings?
 7        A.   I believe so.  Are you looking in the
 8  center of the picture somewhat?
 9        Q.   Roughly.
10        A.   Yes.
11        Q.   Tell me what other markings you see in
12  the center and what they mean.
13        A.   I see an "S" and an "M."  So "S" equals
14  suspect and "M" equals me.
15        Q.   So on this form -- or image, are you
16  able to place Officer McArthur?
17        A.   No.  She was behind me and to my left a
18  little bit.  Other than that, I couldn't tell you
19  where she was at.
20        Q.   All right.  Let me just make sure that
21  we are both looking at the same thing, and I think we
22  are.
23             Show me on Exhibit 2 where you see the
24  "S" that you've marked and where you see the "M."
25        A.   So fairly centered in the page right
```

1   here where my finger is:  "S."  And just below that,

2   if you look at the top to bottom of the page, is the

3   "M."

4           Q.   I thought it was kind of obvious, but I

5   just wanted to make sure that I wasn't missing

6   something.

7           Okay.  All righty.  I'm going to come

8   back briefly to this issue of quartering and facing

9   and things like that.

10          Let me reference just Jake Sheeler's

11  torso, okay?  So between -- below the neck, above the

12  pelvis, all right?

13          A.   Okay.

14          Q.   Where was that portion of his body

15  turned or facing at the time that the shooting began?

16          A.   At an -- approximately quarter angle to

17  me.  So if you were to divide a circle, being

18  directly in front of me, 90 degrees, 180 degrees,

19  270 degrees, right?  If you were to divide that, he

20  was a quartering angle -- whether it's exactly 40,

21  45, something like that -- with his left shoulder

22  towards me.  And so his left shoulder would be

23  somewhat towards me and to my right and his -- I

24  would be looking at his torso at this angle, so I

25  would not be able to see the -- from about the front

1    of his right side around to his back.

2              Q.   But he did have his hand directly facing

3    you; is that correct?

4              A.   His arm.

5              Q.   His right hand?

6              A.   His arm came out in a firing stance

7    towards myself and Officer McArthur who was to my

8    left and behind me.

9              Q.   So his -- it looked like maybe you were

10   illustrating using a fist; is that right?  Just

11   illustrating your point with a fist?

12             A.   Yes, I had my hand clenched.

13             Q.   So with the same illustration, the fist

14   was not pointed directly at you?

15             A.   It was pointed at myself and Officer

16   McArthur's general direction.

17             Q.   Yeah.  But since you weren't standing,

18   you know, literally side by side, it was not

19   pointing -- if it was pointing in part at her, it was

20   not pointing directly at you; isn't that true?

21             A.   I can't recall the exact location his

22   hand was pointed.

23             Q.   Okay.  But you did tell us that it was

24   somewhere between you?

25             A.   In our general direction is what I said.

1          Q.    Right.  Not at you, though, directly?

2          A.    In our general direction.

3          Q.    I'm talking about you, Jeff Eldridge.

4    Was the right hand pointed at you directly?

5          A.    I think I just answered that as I can't

6    say exactly where his hand was pointed.

7          Q.    One way or the other, correct?  You

8    can't say one way or the other where his hand was

9    pointed at the time the shooting started?

10         A.    I said it was pointing in our general

11   direction.  Pointed exactly at what, no, I can't say

12   that.

13         Q.    Okay.  Did you -- at some point in the

14   future you learned that no gun was found, correct?

15         A.    Yeah.

16         Q.    And approximately when did you learn

17   that?  It's a "when," not a "how."

18         A.    I know.  It would have been

19   approximately five days later.

20         Q.    So did you learn in the context of the

21   interview?  I'm not asking any other source.  In the

22   context of the -- well, let's say before the recorder

23   came on in your interview, did you learn that no gun

24   had been found?

25         A.    Yes.

1              Q.    Okay.  And that -- who was present when
2    you learned that no gun had been found?
3              A.    My attorney.
4              Q.    Only your attorney, or anyone else?
5              A.    My attorney.
6              Q.    Alone with you?
7              A.    Yes.
8              Q.    Not Graham or Dobson or Dalley?
9              A.    No.
10             Q.    Okay.  Then I shall move on.  Did you
11   see -- oh, no, strike that.
12                   How far away from Jake Sheeler were you
13   when you started shooting?
14             A.    I don't know an exact distance.
15             Q.    Could you approximate it?
16             A.    I estimated about -- between 15 and
17   20 yards.
18             Q.    In your statement you said probably
19   between 10 and 15.  Was that feet or was that yards?
20   I can show you.  It's on page 87.
21             A.    Of?
22             Q.    Of your Exhibit 4.
23             A.    Page what?
24             Q.    87.  You can read the whole thing, but
25   the 10 to 15 reference is on line 6, but you might

```
 1   want to look at line 5 also.
 2           A.    Yes, in my statement I did say 10 to 15.
 3           Q.    And was that yards or feet?
 4           A.    It would have been yards.
 5           Q.    Did you have any sort of camera
 6   capability on site?
 7           A.    On my person or --
 8           Q.    Any kind of way to record the events.
 9           A.    Officer McArthur had a body camera.  To
10   my knowledge, that's the only camera system that was
11   available.
12           Q.    Okay.  So you did not have a body cam?
13           A.    No, we did not have issued body cameras
14   at that time.
15           Q.    How was it -- so was Officer McArthur
16   the only one that was issued a body cam?
17           A.    No.  At that time we were testing and
18   evaluating different cameras and so a group of
19   officers had them.  I don't know who else had them at
20   that point.  I know Officer McArthur had one.
21           Q.    Did you have any sort of camera -- let
22   me ask you:  At the bottom of 87, and it goes over to
23   the top of 88, is a whole bunch of frankly blah, blah
24   and vibrating and buttons and things like that.
25                 Do you see what I'm referring to
```

1    generally?

2          A.    Yes, I know what you're talking about.

3          Q.    Yeah.  What is the reference to "camera"

4    there?  What does that mean?

5          A.    In-car camera of my patrol vehicle.

6          Q.    Did you ever get the in-camera -- or,

7    did you ever get the in-car camera going that night?

8          A.    I don't think I had any in-car camera

9    from any of this incident.

10         Q.    Okay.  At some point when you were

11   speaking with -- let me go back.

12               Oh, what the heck.  Let's go to page 89.

13   Feel free to read the whole thing, but there's a

14   reference to a conversation you had with a homeowner,

15   I believe.  And four lines up from the bottom, it --

16   there's a sentence that says, "Jeff stated he made a

17   comment."

18               Read the whole paragraph if you want,

19   but I'm going to ask you about that.

20         A.    Which paragraph?

21         Q.    The first -- it's incomplete.

22         A.    The first paragraph?

23         Q.    Yes.  You might want to dip back to the

24   line before that because it's -- it'll inform you

25   about the homeowner.

1          A.    So starting on page --

2          Q.    Look at the last line of 88 -- last two

3    lines just to give you some context.

4          A.    Just to make sure I'm correct, you're

5    talking the first paragraph on 89, last partial

6    paragraph on 88?  Is that -- that's what we're

7    discussing?

8          Q.    Yeah.  That -- it comprises a full

9    paragraph.

10          A.    Okay.  Okay.

11          Q.    Okay.  Did you have that conversation

12    with the homeowner before the shooting of Jake

13    Sheeler?

14          A.    Yes.

15          Q.    Okay.  So prior to shooting at Jake

16    Sheeler, you knew that a homeowner had pulled a gun

17    on Jake Sheeler and Jake Sheeler had not shot him,

18    correct?

19          A.    Yes.

20          Q.    And you knew that the homeowner had not

21    shot Jake even though Jake had pulled a gun on him,

22    right?

23          A.    Yes.

24          Q.    While we're on that exhibit, let me back

25    you up to 85.  I forgot something.  As always, you

1    can read the whole thing, but I'm going to ask you

2    about a sentence that starts on the sixth line down,

3    third word in.  It begins, "Jeff stated."

4              A.    In the center paragraph on that page?

5              Q.    I apologize.  In the second -- yes, in

6    the center paragraph.

7              A.    Okay.

8              Q.    Okay.  For the record, I'll read it.

9    "Jeff stated, when he initially noticed him, he was

10   at that slow jog" -- I think that should be "jog."

11             A.    Yes, ma'am.

12             Q.    -- "The suspect paused.  At the end of

13   the trees, there is a little creek and he kind of

14   paused for just a second."

15                   And let me stop there for just one

16   second.

17                   Can you describe for me what you mean by

18   the suspect pausing?

19             A.    Stopped moving forward at a jog.

20             Q.    Okay.  Was he moving forward?

21             A.    No.

22             Q.    He was standing still?

23             A.    Stopped for just a second or half a

24   second.  I mean, it's -- when I say that he's paused

25   for just a second, it's more of a term than a time

1    measurement.

2          Q.    But now I'm asking you for a time

3    measurement.

4          A.    I can't give you an exact time

5    measurement.  He paused for a brief time.

6          Q.    And then resumed doing what?

7          A.    Resumed moving forward along that creek

8    and treeline.

9          Q.    Was he running at that point?

10         A.    No.

11         Q.    Now, let's see.

12         A.    I would say a determined walk.

13         Q.    Okay.  Let's finish that same sentence.

14               Quote, "And he could see the suspect do

15    something with his hands in front of him but couldn't

16    tell what it was."

17               Can you describe for us what you saw

18    Jake do with his hands in front of him?

19         A.    His hands were at about waistline in the

20    front of him, which he was at that point kind of

21    facing away from me but I could see a little bit of

22    an angle across in front of him.  So he wasn't

23    directly away from me; he was kind of facing towards

24    my right a little bit.  And his hands were moving in

25    front of him, and then he turned to where he was

1    quartering towards me and began that determined walk

2    with his right behind his back.

3         Q.    So you say you could not see his right

4    hand where it was or you could?

5         A.    I couldn't see his hand.  I could see

6    part of his arm from about midforearm up to his

7    shoulder.

8         Q.    At any point prior to shooting at Jake

9    Sheeler could you see his right hand?

10        A.    Possibly when he paused there and moved

11   it a little bit and then when he put it behind his

12   back.  I didn't see it again until he stopped and

13   pushed it out towards us.

14        Q.    And we've been talking a little bit

15   about what I think you've characterized as a punch.

16   Show me what the hand looked like when he punched

17   out.

18        A.    I think I kind of demonstrated that

19   earlier.

20        Q.    You did, but I wasn't clear on the

21   context for purposes of my memory, so I'm asking you

22   a clear question now.

23             When he punched out his hand, was it a

24   punch as in a closed fist?

25        A.    Due to distance and lighting, it

1    appeared that way, yes.

2          Q.   Okay.  Okay.  And there's a reference

3    here in sort of the bottom third of that big

4    paragraph.  It's the second line from the bottom of

5    that big paragraph on 85, and it says -- actually,

6    let me read the whole sentence for the record.  It

7    starts four lines up.

8               "Jeff stated, as he got to the end of

9    the trees, he was looking just over his optic on his

10   handgun and he saw the suspect square up with him and

11   his hand came out really fast and punched out to him,

12   towards him in a firing stance."

13              So the -- the closed fist punched toward

14   you in a firing stance?

15         A.   Yeah.

16         Q.   Okay.  Can you describe for me what you

17   mean by "a firing stance"?

18         A.   An aggressive fighting stance like I

19   mentioned before, and then punching that hand out

20   towards the threat or punching that hand out towards

21   something.

22         Q.   Okay.  And this says "firing stance" and

23   you just said "fighting stance."  But did you mean

24   "firing stance" when you were talking in this

25   interview?

1          A.    Yes.  Firing stance and fighting stance

2  are kind of the same thing.

3          Q.    Okay.  A person could get in a fighting

4  stance and have nothing to do with firing a weapon,

5  though, correct?

6          A.    Correct.

7          Q.    So "fighting stance" is broader?

8          A.    It can be.  A fighting stance can be

9  broader, yes.

10          Q.    Did Jake Sheeler ever stare at you?

11          A.    I don't know.

12          Q.    Did you see him staring at you?

13          A.    Not that I recall.

14          Q.    Did you ever tell Jake Sheeler to get on

15  his knees?

16          A.    Not that I recall.

17          Q.    Did you ever tell Jake Sheeler to slowly

18  remove the hand from his waistband?

19          A.    Not that I recall.

20          Q.    Did you ever tell Jake Sheeler to put

21  his hands on his head?

22          A.    No.

23          Q.    Did you ever tell Jake Sheeler to get on

24  his stomach?

25          A.    Possibly.

1       Q.   If you did -- well, actually, let me --

2    in fairness, because I'm not trying to pull something

3    on you, let me have you go to page 91, and it's the

4    first full paragraph.  Just have a quick look at that

5    and then I'll ask the question again.

6       A.   Okay.

7       Q.   So there was a list of things that you

8    had mentioned during your interview that you would

9    have done if -- or commanded him if Jake had stopped,

10   and the last one was "Get on your stomach."

11           Does that refresh your recollection of

12   whether you ever did tell Jake to get on his stomach?

13      A.   The only reason I said "possibly" is, as

14   we approached after we fired, I may have told him to

15   roll over to his stomach.  I don't remember if I did

16   or not.

17      Q.   Okay.  Did it appear to you that Jake

18   was physically able to roll over onto his stomach

19   after he had been shot?

20      A.   At that point, I didn't know.

21      Q.   And you never told Jake to put his hands

22   in the air, correct?

23      A.   No, I did not.

24      Q.   Pardon?

25      A.   No, I did not.

1          Q.   Okay.  Just a couple of quick questions
2    to see if they may jog your memory at all.
3               Did you hear any officers tell Jake to
4    back up?
5          A.   I did not.
6          Q.   Have you ever been involved in any
7    other -- no, strike that.
8               Have you ever fired your gun in the line
9    of duty other than the Jake Sheeler incident?
10         A.   Not at a person.
11         Q.   Okay.  Something that's not
12   training-related?
13         A.   To dispatch animals for mercy, like deer
14   that have been hit with a car, that's the only other
15   time other than training.
16         Q.   When did you first contact an attorney?
17         A.   That night after I got back to the
18   Pocatello Police Department.
19         Q.   Okay.  And remember, I don't want to
20   hear any conversations, okay?
21              Did you contact the attorney directly or
22   did you ask someone else to do it?
23         A.   I contacted him.
24         Q.   Okay.  Did you speak with anyone from
25   the FOP that night?

1            A.    My attorney was an FOP attorney.

2            Q.    Is he employed by FOP?

3            A.    He's -- I don't know his -- if he's

4     employed or contracted or what.  I don't know exactly

5     how that works.

6            Q.    I apologize if I've already asked you

7     this.  It's unintentional.

8                  Prior to the shooting of Jake Sheeler,

9     you had not heard of any physical harm caused by Jake

10    Sheeler, correct?

11           A.    Not to my knowledge.

12           MS. PORTER:  If we can just have a couple of

13    minutes, I will see if we've got anything left.

14                 (A recess was taken from 1:03 p.m. to

15    1:08 p.m.)

16                 (Exhibit 5 marked.)

17           Q.    (BY MS. PORTER):  I've marked something

18    as Exhibit 5.  It's in front of you.  Do you see it?

19           A.    Yes.

20           Q.    Okay.  Can you take a quick look at that

21    and let me know when you've had a chance to review it

22    and are ready for a quick question?

23           A.    Okay.  I didn't read all the way through

24    it but I skimmed it.

25           Q.    We're just going to ask you about the

1    photos.  Do you recall receiving -- or, no, strike

2    that.

3                Do you recall seeing any of the images

4    that are contained within Exhibit 5 on September 25th

5    before the shooting?

6           A.   I think I recall seeing all of them.

7           Q.   And is it your contention that all of

8    these images depict the same person?

9           A.   Yes, other than the vehicle.

10          Q.   Did that turn out to be a red herring?

11          A.   I don't know what it turned out to be.

12          Q.   I asked you a little bit earlier about

13   some of the clothing issues, and let me ask you one

14   last question about the clothing.

15               So the first description was a gray

16   hoodie, right?

17          A.   Yes.

18          Q.   And then green and then maroon.  And did

19   you have a theory of how it ended up back from maroon

20   to green?

21          A.   My only thought was that he was changing

22   clothes somewhere.

23          Q.   Okay.  A couple of final questions here.

24   When you were on scene, you expected Jake Sheeler to

25   pay attention to what you were shouting, correct?

```
 1              A.    Yeah.
 2              Q.    And you expected Jake Sheeler to pay
 3     attention to what the other officers were shouting,
 4     correct?
 5              A.    Yeah.
 6              Q.    You expected Jake to comply with your
 7     orders, correct?
 8              A.    Yes.
 9              Q.    And you expected Jake to comply with
10     orders given by other officers, correct?
11              A.    Yes.
12              Q.    Did you ever announce your intent to
13     place Jake under arrest?
14              A.    I don't recall.
15              Q.    You don't recall one way or the other?
16              A.    No.
17              Q.    What steps, if any, did you do to make
18     sure that you had the most current information about
19     Jake Sheeler before arriving on scene?
20              A.    I think you need to define which scene.
21              Q.    The shooting scene.
22              A.    Okay.  Communication with other officers
23     of information where he was last seen, which
24     direction he was going.
25              Q.    And how did you do that communication?
```

1   Through in person or phone or radio or what?

2          A.   It wouldn't have been phone.  It would

3   have been either radio or person or both.

4          Q.   And what was the mechanism for conveying

5   information to others via radio?  How did you

6   physically do such a thing?

7          A.   Just get on the radio.  General

8   procedure for that is -- and I can't remember exactly

9   what was said or how it was done that night.  But the

10  general procedure for that is, if I have information

11  that I need to give out of a person that's going

12  somewhere that we're looking for, it's something to

13  the effect of "Units in the area of this location,"

14  whatever it might be.

15              Like, so, for example, if it was here at

16  Holiday Inn -- he was in there at Holiday Inn, you

17  know, "Suspect was last seen doing this or wearing

18  this" or whatnot.  It depends on what the information

19  is that we need to get out.

20         Q.   And was there a similar process

21  available on September 25th, 2020?

22         A.   Yes.

23         Q.   You had received some report from an

24  Idaho State Trooper named Noyes that he had possibly

25  located the suspect; is that correct?

1          A.    Overheard his radio traffic, yes.

2          Q.    Okay.  And he mentioned during that

3    radio traffic that the subject had a backpack,

4    correct?

5          A.    I don't remember that.  I -- I don't

6    recall if he said he had a backpack or not.

7          Q.    When you arrived on scene, Jake Sheeler

8    did not have a backpack on, correct?

9          A.    I don't recall.

10          Q.    Did you undertake any efforts to

11    deescalate the situation prior to the shooting of

12    Jake Sheeler?

13          A.    I guess I'd have to ask what is your

14    definition of deescalate?  Like, what do you mean?

15          Q.    Do you have any understanding of the

16    word "deescalate"?

17          A.    Yes.

18          Q.    All right.  What is your understanding

19    of the word "deescalate"?

20          A.    To hopefully calm and defuse a

21    situation.

22          Q.    I'll take that definition.  Using your

23    definition of deescalation or deescalate, did you

24    make any efforts to deescalate the situation before

25    shooting at Jake Sheeler?

1          A.   Yes.  I gave him several commands to

2   stop moving and to get on the ground.

3          Q.   Anything else?

4          A.   If he drew his gun, I would shoot him.

5          Q.   Anything else?

6          A.   Not that I can think of right mow.

7          Q.   Did you say anything in an attempt to

8   calm the subject down?

9          A.   Not that I know of, no.

10          Q.   At any time while you were shooting at

11   Jake Sheeler, did you pause to assess whether he had

12   been subdued?

13          A.   I watched Mr. Sheeler until his arm

14   dropped, came down to his sides, and he started to

15   fall over backwards, and then that's when I stopped

16   firing.

17          Q.   Did you have to pull the trigger each

18   time in order to project a bullet at Jake Sheeler?

19          A.   Yes.

20          Q.   Is that a "yes"?

21          A.   Yes.

22          Q.   To your knowledge, were your actions at

23   the scene of the shooting consistent with Pocatello

24   PD policy?

25          A.   To my knowledge.

1          Q.    And you never received any sort of

2    discipline or reprimand in relation to the shooting,

3    correct?

4          A.    No, I did not.

5          Q.    Were you requested to perform any

6    additional training after the shooting?

7          A.    No.

8          Q.    Did anything happen on site of the

9    shooting for which you had not previously been

10   trained?

11         A.    Not that I can think of.

12         Q.    Before or after the shooting of Jake

13   Sheeler have you ever been accused by anyone of

14   excessive force?

15         MR. ANGELL:  Object to the form.

16              But go ahead and answer that, if you

17   can.

18         THE WITNESS:  Not that I recall.

19         Q.    (BY MS. PORTER):  Did Jake Sheeler say

20   to you -- no, strike that.

21              Did you hear Jake Sheeler say, "I will

22   shoot you"?

23         A.    I don't recall him saying that, no.

24         MS. PORTER:  Anything?

25         MS. CHRISTIANSEN:  No.

1          MS. PORTER:   I think that's all we've got.

2          MR. ANGELL:   I don't have any questions.

3           (Deposition concluded at 1:19 p.m.)

4                  (Signature requested.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF JEFFREY ELDRIDGE

I, JEFFREY ELDRIDGE, being first duly sworn, depose and say:

That I am the witness named in the foregoing deposition; that I have read said deposition and know the contents thereof; that the questions contained therein were propounded to me; and that the answers contained therein are true and correct, except for any changes that I may have listed on the Errata Sheet attached hereto.

DATED this _____day of _____20_____.

CHANGED ON ERRATA SHEET   YES___NO___

_____
JEFFREY ELDRIDGE

SUBSCRIBED AND SWORN to before me this _____day of _____20_____.

_____
NAME OF NOTARY PUBLIC
RESIDING AT_____
MY COMMISSION EXPIRES_____

```
1              ERRATA SHEET FOR JEFFREY ELDRIDGE

2      Page_____Line_____Reason for Change
       _____
3      Reads
       _____
4      Should Read
       _____
5      Page_____Line_____Reason for Change
       _____
6      Reads
       _____
7      Should Read
       _____
8      Page_____Line_____Reason for Change
       _____
9      Reads
       _____
10     Should Read
       _____
11     Page_____Line_____Reason for Change
       _____
12     Reads
       _____
13     Should Read
       _____
14     Page_____Line_____Reason for Change
       _____
15     Reads
       _____
16     Should Read
       _____
17     Page_____Line_____Reason for Change
       _____
18     Reads
       _____
19     Should Read
       _____
20     Page_____Line_____Reason for Change
       _____
21     Reads
       _____
22     Should Read
       _____
23

24

25        SIGNATURE:_____
```

1                    REPORTER'S CERTIFICATE

2              I, Amber S. Williams, CSR NO. 1080,

3    Certified Shorthand Reporter, certify:

4              That the foregoing proceedings were taken

5    before me at the time and place therein set forth, at

6    which time the witness was put under oath by me.

7              That the testimony and all objections made

8    were recorded stenographically by me and transcribed

9    by me or under my direction.

10             That the foregoing is a true and correct

11   record of all testimony given, to the best of my

12   ability.

13             I further certify that I am not a relative

14   or employee of any attorney or party, nor am I

15   financially interested in the action.

16             IN WITNESS WHEREOF, I set my hand and seal

17   this 23rd day of February, 2023.

18

19                          _Amber S. Williams_

20             _____

21             AMBER S. WILLIAMS, CSR NO. 1080

22             Notary Public

23             Post Office Box 2636

24             Boise, Idaho  83701-2636

25   My commission expires June 1, 2027

# Exhibit 6

Exh. No: 4
Date 2-15-23
Name Eldridge
M & M Court Reporting

▶ Eastern Idaho Critical Incident Team

### Supplemental Report Form

### Supplement Number:

**Investigative Team:** Detective Zach Dalley Bingham County Sheriff's Office, Loren Dobson Blackfoot Police Department, Zeb Graham Bonneville County Sheriff's Office.

**Case Number:** 01-2020-05034 Bingham County Sheriff's Office.

### Associated Case Numbers:

**Date and Time Occurrence:** 09/25/2020 at approximately 2300 hours. The field south of the Red Lion Hotel located at 1555 Pocatello Creek Road, Pocatello, Idaho 83201

**Location:** Stephen Muhonen's Office located at 201 East Center Street, Pocatello, Idaho 83201.

**Supplement:** On 09/30/2020 at 1324 hours I started my recorder for an interview with Pocatello Officer Jeff Eldridge. Present in the room I, Detective Dalley Bingham County Sheriff's Office, Loren Dobson Blackfoot Police Department, Zeb Graham Bonneville County Sheriff's Office, Sgt Derick Daniels Pocatello Police Department, Lieutenant Bill Collins Pocatello Police Department, Stephen Muhonen counsel for Officer Jeff Eldridge, and Jeff Eldridge Pocatello Police Department.

I advised Jeff this was being recorded, this is a criminal investigation and you are being represented with your legal counsel. I asked if he wished to proceed with this and Jeff stated he does. I asked Jeff to state his full legal name and date of birth, Jeff stated Jeffery Erik Eldridge, 7-4-76.

I asked what his date of hire, rank, and badge and or radio number are, Jeff stated date of hire with Pocatello Police Department was July 30th, 2012, currently a patrol corporal, badge number 5262. I asked Jeff to describe his law enforcement experience, Jeff stated almost 20 years total, he stated at a prison in Nevada and was there for 6 years, started in November of 1999. Jeff stated he left there in January of 2006 where he moved to Chubbuck Police Department, he was with them for 6 and a half years, from January 2006 to July of 2012 and has been with Pocatello since then.

I asked Jeff to describe his current assigned shift, Jeff stated he is currently assigned as a patrol corporal on the swing B shift, which is a 12 hour shift from 3p.m. to 3a.m. working Friday, Saturday, Sunday, and every other Thursday. The Thursday is an 8 hour shift.

I asked what time he started his shift that day, Jeff stated he started his shift about 2:45p.m. I asked if he was off duty at the time, Jeff stated no it was a regular scheduled shift. I asked when the last time was he slept prior to the incident and for how many hours, Jeff replied the night before, approximately 8 hours. I asked when the last time you ate prior to the incident was, Jeff stated probably about 1 p.m. that afternoon, before he came into work.

Revised 2019

DEFENDANTS 000079

▶ Eastern Idaho Critical Incident Team

I asked Jeff to describe the vehicle he was operating in during the incident and if it has a unit number, Jeff replied unit number 235, Ford explorer, marked patrol unit with Pocatello Police on the side, overhead lights on the top, black and white, it says PPD 235 on the license plate. I asked if it had in car camera, Jeff stated that it does. Muhonen asked if it was utilized in this incident, Jeff stated not during the use of force portion, he was out of range. I asked if that was just the mic that would be out of range and he stated yes.

I asked prior to the incident what type of calls did you handle and how busy was the shift, Jeff stated this was his first call of service for the day. Jeff stated listening to the radio there was a few other calls but this was his first call for the day. I asked if anything out of the ordinary happened prior to the incident, Jeff asked prior to him responding to the initial call, no. I asked if he was upset in anyway prior to the incident, Jeff stated no.

I asked if he would describe the make, model, caliber, and finish of the firearm that you used, including any special modifications. Jeff stated Glock, Model 17, 9mm, it had a Leupold delta point red dot optic on it, and backup iron sights, and a weapon mounted light. I asked if it was department issued, Jeff stated the light and firearm are, the sight and backup iron sights were put on by him.

I asked him describe the type of ammunition used, and how man rounds were in the gun at the time of the incident, Jeff stated spear gold dot 147 grain with 18 rounds in it, 17 in the magazine and one in the chamber. I asked if the firearm and ammunition were department or personal, Jeff stated department issued.

I asked when he last qualified with the firearm, Jeff stated the night before, September 24th. I asked Jeff if he has had any specific or specialized training with the firearm, Jeff replied our standard department training that everybody has had, in around May of 2019 he believes he went to a handgun optic class in Ada County. I asked any other training, Steve stated how about not with just that firearm but any specific or specialized training, Jeff stated his monthly swat training and they go to the range almost monthly, he is a firearms instructor, he uses that quite a bit in practice shoots and department training, he went to Provo Utah in September of 2018 for Law Enforcement Training Camp put on by action target, Jeff stated looking back his instructor classes, combat instructor believes in 2014, rifle, shotgun, and handgun in 2009 and 2010.

I asked Jeff to describe any other weapons that he had access to at the time of the incident, Jeff stated he had a backup handgun on the inside of the shirt, strapped to the his vest on the left side. Jeff stated it was a Kimber ultra-carry 2 with 8 rounds, 7 in the magazine and one in the chamber. Jeff stated he also had his less lethal, his Taser was on his belt, his asp. Jeff stated he also had several pocket knives. I asked on the Kimber has he qualified with that, Jeff stated he has but doesn't remember the last date, he believes it was in either May or June but isn't positive on that. Steve stated 2020, and Jeff stated yes. I asked if he has had any specialized training in the Kimber, Jeff stated same stuff that he has done with the handgun, he does off duty practice with it at the practice shoots.

Revised 2019

DEFENDANTS 000080

▶ Eastern Idaho Critical Incident Team

I asked Jeff to describe the clothing he was wearing at the time of the incident, Jeff stated he had on his patrol uniform which is a dark blue uniform of a utility pants, black boots, duty belt, body armor, soft body armor, patrol shirt. I asked Jeff to describe any markings that identify you as a law enforcement officer, Jeff stated on the top left of the chest there is an embroidered badge on the shirt, has his name on the right chest, there is Pocatello Police patch on the shoulder, American flag on the other shoulder, and corporal strips on both sleeves. I asked if there was anything on the back and he stated no.

I asked what Jeff was doing when the call came in, Jeff stated he was in his patrol in the back lot, logging back into his camera system, they have an automatic shutoff after a certain period of time. Jeff stated he was in the station for about an hour and a half so he was logging into his camera and Spillman system when he heard them broadcast the attempt to locate.

I asked Jeff if he could provide a detailed description of the incident. Jeff stated he was sitting in the back lot in his patrol car. Jeff stated he heard dispatch get on the radio and broadcast an attempt to locate for a male subject who had just stolen a firearm in the 1200 block of East Maple. Jeff stated once they broadcast that he left the back lot and they dispatch several other officers to the location. Jeff stated due to the nature of it he didn't say he was in route just in case somebody came across. Somebody had just stolen a firearm and he didn't want to tie up the airtime. Jeff stated he responded up the area where he ended up. Jeff stated as he was arriving he thinks Corporal Miller said that suspect was last seen in the 300 block of Fairmont, so he went to the north end of that block at Walnut and Fairmont and parked to try and establish a perimeter. Jeff stated he parked his patrol car there and got out and deployed his patrol rifle. Jeff stated he had that slung and was just watching the area for the description that officer Miller gave, initially in a gray hooded sweatshirt and dark pants and last been seen running west bound into that 300 block area. Jeff stated he remained there and try to help coordinate units about a two block radius between Franklin and Filmore and Maple Walnut, which would cover the 300 Block from Franklin down to Filmore. Jeff stated he remained there and a decision was made to start doing a foot search. Jeff stated officer Fetchin arrived to his location and advised that she had a drone in her vehicle and she could deploy the drone. Jeff stated he had officer Mickelson park with her and provide her security while she was operating the drone. Jeff stated officer Amos and he started walking the area to Maple and Fairmont to meet up with Miller to begin a foot search.

Jeff stated while they were doing that Fetchin stated the wind was too strong for her small drone and it was stopping the functions to where she couldn't get any good video. Jeff stated they decided to start doing their search at the last known location. Jeff stated they had two search teams Cpl Miller and him and the other team was officer Higbee, Amos, and officer Namohola. Jeff stated they began searching there and while they were searching there they were approached by a witness. Jeff stated that the witness came up and told them that he had chased the subject into a backyard and as he chased him over the fence the suspect had pointed a gun at him and jumped over the fence and ran up onto he believes Fairmont. Jeff stated and then they lost sight of him, and about that time he believes that officer Anderson contacted somebody and got some video of suspect. Jeff stated he broadcast a picture of the suspect through email which he looked at, dark pants, dark shoes, dark green hooded sweatshirt, and shaggy dark hair wearing glasses seeing glasses not sunglasses. Jeff stated they began their search checking house to house checking houses, out buildings, vehicles for exigent circumstances they cleared houses. Jeff

DEFENDANTS 000081

 Eastern Idaho Critical Incident Team

stated they searched the entire block of Fairmont, most of Filmore and part of Franklin so just the two blocks that they had perimeter in they searched that whole area, they were getting ready to go back to the command post where Sergeant Buck was at, at Maple and Fairmont. Dispatch contacted on the radio that possibly two males at 465 Fairmont, one wearing a mask. Jeff stated several of them went that direction and he was with Miller at the time, there were several officers a head of them and got there before them. Jeff stated they fanned out and started doing a search north bound from that location. Jeff stated the reporting party thought he ran north bound.

Jeff stated they got to the address and contacted the RP and he was able to video, Jeff stated the male in the video was slender build a little bit taller, shaggy hair, wearing glasses, however he was wearing black shoes, dark shorts, and a gray and blue jersey. Jeff stated you could see a good facial feature and it looked like the same suspect. Jeff stated another officer broadcasted a booking photo and he was able to look at that and confirmed it was the same person. Jeff stated next video shows the same guy come back however he was wearing a maroon hooded sweatshirt and a plaid colored mask at that time but the shoes, shorts, and jersey were all the same. Jeff stated he hides behind a car and the video cuts out, it doesn't show which way he went. Jeff stated Cpl Miller and him searched that guy's backyard and the two surround to double check and make sure he wasn't hiding anywhere. Jeff stated they then went up and assisted in setting up a perimeter at Euclid and Pine just to try and watch to make sure he didn't come out anywhere. Jeff stated why they were doing that, he can't remember which officer got on the radio and said they had been approached by a female subject in the area of 1100 block of east Poplar, the female stated a guy matching that description had run into her house and left the house with a male named Christian Franco and got in a car and drove away. Jeff stated at that point they believed he had gotten in a vehicle and driven away.

Jeff stated they held their perimeter and then the determination was to go back and contact Sgt Buck who as the incident commander and he went to help Detectives on Hyde where the initial firearms were stolen. Jeff stated during this time they broadcast that one of the firearms was a Taurus Judge and the other was a .45 cal Highpoint that had been taken from the victim. Jeff stated he got back over to the victims house and was speaking with Detective Olson, he explained that he wanted everybody who had collected any video from anyone to make sure that got downloaded and brought back as evidence. Jeff stated he was notified by dispatch that there was a home owner on Filmore, he thinks 342 Filmore, that wanted officers to come to his residence and search his residence because it had been unlocked, he hadn't been inside he just wanted it checked. Jeff stated Officer Anderson and Cpl Miller went to that house and searched it, the out buildings and didn't have anything. Jeff stated he went back to the address on Hyde where the original theft had occurred, while he was there the homeowner had told him the suspect had pointed the stolen handgun at him, and told the homeowner he would shoot him. The homeowner stated he chased him out of the garage, where he turned and pointed the handgun at him, the home owner stated at this time he had his own gun out and the suspect told him again I'll shoot you and took off running. Jeff stated he waited there with Olson until they were doing collecting what they needed. Jeff stated when he cleared he made sure they assigned the call to Detective Olson and checked them all 24 or cleared the call. Jeff stated about the same time dispatch got back on the radio and said they had a reporting party at 1625 Beth stating there is a male matching the description of suspect asking for a ride and offered to sell this RP a revolver. Jeff stated he turned around and was going south on Hyde and started back up Hyde and went

DEFENDANTS 000082

 Eastern Idaho Critical Incident Team

over to Franklin, he followed Miller and could see his taillights going up the hill, or what he thought were his taillights going up the hill. Jeff stated it was dusk getting into dark at this point. Jeff stated he went up and as he was crossing the Monte Vista overpass Miller advised that he went on the wrong street. Jeff stated he was 23 on scene, and turned off Monte Vista onto Renee and north bound on Beth as he turned onto Beth the reporting party, he thinks is the second house 1625 Beth, he was standing at the street with he was assuming to be his wife, he flagged him down as he pulled up there, rolled his window down and he pointed east bound on Beth, the guy went up the hill to his neighbor's house, he was talking to his neighbor and he may have had a passenger in his vehicle but wasn't sure. Jeff stated he put that information out over the radio as he was driving up the road and as he topped the hill, he got to about 1740 1750 block of Beth and was flagged down by another reporting party. Jeff stated by then it was pretty much dark and he has to have headlights on to see, you could see maybe somebody in the road but you wouldn't have been able to identify them it was that dark by then. Jeff stated he pulled up there had a gentleman flag him down and state that he just had this sketchy guy asking him for a ride and he told him no. Jeff stated there was another guy with the RP and he stated that the other guy said he went up here and went left onto Lucille, Jeff stated that he asked how long ago and was told about five minutes ago. Jeff stated he put that out on the radio and dispatch started dispatching more units to the area.

Jeff stated he put the information out and started checking and driving the entire area looking for anyone on foot matching the description, Jeff stated he didn't see anybody and contacted one African American male that was in the area to see if he had seen anything and he said he hadn't. Jeff stated he continued to drive the area and parked at Horizon and Monte Vista will all his lights off for probably 15 to 20 minutes looking for foot traffic, just seeing if he saw anybody walking based on the direction of travel he had been going, he thought he would be going in a eastern direction.

Steve stated he was interrupting and asked what the description of the suspect was at this time, Jeff stated still in dark clothing he believed, they didn't give specific colors at that time.

Jeff stated he sits there and watches for a while and Cpl Miller had responded up there to help, he gets on the radio and asked if they needed to contact the reporting party. Jeff stated that he said they did and Miller stated he was going to respond to the 1625 Beth address and he told him he would respond back to the other RP's address because he didn't give that out over the radio but he knew where it was. Jeff stated he responded back to that address at the 1700 block of Beth and got out of his car and walked back and contacted that RP in his front driveway at the curb. Jeff stated just barely after contacting him Officer Smith comes through the intersection and he hears a male yelling officer, officer several times chasing after Smith. Jeff stated he contacted him and he says there is a guy in his garage and pointed at a house at the corner of Beth and Lucille. Jeff stated he got on the radio and told Cpl Miller to respond to his location, which he had given it to dispatch when he checked out there at that time. Jeff stated the suspect is possibly in the garage at Beth and Lucille and got the guys address as they started towards his house. Officer Smith and he started jogging over to that residence with that guy and as they got there a female came out of the garage and started pointing north bound on Lucille, stating that he had run north bound towards Jean. Jeff stated he asked what way he had went when he got to Jean and she wasn't sure but thought he had turned north on Jean. Jeff stated Smith and him were

DEFENDANTS 000083

 Eastern Idaho Critical Incident Team

jogging down the road with their lights on searching. Miller came in with his patrol car, all three were at the intersection of Jean and Lucille at the same time. Officer Miller said there is somebody down there which would be to the west on Jean from Lucille as they turned he could see a figure in the road but he could tell it wasn't there suspect, it was a citizen that was pointing north bound towards the houses across the street on Monte Vista. Jeff stated Miller got on the radio and said he was running towards Monte Vista, Smith and him started going through across from where the reporting party had pointed. Jeff stated they began searching the first house off of Jean, the garage and any out building but everything was secured at that time. Jeff stated there was an open spot in the fence that was a pathway not a gate into the backyard behind there, Smith and he went there and started checking out buildings in that area, while they were doing this he noticed off to the east there was an open gate and the west side is all open area to the street. Jeff stated he did notice the open gate do he went to that side and checked the next gate and it was closed. Jeff stated he noticed people inside that house watching him so he went inside and asked them if they saw anything, they stated they hadn't seen or heard anything. Jeff stated he told them to lock their doors and asked permission to check their property which they granted. Officer Smith, Cpl Miller, and he searched that property as well as the property to the east and the west of there. Jeff stated they didn't see any signs of suspect anywhere in there. Jeff stated they then crossed Monte Vista and began to search the residence directly across to the north. Jeff stated they contacted that home owner and told him what they were doing and he gave them some information that there was a chicken coop in the back but everything else should be secured. Jeff stated at this point it was him, Cpl Miller, Officer Smith, and Officer McAruthor that are searching this property. Jeff stated while they were searching that property an ISP trooper got on the radio to Pocatello's dispatch stating that he was in the area of the Red Lion and he had night vision and he could see a subject in dark clothing walking in the trees on the south end of Red Lion and that he was east bound from the interstate area.

Jeff stated they made the determination to go out from the back of the house the hill kind of rolls down, goes out a ways and then rolls down and drops into the Outback Golf Course. Jeff stated they made the determination that they were going to work their way in a search line, Officer Smith was on the far left, they were facing west at this time by a fence line, Cpl Miller, Officer McAruthor, and he was right where the hill rolls. Jeff stated they started searching that hill side working their way to the Red Lion. Jeff stated as they started getting a little bit closer he heard radio traffic that there was another handgun stolen from house on Lucille from the garage that he had been in, said it was a Glock 45 that had been stolen there, they said it had hollow point ammunition, because the owner had been carrying it to shoot bear while he was hunting if need be.

Jeff stated they continued working west bound and he heard the ISP trooper state, he was ask by his dispatch if he needed more units and they already had, Cpl Miller had already asked units to go over and help him. Jeff advised that the trooper told his dispatch that he did but he was going to have to contact the guy because he was coming right at him. Jeff stated he didn't hear anything else from him, somebody status checked him and he didn't answer. Jeff stated as they were working their way down that hill, he could see what appeared to be officer's flashlights searching the area south of the Red Lion parking lot. Jeff stated at that point he told Cpl Miller that McAruthor and he would drop down on the grass at the golf course and asked him and officer Smith to stay up on the hill so they can keep that contained if need be and keep searching.

DEFENDANTS 000084

 Eastern Idaho Critical Incident Team

Jeff stated they dropped off the hill and started working towards the officers, they are going in a north west direction at that point. Jeff stated he told Officer McAurthor that he was going to go towards the tree line, it kind of comes from the south area of the Red Lion and works easterly into the Outback Golf Course, he told her he was going to go over to the trees you kind of stay in the middle and work your way that way. Jeff stated he turned and started walking towards the beginning of the trees when he heard Officer McAurthor yell there he is, Jeff stated she had a flashlight on him. Jeff stated at that point he pulled up his flashlight and he could see a male kind of at a slow jog, dark pants, dark shoes, shaggy black hair, dark brimmed glasses with a dark greenish hoodie on, which matched the suspect, it looked exactly like the picture he had. Jeff stated he was certain it was the guy who had committed the aggravated assaults, robbery, burglary, grand theft.

Jeff stated at that point they both started running towards him, officer McAruthor tried to get on the radio and broadcast clear the air, which there was people talking. Jeff advised he continued to hit his radio mic until it clicked in. Jeff stated he yelled in Pocatello clear the air and described where they had him at the south end of Red Lion and the Golf Course. Jeff stated at that point he started yelling police don't move multiple times. Jeff stated there was no response from him at that point. Jeff stated when he initially noticed him he was at that slow job, the suspect paused, at the end of the trees there is a little creek and he kind of paused for a just a second and he could see the suspect do something with his hands in front of him but couldn't tell what it was. Jeff stated at that point he had already draw his gun because of the suspected theft of three different firearms and he had already been reported to point a gun at other people. Jeff stated as they were going towards him after he makes that little pause and does that with his hands, suspect turns to where he is kind of facing him and moving in a quartering facing and his hand is behind his back at his waistband at the small of his back. Jeff stated at about this time suspect yells I have a gun, he yells police don't move. Jeff states the suspect continues to say he has a gun and he heard it at least twice for sure that he says he has a gun. Jeff stated he said something to the effect of if you draw your gun I will shoot you. Jeff stated he told him to get on the ground, the whole time the suspect is not complying with any of his commands. Jeff stated he can hear officer McAruthor off to his left and a little bit behind him, he could hear it but doesn't know what she was saying. Jeff stated he could hear her saying she was giving him commands and he was not complying with anything they were telling him to do. Jeff stated like he said a couple times said he has got a gun. Jeff stated he continued at that quartering facing towards him with his hand behind his back in the small of his back, he continued in that in a little bit of a north east direction along that creek line. Jeff stated as he got at the end of the trees, he was looking just over his optic on his handgun and he saw the suspect square up with him, and his hand came out really fast and punch out to him, towards him in a firing stance. Jeff became emotionally upset telling this part of the incident.

Jeff stated the suspect punch that hand out into a firing stance and at that point he thought he was going to shoot him and he felt fear, and as soon as he saw that hand come out to a full extension as he was bringing his gun up he began firing. Jeff stated that he thought he was going to shoot him, he thought he was going to shoot Officer McAurthor, he knew that Officer Miller and Smith were behind him somewhere. Jeff stated he started firing and continued to fire until he saw his arms go to his sides and he fell over backwards, there was no other threat at that point and stopped firing. Jeff stated as soon as his arms came to his sides he stopped firing and he fell over.

DEFENDANTS 000085

 Eastern Idaho Critical Incident Team

Jeff stated McAruthor and he started to approach, keeping cover on him in case he reached for a weapon. Once they got to him he started moving his arms and they pinned his arms with their foot until ISP trooper Orr arrived and about the same time several other officers arrived, Officer Miller and Smith. Jeff stated he holstered his gun and they started doing first aid. Jeff stated Trooper Orr started cutting off clothing to find out where bullets were, Jeff stated he remembers asking where are you hurting. Jeff stated he provided Trooper Orr with a Israeli combat pressure dressing in his pocket he pulled that at. Trooper Orr had found a couple wounds on the left rib cage area but do to the possible lung wounds they didn't want to do that so another officer had a chest seal that they put on. Jeff stated somebody pulled his pants off and found a wound on his left leg and he applied a tourniquet to the left leg and then put the pressure dressing on the wound on the left leg. Jeff stated after that he got blood on his hands because he had not put gloves on so due to the blood exposure he had some hand sanitizer in the left chest pocket of his uniform and had officer Namohola get that and spray his hands and wiped his hands down with that. Jeff stated that he walked him out to his car where he used some more of that and about that time he tried to contact Steve and tried to contact his wife. Jeff stated then officer Namohola drove him back to the police department.

I advised Jeff that we were just going to go back and go over a few more things that I had a couple questions on. I asked Jeff where he was at when he said he was east bound was that at Walnut and Fairmont, Jeff stated Walnut and Fairmont would be the north end of the 300 block. Jeff stated Franklin, Fairmont, Filmore, and Hyde all run north and south, Maple Walnut run east west. I asked what was the other house that had the stolen gun from. Jeff stated the residence at the corner of Lucille and Beth, he wasn't positive on the address, but he thinks it was 960 or something like that. I stated when you are confronting him and yelling police, how many times do you think you yelled police, Jeff stated at least two. I stated I know it is hard to describe how loud you were giving them but were you yelling or screaming it, Jeff stated he wasn't screaming but it was a loud firm voice, it was a command presence thing, loud, clear, police, don't move. Zeb stated scale of 1 to 10, 10 being the loudest you can get and 1 being almost a whisper, Jeff stated best guess 7. I asked do you think he heard you, Jeff stated yes his response was I got a gun. I stated when he made the motion with his hand behind his back and he pulled it out towards him what were you feeling at that time, Jeff stated fear, it was that thing he was afraid for him, afraid for Officer McAruthor, just based on the information from the previous descriptions he had stolen three firearms, he felt like he was going to be shot and might die. I asked how many times he thinks he shot, Jeff stated his estimation would have been five, he was there when they did a round count and it appeared that he shot nine.

I asked Zeb if he had anything else, Zeb stated Jeff did you do anything deliberately or accidently to alter the crime scene in anyway, Jeff stated no but there was one thing he forgot, as they were coming up giving commands, at that point he was probably 20 to 25 yards away from him. Jeff stated he had his flashlight in one hand and his gun in the other, Jeff stated he thought to himself that this is a long shot so he went to put his flashlight away knowing that he had his weapon mounted light. Jeff stated he missed the ring on his belt and dropped his flashlight so that was left kind of back behind where he ended up shooting. Jeff stated he just continued to advance pacing him but trying to close that distance at the same time trying to get to him. Jeff stated one other thing that he forgot about at the time was that there was probably estimated 10 people sitting at the driving range in the direction he was going that were up there driving balls

Revised 2019

DEFENDANTS 000086

 Eastern Idaho Critical Incident Team

the whole time they were doing this. Jeff stated he didn't want to let him with the past information where he had already pointed a gun at somebody, wouldn't want to let him get to that so he was trying to get ahead of him and cut him off. Zeb stated is it fair to say Jeff you were concerned for safety of the citizens that were in the immediate area, Jeff stated yes. I stated you just said 25 yards away, is that how far you think you were away when the incident, Jeff stated when he dropped his flashlight, when he started shooting probably between 10 and 15. Zeb stated did you contact him first or did officer McAruthor, Jeff stated officer McAruthor started yelling first. She was giving commands until he could get off the radio until he could tell people where they were at and he started giving more commands. Zeb asked do you know if your transmissions ever went out, Jeff stated he doesn't know, he continued to click that until he heard the beep that says the mic is open and that is when he gave his information so he doesn't. I asked Jeff if he could describe the lighting that was right there, Jeff stated on the golf course there are several overhead mass lights which, which McAruthor and he coming in were front lit, he was slightly backlit but he was also in the shadow of the trees. Jeff stated as he was moving along so they had to have flashlights on him, he couldn't have identified him without putting a flashlight on him. Officer McAruthor and he both had their flashlights on him at the same time and were able to identify him, the flashlights they have are the bright stream lights, his was on the brightest setting as was able to identify him using that. Steve stated no questions, Jeff stated no questions. Jeff stated she saw him with her light, he brought his light up and was able to identify him as he was at that jog up towards the creek line, and then once he dropped his light he still had to see and light him up with his weapon mounted light to see him. Zeb asked did you activate your weapon mounted light, Jeff stated yes. Steve stated and at that point you were now closer to the individual, Jeff stated yes, as soon as he dropped his handheld flashlight he went to his weapon mounted light and activated it as he continued to move forward towards him.

I stated I know earlier you stated that one of the officer's had a drone but it was too windy, can you just describe just the weather conditions, Jeff stated it wasn't real windy but a little bit of a stiff breeze, not extremely windy. Jeff stated during the day time it was clear, sunny, hot, once the sun went down it was still clear no major wind or storm, it cooled down a bit but comfortable temperature wasn't real hot wasn't cold.

Zeb stated he has just a couple of things for him, when you initially left your patrol vehicle at the call near Beth Lucille area did you say that your mic was activated, do you have mic pack that talks to your car camera, Jeff stated yeah he has a audio pack and he wears it on the left side of his belt buckle. Jeff stated once you get to a certain range away from there the way his he has it set up it vibrates once it goes out of range, that distance varies sometimes he can go in the police department and it will stay in range and sometimes it won't, depending on where his car is parked outside. Jeff stated out in the open like that he thinks he was off to the north side of Monte Vista when he felt it start vibrating so he knew it was out of range and knew it wouldn't pick up any audio or activate the camera if need be because he didn't activate the camera when he got out of the car there. Zeb asked if he turned it off or leave it on since it was vibrating, Jeff stated he may have turned it off but he doesn't remember, he very often turns it off when it starts vibrating just so it doesn't to sit there and continue to vibrate. Zeb stated he is going to assume on that pack that if it is turned on you can push a button and turn the camera on, Jeff stated there is, on the top there is three buttons, there is a red button that activated the trigger to start the camera, you push it again it deactivates the trigger but leaves the camera on, there is a mute

Page 9 of 11

Revised 2019

DEFENDANTS 000087

 Eastern Idaho Critical Incident Team

button and mode button. There is three modes on that one is completely silent no light or vibration, one of them is vibration only, one of them is light and vibration. Jeff stated he leaves it on the light and vibration so he can take the snap off and see the light and know that it is activated or know that it is not activate but on and linked to the camera. Zeb stated during the portion on Hyde was the camera ever activated, Jeff stated no for whatever reason when he was trying to log in and get out to the scene he couldn't get it to reactivate and login, he ended up having to shut his computer off then turn it back on before he could login back into his camera after the search. Zeb stated on Hyde, Jeff stated on Fairmont.

Zeb asked if he fired his backup gun at all, Jeff stated no he never drew it. Zeb stated are there other individuals that have the same setup as you with the optic and iron sights, Jeff stated yes it is an authorized use to be able to carry an optic they just have to purchase the optic, iron sights, and holster.

Zeb is it fair to say that all the events that happened that day consumed your entire shift, Jeff stated yes. Zeb stated did you take any calls from original Hyde call before going up to Beth. Jeff stated no when he got to work Cpl Ballard came to him with a child protection call that he wanted him to do some follow up on and he was planning on doing to do that when this call came in. Jeff stated while he was sitting at Monte Vista and Horizon dispatch instant message on Spillman and asked if he just wanted her to send a couple patrol officers because Health and Welfare was asking about it. Jeff stated he said send a couple patrol officers and soon as he gets done there he will come and help. Jeff stated that was just slightly before he left the Monte Vista and Horizon area where he had been blacked out and went back to the address on Beth. Zeb stated really for the most part this consumed your entire shift from the initial call to when you ultimately got driven back to the police department, Jeff stated yes.

Zeb stated regarding the images that were sent out of the suspect by which means were they sent out, Jeff stated department email. Zeb stated who sent them and was there more than one, Jeff stated there was a couple, Cpl Bloxom sent out the Spillman mug shot and he was pretty sure Tyler Anderson who sent out the video screenshot of the suspect via the department email. Zeb asked what his department email was, Jeff stated jeldridge@pocatello.u.. Zeb asked if you looked at both the email, Jeff stated yes. Zeb asked if the booking photo looked similar to the other image, Jeff stated yes other than color of hair. Zeb stated regarding Poplar, you mentioned that some officers were approached by a woman on Poplar and she said that the subject you were looking for on Hyde may have left with a Christian Franco, Jeff stated yes he was actually called by a Bannock County deputy between he got up to the Beth area or might have been when he was on his way to Beth, Bannock County Deputy Anthony said that when he heard the name Christian Franco he called some Bingham County Deputies and said hey these guys may be going to this address where he lives in Bingham County or Blackfoot whatever. He said some Bingham County Deputies went there and contacted Franco and Franco's girlfriend, separated them and were fairly confident that based on both their stories that Franco had never been involved and had been at his house in Bingham County the whole time. Zeb asked if he knew who this female, Jeff stated he did not.

Zeb stated for the initial call on Hyde for the initial theft of the firearms happened did you speak with that actually homeowner the actual victim or were you there when he spoke with other

Revised 2019

DEFENDANTS 000088

 Eastern Idaho Critical Incident Team

officers, Jeff stated he was there later when he spoke to other officers and he spoke to him some too. Zeb stated can you tell me again what he said, what you heard him say or what he said to you, Jeff stated he said that when he went into his garage he went to get something out of his truck and when he looked up the suspect was on the other side of his truck, so he was on the passenger side and suspect was on driver's side. He yelled at him what are you doing, guy came around and pointed a gun at him and said I'll shoot you. Jeff stated he doesn't know what transpired between them but he said they got outside and he had pulled his gun and the suspect turned again and said I'll shoot you. Jeff stated he made a comment I'm glad I didn't shoot him, he had that Taurus Judge that had been pointed at him, he said that he had it to shoot grouse when he was grouse hunting. Jeff stated one of the other witnesses had gave chase said he pointed a gun at him but he doesn't remember if the suspect had told him anything at that point.

Zeb stated how long would you estimate that you were on the initial call that started on Hyde from start to finish would you approximate you were on that call, Jeff stated before we went to Beth, Zeb stated before you went to that, Jeff stated probably 2 and a half hours, the call came in around 1615 and he went up to the scene and it gets dark a little after 7 and it was dusk when he was clearing so probably two and a half hours if not more. Zeb asked if dispatch sent officers to the call on Beth, how did you get to Beth, Jeff stated that was on dispatch because he cleared them from Hyde and dispatch dispatched him and Cpl Miller to Beth.

Zeb stated you mentioned hearing some ISP radio traffic, can ISP talk to PPD on your frequency, Jeff stated yes they quite often do and he said something about his number and he was on their frequency. Zeb stated so were you only on one channel on your radio and Jeff stated yes and never bounced over to another channel. Jeff stated he stayed on their primary radio channel the entire time. Zeb stated so when you heard ISP talking that was on your channel, Jeff stated yes. Zeb asked if Pocatello dispatch was attempting to try and status check that trooper, Jeff stated he doesn't know, when they first made contact and were having trouble getting through his dispatch was talking to one of their officers, he thinks it was Officer Anderson and he was in the same area behind Red Lion. Jeff stated Anderson had said something and dispatch was responding and that is when they made contact with the suspect during that radio transmission. Zeb stated as you are making contact with the suspect there is radio traffic going on, Jeff stated yes that is why he kept clicking that mic button and that is why it was giving him a busy signal, finally he heard the beep and he gave out clear the air. Zeb stated and with your radio system if somebody is talking it will give you deny the call if somebody else tries to key up, Jeff stated yes.

Zeb stated just one other thing that he had for him was in the way the suspect punched out in a firing stance is what he did in that stance consistence with what people do when you have been instructing firearms, when you have been teaching people how to shoot, Jeff stated yes it is very consistent with what they teach as you draw your gun from your holster you punch out at your threat, your eyes can catch the sights and punch out.

At this point Zeb handed Jeff a aerial photo of the shooting scene and Jeff stated he recognized the picture. Jeff was asked to label where he was standing and where the suspect was standing. The picture was not to scale it was for approximation. Jeff labeled S for suspect and M for Jeff. Jeff labeled north and the markings were made by Jeff and todays date. Jeff also labeled it as exhibit B. Muhonen was provided a copy at the end of the interview.

DEFENDANTS 000089

 Eastern Idaho Critical Incident Team

I advised Jeff he did good on identifying officers that were on there can you think of any other officers that you didn't mention, Jeff stated immediately after when they started arriving for first aid he knew that he saw Trooper Orr, Trooper Noyas he is the one who initially called out behind the Red Lion, Cpl Miller, Officer Smith, McAruthor, himself, saw Officer Saldona, Fetchin, Card, Namohola. Jeff stated that was the people he seen initially from there out he knows there were others that responded after but doesn't know. Jeff stated and Officer Anderson as well.

I asked Jeff if he knew the suspect prior to the incident, Jeff stated no.

I advised Jeff I know he went over his physical appearance but will you go over it again when you made contact, Jeff stated when he brought his light up it was that dark green hoodie, had a bit of a tee shirt hanging out white or light gray, Jeff moved his hands to the bottom of his shirt and I asked if it was hanging out at the bottom and he stated out of the bottom of the hoodie in the waist band area, dark pants, dark shoes, shaggy hair, dark brimmed glasses.

I asked what the suspect's demeanor was during the incident, Jeff stated uncooperative, ignoring commands, threatening saying he has a gun. Steve asked if his actions were threatening too, Jeff stated very determined, it was a very determined walk when he squared up with him it was fast it was he turned, punched his arm out. Jeff stated his arm he knows his arm was at full extension pointed at him before he opened fired. I asked what about his expressions, Jeff stated he was far enough away he couldn't see any facial expressions.

I stated you already covered what the suspect said but did he say anything else then what you already said. Jeff stated after we shot and approached he remembers him saying I can't feel my legs, he made some comments there but he doesn't remember the exact words.

I stated I know you have already described it but, describe the suspect's physical actions or conduct if you feel you need to add anything to what you already said, Jeff stated not that he can think of.

I asked Jeff if he had any prior knowledge of the suspect being under the influence of anything, Jeff stated no.

I stated we already went over verbal commands is there anything you feel you need to go over on that, Jeff stated no they practice that all the time when you go to that low ready, it's Police don't move and that is there challenge command and he knows he said it at least twice, Jeff stated he didn't get a cooperative response from him.  Steve stated do you mean he continued to move, Jeff stated yes he continued to move and responded by saying I've got a gun. Zeb stated would it be fair to say that he ignored you, Jeff stated yes.

I stated you mentioned agg assault, robbery, grand theft, and burglary, are those the crimes that you knew the suspect to commit prior using deadly force. Jeff stated unlawful entry to the point he was contacted resist and obstruct, he knows two people where he pointed a gun at and said I'll shoot you, robbery of the initial firearm owner, burglary for going in there and committing the theft, unlawful entry for going into the house on Lucille, and taking their firearm for another

Revised 2019

DEFENDANTS 000090

▶ Eastern Idaho Critical Incident Team

grand theft or burglary, aggravated assault when he pulled that hand and pointed it at me that is how he felt, he felt that he was going to shoot him, he felt that it was an aggravated assault or attempted. I asked would you say you were in fear for your life, Jeff stated he was as well as the life of Officer McAruthor or her safety and he knew Officer Miller and Officer Smith were behind him somewhere he didn't know how close they were at that point.

I asked if the suspect could have given up or stopped this incident at any time prior to the use of deadly force, Jeff stated absolutely he could have stopped and obeyed their commands to get on the ground, stop moving, if he would have just stopped when he said police don't move he would have continued to give commands, turn and face away from me, get on your knees, slowly remove the hand from your waist band, put your hands on your head, get on your stomach, he would have prone him out at the high risk stop training that they do, get them prone out get them safe where you can see their hands and there are no weapons, he could have just stopped when he said police don't move he wouldn't have shot.

I stated I know Graham asked but did you do anything deliberately or accidently to alter the crime scene, Jeff stated no.

I asked if there was anything that he needed to add or any questions. Jeff stated not that he can think of right now.

Zeb stated he just had one more thing for him, did you deploy anything on your duty belt or use any other equipment like Taser or OC or baton, Jeff stated no less lethal use of force it was only firearm his duty handgun.

Muhonen stated he does have some follow up questions, did you ever observe any indication from the suspect that he was surrendering, Jeff stated no. Steve asked you ever hear anything from the suspect that he was surrendering, Jeff stated no. Steve stated that was all he had.

I ended the recording at 2:44 P.M.

Nothing further at this time. ZD 377

DEFENDANTS 000091

# Exhibit 7

# In The Matter Of:

*SHEELER vs.*

*MCARTHUR, et al.*

---

*ROBERT H. FRIEDMAN, M.D.*

*December 27, 2023*

---

*T&T Reporting, LLC*

*477 Shoup Avenue, Suite 105*

*Idaho Falls, Idaho 83402*

*(208) 529-5491*

Min-U-Script® with Word Index

1

1          UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF IDAHO

3

4   JAKE L. SHEELER, an individual,    )
                                       )
5                    Plaintiff,        ) Case No.
    vs.                                ) 4:22-cv-00313-AKB
6                                      )
    BRIDGET MCARTHUR, an individual;   )
7   JEFFREY E. ELDRIDGE, an            )
    individual; MARISA A. SALDANA,     )
8   an individual; ROGER SCHEI, an     )
    individual; and CITY OF            )
9   POCATELLO, a municipal             )
    corporation,                       )
10                                     )
                     Defendants.       )
11

12        DEPOSITION OF ROBERT H. FRIEDMAN, M.D.

13        Wednesday, December 27, 2023, 2:30 p.m.

14

15

16

17          BE IT REMEMBERED that the deposition of
    Robert H. Friedman, M.D., was taken by the attorney
18  for the defendants by Zoom before Sandra D. Terrill,
    Court Reporter and Notary Public, in and for the
    State of Idaho, in the above-entitled matter.
19

20

21

22

23

24

25

2

1                    A P P E A R A N C E S

2

   For the Defendants:
3            HALL ANGELL & ASSOCIATES, LLP
             BY:  SAM L. ANGELL
4            1075 Utah Avenue, Suite 150
             Idaho Falls, Idaho  83402
5            (208) 522-3003
             sla@hasattorneys.com

6

7   For the Plaintiff:
             CHRISTENSEN & JENSEN, P.C.
8            BY:  STEPHEN KELSON
             257 East 200 South, Suite 1100
9            Salt Lake City, Utah  84111
             (801) 323-5000
10           stephen.kelson@chrisjen.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    E X A M I N A T I O N

2

3    ROBERT H. FRIEDMAN, M.D.                        Page

4      BY MR. ANGELL.................................  5

5

6

7

8

9

                        E X H I B I T S

10

    No.                                            Page

11

12    Exhibit 1.    Report from Integrated Medical ..  4
                    Evaluations, Inc., regarding
13                  Jake Sheeler
      Exhibit 2.    Supplemental report from Robert .  4
14                  H. Friedman, M.D.
      Exhibit 3.    Wound pictures..................  4
      Exhibit 4.    South Davis physical therapy ....  4
15                  notes
      Exhibit 5.    Portneuf Medical Center medical .  4
16                  record
      Exhibit 6.    Dr. Friedman's rebuttal report ..  4
17                  to Dr. Wolf's report

18

19

20

21

22

23

24

25

1              (The deposition proceeded at 2:30 p.m.

2    as follows:)

3              (Exhibit 1 through 6 premarked.)

4              Robert H. Friedman, M.D.,

5    produced as a witness at the instance of the

6    defendants, having been first duly sworn, was

7    examined and testified as follows:

8

9         MR. ANGELL:  Thank you.  We'll let the record

10   reflect that this is the time and place set for the

11   deposition of Dr. Robert Friedman.  This is in the

12   case of Sheeler versus City of Pocatello.  My name is

13   Sam Angell.  I represent the City of Pocatello and

14   the other named defendants.

15             I will note for the record that we have

16   Stephen -- what's your last name again?  Sorry.

17        MR. KELSON:  Kelson.

18        MR. ANGELL:  -- present on behalf of the

19   plaintiff, Mr. Sheeler.  And then Dr. Friedman is

20   appearing in person.  We have this deposition set via

21   Zoom so we're not in the same room.

22             Counsel and Dr. Friedman, are you okay

23   proceeding with this with the court reporter not

24   present in the same room?

25        MR. KELSON:  Yes.

1          THE WITNESS:  Yes.

2

3                      EXAMINATION

4  BY MR. ANGELL:

5          Q.   And I'll try -- Dr. Friedman, I'm going

6  to try to speak a little bit slowly and give a pause

7  between the question and answer so our court reporter

8  can take this down.  I would ask you to do the same.

9  Is that okay?

10          A.   Well, I'll try.  That is not what I'm

11  known for.

12          Q.   If you can't hear my question, let me

13  know and I'll try to repeat that just so we make a

14  clear record; is that fair?

15          A.   Oh, yeah.  No problem.

16          Q.   You've had your deposition taken before,

17  I understand.

18          A.   Yes.

19          Q.   And you understand that this case is

20  pending in federal court -- in the federal district

21  court for the State of Idaho?

22          A.   I understood it was a federal case, yes.

23          Q.   Have you testified in a federal case

24  before?

25          A.   Yes.

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

6

1          Q.   Are you familiar with the Federal Rules

2     of Civil Procedure and the general requirements that

3     they place on expert witnesses in terms of expert

4     witness disclosures?

5          A.   No.

6          Q.   Are you familiar with the rule that

7     requires an expert witness to disclose, for example,

8     a written report in a federal case?

9          A.   I understand the basic concepts.  I've

10    only testified as an expert in one federal case.  And

11    so it's not that much different from the state

12    courts, but I know there's some other rules like I

13    can't take my recorder into the courtroom, things

14    like that.

15         Q.   Okay.  Do you keep an updated CV as part

16    of your practice as a doctor?

17         A.   I do.

18         Q.   And do you keep an ongoing list of cases

19    in which you testify as -- in any other cases that

20    you've testified in?

21         A.   Yes.

22         Q.   What is the purpose of keeping that

23    list?

24         A.   To satisfy expert witness

25    requirements -- I believe it's for five years -- for

 1   the state.

 2            Q.   Okay.  And do you know if that rule also

 3   applies to cases pending in federal court?

 4            A.   I don't -- I do not know the answer to

 5   that question.

 6            Q.   Okay.

 7            A.   I presume so.

 8            Q.   And in terms of keeping -- for example,

 9   on that question about the list of cases, do you keep

10   that personally in your practice?

11            A.   I have somebody that does it for me and

12   it's individualized to each practice.  So it is for

13   me.  I don't maintain it.

14            Q.   How do you make sure that it's up to

15   date correctly?

16            A.   We review it on a quarterly basis in our

17   medicolegal committee inside the practice.

18            Q.   And when you say "we review it," who is

19   the "we" in that?

20            A.   Well, it's whichever physician has been

21   assigned to that committee inside our six-person

22   practice.  Right now it's myself.  And the

23   administrative person is a lady named Rachel Dugdale.

24            Q.   And so you and Rachel are currently in

25   charge of making sure that the list of cases are up

1   to date, if I understand it, for each of the six

2   physicians in your practice?

3          A.   Rachel is responsible for that.  Each

4   physician is responsible to review it on a quarterly

5   basis.  And so each -- I would not review my

6   partner's list because I wouldn't know what they have

7   or have not done.

8          Q.   But you review your own list?

9          A.   I do.

10         Q.   And how do you make sure that it's up to

11  date in terms of each case in which you've testified

12  either by deposition or by in-person testimony at

13  trial?

14         A.   It doesn't change for anything that's

15  old and it's updated every quarter, and so we can run

16  a report to make sure they're all there.

17         Q.   What do you mean "run a report"?  How do

18  you do that?

19         A.   In our medicolegal billing system we

20  code for medicolegal work, and there are different

21  codes for doing an independent medical exam versus a

22  chart review versus a deposition versus a court

23  appearance.

24              Those codes are not any standard codes

25  because those don't exist.  Like you would do for

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

9

1    billing for an evaluation and management code, those

2    are made up by the AMA.  So we use their coding

3    system.  There is no codes for a lot of the

4    medicolegal work so we have our own.  It only works

5    internal, but it would tell us what we billed for by

6    code.

7         Q.   And so when you say you run that report,

8    you basically -- your computer software generates a

9    report based on any time you've had a code for the

10   deposition or the trial?

11        A.   We would ask it and we ask it quarterly.

12        Q.   And then do you go back and review it,

13   kind of put your eyes on it to make sure that it

14   includes all of the cases from your memory that you

15   have participated in?

16        A.   I would if I had that good of a memory.

17        Q.   Is there any --

18        A.   The answer is I can do it for a couple,

19   three months, but after that I don't know.  And we --

20   it rolls forward so if they're just asking what I

21   have participated in and done, things don't drop off

22   that list because I did it.  So the list just grows

23   in the -- recently within the last three months.

24        Q.   Let me just share the screen on that.

25   Let me see if you can see this before I ask the

1    question.  Can you see that screen share?

2          A.    I can.

3          Q.    Okay.  So I'll just scroll up a little

4    bit.  This is your CV; is that correct?

5          A.    That's page 1, yeah.  Yeah, that's my

6    CV, correct.

7          Q.    Page 2.  It looks like page 3 is --

8    well, what is page 3?

9          A.    It's a list of my depositions and court

10   testimony from 2019 to May of 2023.

11         Q.    And that's you keeping this sort of

12   rolling list for the last five years based on the

13   process you just described for me?

14         A.    Well, we did it manually until we

15   switched over to this electronic medical record and

16   developed the coding.  So I would -- to the best of

17   my recollection, that's been the last two years.  So

18   the one you see there is good as of June 2023.

19         Q.    Okay.  Any other checks that you have to

20   make sure that this list is up to date?

21         A.    No.

22         Q.    And you understand that the purpose of

23   providing this list is to allow the attorneys to

24   understand which cases you have provided testimony

25   in?

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

11

1        A.   That is my understanding.  That is

2  correct.

3        Q.   And also to allow the court the same

4  opportunity to see which cases you have provided

5  testimony in?

6        A.   If you share it with the court, yes.

7        Q.   Who is Integrated Medical Evaluations,

8  Inc.?

9        A.   I do not know the answer to that

10  question.  I can tell you that they are one of a

11  number of corporations incorporated that present

12  themselves as a resource to coordinate, schedule, and

13  deliver independent medical exams and their reports.

14        Q.   So you don't have personal knowledge of

15  which company this is?

16        A.   This says Integrated Medical

17  Evaluations, Inc.

18        Q.   Do you know -- do you go out and solicit

19  or put your name on their list for expert witnesses

20  or how does that happen?

21        A.   I don't solicit nor do I go out and

22  advertise for this.  I am a certified independent

23  medical examiner.  That list is published by whoever

24  maintains that list of certified examiners and it's

25  usually by state.  And I don't know if this company

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

12

1   identified me as an examiner that way but other

2   corporations have.

3           Q.   How do they get the information for your

4   retainer, court appearance, billing rates listed

5   here?

6           A.   How do they?  They ask for it.  We

7   provide it.

8           Q.   And does this accurately state your

9   current retainers and billing rates?

10          A.   I do not know the answer to that

11  question unless they give a date on it.

12          Q.   That's the full page I have.

13          A.   Yeah.  And it looks like they

14  transcribed whatever we sent them.  I just don't know

15  when it was sent to them.  This looks about right.

16          Q.   Okay.  My computer is giving me the

17  spinning wheel of death here so hang on.

18          A.   We'll be patient.  Trust me.  Today is

19  the first day my practice switched over to the cloud

20  for all of our electronic medical records.  It's been

21  not enjoyable.

22          Q.   I can imagine.

23               In terms of going back to your CV, how

24  often do you update your CV?

25          A.   I usually do it annually.  And at this

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

13

1   point in my career what I wind up doing is taking

2   things off of my CV that I'm no longer doing.  Like

3   as an example, I know this one is not up to date

4   because -- oh, I guess it won't happen until

5   1-1-2024.  I did not renew my Montana license.  I

6   just chose not to do that.  So technically it is

7   correct, but in a week it won't be.

8           Q.   Okay.  I was going to share that screen

9   with you, but my computer is wanting to freeze so let

10  me do this:  Can you give me some clarification about

11  your background?  I'm looking at it from your CV.  It

12  looks like you -- do you have that, by the way, in

13  front of you?

14          A.   I do have my curriculum vitae in front

15  of me.

16          Q.   Okay.  A couple questions for you.  I

17  want to maybe jump right to the nuts and bolts of

18  this case.  This case involves a police shooting.  We

19  have a plaintiff who was paralyzed from gunfire.  I

20  want to know what experience you have in the area of

21  trauma or emergency medical?

22          A.   I have no experience other than medical

23  school in trauma or emergency medicine.  In my

24  residency and specialty of physical medicine and

25  rehabilitation during my training, we were expected

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

14

1    to and required to go to the emergency room when a

2    patient was identified as having a spinal cord injury

3    to do an immediate examination by our professor.

4            Q.    Have you ever treated a patient with a

5    spinal cord injury due to gunfire?

6            A.    Absolutely.

7            Q.    And when was that?

8            A.    Well, I think a couple of my present

9    patient populations are injuries due to gunshot

10   wounds or gunfire.  People's spinal cord injuries

11   don't go away and they need to be managed for their

12   spinal cord injury.  A gunshot wound is simply the

13   cause of the spinal trauma.  Thereafter it's in my

14   specialty training to take care of people who have

15   sustained permanent spinal cord injuries.

16           Q.    In your training as a medical doctor,

17   have you ever treated a person, I guess, immediately

18   for a gunshot wound?

19           A.    Other than being expected to and, in

20   fact, going to the emergency room for emergency

21   spinal cord injuries, no.  It was not about treating

22   their gunshot wound.  It was about doing an

23   evaluation to be predictive for the outcome of their

24   spinal cord injury.

25           Q.    And when was the last time that you've

1    done that?

2              A.    Oh, 30 years ago, 35 years ago.

3              Q.    It's not something you currently do in

4    your practice?

5              A.    No.  I'm not even sure it's the standard

6    of care anymore.

7              Q.    Okay.  And what do you mean by "not the

8    standard of care"?

9              A.    So when I trained, one of my professors

10   is the one who described predicting spinal cord

11   injury outcomes from emergency room evaluations done

12   at Santa Clara Valley in California.  He was one of

13   the study participants and wrote the paper.  So our

14   expectation where we trained at the University of

15   Michigan as part of our rehabilitation board

16   certification was to evaluate the spinal cord injury

17   patients in the emergency room to be predictive of

18   their outcome.

19                  I am not aware that that is the standard

20   of care -- I know it's not in Boise, and that most

21   places are no longer doing that emergency room

22   evaluation because it doesn't change outcomes.

23             Q.    Let me shift the question slightly.  In

24   your medical training have you ever been asked to

25   determine a gunshot bullet -- or I guess a bullet

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

16

1  trajectory in terms of a gunshot wound?

2      A.    No.

3      Q.    Have you ever been asked to determine an

4  entry or exit wound from a gunshot wound?

5      A.    They are different but, no, I have never

6  been asked that question.

7      Q.    Over the course of your practice as a

8  medical doctor, have you ever had the opportunity to

9  treat a patient where you were -- as part of that

10 treatment you were determining whether they had an

11 entry or exit gunshot wound?

12     A.    I've been asked whether they have wounds

13 but not whether they're entry or exit.

14     Q.    What subspecialty in the medical field

15 is involved with determining and treating entry and

16 exit gunshot wounds?

17     A.    I would expect the trauma surgeons would

18 be determining that initially based on experience and

19 education through the military forces.  So people who

20 were working field hospitals would know the answer to

21 that.  It wouldn't be a specific specialty, meaning

22 there is no specialty for wound determination in

23 terms of entry and exit wounds.

24     Q.    What sort -- what category of medical

25 doctors would be those responsible in general for

1    treating people who are injured by gunshots?

2          A.    Well, that would be based on what types

3    of injuries they sustained.  So if they had lung or

4    cardiac issues, I would expect a pulmonologist or a

5    cardiologist to do that.  If you have a spinal cord

6    or a brain injury, it would fall in the -- once the

7    acute trauma is over, it would fall inside my

8    specialty, which is physical medicine and

9    rehabilitation.

10         Q.    And what do you do on a day-to-day in

11   your specialty as a physical medicine and

12   rehabilitation?

13         A.    So on a day-to-day basis I follow

14   patients with spinal cord injuries, head injuries,

15   orthopedic traumas, amputations.  In my personal

16   practice I see pediatric and genetic disorders.  I'm

17   the muscular dystrophy doctor for Idaho so I follow

18   kids and subsequently adults with that.  Spina

19   bifida, cerebral palsy.  I see a lot of people with

20   long-term chronic disease processes, neuropathies,

21   and I manage their symptoms and maximize their

22   function.

23         Q.    What percentage of your medical practice

24   is your expert witnessing component?

25         A.    It's a small number of patients, but

1    it's probably less than 7 percent of my total patient

2    population.

3         Q.   And that would include any on the

4    plaintiff or defense side that you are -- in the

5    cases in which you're acting as an expert witness?

6         A.   Correct.  I do about 50 percent

7    plaintiff and 50 percent defense.

8         Q.   And maybe just to make sure I'm

9    understanding you, you've said less than 7 percent of

10   your patients fall into this category of the expert

11   witnessing.  What percentage of your time during the

12   week is spent doing -- whether it's medical record

13   reviews or other things associated with the expert

14   witness testimony?

15        A.   Well, it waxes and wanes depending on

16   how many times I've been asked to perform medicolegal

17   work.  I would say in an average 60-hour work week

18   for me, I spend somewhere around 10 to 12 hours a

19   week or about 20 percent of my time doing medicolegal

20   work reviews, writing letters of opinions.

21        Q.   Are you a treating physician of Jake

22   Sheeler?

23        A.   No.

24        Q.   Have you ever met Mr. Sheeler in person?

25        A.   No.

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

1          Q.    Have you ever performed any sort of an

2    evaluation of Mr. Sheeler?

3          A.    I have never seen or touched

4    Mr. Sheeler.  I have not -- I have reviewed his

5    records.  That is a type of evaluation.  But I have

6    not done a hands-on evaluation with Mr. Sheeler.

7          Q.    So your work in this case has been

8    limited to a medical records review only?

9          A.    Yes.

10          Q.    And then just to make sure, you didn't

11   meet him on Zoom or see him on some other kind of

12   videoconferencing?

13          A.    No.  I've seen videos, but they are not

14   interactive video.  They've just been like a movie or

15   a TV show.

16          Q.    And when was it that you were asked to

17   participate and do the medical records review in this

18   case, do you recall that?

19          A.    I don't recall the exact date we

20   received an inquiry and subsequently received the

21   records.  That would have been from Integrated

22   Medical.

23          Q.    Do you know if it was this year or was

24   it a prior year?

25          A.    Oh, no.  It was in 2023.  My response

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

1  letter was August 4th of 2023.  I just don't have a

2  copy of their cover letter requesting the review.

3           Q.   So to your memory it would have been

4  sometime around July or August of 2023?

5           A.   Correct.

6           Q.   And a couple more points of

7  clarification, you have not practiced as an emergency

8  room doctor?

9           A.   Correct.

10           Q.   You are not a forensic pathologist?

11           A.   Correct.

12           Q.   You are not a trauma surgeon?

13           A.   Correct.

14           Q.   What are your qualifications to opine on

15  whether a gunshot wound is the cause of paraplegia?

16           A.   Well, as a spinal cord injury physician,

17  I can identify what the neurologic level is at and

18  look for local potential causations, which could

19  include trauma, gunshot wounds, knife wounds, a lack

20  of blood flow, or ischemic wounds.  That's a lot of

21  -- infectious wounds, compression wounds --

22  compressive causes.

23               So as a spinal cord injury treating

24  physician, it would be in my scope of practice to be

25  aware of how the spinal cord injury occurred.

1          Q.   In your report in this case you make the

2     conclusion that the gunshot wound to the chest

3     involving the left T4, T5, and T6 vertebrae was from

4     the posterior.  And you have in parentheses "back,"

5     period.  How did you reach that conclusion?

6          A.   I reached that conclusion based on the

7     radiology reports that describe metal fragments and

8     associated fractures of the spine in the posterior

9     elements, meaning elements towards the back, without

10    any description of any injuries to the spine elements

11    in front, meaning the vertebral bodies or disks.

12         Q.   Did you review all of the medical

13    records, including the written records from the

14    emergency room physicians that treated Mr. Sheeler?

15         A.   I reviewed all the records that were

16    provided.  I don't remember seeing any handwritten

17    records, per se, but I did review the emergency room

18    records and the surgeon's records from the emergency

19    room.

20         Q.   Okay.  You also mentioned that you

21    reviewed multiple photographs of Mr. Sheeler and you

22    described those.  Were you provided those photographs

23    through the attorneys?

24         A.   Some of them came through Integrated

25    Medical Evaluation and I believe some came directly

1    from the attorneys, including the videos from the

2    policemen's body cameras.

3         Q.   Do you have any idea who took the

4    photographs that you looked at?

5         A.   No.  Well, I mean, the body cams, they

6    report whose they were on.  I, of course, don't know

7    any of these people so I don't -- it doesn't really

8    have a particular meaning who it was.  But, yes, they

9    talk about where those came from.  And otherwise, no,

10   the photographs don't usually have who took them

11   posted on them.

12        Q.   And do you know when the photographs

13   were taken that you looked at?

14        A.   Some of the photographs were taken and

15   dated.  Some were not.  I presume that some of the

16   ones where they were picking up casings or had

17   clothing in the field would have been right at or

18   about the time of the gunshot incident or the next

19   day or so.  They wouldn't have left all of that in

20   the field for weeks to months.

21             The photos of his chest and his body

22   were over several months.  Some of them were in the

23   hospital.  Some of them were not.

24        Q.   Do you know the angle that the -- that

25   Mr. Sheeler was standing in relation to the police

1    officers at the time that he was shot?

2        A.    I do not.  I could not discern that as a

3    just average bystander from the videos I was

4    provided.

5        Q.    You would agree that there is evidence

6    in the medical records that Mr. Sheeler was shot on

7    the left side below the armpit on an entry wound on

8    the lateral -- left lateral side that exited in the

9    middle of the back?

10       A.    There's wounds in both places, and I've

11   already testified I'm not an expert in entry and exit

12   wounds.  So I know there's a wound which I was able

13   to see on some video and photos under the armpit

14   along the side, one in the back, one up -- he had

15   some more, but I'm aware of that.  Couldn't tell you

16   which way it went in and which way it came out.

17   Don't know that.

18       Q.    Okay.  So you are not offering an

19   opinion that the bullet entered from the back and

20   exited out the front or left lateral side?

21       A.    Not only am I not testifying to that,

22   I'm not testifying that it went in on the lateral

23   side and went out the back.  I don't know.

24       Q.    You don't know.  Is that true with each

25   of the wounds that you reviewed in terms of the

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

**24**

1    photographs and the medical records?

2         A.   Yes.

3         Q.   So you were not going to offer an

4    opinion as to whether Mr. Sheeler was, let's say in

5    layman's terms, shot in the back?

6         A.   Well, it certainly -- in laymen's terms,

7    I can't answer that question.

8         Q.   Why not?

9         A.   Well, because I don't know entry and

10   exit wounds.  I know that some of the bullet material

11   wound up in his back on x-rays causing his spinal

12   cord injury.  So the bullet transversed whichever way

13   it went in into his spine and causing damage in the

14   -- what we call posterior elements -- meaning front

15   of the body is anterior, back is posterior -- and his

16   spinal canal is built of bones.  He didn't have

17   damage to the front part more towards his chest.  He

18   only had damage in the back part.  How the bullet got

19   there, I can't answer that.

20        Q.   And you note that what you viewed on the

21   radiology reports were fragments?  I'm hearing you

22   say fragments, right?

23        A.   I believe that's how they described it

24   in the radiology report.

25        Q.   Which means that the bullet fractured

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

25

1   within his body and fragments went in different

2   places?

3           A.    Again, I'm not a ballistics expert so I

4   don't know that the bullet fragmented in his body.

5   That would be what I would expect, but you're outside

6   of my area of expertise.

7           Q.    And it would also --

8           A.    But fragments don't get there without a

9   bullet.

10          Q.    That's fair.  When you say it was

11  outside of your area of expertise, you're referring

12  to sort of the travel of fragments from a bullet

13  within a body is outside your area of expertise?

14          A.    I would say that plus I know there are

15  different types of bullets, and they all change as

16  they enter tissue.  It doesn't have to be a body.  It

17  could be a deer.  And I -- you're outside of my area

18  of knowledge.  I'm not a metallurgist either.

19          Q.    So if I'm tracking with you, your

20  opinion is that it was bullet fragments found near

21  the spine that caused the spinal column injury,

22  right?

23          A.    I don't know if it was the fragments.

24  The fragments are evidence that there was something

25  that entered and stopped the moving by his spine.

1    And the radiology reports, including the MRI, show

2    bone injuries and a read-out as "spinal cord injury"

3    all in the same localized area.

4         Q.    So what does that mean, in your opinion?

5         A.    Well, it means that there was something

6    that came in, caused local damage, caused fractures,

7    and induced trauma into the spinal cord.  And I don't

8    know of any other trauma to that area other than the

9    bullet fragments as evidence that there was a bullet

10   there.

11        Q.    Okay.  So, again, let me try to restate

12   that and make sure I'm understanding what you're

13   saying because it's a little bit hard with medical

14   terminology.

15             So as a person unfamiliar with medical

16   terminology, I hear you saying that as a medical

17   doctor, you can tell that Mr. Sheeler was hit by what

18   looks like a bullet.  You can't tell where it entered

19   or exited.  Is that correct?

20        A.    Well, I can't tell where it went in.  It

21   left fragments.  It may never have exited.  If it

22   shattered -- I mean, if it fragmented, it would slow

23   down much quicker and it may not have penetrated

24   through and through.  But I don't know the answer to

25   that.

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

27

1          Q.    Okay.  You do not know the enter whether
2     it was -- the direction -- excuse me.  You do not
3     know the direction that the bullet entered, whether
4     it was from the front or the back; is that right?
5          A.    No.  I know it didn't enter from the
6     front, and I know that because where the damage was
7     described on the radiologic studies, the front part
8     of the spine was never injured.  All of the
9     description is in the back part of the spine and
10    where the spinal cord is.  This isn't really a
11    medical science issue.  It's just you can't get to
12    the back of the spine from the front without doing
13    tissue damage on the way there.  There is none.  So
14    it couldn't have come from the front to the back.
15         Q.    Okay.  And then your opinion with regard
16    to the hole that's on the lateral side under his
17    armpit, again, you don't know if that's an entry or
18    an exit hole?
19         A.    Correct.
20         Q.    Okay.  So if that one is an entry hole,
21    that could very possibly be the entry of the bullet
22    that entered his rib cage area and fractured leaving
23    spinal cord damage?
24         A.    I would have to do a lot more work to
25    answer that question in terms of what level there is.

1  He had a bunch of rib fractures, and there's a wound

2  in the back so that would talk about if it entered,

3  as you said, from anterolateral, the one in the back

4  has to be an exit wound.  And I don't know where that

5  is and whether it would be related to the trauma,

6  though what I have seen places the wound further out

7  to the side and would not be near the spinal cord.

8          MR. ANGELL:  I was going to try to show you

9  these pictures, but I don't know if I can get my

10  screen share to work.  Let's take a quick break off

11  the record.  If we can just take a minute or two.

12  Let me refresh this.

13          THE WITNESS:  Are these the pictures you're

14  talking about?

15          MR. ANGELL:  Yes.

16          THE WITNESS:  So I do have some of them.

17          MR. ANGELL:  Yeah.  It's just a little easier

18  for me to look at them if I can put them on the

19  screen and move my pointer around.  Let me see if I

20  can get my reader to refunction here.  Hang on for a

21  minute.  Let's take a five-minute break and we'll

22  jump back on.

23              (A recess was taken from 3:06 p.m. to

24  3:07 p.m.)

25          Q.   BY MR. ANGELL:  Back on the record.

1              Dr. Friedman, I've pulled up on screen
2   share what we have marked as Sheeler 017516.  Don't
3   mind the crummy handwriting.  It's really just we
4   wrote that because the Bates number is so small it's
5   really hard to see, but that is the Bates number.
6         A.   I can see it now that you say it, yes,
7   and it's very small.
8         Q.   Yeah, it's on each page.  It was just so
9   hard to read, I wrote those on.
10              I'm going to scroll through these
11  pictures kind of slow.  There are not too many.  Do
12  you recognize these as being photographs that you've
13  reviewed as part of your medical review in this case?
14        A.   Yes.
15        Q.   And that's the entirety of those pages.
16  There are ten of them in this exhibit, in this series
17  anyway.  Are you aware of any other photographs that
18  you looked at?
19        A.   I've seen video.  In terms of still
20  photos, no, I don't think I've seen any other still
21  photos.  There may have been a still -- no, I think
22  that's it.
23        Q.   And when you say you've seen video, you
24  saw the body cam video which shows some, I take it,
25  resuscitation efforts by the police officers?

1          A.    Correct -- well, it shows search.  It

2    shows weapons firing.  It shows resuscitation in the

3    field, cutting off clothing, interaction with Jake

4    Sheeler conversationally.  I guess it's not

5    conversation, but emergent stuff.  I could see all

6    that.

7          Q.    Let me walk you through these pictures.

8    Does Photograph 017516, can you tell me if that

9    helped you at all in your analysis of what caused the

10   trauma to Mr. Sheeler's spine?

11         A.    Well, yes.  It shows there are no wounds

12   in his anterior chest and under his right armpit down

13   the side wall of his body.

14         Q.    You cannot see from this angle the

15   wounds to his left lateral side, correct?

16         A.    Correct.

17         Q.    Or you can't see in this one the

18   wound -- he had a wound above his collarbone on his

19   left side as well; is that right?

20         A.    That is correct.

21         Q.    Are you able to see it in this picture?

22         A.    No.

23         Q.    Did you determine whether or not that

24   wound above his collarbone on the left side was an

25   entry or exit wound?

1          A.    I did not.

2          Q.    Could it have been consistent with a

3    scar left by a bullet entry?

4          A.    A scar?  Well, ultimately when it

5    healed, that's -- yes, it's possible from a bullet

6    entry or exit.

7          Q.    Do you have experience looking at scars

8    after healing to determine whether or not they're

9    from a bullet entry versus a bullet exit wound?

10          A.    I do not have experience in that.  I

11    have limited knowledge in terms of what happens to

12    soft tissue when it's struck by a bullet.  And -- but

13    I can't definitively tell you whether I'm seeing an

14    entry or exit wound.

15          Q.    I'm going to move to the next

16    photograph.  This one is marked Sheeler 017517.  Did

17    you look at this one?

18          A.    Yes.

19          Q.    Did this -- what can you tell me from

20    this photograph, if anything, that helped you in your

21    review?

22          A.    Other than a bandage to the left side of

23    his neck and all the positioning devices, that's all

24    you can tell.

25          Q.    Do you know what that bandage was to the

1  left side of his neck?

2          A.    I do not.

3          Q.    The next photograph is Sheeler 017518.

4  Did this photograph help you in your review for your

5  opinions?

6          A.    Again, other than the bandage on the

7  left side of his neck, no.

8          Q.    I don't know how this one ended up

9  upside down, but Sheeler 017519, do you see any

10  injuries in this photograph?

11          A.    He has a dressing over the center of his

12  neck at the base of his throat.  I cannot see any

13  other dressings or wounds.

14          Q.    Do you know what the dressing was on the

15  center of his neck under his Adam's apple there?

16          A.    I believe he had a tracheostomy so that

17  they could put a tube in to ventilate him.

18          Q.    Next photograph is Sheeler 017520.  Can

19  you tell me what that is depicting?

20          A.    Well, the only thing I can tell you is

21  it's ribs.  I can't tell you which side.  I can't

22  tell you if that's a wound with a scar in the middle

23  or a nipple.  And below it, assuming that the top of

24  the picture is top and the bottom of the picture is

25  bottom, is what looks like a healed surgical incision

1    like for a chest tube.

2            Q.    Were you able to reach any conclusions

3    from this photograph?

4            A.    No.

5            Q.    Did this photograph assist you in any

6    fashion in reaching the conclusions you did in your

7    report?

8            A.    Other than there is no evidence of an

9    anterior wound -- or a gun wound in this picture.

10   Except that one center thing may be a gun wound.  It

11   may be a nipple.  I can't tell.

12           Q.    Scroll down to the next photo, which is

13   Sheeler 017521.  Do you know what that is showing?

14           A.    Well, it looks like a limb and

15   somebody's finger holding back clothing showing a

16   mark on the arm or leg and a tattoo.

17           Q.    Can you tell if that's an arm or a leg?

18           A.    Not really.

19           Q.    Do you know what the mark is?

20           A.    I do not.

21           Q.    Did this photograph influence your

22   opinion in any fashion?

23           A.    No.

24           Q.    Come down to Sheeler 017522.  Have you

25   looked at this photograph?

1          A.    I have seen it, yes.

2          Q.    Do you have any idea what it shows?

3          A.    Well, there's hair and a bandage and

4    multiple tattoos, and there's a bandage to the

5    upper-right side of this picture.  I believe that's a

6    neck, but I don't know that.

7          Q.    This photograph appears to be inverted,

8    but I don't know that for sure either.  Can you tell?

9          A.    Well, I don't think it's a leg or an arm

10   because of the amount of hair on the bottom, if you

11   want to put it that way, of the way the picture is

12   oriented.  That looks like scalp hair to me.  I'm not

13   an expert.

14         Q.    There is what appears to be a mark on

15   the body.  I can't tell if it's a mole or something

16   else.  Have you reviewed that?

17         A.    Are you referencing the small round

18   spot?

19         Q.    Where the curser is.

20         A.    Uh-huh.  Yeah, by the tattoo.  No, I

21   don't know what that is.

22         Q.    No way to tell if that's a bullet entry

23   or exit wound?

24         A.    No way to know how old it is or how long

25   it's been there.  Don't know.

1          Q.    How about the next photograph, Sheeler

2     017523?  Have you seen this one?

3          A.    I have.

4          Q.    Do you know what that shows?

5          A.    It looks like a side view.

6          Q.    Okay.  Do you know who this is?

7          A.    Pardon?

8          Q.    Do you know who the picture is, who is

9     in the picture?

10          A.    Well, other than it's labeled Sheeler,

11    no, there would be no way to identify who this is.

12          Q.    Have you spoken with your -- Mr. Sheeler

13    or the attorneys to get any information about who

14    this is?

15          A.    I have not.  It came in the package with

16    all of the other information, medical records, and

17    photos.

18          Q.    Do you know -- can you tell what these

19    marks are on the body?

20          A.    They look like healing wounds that go

21    between ribs, and there's a wound on the bottom a

22    little to the right, and as you go vertically up and

23    a little to the left, there's another darkened area

24    that looks like a wound to me.  And then there's a

25    dressing in the middle of the back, which I can only

1    see the dressing.  I cannot see a wound.

2          Q.   In your training and expertise do you

3    have any ability to tell what these marks are?

4          A.   I can't tell what they are simply by the

5    photos, no.

6          Q.   In relation to what you have read in the

7    medical records, does this photo provide any

8    information to you?

9          A.   Well, it is my interpretation that

10   that -- we see his right arm.  Based on my

11   interpretation of his anatomy, this would be his left

12   lateral chest.  And the hole at the bottom to the

13   right would be consistent with the described left

14   lateral anterior chest bullet wound.  And the mark

15   above could be another wound related to a bullet or

16   direct trauma.  I can't tell you.

17         Q.   Do you have the ability to -- well, let

18   me ask this question.  Do you know when this

19   photograph was taken?  Have you been able to

20   determine that?

21         A.   I have not.  He's in a hospital bed.  So

22   I presume it's in a hospital setting.  But I can't

23   tell you if it's an acute hospital or rehab hospital.

24         Q.   I'll go to the next picture.  This is

25   Sheeler 017524.  Have you looked at this one?

1          A.    I have seen it, yes.

2          Q.    Do you know what it depicts?

3          A.    I do not.

4          Q.    Do you know who is in the picture?

5          A.    I do not.

6          Q.    Have you spoken with counsel for the

7     plaintiff or plaintiff himself to ask if this is

8     Mr. Sheeler?

9          A.    I have not.

10         Q.    In connection with your review of the

11    medical records, did this photograph provide you with

12    any information that you used in your report?

13         A.    No.

14         Q.    Let me move to Sheeler 017525.  Have you

15    looked at this photo?

16         A.    I have.

17         Q.    Do you know who the person is that's

18    shown in the photo?

19         A.    I do not.

20         Q.    Do you know who took the photo?

21         A.    I do not.

22         Q.    Do you know from conversations with

23    counsel or Mr. Sheeler whether this is Mr. Sheeler

24    that's in the photo?

25         A.    No.

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

38

1           Q.    In relation to your review of the
2    medical records, did this photograph provide any
3    information that you relied on in your report?
4           A.    No.
5           Q.    That's the last photo in this series of
6    ten.  Is it fair to say that the photographs did not
7    provide you with information upon which you relied in
8    your report?
9           A.    Some of the photos I did not rely on.
10   Some of the photos I did rely on.
11          Q.    Which were the ones that you relied on?
12          A.    How would you like me to answer that?
13          Q.    Maybe if you can --
14          A.    Do you want me to give you the numbers?
15          Q.    Yes, if you could list them by number.
16          A.    Yeah.  017516.
17          Q.    And for what reason did you rely on that
18   photo?
19          A.    Because it does not reveal or indicate
20   any wounds to the front of the chest or abdomen right
21   and left and under the armpit on the right.
22          Q.    Any other photographs that you relied
23   on?
24          A.    017519.
25          Q.    And why did you rely on that one?

1        A.    It does not reveal any wounds or scars

2   on the anterior chest or abdomen that would be

3   indicative of trauma from the front.

4        Q.    Any other photographs you relied on?

5        A.    017523.

6        Q.    And why did you --

7        A.    Those are wounds which I believe are on

8   the left side in the lateral side of the chest but

9   only on the left.

10       Q.    Any other photographs that you relied on

11  in formulating the opinions in your report?

12       A.    Not in this package.  That is correct.

13       Q.    Do you have any reason to disagree with

14  Dr. Jorge De Amorim Filho who wrote in his medical

15  records that there was a, quote, left lateral entry

16  wound with a medial exit wound, end quote, found on

17  Mr. Sheeler?

18       MR. KELSON:  I object.  Foundation.

19       THE WITNESS:  He may have authored that.

20  That is possible.

21       Q.    BY MR. ANGELL:  Let me clean up that

22  objection.  Let me show you if I can -- hang on one

23  second.  Let me try the screen share once more.  Are

24  you seeing the Portneuf Medical Center record?

25       A.    I am.

1        Q.    This is one page of many hundreds or

2   maybe even thousands.  Do you know if you have

3   reviewed this record?

4        A.    I have.

5        Q.    I would note -- maybe I would just

6   highlight a little bit.  Do you see the part that

7   I've highlighted there?

8        A.    Yes.

9        Q.    What did that -- what do those words

10  mean to you?

11       A.    It means he had on his left side --

12  whoever wrote this determined an entry wound and it

13  was on the lateral side, so it's on the side of his

14  body, not the front, wound with medial exit wound.

15  He doesn't describe whether it's in the front or the

16  back, and no active extravasation means it's not

17  actively bleeding.

18       Q.    Would you agree with me that the

19  treating emergency room surgeon would be in a better

20  place to determine entry and exit wounds than you

21  would be?

22       A.    I can't opinion about his expertise in

23  determining entry and exit wounds.  He can describe

24  the wounds, and the trauma surgeon may have the

25  expertise to make that decision.  I have already

1    testified I do not.

2              Q.    Okay.  Can you look at your report dated

3    August 8, 2023, for me.

4              A.    Okay.

5              Q.    It is a two-page written report; is that

6    right?

7              A.    Correct.

8              Q.    On the second page of that report you

9    have this sentence:  It is my medical opinion based

10   on the records provided that the upper thoracic

11   gunshot wound, cause of paraplegia, entered from the

12   posterior back based on the wound descriptions and

13   radiologic report, period.  Did I read that right?

14             A.    Correct.

15             Q.    Beyond what you've already described to

16   me, do you have anything else that caused you to

17   reach that conclusion?

18             A.    I guess I don't understand the question

19   as you've asked it, "anything else."  Are you

20   referencing just the radiologic reports as my --

21   determining my medical opinion, or all of the photos

22   and all of the other information I received?

23             Q.    Let me see if I can word it this way:

24   Beyond the descriptions you've provided to me is

25   there any other evidence in the medical records that

ROBERT H. FRIEDMAN, M.D. - December 27, 2023

42

1    supports your conclusion that the gunshot wound

2    entered from the back?

3            A.    No.

4            MR. ANGELL:  That's all I have, Doctor,

5    unless counsel has any questions for you.

6            MR. KELSON:  No.  No questions.

7            MR. ANGELL:  We can go off the record.

8            (The deposition concluded at 3:32 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43

1                    REPORTER'S CERTIFICATE

2

3    STATE OF IDAHO            )
                               )    ss.
4    COUNTY OF BONNEVILLE      )

5

6

7         I, Sandra D. Terrill, CSR, RPR, and Notary
     Public in and for the State of Idaho, do hereby
8    certify:
          That prior to being examined Robert H. Friedman,
9    M.D., the witness named in the foregoing deposition,
     was by me duly sworn to testify to the truth, the
10   whole truth, and nothing but the truth;
          That said deposition was taken down by me in
11   shorthand at the time and place therein named and
     thereafter reduced to typewriting under my direction,
12   and that the foregoing transcript contains a full,
     true, and verbatim record of said deposition.
13        I further certify that I have no interest in the
     event of the action.
14        WITNESS my hand and seal this 30th day of
     December 2023.

15

16                         SANDRA D. TERRILL
                           COMMISSION NO. 30961
17                         NOTARY PUBLIC
                           STATE OF IDAHO
                    MY COMMISSION EXPIRES 11/18/2028
18

19

20                         Sandra D. Terrill
                           Idaho CSR No. 702,
21                         Notary Public in and for
                           the State of Idaho
22

23

24

25

# Exhibit 8

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

JAKE L. SHEELER, an individual          )

                Plaintiff,          ) Case No.

vs.                                     ) 4:22-cv-00313-

BRIDGET MCARTHUR, an individual;        ) DCN

JEFFREY E. ELDRIDGE, an individual;     )

MARISA A. SALDANA, an individual;       )

ROGER SCHEI, an individual; and         )

CITY OF POCATELLO, a municipal          )

Corporation;                            )

                Defendants.          )

DEPOSITION OF KIRK HENDRICKS

March 20, 2023

REPORTED BY:

AMBER S. WILLIAMS, C.S.R. No. 1080

Notary public

1         THE DEPOSITION OF KIRK HENDRICKS was taken

2  on behalf of the defendants at Pocatello City Hall,

3  911 North Seventh Avenue, Pocatello, Idaho,

4  commencing at 8:37 a.m. on March 20, 2023, before

5  Amber S. Williams, Certified Shorthand Reporter and

6  Notary Public within and for the State of Idaho, in

7  the above-entitled matter.

8

9                      APPEARANCES:

10 For Plaintiff via videoconference:

11      CHRISTENSEN & JENSEN, PC

12      BY:  KARRA J. PORTER

13      257 East 200 South, Suite 1100

14      Salt Lake City, Utah  84111

15      karra.porter@chrisjen.com

16 For Defendants:

17      HALL ANGELL & ASSOCIATES, LLP

18      BY:  SAM L. ANGELL

19      1075 South Utah Avenue, Suite 150

20      Idaho Falls, Idaho  83402

21      sla@hasattorneys.com

22

23

24

25

1                          **I N D E X**

2

3    TESTIMONY OF KIRK HENDRICKS                    Page

4        Examination by Mr. Angell.....................  4

5        Examination by Ms. Porter....................  59

6

7

8

9                          EXHIBITS

10    Exhibit 1.    Verified Complaint and Demand....   9

11                  for Jury Trial

12    Exhibit 2.    Aerial map of Hyde Avenue and....  20

13                  Maple Street

14    Exhibit 3.    Written statement by Kirk........  56

15                  Hendricks

16

17

18

19

20

21

22

23

24

25

```
 1                      KIRK HENDRICKS,
 2   first duly sworn to tell the truth relating to said
 3   cause, testified as follows:
 4             MR. ANGELL:  Let the record reflect this is
 5   the time and place set for the deposition of Kirk
 6   Hendricks.  My name is Sam Angell.  I represent the
 7   City of Pocatello in a lawsuit that was filed by Jake
 8   Sheeler against the City of Pocatello.
 9                  I will note for the record that Kirk
10   Hendricks is the deponent here today and he's
11   appeared in person, and instead of having an
12   appearance by counsel for the plaintiff in person, we
13   have -- Karra Porter has appeared via Zoom.
14                  And is there anybody else on the line
15   with you, Counsel?
16             MS. PORTER:  Nope.
17             MR. ANGELL:  Okay.  And I'll note for the
18   record that we are here in the law library at the
19   City of Pocatello.  We have a court reporter with us.
20   No one else is in the room here with us.
21                  And I just say that, Mr. Hendricks -- I
22   need to clarify all that for the record.
23                      EXAMINATION
24   BY MR. ANGELL:
25             Q.   Have you ever had your deposition taken
```

1   before, by chance?

2          A.    Not that I remember.

3          Q.    Not too many people have.  Thanks for

4   coming in this morning.  Let me just explain the

5   process to you a little bit.

6                The reason that we have brought you in

7   today is that you were a witness in some -- in a

8   burglary that happened in your home involving

9   Mr. Sheeler a couple of years ago, and that's part of

10  the basis of this lawsuit, so I wanted to ask you

11  some questions about what happened.

12         A.    Okay.

13         Q.    And the way we do that is, with a

14  deposition, we have a court reporter here who's going

15  to type up everything that we say and prepare a

16  transcript when we're finished --

17         A.    Okay.

18         Q.    -- so we'll be able to read that.

19                So a couple of tricky things with a

20  deposition is, in order for our court reporter to be

21  able to prepare a transcript, we need to make sure

22  we're not speaking over top of one another so that

23  she can write down what we're saying.

24         A.    Okay.

25         Q.    And the other thing -- and you're doing

```
 1   good so far.  I always listen -- is we do need to
 2   have you, as a witness, answer audibly; sometimes
 3   with a yes or a no or an answer.  Sometimes we'll say
 4   "uh-huh" and shake our head, which I understand
 5   sitting here, but it won't come through the
 6   transcript.
 7              Does that make sense?
 8        A.    Yes.
 9        Q.    I don't plan to be too long.  I
10   appreciate you coming in on kind of a cruddy morning.
11   Your wife is going to be next, so we'll try to march
12   right through this.
13              If my questions don't make sense, I'm
14   not trying to trick you.  I might just ask a bad
15   question.  If it doesn't make sense, just let me know
16   and I'll try to rephrase it.
17        A.    Okay.
18        Q.    I want to ask a couple background
19   questions to just find out a little bit about you and
20   then I'll ask you about what happened with
21   Mr. Sheeler I think it was on September 25th, 2020.
22        A.    Yes.
23        Q.    Do you remember that day?
24        A.    Yes.
25        Q.    Okay.  And then a couple of other
```

1    things.  I mean, you look all primed and ready to go

2    to me, but are you on any kind of medication or have

3    any medical condition that would affect your ability

4    to testify or remember events?

5             A.    I'm going to say I'm on, like, some PICC

6    line with a penicillin version of a drug.  Them are

7    the only drugs that I am on.

8             Q.    I noticed you have the crutches this

9    morning.  Did you have a mishap?

10            A.    No, it was by choice.

11            Q.    Okay.  What's your current address?

12            A.    My current address is 284 Hyde Avenue.

13            Q.    And how long have you lived there?

14            A.    I've lived there since '98 -- excuse me,

15    '99.  '99.

16            Q.    Do you own that home?

17            A.    Yes, I do.

18            Q.    Who lives there with you?

19            A.    My wife, Mary.

20            Q.    Anyone else?

21            A.    Two dogs.

22            Q.    Okay.  What kind of dogs do you have?

23            A.    A Drathaar and a German Wirehaired

24    Pointer.

25            Q.    Do you do any hunting with the dogs?

```
 1           A.   A lot.

 2           Q.   Do you?

 3           A.   Yes, a lot every day.

 4           Q.   Excellent.  Yeah.

 5                In terms of the address that you live

 6   at, did -- have you raised children there?  Have you

 7   lived there for a while?

 8           A.   My child was 16 roughly when he moved in

 9   with me.  He's 39 now.  Probably lived there two -- a

10   couple of years, three years.

11           Q.   How long have you lived in the Pocatello

12   area?

13           A.   My entire life.

14           Q.   And can I get an idea of what -- are you

15   employed right now?

16           A.   No.  I've been retired for seven years.

17           Q.   Oh, okay.

18           A.   Just short of seven years.

19           Q.   Where did you work before you retired?

20           A.   I worked at a Union Pacific Railroad.

21           Q.   Okay.  What did you do there?

22           A.   I retired as a yardmaster there.

23           Q.   Spend your whole career with the Union

24   Pacific?

25           A.   Started out as a janitor and retired as
```

1   a yardmaster, yes, sir.

2         Q.   And what -- and let's see.  You retired

3   seven years ago, you said?

4         A.   Just -- yeah, six -- six years and

5   10 months, but who's counting?

6         Q.   Okay.  And I asked you early on if you

7   had ever been in a deposition and you said you didn't

8   think so.

9         A.   Not that I remember.

10         Q.   Have you ever been involved in a lawsuit

11   at all?

12         A.   Not that I remember.

13         Q.   Okay.  I noticed that -- I'm going to

14   hand you --

15         MR. ANGELL:  I don't know how I'm going to

16   show this to you, Counsel.

17              (Exhibit 1 marked.)

18         Q.   (BY MR. ANGELL):  I'm going to hand you,

19   Mr. Hendricks, what we've marked as Deposition

20   Exhibit No. 1, and it appears to me to be a complaint

21   that was filed in state court in Idaho by Anthony

22   Budge, listing Kirk Hendricks and Mary Hendricks,

23   Plaintiffs, versus Jake Sheeler, Defendant.

24              Have you seen this complaint?

25         A.   Yes.  I haven't actually seen this, but

```
 1   yes, I'm aware of this.  Yes.
 2          Q.   Can you tell me just what the purpose is
 3   behind this complaint?
 4          A.   Well, the purpose is this man has
 5   destroyed my life continually.  It's like I woke up
 6   this morning -- I get a little emotional, I
 7   apologize.  I woke up this morning and I told my
 8   wife, "Isn't this great?  Two years later, another
 9   sleepless night because of this individual, what he's
10   done to our lives."
11          Q.   And so let's talk about that.  I want to
12   just make sure that you knew that this has been filed
13   in the courts.
14          A.   Yes.
15          Q.   And your attorney is Anthony Budge?
16          A.   Yes.  That is correct.
17          Q.   September 25th, 2020.  Can you --
18          A.   Yes.
19          Q.   -- give -- so can you give me an idea of
20   what your days looked like in September of 2020?
21   What would you be doing during the day?
22          A.   Well, I can -- you know, I don't
23   remember what I was doing earlier in the day.  I
24   remember that day that I had went to the C-A-L Ranch
25   store in my -- in my pickup, and I returned home
```

1    approximately, oh, 2:43, right in there, 2:45.  And

2    then I put -- which I drove my truck into the shop,

3    and then I was waiting for my wife to return.

4                Upon her returning, we talked about

5    going and taking the dogs for a walk.

6          Q.    What happened next?

7          A.    So I -- we decided to go take the dogs

8    for a walk.  I went to go to my shop that I had been

9    in there two hours prior and the door was locked, and

10   I thought, "Boy, that's odd that I -- the door would

11   be locked."

12         Q.    Is that the man door that you walk in?

13         A.    Well, my shop is separate from my home

14   so it's, you know, probably 5, 8 feet from the back

15   of my porch, and the door was locked.  So I then

16   returned into the home to get a key to the shop, at

17   which time I opened up the shop door and I thought,

18   "Well, I'll grab my other keys out of the truck,"

19   which I just parked in there, since we were going to

20   just leave from our home.

21               And when I went in there, I opened up

22   the truck door to -- the passenger side of the truck

23   door to get my keys, and at that time I seen an

24   individual -- I have a -- not a crew cab but an

25   extended cab.

1           At that time I see this individual's

2    head smiling at me on the other side of my truck, and

3    I -- in my mind I thought it was the neighbor boy.

4    Necus (phonetic) is his name.  And Necus has been

5    over in my shop before, and I just figured he was in

6    there, you know, helping himself a little bit.

7    Not -- he doesn't steal, but he has been known to be

8    over there.

9           And so I thought that was Necus, and I

10   hollered at him to get the F out of my shop.

11        Q.    Uh-huh.

12        A.    And at that time I kind of proceeded to

13   the back of my truck, which would be on the north

14   side of my shop, and at that time, Mr. Sheeler walks

15   around, points a gun at my stomach and said, "Sir, I

16   don't want to shoot you but I will."

17           And at that time I didn't really

18   recognize him, but I could -- the guy was very -- he

19   had a stone-cold look on his face so, to me, there

20   was no doubt in my mind he was willing to shoot me.

21   I mean, I -- of course being familiar with firearms,

22   I noticed that he had a -- a Judge pistol that was

23   pointing at me, and I thought, either way, regardless

24   of what he's got in there, I'm in trouble, whether

25   it's a .410 or the .45.

1              So actually -- in between that, my dog

2   actually went crazy on Sheeler being in there, and I

3   called her off thinking it was Necus.

4         Q.   So when you first came in and saw him,

5   your dog --

6         A.   Well, when I opened the door to the

7   truck, that dog went ballistic, and -- and -- at that

8   time, but -- or, in there sometime.  I can't remember

9   there exactly.  But I remember my dog did go

10  ballistic and I called the dog off.

11        Q.   Was the garage door that you drive the

12  vehicle in open or closed?

13        A.   The garage door was closed.  When I --

14  when I drove the vehicle in, I shut the door.

15        Q.   And so what happened -- after the guy

16  pointed the gun at your stomach, what happened next?

17        A.   Well, he -- he kept pointing the Taurus

18  Judge at me, and I -- at one time I kind of reached

19  towards my pocket.  I was wanting to kind of click my

20  phone on or something, and he repeated again that he

21  would shoot me again and any movement I made, he made

22  it very clear that he would shoot me.

23              And so I'm just -- there was not any

24  talking or anything.  I -- that -- this guy's face,

25  to me, was just stone -- stone cold.  There was no

1    smiling or happiness anymore in that face.  It was

2    just very -- very a stone-cold -- I just -- I really

3    remember the piercing eyes just staring at me.

4            Q.    What did he look like?  Can you describe

5    him?

6            A.    You know, you think you would be able

7    to.  I can because of the photos that I've seen.

8    I'd -- actually had seen the individual before at the

9    neighbor's house.  I remember he had a mole on his

10   face, but for some reason, I -- I -- you know, I just

11   remember he had a mole on his face, because that's

12   what I was focused on and -- and he had a hoodie on

13   at the time.

14           Q.    Was it light or dark in your shop?

15           A.    I'm going to say it's probably a medium,

16   between the -- I don't believe I turned the lights

17   on.  I mean, I believe I just -- it was good enough

18   to see in there, but it's not real -- real bright,

19   no.  I don't have a lot of -- two windows is all.

20           Q.    So you said that -- I kind of

21   interrupted you.  You said that you had reached

22   towards your pocket, he again said that he would

23   shoot you?

24           A.    Yes.

25           Q.    Do you remember what happened next?

1         A.    We kind of started side- -- I mean, he

2    kept this kind of sidestep towards the door, both of

3    us.  I mean, like I said, I had thoughts go through

4    my mind, but I knew that, when somebody's got a gun

5    on you, there's -- you're done.  You're -- there's

6    nothing that you can do in your defense.

7              And so -- okay.  I'm just reading this.

8    I kind of wrote down he did -- he did -- he had

9    glasses and a hood, but he did --

10        MS. PORTER:  Can I -- pardon me, folks.  Can

11   I get clarification of what the witness is reading

12   from?

13        MR. ANGELL:  He has a --

14        THE WITNESS:  I just wrote some notes down

15   prior.

16        MS. PORTER:  I'm sorry.  I understand.  Can

17   you get a copy of that?

18        MR. ANGELL:  Yes.  We can get a copy of that

19   if Mr. Hendricks is okay with that.

20        THE WITNESS:  I'm not very happy with it.

21        MS. PORTER:  I mean, he's using it to refresh

22   his recollection, and I've seen him do it a couple of

23   times, looking at something during the deposition, so

24   I do believe that the court reporter needs to get a

25   copy of that for us at her convenience.  I don't mean

1 | right this instant.

2 |         Q.    (BY MR. ANGELL):  You can go ahead,

3 | Mr. Hendricks.

4 |         A.    Well, why don't we just read this?

5 |         MS. PORTER:  Well, that's kind of my point.

6 | If you're going to read from something -- but it

7 | doesn't matter.  We just need her to get a copy, only

8 | at her convenience.

9 |         Q.    (BY MR. ANGELL):  If that would help

10 | you, Mr. Hendricks, I don't have a problem if that

11 | would help you refresh your memory.

12 |         A.    I wrote a lot of this down, and there's

13 | a couple of things I've questioned about that's on

14 | here, but...

15 |         MS. PORTER:  Well, Amber, what's the most

16 | convenient way for you?  Do you want to just take a

17 | picture with your phone or is there a copy machine,

18 | like, in the room I can't see?

19 |         MR. ANGELL:  We can make a copy.  That

20 | wouldn't be a problem.  We'll do that.

21 |         Q.    (BY MR. ANGELL):  And let me explain,

22 | Mr. Hendricks.  It's not a problem that you wrote

23 | down some notes.  I understand that this happened a

24 | couple of years ago and memories tend to fade.  In

25 | fact, I'm glad you did that because it helps.  As

1    time goes by, we tend to forget.

2              I don't mind if you just continue to

3    describe from your memory what happened, but if you

4    wouldn't mind if we kept a copy of your notes, I

5    think in fairness to Counsel --

6         A.   That's fine.  That reason I -- I want to

7    be as accurate as possible so people really

8    understand the -- what I went through.

9         Q.   Right.  So you -- let's go by memory as

10   well as you can.

11             So you remember being in the shop, he's

12   got the gun on you, I think you told me he's kind of

13   sidestepping toward door.

14        A.   He's sort of -- yeah, kind of -- he

15   just -- just kind of going back and forth, you know,

16   towards -- you know, looking back where he was

17   looking toward the door.  I mean, this guy's --

18   there's only one way out through an east-facing door

19   in the shop.

20        Q.   And is that the one that you came in

21   through?

22        A.   That's the one that I come in, yes.  My

23   wife was actually standing outside of the door and

24   was -- she seen what was going on.  I actually at

25   some time yelled "Call 911."  But when she seen this

1    individual threatening me with a gun, she was frozen

2    and unable to move.

3              We had several interactions.  Like, I

4    actually had a firearm that I was carrying that I am

5    licensed to carry in the state of Idaho, and -- but

6    my firearm was not cocked.  So there I go -- is --

7    he's got me right there.  I've got a firearm that's

8    not cocked.  There's no -- you're done.

9              And we went towards the door, and I want

10   to say at least a minimum of five times this guy

11   threatened to shoot me.  He was making it real clear

12   that he didn't want to but he would.

13             And as we proceeded to the door,

14   continually him reminding me all this time and --

15   like I said, this guy didn't smile, very stoic.  He

16   was scary.  A very, very, very scary-looking

17   individual.  And when he -- he turned to go out the

18   door, and at that time I considered pulling out my

19   firearm because I was in fear of my wife's life at

20   this time but I was concerned that it wouldn't be --

21   he would turn and possibly I would -- wouldn't be a

22   frontal shot, and I was hoping that he wasn't going

23   to grab my wife or whatever, hold her as hostage or

24   whatever.  And at that time, of course, he reminded

25   me again that he would shoot me.  And then at that

1  time he started to -- he yelled at my wife several

2  things, and then he proceeded to got out of the shop

3  and proceeded to run north up the street which I

4  chased him yelling for the neighbors to call 911,

5  he's a thief, he's armed.  And as such -- of course,

6  I got a gimp leg, had a gimp leg then.  The guy

7  picked on a cripple.  He didn't care.  And he

8  proceeded up the street.

9           And then Mr. Hernandez, who was the

10 neighbor -- he's actually my son's father-in-law --

11 proceeded up the street, and then he had his

12 altercation with him there.  But at that time I was

13 further back and I was regrouping to make sure

14 everybody was safe with the gentleman running around

15 this neighborhood with a gun.

16           Q.   Let me stop you there, if that's okay.

17           A.   Okay.

18           Q.   I'll let you pick that up in a minute.

19 I just -- I wanted to ask a few questions that came

20 to my mind when you were talking about what happened

21 in your shop.

22           A.   Okay.

23           Q.   First of all, which way was your truck

24 parked in the shop?

25           A.   Okay.  My truck has two double doors and

1    they face north.  So I pulled in off Maple Street

2    directly into my garage with -- they're facing north.

3          Q.    Could I show you an overhead?  Would

4    that be okay?

5          A.    Yes.

6          Q.    We can mark this as a deposition exhibit

7    and see if we can -- it'll help us understand where

8    your shop is at.

9                Can you show me Mr. Hendricks where your

10   house is at so that we don't put the sticker on top

11   of it?

12         A.    Okay.  My address is actually on Hyde.

13   This is -- this isn't even the -- this isn't the

14   correct -- your street is incorrect.  It shows

15   Moreland Avenue here.  That is Maple Avenue.

16               But -- but this is -- this is my home

17   here.  This faces east.  This faces north.  There's

18   the driveway.  See?  There's -- it's not very far

19   from my home to my shop door right there.

20         Q.    Hold on one second.  Okay.  So let me --

21   I'm going to put a sticker on this just so we can

22   keep track.

23               (Exhibit 2 marked.)

24         Q.    (BY MR. ANGELL):  This is Deposition

25   Exhibit No. 2, and we just marked this so we can keep

1    track of it down the road.

2            A.    Yes, sir.

3            Q.    And I understand -- and I just printed

4    this off of Google Earth, so, apparently, they got a

5    street labeled wrong?

6            A.    Yes.  Yes.  Because that's the --

7    because that is where the individual left from,

8    and...

9            Q.    Okay.  So this is the Rufis' house on

10   Hyde Avenue?

11           A.    Yes, that's correct.  My next-door

12   neighbors.

13           Q.    Now, let me just see.  Hold on.

14                 I'm going to give you a red marker.  Do

15   you mind just -- maybe just outlining a little bit in

16   red where that Rufi house is -- the one that's

17   Rufis'?  Okay.  And I'm going to just have you put an

18   "X" in your driveway if that's okay so that we know

19   which driveway is yours.

20                 Okay.  I think that will help us down

21   the road.  So you -- for Counsel who's on the Zoom,

22   you have done a circle around the Rufis' house and an

23   "X" on your driveway on Maple Avenue --

24           A.    Correct.

25           Q.    -- and you wrote "Maple" on the road

1    there where it's mis-marked as Moreland for whatever

2    reason on Google Earth?

3              A.    Yes.   That's correct.

4              Q.    Okay.   So your shop -- I need you to do

5    an arrow -- can you do an arrow on Hyde Street for

6    north and an arrow on Maple for east with maybe an

7    "N" there?   Perfect.   And then east?

8                   All right.   That helps me.   So now I can

9    sort of orient a little bit there.

10             A.    I mean, I was born and raised in this

11   neighborhood.

12             Q.    And so when you pull into your driveway,

13   your detached shop, do you pull your truck straight

14   into that shop or do you back it in?

15             A.    Yeah.   No, no.   I pull -- I usually pull

16   it in.   I have a double door there, a single door

17   there, and I -- I pull it in -- I pull it into that

18   side.

19             Q.    Okay.   And then your man door -- can you

20   show me where the man door is that comes from the

21   house?   All right.   And you made a little hashmark on

22   the side there that --

23             A.    A little hashmark, yes, sir.

24             Q.    And it was that man door that you walked

25   in, and then that's when you saw him?

```
 1          A.    I did not see him until I physically
 2   went over and opened up my truck -- truck door, which
 3   I have two trucks.  So I walked by one truck, toys,
 4   and then opened up the other truck door.
 5          Q.    Okay.
 6          A.    I take it back.  I didn't have two
 7   trucks then.  I'm going back in time here.  But I did
 8   not see him until I opened up my passenger truck door
 9   parked.
10          Q.    So your passenger door, the way you had
11   it parked, it would have been closest to you as you
12   came in the shop?
13          A.    Yes.  Correct.
14          Q.    And you said you came back from C-A-L
15   Ranch.  Are you sure that you shut the garage door
16   when you came in behind yourself?
17          A.    Positive.
18          Q.    And is that your normal practice to do
19   that?
20          A.    Always.  Always.
21          Q.    Even on a day when you're thinking you
22   might take off again and go walk the dogs or go out
23   with your wife?
24          A.    Yes.  Unless I'm, yeah, like -- yes.
25          Q.    Do you leave the side man door locked
```

1   normally?

2        A.    I normally do, yes.

3        Q.    And that day it wasn't locked?

4        A.    Well, I was going to come back out.

5   I -- I normally didn't -- if I'm home, I normally do

6   not because I do a lot out in -- and I -- back and

7   forth a lot.

8        Q.    And so if I'm tracking with you, during

9   the day when you're home, you will leave it unlocked

10  during the day, your man door?

11       A.    I used to, yes.

12       Q.    And then would you -- is it something

13  you would normally lock up at night when you would go

14  to bed?

15       A.    Oh, yes.

16       Q.    Okay.  Anyway, you were surprised to

17  come back out -- I think you told me you were

18  surprised to see that it was locked --

19       A.    Right.

20       Q.    -- when you came back out to your shop?

21       A.    Correct.

22       Q.    Did you have to go find a key to get in

23  there?

24       A.    No.  I had the extra key in the house.

25  I knew where another extra key was.

1          Q.    And now, you are a gun owner, right?

2          A.    Yes.  That's correct.

3          Q.    And you told me you were carrying one

4    gun that day?

5          A.    Yes.

6          Q.    Do you remember what you had that you

7    were carrying?

8          A.    Yes.  It was a -- it was a GLOCK,

9    Model 43.

10         Q.    Which caliber is that one?

11         A.    That's a 9 mm, five shot, small

12    capacity.

13         Q.    I don't know if I've seen one of those.

14    Okay.

15               And how do you carry that one?

16         A.    I -- that one I carry just inside my

17    pants un-holstered.  I just put it inside my pants.

18         Q.    Along your belt on your right side?

19         A.    Yes.  Between my pants and my skin.

20         Q.    And you say you -- you say that you knew

21    you had it but it wasn't cocked?

22         A.    That -- that's correct.

23         Q.    Did it have one chambered or did it --

24         A.    No.  I did not have one chambered

25    because I'm not -- I'm not going to carry one in my

1    pant leg like that --

2              Q.    With a bullet chambered?

3              A.    Right.  Which is considered hot.  It was

4    not hot.

5              Q.    So you knew when you were confronted by

6    this individual in your shop that, in order for you

7    to defend yourself, you would have had to pull that

8    out and chamber a bullet?

9              A.    Yes.  It was worthless.

10             Q.    Not practical to try that?

11             A.    Not when somebody's got the -- a gun

12   pointed at you.

13             Q.    When you saw the individual in your

14   shop, did you recognize -- holding the gun, I should

15   say -- did you recognize that as being your gun right

16   off or no?

17             A.    I didn't.  I did not, no.

18             Q.    But you identified it as a Taurus, as a

19   Judge?

20             A.    Yes.  They're very distinctive, yes,

21   sir.

22             Q.    How long do you think it had been since

23   you had been out to your shop?  I think you told me a

24   couple of hours.  Did I remember that right?

25             A.    Well, my notes showed I got back at

1    14:43, so that was when I was in my shop.  We went

2    back two hours later -- well, an hour and a half

3    later, which would have been 16:16 -- I wrote down on

4    this.

5             Q.    How did you know those exact times?

6    Were you able to go back and figure that out somehow?

7             A.    Yes.  I had some cheap cameras at the

8    time which Mr. Sheeler disabled.

9             Q.    And were you able to go back from those

10   cameras and view anything on the -- that the cameras

11   recorded?

12            A.    No.  Because he covered -- the one

13   camera that would have got any documentation on it he

14   was able to cover it up with a -- one of my dog poop

15   bags -- to cover the camera up so there would be

16   no --

17            Q.    Where was that camera at in your shop?

18            A.    That camera was actually on my home,

19   facing the shop door.  So according -- according to

20   this exhibit here, underneath that canopy there's a

21   little garage door going into this garage here.  That

22   camera was facing towards that door.

23            Q.    And when you went out to look at it, you

24   saw that it had a dog bag on it?

25            A.    I did not notice the dog bag until

1   afterwards when the police officers come back, and at
2   that time it was noticed that there was a dog bag on
3   that.  A poop bag.
4           Q.   A poop bag.  When you -- how did you
5   figure out the time 2:43 that you came back home?
6           A.   I don't really remember.  I mean, it's
7   been -- and I may have looked back at that
8   camera's -- to get the times.
9           Q.   When did you write the notes that you
10  have that you brought with you?
11          A.   I want to say a couple of days after the
12  incident.
13          Q.   Okay.
14          A.   It wasn't right -- and it might have
15  been a little longer than that.  Even I -- this
16  incident has mentally threw me for a loop.  I mean...
17          Q.   Yeah.
18          A.   So...
19          Q.   But you think pretty close to the date
20  of that incident you took some -- you wrote down
21  these notes?
22          A.   Yes.  Yes.  Yes.
23          Q.   Well, that's helpful.  Thanks for doing
24  that.  Not too many people do that.
25          A.   Well, my brother actually said, "You

1   need to write this down."

2           And I says, "I will never forget it."

3           And he suggested that I did write it

4   down, yes.

5       Q.   And it's crazy -- right? -- even of what

6   you can't remember after a couple of years?

7       A.   Well, like I said, I actually was born

8   and raised in this neighborhood.  I could hit my

9   house I was raised in with rock from my house.  We

10  just...

11      Q.   So a couple more questions that came to

12  mind.  He would have been on the driver's side of

13  your pickup when you first saw his face, then?

14      A.   Correct, he was.

15      Q.   Did you notice while you were in there

16  if there was anything else that was out of sorts in

17  your shop?

18      A.   Not at the time, no.

19      Q.   And he would have had to get out around

20  your truck to get out the door, right?

21      A.   Correct.

22      Q.   Do you remember if he went around the

23  front or the back of the truck?

24      A.   He come around the rear of the truck,

25  yes.

1          Q.    And the rear of the truck would have

2    been towards the big sliding garage door?

3          A.    Yes.  Yes.  Yes.

4          Q.    And then eventually he made his way out

5    the man door and ran towards Maple Street?

6          A.    Yes.  Ran north towards Maple Street and

7    then went up Hyde.

8          Q.    So then he ran kind of east a little bit

9    on Maple and turned north on Hyde?

10         A.    Yeah.  He kind of run here.  He run

11   across the lawn there and then he run up here.  There

12   was a couple of guys out in their front yard up here

13   that, when they heard me yelling, I remember them

14   stepped out.  Dale something.  And Mr. Sheeler then

15   proceeded through the Barrus property, and that's

16   where they got the picture of him holding the Taurus

17   Judge off their camera.

18         Q.    Can you write "Barrus" on there for me

19   where the Barrus property is, if you don't mind?

20         A.    Okay.

21         Q.    I noticed just there -- and not that it

22   matters -- but you're a lefty, too?

23         A.    Yes, sir.

24         Q.    Do you carry that gun on your left side

25   or your right, that concealed one?

1          A.    I'm right-handed -- okay.  When I grew
2    up, if you weren't right-handed, you didn't get
3    nothing so I learned to do everything with my right
4    hand other than -- if it wasn't, like, a baseball
5    mitt, you were required -- I'm left-handed, otherwise
6    I'm right-handed.  And I'm right-eye dominant, which
7    makes a difference also.
8          Q.    So you shoot with your right hand.  Is
9    that what you're saying?
10          A.    Yes, sir.
11          Q.    But you write with your left?
12          A.    Yes.
13          Q.    Okay.  I only picked that up because you
14    indicated where you carry your gun with your right
15    hand and then I saw you pick up the pen with your
16    left --
17          A.    Correct.  Correct.  But I am right-eye
18    dominant, so...
19          Q.    Okay.  Anyway, back to that story.  So
20    the Barruses, he ended up cutting across the
21    Barruses' property a little bit?
22          A.    Yeah.  When he run up that driveway
23    there, that's when I lost sight of him.  And
24    Mr. Hernandez was chasing him up -- up the street.
25    And you got to remember, Richard is a year older than

1    I am so there's no lightening involved in any of

2    this.

3            Q.    So he ran up the Barruses' driveway, and

4    then that's where you lost sight of him?

5            A.    Correct.  Our grandchildren were playing

6    over here in this yard, so we are concerned not

7    only -- we're concerned about our children.

8            Q.    And he would have been just across the

9    back fence from the Hernandezes' backyard?

10           A.    Which they had been jumping on the

11   trampoline prior to this, which was right there.

12           Q.    That trampoline?  You can see it right

13   there, right?

14           A.    Yes.

15           Q.    Okay.  Do you recall -- do you remember

16   if you heard any of the interaction between

17   Mr. Hernandez and the -- Sheeler running away?

18           A.    No, I do not.  Because I -- I returned

19   back down -- I returned back down Hyde Street onto

20   Maple Street.  I was going to proceed down

21   Franklin -- towards Franklin, which is the next

22   street over, and at that time, then I seen a police

23   officer driving up the street, waved him down.

24           Q.    Was he just happening to come by?

25           A.    I believe -- to my understanding, the

1    officer was on Hyde -- or, excuse me -- on -- down on

2    Jefferson.  I don't know exactly where, but he was on

3    Jefferson when they got the first 911 call.  I don't

4    know how many 911 calls they had, but when I called

5    them, she said they're already had numerous calls.

6             Q.    And when you were in the shop and he's

7    got the gun pointed at you, when did you first kind

8    of become aware of the fact that your wife was close

9    to the door?

10            A.    Probably the second time he threatened

11   to shoot me.

12            Q.    And what was it that alerted your

13   attention; do you remember?

14            A.    Well, no.  Because this actually was

15   like somebody clicked the switch on to slow motion.

16   This -- I have no idea how long this took place, but

17   at that time, in my mind, it was a long -- I mean, I

18   had a lot of thoughts I had considered of how to

19   defend myself, to unarm this individual.  But with

20   the stoic look that he had on his face, much -- much

21   healthier younger man than me, you know, there's

22   just -- there was just no -- no way.  It was a no-win

23   situation.  I just knew there was just -- it would

24   be just be a losing situation.

25            Q.    A couple of things.  To be 100 percent

1    clear, you did not pull a gun out on him while he was

2    in your shop?

3          A.    I did not -- physically I did not get it

4    pulled all the way out, correct.  I started to pull

5    it out and then I returned it back because he had

6    turned and I felt that he was not a threat to me, but

7    he was still a threat to my wife.

8          Q.    Was he headed out the door then or was

9    he still inside the shop?

10         A.    He was still approximately probably

11   5 feet inside the shop.

12         Q.    And where were you at the point where

13   that happened?

14         A.    Straight across from him again.

15         Q.    And was he headed towards the door at

16   that point?

17         A.    He had turned -- and I don't know if he

18   turned to look at the wife or turned to get his

19   balance, you know what I mean?  His escape route

20   or -- I don't know.  I can't speak -- but I know that

21   he had turned like this, and at that time I thought

22   "This is my chance," and then I thought, "No."

23   Because if he turned just a little further, it would

24   not be good for me.  Like I said, this -- this is in

25   slow motion.

1         Q.    How close do you think he came to your
2    wife as he was leaving the shop?
3         A.    I'm going to say he probably -- within
4    3 feet, if that.
5         Q.    Could you see her out the door of the
6    shop as he was leaving?
7         A.    Yes.
8         Q.    And you say your memory was that she was
9    just kind of froze?
10        A.    Yes.  Yes.
11        Q.    Could you describe her any more than
12   froze?
13        A.    Well, I'm going to tell you she was
14   probably as white as the top of that canopy right
15   there.  I remember that.  There was definitely --
16   definitely fear.
17        Q.    Yeah, I imagine.  Did she say anything?
18   Do you remember her saying anything?
19        A.    Not that I remember, no.
20        Q.    Did the dogs continue to bark and make a
21   ruckus?
22        A.    No.
23        Q.    They're obedient dogs?
24        A.    They're very -- they are very
25   well-trained -- trained dogs, yes.

1         Q.   And then I had written down to ask you
2    this and I know this is going to be a hard one, but
3    the best that you can recall, how long do you think
4    you were in kind of this tense situation in the shop
5    with you in there and him in there pointing the gun
6    at you?
7         A.   I would probably say 5 to 10 minutes.
8         Q.   That's a long time.
9         A.   It was a long time.  It was very -- the
10   amount of thoughts that had went through my head in
11   that amount of time was -- it was a long time.
12        Q.   Was he attempting to -- could you tell
13   if he was trying to do something as he's holding you
14   at gunpoint?  Did you --
15        A.   You know, the only thing he was intent
16   on was watching me and holding that gun where it was.
17   He -- he never once dropped the gun until he got
18   ready to -- to leave.
19        Q.   To head out?
20        A.   To head out the door, correct.
21        Q.   Did he make his way out with anything in
22   his arms?  Did he try -- was he trying to grab and
23   run with stuff, did you notice?
24        A.   Nope.  No.  He just -- he just had the
25   firearm.

1         Q.    Can you remember any other words that he
2    used besides "I will shoot you"?
3         A.    Well, he used "Sir, I will shoot you."
4    I -- I remember that he used that word, that "Sir, I
5    will shoot you," and that was -- to my knowledge,
6    them were the only words he ever spoke to me --
7    was -- made it very clear.
8         Q.    So I want to just see if I'm sparking a
9    memory but I don't mean to put words in your mouth at
10   all.
11              Did he say, for example, "I need
12   something" or tell you to do something else?
13        A.    No.
14        Q.    Just "Sir, I will shoot you"?
15        A.    "I will shoot you."  Any time I made any
16   movement other than he allowed me to sidestep with
17   him.  And I think that the reason for that is because
18   he knew he had a good shot.
19        MS. PORTER:  I'm going to object and move to
20   strike as nonresponsive.
21              Go ahead.  That's just for the record.
22        Q.    (BY MR. ANGELL):  Sometimes the attorney
23   may have an objection that the judge will have to
24   deal with later on down the road.  So she's able to
25   just state that.

1              A.    Sure.

2              Q.    You made a comment that you thought he

3     might have had a good shot.  Why did you think --

4     what did you observe that made you think that?

5              A.    That -- that he had a good shot?  Well,

6     you don't miss with a firearm within a -- a shotgun

7     within 2 or 3 feet of you.  You're not going to miss.

8     And he was going to shoot you -- would be in the

9     belly, and it's not going to be -- the outcome is not

10    good.

11             Q.    So when he first had the gun pointed at

12    you, was it pointed across the vehicle?

13             A.    No.  When he come around the vehicle, he

14    immediately had the gun pointed at me.

15             Q.    Okay.  So you saw him through the extra

16    cab window first?

17             A.    Correct.  Correct.

18             Q.    But then he moved which direction?

19             A.    He moved north towards the front of my

20    shop towards the overhead doors towards Maple Street,

21    then he cut around -- I mean, after I seen this thing

22    I don't know, but he come around at the north end of

23    my vehicle, and at that time he had the gun on me and

24    explained that he would shoot me.

25             Q.    And so you were kind of close to the

1   passenger-side door?

2           A.    I was probably within -- like I said, I

3   was within 2 or 3 feet of him when he come around,

4   and that's pretty much where the distance stayed.

5           Q.    And he had the gun leveled at your

6   stomach area?

7           A.    Yes.

8           Q.    The entire time?

9           A.    Yes.

10          Q.    I know what a Taurus Judge is.  I should

11  have you explain what that is.  What is a Taurus

12  Judge?

13          A.    A Taurus Judge is a pistol.  They tend

14  to have -- I think that one has a 3-inch -- but it's

15  able to shoot either a .45 Long Colt or a .410

16  shotgun shell out of that gun.

17          Q.    It's a rather large handgun?

18          A.    It's -- yes.  It's -- I would compare it

19  with probably right around between the .35- -- well,

20  probably closer to a .44 Magnum.

21          Q.    What color was that one?

22          A.    It was silver-plated -- it's not silver,

23  but it's kind of a dull silver.  I can't think right

24  now what it's called, but it's -- you know, it's not

25  black.  This one is not black.  But they do make them

1    that way.  But this one was not black.

2              Q.    Not a blue barrel?

3              A.    No.

4              Q.    And it's not a stainless either.  It

5    was --

6              A.    It wasn't stainless either.  It's kind

7    of like -- I want to say like a magnesium-type color.

8              Q.    Okay.  Are there windows in your shop?

9              A.    There are two windows in my shop facing

10   west, facing the home.

11             Q.    And so there would have been light

12   coming in the windows of the shop?

13             A.    Yes.  Also, with the door opened.

14             Q.    And that's what was providing the light

15   that you were working with in the shop?

16             A.    Yes.

17             Q.    And this would have been around 4,

18   4:30-ish in the afternoon?

19             A.    Yes.  Yes.

20             Q.    And the weather outside, do you happen

21   to remember was it cloudy or sunny?  Do you remember?

22             A.    I remember it was a nice day to go for a

23   walk.

24             Q.    Did you have a camera or anything inside

25   of the shop?

```
 1            A.    No, sir.  I do now.
 2            Q.    I'll bet, yeah.
 3                  Sorry.  I'm just checking a couple of
 4    notes.  You've explained most of this to me and I
 5    write all these notes down.  Let me just double check
 6    a few things.
 7            A.    It's all good.  It helps me get my
 8    emotions back.
 9            Q.    I think that -- well, I don't want to
10    restate what you said.  Did you recognize him at all
11    as he was in your shop as you're looking at this
12    individual?
13            A.    No, I did not.
14            Q.    I think you mentioned later you think
15    you may have seen this guy around?
16            A.    Well, I -- I had seen him prior, but
17    it's -- okay.  I wear glasses.  Usually when I go
18    outside, I don't have the glasses.  The -- I know
19    that he drove a Jeep, but, I mean, I didn't realize
20    that that was him at the time.
21            Q.    Okay.  So later on you learned that this
22    was Jake Sheeler who had entered your shop?
23            A.    Yes.
24            Q.    And then, when you learned it was Jake
25    Sheeler, then you knew that "Oh, I had seen him
```

1   around -- Jake Sheeler around"?

2        A.   Well, when they told me that he had left

3   the Rufis' house, then two -- I started putting two

4   and two together, yes.

5        Q.   Tell me about that a little bit.  How

6   often had you seen Jake Sheeler at the -- is that how

7   they say it?  Rufi?

8        A.   Rufi.  Oh, I don't -- you know, off and

9   on.  To be right honest with you, there was a lot of

10  drugs at the home.  The girls have both been on

11  probation.  Probably were or are at the time, so I --

12  I was concerned with the individuals that were there.

13       MR. ANGELL:  Are we still coming through

14  okay, Counsel?

15       MS. PORTER:  Yeah.  Sorry.  I thought I had

16  turned off my sound.  I got that.

17       Q.   (BY MR. ANGELL):  How well did you know

18  the Rufis that live there kind of kiddie corner to

19  you?

20       A.   We were fairly -- fairly good

21  acquaintances.  I actually went to school with their

22  mother.  Well, off and on, I should say.  She went to

23  Poky later and I went to Highland.  But she's a year

24  younger than me.  I knew their family.

25       Q.   Who was the one that you knew?

1          A.    Her mother, Kathy.  But I also did know

2    Whittney and the other girl from acquaintances.

3    We're a fairly -- fairly close neighborhood.  We

4    spent a lot of time across the street on the

5    neighbor's porch.

6          Q.    Okay.  Is there a fence that separates

7    you from the Rufis' back fence there?

8          A.    There -- there -- there is a -- this --

9    this fence was there, but I had been getting wood in

10   prior in my driveway there, and the fence wasn't much

11   of a fence; it was a chicken-wire thing.  But it was

12   like -- it was down.

13         Q.    So if a person wanted to walk from, say,

14   the side -- kind of the side backyard of the Rufis',

15   they could walk right into your backyard over the

16   chicken wire?

17         A.    That is correct, yes.  Well, it was down

18   because I was getting -- stacking wood back there.

19         Q.    Okay.  Had you happened to notice if

20   there were people out and about in the neighbor -- in

21   the Rufis' yard that afternoon when you were home?

22         A.    No.  Because I -- I didn't really go out

23   in the front of my house that day.  I noticed my

24   neighbor was across the street sitting on the porch,

25   but he was sound asleep.  He's 89, so I guess that

1   would put him at 80-something then.  But he was
2   asleep.
3            I believe that -- I can't -- he was --
4   this gentleman was a police officer, and they did
5   have a video, but it was an extremely poor video of
6   the incident.
7        Q.   I wanted to -- hang on.  I'm trying to
8   find the spot in the police report, but I -- and I
9   had it, but of course I can't find it now.  Hold on.
10           I want to run through a couple of notes.
11  This is just from the police report.  I want to make
12  sure the police officer got this right when he wrote
13  it down.
14       A.   Okay.
15       Q.   So this is Officer Olsen --
16       A.   Yes, sir.
17       Q.   -- if that rings a bell.
18       A.   Yes, sir.
19       Q.   And I think he was one of those that
20  responded that day.
21       A.   Yes, sir.  He -- he -- I believe he was
22  the investigating officer.
23       Q.   So he writes, "Kirk Hendricks then told
24  me what occurred.  He said at approximately 16:16
25  hours, he was going to leave to go on a walk, and he

1  went into his garage to obtain some keys to his

2  residence and found the walk-through door locked."

3          A.    Correct.

4          Q.    "He said this was odd, as he often left

5  it unlocked when he was at home.  He said he returned

6  to his residence and obtained a pistol."

7              Do you remember if it was the locked

8  door that caused you to go get the pistol?

9          A.    No, because I was going to go for a

10  walk.  We were going to go up Sleigh Hill, up in that

11  area.  You know, you never know what you may

12  encounter.

13          Q.    So in other words, it would have just

14  been normal for you to grab the pistol just to carry

15  it to go for a walk?

16          A.    Yes.

17          MS. PORTER:  I'm going to object to leading

18  questions.

19          Q.    (BY MR. ANGELL):  Well, let me ask that

20  a little bit differently.

21              Was it common for you to carry your

22  concealed carry when you went for a walk in the

23  foothill area?

24          A.    Yes.  That's why I have a concealed

25  weapons license.

1         Q.   Okay.  I wanted to ask you another

2    question about something the officer wrote down.  He

3    said -- I'm just going to read a couple of lines

4    here.

5              "He," being Mr. Hendricks, "said the

6    male subject said, 'Stop, sir.  I'll shoot,' and

7    pointed a handgun at Kirk Hendricks.  He said several

8    times after this the male subject repeatedly said,

9    'I'm going to shoot you.'  He said he pulled out his

10   phone and attempted to take a picture of the male

11   subject but the subject said, 'Don't.'"

12        A.   Correct.

13        Q.   And do you remember doing that -- trying

14   to get your --

15        A.   Well, yeah.  As I stated earlier, I

16   reached into my pocket, possibly for my phone to --

17   picture, 911 -- something.

18        Q.   Then the report says, "Kirk Hendricks

19   said the male then began moving toward the exit door

20   to exit the garage.  Kirk Hendricks said he removed

21   his hand from his waistband and pointed it at the

22   male -- his had gun from his waistband and pointed it

23   at the male subject."

24              Do you remember doing that?

25        A.   I don't remember pointing at him.  I

1    remember pulling it out and putting it back.  That's

2    when he -- that's when he turned.  And at that time

3    he'd never known whether I had or not because he was

4    not facing me.

5              Q.    That's when he left the --

6              A.    As he was getting ready to leave, yes.

7              Q.    The next line in the police report is --

8    and he said it's "He," but it's Mr. Hendricks --

9    "said the male told him 'I'm going to shoot you.'

10   Kirk Hendricks said he backed off and allowed the

11   male to leave.  He said the male left the garage and

12   proceeded northwest across his driveway," and then it

13   continues on.

14              So I wanted to just clarify that point,

15   that you don't believe you got your handgun out to

16   point at Mr. Sheeler?

17             A.    I got it out to point at him at that

18   point, but it was not -- it would not have been good.

19   I've had some training in regards to handguns, et

20   cetera.  I was a private detective at one time, went

21   through several NRA training courses, et cetera, so

22   I'm -- I'm fluent with firearms.

23             Q.    And I just want to make sure I

24   understand what happened accurately, and part of what

25   I'm understanding from seeing you today is not going

1    to get captured in the transcript, and that is, as

2    you've described going -- grabbing your gun, you've

3    kind of lifted it up and put it back in your

4    waistband.

5            A.    Correct.

6            Q.    The police officer, though, reported

7    that "Kirk Hendricks said he removed his handgun from

8    his waistband and pointed it at the male subject,"

9    period.

10               So help me understand how -- which

11    one -- I want to know which one of those is right.

12           A.    To my knowledge -- okay? -- I don't ever

13    remember pointing it at him.

14           Q.    Okay.

15           A.    Okay?  And I have read a few things

16    that -- disparity of what I felt happened and what

17    they felt happened, so...

18           Q.    So your best recollection is that you

19    kind of lifted it up off your waistband?

20           A.    Yes.

21           Q.    Did he say something to you at that

22    point or did you just think better of it and put it

23    back in?

24           A.    I think thought better of it.

25           Q.    Okay.  Did you end up going through and

1   kind of doing an inventory -- oh, you can check those
2   notes if you want.
3           A.    Well, I guess so.
4           Q.    Hang on one second.  Let's just give you
5   a minute to look back.  That might help refresh your
6   memory.
7           MS. PORTER:  Is the witness looking at those
8   papers again?
9           THE WITNESS:  I'm looking at my notes again,
10  yes, ma'am.
11          MS. PORTER:  Okay.
12          MR. ANGELL:  He's got his -- yeah, his
13  handwritten notes.
14          THE WITNESS:  Okay.  According to this, he
15  seen my firearm, so -- and he did threaten me at that
16  time to shoot me and I returned it.  But I don't --
17  never pointed it.
18          Q.    (BY MR. ANGELL):  Okay.  Do you mind
19  just reading a couple sentences there that -- or,
20  whatever your note is that you have written down?
21          A.    Well, I was just reading.
22          Q.    Do you mind just reading it out loud so
23  the court reporter can write it down?
24          A.    "Approximately 5 feet from the door, he
25  again said, 'Sir, I will shoot you,' again.  I feared

1    for my life.  After he threatened to shoot me, he
2    looked out the garage door at my wife, and at that
3    time I drew my firearm."
4                Okay.  "When he seen it, he told me, 'I
5    will shoot you, sir,' pointed the gun at me and then
6    he stated -- he started to flee.  I returned the gun.
7    As he's leaving, he kept saying, 'Don't follow me.
8    I'll shoot,' and he took off running."
9                Q.   Okay.
10               A.   So I don't believe at any time I pointed
11   the gun at him.
12               Q.   And that -- in any event, that bit of
13   the interaction was happening right before he turned
14   to run?
15               A.   Correct.  Correct.  That was the only
16   time that individual didn't have that gun pointed in
17   my stomach -- or, at my stomach, I should say.
18               Q.   Okay.  Thanks.  I appreciate that.
19               Did you have -- did you go through and
20   do an inventory of anything that was possibly missing
21   from your property?
22               A.   Yes, we did.  Me -- me and -- Officer
23   Olsen and myself, yes, sir.
24               Q.   Do you happen to recall what it was that
25   was missing?

1           A.   Well, at -- at the time I thought that
2    he had taken a -- I hate to even admit that I own
3    one -- a High Standard .45, which I had had out there
4    hidden.  He -- he had went through my entire shop.
5    There were -- stuff was pulled out everywhere, and it
6    was at that time that we noticed that the Taurus
7    Judge -- which was in a backpack up on my bench
8    because the day prior to it we had went for a walk.
9    That is an exceptional gun for shooting snakes,
10   rattlesnakes.
11          Q.   And so that -- that's when you learned
12   that that was your Taurus Judge?
13          A.   Yes.  That's when I learned that that
14   was -- right.  I went through -- I could see my
15   backpack had been ruffled through, but, I mean, in my
16   mind, I was thinking -- but I -- I never knew until I
17   went -- I went to retrieve that backpack.
18          Q.   And you realized that -- were you able
19   to then realize that was your gun?
20          A.   Then I realized that was mine, yes.
21          Q.   Was there anything else missing besides
22   the Taurus Judge and -- I think you said "High
23   Standard."  Did you mean Hi-Point?
24          A.   Hi-Point, yeah.  I wished it was a High
25   Standard.

1           Q.   Yeah.  Because you said that --

2           A.   Hi-Point, yes.

3           Q.   Being a gun owner, I'm like, High

4    Standards are pretty good.

5                So you thought a Hi-Point was missing.

6    Did you end up finding it?

7           A.   Yes, I did.  It had been moved, but it

8    was -- it was there.

9           Q.   How much of your shop had he rummaged

10   around in?

11          A.   Evidently -- and I'm guessing from the

12   time that I got there, whatnot -- he had been in

13   there approximately 50 minutes from the time I had --

14   because I had been hunting prior to that so I had a

15   couple of rifles that were in my truck and whatnot.

16               And he had some ammunition out.  He had

17   my rifles laying down in front of my truck, different

18   things he was getting ready to -- also, he had taken

19   my truck keys out of the ignition, and they were

20   laying also up there with all the other items.

21          Q.   Laying up where?

22          A.   In front of my pickup in my shop.  My

23   shop's 32 by 36, so there was room in front of the

24   shop, and he had all these -- some ammunition pulled

25   down and he had these firearms pulled down.

1         Q.    On the floor?

2         A.    On the floor they were laid out -- I

3    could see where he had -- he had went through from

4    one side of my shop clear around the wall and clear

5    back to the other wall looking through stuff.

6         Q.    And how do you know that?

7         A.    Because I could tell my drawers being

8    opened.  And we've tried to -- they tried to

9    fingerprint them at that time.  Things were not --

10   I'm fairly tidy, I guess I should say.

11        Q.    I'm only -- I'm smiling because I have

12   teenagers and I can go out in my shop and I can tell

13   if a teenager has been in there looking for

14   something.

15        A.    Correct.  Correct.  Yeah.  I mean --

16   yeah, there was -- I mean, there was stuff pulled

17   down, boxes moved.

18        Q.    Was there anything else laid out on the

19   ground that he was apparently in the mood to take

20   with him?

21        A.    I believe he had --

22        MS. PORTER:  I'm going to object -- excuse

23   me.  I'm going to object.  Assumes facts not in

24   evidence, calls for speculation.

25        Q.    (BY MR. ANGELL):  Let me rephrase that

1   question.

2                  Was there anything else on the ground in

3   front of your truck?

4         A.    A couple of firearms, there was quite a

5   bit of 9 mm and .45 ammunition there.

6         Q.    The keys to your truck?

7         A.    The keys to my truck were also there.

8   When I got into my truck, there also was -- and I --

9   there, also, I had had a -- oh, in 2004 they didn't

10  put ashtrays, but they had a little container that

11  you could flip your ashes in.  There was some money

12  in it.  It was open.  The money had been removed.

13        Q.    Any other money that was missing?

14        A.    No.  There's no other money that was

15  in -- I kept in the shop.

16        Q.    What year was your truck?

17        A.    It's a 2004.

18        Q.    Chevy truck?

19        A.    Yes.

20        Q.    You say you thought he had been in there

21  for 50 minutes.  Do you know how you were able to

22  determine that?

23        A.    We were able to determine from the time

24  that the camera was covered and from the time I went

25  to the shop.

```
 1              Q.   So it was covered, then, 50 minutes
 2    before you walked into the shop?
 3              A.   Yes.  Yes.
 4              Q.   And at that point you would have been
 5    in -- were you in your house?
 6              A.   Yes, I was in my home.
 7              Q.   And your wife was there with you?
 8              A.   My wife had went to the store, and she
 9    returned about -- I wrote down 3:50.
10              Q.   And where were your dogs at?
11              A.   The dogs were in the house with me.
12              Q.   So they must not have heard him?
13              A.   No.
14              Q.   Let me ask that better.  They didn't
15    sound off or --
16              A.   They didn't alert me to it, no.  I have
17    one -- the dog that was with me that is extremely
18    protective barks a lot at people and -- other people,
19    et cetera, yeah.
20              Q.   And he didn't alert you?
21              A.   She.  She --
22              Q.   She?
23              A.   Not that I -- you become lackadaisical
24    with these things as time goes on.  Just -- we live
25    in -- well, we lived in Pocatello, the old Pocatello.
```

1          Q.    I note one spot in the police report the

2    officer wrote down, "While at the PPD," which I think

3    he means Pocatello Police Department, "I was called

4    by Kirk Hendricks who said he believed a GLOCK

5    semi-auto .45 caliber Model 30 had been stolen."

6          A.    That's correct.

7          Q.    What was that?  Do you remember what

8    happened with that?

9          A.    Well, what happened with that is I went

10   through everything I own that night and I was unable

11   to find my -- that GLOCK at first, okay?  And I

12   thought possibly he had taken that out from my --

13   it's not a jockey box; it's a thing between the

14   seats, which also was opened.  And then with further

15   investigation -- I kind of jumped the gun on that,

16   and with further investigation, I found it.

17         Q.    So it was not taken?

18         A.    Correct.

19         Q.    Do you need to take a break?  Are you

20   okay?

21         MR. ANGELL:  Let's take five minutes off the

22   record.

23               (A recess was taken from 9:49 a.m. to

24   9:55 a.m.)

25               (Exhibit 3 marked.)

1          MR. ANGELL:  So we did mark Mr. Hendrick's

2     notes as Exhibit 3, and they will be attached to his

3     transcript.

4          MS. PORTER:  Amber, have you had a chance to

5     e-mail that to me?

6               (A brief pause was taken to e-mail

7     Exhibit 3 to Ms. Porter.)

8          Q.   (BY MR. ANGELL):  Mr. Hendricks, I

9     wanted to ask you:  You mentioned you had grandkids

10    over in the yard, kiddie -- kind of across the

11    street?

12         A.   Yes, that's correct.

13         Q.   And so that's your son's children?

14         A.   My -- well, one of them is my son's

15    child; the other two child (sic) are I guess his

16    nieces and nephews.  They're fatherless.

17              So I -- actually only one is physically

18    my grandchild.  The other two aren't but are.

19         Q.   And what are their names?

20         A.   Well, one of them -- my grandson's name

21    is Hudson.

22         Q.   And how old is Hudson?

23         A.   Hudson is currently nine years old.

24         Q.   So he would have been seven?

25         A.   Seven.  Georgia is in first grade now,

1    so that's six -- six years old, and then we call him

2    Little Richard, because grandpa is Richard.  So

3    Little Richard, he's in I want to say seventh or

4    eighth grade now, so...

5            Q.    So they were over at Richard Hernandez's

6    house?

7            A.    Correct.

8            Q.    And is that where they live?

9            A.    No, they do not.  The two older

10   children, yes, do.  The grandson, Hudson, does not

11   live there.

12           Q.    Anyway, they were out you say playing in

13   the backyard that day?

14           A.    Previously.  Previously, earlier.

15           Q.    Okay.

16           A.    This little girl probably goes around

17   that house 200 times an hour, so...

18           Q.    A lot of energy?

19           A.    A lot of energy.

20           Q.    Do they ever come over to your house?

21           A.    Yes, they do.

22           Q.    Would it be uncommon for them to kind of

23   come across the street and knock on the door and want

24   to come in?

25           A.    Yes.  I'm not saying that they haven't,

1    but they don't do it very often.

2            Q.    Not too often?

3            A.    No, sir.

4            Q.    Okay.  Did you ever see Mr. Sheeler

5    again in person after this confrontation that -- in

6    your shop?

7            A.    The next time I seen Mr. Sheeler was

8    when I went to his hearing.  And when I realized who

9    it was, I literally had to move and -- fortunately,

10   the gal in there had an emotional dog which she

11   brought.  I was able to get my composure back a

12   little bit.  I still fear with -- fear that man.  I

13   still fear him.

14           Q.    When you saw him again in court even?

15           A.    Well, he was -- he was sitting ahead of

16   me, and when I realized who it was, it was just

17   horrifying to me that -- that -- that just -- that we

18   just let him run free.

19           MR. ANGELL:  Well, thank you, Mr. Hendricks.

20   I think that that's all I had to ask you, so I -- I

21   know that Counsel will have some questions for you.

22           THE WITNESS:  Okay.

23           MS. PORTER:  Thank you.  I do have a few.

24                      EXAMINATION

25   BY MS. PORTER:

1          Q.    I want to talk about your conversations

2    with law enforcement on the day of this event, okay?

3    You've been pretty good at giving us specific times.

4    Can you tell us approximately when was the first time

5    you spoke with a police officer on September 25th?

6          A.    I'm going to say the -- I spoke with the

7    police officer that was driving up the street after

8    Mr. Sheeler had escaped, so -- you know, I can't

9    really give you a time.  I don't know what time out

10   of the garage it was or whatnot, but from the time

11   that he'd left, I'm going to say the officer probably

12   arrived within five minutes.

13         Q.    Okay.  Do you know who that officer was?

14         A.    No, I do not.

15         Q.    Okay.  And what did you tell that

16   officer?

17         A.    I told him I had been robbed and -- by

18   the individual and he was armed.

19         Q.    Is that all?

20         A.    You know, I don't remember exactly what

21   I said to the officer other than -- you know, we had

22   a convers- -- a little bit of a conversation.  We

23   were trying to figure out where the individual had

24   went.  They already had a description of him.  They

25   already knew who he was.

1          Q.    So have you told us everything you can

2    remember telling the officer?

3          A.    That police officer, yes, that's

4    everything I can remember.  I just -- normal

5    conversation.

6          Q.    Okay.  You told the officer you had been

7    robbed.  So did you tell him what had been robbed?

8          A.    I explained to him that the individual

9    had a Taurus Judge with him.

10         Q.    And so did you tell the officer you

11   believed he had robbed you of your Taurus Judge?

12         A.    I believe I -- I'm not saying "my Taurus

13   Judge."  I'm saying he had a Taurus Judge and he had

14   threatened me with my life.

15         Q.    Did you tell that officer that it was

16   your Taurus Judge that the individual appeared to

17   have with him?

18         A.    I don't remember.

19         Q.    Did you tell that officer that -- hang

20   on one sec.

21         A.    We kind of need to get a little

22   clarification here.  Which officer are we talking

23   about?  I -- I had spoke to -- there's been numerous

24   people involved.

25         Q.    The first one.  We're still on the first

1    one that I asked you about, and -- we're going to go

2    through each of your conversations with law

3    enforcement and I'm still on the first one that you

4    spoke with.

5              You told the first one that you had been

6    robbed.  "Robbed" usually means that something was

7    taken from you, so I was trying to figure out what

8    you were telling him had been taken from you.

9              Do you -- can you elaborate on that at

10   all?

11        A.   No, I didn't write down what I told that

12   police officer, so -- I know that I had been robbed

13   with a Taurus .410 -- excuse me.  Excuse me -- my

14   life threatened with a Taurus .410.

15        Q.   Did you tell that first officer that you

16   recognized the Taurus Judge as one you had in your

17   collection?

18        A.   I -- I could have, but I don't exactly

19   remember what I said at that time.

20        Q.   Okay.  Did you tell the first officer

21   that you had had the Taurus Judge in a backpack

22   inside your shop?

23        A.   Well, if that's what the police officer

24   said, I must have told him that, then, because it was

25   in a backpack.  How else would he know that

1    information?

2          Q.    Well, I just want your memory.  If you

3    don't remember, just tell me you don't remember.

4          A.    Okay.  I already stated I don't really

5    remember a lot of my conversation with that officer.

6    My emotions were running very high.

7          Q.    Did you tell that first officer that the

8    Taurus Judge was currently loaded with .410 bird

9    shot?

10         A.    I probably did.

11         Q.    Okay.  Do you remember anything else you

12    told the first officer that you spoke to that you

13    haven't already told us about?

14         A.    I do not remember a lot of my

15    conversation with that first officer.  I'm still

16    reeling in from having my life threatened.

17         Q.    Okay.  Let's talk about the second

18    officer.  When -- when -- and I'm going to assume you

19    didn't write the time down on this either.

20                When was the next time that you spoke

21    with a police officer?

22         A.    There were so many police officers

23    there, I -- I could have spoke to several of them.  I

24    don't know.

25         Q.    All right.  Let's just go with whoever

1    you remember next having spoken with, and I'm

2    referring to law enforcement.

3         A.    Well, I remember standing down there,

4    approximately a couple of blocks down, talking to

5    several law enforcement, but I don't really remember

6    our conversations in regards exactly.

7         Q.    Well, I'll take what you do remember.

8    It doesn't have to be exact.

9         A.    Well, I don't remember a lot other than

10   I remember we were looking for -- trying to figure

11   out where Mr. Sheeler was running around the

12   neighborhood armed.  I remember my dog was with me.

13   I -- I remember Ms. Rufi mysteriously driving back

14   and telling my wife thanks for the tomatoes she gave

15   her.  I remember -- I don't know.  That's about --

16   I'm going to say, as far as we -- they were trying to

17   locate Mr. Sheeler and they asked me to stand there

18   and -- until we were done.

19        Q.    Okay.  Have you told us everything you

20   can remember about the next I guess I -- we could

21   call it the second, or at least the next conversation

22   with law enforcement that you remember?

23        A.    The -- probably the next conversation

24   when I got my composure back, I'm going to say

25   probably was with Officer Olsen when we returned to

1    my home.

2         Q.   Okay.  And tell us what you can remember

3    telling Officer Olsen.

4         A.   I can remember telling Officer Olsen

5    that I had an individual threatening me with a

6    life -- my life and holding a firearm on me.

7         Q.   Anything else you remember telling

8    Officer Olsen?

9         A.   Well, I pretty much gave Officer Olsen

10   the -- somewhat of the statement in regards to how

11   Sheeler had -- I had walked into my garage -- pretty

12   much what I stated earlier -- walked into my garage

13   and seen a smiling face on the other side which I

14   thought was Necus, and then he come around to the

15   rear -- or, my dog went off on him, which I got the

16   dog back and --

17        Q.   Wait.  Are you saying that you told all

18   of this to Officer Olsen?

19        A.   I -- I believe I did.  I'm not --

20        Q.   Okay.

21        A.   I'm not exactly sure.  I -- I didn't

22   write down what I told Officer Olsen, but I do know

23   that I told him I had been threatened with a handgun

24   and my life had been threatened.

25        Q.   Okay.  Go ahead and tell us to the best

```
 1   of your recollection -- I -- I won't interrupt you.
 2   Tell us to the best of your recollection what you
 3   told Officer Olsen.
 4          A.    The best of my recollection is I told
 5   Officer Olsen, as I had stated earlier, in regards to
 6   Mr. Sheeler smiling at me on the other side of my
 7   vehicle, coming around pointing a firearm in my
 8   stomach, threatening to shoot me, that it had went
 9   on.  I believe I told -- I told Officer Olsen that I
10   was armed, that I had -- trying to get this in
11   sequence here -- that I had -- the garage had been
12   locked or whatever, and then I returned back, but --
13   pretty much relayed the incident of Mr. Sheeler
14   continually threatening to shoot me in my shop and
15   that I did pull my sidearm out, but I do not remember
16   pointing it at Mr. Sheeler, which I did not, and then
17   him escaping and threatening my wife on his way out,
18   chasing him up the street.
19          Q.    You mentioned earlier that Mr. Sheeler
20   had been looking at the door -- or, looking toward
21   the door, words to that effect.  Was he doing that
22   throughout the encounter between you and him?
23          A.    He -- my wife was standing out there,
24   so -- you know, I know that he had done it a time or
25   two.  He wasn't taking his eyes off me very much.
```

1          Q.   Is it fair to say that you understood
2    that he was wanting to leave?
3          MR. ANGELL:  I'll just object to the form.
4    It calls for speculation.
5               But you can answer that, if you can.
6          THE WITNESS:  No.  I -- I don't -- I don't --
7    I -- I couldn't see any reaction with his stoic death
8    look that he was staring that he was really concerned
9    about much.
10         Q.   (BY MS. PORTER):  You said he was
11   sidestepping.  Was he sidestepping toward the place
12   where he could leave or away from the place where he
13   could leave?
14         A.   No.  He -- he would sidestep towards the
15   door, yes.
16         Q.   Okay.  And he was looking toward the
17   door periodically, correct?
18         A.   He would glance out to look at my wife,
19   yes.
20         Q.   Well, you don't know what he was looking
21   at, right?
22         A.   And I don't know whether he was trying
23   to escape.
24         Q.   Right.  But I'm just saying -- my
25   question is:  He was looking toward the door

1    periodically, correct?
2           A.    He had a few glances towards the door,
3    yes.
4           Q.    Okay.  And he said he didn't want to
5    shoot you, correct?
6           A.    He said he don't want to but he sure
7    will.
8           Q.    And you understood that when he said "I
9    will shoot you," that he meant if you tried to
10   interfere with him leaving?  Is that a fair
11   statement?
12          A.    No.  No.
13          Q.    Okay.  Now, at some point you reported
14   to the police that you believed Mr. Sheeler had taken
15   how many guns?
16          A.    I thought he had possibly taken two to
17   three guns.
18          Q.    Okay.  And how carefully did you look
19   for those guns before you told the police that you
20   thought Sheeler had taken them?
21          A.    I was surveying what I had.  I -- I -- I
22   don't like that question.  How carefully?
23          Q.    Yeah.
24          A.    That's kind of an open statement.
25          Q.    Yeah.  Okay.  I'll ask it this way.

1          A.    Let me put it to you this way:  I looked

2    carefully enough to find out that he had not taken

3    them.

4          Q.    Okay.  You notified the police that you

5    believed Mr. Sheeler had taken up to three guns of

6    yours, correct?

7          A.    I originally notified the police that I

8    was missing the Hi-Point, which had been moved, and

9    then as I had went through searching later, was

10   surveying the -- my firearms and I could not find a

11   GLOCK, and -- at that time I was in fear that he also

12   had a GLOCK and that the police officers ought to

13   know that for their safety.  And at that time I --

14   then I searched further and found the GLOCK.

15         Q.    Okay.  So you knew it was important to

16   accurately provide information to law enforcement

17   about whether Jake had a GLOCK; is that true?

18         A.    I'm not answering that.

19         Q.    Yeah, I think you are.  You have to.

20         A.    Okay.  I want that question again,

21   please.

22         Q.    Yeah.  She --

23         MS. PORTER:  Go ahead, Court Reporter.

24              (The record was read.)

25         THE WITNESS:  Yes.  I guess -- yeah, for

1  their protection, certainly.

2          Q.   (BY MR. ANGELL):  Okay.  And also to

3  make sure that they didn't think he had more weapons

4  than he did.  Did that occur to you?

5          A.   I -- I don't know what my feelings were

6  at that time.

7          Q.   Okay.  All right.  Knowing that it was

8  important to give accurate information to law

9  enforcement about the GLOCK, please describe for me

10 the search you had made for the GLOCK at the time you

11 had reported it missing?

12         A.   I was going through my personal

13 belongings checking my firearms.

14         Q.   Can you be more specific, please?  What

15 did you do to look for the GLOCK before you reported

16 that Jake Sheeler might have stolen it?

17         A.   I had went through my belongings in the

18 shop.  I also returned into my home and checked a

19 couple of spots, and then when I went out to the

20 truck, the thing was open and I felt at that time

21 that that gun was missing, and then I proceeded to

22 look more, upon which I found the GLOCK and

23 immediately called the police.

24         Q.   Okay.  At what point during the search

25 did you call the police and report that Jake Sheeler

1    has taken your GLOCK?

2          A.   I'm going to say it was several hours

3    later.  I don't really remember exactly.

4          Q.   Okay.  How much time passed between when

5    you reported the GLOCK missing and when you reported

6    the GLOCK found?

7          A.   The best I'm going to -- now I'm just --

8    the best I can say is probably 45 minutes to an hour.

9          Q.   Where did you find the GLOCK?

10         A.   I found it in my home.

11         Q.   Where in your home?

12         A.   Don't really remember.

13         Q.   So you are a person who has children in

14   your home, et cetera.  Do you keep your guns in a

15   particular secured location?

16         MR. ANGELL:  Hang on.  Just object to the

17   form.

18         Q.   (BY MS. PORTER):  Or did you at the

19   time?  I don't care currently.

20         MR. ANGELL:  Object to the form.

21              Go ahead and answer, if you can.

22         THE WITNESS:  My firearms are not available

23   to the children.

24         Q.   (BY MS. PORTER):  Okay.  Did you have a

25   regular location --

1          A.    Yes.  I -- I --

2          Q.    -- that the guns would be expected to be

3     found in?

4          A.    I have a gun safe, yes, ma'am.

5          Q.    Did you find the GLOCK in your gun safe?

6          A.    No, I did not.

7          Q.    Okay.  So it wasn't in your gun safe.

8     Where was it?

9          A.    I believe it was along in my --

10    alongside my bed stand.

11         Q.    Okay.  And you hadn't looked there

12    earlier?

13         A.    I don't remember.

14         Q.    Okay.

15         A.    I'm pretty shook up -- I'm pretty shook

16    up at that -- this point, you know?  Pretty shook up.

17         Q.    I'm sorry?

18         A.    I said I'm extremely shook up.  I'm not

19    a thought -- a thinking man after having my life

20    threatened.

21         Q.    Now, you also reported a Hi-Point

22    missing; is that correct?

23         A.    That is correct.

24         Q.    Okay.  Please describe what search you

25    had done for the Hi-Point before reporting that Jake

1    Sheeler had taken it?

2            A.    What I did is I opened up the toolbox,

3    bottom of the toolbox, and went back in there and

4    noticed that it had been removed from where it was,

5    and then I found it later underneath the toolbox.

6            Q.    So when you looked in the toolbox and

7    didn't see it, you did not pick up the toolbox to see

8    if it was in the vicinity?

9            A.    I wished I was that strong.

10           Q.    Okay.  So how did you move the toolbox

11   later?

12           A.    I looked underneath the toolbox later

13   with a flashlight.

14           Q.    Okay.  How -- but you said you wished

15   you were strong enough earlier.  How were you strong

16   enough later to do that?

17           A.    It's a toolbox on wheels.

18           Q.    Yeah, I -- I'm -- I'm familiar with

19   those.  So did you get somebody to help you when you

20   looked later or did you somehow gain the strength?

21           A.    The toolbox was on wheels.  I pulled the

22   bottom drawer out where it has always been stored.

23   It was not in there.  It had been moved.  Upon --

24   later I looked underneath the toolbox.  I did not

25   have to lift the toolbox.  It had wheels.  I looked

1   underneath the toolbox with a flashlight.  Upon that

2   point, I seen the GLOCK -- or, the Hi-Power -- or,

3   the -- yeah.

4          MR. ANGELL:  Hi-Point?

5          THE WITNESS:  Hi-Point.

6          Q.   (BY MS. PORTER):  Hi-Point.  Okay.

7               And so when you saw that it was not in

8   the drawer where you expected it, you did not look

9   under the toolbox at that time?  Is that what you're

10  telling me?

11         A.   That is correct.

12         Q.   Okay.  How much time passed between when

13  you told the police that Sheeler had taken your

14  Hi-Point and when you told the police he had not

15  taken your Hi-Point?

16         A.   I don't remember.

17         Q.   Did you believe it was important to

18  notify the police as soon as you realized you were

19  wrong about the Hi-Point?

20         A.   Absolutely.

21         Q.   Okay.  Same question with the GLOCK.

22         A.   Absolutely.

23         Q.   You mentioned something earlier that he

24  I think you said picked on a cripple.

25         A.   Yeah, I'm a crippled.

1          Q.    Visibly -- what is your visible

2    disability?

3          A.    I have a leg that has been -- is shorter

4    than my other leg, with a drop ankle.  I walk with a

5    noticeable limp and have since I was in about seventh

6    grade.

7          Q.    So you consider yourself a cripple?

8          A.    Well, I'm on crutches now.  I certainly

9    do.

10         Q.    Have you -- how long have you been on --

11   were you on crutches on September 25th?

12         A.    No, I was not.

13         Q.    Okay.  So you had this drop ankle, et

14   cetera, your whole life, and -- so I'm asking you,

15   though:  You've been able to work on railroads or --

16   have you been on disability your whole life?

17         A.    No.  I was -- I was able to work at the

18   railroad and -- and I was able to cle- -- work as a

19   janitor.  I was unable to work as a switchman or an

20   engineer.  I was denied the position.  I was unable

21   to work as a carman.  I was denied that position also

22   as being a crippled.

23         Q.    Okay.  And so you believe that

24   Mr. Sheeler could see that you had a drop ankle and

25   one leg shorter than the other?

1          A.   I don't -- I can see -- he could see I
2    walked with a limp.
3          Q.   Okay.  A lot of people walk with a limp
4    who aren't crippled.  Would you agree with that?
5          A.   I don't know.
6          Q.   Okay.  Did you believe -- you said he
7    picked on a cripple.  Did you believe that
8    Mr. Sheeler knew that you were, quote, a cripple and
9    somehow deliberately picked on you because of it?
10         A.   I don't know what Mr. Sheeler felt.
11         Q.   Well, you said -- you're the one who
12   testified that -- you said he picked on a cripple.
13   I'm trying to figure out what you meant when you said
14   that Mr. Sheeler picked on a cripple.
15         A.   Mr. Sheeler knew I had a limp.  That's a
16   cripple.
17         Q.   I'm limping right now.  I limp every
18   day.  I'm not crippled.  Like, is it just -- do you
19   just view yourself as crippled?  Is that what you're
20   telling me?
21         MR. ANGELL:  I'm just going to object that
22   it's argumentative.
23              But go ahead and answer, if you can.
24         THE WITNESS:  Yes.  I view myself as a
25   cripple, yes.  I've...

1          Q.   (BY MS. PORTER):  Oh, that's too bad.
2     That would be hard to go through life thinking that
3     if you got a limp.
4          MR. ANGELL:  I'll just object, again, to
5     Counsel's commentary as being inappropriate and
6     somewhat condescending.
7          THE WITNESS:  I -- I take offense to it.
8          MS. PORTER:  I'll withdraw it.  I --
9          THE WITNESS:  I take offense to it.
10          MS. PORTER:  -- will withdraw that.
11          THE WITNESS:  I take offense to it.
12          Q.   (BY MS. PORTER):  Pardon?
13          A.   I -- I -- I think it's offensive.
14          Q.   Well, I withdrew it, but you're the
15     person who's saying that, if you have a limp, you
16     should assume- -- people should assume you're a
17     cripple, and I guess I just -- I -- I personally have
18     a problem with that.  But I withdrew it because I
19     don't want to make a personal thing.  I just know
20     plenty of people who have limps that I don't consider
21     to be cripples.  That's all.  I -- I withdrew it,
22     though.
23               Okay.  All right.  Now, you mentioned
24     that there was a bag on the camera.  But you could
25     tell when the bag went onto the camera?

1              A.    I was able to go back into the footage
2    on the camera and figure out the time that the bag
3    went on the camera.  You can see from the footage at
4    that time of when it went on the camera.
5              Q.    Right.  And you gave that footage to the
6    police?
7              A.    I believe so, yes, the best that we
8    could.  They were -- yes.
9              Q.    Okay.  Now, there was a document that
10   was marked as an exhibit that, frankly, I have not
11   received from Amber, but that's okay.
12             MS. PORTER:  What document number is that,
13   Amber?
14             THE COURT REPORTER:  3.
15             Q.    (BY MS. PORTER):  Can you identify for
16   us what Exhibit 3 is?
17             A.    Exhibit 3 is something that I personally
18   wrote -- and I'm not exactly sure of the date or what
19   after the incident -- so that I would be able to
20   remember, more to refresh my mind in regards to this
21   terrifying incident.
22             Q.    Okay.  So in other words, Exhibit 3 are
23   notes that you personally wrote within a relatively
24   short time of the events.
25                   Is that -- is that a fair statement?

1          A.    A fair statement is within a week, yes.

2          Q.    Okay.  That's -- that's helpful.  And

3     you mentioned that Mr. Sheeler came within you

4     estimated about 3 feet of your wife.  Was he walking

5     at that point or running?

6          A.    He was -- he was -- he was walking and

7     then he took off running.

8          Q.    Okay.  Did he -- he was walking when he

9     exited and then took off running when he had cleared

10    the doorway.  Is that what you mean?

11         A.    The best that I remember is he walked

12    out the door, threatened my wife, and then took off

13    running.

14         Q.    Okay.  Now, you mentioned something

15    about him saying, "Don't follow me.  I'll shoot."

16              Is that the threat you're talking about?

17         A.    That is the threat I'm talking about, I

18    believe, yes, to my wife, yes.

19         Q.    So --

20         A.    Yes.

21         Q.    But it -- but you went ahead and

22    followed him, right?

23         A.    Yes.

24         Q.    Okay.  So you weren't really scared for

25    your life, were you?  Because he had told you that,

1    if you followed, he would shoot you?

2           MR. ANGELL:  Hang on.  I just need to object

3    to the form for a number of reasons.

4              But go ahead and answer that, if you

5    can.

6           THE WITNESS:  I know the capability of

7    a .410, of what is a safe distance to be from.

8           Q.  (BY MS. PORTER):  So you knew you were

9    far enough away from him that, even if he tried to

10   shoot you, it wouldn't -- it probably wouldn't

11   happen?

12          A.   Wouldn't kill me.

13          Q.   Okay.  So he said, "Don't follow me.

14   I'll shoot," and you followed him.  Did your wife

15   follow him?

16          A.   Absolutely not.

17          Q.   Okay.

18          A.   And -- and I didn't -- when we talk

19   "following him," there was a large distance between

20   us.

21          Q.   Did he turn around to look and see if

22   you were following him, as far as you could tell?

23          A.   I don't remember.  I'm going to say no.

24          Q.   Okay.  What is the address of the house

25   where the grandchildren had previously been outside?

1           A.   I got to get my phone out.  It's on

2    Maple Street.  I'd have to Google it.  It's like

3    1347 Maple.  I couldn't tell you exactly the address.

4    I could sure get -- sure could look it up for you if

5    you would like.

6           Q.   Well, let me think.  Is it -- I mean,

7    who's -- who would be the registered homeowner, if

8    you know?

9           A.   The registered homeowner would be

10   Richard Hernandez.

11          Q.   Okay.  All right.  That's helpful.

12               Okay.  Do you happen to remember

13   speaking with any other police officers on

14   September 25th that you haven't already described to

15   us?

16          A.   There was an attending officer also with

17   Mr. Olsen.

18          Q.   Okay.  Did you say anything different to

19   that attending officer than you did to Officer Olsen?

20   In other words, was there a period of time when Olsen

21   wasn't there and you were still talking to the other

22   officer?

23          A.   Not that I remember.

24          Q.   Okay.  Any other discussions that you

25   had with law enforcement on September 25th that you

1   haven't described already?

2            A.    There were -- there was several

3   back-and-forth discussions with him in regards -- I

4   mean, we talked about going through the shop together

5   and seeing the stuff that had been moved and whatnot.

6            Q.    Earlier you said something about you had

7   read some things that you felt there were some

8   disparities between what you thought happened and

9   what they thought happened, or words to that effect.

10           Do you remember mentioning something to

11  that effect earlier in your deposition?

12           A.    What disparities are you talking about?

13           Q.    Well, that's my question to you.  You

14  were the one that mentioned it.

15           A.    I know that I -- to my best

16  recollection, I never pointed a gun at Jake Sheeler.

17  That's the only disparity I believe.  And I don't

18  know if he said "pointed" or not, so -- that's the

19  only disparity that I'm aware of.

20           Q.    Okay.  What did you do to prepare for

21  today's deposition?

22           A.    Okay.  Well, I'm going to get right

23  graphic with you.  I felt very nauseous.  I went to

24  the bathroom about eight times.  Tried to get some

25  sleep last night.  Did not get sleep.  So I'm going

1  to say my preparation probably was not as good as I

2  wished it would have been.

3          Q.   Did you review any documents in

4  anticipation of this deposition?

5          A.   I read my notes two days ago, and I

6  can't honestly say the -- I have had a blur this

7  morning.  I don't know if I reread them or not today.

8          Q.   Okay.  Did you read any other documents

9  in preparation for this deposition?

10         A.   No.

11         Q.   Did you review any depositions?

12         A.   I reviewed the deposition to make sure I

13  was in the right building.

14         Q.   You mean the -- did you review like a

15  notice that told you where to come?  I can't -- what

16  does it say?

17         A.   Well, what it is is this is my subpoena

18  that explained where I needed to go.

19         Q.   Okay.  And did you -- when you received

20  that subpoena, did you understand who it was that was

21  requiring you to come to this deposition?

22         A.   Oh, yeah.  I've never forgot this

23  individual.

24         Q.   Okay.  Well, you understand that we did

25  not notice that up, but it's the City of Pocatello

1   that subpoenaed you and required you to come to this

2   deposition.  You do understand that, don't you?

3         A.   I -- all I know is it said -- I was

4   subpoenaed, and it said "Jake Sheeler."

5         Q.   So did you blame Jake Sheeler for

6   scheduling this deposition?

7         A.   Blame?  I believe he caused this.

8         Q.   Okay.  But earlier you said you had had

9   a sleepless night, and I -- I may have misunderstood.

10  I thought you said you were blaming Jake Sheeler for

11  the sleepless night.

12        A.   Yes.  I -- Jake Sheeler has traumatized

13  me.  I don't sleep nights anymore thanks to this

14  individual.  I have a lot of issues thanks to this

15  individual.

16        Q.   Okay.  What kind of therapy have you

17  undergone in -- that you attribute to the incident

18  with Jake Sheeler?

19        A.   I haven't went to any therapy.  I don't

20  believe in therapists.

21        Q.   Okay.  All right.  Did you -- have you

22  ever spoken with Pocatello's lawyer -- or, lawyers

23  about this incident?

24        A.   I received a phone call in the past in

25  regards to this incident and we visited about it.

1        Q.    Do you know who was on the other end of

2   that call?

3        A.    I don't remember exactly who it was.  He

4   identified himself, explained the law firm, which

5   come up on my phone also, and he explained who he

6   was, et cetera.

7        Q.    Do you believe that it was Mr. Angell

8   sitting next to you?

9        A.    As I said, I don't remember the

10  individual's name.

11       Q.    Okay.  Okay.  Tell me what the lawyer

12  said to you during that conversation.

13       A.    He basically asked if I would be willing

14  to testify in regards to this horrific incident, and

15  I at that time said yes, I would.  I'm here now.  We

16  talked a little bit about what had went on.  I don't

17  remember exactly what we talked about, but it was in

18  regards to the incident.

19       Q.    Okay.  Did the lawyer tell you anything

20  that was in the police report that is inconsistent

21  with your statement?

22       A.    No, not that I remember.

23       Q.    Did the lawyer tell you anything that

24  was in the police reports?

25       A.    No, not that I remember.

1              Q.   Did the lawyer ask you if you had

2   pointed your gun?

3              A.   No.

4              Q.   Okay.  How long did this conversation

5   last?

6              A.   I don't know that.  I don't know.  It

7   was probably five minutes as a guess.  It was not a

8   very long conversation that I remember.

9              Q.   And then you testified -- well, have you

10  given any testimony relating to this incident?

11             A.   Yes, I gave testimony in

12  Mr. Sheeler's -- I can't think of the word.

13             Q.   Sentencing?

14             A.   Sentencing.  There we go.  Thank you.

15  Yeah, sentencing -- in his sentencing, yes.  I did

16  the best I could before I broke down, yes.

17             Q.   And did you have any conversations with

18  any attorneys or anyone working for attorneys about

19  that testimony?  And I mean before you testified.

20             A.   The only conversations I had was with

21  the -- I can't remember his name that sends out the

22  papers, and she had the support dog for me.  I

23  believe that's all I visited with.

24             Q.   So I take it you never had anybody

25  threaten you while you were a private investigator;

1    is that right?

2            A.    Now, repeat that question.

3            Q.    Okay.  Let me rephrase it.  You said you

4    were a private investigator at one point.

5            A.    Yes.  I was for about -- for probably

6    six to nine months, yes, ma'am.

7            Q.    Okay.  Did you ever have any

8    confrontations with anyone while you were a private

9    investigator?

10           A.    Absolutely not.

11           Q.    Okay.  Let's see.  You said you did not

12   point a gun at Mr. Sheeler, so -- hang on.  Let me

13   rephrase this question.

14                 Have you ever pointed a gun at a human?

15           A.    No, not that I remember.

16           MS. PORTER:  I don't think I have anything

17   further.  I didn't receive the Exhibit 3, but I'll

18   just wait until I see it with the deposition

19   transcript.

20           MR. ANGELL:  All right.  Thank you,

21   Mr. Hendricks.  I don't have anything else.  I

22   appreciate you coming in and giving your testimony

23   today.

24                 (Deposition concluded at 10:41 a.m.)

25                     (Signature waived.)

1                    REPORTER'S CERTIFICATE

2              I, Amber S. Williams, CSR NO. 1080,

3    Certified Shorthand Reporter, certify:

4              That the foregoing proceedings were taken

5    before me at the time and place therein set forth, at

6    which time the witness was put under oath by me.

7              That the testimony and all objections made

8    were recorded stenographically by me and transcribed

9    by me or under my direction.

10             That the foregoing is a true and correct

11   record of all testimony given, to the best of my

12   ability.

13             I further certify that I am not a relative

14   or employee of any attorney or party, nor am I

15   financially interested in the action.

16             IN WITNESS WHEREOF, I set my hand and seal

17   this 31st day of March, 2023.

18

19

20   _____

21             AMBER S. WILLIAMS, CSR NO. 1080

22             Notary Public

23             Post Office Box 2636

24             Boise, Idaho  83701-2636

25   My commission expires June 1, 2027

# Exhibit 9

Exh. No. 3
Date 3.30.23
Name
Hendricks, K
M & M Court Reporting

9/25/2020   16:16

I Returned From CAL Ranch at 1\4,43 PM Parking In Shop
Wife Returned from Store Approx 15,50

Decided To Go for a Walk with my Wife + Dogs
Went to the Shop at 16:16 AND the Door WAS Locked
Returned to the House At to Get the Keys,
Unlocked the Shop At 16:17 Proceeded Into the
Shop the Dogs Started Barking JAKE WAS Walk'n towards
My 2004 Chevy P4u to Get my EXTRA House Keys
Opened the Passenger Door, Looked thru the Truck
To Backseat Window And See A FACE Looking At
Me Smiling, The Dog WENT CRAZY AND I Called Them
off Account thought The person WAS the Nieghbor
Boy, Yelled Get the fuck out of GARAGE (Shop) Now
The Suspect Walked behind the My TRUCK, CAME
Around the Side (I WAS Expecting The Nieghbor)
He Pulled A TAURUS Judge At Me Pointing It At
My Stomach And Said Politely Sir I'll Shoot U,
I put my Hand In My Pocket And Susp Jake (suspect,
with Glasses And a Hood ON (Greyish Green)
He Immediately Said Agin Sir I'll Shoot You
The Suspect WAS Walking Sideways Slowly To Wards
The Door, Saying Several Time Repeating Sir I'll
Shoot, Slowly Side Stepping To the Door Holding
The Gun on Me, He Proceded to the ENTRANCE
Door. Approximitely 5Ft From The Door He Again
Said Sir I'll Shoot. AGAIN FEARed for My Life,

*Fearing for My Life*

*Again Fearing For Life Pointing the Gun At Me*



After He threatened to Shoot Me, He Looked out the Garage at My Wife AND at that Time I drew my Firearm, When he Seen It he told Me I Shoot in Sir Pointed The Gun at Me AND the He Stacted To flee, I returned the Gun, As he leaving he Kept Saying Don't Follow Me I Shoot, He took off Running North across Maple Street Toward Hinde St. I Started Chasing Him Screaming Thief Thief, Call 911 He Has Gun He Has A Gun Continued Yelling Until he Left my Site going thru Barrus Yard on Hyde with Richard Hernadez in Persuit ahead of me, I RAN up 3 or 4 house AND Due Due to My Age WAS Out of Breath and Returned back to Hyde AND Maple AND the Proceded toward Franklin AND then Called 911 WAS Giving my Name Etc AND Noticed Police, Informed Operator Then Flagged officer Down.

# Exhibit 10

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

JAKE L. SHEELER, an individual,          )

                Plaintiff,          ) Case No.

vs.                                       ) 4:22-cv-00313-

BRIDGET MCARTHUR, an individual;          ) DCN

JEFFREY E. ELDRIDGE, an individual;       )

MARISA A. SALDANA, an individual;         )

ROGER SCHEI, an individual; and           )

CITY OF POCATELLO, a municipal            )

Corporation;                              )

             Defendants.          )

DEPOSITION OF MARY HENDRICKS

March 20, 2023

REPORTED BY:

AMBER S. WILLIAMS, C.S.R. No. 1080

Notary public

1              THE DEPOSITION OF MARY HENDRICKS was taken

2    on behalf of the defendants at Pocatello City Hall,

3    911 North Seventh Avenue, Pocatello, Idaho,

4    commencing at 10:48 a.m. on March 20, 2023, before

5    Amber S. Williams, Certified Shorthand Reporter and

6    Notary Public within and for the State of Idaho, in

7    the above-entitled matter.

8

9                        APPEARANCES:

10   For Plaintiff via videoconference:

11        CHRISTENSEN & JENSEN, PC

12        BY:  KARRA J. PORTER

13        257 East 200 South, Suite 1100

14        Salt Lake City, Utah  84111

15        karra.porter@chrisjen.com

16   For Defendants:

17        HALL ANGELL & ASSOCIATES, LLP

18        BY:  SAM L. ANGELL

19        1075 South Utah Avenue, Suite 150

20        Idaho Falls, Idaho  83402

21        sla@hasattorneys.com

22

23

24

25

1                          I N D E X

2

3    TESTIMONY OF MARY HENDRICKS                    Page

4        Examination by Mr. Angell....................   6

5        Examination by Ms. Porter...................  36

6        Examination by Mr. Angell...................  38

7

8

9

10

11                        NO EXHIBITS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      MARY HENDRICKS,

2    first duly sworn to tell the truth relating to said

3    cause, testified as follows:

4           MS. PORTER:  And can I confirm Mr. Hendricks

5    is not in the room?

6           MR. ANGELL:  He is in the room right now.

7           MS. PORTER:  Well, he's -- until -- until the

8    trial testimony, I'm going to invoke the exclusionary

9    rule.

10           MR. ANGELL:  I'm not the Judge.  I'm going to

11    let Mr. Hendricks decide that.

12           THE WITNESS:  He's just sitting there.

13           KIRK HENDRICKS:  If I've testified, you've

14    got my test- --

15           MS. PORTER:  But you haven't testified at

16    trial, sir, and under the exclusionary rule -- once

17    you've testified at trial, you can sit in any time

18    you want anywhere, but before then, you -- you should

19    not be sitting in when another witness is testifying.

20           THE WITNESS:  He's not saying anything to me.

21    I'd rather have him here for moral support.  You're

22    making me very nervous.

23           MS. PORTER:  Okay.  Well, I'll say this,

24    then:  I'm going to take the position, Sam, that this

25    deposition may be inadmissible for Pocatello to use

```
 1   due to the refusal of the witness to leave the room.
 2   But having said that...
 3            THE WITNESS:  Wow.  I guess he'll leave.  No
 4   big deal.
 5            MR. ANGELL:  Well, hang on one second.
 6                 Are you ok- -- I mean --
 7            THE WITNESS:  I'm okay.  I just -- you know,
 8   I feel better having him here for -- because he's my
 9   husband and I'm really nervous, so...
10            MS. PORTER:  But you understand that I can't
11   see you, and -- and there's a reason for the rule.  I
12   mean, it may sound silly, but there is a reason for
13   it.
14            MR. ANGELL:  I'm just going to add for the
15   record, I mean, I don't represent these folks.  I
16   don't believe that Mr. Hendricks would need to leave
17   the room for this deposition where his deposition has
18   already been taken.  I understand, Counsel, your
19   difficulty of seeing him in the room.  I think that's
20   caused by your not being here in person.
21                 But I'll just leave that up to the
22   Hendrickses because I don't represent you.
23            THE WITNESS:  Well, if my testimony is
24   inadmissible, then have him leave.
25            MR. ANGELL:  Okay.  You would rather have
```

```
 1   your -- make sure we're avoiding that.
 2            THE WITNESS:  Sure.  Yeah.
 3            MS. PORTER:  I mean, we could -- I don't --
 4   we could call the judge and get a definitive ruling.
 5            THE WITNESS:  We -- he's leaving.  He's
 6   leaving, okay?
 7            MR. ANGELL:  Okay.  Thank you.  I
 8   appreciate --
 9            MS. PORTER:  Okay.  I just meant -- because
10   Sam could be right and I could be wrong.
11            MR. ANGELL:  All right.  Mr. Hendricks is --
12            KIRK HENDRICKS:  Mr. Hendricks is leaving.
13            MR. ANGELL:  He's going to walk out the door
14   here, so...
15            MS. PORTER:  Okay.
16            KIRK HENDRICKS:  Good luck, Mary.
17            THE WITNESS:  Thank you, honey.  Bye.
18                          EXAMINATION
19   BY MR. ANGELL:
20            Q.  All right.  With that, Ms. Hendricks, I
21   just want to introduce myself on the record.  My name
22   is Sam Angell.  I represent the City of Pocatello,
23   and this is in a lawsuit that was filed by
24   Mr. Sheeler against the City of Pocatello.  And in
25   that lawsuit, Mr. Sheeler is claiming some damages
```

1  against the City of Pocatello for a shooting that

2  occurred.

3           As part of that, the reason you're here,

4  from my perspective --

5       A.   Yes.

6       Q.   -- is that you were a witness because

7  Mr. Sheeler entered your shop.

8       A.   Yes.

9       Q.   Do you remember that day?

10       A.   I -- yes, I do.

11       Q.   Okay.  I just wanted to give you that

12  introduction as to why we're here.

13       A.   Okay.

14       Q.   And I will note for the record that on

15  the Zoom is counsel for Mr. Sheeler.  This is

16  Ms. Karra Porter.  She represents Jake Sheeler, the

17  plaintiff.

18           And also with us, we have a court

19  reporter who is going to type up everything that we

20  say today.

21       A.   Okay.

22       Q.   She's going to prepare a transcript when

23  we're finished so that we can read that.  So a couple

24  of things with that, it's important that you and I or

25  you and the other attorney not speak over the top of

1    one another so that she can write down what you're

2    saying.

3              A.    Okay.

4              Q.    And then the other thing, and you've

5    done well so far, is to answer audibly with a "yes"

6    or "no" or "okay."  Sometimes we'll nod our head and

7    say "uh-huh," which I understand sitting here --

8              A.    Right.

9              Q.    -- but it won't come through the

10   transcript well.

11             A.    Okay.

12             Q.    So thank you.  My purpose today -- as I

13   mentioned, you're a witness.  I want to ask you some

14   questions.  I don't mean to trick you, so if I ask a

15   bad question that you don't understand, just tell me

16   and I'll try and rephrase it.

17             A.    Okay.

18             Q.    So to begin with, I wanted to ask a

19   couple of -- a little bit of background information

20   so I can learn something about you.

21             A.    Okay.

22             Q.    And first of all, you are Kirk

23   Hendricks's spouse; is that right?

24             A.    Yes.

25             Q.    How long have you two been married?

```
 1              A.    Sixteen years.
 2              Q.    Okay.  How long have you lived at the
 3     address on -- where you're at now?
 4              A.    I've lived there 16 years.
 5              Q.    Do you own that house?
 6              A.    Yes.
 7              Q.    Do you know your neighbors -- how do you
 8     say their name?  Is it Rufi or Rufi?
 9              A.    Rufi, yes.
10              Q.    Rufi?  How do you know them?
11              A.    We were very friendly with them, always
12     said hello, gave her tomatoes out of the garden.
13     That's basically it.  They were very nice people.
14              Q.    Who are they?  Who are the Rufis?  What
15     are their names?
16              A.    Kathy Rufi, Danielle Rufi, Whittney
17     Rufi.  And they have a son, but he doesn't live
18     there.
19              Q.    Are Danielle and Whittney daughters?
20              A.    Yes.
21              Q.    How long are -- have the Rufis lived
22     next to you?
23              A.    Ever since I've lived there.
24              Q.    Okay.  I want to just get this out of
25     the way because I know it's nerve-racking.  I would
```

1    like -- do you remember September 25th of 2020?

2         A.    Yes.

3         Q.    Can you just tell me what you remember

4    kind of the start of your day and walk me through

5    that day what happened.

6         A.    Well, every day Kirk and I take the dogs

7    for a walk.  And it was 3, 3:30, something like that.

8    It was time to go for a walk so we went out.  We have

9    a patio.  You walk through the patio and then a

10   little area and then the shop.  And we always left

11   the shop door open.

12              And I followed behind him, and the shop

13   door was locked.  We went, "That's weird.  I think I

14   better go back in and get a key.  I don't remember

15   locking the door.  That's weird."

16              So he went back in the house, got the

17   key, and he said he got his gun -- okay? -- which

18   he -- normally I sat, "You better bring it in case

19   there's a snake or something on the road," or -- it

20   just made me feel better, you know?

21              Anyway, we went out and he unlocked the

22   door.  I'm right behind him.  The dogs were barking,

23   and he's like, "Oh, knock it off, dogs."  He thought,

24   "What's going on?"  And there was somebody in our

25   garage, and we thought it was a neighbor boy, so I

 1  didn't think much of it.  I'm just kind of standing

 2  behind.  And then he saw somebody around the truck

 3  and said, "What are you doing in here?  Who are you."

 4          MS. PORTER:  I'm sorry to interrupt, but

 5  could we ask the witness, if she's going to give a

 6  narrative to make it clear as to what she is

 7  observing versus what she has been told?

 8          MR. ANGELL:  Hang on.

 9              Counsel, you will get lots of

10  opportunity to ask her all sorts of questions.

11          MS. PORTER:  But I'm going to object to --

12  that the question calls for a narrative.  I was okay

13  with the narrative as long as she distinguished what

14  she saw versus what she was told.

15          THE WITNESS:  I was --

16          MS. PORTER:  If it calls for a narrative,

17  then it's an objectionable question to the form.

18          MR. ANGELL:  Okay.  Counsel -- and so you and

19  I have been over this before.  Under the Federal

20  Rules of Civil Procedure, there's an appropriate

21  objection to make and it's "objection to the form."

22  If you want to add a one- or two-word qualifier after

23  that, I'm fine with that, but these rambling

24  objections, I view them as coaching a witness and so

25  I would ask you to please not do that.

```
 1            MS. PORTER:  Well, it's -- clearly I'm not
 2    coaching this witness.  This witness is apparently
 3    suing my client or whatever, but in -- and I -- this
 4    may be a jurisdictional difference.  In our
 5    jurisdiction, we are expected to explain briefly, I
 6    guess, what -- how to correct the form.  But I will
 7    object.
 8            Object to the form, narrative.
 9            Q.   (BY MR. ANGELL):  For you,
10    Ms. Hendricks, at times the attorney for Mr. Sheeler
11    may have some objections that she needs to state for
12    the record.  We won't deal with those now as we do
13    not have a judge sitting here with us today, so I
14    would like you to just continue with the answer to
15    your question that was interrupted.
16            A.   Okay.
17            Q.   And I think you were telling me about
18    what had happened as your husband entered the shop.
19            A.   Correct.  There was an intruder in our
20    shop.  I saw the intruder.  He came around and
21    pointed a gun at my husband.  I was right behind my
22    husband.  It was like slow motion.  I don't
23    remember -- I -- I was in shock.  But I saw him
24    pointing a gun and it scared me.  I could have walked
25    out of the shop, but I thought, if I leave, he's
```

1    going to shoot my husband.  I was afraid.

2              Then he -- I -- I was out of the shop,

3    and he came out of the shop with the gun in his hand,

4    and he said to me, "Don't follow me," and he turned

5    around and he ran off.

6              That's basically all I have to say.  But

7    I did see him point a gun at my husband.  He had the

8    gun in his hand, and I was fearful.  I was scared

9    that he was going to shoot him, maybe shoot me

10   because he had the gun in his hand.  And he turned

11   around and he ran, and he ran fast, and, of course,

12   my husband who is an old guy that can't run,

13   crippled, runs after this guy yelling, "Thief.  He's

14   got a gun" -- yelling it, and all the neighbors came

15   outside.  I called 911 immediately, and that's

16   basically all I have to say.

17             He ran down the street, and he was -- it

18   was scary.  That's all I have to say.  I don't know

19   what else.  That's basically it for me.

20        Q.   Thank you, Ms. Hendricks.  I appreciate

21   it.  That causes me to have a couple of questions for

22   you.  Do you mind if I just follow up on a couple of

23   things?

24        A.   Yes.

25        Q.   When you came to the shop and you

1    said -- I think you said you were behind your

2    husband, right?

3            A.    Well, I wasn't in there right away until

4    I realized something was going on, and I went into

5    the shop, but I was behind him.

6            Q.    So at first, you were waiting outside?

7            A.    Outside the shop, yes.

8            Q.    Were you able to -- you said you saw the

9    intruder in the shop.  Did you see him through the

10   doorway?

11           A.    I walked in because he was yelling at

12   somebody and I didn't know what it was so I walked in

13   there and saw him.

14           Q.    So you were inside the door of the shop

15   when you saw the intruder yelling and your husband in

16   there?

17           A.    Yes.  Yes.

18           Q.    Were you inside the shop when you saw

19   the intruder pointing the gun at your husband?

20           A.    Yes.

21           Q.    Do you remember what he was saying?  Are

22   you able to remember that?

23           A.    Something to the effect of "I don't want

24   to shoot you, sir" -- something to the effect of

25   that.  "I don't want to have to shoot you."

1          Q.    And what -- do you remember what your
2     husband was doing?  Did you have the ability to look
3     at him?
4          A.    I wasn't -- I -- I don't recall.  He was
5     I'm sure in shock, as I was.
6          Q.    And I --
7          MS. PORTER:  Move to strike as nonresponsive
8     and speculative.
9          Q.    (BY MR. ANGELL):  I think you also said
10    that at some point you went back outside the shop?
11         A.    Yes.
12         Q.    Do you remember when that was?
13         A.    It was -- like I said, it was all in
14    slow motion.  I don't know.  I just walked out.  I
15    didn't want to leave him, and it was just -- I walked
16    out and I -- why didn't I call 911?  Because I didn't
17    want to leave his sight and waited for -- you know,
18    he left and that's -- that's it.
19         Q.    When you were back outside of the
20    shop -- so let me -- hang on.
21               You were back outside the door of the
22    shop before the intruder ran out the door?
23         A.    Yes.  Yes.  He came out the door, and
24    then my husband was behind him, and he looked me in
25    the eye and said, "Don't follow me," and he turned

1  and he ran.

2        Q.   Do you know if he had the gun pointed at

3  you when he --

4        A.   No, he didn't have it pointed at me, but

5  it was in his hand and I saw it just on the side in

6  his hand.  But I did feel threatened.  I was scared

7  to death.

8        Q.   Now, I know that you have said it felt

9  like it was slow motion -- I think was your phrase.

10       A.   Yes.

11       Q.   And I want to ask you a question.  It

12 might be a hard one.  I understand that.  But can you

13 give me an idea of how long the encounter was from

14 the time that your husband went in the shop and then

15 to the time that the guy came out of the shop?

16       A.   Probably three to five minutes, if even

17 that.  It was a very short time.

18       Q.   And so they were in there for some

19 amount of time with some --

20       A.   I -- I don't know.  It's -- it's all

21 kind of, like I said, a blur of sorts because it's --

22 I remember being in there watching him, not wanting

23 to leave and not -- why wouldn't I leave and go run

24 out and call?  I couldn't.  I was scared.  I was in

25 shock.

1          Q.   You know, a couple of things about your

2    home and shop, your husband mentioned that he had a

3    camera posted that had some view of that shop.

4          A.   Yes.

5          Q.   Did you know about that?

6          A.   Yes.  We had a camera up, and apparently

7    he had taken -- we have dog bags, poop bags, and he

8    put that on top of the camera.  So he apparently knew

9    what he was doing, noticed that before, but I -- I

10   noticed him a couple of days previous, and -- we were

11   going to go camping, and he was outside by the

12   neighbors watching us.

13         Q.   So when --

14         A.   So that's why we think maybe either the

15   neighbors said, "Go get Kirk and Mary's house" or he

16   was just watching us knowing we were going to go

17   camping, you know.  And we came back early and maybe

18   he thought we were still gone.  I don't know.

19         Q.   So when you saw the individual leave

20   your shop, did you recognize him as being the person

21   who had been at your neighbor's house before?

22         A.   I don't know.

23         Q.   Or is that something that after the fact

24   you learned it was Jake Sheeler?

25         A.   Yes.

1            Q.    Do you remember how you learned that?
2            A.    No.  I don't know.  I don't know.  It's
3      all --
4            Q.    All run together?
5            A.    Yes.
6            Q.    I know, it's been --
7            A.    It's crazy.
8            Q.    It's been a couple of years.  I
9      understand.
10            A.    Yeah.
11            Q.    But at some point you learned it was
12      Jake Sheeler, and is that what caused you to know,
13      "oh, I've seen Jake Sheeler at the neighbor's house"?
14            A.    Yes.
15            Q.    And then I wanted to ask you:  Had you
16      had a conversation with Jake Sheeler in the past?
17            A.    No, never.  He just watched us.  And you
18      know, when we were loading our camper, he was
19      standing outside, and I do remember that.
20            Q.    How long before this date when he
21      intruded in your shop was it that you saw him
22      watching you load your camper?
23            A.    A couple of days.
24            Q.    Had you just been on a camping trip?
25            A.    Yes.  And we came home a day early.

1          Q.    Had you come home on the 25th?

2          A.    I don't remember.

3          Q.    A couple of other things.  Sorry I'm

4     jumping around a little bit.  But the garage door

5     that you drive the truck in, was it closed?

6          A.    Yes.

7          Q.    So when this intruder was in your shop,

8     the only door that was open was the man door?

9          A.    Right.

10          Q.    Okay.  Do you remember, for example, if

11     the lights were on inside the shop?

12          A.    I don't remember.  I'm sure they were.

13          Q.    Are there windows on that shop?

14          A.    Yes.

15          Q.    In any event, you were able to see the

16     intruder in the shop?

17          A.    Yes.

18          Q.    Can you give me your best description of

19     what he looked like?

20          A.    I couldn't really tell.  He had a hoodie

21     on, so -- I don't know.  But at the time I didn't

22     think, you know, that it was him or -- I didn't know

23     who it was.  It's just after the fact that I realized

24     it was him.

25          Q.    Prior to deciding to take the dogs out

1   for the walk, do you know how -- what -- where was

2   your husband at before that?

3           A.   We were both in the house.

4           Q.   How long had you been in the house for

5   do you think that day?

6           A.   I don't remember.  I don't remember.

7           Q.   More than five or ten minutes?

8           A.   Oh, yeah.

9           Q.   Your husband told me that he had gone to

10  C-A-L Ranch -- he remembered going to C-A-L Ranch

11  earlier that day.

12          A.   Probably so.

13          Q.   Does that happen to ring a bell?  Do you

14  know if he went to C-A-L Ranch that day or not?  Do

15  you remember?

16          A.   Probably.  I don't remember, but...

17          Q.   That's something he did frequently?

18          A.   Oh, yes.

19          Q.   But you don't know for sure if he went

20  that day?

21          A.   I don't know for sure.

22          Q.   Do you know if you had gone out earlier

23  that day to do anything?

24          A.   I don't remember.

25          Q.   I think he -- I don't want to misphrase

```
1   what he told me.  I think I remember him saying that
2   you had gone out maybe to buy something an hour or
3   two before this incident happened.
4            A.    Probably so.
5            Q.    You can't remember one way or the other
6   today?
7            A.    No.  No.
8            Q.    That's fine.  I understand.  I want to
9   get a feel for how much -- what you actually
10  remember.  I know it's been a couple of years.
11           A.    Uh-huh.  Yeah.
12           Q.    Do you remember what the weather was
13  like that day?
14           A.    It was beautiful.  It was a beautiful
15  day.  We used to go every day to take the dogs and
16  just -- "Well, it's time to go for our walk."
17           Q.    And would you walk right from your
18  house?
19           A.    Yes.  Sometimes we would drive to
20  different places.  But that day we were just going to
21  walk around the neighborhood through the school,
22  around -- just around.
23           Q.    Do they walk on a leash or do they just
24  kind of walk by you?
25           A.    They walk on a leash.
```

1          Q.    And you do remember the dogs barking --

2          A.    Yes.

3          Q.    -- or alerting when your husband went in

4     the shop?

5          A.    Yes.

6          Q.    Have you ever had intruders in your shop

7     before; do you remember?

8          A.    No.  No.

9          Q.    Did you spend a lot of time out in the

10    shop or is that --

11         A.    Not really, no.  Just to go out if he's

12    out there and, you know, see what he's doing.  Not

13    really.

14         Q.    The reason I ask that is your husband

15    was able to describe that certain things had been

16    moved or opened or changed.

17         A.    Right.

18         Q.    Did you have the ability to know if

19    someone had been in your shop, either picking up or

20    moving things around?

21         A.    No.  That would be his category there.

22    He knew where every -- all of his things are.

23         Q.    Were you out in the shop when he was

24    going through and looking to see if things had been

25    taken?

1          A.    No.

2          Q.    I know he described doing at least part

3    of that with a police officer.

4          A.    Yeah.

5          Q.    Does that ring a bell?

6          A.    Yes.

7          Q.    Do you remember if you were out there

8    with him and the police officer doing that?

9          A.    No.

10          Q.    Where were you at?

11          A.    In the house, petrified.

12          Q.    I imagine.

13          A.    I do know that he couldn't find the

14    truck keys and found them later, but at that point we

15    called because he'd had all the house keys.  We had

16    called a locksmith right away to get the keys -- the

17    new keys made for the house.

18          Q.    Your concern was that the suspect might

19    have made off with your keys?

20          A.    With our keys and was able to get in our

21    house, you know.  So that was another thing that was

22    pretty scary.

23          Q.    So how long was it that you stayed in

24    the house after this happened?

25          A.    All the time.  I wouldn't leave the

edit

1   house.  I was afraid.

2           Q.   Has it changed the way that you go about

3   things on a day-to-day basis?

4           A.   Oh, yes, definitely.  We lock the doors,

5   lock the shop which we never did before.  I'm afraid

6   of our neighbors.  We put fences up.  We have a whole

7   new security system.  Every time my phone goes

8   "bling," I'll look and -- scared.  It's different.

9   It's -- it's different.

10          Q.   In what ways, if any, has it affected

11  your life?

12          A.   I'm paranoid.  I have -- you know, I --

13  I'm afraid to leave the house a lot.  I'm better now.

14  But I didn't want to go camping, didn't want to leave

15  in case somebody else would come rob us.  It's better

16  now, but...

17          Q.   It's taken some time?

18          A.   It's taken a lot of time.

19          Q.   Have you sought any treatment or

20  anything for anything you've --

21          A.   No.  No.  I just figured I could deal

22  with it.  But it's -- it's kind of annoying to my

23  husband because he wants to go and I -- you know, I'm

24  better now, but I didn't want to leave for fear,

25  or...

1          Q.    How long did it take before you felt
2    like you could kind of get back to somewhat of a
3    normal situation?
4          A.    Six months, eight months, something like
5    that.  It's still -- you know, you go out and look
6    around, you've got the key to open the garage, look
7    around, and it's still -- and I know that he gets
8    freaked out sometimes going out there.  I don't know
9    if I could say that or not, because that's what he
10   does.  But, you know, it is -- it is different.
11         Q.    But your observation is it makes him
12   nervous when he first walks out to the shop?
13         A.    Yes.
14         Q.    And that's even still?
15         A.    I don't know.  I -- yeah.
16         Q.    On the day -- when he ran down the
17   street, did you go outside of your yard at all?
18         A.    No.
19         Q.    Did you speak with any of the neighbors
20   or anything?
21         A.    Yes.
22         Q.    Who did you speak with?
23         A.    The neighbors across the street.
24         Q.    Hang on.  Who were they?
25         A.    I don't know her name.  They live in the

1    apartments.  But he was -- you know, "What happened?"

2    And then all the neighbors seemed to come around and

3    ask what happened, and -- yeah.

4            Q.    I know your husband described going down

5    Hyde Street a ways to kind of help point out to the

6    officers where he had went.

7            A.    Yes.

8            Q.    Did you go down there and do that as

9    well?

10           A.    No.  I stayed on our yard.  I didn't

11   leave the yard.

12           Q.    So the neighbors that you spoke with

13   would have come kind of to your yard area?

14           A.    Yes.  They came and talked to me because

15   I was out there.  "What's going on?  Have they found

16   him?  Have they got him?"

17               "No."

18               And it -- they were out there for hours.

19           Q.    Everybody reacts to shock a little bit

20   differently.

21           A.    Right.

22           Q.    I don't mean to pry too much, but how

23   did it affect you?  Were you able -- were you

24   tearful?  Were you shaking?  How did it affect you?

25           A.    I was shaking.  I was tearful.  I was

1    all of the above.  I was in shock.  I was scared.

2         Q.   Do you have close friends that are in

3    that neighborhood?

4         A.   Yes.

5         Q.   Who are your close friends in that

6    neighborhood?

7         A.   Darrell across the street.  There's

8    another Darrell across the street.  The Hernandezes

9    are our in-laws.  Used to be the Rufis but not so

10   much now.  The policeman across the street who has

11   since moved.  Darrell across the street has moved.

12        But we were all very, very close

13   neighbors.  Erica, across, two doors down.  It's

14   basically at -- the corner house -- the next house

15   across the street, the two houses and the house next

16   to Darrell's on Erica, so...

17        Q.   After this individual ran away, did at

18   any point later that day you talk to either of the

19   Rufis -- any of the Rufis?

20        A.   Well, it was a weird thing, because I

21   had just given Kathy Rufi some tomatoes from the

22   garden, and I was outside, police cars everywhere,

23   and she just was like, "Oh, hi, Mary.  Thank you for

24   the tomatoes."

25        "Oh, sure," you know.  And I didn't

1  think anything of it.  And then the next day I went,

2  "Well, why would she take off and not ask what's

3  going on or anything like that?"  She just acted like

4  "I got to get out of here," you know, not "What's

5  going on?  Why are there policemen here?"  She just

6  said "Thank you for the tomatoes" and left.

7              And I was so upset I didn't think

8  anything of it until the next day when I saw her

9  and -- "Who is this guy and how could you allow this

10  to happen?"

11             She played stupid, "I don't know who he

12  is."  And then come to find out later on she did.  It

13  was her daughter's boyfriend.  So that's kind of a

14  strange thing.

15         Q.   So when you say she said "Thank you for

16  the tomatoes" --

17         A.   Yes.

18         Q.   -- was she in her car?

19         A.   Yes.  Had the window rolled down, waved

20  at me, "Thank you for the tomatoes," and just took

21  off.  Didn't ask --

22         Q.   Drove away?

23         A.   Drove away around the corner the

24  opposite direction, and...

25         Q.   And there were police cars out and

1  about?

2        A.    Everywhere.  Oh, yes, there was three or

3  four right on the block everywhere.  People were

4  outside.  She didn't make comment on any of that.

5        Q.    Was she one of the neighbors that had

6  come to your yard to talk to you?

7        A.    No.  None of them came over at all.

8        Q.    And then you spoke with her again the

9  next day?

10        A.    Yes.

11        Q.    How did that conversation come up?

12        A.    Not very well.  I just --

13        Q.    How did it start?  Did she come to your

14  house?  How did you --

15        A.    I think we were outside and she pulled

16  up and just -- you know, everybody got mad at her for

17  allowing that to happen.  And she played stupid,

18  so...

19        Q.    When you say "everyone got mad at her,"

20  what do you mean by that?

21        A.    Well, the neighbors, when they -- you

22  know, the Hernandezes, the -- I don't know.  Just --

23  I think Kirk's son was out there and yelled at her,

24  you know.

25        Q.    What did she say?

1           A.    "I don't know anything about it," so...

2           Q.    And then just -- did she say anything

3    else?

4           A.    Just -- no, not really.  And her kids

5    were sticking up for her and -- you know, just within

6    the next week or so and -- we had put up a fence

7    and -- "Don't talk to us.  Don't look at us.

8    Don't" -- you know, "Stay away from us.  We want

9    nothing to do with you."

10          Q.    They were saying those things?

11          A.    We said that to them.

12          Q.    Okay.

13          A.    "Stay away from us," you know.  And I

14   wanted to say "I'm afraid of you," but Kirk said

15   don't do that because you want to show that you're

16   strong, you're not afraid, which I was deftly afraid

17   of them.  And I said -- within a week we had a big

18   fence up so that we couldn't see them or they

19   couldn't see us.

20          Q.    How did you learn that this Mr. Sheeler

21   was I think you said the boyfriend of the Rufis'

22   daughter?

23          A.    Somebody said on Facebook.  Of course,

24   social media, yeah.

25          Q.    You don't know what the post came from?

1          A.    No.   No.   I don't know.   And I didn't
2     see it.   I just heard that that was her boyfriend.
3          Q.    How often -- once you learned who it
4     was, how -- can you give me an idea of how often you
5     had seen him kind of at the Rufis' house or in that
6     neighborhood?
7          A.    You know, I never really paid attention,
8     not really.   I don't know.   I just saw him the one
9     time outside.   Because I never really paid attention.
10    It was just like, "Hey, what's up?" or -- I -- I
11    never really paid attention until that one day when
12    he was outside watching us.   And I didn't think
13    anything of that either.   I just looked at him and
14    thought who is that, you know?   That was him.
15         Q.    Did you give a statement to any of the
16    police officers that were there on the day,
17    investigating?
18         A.    I don't know.
19         Q.    Do you remember if you spoke to any of
20    them?
21         A.    Maybe just to give my statement as to
22    what happened.
23         Q.    For example, can you remember any of
24    their names if I asked you?
25         A.    No.   No.

1        Q.    I know it's been a couple of years, but

2   do you know if you spoke to one or more officers?

3        A.    There was three there, I think, and --

4   getting fingerprints, going through the shop.  They

5   dealt more with Kirk than with me.  They just asked

6   me a few questions, that I can remember.  That's

7   about all.

8        Q.    A couple more things.  I know we can go

9   on and on, but do you know if you were involved with

10  trying to figure out if you could get the video off

11  of your little camera that was posted?

12       A.    No.

13       Q.    That was Kirk that did that?

14       A.    Yeah.

15       Q.    And Mr. Hendricks had given some pretty

16  specific times that he felt like it was.

17       A.    Yes.

18       Q.    Do you know how he figured out what

19  those times were?  He -- I don't know if he could

20  remember to tell me.

21       A.    Well, I think it was because the -- the

22  camera was covered up at a certain time, and we

23  figured that he was in our shop for a good 45 minutes

24  to an hour maybe just going through everything and

25  thinking he was -- "Oh, boy," you know, because he

1    had all his guns and bullets and -- you know, why

2    they -- he wasn't interested in bicycles, I don't

3    know.  But, I mean, he has everything in his shop,

4    and I think he went through and, just from what I

5    understand, had stuff all laid out ready to go.

6                    That's why I'm saying the keys were not

7    in the truck where they normally are.  They were on

8    the ground next to the truck.  So I think he was

9    going to put stuff in the truck and have his way.  We

10   just caught him in time.  If we would have waited,

11   who knows what would have happened.  I don't know.

12             MS. PORTER:  Objection.  Move to strike as

13   nonresponsive, speculative, and lacks foundation.

14             Q.   (BY MR. ANGELL):  Are you employed right

15   now?

16             A.   No, I'm retired.

17             Q.   Where did you work at before?

18             A.   I worked for Dr. Chester in town for

19   28 years.

20             Q.   Do you have children?

21             A.   Yes.

22             Q.   Where do your children live?

23             A.   One lives in town and the other in North

24   Dakota.

25             Q.   And your child that lives in town, do

1  you see them often?

2          A.   Yes.

3          Q.   Do they live close to you?

4          A.   Sort of.

5          Q.   Do you have grandchildren?

6          A.   No.  Well, I have a step-grandchild,

7  yes.

8          Q.   Sorry.  I'm going to run back through my

9  notes.  I made some notes.  I think you've answered

10 most of my questions.  I just want to make sure.

11          You mentioned right at the beginning

12 that, when you and your husband walked out to go on

13 the walk with your dogs and your husband found the

14 shop locked --

15          A.   Yes.

16          Q.   -- maybe you didn't -- I don't know if

17 you said it.  I saw some surprise in your face.  Was

18 that uncommon for the shop to be locked in the middle

19 of the day?

20          A.   Yes.  We always left it open until it

21 got dark, and then we would lock it at nighttime.

22 But during the day, going in and out of the shop was

23 very common for him so we left it open.

24          Q.   And so in your mind, that was odd that

25 it was locked in the middle of the day?

1          A.    Yes.

2          Q.    Did you have the ability to see how

3    close that intruder was to your husband when he had

4    the gun pointed at him?

5          A.    Yes.

6          Q.    How far away do you think it was?

7          A.    Like from me to you.

8          Q.    Which I'm not great at estimating

9    distances, but we're sitting across a conference

10   table.

11         A.    Right.  5 feet, 6 feet.

12         Q.    Okay.

13         A.    Pretty close.  Yeah, I could see he was

14   pretty close.

15         Q.    And do you know -- are you a gun person?

16   Could you identify the kind of gun that he had?

17         A.    No.  It was a handgun.  I don't know.

18   I'm afraid of guns, which is crazy because my husband

19   is an avid hunter, so...

20         Q.    Could you tell what color the gun was?

21         A.    No.

22         Q.    There are different styles of handguns.

23   Some are semiautomatics, some are revolvers.  Could

24   you tell one way or the other?

25         A.    No, not at all.

1          Q.    Just asking.

2          A.    Right.

3          Q.    And your husband mentioned that he was

4    carrying a concealed gun under his waistband.

5          A.    Yes.

6          Q.    Did you ever see him get his gun out?

7          A.    No.

8          MR. ANGELL:   I think that's all the questions

9    I have.  I think Counsel may have some questions for

10   you.

11         THE WITNESS:   Okay.

12                      EXAMINATION

13   BY MS. PORTER:

14         Q.    Did you see your husband make any

15   gesture that appeared to be reaching for or perhaps

16   pulling out his gun?

17         A.    No.

18         Q.    At some point did you become aware that

19   your husband believed that Jake Sheeler had stolen a

20   GLOCK?

21         A.    No.

22         Q.    Okay.  Did you help your husband look

23   for a GLOCK that he thought was missing?

24         A.    No.

25         Q.    Did you help your husband look for a

1    Hi-Point that your husband thought was missing?

2          A.    No.

3          Q.    Were you aware that your husband told

4    the police that Jake Sheeler had taken the GLOCK and

5    the Hi-Point?

6          A.    Yes, I am aware.

7          Q.    Okay.  How are you aware of that?

8          A.    I was there when he talked to the

9    police.  After the fact, he told me.

10         Q.    So after he told the police that the

11   GLOCK and the Hi-Point were missing, did your husband

12   look for those guns as far as you know?

13         A.    Yes.

14         Q.    And do you know where your husband found

15   those guns?

16         A.    No, I do not.

17         Q.    I believe your husband mentioned

18   something about a bedside table, or something to that

19   effect.  Do you know whether your husband found one

20   of the guns in the vicinity of a bedside table, bed

21   stand?

22         A.    No, I do not.

23         Q.    Did your husband keep guns in or near a

24   bed stand at that time?

25         A.    Probably, yes.

1          Q.    And was that a locked bed stand?

2          A.    No.

3          Q.    Okay.  So it just had a drawer that

4    would open and the gun would be in there?

5          A.    Yes.

6          Q.    Maybe -- let me just look.  Oh, where --

7    let's see.  You mentioned that the keys were found,

8    the keys to the truck.

9          A.    Yes.

10         Q.    Do you know where those were found?

11         A.    They were on --

12         Q.    Okay.  Do you know where they were

13   found?

14         A.    On the ground by the truck.

15         Q.    Did you see them on the ground?

16         A.    I did not.  He told me they were there.

17         Q.    On the ground near the truck?

18         A.    Yes.

19         Q.    Okay.

20         MS. PORTER:  I don't have any further

21   questions.

22                    FURTHER EXAMINATION

23   BY MR. ANGELL:

24         Q.    Let me ask a couple of additional

25   questions, Ms. Hendricks.  I may have mixed up

1    earlier and I want to make sure that I understood you

2    right.

3              When you were telling me -- I may have

4    said Ms. Rufi.  I don't -- Rufi.

5         A.   Rufi, yes.

6         Q.   Who was it that drove out in the car and

7    spoke to you and then kind of drove off the day that

8    the incident happened?

9         A.   Kathy Rufi, the mother.

10        Q.   Okay.  So I want to read back the police

11   report, because maybe they've got it wrong in the

12   police report.  Let's make sure we've got this right.

13        A.   Okay.

14        Q.   So I'm looking at the incident report

15   that was written by an Officer Miller, and Officer

16   Miller's report -- let me read you a couple of

17   sentences.

18              He says, "Mary Hendricks said she had

19   seen the male hanging around at the Rufi residence

20   next door a couple of weeks prior."

21        A.   Yes.

22        Q.   Does that sound right?

23        A.   Yes.

24        Q.   "Mary Hendricks told me she found it

25   suspicious that during the police search of this

1    surrounding area Whittney Rufi drove up while she was

2    standing in the front yard."

3         A.   I -- I thought it was Kathy that asked

4    me about the -- said thank you for the tomatoes.

5         Q.   Your memory is that it was Kathy who

6    drove up?

7         A.   Yes.  Yes.

8         Q.   Maybe the officer wrote that down wrong.

9    I just want to make sure I understood what your

10   memory is.

11        A.   Okay.  Yeah, I don't recall Whittney.

12        Q.   Because the next sentence is, "She

13   said," meaning you, "Ms. Hendricks said Whittney Rufi

14   thanked her for some tomatoes that she had given

15   Whittney Rufi."

16        A.   Okay.  It was Kathy, the mother.

17        Q.   It's Kathy?

18        A.   Right.  Yes.

19        Q.   And I keep saying Rufi.  It's Rufi?

20        A.   Rufi, yes.

21        MR. ANGELL:  That's the only thing I needed

22   to clarify.

23             Does that cause any other questions,

24   Counsel?

25        MS. PORTER:  I don't think so.  I'm just --

1    I'm sorry.  Give me 30 seconds here.  I'm having a

2    technical issue.  Hold on.

3                    Okay.  No, I don't have any further

4    questions.

5            MR. ANGELL:  We can go off the record, then.

6            (Deposition concluded at 11:29 a.m.)

7                    (Signature waived.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2              I, Amber S. Williams, CSR NO. 1080,

3    Certified Shorthand Reporter, certify:

4              That the foregoing proceedings were taken

5    before me at the time and place therein set forth, at

6    which time the witness was put under oath by me.

7              That the testimony and all objections made

8    were recorded stenographically by me and transcribed

9    by me or under my direction.

10              That the foregoing is a true and correct

11    record of all testimony given, to the best of my

12    ability.

13              I further certify that I am not a relative

14    or employee of any attorney or party, nor am I

15    financially interested in the action.

16              IN WITNESS WHEREOF, I set my hand and seal

17    this 31st day of March, 2023.

18

19

20    _____

21              AMBER S. WILLIAMS, CSR NO. 1080

22              Notary Public

23              Post Office Box 2636

24              Boise, Idaho  83701-2636

25    My commission expires June 1, 2027

# Exhibit 11

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAKE L. SHEELER, an individual, | ) |
| Plaintiff, | ) Case No. |
| vs. | ) 4:22-cv-00313- |
| BRIDGET MCARTHUR, an individual; | ) DCN |
| JEFFREY E. ELDRIDGE, an individual; | ) |
| MARISA A. SALDANA, an individual; | ) |
| ROGER SCHEI, an individual; and | ) |
| CITY OF POCATELLO, a municipal | ) |
| Corporation; | ) |
| Defendants. | ) |

DEPOSITION OF RICHARD HERNANDEZ

March 21, 2023

REPORTED BY:

AMBER S. WILLIAMS, C.S.R. No. 1080

Notary public

1         THE DEPOSITION OF RICHARD HERNANDEZ was

2  taken on behalf of the defendants Pocatello City

3  Hall, 911 North Seventh Avenue, Pocatello, Idaho

4  Falls, Idaho, commencing at 11:58 a.m. on

5  March 21, 2023, before Amber S. Williams, Certified

6  Shorthand Reporter and Notary Public within and for

7  the State of Idaho, in the above-entitled matter.

8

9               APPEARANCES:

10  For Plaintiff via videoconference:

11     CHRISTENSEN & JENSEN, PC

12     BY:  KARRA J. PORTER

13     257 East 200 South, Suite 1100

14     Salt Lake City, Utah  84111

15     karra.porter@chrisjen.com

16  For Defendants:

17     HALL ANGELL & ASSOCIATES, LLP

18     BY:  SAM L. ANGELL

19     1075 South Utah Avenue, Suite 150

20     Idaho Falls, Idaho  83402

21     sla@hasattorneys.com

22  Also present via videoconference:

23     Jake Sheeler

24

25

1                          **I N D E X**

2

3    **TESTIMONY OF RICHARD HERNANDEZ**                    **Page**

4       Examination by Mr. Angell....................   4

5       Examination by Ms. Porter....................  27

6

7

8

9

10                         **EXHIBITS**

11   Exhibit 1.    Aerial map of Hyde Avenue and....  11

12                 Maple Street

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     RICHARD HERNANDEZ,
 2    first duly sworn to tell the truth relating to said
 3    cause, testified as follows:
 4                        EXAMINATION
 5    BY MR. ANGELL:
 6          Q.   Mr. Hernandez, we'll just state for the
 7    record that this is the time and place set for the
 8    deposition of Richard Hernandez.
 9               Am I saying your name close to right?
10          A.   Yes.  Richard Hernandez.
11          Q.   I introduced myself off the record, but
12    my name is Sam Angell.  I represent the City of
13    Pocatello and four different named police officers
14    that are named in this lawsuit.
15               Jake Sheeler is the plaintiff.  He is
16    represented by his attorney who is also present via
17    Zoom for this deposition, Karra Porter.  And I
18    understand that Jake Sheeler is also present via Zoom
19    for this deposition.
20          A.   All right.
21          Q.   To just give you a little bit of
22    background as to why you are here, Mr. Sheeler was
23    arrested by police on September 25th of 2020 for some
24    burglaries.
25          A.   The same day he held a gun in my face,
```

1   yes.

2           Q.   Correct.  So he -- he was also shot by

3   police.  He has filed a lawsuit against the City of

4   Pocatello.  I am defending the City of Pocatello, and

5   Ms. Porter represents the plaintiff.  I'm just trying

6   to give you the understanding of who we are.

7           A.   Uh-huh.

8           Q.   I have brought you in for this

9   deposition because I know that you were a witness and

10  that you were involved with confronting Mr. Sheeler

11  so I wanted to be able to ask you some questions.

12          A.   Right.

13          Q.   So if that makes sense, I want to just

14  start by asking you, just to confirm, what's your

15  current address?

16          A.   1256 East Maple.

17          Q.   And how long have you lived there?

18          A.   Sixteen years, I believe.

19          Q.   And you're not planning to move

20  anywhere, are you?

21          A.   No.  I -- no.

22          Q.   Okay.  Do you live at that address with

23  anyone else?

24          A.   Yes.  My wife, my daughter who had

25  cancer, and my two grandchildren from that daughter.

```
 1            Q.   How long has your daughter and two
 2   grandchildren lived with you?
 3            A.   Well, my grandson is 14, so he's been at
 4   least 13 years.  My granddaughter was nine months old
 5   when we got custody, and -- so that long.  So about
 6   12 years.
 7            Q.   Okay.  So your grandchildren have been
 8   there in the house with you for at least the last few
 9   years?
10            A.   Yes.
11            Q.   Are you a lifelong Pocatello resident?
12            A.   Yes, sir.
13            Q.   Okay.  Did you graduate from high
14   school?
15            A.   No, sir.
16            Q.   What high school did you go to?
17            A.   Pocatello.
18            Q.   Pocatello?  What do you do for a living?
19            A.   I'm retired.
20            Q.   Retired now?
21            A.   Yes.
22            Q.   Good.  What did you do for work?
23            A.   Well, I worked 17 years for the railroad
24   and then 26 years for the City of Pocatello, heavy
25   equipment operator for the water department.
```

 1          Q.   Oh, okay.  Did you retire from the City
 2   of Pocatello?
 3          A.   Yes.
 4          Q.   Well, let me just jump right to why I
 5   brought you here, and that is, on September 25th,
 6   2020, there was an incident where Jake Sheeler was
 7   arrested by police for burglarizing Kirk Hendricks's
 8   home.
 9               Do you know who Kirk Hendricks is?
10          A.   Yes, sir.  We share a grandchild as a
11   matter of fact.
12          Q.   And do you know where he lives?
13          A.   Yes, I do.
14          Q.   And it's kind of kiddie-corner across
15   the street, right?
16          A.   Pretty close, yeah.  There's one house
17   on the corner -- my house, and then a house on the
18   corner which is kiddie-cornered from his.
19          Q.   Let me just -- if you don't mind, I
20   would like -- do you remember that day?
21          A.   Yes.
22          Q.   And I've kind of been asking people
23   this, but are you able to testify today?
24          A.   Yes.
25          Q.   Can you just tell me what you remember

1    about September 25th, maybe kind of starting earlier

2    in the day and what you remember seeing.

3            A.    Well...

4            MS. PORTER:  Objection.  Calls for a

5    narrative.

6            Go ahead.

7            Q.    (BY MR. ANGELL):  Hang on one second.  I

8    want to clear up that objection.  I don't want to

9    have your testimony under an objection.  And I should

10    have mentioned earlier, Mr. Hernandez, that we don't

11    have a judge here to rule on objections, so --

12    Counsel may have some objections, she will state

13    those, and then we'll just continue on and we'll deal

14    with the objections later on.

15            But let me reword that question and I

16    will start with this:  On September 25th, 2020, at

17    about -- and we'll say early afternoon, were you at

18    home?

19            A.    Yes.

20            Q.    And what were you doing that day?

21            A.    Well, the reason I went out of the house

22    was to take out the garbage.  I noticed my neighbor,

23    the one that lived in the corner house kiddie-corner

24    from, Kirk.  He was staring at the chimney.

25            So I went over and go, "What are you

1    doing?"

2              And he said, "I think I got a bird in my

3    chimney."

4              And it was about that time that

5    Mr. Sheeler -- see, my grandson's my -- I mean, my

6    son-in-law is named Jake also.

7         Q.   Okay.

8         A.   And see, he's involved in this

9    somewhere.  But anyway, Mr. Sheeler come running

10   around Mr. Hendricks's house.  Mr. Hendricks and his

11   dog followed, Mr. Hendricks yelling, "Stop.  Thief."

12             Okay.  So, you know, he went running,

13   dog chasing him.  He got parallel to where we were

14   at, my neighbor's house, and the dog was on him.  And

15   so I go -- well, no.  See, the dog's chasing him and

16   he's running -- I'm sorry, I can't stand up -- but

17   he's running along, turns sideways like that, points

18   at the dog with the gun -- points the gun at the dog

19   and my neighbor yells, "He's got a gun."

20             And so I'm hoping I can show you the

21   layout of my backyard.

22        Q.   Yeah.

23        A.   But anyway, if he would have got past

24   those two driveways, the Barruses' -- and I don't

25   even know the name of the other people that live next

1  to them -- if he would have got past them two

2  driveways, I would have not known it, but he didn't.

3              He -- as soon as he pointed his gun at

4  the dog, Kirk called his dog off, okay?  So, you

5  know, I start paralleling him to keep him from coming

6  to my backyard.  I mean -- well, coming anywhere

7  close to my house.  And that's -- that's the path,

8  those two driveways.

9              Beyond that, it's -- there's a yard with

10 a big garage built all the way back to his fence, his

11 house, and then -- just like Kirk's house.  He got a

12 big garage in his backyard, too.  In fact, that's

13 where Mr. Sheeler got the guns and stuff was out of

14 his garage.

15      Q.    So let me reroute you.  So he's -- you

16 see Mr. Sheeler running with the gun.  He points --

17      A.    Yes.

18      Q.    -- the gun at the dog?

19      A.    At the dog, yes.

20      Q.    And then what happened?

21      A.    And he's running and Mr. Hendricks

22 called the dog off.

23      Q.    Then what happened?

24      A.    So then he started crossing the street.

25 So I'm running my fat old body at -- you know, trying

1    to block him, keep him over there, and poof, he goes

2    up Barruses' driveway.  And there is a video that the

3    Barruses got.

4           MR. ANGELL:  Counsel, your computer keeps

5    chiming.  Can you turn that volume off?

6           MS. PORTER:  Sure.  I'm just so darn poplar.

7           Q.   (BY MR. ANGELL):  Go ahead.

8           A.   Okay.  So he crosses, he goes up, and --

9    like I say, there is a video that the Barruses got.

10   And from what -- see, I just talked to him yesterday.

11   That's when I learned my son-in-law is the one that

12   made the noise that made everything snap, that he

13   jumped over the fence.  But that's later in the

14   story.

15           But -- so I'm running along.  The video

16   will show that, when I'm directly in front of the

17   Barruses' house, I'm -- you know, because it's -- I

18   mean, if you can -- my backyard is like --

19           Q.   Let me do this, Mr. Hernandez.  I'll --

20   let me stop and mark this overhead so you can do some

21   markings on this.

22           (Exhibit 1 marked.)

23           Q.   (BY MR. ANGELL):  We'll jump back on the

24   record.  So I printed this as a Google Earth

25   overhead.  Are you familiar with Google Earth?

```
 1            A.    Yes.
 2            Q.    Yeah.  So for whatever reason,
 3   Mr. Hernandez, she won't be able to see it.
 4            MR. ANGELL:  And I'll just represent,
 5   Counsel, that we've got an overhead of the street
 6   that we used as -- one of the same type of overhead
 7   we used the other day in one of these depositions.
 8            Q.    (BY MR. ANGELL):  But Mr. Hernandez, I
 9   will say that, for whatever reason, it comes up with
10   your street, but it's calling it Moreland Ave.
11            A.    Yeah.  I'm going "What"?
12            Q.    I don't know why it did that, but
13   Mr. Hendricks pointed that out to me yesterday, that
14   that's the wrong name.  We understand that that's
15   Maple Avenue, right?
16            A.    Yes.
17            Q.    Can you find your house on that?  Do you
18   see it?
19            A.    Yes.
20            Q.    Do you mind just drawing a box around
21   your house?
22            A.    Okay.
23            Q.    Around your property there.
24            A.    Okay.  That's pretty much my --
25            Q.    I won't hold you to the exact scale.
```

1   Now, if you can, it would be helpful to me if you
2   could just draw a line that was sort of the path that
3   Mr. Sheeler was running as he ran down the street.
4   And take your time and get that.  That would be
5   helpful to me.
6           A.   Do you want me to put an "X" where he
7   started --
8           Q.   Yeah.
9           A.   -- at Mr. Hendrick's house?
10          Q.   Sure.
11          A.   Okay.  This is where it started, the dog
12  chasing him, come over here and paralleling here.
13  I'll put a circle where he put -- or, pointed the gun
14  at the dog.
15          Q.   Okay.
16          A.   We got -- well, I don't know if that car
17  was there at the time.  But we got running, and so
18  I'm running -- like, I'm putting me as dots.
19          Q.   Okay.
20          A.   Okay.  And then he's going and he starts
21  crossing the street.  And like I say, I'm going as
22  fast as my fat butt will go, and it won't.  But he
23  crosses and he goes right into the Barruses'
24  driveway.  He goes up, he goes around, and this is
25  where my encounter was with him.

```
 1            Q.   So when you got -- were you running kind
 2   of beside him that whole time?
 3            A.   No.  He was fast.
 4            Q.   He was ahead of you?
 5            A.   Yeah.  He was faster than me.  A lot
 6   faster than me.
 7            Q.   And so that "X" at the end of the Red
 8   Lion is where your encounter was with him?
 9            A.   Yes.
10            Q.   And what -- let me just take this back
11   so I can keep that so I can kind of see it.
12            What happened there at the "X"?
13            A.   Well, see right here, there was -- my
14   neighbor had a box of wood -- oh, he's clear over
15   here right beside the garage, a little one-by-one,
16   you know -- he used to burn it in his fire pit.
17   Well, there's one that's about that long, 2 foot, 2
18   and a half foot.  I reached down and grabbed that,
19   went walking around -- I'm running around the garage
20   because I didn't think he would still be standing
21   there.
22            I got around the garage.  I had my stick
23   and he's got the gun and it's like this, you know.  I
24   mean, we're this close.  My hand is this close to
25   that gun.
```

1          Q.    Within arm's reach?

2          A.    Right.  But me, I'm so surprised, that

3     all I could do was sit there and look at that barrel

4     waiting for that bullet to come out and take my life.

5     He -- you know, I stared at that gun barrel and -- I

6     don't know.  It was like the -- my eyes, my mind -- I

7     resolved, you know, "Okay.  There's -- I'm here to

8     stop this."

9               Okay.  So he tells me, "Don't."  And I

10    look away from the gun; I look at him -- no.  I look

11    away from the gun and I look at his eyes, and he's

12    looking at me like I'm stupid, and I am.  It's --

13    nobody chases a guy with a gun with a stick.

14              But -- so he told me, "Don't," and he

15    took a step backwards, and I bounced on him at the

16    same time.  And right there's the gun barrel again so

17    I'm staring at that.  And see, I get the resolve

18    again.  I look at him.  He gets the resolve again and

19    he tells me, "Don't."

20              So we do this, like, three times.  And

21    he steps a little to the side on the last time,

22    because we were facing the fence, and the garage was

23    behind me -- the fence was behind him, the garage was

24    behind me.  And we heard a noise.

25              And this is where my son-in-law comes

1  in.  He ran up the driveway, jumped my fence thinking
2  that Jake Sheeler had went that way and over, because
3  that's obviously the easiest way out of -- from my
4  backyard.
5              And so we heard -- Jake hid in my yard,
6  and I looked over to see if it was one of my
7  grandkids, you know, and I looked back and he's over
8  jumping off of this.
9              See, we've got all these retaining
10  walls.  When my -- well, my one last here against the
11  Barruses' is probably 2 foot high.  The one at
12  Barruses is probably 3 or so.  And this fence right
13  here, the wooden fence -- well, it's not there
14  anymore.  It's a -- he replaced it because Jake
15  probably broke the top.  The -- well, he got to
16  replace it -- anyway.  Right here in this house.
17         Q.   So which way did Sheeler go?  Can you do
18  an arrow of the way he got -- escaped from where you
19  were at?
20         A.   Okay.  See, there's a telephone pole
21  right here and the retaining wall.  They say it's
22  3 feet high.  The fence in the back of Barruses' yard
23  was probably about 8 foot high and then a drop
24  into -- but anyway.  Okay.  Let me get back to your
25  question.

1              Jake Sheeler hit the retaining wall,

2    pushed off the telephone pole and, like I say, he

3    broke the wooden fence right there at the telephone

4    pole, and so that's why Mike replaced it.  But when

5    he -- he landed in Mike's backyard -- and it's an

6    easy 12-foot drop.  Easy, if not more.  It could be

7    more.  With the lattice on top of that fence, it's

8    probably closer to 10 -- or, I mean, it was -- it was

9    higher.  It was -- but because -- I can show you a

10   picture of what it looks like, the difference in what

11   was there and what's there now.

12              But yeah, he landed.  Do you want me to

13   put a circle where he landed?

14         Q.   Yeah, that would be great.

15         A.   Okay.  He landed here and proceeded to

16   run.  Is that -- yeah, that's the right house.  Okay.

17   Between here.  And I threw my stick at him at this

18   point, and one of my neighbors picked it up.  I

19   wanted it back.  No.

20         Q.   And did you lose sight of him then when

21   he ran through that yard?

22         A.   Huh?

23         Q.   Did you lose sight of him then?

24         A.   Well, when he hit the -- see, in between

25   the two houses, the -- well, he jumped into Mike's

1    backyard.  And I can't remember the lady's name that

2    lives next to Mike, but their house -- he ran right

3    between their houses.

4              And then later on there was a report --

5    I don't think -- I don't know if it's on this one or

6    not.  Well, see, he was caught on a lot of cameras.

7    People were posting on, like, Facebook, and he was --

8    showing that someplace.  I can't -- maybe it's --

9         Q.   Let me ask you a couple of things.

10        A.   Tried to get through a fence on another

11   video camera.

12        Q.   Let me ask you a couple of things about

13   where you threw the stick at him.  You didn't make

14   the jump down off of that fence?

15        A.   Heck no.  I wouldn't even jump my fence,

16   and it's only -- well, from Barruses' yard, probably

17   only a 4 footer or maybe 5.

18        Q.   But you did see him run through the gap

19   between Mike's house and whoever his neighbor is?

20        A.   Yes.  And I was yelling all the time

21   trying to get Kirk's attention or somebody's

22   attention, you know.

23        Q.   What's Mike's last name?

24        A.   I don't know.  He used to be a mailman.

25        Q.   Forget his name?  That's fine.  Okay.

1    Well, I appreciate that.

2                   With -- do you know if there was anybody

3    else at your house at the time that this was going on

4    besides Jake, your son-in-law?

5         A.    Well, yeah, everybody was home.  I mean,

6    we had -- they had just called the pandemic, you

7    know.  Yeah, we were all there.

8         Q.    And your grandkids were there, too?

9         A.    Yes.

10        Q.    Do you know --

11        A.    Probably all three of them.

12        Q.    Do you know if they were inside or

13   outside at the time?

14        A.    I -- at the time they were probably

15   inside.  That's when, you know -- because I didn't

16   see them.  When we heard the noise and Jake went for

17   the retaining wall and over the fence, I go after

18   him, jump on the retaining wall, throw my stick and

19   start yelling for Kirk, "He's over here.  He's over

20   here."

21                   See, and Jake -- I don't know what -- I

22   know he's the noise we heard because -- and I just

23   found this out, like, yesterday -- well, the day

24   before yesterday, because I asked Chris Barrus -- or,

25   I'm not quite sure what -- if, you know, he had the

```
 1    tape, you know, because I -- and he goes, "Yeah," he
 2    goes, "I've got it."  Okay.  He goes, "Yeah," and
 3    he -- I mean, it shows Jake Sheeler running up, shows
 4    me running up and then making a derogatory statement
 5    at the time towards Jake Sheeler, and then I went
 6    running, picked up the stick, came around to a gun
 7    barrel.
 8              And so then, like I say, we did the
 9    dance.  He jumped over the fence.  I threw my stick.
10    I started yelling, and then I ran out to try and get,
11    you know, somebody's attention, you know.
12         Q.   Were you able to -- when you were right
13    there in front of him with the gun pointed at you,
14    could you tell what kind of a gun it was?
15         A.   I couldn't tell.  It was a -- it had a
16    cylinder.
17         Q.   It was a revolver style?
18         A.   Yes.
19         Q.   But from -- I guess with the barrel
20    pointed at you, you couldn't tell what the make or
21    model was?
22         A.   Oh, no.  No.  I -- there was a barrel
23    and his eyes.  That's -- you know, I was either
24    staring at the barrel or I was looking at him.  My
25    intent was, okay, when the -- first, I was just
```

```
 1   scared.  I didn't know what to do.  And then he said,
 2   "No," took a step backwards, and I advanced with him,
 3   and I'm back at the gun and now I'm back at his eyes
 4   and, you know, like I say, just -- and then he's over
 5   the fence.  And, like, say, they -- that -- you know,
 6   he -- I don't know how long we were back there.
 7           Q.   I was going to ask you that.  How long
 8   did that little --
 9           A.   I don't know.  I can't -- I can't tell
10   you how long I stared at that barrel.  I can't tell
11   you how long it took us to act -- I mean, take the
12   steps to -- you know, until we heard the noise.  He
13   went over, and like I say, all I could do then was
14   holler trying to get somebody, you know, going this
15   way.
16           Q.   Let me ask you a couple of other
17   questions if you don't mind.
18           A.   I don't.
19           Q.   Did you happen -- did you get a good
20   enough -- are you able to tell me what he was
21   wearing -- Jake Sheeler was wearing?
22           A.   No.  No.  I -- I got -- I don't know.
23   But there was a white car involved.  I know that
24   much.
25           Q.   What do you mean?
```

```
 1              A.   Because they -- well, I don't know.  It
 2     pulled up at the next door to Kirk.
 3              Q.   And is this stuff that you saw or that
 4     you heard about?
 5              A.   No.  This was what I saw.
 6              Q.   Okay.
 7              A.   This is what he got -- you know, he --
 8     he got out of that car.
 9              Q.   Was that earlier in the day?
10              A.   Yeah.
11              Q.   Do you know how --
12              A.   It was probably about a half hour
13     because -- I wasn't out of my house.  I looked out
14     the window.
15              Q.   So hang on.  Let me just make sure we're
16     clear on the timeline.  So a half hour before you ran
17     up to the street kind of chasing him, you had
18     looked -- you were in your house?
19              A.   Yeah, you know --
20              Q.   And looked out the window?
21              A.   Yeah.  And I just -- okay.  When the car
22     pulled up and he'd get out, okay, I didn't sit there
23     and watch, no.  I didn't sit there and watch.  Okay.
24     So then, you know, go back to business, my business,
25     and get the garbage, take it out.
```

```
 1          Q.   And that's when everything happened?
 2          A.   Yeah.
 3          Q.   Do you remember were you interviewed by
 4   police officers that day?
 5          A.   Yes.
 6          Q.   Do you remember did you give a written
 7   statement by chance to police officers?
 8          A.   No, I don't believe so.
 9          Q.   Some did, some didn't, and I did not see
10   one from you.
11          A.   Yeah.  They -- they came and they had
12   a -- a lineup or something.
13          Q.   And so the neighbor Barrus is
14   Christopher Barrus?
15          A.   Yes.
16          Q.   And the police officer has him listed as
17   B-a-r-r-u-s.  Does that sound right?
18          A.   Yeah.  Barrus.  Barrus.  I can't...
19          Q.   Could you tell what hand he had the gun
20   in?
21          A.   I believe it was his left hand.
22   Because, like, when I said he's running from the dog
23   and he went -- I mean, it was a sideways turn, just
24   like that, and still running, and -- yeah.  And like
25   I say, I come around the garage with my stick, and
```

1    the gun was not -- it had to be in his left hand
2    because I was -- that was one of my thoughts going
3    through:  I'm going to disarm him, you know.  I
4    wasn't ever going to try and hit him with the stick
5    because that finger's a lot -- you know.
6              Right before we heard a noise, I was
7    going to -- I mean, we didn't talk at all when we
8    were back.  I never said a word.  He's the only one
9    that said a word and it was, "Don't.  Don't.  Don't.
10   Don't."
11        Q.   I've never been face-to-face with a gun
12   barrel.  What physical reaction did that cause you to
13   have?
14        A.   Well, just say it took my manhood away.
15   I mean really I ought to do the job.  I was there to
16   protect my family and I didn't complete it.  Scared
17   him off maybe -- well, Jake scared him off when he
18   landed in my yard, but yeah, all I experienced was
19   fear.
20        Q.   Fear?
21        A.   Yes.
22        Q.   I was going to say how did that make you
23   feel?
24        A.   Well, I'll tell you every time I looked
25   at that gun barrel, I was just waiting for that

1  bullet to come out.  It -- then I'd look in his eyes

2  and it was a -- you know, he would look, like,

3  confused, like I'm crazy, you know.  I was -- you

4  know, thinking you don't show up to a gun fight with

5  a stick.  But, you know, protecting my family was my

6  goal.

7          Q.   Has that day affected you in your life

8  kind of moving forward?

9          A.   Well, of course.

10          Q.   How?

11          A.   Well, I'm -- you're suspicious of

12  everybody, you know.  You don't know -- I mean, heck,

13  you know, like I say, when I saw him get out of that

14  car over by Kirk's, I didn't think nothing of it.  If

15  I'd know it now, I would have just ran and got my

16  gun, my dogs even.  I mean, you know, as far as

17  the -- the gun incident, you know, I -- I've grown up

18  in Pocatello.  I've had, you know, my own guns but

19  never had one in my face.

20          Q.   Have you ever seen Jake Sheeler since

21  that day?

22          A.   Yes.  In court.

23          Q.   Did you go -- I was going to ask:  Did

24  you go down to the court sentencing?

25          A.   I did.

1          Q.   Did you make a statement that day?

2          A.   I did, and I don't know what it was.  It

3    was -- I was -- every time I would be in his

4    presence, I would snap.

5          Q.   What do you mean by "snap"?

6          A.   I would scream, holler.  That's all I

7    did, if you want to call it a statement.  All I did

8    was scream and holler, I mean, at him, you know.  And

9    the judge reprimanded me for it, you know, but -- you

10   know.  So yeah, it puts you right back where, you

11   know, this guy's going to take my life.

12         Q.   Okay.

13         A.   You know, I didn't know at the time he

14   was a convicted felon or I probably would have not

15   went -- I wouldn't have followed him straight back.

16   I would have went toward my house like Jake did, my

17   son-in-law.

18         Q.   Let me ask you a couple of things.  I

19   just wanted to run through a couple of things that

20   were in the police report.  One of those things

21   was -- the officer reports, "I asked Richard

22   Hernandez if he could describe the gun.  He said it

23   had a silver barrel but could not describe the

24   handle."

25              Is that -- did he get that down right?

1          A.    I never said that, no.  I -- I don't
2    think I described the gun for him.
3          Q.    You don't think you could describe it?
4          A.    Well, it wasn't silver I don't think.
5    That's not what I picture in my brain.  But like I
6    say, I wasn't inspecting the gun.  I never -- I never
7    had the thoughts going to -- I mean, I wasn't
8    thinking clearly enough to see if -- okay, you can
9    see that safety button on a gun, you know, and I
10   wasn't even looking to be able to see that because,
11   if I would have seen that safety on, I would have --
12   I would have went for it.  But, you know, just
13   like -- you know, this is all in the hindsight.
14         Q.    Right.
15         A.    You know.
16         Q.    Let me just run through my notes.  I
17   made a few notes of things to ask you and I think
18   you've answered those questions but let me double
19   check.
20              Mr. Hernandez, I think that that answers
21   all my questions.  Counsel may have some questions
22   for you.
23         MS. PORTER:  Just a couple.
24                    EXAMINATION
25   BY MS. PORTER:

1          Q.   So is it fair to say that Jake Sheeler
2     was running away the whole time that -- of his
3     encounter with you?
4          A.   No.
5          Q.   Okay.  Did he stop?
6          A.   Did he stop?  Yes, he was stopped behind
7     the garage where we had our encounter.  When I come
8     around the garage, it was to Jake with a gun.
9          Q.   And then he ran away; is that right?
10          A.   No.  Then he told me, "Don't," and then
11     stepped back.  I followed him, then I looked at the
12     gun barrel again and then looked at him, and he told
13     me "Don't" because I'm sure that my eyes revealed
14     that I had thought of something else -- I was going
15     to try something because that's what I wanted:  That
16     is protecting my family.
17          Q.   Did he ever run away or did he just stay
18     there the whole time?
19          A.   Well, the whole encounter with me he
20     stayed there until he heard the noise, which was my
21     son-in-law jumping over the Barruses' fence -- our
22     mutual fence.
23          Q.   And then he ran away.  Is that a fair
24     statement?
25          A.   Yes.

1          Q.    Okay.

2          A.    Well, he had to get away from me.

3          Q.    He ran away.  I mean, I don't understand

4    what your objection is to the term "he ran away."

5          A.    Well, he -- okay.  Let me put it this

6    way to you:  He was in control of the situation

7    behind the garage.

8          Q.    Okay.  Did he ever run away or not?

9          A.    Well, yes, he did, but not --

10         Q.    Okay.

11         A.    -- until after he threatened me four or

12   five times.

13         Q.    I'm just asking you whether he ran away,

14   and it's -- I just -- that should have been, like, a

15   five-second question, so I just wanted to figure that

16   out.

17         A.    Well, he jumped away.

18         Q.    Have you ever spoken with Kirk Hendricks

19   about the incident?

20         A.    Have I what?

21         Q.    Have you ever spoken with Kirk Hendricks

22   about the incident?

23         A.    I spoke to Kirk Hendricks on the --

24   well, it would have been Sunday the 19th, I believe,

25   and I asked him about the phone call I got and --

1          Q.    Well --

2          A.    -- you know, I was --

3          Q.    I can save you some time.  My questions

4    are probably going to be "yes" or "no" and then I

5    will probably follow up with follow-up questions,

6    because I really -- these are really short questions,

7    I promise.

8                Have you spoken with Kirk Hendricks more

9    than once about the incident?

10         A.    Yes.

11         Q.    Okay.  So how many times approximately

12   have you spoken with Kirk Hendricks about the

13   incident?

14         A.    I'm -- probably every time we've gotten

15   together, which like I stated earlier, we share a

16   grandson.

17         Q.    Okay.

18         A.    And so family get-togethers.

19         Q.    That's good enough.  That's good enough.

20   I promise these are short questions and short

21   answers.

22                How long after the incident was the

23   first time that you spoke with Kirk Hendricks?

24         A.    Oh, my God.

25         Q.    I mean, for example did you speak with

1    Kirk Hendricks the same day as the incident?

2         A.    I'm sitting here -- okay.  See, what --

3    this is the way it happened:  We had our little dance

4    behind the garage.  Jake jumped over the fence.  He

5    jumped over the fence.  I was worried about my

6    son-in-law so I hopped in the car.

7         Q.    I'm going to interrupt here and I'm

8    going to move to strike.

9         A.    Okay.  I can't remember --

10        Q.    My question is:  Did you -- please

11   listen to my question, as these are short.  They

12   really are.

13             Did you speak with Kirk Hendricks about

14   the incident on the day of the incident?

15        A.    I can't remember, but I would just

16   assume so.

17        Q.    Okay.  The -- whenever it was -- let's

18   go to the first time you do remember speaking with

19   Kirk Hendricks about the incident.  What did he tell

20   you about the incident?  What did Kirk Hendricks tell

21   you?

22        A.    I don't know.  Just that Sheeler is

23   getting away with all of this -- is what he told me.

24        Q.    Has Kirk Hendricks ever told you what

25   went on inside the shop?

1          A.   Oh, yes.  Yes.  Yes, he did.

2          Q.   Okay.  What has he said?

3          A.   He said that -- see, they -- I don't

4   know.  This was three years ago.  Plus it's something

5   I don't want to remember.  But yes, he told me that

6   he got home, was -- they were going to the house.  He

7   looked at his garage, seen a face with a smile and

8   assumed it was our neighbor, a little kid that lived

9   next door to my house named Necus, and he just went

10  in the house, and then he went out to the garage and

11  was faced with a gun and then Mary came out.  She was

12  also faced with a gun, and they were pretty much

13  ushered into their garage and that's when Jake

14  Sheeler went running --

15         Q.   Okay.  And what did --

16         A.   -- with the gun pointed at him.

17         Q.   I'm sorry.

18         A.   Okay.

19         Q.   When did Mr. Hendricks tell you that?

20         A.   That would have been the very first time

21  I spoke to him, which I assume would have been the

22  same day, but I don't know.  It was -- there were

23  police and neighbors and --

24         Q.   Fair enough.  That -- that's fine.  So

25  did Mr. Hendricks say anything about what he did with

1   the gun that he had during this encounter?

2          A.   No.  I really -- no, he didn't actually

3   say he was carrying a gun because I would have asked

4   him, "Why didn't you shoot him?"

5          Q.   But you're saying he never mentioned

6   that he had a gun on him?  Is that what you're

7   saying?

8          A.   No.  He didn't say, no.  "I'm carrying a

9   gun and I didn't shoot him"?  No, he never said that.

10          Q.   Well -- but did he -- just so that our

11   record is clear, did Mr. Hendricks ever say anything

12   to you about the fact that Mr. Hendricks had a gun on

13   him?

14          A.    No, he did not.  If he had, I would have

15   told -- I would have asked him why he didn't shoot

16   Jake Sheeler after he pointed a gun at me and my

17   wife.

18          Q.   Okay.  Have you ever spoken with

19   Ms. Hendricks about the incident?

20          A.    When we were at the courthouse,

21   Mr. Hendricks was -- I'm not sure if he was having

22   surgery or what, but he was not able to be there and

23   Mary was there, and -- I don't know.  I remember

24   small talk with her while we were waiting to be

25   interviewed.

1          Q.   Do you remember anything that
2     Ms. Hendricks has said to you about the incident?
3          A.   No.  Everything concerning the incident
4     with Mary was told to me by Mr. Hendricks.
5          Q.   Okay.  Then I won't be interested in
6     that, then.  Okay.
7          MS. PORTER:  I don't have any further
8     questions.
9          THE WITNESS:  All righty.
10         MR. ANGELL:  Well, I think that's it.  I
11    think we can go off the record.
12          (Deposition concluded at 12:38 p.m.)
13                 (Signature waived.)
14
15
16
17
18
19
20
21
22
23
24
25

1      REPORTER'S CERTIFICATE

2          I, Amber S. Williams, CSR NO. 1080,

3   Certified Shorthand Reporter, certify:

4          That the foregoing proceedings were taken

5   before me at the time and place therein set forth, at

6   which time the witness was put under oath by me.

7          That the testimony and all objections made

8   were recorded stenographically by me and transcribed

9   by me or under my direction.

10          That the foregoing is a true and correct

11  record of all testimony given, to the best of my

12  ability.

13          I further certify that I am not a relative

14  or employee of any attorney or party, nor am I

15  financially interested in the action.

16          IN WITNESS WHEREOF, I set my hand and seal

17  this 4th day of April, 2023.

18

19                                    _Amy Horsley_

20          _____

21                AMBER S. WILLIAMS, CSR NO. 1080

22                Notary Public

23                Post Office Box 2636

24                Boise, Idaho  83701-2636

25  My commission expires June 1, 2027

# Exhibit 11

UNITED STATES DISTRICT COURT

IN AND FOR THE STATE OF IDAHO

| | |
|---|---|
| JAKE SHEELER, an individual, | ) |
| Plaintiff, | ) Case No. |
| vs. | ) 4:22-cv-00313- |
| BRIDGET MCARTHUR, an individual; | ) DCN |
| JEFFREY E. ELDRIDGE, an individual; | ) |
| MARISA A. SALDANA, an individual; | ) |
| ROGER SCHEI, an individual; and | ) |
| CITY OF POCATELLO, a municipal | ) |
| Corporation; | ) |
| Defendants. | ) |



DEPOSITION OF BRIDGET MCARTHUR

February 15, 2023

REPORTED BY:

AMBER S. WILLIAMS, C.S.R. No. 1080

Notary public

1          THE DEPOSITION OF BRIDGET MCARTHUR was taken

2    on behalf of the plaintiff at the Holiday Inn Express

3    & Suites, 200 Via Venitio, Pocatello, Idaho,

4    commencing at 8:33 a.m. on February 15, 2023, before

5    Amber S. Williams, Certified Shorthand Reporter and

6    Notary Public within and for the State of Idaho, in

7    the above-entitled matter.

8

9                       APPEARANCES:

10   For Plaintiff:

11        CHRISTENSEN & JENSEN, PC

12        BY:  KARRA J. PORTER

13        BY:  ANNA P. CHRISTIANSEN

14        257 East 200 South, Suite 1100

15        Salt Lake City, Utah  84111

16        karra.porter@chrisjen.com

17        anna.christiansen@chrisjen.com

18   For Defendants:

19        HALL ANGELL & ASSOCIATES, LLP

20        BY:  SAM L. ANGELL

21        1075 South Utah Avenue, Suite 150

22        Idaho Falls, Idaho  83402

23        sla@hasattorneys.com

24

25

1                      **I N D E X**

2

3    TESTIMONY OF BRIDGET MCARTHUR                    Page

4       Examination by Ms. Porter....................  4

5       Examination by Mr. Angell.................... 106

6       Examination by Ms. Porter.................... 107

7

8

9

10                      **EXHIBITS**

11   Exhibit 1.    Firearms Qualification and.......  14

12                 Evaluation,

13                 Bates Nos. DEFENDANTS 000266 -

14                 DEFENDANTS 000271

15   Exhibit 2.    Eastern Idaho Critical Incident..  64

16                 Team Supplemental Report

17                 Form 18, Bates Nos. DEFENDANTS

18                 000162 - DEFENDANTS 000172

19   Exhibit 3.    Aerial View of Scene............  81

20

21

22

23

24

25

```
 1                    BRIDGET MCARTHUR,
 2   first duly sworn to tell the truth relating to said
 3   cause, testified as follows:
 4                      EXAMINATION
 5   BY MS. PORTER:
 6          Q.   Good morning.  Would you please state
 7   your name for the record.
 8          A.   Bridget McArthur.
 9          Q.   My name is Karra Porter, and with me is
10   Anna Christiansen, and we represent Jake Sheeler in
11   this case.
12               Have you ever had your deposition taken
13   before?
14          A.   No, not a deposition.  Just court
15   testimony.
16          Q.   Okay.  How many times approximately have
17   you testified in court?
18          A.   I don't know.  That would be something
19   that I would have to look up with each individual
20   case.
21          Q.   Sure.  And it's not the case cracker.
22   So do you think it's been more than 100 times?
23          A.   No, not more than 100.
24          Q.   More than five?
25          A.   Yes.
```

1          Q.   Can you just give me a couple of
2     examples of the type of testimony that you've given
3     in court before?  The general --
4          A.   The types of cases?
5          Q.   Yes.
6          A.   Domestic battery, drug cases, a murder
7     trial, attempted strangulation, battery.  That's the
8     general.
9               Does that -- do you want more than that?
10         Q.   No, that's very helpful.
11         A.   Okay.
12         Q.   And in those examples that you just
13    gave, were you giving testimony of things that you
14    had observed, you know, as a fact witness or were you
15    giving any sort of what you understood to be expert
16    testimony?
17         A.   I wasn't giving expert testimony, just
18    as a fact witness.
19         Q.   What is your current employment?
20         A.   Pocatello Police Department as patrol
21    officer.
22         Q.   And how long have you worked for the
23    Pocatello Police Department?
24         A.   Since December of 2015.
25         Q.   Have you always had the same position?

1        A.    Yes.

2        Q.    Have you ever applied for any sort of

3    promotion or different position that you were not

4    given?

5        A.    I'm on a promotion list.  So, like, for

6    a corporal position -- so I applied for a corporal

7    position, and I'm currently on that list.

8        Q.    How long have you been on that list?

9        A.    It's been since October.

10        Q.    Of?

11        A.    Of last -- so 2022.  October of 2022.

12        Q.    I appreciate that.  What did you do in

13    terms of employment before you were hired by

14    Pocatello Police Department?

15        A.    So I worked at Old Town Gunslingers,

16    which is a gun shop.  I worked for Estée Lauder at --

17    it used to be Herberger's in town.  Before that, a

18    librarian.  I went to school for aesthetics in

19    beauty.  That's -- yeah, that's about the scope of my

20    jobs, so...

21        Q.    Just briefly what were your duties

22    generally at -- was it Gunslinger?

23        A.    Old Town Gunslingers.  So selling

24    firearms.  That was the scope really of the duties

25    and running the gun shop with the owner, so...

1            Q.    And what generally were your duties with

2    Estée Lauder?

3            A.    Just selling makeup, skin care.

4            Q.    And generally what were your duties with

5    respect to the library?

6            A.    So shelving books, checking people out,

7    checking books in.  So just more of -- just the

8    library technical skills, not the actual library.

9            Q.    And then I don't know if I wrote it down

10   wrong, but did you work at a place with aesthetics,

11   or were -- was that your training?

12           A.    That was my training, and then it just

13   applied to the Estée Lauder job, so...

14           Q.    Okay.  What I'm going to try to do today

15   is not dillydally, if possible.  So just to give you

16   a preview, what I'll try to do is use part of -- or,

17   use -- there's a summary of a statement that you

18   gave.

19                 Do you know what I'm talking about, with

20   respect to the summary of your statement?

21           A.    No.  What specific summary are you --

22           Q.    Okay.  The -- is there more -- are you

23   aware of any summaries of your -- of any statements

24   you've given with respect to this incident?

25           A.    Any summaries, no.  That would be

1    something that I would have to know exactly what

2    you're talking about.

3            Q.   Okay.  I'll show it to you in a minute.

4            A.   Okay.

5            Q.   I'm not going to mark it as an exhibit

6    because it is just another officer summary of your

7    statement, but I'm just going to try to use it as

8    sort of an outline of some questions that I had to

9    follow up on your statement.  So in other words, I'm

10   not going to ask you to redo everything you did in

11   that statement.

12           A.   Oh.  So are you saying it's a summary of

13   another officer's statement?

14           Q.   No.  It's an officer's statement of -- a

15   summary of your statement.

16           A.   Okay.

17           Q.   Do you remember giving a statement to

18   anyone with respect to the shooting?

19           A.   Yes.

20           Q.   To whom did you give that statement?

21           A.   To detectives -- I believe it was Zeb

22   Graham and a sergeant -- a sergeant with ISP as well

23   as Steve Muhonen, my attorney, things like that.

24           Q.   And that is the statement that I'm

25   talking about.

1          A.    Okay.

2          Q.    I'm not trying to say there's something

3    else floating out there.

4          A.    Okay.

5          Q.    When did you first retain an attorney

6    with respect to this shooting?

7          A.    The night of.

8          Q.    And how did you retain the attorney?  I

9    don't mean any conversations.  I just mean did you

10   call someone?  E-mail someone?

11         A.    Call through FOP.

12         Q.    So you called FOP.  And you did not

13   speak directly to the attorney?

14         A.    I didn't specifically --

15         MR. ANGELL:  Careful.  Just questions -- that

16   question is dancing around attorney-client privilege.

17   So I think the way she's worded it is okay, but I

18   don't want you to disclose your conversation with

19   your attorney.

20         THE WITNESS:  Right.  I won't disclose any

21   details.

22              I don't recall if I specifically called

23   Steve Muhonen or if I had someone else call, but I

24   requested they call Steve Muhonen.  If that's the

25   case -- if I didn't specifically call him, I

```
 1   requested they call Steve Muhonen.
 2          Q.   (BY MS. PORTER):  Okay.  Did you call
 3   FOP?
 4          A.   No.
 5          Q.   Do you know if somebody did?
 6          A.   I don't.
 7          Q.   Did you speak with anyone from FOP that
 8   night or the next day with respect to the shooting?
 9          A.   No.  Steve Muhonen is the only person I
10   spoke with.
11          Q.   And I totally agree with your counselor:
12   I have no interest in conversations you had with
13   Mr. Muhonen.
14               Do you know whether Mr. Muhonen
15   represented anyone else in connection with the
16   shooting?
17          A.   I believe so.
18          Q.   And again, without delving into
19   communications, with respect -- to your
20   understanding, who else did Mr. Muhonen represent
21   with respect to the shooting?
22          A.   I believe Corporal Eldridge, now
23   Sergeant Eldridge, and Officer Saldana.
24          Q.   Do you know whether any of the bullets
25   that you fired struck Jake Sheeler?
```

1          A.    I don't.

2          Q.    And why don't you know that?

3          A.    It wasn't information that I was

4     provided.

5          Q.    Did you ever ask?

6          A.    No.

7          Q.    You gave your gun to someone after the

8     shooting; is that right?

9          A.    Correct.

10          Q.    Did you expect that they would compare

11     the bullets in Jake's body with your gun?

12          A.    I didn't expect that.

13          Q.    You didn't think that part of the

14     Pocatello Police Department's investigating into the

15     shooting of Jake Sheeler would include determining

16     who shot him?

17          A.    No.  Not specifically what you're

18     asking, no.

19          Q.    Okay.  What did you think they were

20     going to do with your gun when you gave it up?

21          A.    To me, it's evidence and that -- so

22     that's why they took the firearm:  as evidence.

23          Q.    And then did you get it back at some

24     point?

25          A.    Yes.

```
 1              Q.    When?
 2              A.    It had to have been after I had returned
 3     from my leave at work.
 4              Q.    Can you --
 5              A.    I don't have a specific date.  That's
 6     something that I think would need to be requested
 7     through an evidence chain of command.  I'm not
 8     certain on the date.
 9              Q.    Is there any way you can narrow it down
10     to like a month or a season?
11              A.    I can't.  It was such a long time ago
12     that I don't -- I don't remember.
13              Q.    Do you remember how long you were on
14     leave after the shooting?
15              A.    I believe approximately two weeks.
16              Q.    Did you care whether or not any of your
17     bullets had struck Jake Sheeler?
18              A.    Did I care?
19              Q.    Yeah.
20              A.    I mean, of course I would care.
21              Q.    Okay.
22              A.    And that's -- but I -- I wasn't going to
23     ask specifically.  If that's information they
24     provided to me, then I would know that, but I don't
25     know that because they didn't provide that
```

Bridget McArthur - February 15, 2023                    13

1    information to me.

2          Q.   Was there anything preventing you from

3    asking someone whether any of your bullets struck

4    Jake Sheeler?

5          A.   No, there wasn't anything preventing me,

6    but that wasn't information that was given so I

7    didn't go and ask for that.

8          Q.   Is it a fair statement that you cared

9    whether your bullet -- any of your bullets had hit

10   Jake Sheeler but not enough to ask?

11         MR. ANGELL:  Object to the form.

12              You can answer, if you know.

13         THE WITNESS:  Okay.  Will you ask that

14   question one more time, please, or just read it?

15              (The record was read poorly.)

16         Q.   (BY MS. PORTER):  It's kind of almost

17   unfair to spring that on the court reporter.

18              Is it a fair statement that you cared

19   whether any of your bullets had hit Jake Sheeler but

20   not enough to ask?

21         A.   No, that's not a fair statement.

22         Q.   Okay.  Then why didn't you ask?

23         A.   Because I didn't have to ask.  That

24   wasn't something that I have to ask.  If that was

25   information provided to me, then that would be

1    something that I know.  But it wasn't something that
2    came to the top of my head of I need to ask this.  Of
3    course I care, but the way that it's being worded is
4    that I cared but I didn't care enough to ask and I
5    don't think that that's fair to say.
6              Q.   So what prevented you from asking, then?
7              A.   Nothing prevented me.  It wasn't
8    something that I thought of.
9              Q.   And you've never asked anyone during the
10   two-plus years since the shooting, correct?
11             A.   Correct.
12             MS. PORTER:  Can you get me the McArthur
13   summary?  It's marked.
14             Q.   (BY MS. PORTER):  Actually, let me show
15   you something first and just --
16             MS. PORTER:  Well, give me the firearms
17   qualification.
18                  (Exhibit 1 marked.)
19             Q.   (BY MS. PORTER):  Let me show you what
20   has been marked as Deposition Exhibit 1.  You're
21   welcome to look at anything within Exhibit 1, but I'm
22   going to specifically direct your attention to a page
23   that at the bottom says "000269."
24                  Have you seen page 269 before within
25   Exhibit 1?

1          A.    I signed it so I must have whenever the
2    page was given to me.
3          Q.    All right.  I just want to ask a few
4    questions about this.  Now, as I understand it, this
5    is documentation of your firearms qualification -- is
6    that right? -- and evaluation?
7          A.    Firearms qual- -- yeah, correct.
8          Q.    And this was March 26, 2020?
9          A.    Yes, that's the date on there.
10          Q.    Let me just ask you a few terminology
11    questions.  Let's look at paragraph 1.  And again,
12    you are always welcome to read anything else in the
13    document or on the page that you want, but I'm going
14    to direct your attention to the third line down after
15    the word "threats."
16               It says, "Knows and follows the four
17    universal firearms rules."
18          A.    Are you talking about under
19    "Marksmanship"?
20          Q.    Under No. 1.
21          A.    Okay.
22          Q.    Paragraph No. 1.
23          MR. ANGELL:  Just take a minute and read this
24    paragraph.
25               THE WITNESS:  Okay.

1          Q.   (BY MS. PORTER):  Having read the text

2     of paragraph No. 1, let me direct your attention to

3     sort of the end of the third line.  There's a clause

4     that says, "Knows and follows the four universal

5     firearms rules."

6               Do you see that?

7          A.   Yes.

8          Q.   What are the four universal firearms

9     rules?

10         A.   Treat your firearm as if it's always

11    loaded, finger off the trigger, know your backstop

12    and what's beyond it -- sorry -- know your backstop,

13    what's beyond it.

14              Did I go over all four?

15         Q.   No, we've got three.

16         A.   Don't point your gun at anything that

17    you're not willing to shoot at.  I mean, know if

18    you're pointing a gun that you have a loaded firearm

19    that you could shoot with.

20         Q.   Okay.  You believe those are the four

21    universal firearms rules?

22         A.   Yes.

23         Q.   Okay.  You mentioned a backstop and what

24    is beyond it.  What did you mean by that?

25         A.   Know what's beyond what you're shooting

1    towards.

2            Q.    In other words, if you miss your

3    subject, what might you be hitting behind it?

4            A.    Correct.

5            Q.    Okay.  Let's go to paragraph 2.  And why

6    don't you just take a second to read that to

7    yourself.

8            A.    Okay.

9            Q.    Okay.  Just a couple more terminology

10   questions.  In paragraph 2, the first full sentence

11   states, "Officer knows and follows the six-step

12   draw."

13            What is the six-step draw?

14            A.    Do you want me to, like, demonstrate?

15            Q.    You can either describe it or you can

16   demonstrate and we can try to -- if it matters, we

17   can end up putting it on the record.

18            A.    Okay.

19            THE WITNESS:  Do you want me to try to

20   demonstrate?

21            MR. ANGELL:  Yeah, you can do that if you

22   need to.

23            THE WITNESS:  I think it's going to be hard

24   to -- yeah.  And obviously, I'll just --

25            MR. ANGELL:  The only challenge is our court

1    reporter trying to take that down, but I need you to

2    answer it the way you can answer it.  So do what you

3    have to do to answer the question.

4            THE WITNESS:  Okay.  So a six-point draw

5    would be -- so this is just my hand.  Your firearm is

6    in the holster, you're breaking the retention,

7    pulling the firearm out, coming up, meeting it with

8    your hands, and coming out.

9            Does that kind of help demonstrate?

10           Q.   (BY MS. PORTER):  Yeah.  Do you mind

11   telling me which of the steps -- because to a

12   layperson like me, that looked like three stipes.

13           A.   I don't know that I can break down every

14   step for you.  That's the best way that I can

15   describe that -- is breaking the retention, making

16   sure that your hand is secure, you're grabbing the

17   firearm, pulling your hand up past the holster,

18   rocking it towards your ribcage/chest area, meeting

19   of your hands, moving it out.  That's the best way

20   that I can describe that for you.

21           Q.   Okay.  And is that the process that you

22   followed with respect to the shooting of Jake

23   Sheeler?

24           A.   Yes.  Although, I did have a flashlight

25   in my left hand so I -- there was not two hands on

```
 1    the gun.
 2          Q.   Okay.  Has anyone -- and I -- by the
 3    way, none of my questions ever ask for conversations
 4    with attorneys, okay?
 5          A.   Okay.
 6          Q.   So excluding attorneys, has anyone ever
 7    suggested to you that, if none of your bullets struck
 8    Jake Sheeler, you might not even have to be in this
 9    lawsuit?
10          A.   No.
11          Q.   Does that make you want to ask the
12    Pocatello Police Department whether any of your
13    bullets struck Jake Sheeler?
14          A.   No.
15          Q.   Okay.  Now, in that same Paragraph 2,
16    the third full sentence said, "Places non-shooting
17    hand on chest when appropriate."
18               Can you tell me what that generally
19    refers to?
20          A.   That would mean -- so, for example, if
21    I'm doing a firearm qualification and I'm shooting
22    one-handed, we go through that draw.  This hand, if
23    it doesn't have a flashlight or anything else in it,
24    needs to be on the chest.  So if I'm shooting
25    one-handed with my strong hand, my left hand is going
```

1    to be on my chest and out of the way so it's not just

2    hanging down.  It's not out in the way of the

3    firearm; it's on my chest.  And the other hand is out

4    with the firearm.

5          Q.    Do you have an understanding of why in

6    the situation you just described there's a

7    recommendation that you put that hand on your chest?

8          A.    For safety reasons, I believe.

9          Q.    Okay.  How -- remember, layperson here.

10          A.    Okay.

11          Q.    Do you have an understanding of why that

12    is more safe than just letting your hand dangle?

13          A.    I guess there could be several reasons:

14    If you're shooting one-handed but transitioning to

15    two-handed shooting, this is closer and quicker to

16    come from the chest than down at your side.

17                Safetywise, just having it on your chest

18    instead of being lain down by your side, that's just

19    a part of the safety to just not have it out in front

20    of you.  So that's the best way that I would describe

21    that.

22          Q.    Let's go down to Paragraph 4.  And why

23    don't you take a second to read that to yourself.

24          A.    Okay.

25          Q.    First, let me ask you:  Did you have a

1    weapon-mounted light on the night of Jake Sheeler's

2    shooting?

3            A.    Yes.

4            Q.    Did you utilize it?

5            A.    No.

6            Q.    Why not?

7            A.    Because I had my flashlight which is a

8    much brighter light.

9            Q.    Okay.  So the weapon-mounted light was

10   turned off?

11           A.    Correct.

12           Q.    And you mentioned you had your

13   flashlight which is a much brighter light.  Do you

14   happen to know the --

15           A.    Lumens?  I don't know the specific

16   lumens on that, but I believe that's something that

17   you could request, so...

18           Q.    Okay.  Do you happen to remember any

19   details about the flashlight, like it's make or model

20   or anything?

21           A.     I'm trying to think.  I believe it's a

22   Streamlight brand.  It's longer, probably about the

23   size of this water bottle.  I would say a handle --

24   long handle, just a single large bulb at the top.

25   There's a button on the side that you just press

1   down -- press up and down to turn off and on.

2              So that's the best way that I can

3   describe that to you.

4        Q.   Have you ever had one of those

5   flashlights shined at you?

6        A.   Yes.

7        Q.   Was it in the dark?

8        A.   It's been in the -- in both settings,

9   the dark and the light.

10       Q.   When one of those flashlights was shined

11  at you in the dark, what did you see with respect to

12  the person holding it?

13       A.   I -- I would have to know exactly what

14  the situation I was in.  I mean, I feel like that's

15  kind of broad.

16       Q.   Well, let me narrow it.  It's a bright

17  light.  You would agree with that, right?

18       A.   Correct.

19       Q.   Somebody is shining a bright light at

20  you, okay?

21       A.   Okay.

22       Q.   Were you able to see anything other than

23  the bright light?

24            MR. ANGELL:  Object to the form.  It's an

25  improper hypothetical.

1          You can answer that, if you can.

2          Q.   (BY MS. PORTER):  I'm referring to your

3  past experience.

4          A.   Your eyes have to adjust, just like in

5  any situation, if you're going into darkness or

6  light.

7          Q.   And do you remember how long it took

8  your eyes to adjust?

9          A.   I don't.

10          Q.   But you were aware of that, I'll say

11  phenomenon, that it takes a while for your eyes to

12  adjust before September 25th, 2020, correct?

13          A.   I didn't say it takes a while.  It does

14  take time for your eyes to adjust.  I'm not going to

15  specifically say how much time because I feel like

16  that can be different for a number of reasons.

17          Q.   Prior to the shooting of Jake Sheeler,

18  you did know that it would take some time to adjust

19  to having that bright light shined at you, correct?

20          A.   Correct.

21          Q.   Okay.  We're going back to paragraph 4,

22  and I'm going to direct you to the fourth line down.

23  There's a sentence that begins, "Able to

24  communicate."

25          Do you see that sentence?

1            A.    Yes.

2            Q.    And for the record, I'll read it.  "Able

3    to communicate with teammates and follow proper

4    procedure when making entry."

5                 Do you happen to have an understanding

6    of what this means when it says, "Able to communicate

7    with teammates"?

8            A.    Yes.

9            Q.    What is that understanding?

10           A.    Communicating as we're making entry.  So

11    telling each other, "Hey, I'm moving, I'm covering,

12    I'm" -- those would be the two terms:  I'm moving and

13    I'm covering.

14           Q.    Did you communicate with any of your

15    colleagues when you were on site where Jake Sheeler

16    was shot?

17           A.    In what specific way?

18           Q.    Any.  I'll take any communications.

19    Once you were on site where Jake Sheeler was shot,

20    I'll take any communications you had with any law

21    enforcement officer.

22           A.    So prior to --

23           Q.    No.  On site.

24           MR. ANGELL:  Hang on, Counsel.  Let her

25    answer the question.

1          MS. PORTER:  I'm sorry.  I thought she was

2    asking for clarification.  I apologize.

3          THE WITNESS:  Corporal Eldridge and I, when

4    we were walking and I observed Sheeler run from the

5    treeline and I had shined the flashlight and I said,

6    "Who's that," I would consider that us communicating.

7          Q.   (BY MS. PORTER):  All right.  Give me

8    your next one with any law enforcement officer.

9          A.   I think that's such a broad -- I think

10   that it would be easier if you asked me what -- what

11   specific communications I gave.

12         Q.   I'll just tell you I couldn't find any.

13   After you said, "Who's that," or something to that

14   effect, I couldn't find any.  That's why I'm asking

15   you to help me out.  I've read everything.  I've seen

16   the video.  I've heard -- I've read the summaries,

17   I've read the reports.  I couldn't find any

18   communication by you with any law enforcement officer

19   after you said something to the effect of "Who's

20   that" or something.

21         A.   We can hear each other if we're in that

22   proximity.

23         Q.   What did you say to any other law

24   enforcement officer after that point?

25         A.   I don't recall.

1           Q.    Okay.  So you can't point me to

2    anything, can you?

3           A.    I don't recall.

4           Q.    Okay.  What did you do to prepare for

5    this deposition?

6           A.    I read through the reports, read through

7    the report that was made up from -- I shouldn't say

8    made up -- that was written up from Detective Graham

9    and the ISP sergeant.

10          Q.    Did you re-watch your body cam footage?

11          A.    I did not.

12          Q.    When's the last time you saw that body

13   cam footage?

14          A.    I would say it has to have been at least

15   a year and a half to two years ago.

16          Q.    Okay.  You said you read reports and

17   then you mentioned the document prepared by I think

18   Sergeant Graham and you said an ISP sergeant.  Were

19   those the only reports that you read or were those in

20   addition to other reports that you read?

21          A.    That was the report that I read -- was

22   the one that was from my interview.

23          Q.    Okay.  Did you read any of the other

24   officers' reports in connection with the shooting?

25          A.    No.  I read the deposition I believe

1   from you guys -- from your office.  The -- a copy of

2   the --

3           Q.   The notice of deposition?

4           A.   Correct.

5           MR. ANGELL:  I think that's what you're

6   remembering.

7           Q.   (BY MS. PORTER):  Sure.  Okay.  Did you

8   listen to any audio in anticipation of this

9   deposition?

10          A.   No.

11          Q.   Can you tell me of -- well, strike that.

12          Did you do any planning with any law

13  enforcement officer with respect to how to avoid

14  giving conflicting instructions?

15          A.   No.

16          MR. ANGELL:  Hang on.  Object to the form of

17  the question.

18          Go ahead.

19          THE WITNESS:  No.

20          Q.   (BY MS. PORTER):  Did you have any

21  communications with any other law enforcement officer

22  about who should actually give instructions?

23          A.   Give instructions for what?

24          Q.   To Jake Sheeler.  Orders.

25          A.   On the -- okay.  Can you --

1        Q.    I'm asking for any because I can't find
2    any.
3        A.    Can you ask it again?  Because I was
4    confused as to what you were asking me as far as
5    instructions.
6        Q.    I am asking you if you can tell me about
7    any planning or arrangements that you participated in
8    with any other law enforcement regarding who should
9    give Jake Sheeler commands?
10       A.    No.  That's a very -- that's a very
11   split-second -- split seconds of evolving events.  I
12   don't have time to sit and say, "Hey, are you going
13   to give commands or yell to someone?  Are you going
14   to" -- that would be an unreasonable thing that there
15   was time to sit and plan.
16       Q.    Okay.  Say the phrase "I got this."  Go
17   ahead.
18       A.    I got this.
19       Q.    Does that take less than a second to
20   say?
21       A.    Yes.
22       Q.    Okay.  You could have said -- you
23   started with the commands, correct?  You were the
24   first one to give a command to Jake Sheeler?
25       A.    That would be something that I would

1   have to review the body cam for.

2          Q.    Okay.  Let me assume -- or, let me ask

3   you to assume that that's what Sergeant Eldridge

4   said, that you gave the first command to Jake

5   Sheeler.

6          A.    Okay.

7          Q.    Let me ask you to assume that.  And then

8   let me ask you to assume that, after you were already

9   giving Jake Sheeler commands, Sergeant Eldridge came

10  in and started giving his own commands.

11               What would have prevented you from

12  saying "I go this"?

13         A.    That I was giving commands?

14         Q.    Yeah.  In other words, "Stop giving

15  commands.  I am giving him commands."

16         A.    Like, I was giving commands.  That would

17  have prevented me --

18         Q.    But you were both -- now, at this point

19  you're both giving commands, right?

20         A.    So you're saying that -- I'm just

21  telling you I was giving commands.

22         Q.    Yes.  And then you heard someone else

23  start to give commands, correct?

24         A.    Correct.  So are you saying that I

25  should have stopped giving commands?

1          Q.   No.  I'm saying you should have said,
2    "I've got this.  I am already giving him commands,"
3    or something.  "I got this."  Most people know what
4    that means.
5          A.   I believe that's your opinion, but...
6          Q.   Is it fair to say that you did nothing
7    to prevent any other officer from giving simultaneous
8    commands?
9          A.   I didn't tell any other officer "Stop
10   giving commands" because I was giving commands.
11          MS. PORTER:  Can I have my question read
12   back, please.
13              (The record was read.)
14          MR. ANGELL:  Hang on.
15          Q.   (BY MS. PORTER):  Yeah, I need you to
16   answer the question, please.
17          MR. ANGELL:  She did.  Asked and answered.
18          Ms. PORTER:  No.  She said she didn't say
19   anything.  I asked -- my question was broader.
20          Q.   (BY MS. PORTER):  Did you do anything of
21   any nature to stop other law enforcement from giving
22   simultaneous commands?
23          A.   I was giving commands.
24          Q.   Is that a "no"?
25          A.   You're saying is it fair to say.  I'm

1    giving you my answer of -- that -- that's my answer.

2          Q.   Okay.  Is it -- my question is a

3    yes-or-no question, all right?

4               Did you do anything of any kind to

5    prevent anyone else from giving simultaneous

6    commands?

7          A.   I didn't give any other orders to any

8    other officers.

9          Q.   Did you do anything else?  We've

10   excluded that one.  Did you do anything else?

11         A.   Anything else in what way?

12         Q.   Radio in or say, "I got this," or ask

13   somebody else to stop?

14         A.    No.  I've made it clear that I did not

15   ask anyone else to stop.  I was giving commands, so

16   the words were coming out of my mouth but they

17   weren't towards other officers.  They were my own

18   commands.

19         Q.   You have watched the body cam footage

20   before, correct?

21         A.   Correct.

22         Q.   And you could tell from the body cam

23   footage that there were at least five different law

24   enforcement officers giving Jake Sheeler simultaneous

25   commands; is that true?

1           MR. ANGELL:  Object to the form.

2               Go ahead and answer.

3           THE WITNESS:  No, that's not true.

4           Q.   (BY MS. PORTER):  Okay.  How many law

5    enforcement officers did you hear giving simultaneous

6    commands to Jake Sheeler?

7           A.   From what I recall from watching the

8    video, I could hear Officer Eldridge giving commands

9    and I could hear Officer Saldana -- correction.  Do

10   you want me to say "Corporal"?  Do you care how I

11   refer to Eldridge versus --

12          Q.   I don't because I don't really know

13   their ranks now versus then, et cetera.

14          A.   Okay.

15          Q.   So are you denying that Officer Anderson

16   gave any commands that you heard?

17          A.   I did not hear any commands from Officer

18   Anderson.

19          Q.   Are you denying that Officer Orr gave

20   any commands?

21          A.   I did not hear any from Officer Orr.

22          Q.   But you did hear simultaneous commands

23   from Officer Eldridge and Saldana, correct?

24          A.   Correct.  And let me be more specific in

25   this:  I heard simultaneous commands from Officer

1  Eldridge, however, I heard Officer Saldana's commands
2  after reviewing the body cam video.  At the time I
3  did not specifically hear that.  So I think that's
4  important to say that as well because, at the time
5  versus when I'm re-watching the video, I can hear
6  different voices in the video versus when I'm right
7  there.
8      Q.   Now, you do understand that Jake Sheeler
9  could have heard different things than you were
10 hearing?
11     MR. ANGELL:  Object to the form.  Calls for
12 speculation.
13          We don't want you to speculate as to
14 what Jake Sheeler is hearing.
15     Q.   (BY MS. PORTER):  Did it occur to you
16 before you shot at Jake Sheeler that he might be
17 hearing commands from multiple law enforcement
18 officers?
19     MR. ANGELL:  Object to the form.  Calls for
20 speculation about --
21     Q.   (BY MS. PORTER):  No, I'm asking you
22 whether it occurred to you prior to you shooting at
23 Jake Sheeler.
24     MR. ANGELL:  And I'm telling you that calls
25 for speculation.

1          MS. PORTER:   No.   I want to know what was in

2     her head when she started shooting at Jake Sheeler.

3     It's not speculation.

4                But his objections are for later

5     decisions by a judge so you need to go ahead and

6     answer.

7          MR. ANGELL:  Go ahead.

8          THE WITNESS:  Will you -- I'm sorry, but will

9     you ask it one more time just because there was a lot

10    of going back and forth, so -- I just want to be

11    clear before I answer.

12         Q.   (BY MS. PORTER):  Did it occur to you

13    prior to when you started shooting at Jake Sheeler

14    that he might be hearing commands from multiple

15    officers?

16         A.   That's not something that I specifically

17    remember thinking to myself.

18         Q.   Okay.  Now, what commands did you give

19    to Jake Sheeler?

20         A.   My commands were "Show me your hands."

21         Q.   "Show me your hands"?

22         A.   Correct.

23         Q.   Okay.  Now, as I understand it -- well,

24    tell me what were his hands doing at the time that

25    you told him to show you his hands?

1          A.    Do you want me to stand up and

2    demonstrate?

3          MR. ANGELL:  Whatever you need to do to

4    answer the question.

5          MS. PORTER:  Sure.  And I think we'll get a

6    picture of this if the court reporter doesn't mind --

7    just a still shot.

8          Q.   (BY MS. PORTER):  Go ahead and

9    demonstrate for us and then I will ask you to strike

10   a pose, so to speak.

11         MR. ANGELL:  And I'll consider whether we're

12   going to do that.

13              But go ahead and answer the question

14   first.

15         THE WITNESS:  So right hand back of the

16   waistband, arm out to the side.

17         Q.   (BY MS. PORTER):  Left arm out to the

18   side?

19         A.    Correct.

20         Q.    Okay.  And you wanted him to do what?

21   Show us what you wanted him to do with the right

22   hand.  Well, that's raising them up, right?

23         A.    That would be showing your hands.

24         Q.    But there's more than one way to show

25   your hands, right?

1          A.    Correct.

2          Q.    You never told him, "Get your hands up,"

3   did you?

4          A.    I said, "Show me your hands."  That

5   would be showing your hands.

6          Q.    Yeah.  And so would -- so would this,

7   right?

8          A.    Nobody should respectively go like this

9   to show your hands.  Now, here would be okay.

10         Q.    So he could do this or he could do --

11         A.    He could lift them up, he could lift

12  them out.  When I say, "Show me your hands," this is

13  a sign of surrender or "Hey, I'm done."

14         Q.    But you never said, "Put your hands in

15  the air," right?  You agree with that?

16         A.    I said, "Show me your hands," which is a

17  very -- which is a statement that I made.  That's all

18  that I'm going to say about that.

19         Q.    So if he showed you his hands by, for

20  example, bringing it out like his left hand was, were

21  you still going to shoot at him?

22         A.    If his left hand was out?  His left hand

23  was out.

24         Q.    Correct.  So if he brought his right

25  hand out the same way his left hand was out, did that

1  count?

2          A.    His right hand never came out this way.

3  His right hand came out into the front of him.

4          Q.    But I'm asking you -- you're the one

5  giving him a command.  I want to know what you were

6  commanding him to do.

7          A.    To "show me your hands."

8          Q.    Yeah, but you keep raising them up and

9  you never told him that.  So let me ask this --

10          A.    But you're -- I'm --

11          Q.    Would it have complied with your command

12  that you were giving --

13          A.    To put his hand down to his side?

14          Q.    Or out like the left hand was.

15          A.    I'm not going to speculate on the

16  certain situation.  I mean, that would depend.  What

17  if he had something in his hand when he moved it out

18  this way?  I think that that's -- you're asking too

19  broad of a question.

20          Q.    I'm asking what Jake Sheeler could have

21  done that you would have considered compliant with

22  his commands?

23          A.    Put his hands up in the air.

24          Q.    That was the only choice he had?  Any

25  other way of showing you his hands you were going to

1  shoot?

2          A.   No, I'm not --

3          MR. ANGELL:  Object to the form.

4          THE WITNESS:  No.

5          Q.   (BY MS. PORTER):  So let me go back to

6  the --

7          A.   There could have been other ways.

8          Q.   And one of them could have been --

9          A.   I'm not going to --

10         Q.   -- right --

11         A.   -- say what --

12         MR. ANGELL:  Hang on one second.  Let her ask

13  her questions.  She is being very argumentative, so

14  let her get it out.

15         THE WITNESS:  Okay.

16         MR. ANGELL:  And then answer her question,

17  but give our court reporter a chance to write down

18  what she's saying before you answer a question.

19         THE WITNESS:  Okay.

20         Q.   (BY MS. PORTER):  Okay.  And I'm just

21  trying to ask what Jake Sheeler could have done to

22  comply with the order that you were giving, right?

23  I'm not asking what could he have done to comply with

24  anyone else's order, okay?

25              So you've said, if he raises his hands

1    up in the air, that would have -- you would have

2    considered that compliance, right?

3              A.    Correct.

4              Q.    If he raised his hand out to the side,

5    compliance or not?

6              A.    Depending on the situation.  I'll say

7    depending.

8              Q.    So how would Jake Sheeler have known

9    what was in your head and what would count as

10   compliance and what wouldn't?

11             MR. ANGELL:  Objection.  Calls for

12   speculation.

13                   I don't want you to speculate about Jake

14   Sheeler.

15             Q.    (BY MS. PORTER):  But go ahead and

16   answer, though, because it's not one of the --

17             A.    My answer is I'm not going to speculate

18   on what he would have considered.

19             Q.    Well, when you're giving someone a

20   command and you're intending to shoot at them if they

21   don't comply, doesn't it at least cross your mind, "I

22   wonder if this person knows how to comply"?

23             A.    Doesn't this person know how to comply?

24             Q.    Yeah.  I mean, don't you -- okay.  Let's

25   assume -- no, I'm not going to ask you to assume; I'm

1    actually going to ask you that night.

2              That night you're giving a command to

3    someone, and were you intending to shoot him if he

4    didn't comply with your command?

5         A.   I think that's -- I don't like how

6    that's worded.  I think that's -- I'm not going to

7    answer that.  I think that it needs to be worded

8    differently.  I'm not going to answer that.

9         Q.   Well, then we're going to call the judge

10   because that is actually a very easy, fair question.

11        A.   I don't -- the way that it's worded, I

12   think there's -- you can't just say just because his

13   hands went a certain way is why he was shot.

14        Q.   I'm asking what your intent was.  You

15   keep rewording my question and not answering my

16   question.

17        A.   I'm not trying to.

18        MR. ANGELL:  Okay.  Counsel, hang on.

19        THE WITNESS:  I'm trying to understand it.

20        MR. ANGELL:  Let's take a break off the

21   record for a minute.

22              Is that acceptable to you?

23        MS. PORTER:  I mean, there's a question

24   pending and then you're welcome to take a break any

25   time after the question is answered.  I'm good with

```
 1  breaks.
 2          MR. ANGELL:  That's great.  Then why don't
 3  you ask the question again?
 4          MS. PORTER:  Can you find it?
 5          THE WITNESS:  I'm not trying to be
 6  argumentative.
 7          MS. PORTER:  Wait, wait, wait.  Nobody
 8  speaks.
 9              (The record was read.)
10          MR. ANGELL:  That's the question.
11          THE WITNESS:  No, I wasn't intending to shoot
12  him just specifically based off of that reason.
13          MR. ANGELL:  Now can we take a break off the
14  record?
15          MS. PORTER:  Sure.
16              (A recess was taken from 9:16 a.m. to
17  9:27 a.m.)
18          MS. PORTER:  So we have taken a 10-minute
19  break.  Are you guys ready to start up again?
20          MR. ANGELL:  Yes, we're ready.
21          Q.  (BY MS. PORTER):  Okay.  Now, we were
22  talking about the commands that were given to Jake
23  Sheeler and you told me that you did hear commands
24  being given by Eldridge and Saldana in addition to
25  yourself.  That's correct?
```

 1          A.    Saldana through the video, Eldridge at
 2    the time.
 3          Q.    Oh, okay.  So the only ones you heard
 4    were you and Eldridge at the time?
 5          A.    Yes.
 6          Q.    Was any sort of mechanism in place where
 7    you could all hear, like, for example, through your
 8    radios or anything like that what other people were
 9    yelling at Jake Sheeler?
10          A.    No.  We weren't -- the radio wasn't,
11    like -- the mike wasn't held down, so...
12          Q.    Were there -- oh, strike that.
13                Okay.  Do you mind again demonstrating
14    where Jake Sheeler's hand was at the time that you
15    were telling him to show you his hands?
16          A.    The same position?
17          Q.    Pardon?
18          A.    The same position that I demonstrated?
19          Q.    Yeah.  Just -- it leads to the next
20    question.
21          A.    Okay.
22          Q.    Okay.  Now, can you show me your right
23    hand without moving?
24          MR. ANGELL:  Object to the form of the
25    question.

1          Q.    (BY MS. PORTER):  I mean, there were
2    simultaneous commands given to show me your hands and
3    to not move so I would like to know how Jake Sheeler
4    could have complied with those commands.
5          MR. ANGELL:  Objection.  It's argumentive and
6    misstates facts.
7          Q.    (BY MS. PORTER):  Can you think of any
8    way?
9          A.    Can I think of any way how someone can
10   show a hand?
11         Q.    No.  Could you -- can you think of any
12   way that Jake Sheeler could have shown you his hands
13   without moving?
14         A.    Yes.  Without moving his entire body?
15         Q.    Without moving, period.
16         A.    I can't.  I can't think of any way
17   specifically, based on that very specific question.
18         Q.    Okay.  From what you could see of Jake
19   Sheeler that night, can you think of any way that
20   Jake Sheeler could have simultaneously shown you his
21   hands while also getting on the ground?
22         MR. ANGELL:  Object to the form.
23              Go ahead and answer the question, if you
24   can.
25              THE WITNESS:  Could he have shown me his

1   hands while getting on the ground?

2           Q.   (BY MS. PORTER):  Yes, at the same time.

3           A.   Yeah.

4           Q.   Okay.  Can you demonstrate for me how he

5   could have gotten on the ground at the same time as

6   showing you his hands?

7           MR. ANGELL:  Counsel, she doesn't need to

8   demonstrate that.

9           Q.   (BY MS. PORTER):  Are you refusing to

10  show me how he could have complied with those

11  simultaneous commands?

12          MR. ANGELL:  Counsel, she's not -- I'm

13  telling you I think that's an inappropriate question

14  to ask a witness to do at a deposition.

15          MS. PORTER:  I don't think so, because

16  they're the ones giving the commands that he's

17  supposedly not following.  I'm trying to figure

18  out how he could have done it.

19          MR. ANGELL:  Counsel, I can ask you if a

20  person can do a round-off back handspring at the same

21  time, you can say yes, and I could ask you to

22  demonstrate that, and you may or may not be able to,

23  but I'm not -- I do not think it's appropriate for

24  the witness to have to demonstrate how a pretty basic

25  human action can be taken.  So help me understand why

1   that's important for a deposition.

2         MS. PORTER:  You know, let me add something

3   that would actually make your hypothetical a little

4   more pertinent to our case.  What if you were

5   commanding -- what if someone was commanding someone

6   to do this double handspring, whatever you said.  She

7   was giving a command, she had a gun pointed at our

8   client, and I am trying to figure out how he could

9   have complied with her command and at the same time

10  comply with the commands he was being given by

11  others.  That seems pretty pertinent.

12        MR. ANGELL:  You can ask those questions, but

13  I'm telling you she's not going to stand up and do a

14  demonstration for you.

15        Q.   (BY MS. PORTER):  Okay.  Is it your

16  testimony that he could have shown you his hands and

17  simultaneously been getting on the ground?

18        A.   Yes.

19        MR. ANGELL:  Asked and answered.

20        THE WITNESS:  Yes.

21        Q.   (BY MS. PORTER):  Is there -- did you

22  hear any of the commands to Jake Sheeler to get on

23  the ground?

24        A.   I -- I said them, so yes.  To get on the

25  ground?  Are you saying --

1          Q.   Did you --
2          A.   Okay.  Let me -- let's -- sorry.  Did I
3     hear any of the commands being told to him, or my
4     commands?  I confused myself I think by -- okay.
5          Q.   No, that's fair.
6          A.   I think that I confused myself.  Did I
7     hear the words "get on the ground" from any --
8          Q.   -- other officers?
9          A.   Yes, I believe so.
10         Q.   Okay.
11         A.   I believe so.
12         Q.   And that was Saldana, wasn't it?
13         A.   I believe -- correct.  But that would be
14    because I watched the video, yeah.
15         Q.   So you didn't hear "get on the ground"
16    from anybody else until you saw the video?
17         A.   I don't recall.
18         Q.   Okay.  Can you think of any way that
19    Jake Sheeler could have simultaneous gotten on the
20    ground and backed up?
21         MR. ANGELL:  Object to the form.  Assumes
22    facts that are not in evidence.  It's a hypothetical.
23              But go ahead and answer, if you can.
24         THE WITNESS:  Do I think he could have gotten
25    on the ground and backed up?

1          Q.    (BY MS. PORTER):  At the same time.

2          MR. ANGELL:  Same objection.

3               Go ahead, if you can.

4          THE WITNESS:  I don't know that I can, so...

5          Q.    (BY MS. PORTER):  Okay.  Okay.  Is it

6    your testimony that it was Jake Sheeler who said, "I

7    will shoot you" --

8          A.    Yes.

9          Q.    -- and not Eldridge?

10         A.    That was my testimony, yes.

11         Q.    Is that still your testimony?

12         A.    Yes, that's what I heard.

13         Q.    Okay.  And is your testimony on that

14   point as accurate as all the rest of your testimony?

15         A.    All of my testimony is accurately what I

16   heard, saw.  So yes, all my testimony is accurate.

17         Q.    Equally accurate?

18         A.    Yes, equally accurate.

19         Q.    Okay.  Now, you initially thought you

20   had shot at Jake three times?

21         A.    Correct.  I believed that I fired three

22   bullets.

23         Q.    And then you found out that you had

24   fired five times?

25         A.    Correct.  After a round count.

```
 1            Q.   Do you know why you didn't realize that
 2   you had actually shot at him five times?
 3            A.   Do I realize why?
 4                 (Ms. Porter indicated the record be read
 5   and the record was read.)
 6            THE WITNESS:  Do I know why -- why I didn't
 7   realize it?  Because it's a very rapidly evolving
 8   situation.
 9            Q.   (BY MS. PORTER):  You mentioned
10   something earlier about "split second."
11                 Do you remember mentioning that?
12            A.   Yes.
13            Q.   And it wasn't split second, though, in
14   the 33 seconds before you started shooting, was it?
15            MR. ANGELL:  What was -- object to the form.
16            THE WITNESS:  Yeah.
17            Q.   (BY MS. PORTER):  I mean, it was
18   33 seconds, right?  Not a split second.
19            A.   I think it's a rapidly evolving
20   situation.
21            Q.   What was rapidly evolving from your
22   perspective before you started shooting?
23            A.   Every -- every aspect of it.
24            Q.   Please describe for me every aspect that
25   was rapidly evolving during the 33 or so seconds
```

1   before you started shooting.

2        A.   Him moving, saying he has a gun, he was

3   going to shoot, not following commands, us moving.

4   Everything is a rapidly evolving situation.

5        Q.   Okay.  And you expected him to follow

6   your commands, correct?

7        A.   Correct.

8        Q.   You expected him to follow Officer

9   Eldridge's commands, correct?

10       A.   I expected him to follow police

11  commands.

12       Q.   You expected him to follow every command

13  issued by a law enforcement officer --

14       A.   I expected him to follow any command

15  that would show that he was complying.

16       Q.   Let me ask my question, okay?

17       A.   Okay.

18       Q.   You expected him --

19           MR. ANGELL:  Counsel, hang on.  Counsel,

20  she's going to answer your questions and you can ask

21  another one, but I think that it is unfair to

22  criticize a witness for not answering your question

23  when you just don't like the answer you got.

24           MS. PORTER:  Do you know that she cut me off

25  when I was not done with my question?

1          MR. ANGELL:  No, you cut her off.

2          MS. PORTER:  She cut off my question.  I

3  didn't get my question out.

4          MR. ANGELL:  And I would suggest that you're

5  cutting her off in her answer and arguing with the

6  answer that you don't like.  So why don't you allow

7  her to answer a question and then ask another one.

8          Q.   (BY MS. PORTER):  But you do know that

9  you have to let me get my question out, correct?

10         MR. ANGELL:  She will do that and I will make

11  sure she does that.

12         THE WITNESS:  I'm sorry that I interrupted

13  you.

14         Q.   (BY MS. PORTER):  Okay.  And it is human

15  nature and I will try not to do that with you.

16         A.    Okay.

17         Q.    But let me get my question out, okay?

18         A.    Okay.

19         Q.    You expected Jake Sheeler to comply with

20  commands given by any law enforcement officer on the

21  scene, correct?

22         A.    Correct.  I expected him to comply with

23  any commands that would show that he's complying.

24         Q.    So we're -- did you only expect him to

25  comply with certain types of commands, then?

1         A.   My expectation of Mr. Sheeler was to

2    comply with a command by showing that he was

3    complying -- showing compliance.

4         Q.   And you're referring to any command by

5    any law enforcement officer on scene, correct?

6         A.   No.  I don't -- I don't want to say any

7    command by any law enforcement officer on scene

8    because I don't know every command that was given, so

9    I don't want to say yes to that.  But I would expect

10   him to follow a command by showing compliance.  So

11   any commands that would have shown compliance.

12        Q.   Why didn't you know what commands other

13   law enforcement officers were giving Jake Sheeler?

14        A.   I don't know how anyone would expect me

15   to hear what you're saying is five different people

16   yelling.  I don't think that's fair to say that I

17   would be able to hear every single person while also

18   giving commands myself.

19        Q.   And is that because no arrangement had

20   been made ahead of time as to who would give commands

21   to Jake Sheeler?

22        A.   Correct.  It's not police procedure to

23   stop in the middle of an actively evolving -- rapidly

24   evolving situation and make a plan.  That's not how

25   we train.  That's not how things are done.

1          Q.    Now, you could have made an arrangement,

2    let's say, three minutes earlier, right?  Or an hour

3    earlier or four hours earlier, correct?

4          A.    No.

5          Q.    You couldn't have made -- are you

6    telling me it would have been impossible to make

7    arrangements to say, "Whoever sees him, it's going to

8    be this agency or this agency who will take command

9    of the scene"?

10          A.    No.

11          Q.    So that would have been possible?

12          A.    No, it wouldn't -- it wouldn't have

13    been -- no, it wasn't something that you could

14    possibly do.  Because you're asking about hours

15    before when I wasn't even in that situation, so no.

16          Q.    Well, you said you had been following

17    sort of the updates throughout the day --

18          A.    So --

19          Q.    -- right?

20          A.    Yes.  But I think that it's unreasonable

21    to think that I would communicate with 18 to 20

22    officers and make a plan for each of us to give

23    certain commands.

24          Q.    Well, you have an e-mail system, right?

25    It would have taken about 15 seconds.

1          A.    No one e-mails to -- no one e-mails and

2    says, "This is the commands we're giving for the

3    day."  That's not a -- that's just not police

4    practice.  That's not policy.  That's not procedure.

5    That's not something that you do.

6          Q.    Well, it's not something that Pocatello

7    Police Department does?

8          A.    I don't know an agency that does do

9    that.

10          Q.    All right.  And you're saying that, as

11    of September 25th, 2020, Pocatello Police Department

12    to your knowledge did not do that?

13          A.    Correct.

14          Q.    Okay.  What about somebody notifying

15    dispatch to put the word out that, if anybody finds

16    this guy, here is which agency is going to be in

17    command of the scene?

18          A.    No.

19          Q.    Impossible?

20          A.    It's not -- it's not practice or

21    procedure.

22          Q.    So it's not done.  Is it possible?

23          A.    I think anything is possible.

24          Q.    Right.  So if you're trying to avoid a

25    suspect from being given competing commands, is there

1   anything you're aware of in Pocatello Police
2   Department procedure that would have accomplished
3   that?
4           A.   I think that, like I said, anything
5   could be possible, but that doesn't mean that it's
6   policy, procedure, implemented training.  That is not
7   a practice or anything that we've ever done.  That's
8   not something that we've ever done.  That's not --
9   law enforcementwise, it's -- I don't know -- I don't
10  personally know of any agency that would send out an
11  e-mail saying "These are the commands that we're
12  giving today" or having dispatch send out an alert
13  saying, "Whoever comes into contact, only give these
14  commands," or "This is the only person giving
15  commands."
16          Does that help to answer that question?
17          Q.   And how many other agencies have you
18  worked for?  Law enforcement.
19          A.   I haven't worked for any other agencies.
20  I just -- there's other agencies around that we work
21  with.
22          Q.   Okay.  All right.  Let's go back to our
23  original Exhibit 1 which you still have in front of
24  you.
25          A.   Okay.

1        Q.   And let's go down to the bottom where it
2    says, "Other comments."  And please take a minute to
3    read that to yourself.
4        A.   All right.  I did read it.
5        Q.   And for the record, it states, "Officer
6    McArthur had a poor attitude at times during the
7    training, but she did participate and her performance
8    was satisfactory."
9             Do you have any understanding of what
10   was meant by "a poor attitude"?
11       A.   I don't recall.
12       Q.   Okay.  Do you remember anything
13   happening during this training on or around
14   March 26th, 2020 that you considered exhibiting a
15   poor attitude?
16       A.   I don't recall.
17       Q.   So you think it didn't happen, or you
18   just don't remember one way or the other?
19       A.   I don't remember.  I don't remember
20   why -- the comments down below are as surprising to
21   me as they are to you, never seeing it before.
22   Obviously I saw this.  My signature is on it.  I'm
23   not disputing that.  But I don't remember
24   specifically what would have happened that day to
25   have those comments be made.

1          Q.   Okay.  So you saw the comment when you
2    signed the document, correct?
3          A.   Correct, in 2020.
4          Q.   Yes.  Did you ask anybody what does that
5    comment mean?
6          A.   I don't remember.
7          Q.   Did you care why that comment was on
8    there?
9          MR. ANGELL:  Object to the form.
10         THE WITNESS:  I don't remember having any
11   conversation.  I don't remember why those comments
12   were made.  I don't remember if it was a good day, a
13   bad day, sunshine, rain.  I don't remember that day.
14   I can't specifically think back to that date.
15         Q.   (BY MS. PORTER):  Okay.  At some point
16   on September 25th, 2020 did you look Jake Sheeler up
17   in your reporting system?
18         A.   Yes.
19         Q.   Can you describe for me what -- exactly
20   what you did in that respect?
21         A.   As to search him -- how I searched him?
22         Q.   Yeah, what you did.
23         A.   Typed in his name in our reporting
24   system to pull him up, and then it would pull up --
25   so that would have pulled up his name, or anyone else

1    in our system listed under that name, then you can

2    click on that name, which provides date of birth,

3    height, weight, driver's license number if it's

4    there, social security, address, phone numbers, and

5    then it'll have pictures in the system.  And it can

6    be several different pictures, which include driver's

7    license, booking photos, anything that was taken and

8    put into the system as a picture, and then it'll have

9    vehicles he's ever been involved with, calls -- any

10   prior previous calls, that type of stuff.  That's the

11   information that's listed.

12        Q.   So sort of -- did it include any prior

13   criminal record?

14        A.   It doesn't -- it's not a criminal record

15   such as like a repository.  It's not -- it's not the

16   same level as like a repository.  But it'll just have

17   previous calls.  It can show bookings -- what someone

18   has been booked for.

19        Q.   Did you review the whole Spillman?

20        A.   No, I didn't review the whole Spillman.

21        Q.   Did you look to see if there was any

22   information in your Spillman about whether he had any

23   violent history?

24        A.   I don't recall.

25        Q.   Did you look at the -- at any prior

1    interactions with Pocatello PD?

2            A.   I don't recall.  I -- my purpose

3    specifically was for looking at photographs -- the

4    different photographs of him.

5            Q.   Did you care at that point whether he

6    had any history of violence?

7            MR. ANGELL:  Object to the form.

8                 Go ahead and answer, if you can.

9            THE WITNESS:  That is something that I would

10   care about.  I mean, that's important to know on any

11   investigation.

12           Q.   (BY MS. PORTER):  Sure.  I thought that

13   was an obvious question.

14           A.   Yeah.

15           Q.   So did you look at the Spillman to

16   answer the question whether Jake Sheeler had any

17   history of violence?

18           A.   I don't believe that's why I looked at

19   it.  I believe why I looked at it was for the

20   photographs -- to see pictures.  But I don't recall

21   what I specifically looked at.  I do recall that I

22   did look at photographs.

23           Q.   Okay.  So are you saying that you just

24   don't recall one way or the other whether you looked

25   with -- to determine if he had a history of violence,

1    or you believe you did not?

2          A.   I don't recall if I looked specifically

3    at all of the calls that he had been involved in or

4    the criminal charges that he had.  I do remember that

5    I specifically looked to look at photographs of him,

6    the different photographs.

7          Q.   Okay.  So just to wrap up what I think

8    you're telling me --

9          A.   It could have -- I could have looked at

10   some of the calls, but I don't remember if I

11   specifically did.

12         Q.   All right.  That's -- I understand.

13              What did you know -- as of the time that

14   you arrived on the scene, what did you know about

15   what Jake Sheeler was suspected of having done?

16   Actually, bad question.

17              When I say "on scene," I'm referring to

18   where he ended up getting shot, okay?

19         A.   Okay.

20         Q.   And so let me ask a better question:

21   When you arrived on scene where Jake Sheeler was

22   later shot, what did you know about what he was

23   suspected of having done that day?

24         A.   I knew that he was suspected of stealing

25   a firearm, or multiple firearms, that he had pointed

1    the firearm at the homeowner and possibly pointed it

2    at others, that he had committed a burglary and

3    aggravated assault and a grand theft by stealing a

4    firearm.  So approximately at least three felonies.

5            Q.    And you knew that, after pointing the

6    gun at whomever, he had not fired it, correct?

7            A.    Correct.

8            Q.    You knew that, after pointing the gun at

9    whomever, he had run away, correct?

10           A.    Correct.  I knew that he ran away.

11           Q.    Okay.  You knew when you arrived there

12   that he had not physically harmed anyone, correct?

13           A.    No, I did not know that.  That's not

14   something I would know.

15           Q.    Did you think he had physically harmed

16   someone?

17           A.    That's not something that I would have

18   known.  Between the time that I had contact with him

19   and his previous contact with anyone, there's no way

20   I would have known if he would have harmed anyone

21   within that timeframe.  So that's -- I wouldn't -- I

22   wouldn't know.

23           Q.    Did you ask anyone at all during the

24   day?

25           A.    Anyone that had contact with him?

1          Q.   No.  Did you ask anyone during the day
2    whether the suspect had physically harmed anyone?
3          A.   No.  That's not something that...
4          Q.   And you did follow the updates
5    throughout the day, correct?
6          A.   Correct.  Through the e-mails, yeah.
7          Q.   Okay.  Okay.  Tell me about the e-mails.
8    So e-mails were going out with pictures of the guy?
9          A.   Yes.
10          Q.   So Pocatello PD does use e-mails to
11    update descriptions of suspects?
12          A.   Correct.
13          Q.   Were you expected to check your e-mails
14    from Pocatello PD periodically?
15          A.   Expected?  I think that it's -- I think
16    it's reasonable to say that, while you're on duty and
17    during a criminal investigation that's ongoing, that
18    it -- that you should check your e-mail periodically
19    throughout the day.
20          Q.   And you did, right?
21          A.   Correct.
22          Q.   And you expected that others would also,
23    correct?
24          A.   No, I'm not going to say that I expected
25    other people.  I -- I did what I needed to, but I

1    don't know that I can say that I expect other people.

2    I feel like that's -- yeah, I don't -- so I'm going

3    to say no, I'm not going to say that I expect them

4    to, because there's people that could be not working.

5    There's situations that can be -- so I don't expect

6    everyone.

7            Q.    On September 25th when you were checking

8    e-mails, did you expect other on-duty police officers

9    to also be checking theirs?

10           A.    Yes.  I would expect if they were

11   involved in the case or didn't have that information

12   from firsthand or encounters with other officers,

13   then yes.

14           Q.    Now, at some point do you recall

15   learning that a male in the area had attempted to

16   sell someone a firearm?

17           A.    Yes.

18           Q.    What do you remember learning about

19   that?

20           A.    I remember the call.  I remember being

21   dispatched around approximately 8 p.m. in the

22   evening, and that was the call details that were

23   provided.

24           Q.    Can you elaborate on the details that

25   were provided?

1          A.    No.   I think those are the details
2    that -- the details that you said are the details
3    that I had.
4          Q.    I believe that in your interview as
5    summarized by Officer Graham, that you said something
6    to the effect that the firearm that the person had
7    attempted to sell matched the description of the
8    firearm that was previously stolen.
9               Do you remember anything like that?
10         MR. ANGELL:  Hang on.  Object to the form of
11   the question.  Counsel, if you want her to confirm
12   what's in her summary, I think it's fair to hand that
13   to her and let her look at it.
14         MS. PORTER:  I'll just go ahead and see if
15   she can go ahead and remember it on her own.
16         MR. ANGELL:  I'll just note that it's -- I do
17   not think it's an appropriate deposition question to
18   ask somebody if you just read her a portion of her
19   summary.
20         MS. PORTER:  Give me her summary.  Actually,
21   that wasn't my question.  You guys always redo my
22   questions.  They're probably better when you redo
23   them but they never quite match my actual question.
24         Q.   (BY MS. PORTER):  Let me just show you
25   the summary so that you can see the exact sentence.

1          MR. CHRISTIANSEN:  I think you might have it.

2              (Exhibit 2 marked.)

3          Q.   (BY MS. PORTER):  Let me ask you to look

4    at what's been marked Deposition Exhibit 2.  And my

5    first question is going to be whether you recognize

6    it.

7          A.   So yes, I recognize this.  I didn't have

8    a copy of this first page and I also didn't have a

9    copy of where it starts with the photographs; so from

10   169 to 172.

11         Q.   And you also did not have 162?

12         A.   Correct.

13         Q.   Okay.  What do you understand pages 163

14   through 168 to be?

15         A.   The report that was done up by Detective

16   Graham of my interview.

17         Q.   And that's a document that you reviewed

18   in preparation for this deposition, correct?

19         A.   Correct.

20         Q.   Let me just ask you a couple of

21   background questions.  So the shooting was sometime

22   between 8 and 9 p.m. on September 25th; is that --

23         A.   Approximately.

24         Q.   -- correct?

25         A.   Yes.

 1          Q.    You were interviewed September 28th at
 2    approximately 11 a.m.?
 3          A.    Correct.
 4          Q.    What did you -- why were you interviewed
 5    two and a half days after this shooting?
 6          MR. ANGELL:  Object to the form.  Calls for
 7    speculation.
 8          Q.    (BY MS. PORTER):  To your knowledge, do
 9    you have any information about why you were not
10    interviewed until two and a half days after the
11    shooting?
12          A.    That's -- that's the policy and
13    procedure we follow after a shooting:  allowing
14    officers to have a couple sleep cycles before they
15    provide an interview.
16          Q.    Is that the same policy that's practiced
17    when a suspect is being questioned?  Are they given
18    sleep cycles?
19          MR. ANGELL:  Object to the form.
20          THE WITNESS:  I wouldn't know that.
21          Q.    (BY MS. PORTER):  Between the shooting
22    and when you were interviewed, did you do anything to
23    prepare for your interview?
24          A.    I didn't do anything to prepare for my
25    interview.  I slept, went through my normal day.

1   There was no preparation for the interview.

2        Q.   I only asked because I saw a

3   communication from your lawyer asking for a copy of

4   the body camera footage that predated your interview,

5   so I was wondering whether you had watched the body

6   cam footage before your interview.

7        MR. ANGELL:  Hang on.  Object to the form of

8   the question.  That calls for

9   attorney-client-privileged information.

10       Q.   (BY MS. PORTER):  No, it was actually

11  done with a police officer who is not you.

12       MR. ANGELL:  Hang on.  The way you worded the

13  question, Counsel, is you asked -- you noted that

14  Mr. Muhonen had requested the body cam interview and

15  then asked her if she saw it.  So that question

16  requires her -- or implies that she did or did not do

17  something with her attorney.

18            So the way that's worded, she is not

19  going to answer that question.

20       MS. PORTER:  I will say this:  An attorney

21  handing something to their client is not privileged.

22       MR. ANGELL:  I disagree.

23       MS. PORTER:  Okay.  Understood.

24       Q.   (BY MS. PORTER):  Did you watch your

25  body cam footage before your interview on

1    September 28th, 2020 at approximately 11 a.m.?
2            MR. ANGELL:  Hang on.  That -- again, if that
3    occurred -- anything that occurred with counsel, with
4    your attorneys, Mr. Muhonen, we're not going to
5    answer that question.
6                    So can you answer that?
7            MS. PORTER:  That's -- no way.  That's --
8            MR. ANGELL:  Yes, absolutely.
9                    Can you answer that question without
10   disclosing what you did or did not do with
11   Mr. Muhonen?
12           THE WITNESS:  No.
13           MR. ANGELL:  Okay.
14           MS. PORTER:  Could you please state your full
15   basis for why you believe me asking her if she
16   watched a video in anticipation of her interview is
17   covered by attorney-client privilege, please?
18           MR. ANGELL:  I just stated it for the record.
19           MS. PORTER:  I know.  I want to make a clean
20   record, and then I want to respond and then we can
21   submit it to the court, if you don't mind, please.
22           MR. ANGELL:  I don't have anything else to
23   add.  I just stated it for the record.
24           MS. PORTER:  Okay.
25           Q.   (BY MS. PORTER):  Okay.  Let me ask you

1    to turn to page 165.  You're still in Exhibit 2, and

2    I will direct you to paragraph 28 which is at the

3    bottom.  Please read that to yourself.

4            A.    Okay.

5            Q.    So there is a reference in paragraph 28

6    to Jake Sheeler having, quote, "Squared up on

7    Corporal Eldridge."

8                  Do you see that?

9            A.    Yes.

10           Q.    Can you describe for us what you mean

11   by -- what you meant by "squared up"?

12           A.    His body, shoulders facing Officer

13   Eldridge.

14           Q.    Okay.  Let me refer you to paragraph 32

15   on page 166 of Exhibit 2.

16           A.    Okay.

17           Q.    It states, "Officer McArthur did not

18   recall if she identified herself as a law enforcement

19   officer while giving commands," and then I believe

20   it's followed by a timestamp.

21                 Do you now recall whether you identified

22   yourself as a law enforcement officer while giving

23   commands?

24           A.    Verbally did I say "Police"?

25           Q.    Right.

1          A.    I don't -- I don't recall.  I don't
2     believe that I said "Police," but I was readily
3     identifiable.
4          Q.    How?
5          A.    My uniform, my gun belt.  The uniform
6     that we wear is very distinctive to a police officer.
7     Normal, average everyday citizens don't wear a full
8     patrol belt that has magazines, your gun holster,
9     baton, Taser, my black/dark blue BDUs with "Pocatello
10    Police" badge and my name and our insignia on it.
11    That's what I would consider that "readily
12    identifiable" as a police officer.
13         Q.    So you're assuming, then, that Jake
14    Sheeler could identify you as a police officer?  Is
15    that what you mean?
16         MR. ANGELL:  Object to the form.  Calls for
17    speculation.  I don't know if you'd assume --
18         MS. PORTER:  I agree it does.  That's why I
19    want to know if that's what she meant.
20         THE WITNESS:  I mean that I was readily
21    identifiable as a police officer.  That's what I
22    meant.
23         Q.    (BY MS. PORTER):  Readily identifiable
24    to whom?
25         A.    To an average person.

```
 1              Q.    Okay.  What about to Jake Sheeler?
 2              A.    Would you say he's an average person?
 3              Q.    I don't know.  It's at night and you're
 4       shining a really bright thing in his eyes so I don't
 5       know how you would --
 6              A.    I would say that there was several
 7       officers and that he was definitely within a distance
 8       where he could see who they were.  And I believe
 9       Corporal Eldridge said, "Police," so therefore, that
10       would mean that there was police there.
11              Q.    Okay.
12              A.    It wasn't like there was no way of him
13       not knowing.
14              Q.    Okay.  But I was just asking you about
15       what you told him, okay?
16              A.    Okay.  And I answered.
17              Q.    Right.  Now, you gestured to your
18       shoulder, I think, when you said you had insignia.
19       You had some insignia on the shoulder areas?
20              A.    The shoulders and the front.
21              Q.    Okay.  Now, of course Jake Sheeler
22       wasn't on the side of you, correct?
23              A.    Correct.  So the front.
24              Q.    The front, how big was that?
25              A.    I don't know the size.
```

1          Q.    Can you estimate for --

2          A.    I'm not going to estimate a size.

3          Q.    Well, I'm asking you to estimate, and

4    that -- it's the size of your insignia that you just

5    mentioned to me.  It's a reasonable thing, and I

6    could give you a couple of things that you can tell

7    me whether it's bigger than.  I've got a sticky pad

8    here that is a large form of sticky pad, and I have a

9    hotel room key since we are in a hotel room -- I mean

10   we're in a hotel doing this.  Can you tell me --

11         A.    The size?  Approximately this size and

12   width for the sewn-on badge that says "Pocatello

13   Police."

14         Q.    And I do understand it's an estimate.

15   And what you were referring to is you picked up the

16   hotel room key, correct?

17         A.    Yes.

18         Q.    Which is roughly the size of a credit

19   card, would you say?

20         A.    Correct.

21         Q.    All right.  And it was your

22   understanding that Jake Sheeler could see something

23   that size from the distance he was?

24         A.    I don't know if he could have or not,

25   but I was wearing a gun belt which is much bigger,

1    much larger and much easier to see as well.

2          Q.    Okay.

3          A.    And the average person doesn't wear a

4    gun belt around.  That's a police officer --

5          Q.    You haven't been to Utah recently.  No,

6    I'm just kidding.

7          A.    Unfortunately, I spent a lot of time in

8    Utah this summer.

9          Q.    What was the color of the gun belt?

10         A.    Black.

11         Q.    And was it dark out?

12         A.    Yes.

13         Q.    What was the color of your uniform?

14         A.    Dark blue.

15         Q.    Did you ever see a gun in the possession

16   of Jake Sheeler?

17         A.    Not at that time.

18         Q.    Did you ever see a gun in the possession

19   of Jake Sheeler?

20         A.    In the video -- so in the e-mail

21   pictures that were sent out, he was shown with a gun,

22   running.

23         Q.    Okay.  On site did you ever see Jake

24   Sheeler with --

25         A.    No.

1          Q.    And there was no gun ever recovered,

2    correct?

3          A.    I don't know.

4          Q.    Did you care whether he had a gun?

5          MR. ANGELL:  Object to the form.

6          THE WITNESS:  I don't think it's fair when

7    you ask did I care.

8          Q.    (BY MS. PORTER):  It may not be fair,

9    but it's going to be a whole lot worse at trial.  You

10   understand that these are relatively mild questions?

11         A.    I don't think they're relatively mild.

12   But did I care if he did have a gun?

13         Q.    Yeah.

14         A.    Yes, I would care if he had a gun.

15         Q.    Did you ever ask anyone whether he had a

16   gun when you shot at him?

17         A.    Did I ask anyone at the scene if he had

18   a gun?

19         Q.    No.  You keep changing my questions.

20         A.    No.  I'm just trying to better

21   understand.

22         Q.    Okay.  Have you ever asked anyone

23   whether Jake Sheeler had a gun on him when you shot

24   at him?

25         A.    No, I don't believe that I asked anyone.

1          Q.    Ever?

2          A.    No.

3          Q.    Are you not curious whether he was armed

4    when you shot at him?

5          MR. ANGELL:  Object to the form.

6          THE WITNESS:  This is like that same question

7    with did I care if my bullet struck him, so -- yes.

8    Do I care?  Yes.  Did I ask?  No.  That's how I'm

9    going to answer that.

10         Q.    (BY MS. PORTER):  Was there anything

11   preventing you from asking Pocatello Police

12   Department whether Jake Sheeler had a gun when you

13   shot at him?

14         A.    No.

15         Q.    Two and a half years later you do not

16   know whether you shot an unarmed man?

17         A.    I know what the report is.  Like what --

18   what's being said?  I know what's being said:  that

19   he did not have a gun on his person at the time of

20   the shooting.  That information.  But yes, it was

21   absolutely put out there.

22         Q.    And I am sorry.  I'm having a brain

23   cramp.  I don't intentionally mean to ask a

24   duplicative.  If this is a duplicate, I apologize in

25   advance.

1              While you were on scene, did you ever
2    see him in possession of a gun?
3         A.    No.
4         Q.    Were you able to see Jake Sheeler
5    perfectly while you were on scene?
6         A.    Yes, I could see him.  I think you're
7    quoting my statement perfectly.  Yes, because my
8    light was illuminating him.
9         Q.    Did you see Jake Sheeler after he was
10   shot?
11        A.    Yes.  I saw him on the ground.  I guess
12   in what -- right there?  Okay.  Yes.  So I saw him.
13   Yes, I was -- after he had been shot and he had
14   fallen to the ground, I was -- I walked up and was
15   there with him.  So yes, I could see him on the
16   ground.
17        Q.    At the time that Jake Sheeler was shot,
18   was he still squared up at Officer Eldridge?
19        A.    Yes.
20        Q.    Did you hear any other officer yell at
21   Jake Sheeler to, quote, "Stop"?
22        A.    I don't recall if that was one of the
23   commands that I heard.
24        Q.    You know what?  In fairness, let me
25   direct you to page 168 --

```
 1            A.    Okay.

 2            Q.    -- paragraph 57.

 3            A.    Okay.

 4            Q.    For the record, paragraph 57, which is

 5    not something you wrote, states, "Officer McArthur

 6    told us that she heard commands from other officers

 7    such as 'stop' and 'get on the ground.'"

 8            A.    Okay.

 9            Q.    "Officer McArthur did not know exactly

10    who said these commands."

11                  After reading paragraph 57, does that

12    refresh your recollection of whether you heard on

13    scene other officers tell Jake to get on the ground?

14            A.    If that -- so based on the interview

15    that I -- and the answer that I provided, yes, other

16    officers -- I told them that I had heard other

17    officers say to stop and get on the ground.  I did

18    not know exactly who these commands came from.

19            Q.    You mentioned earlier that the copy that

20    you had of Exhibit 2 did not have pages 169 through

21    172.

22            A.    Correct.

23            Q.    Have you seen pages 169 through 172

24    before?

25            A.    Yes.  I've -- I have my signature on
```

1   169.  So I see my signature on 169.  I believe
2   they're a copy of each other -- well, no, they don't
3   look to be.  I shouldn't say that.
4          Okay.  So based on what I'm observing,
5   it's a copy of the same picture but other officers
6   names are on the other two pictures.  So the one that
7   I signed would be 169, so that's one that I have
8   seen.
9          Q.  All right.  That's helpful.  And by the
10  way, we tried to see if there was a better original
11  that we had been provided, but --
12          A.  Yeah, I can't read specifically what it
13  says.
14          MR. ANGELL:  Let her just ask a question.
15          Q.  (BY MS. PORTER):  Yeah.  I just didn't
16  want you to think that we had a better one and
17  weren't showing it to you.
18          Let me ask a question.  You do recognize
19  your signature at the top of 169, correct?
20          A.  Correct.
21          Q.  All right.  Is there any handwriting of
22  yours that you can recognize on 169?
23          A.  Yes.  My signature and this partial --
24  and this -- a couple of the letters in the green area
25  and then in the brown area.

```
 1            Q.    In the brown area, it looks like
 2    "Suspect."  Is that how you read your handwriting?
 3            A.    Yes.
 4            Q.    And then I see -- do you believe that
 5    you put that dot there?
 6            A.    Yes, I believe that I put that dot
 7    there.
 8            Q.    Okay.  I can't tell what word you wrote
 9    in that darker area.  Do you know?
10            A.    I don't know.
11            Q.    Do you know -- I mean, for example --
12    okay.  We're both looking at 169, but I'm still going
13    to show you -- we both see the word that we can't
14    make out, right?
15            A.    Correct.
16            Q.    Okay.  Based on its location, do you
17    believe you know at least what those letters
18    reflected even though we don't know what they say?
19            A.    I don't.
20            Q.    Do you know where you were in this
21    overall area?
22            A.    I don't know.  Based on this photograph
23    where I marked my position -- I don't based on the --
24            Q.    Let me show you something, and I'm not
25    going to mark it unless it's helpful to you, okay?
```

1   We tried to take the diagrams of the reports about
2   shell casings and things like that and tried to do a
3   rough estimate of where you were versus the others.
4   We understand this isn't to scale, and ignore the
5   feet on here, okay?
6              But let me just ask you:  If you ignore
7   the feet references, does this document that I'm
8   showing you appear to more or less accurately reflect
9   where you guys were at the time that Jake Sheeler was
10  shot?
11             MR. ANGELL:  Object to the form.
12             Go ahead and answer that, if you can.
13             THE WITNESS:  I think it would be a rough
14  proximity, but I believe that I would have been a
15  little bit further to the west.  If we're looking at
16  this, it goes north, east, south and west.  I believe
17  that I would have been off at an angle more in the --
18  and the feet -- the exact feet, I could not.  I don't
19  know.
20        Q.   Yeah, ignore the feet.  That's something
21  that will be determined from others.
22        A.   I would say that, based on my
23  recollection, Eldridge was off to the northeast of
24  me.
25        Q.   Okay.  So you -- you generally believe

1    that you would be off a little bit more, let's see,

2    northwest?

3             A.    To the west.

4             Q.    More west?

5             A.    Yes.

6             Q.    Of Eldridge?

7             A.    Yes.

8             Q.    Generally does the location of Eldridge

9    look as you recall it?

10            MR. ANGELL:  Objection.

11                 Answer that, if you can.

12            THE WITNESS:  I guess generally it could be,

13   other than it's not -- I don't have approximate

14   estimation of feet and where we're at from each

15   other, but -- so approximately, let's say it's

16   very -- it's very approximate.  It's a very

17   approximate generalization of where we were at, yes.

18            Q.    (BY MS. PORTER):  Okay.  Would you be

19   more comfortable drawing your approximation of where

20   everybody was rather than trying to look at what we

21   put together?

22            A.    No.  I don't know that I would be more

23   comfortable.  I think that we can base it off of

24   this.

25            Q.    Okay.  With that in mind, I will go

1    ahead and mark it, because your qualifications are on

2    the record of it and I think it will be helpful to

3    us.

4                    (Exhibit 3 marked.)

5            Q.    (BY MS. PORTER):  And I'm just giving

6    you that because it goes on your stack.

7                    Did you know that Officer Saldana was in

8    the area?

9            A.    I didn't know until after he had been

10   shot, and I didn't know -- I don't know exactly when

11   she arrived.  I knew that on the scene, after he had

12   been shot, that she was there.  I knew that.  That's

13   what I know.

14           Q.    Have you ever been involved in any other

15   police-related shootings?

16           A.    Yes.  I've been -- just in general on a

17   scene of one?  Or have I -- I guess can I ask --

18           Q.    Let me withdraw it because you are

19   right, it's not a good question.

20           A.    Okay.

21           Q.    Have you ever been an on-call officer

22   when somebody was shot at -- no.  Let me try to come

23   up with that better.

24                    I don't want anything where you showed

25   up later.  I'm wondering if you've ever been on scene

1   when someone was shot other than Jake Sheeler?

2           A.   I guess it would depend.  So there was

3   one other shooting that I was -- showed up right

4   after the suspect had been shot, and I was around the

5   block so I heard the interaction.  Would that -- is

6   that I guess what you're looking for?

7           So yes, one -- I would say one specific

8   shooting prior to this that yes, I had been at, but I

9   was not an officer who fired my firearm.

10          Q.   All right.  That's helpful.

11  Approximately when did that occur?

12          A.   I believe in February of 2020 --

13  February/March.  It was in the early months of 2020.

14          Q.   Did you write a report with respect to

15  the shooting of Jake Sheeler?

16          A.   I didn't specifically write a report.

17  My report was written for me, based on my interview

18  provided to Detective Graham.

19          Q.   And are you considering Exhibit 2 to be

20  that report?

21          A.   Yes.

22          Q.   Did you receive any sort of reprimand or

23  discipline of any kind in connection with the Jake

24  Sheeler shooting?

25          A.   No.

1          Q.   Were you asked to attend any additional

2    training as a result of the Jake Sheeler shooting?

3          A.   No.

4          Q.   To your knowledge, were all of your

5    actions in connection with the Jake Sheeler shooting

6    consistent with Pocatello Police Department policy?

7          MR. ANGELL:  Object to the form.

8               Go ahead and answer that, if you can.

9          THE WITNESS:  Object to the form in -- I

10   guess in what way?

11         MS. PORTER:  Well, that's just for the judge

12   to rule on later.

13         THE WITNESS:  Okay.

14         MR. ANGELL:  Will you make sure you restate

15   that question to her?

16              (The record was read.)

17         MR. ANGELL:  Was the question -- I might have

18   heard that wrong.  Was the question "your" actions?

19         MS. PORTER:  I thought that's what I asked,

20   yeah.

21         MR. ANGELL:  I apologize.  I misheard that.

22   I'll withdraw the objection.

23         Q.   (BY MS. PORTER):  Let me just restate

24   the question so our record is clean.

25              To your knowledge, were all of your

1   actions in connection with the Jake Sheeler shooting
2   consistent with the Pocatello Police Department
3   policy?
4          A.   Yes.
5          Q.   Was there anything that happened in
6   connection with the Jake Sheeler shooting that you
7   had not previously received training for?
8          A.   I don't know.  I would have to have a
9   specific "Did you not receive training for this,
10  this, this and this?"
11         Q.   Well, I wasn't there, so...
12         A.   Okay.  I'm just trying to say that, to
13  my knowledge, I have received the training that I
14  testified to having, or I guess that I interviewed
15  having.  Does that --
16         Q.   Are you familiar with the term "call
17  comment"?
18         A.   Yes.
19         Q.   What does that mean in connection with
20  the Pocatello Police Department?
21         A.   That's details that are placed in a
22  call.
23         Q.   And do patrol officers have access to
24  those?
25         A.   To seeing them, yes.

1          Q.    Did you ever see any of the call

2     comments with respect to the -- any of the alleged

3     activities of Jake Sheeler on September 25?

4          A.    I don't recall, but I would imagine that

5     I had -- I think it's reasonable to say that I would

6     have looked at the call screen and the comments.

7          Q.    Prior to the shooting?

8          A.    Correct.

9          Q.    Do you recall Idaho State Trooper Noyes

10    reporting that he had potentially observed the

11    subject?

12         A.    Yes.

13         Q.    And he mentioned that the subject had a

14    backpack?

15         A.    I don't recall that specifically.

16         Q.    Do you just not remember one way or the

17    other or you believe he did not say that?

18         A.    I don't remember one way or the other.

19         Q.    When you saw Jake Sheeler, did he have a

20    backpack on him?

21         A.    No.

22         Q.    And you mentioned that you did see Jake

23    Sheeler on the ground after the shooting.  Did you

24    see any of Jake Sheeler's wounds?

25         A.    I believe I saw a wound to his leg.

1          Q.    Can you describe it in any more detail?

2          A.    A gunshot wound to his leg.

3          Q.    Which leg?

4          A.    I believe it was the left leg.

5          Q.    Okay.  Did you do anything on scene to

6    deescalate the situation?

7          A.    I gave commands to try to gain

8    compliance.

9          Q.    And those commands were at what you

10   considered to be 10 out of 10 on a volume level,

11   correct?

12         A.    Yes.

13         Q.    So you shouted at him the whole time,

14   correct?

15         A.    Yes.

16         Q.    Okay.  And that's the only effort you

17   believe you made to deescalate the situation?

18         A.    No.  I think that other tactics or other

19   things that I did could be considered a deescalation.

20         Q.    Help me -- tell me what those are.

21         A.    Not only commands but showing a firearm

22   can also be a deescalation tactic, if someone

23   complies with being shown a firearm.  Having a

24   firearm pointed at them, that can be a deescalation

25   to comply.

1          Q.    And that assumes that the person can see
2     the firearm while they've got that big old light
3     shining in their eyes, right?
4          A.    No, I don't want to assume.  I just --
5     that's -- that's what I would consider also could be
6     a form of deescalation.
7          Q.    But only if the subject sees it, right?
8          A.    I think that just depends on the
9     situation.
10         Q.    How could it be a deescalation mechanism
11    if the subject doesn't even see it?
12         A.    I don't know.  So it would be a
13    deescalation tactic if the subject saw it or if an
14    officer verbalized it.
15         Q.    Did you verbalize to Jake Sheeler that
16    you were going to shoot him if some event did not
17    happen?
18         A.    I don't recall saying that specifically.
19         Q.    Did you ever warn Jake Sheeler you were
20    going to shoot before you started shooting?
21         A.    I don't recall specifically.  I have to
22    watch the body cam video again.
23         Q.    So you would just defer to whatever you
24    said on the body camera footage?
25         A.    Correct.

1          Q.   Did you attempt to use a less-lethal
2   option with respect to Jake Sheeler?
3          A.   Just by giving commands and intending
4   him to comply with them, that would be -- but not a
5   less-lethal option such as a Taser or anything of
6   that nature.
7          Q.   Did you at any time while you were
8   shooting assess whether Jake had been struck?
9          A.   Yes.
10         Q.   When did you do that?  After you were
11  done shooting?
12         A.   After this -- the threat had stopped, he
13  had fallen, he has -- he was on the ground.  He had
14  fallen.  That would be --
15         Q.   Did you while you were shooting assess
16  whether Jake had been subdued?
17         A.   Yes.
18         Q.   While you were shooting?
19         A.   Yes.
20         Q.   Okay.  Tell me at what point did you
21  assess whether Jake had been subdued while you were
22  still shooting.
23         A.   While I was shooting I was looking at
24  him and could see that he hadn't fallen down or been
25  on the ground yet, so that was me assessing.

1          Q.   Okay.  So you were going to keep

2    shooting until he was on the ground?

3          A.   No.  Until the threat stopped.

4          Q.   And that was when he was on the ground?

5          A.   Until the threat stopped.  That's the

6    only comment I'm going to make on that.

7          Q.   Do you know that, among other places,

8    Jake was shot in his neck?

9          A.   I don't specifically know that.  I

10   didn't -- I didn't see every single wound that he

11   had.

12         Q.   Okay.  Let's see.  Did you ever attempt

13   to initiate a dialogue with Jake Sheeler?

14         A.   By giving commands.  So yes, by giving

15   commands.

16         Q.   Did you expect him to respond verbally

17   to those commands?

18         A.   Yes, I would expect somebody to respond

19   verbally and physically.

20         Q.   Okay.  How did you leave the scene?

21         A.   I believe I was escorted by Sergeant

22   Hancock at the time.

23         Q.   And you were with Officer Saldana,

24   correct?

25         A.   Correct.  So Sergeant Hancock, Officer

1    Saldana and I -- I believe I was in the front

2    passenger seat, Officer Saldana would have been in

3    the back seat, and Sergeant Hancock would have been

4    driving the vehicle.

5          Q.    And where did you go from the scene?

6          A.    To the Pocatello Police Department.

7          Q.    Was your lawyer already on scene before

8    you left?

9          A.    No.

10          Q.    Did you have any blood tests or alcohol

11    or drug screening after the shooting?

12          A.    No.

13          Q.    Did you speak with any supervisors about

14    the shooting?

15          A.    No.

16          MS. PORTER:  You know, I'll tell you what,

17    let's take a short break and then you guys can

18    stretch your legs.

19                (A recess was taken from 10:32 a.m. to

20    10:44 a.m.)

21          Q.    (BY MS. PORTER):  So some of this is

22    just going to be kind of clean up, so they're going

23    to be kind of random.

24          A.    Okay.

25          Q.    One of these is just something we

1    thought we saw.  We thought we saw that -- a mention

2    that you had some kind of vacation or out-of-town

3    trip scheduled on September 26th and that was why you

4    couldn't do your interview.

5              Does any of that sound familiar at all?

6         A.   I did have a vacation scheduled, but I

7    believe that I did my interview prior to leaving for

8    my vacation.

9         Q.   Okay.  That didn't even matter.  We just

10   wondered.

11        A.   Yes.

12        Q.   All right.  Where were the nearest

13   civilians, so to speak, to your knowledge?

14        A.   To my knowledge, I think there's a

15   couple of different areas that you could consider

16   that would have the nearest civilian:  The Red Lion

17   Hotel, that Outback Golf Course, any residential

18   houses to the north and I guess residential houses

19   that are in the approximate area to the north,

20   south -- to the north and the south and the east.  I

21   believe the west was just trees and the interstate.

22        Q.   Did you see any civilians on the scene?

23        A.   I did not.

24        Q.   Have you ever fired your weapon in the

25   line of duty other than Jake Sheeler?

1           A.    No.

2           Q.    Were you wearing any sort of body armor?

3           A.    Yes.

4           Q.    What were you wearing that night?

5           A.    My duty vest, my tactical -- I'm

6    blanking on the word right now.  Sorry.  My patrol

7    vest.

8           Q.    Kevlar?

9           A.    Yes, Kevlar vest.  I'm sorry.

10          Q.    Okay.  So you were wearing a -- now I'm

11   blanking.  A Kevlar -- is it called vest or what am I

12   thinking?

13          A.    A duty vest, yeah.  Duty -- I mean, it's

14   just your Kevlar vest, yeah.

15          Q.    Can you just describe that for me

16   generically?

17          A.    It's in the shape of a tank top, it's

18   got two straps at the top that Velcro to each

19   shoulder so that you can adjust it, and then two on

20   the side so that the Velcro can come to the front of

21   it and secure it.  And the front portion has a pocket

22   from the bottom that has your body armor in it and

23   the back as well.  So there's a plate in the front

24   and the back and then there is a pocket on the inside

25   of the vest, which I believe had my body camera

1    mount.  So the magnet that, when it's paired up on

2    the outside, your body camera can click into.

3          Q.   Did you put on body armor specific to

4    the search for the suspect or did you typically wear

5    it?

6          A.   No, that -- that was the body armor that

7    I wear every day underneath my uniform.

8          Q.   Did you have any reason to believe that

9    Jake Sheeler had any sort of armor-piercing

10   ammunition?

11         A.   That's not something that I knew.  I

12   didn't know if he did or did not.

13         Q.   Did you ever tell anyone that Jake

14   Sheeler had a gun on him?

15         A.   I don't believe I told anyone.

16         Q.   Do you know of any officer -- no, strike

17   that.

18              Okay.  Our final cleanup is going to be

19   asking you a few things that were denied by you in

20   your answer.  Also, we have your discovery responses

21   that need to be signed, okay?  So we'll get to those

22   last two things.

23              MS. PORTER:  Now, in Utah, we don't typically

24   mark the complaint and answer when we do this.  Is it

25   different here?

1              MR. ANGELL:  You can do whatever you like.

2              MS. PORTER:  Okay.  I'm not going to mark

3     them.

4                   Let's do the complaint and answer.

5     Everyone needs copies.

6              MR. CHRISTIANSEN:  Okay.

7              MS. PORTER:  And the answer.  Did you give

8     her two complaints or two --

9              MS. CHRISTIANSEN:  I gave her two -- I think

10    I handed her --

11             MS. PORTER:  Yeah, we don't need that.  Let's

12    give her -- because we're not marking these, so we're

13    just going to have her look at them so she can help

14    us --

15             MS. CHRISTIANSEN:  Okay.

16             MS. PORTER:  -- with some of the things that

17    were denied.

18             Q.   (BY MS. PORTER):  Okay.  So on the left

19    there's a document called "Complaint and Jury

20    Demand."

21                  Do you see that?

22             A.   Yes.

23             Q.   Okay.  And I'll represent to you that

24    that is a copy of the complaint and jury demand that

25    has been filed in this current action, okay?

1         A.    Okay.

2         Q.    Now, on the right is an answer that you

3    and the other defendants filed to that complaint.

4               Do you see that?

5         A.    Yes.

6         Q.    Okay.  Let me ask you about a few things

7    that were denied in the answer and see if you can

8    help me.

9               So I'm going to ask -- and the thing is,

10   because of the way these work, I have to have you

11   kind of look at both documents at the same time.  So

12   we'll start with the complaint, paragraph 7.

13              Paragraph 7, it'll be a number.  See,

14   there it is.

15        A.    Okay.

16        Q.    And then if you look at the answer,

17   that's how you -- we compare them, okay?

18        A.    Okay.

19        Q.    Okay.  And I'm only going to read the

20   part of paragraph 7 that mentions you, okay?

21              Paragraph 7 says, "At all times relevant

22   to this complaint, Defendant McArthur was acting

23   within the scope of her employment with PPD."

24              You see I made that specific to you?

25        A.    Yes.

1          Q.   Okay.  Now, you denied that in your

2    answer, stating that there was insufficient

3    information to admit or deny.

4               Do you now believe that you were acting

5    within the scope of your employment at the time that

6    Jake Sheeler was shot?

7          MR. ANGELL:  So --

8          THE WITNESS:  So the answer is not something

9    that I --

10         MR. ANGELL:  Go ahead.

11         THE WITNESS:  I didn't specifically answer

12    this.

13         Q.   (BY MS. PORTER):  Well, you either gave

14    the information or you authorized it to be filed on

15    your behalf, and unfortunately, I can't have these

16    denials sitting here.

17         MR. ANGELL:  So Counsel, I'm going to object

18    to the question.  I think the way that it's worded, I

19    will object, because it refers to paragraph 7 and

20    you've changed your question to make it specific to

21    McArthur.  I'm okay with her answering that question,

22    but when we refer to paragraph 7 and a denial and

23    then ask her specifically to herself, it's confusing.

24         Q.   (BY MS. PORTER):  I'll read you the full

25    wording of paragraph 7.  Are you ready?

1              "At all times relevant to this

2   complaint, Defendants McArthur, Eldridge, Saldana and

3   Schei" -- S-c-h-e-i -- "were acting within the scope

4   of their employment with PPD and under state law for

5   purpose of 42 U.S.C. Section 1983."

6              Okay.  Do you know why that paragraph

7   was denied?

8         A.   No, I don't know why.

9         Q.   Okay.  Were you acting within the scope

10  of your employment as far as you know when Jake

11  Sheeler was shot?

12        A.   Yes, with the information given.

13        Q.   Okay.  Let's turn to paragraph 53 of the

14  complaint, and then it would be 53 of the answer

15  also.

16             Paragraph 53 says, "Defendants McArthur,

17  Eldridge and Saldana were each carrying a GLOCK 17

18  9mm semiautomatic pistol."

19             Was that a true statement with respect

20  to you?

21        A.   With respect to me, yes.

22        Q.   Do you know why it was denied by you?

23        A.   So when you're saying "denied by me," I

24  didn't specifically write this.  I understand that

25  you're saying that this was denied based on answers

1    or a statement that I had given, but I can't tell you

2    specifically why that's listed as denied.  It could

3    be for several reasons:  If they had other firearms

4    on them, if they had backup firearms on them.  I

5    don't know that.  I can tell you that I was carrying

6    a GLOCK 17 9mm, and that in the past at our

7    department it was an option at some point to carry

8    either a 45 or a 9mm.  So I don't know if one of them

9    was carrying a 45 or a 9mm.  I don't know.

10            Q.   But with respect to your answer, you

11   would admit that, correct?

12            A.   That I was carrying a GLOCK 17?  Yes, I

13   was carrying a GLOCK 17 9mm.

14            Q.   Okay.  What kind of ammunition did you

15   have in that GLOCK?

16            A.   The department-issued.  I couldn't give

17   you a brand.  I don't know.

18            Q.   Okay.  Eldridge did, clear down to

19   the --

20            A.   He's also a firearms instructor, so --

21   he's the one that provides all of that and I'm sure

22   does some of the purchasing, so...

23            Q.   Do you know whether there was more than

24   one type of ammunition available to you from

25   Pocatello Police Department?

1            A.    Yes, I'm sure there's more than one

2    type, but it's all department-issued.

3            Q.    I understand that.  I'm trying to see

4    whether there's any way you can help us narrow down

5    the type of ammunition you would have had on

6    September 25th, 2020.

7            A.    I can't specifically give a brand.

8            Q.    Okay.

9            A.    It would have been a 9mm bullet.

10            Q.    Did you typically have to sign when you

11    were given ammunition?  Sign something?

12            A.    No.

13            Q.    What was the process for getting

14    ammunition as of September 2020?

15            A.    Just the ammunition that we were issued

16    from the -- from when I first started in -- like,

17    you're given a specific amount of rounds for each of

18    your magazines, including the magazine in your gun.

19            Q.    Now, you used up five of those in the

20    Jake Sheeler shooting, right?

21            A.    Correct.

22            Q.    So did you get five replacement bullets?

23            A.    Yes, I would have been issued more

24    ammunition when I came back to work at some point.

25            Q.    Did you have to request that in some way

1  or did it just show up?

2          A.   I believe someone just -- I believe

3  somebody -- a firearms instructor probably was the

4  one that gave me that.

5          Q.   Okay.  Now, paragraph 56, which is right

6  below that in the complaint says, "Defendant McArthur

7  drew her gun and pointed it at Jake," and that was

8  denied.

9               Did you draw your gun and point it at

10 Jake?

11         A.   Yes, at a certain point.  That's what

12 I'll say.

13         Q.   Okay.  Did Defendant Eldridge draw his

14 gun and point it at Jake?

15         A.   To my knowledge, yes.

16         Q.   Did Defendant Eldridge -- or, excuse

17 me -- did Officer Eldridge state, "I will shoot you,"

18 prior to the shooting of Jake Sheeler?

19         A.   I don't know.  That would be something

20 that you would ask him.

21         Q.   Did you hear him say that?

22         A.   I don't recall.  That's something that

23 would need to be asked to him.

24         Q.   Well, I'm asking what you remembered

25 before you guys shot at Jake Sheeler.

1          A.    I know, and I'm saying I don't recall.

2          Q.    Okay.  Fair enough.  Did Jake Sheeler

3    attempt to flee?

4          A.    Which bullet point are you -- or is this

5    just a question?

6          Q.    This is just generic.  Let me re-ask it.

7    I'm sorry for that confusion.

8                After you arrived on scene, did Jake

9    Sheeler attempt to flee?

10         A.    Yes, he was running.  He was running

11   away from the treeline.

12         Q.    Okay.  And did he ever stop running?

13         A.    I'm sure at some point he stopped

14   running.

15         Q.    Okay.  So he ran through the treeline,

16   or emerged from the treeline running.

17               Is that what you're saying?

18         A.    Yes.

19         Q.    And then he just came to a dead stop or

20   did he start walking?

21         A.    He was continuing to walk sideways.

22   That's the best way can I describe it.

23         Q.    Okay.  And so, now, when he emerged from

24   the trees, he didn't -- had you already announced

25   your presence at the time that he emerged from the

1    trees?

2          A.    I don't recall.

3          Q.    So -- so please tell me at what point

4    from the emerging from the tree until he was shot

5    that he attempted to flee.

6          A.    I mean, fleeing is running.  He was

7    running.  Is that what you're saying?

8          Q.    Yeah.  And then just walk me through

9    this 30-something seconds before he was shot.  He

10   emerged from the trees and he was running.  Is that

11   what you're telling me?

12         A.    Yes.

13         Q.    All right.  Now, tell me, then, what

14   happened at that -- that was fleeing toward you?  Is

15   that what you're saying?

16         A.    It wasn't -- no, I don't know that you

17   can word it as "fleeing" towards us when he wasn't

18   directly coming right up to me.  It was at a sideways

19   angle that he was moving at.  He was not -- he wasn't

20   walking straight on at me or running straight on at

21   me.  He was moving from west to east.

22         Q.    And then at some point did he stop

23   fleeing?

24         A.    He continued to walk and was -- his body

25   wasn't just standing still or completely stopped

1    until he was on the ground.

2          Q.    Okay.  So you were shooting at a moving

3    target?

4          A.    His body was moving, absolutely, as he

5    was moving his body and his arm.

6          Q.    Okay.  Now, he had squared up on Officer

7    Eldridge, right?

8          A.    Correct.

9          Q.    So he was squared up at him and

10   continuing to move?

11         A.    No.  I'm saying that, during every

12   portion -- I mean, he's moving at -- in the portions

13   of this, whether he's moving an arm or yelling or

14   shouting, you could consider that all movement.

15   There was a -- at what point?  You can be squared up

16   and I can still be squared up at you and move my

17   hands and talk and do these kinds of things but have

18   my body squared to you while I'm moving.  So I guess

19   I don't know how to answer that.

20         Q.    All right.  And I was trying to narrow

21   down the fleeing part.  So at any point before he was

22   shot, did Jake Sheeler stop fleeing?

23         A.    He stopped -- he stopped running.  He

24   was at a walk.  He was still moving from east to

25   west.  That's the best way -- or, sorry, excuse me --

1    from west to east.  That's the best way that I can

2    describe that.

3          Q.    And you construed that as fleeing?

4          A.    I didn't construe anything.  I would say

5    that him running and continuing to go away from

6    officers, not walking towards -- directly at me,

7    that's not -- that's evasive movement.

8          Q.    Tell me everything he did with his hands

9    prior to him squaring up.  You just showed us some

10   gestures with your hands while we were talking --

11         A.    He had his right hand tucked in the back

12   of his waistband, and he -- and from what I recall,

13   yelling and obviously body movements, based on if his

14   arms are out or coming in and his right hand tucked

15   behind in the back of his waistband.

16         Q.    Anything -- any other hand movements

17   before he was shot?

18         A.    Not that I recall.

19         Q.    Okay.

20         A.    I guess, unless you're specifying when

21   he removed his hand from the back of his waistband

22   and pushed it forward, I -- I feel like the question

23   was broad.  Is there -- did I cover that?

24         Q.    Add anything you want.  You have

25   described that before.  So it's not like, you know,

1    I'm trying to put one over on you or anything.

2          A.    Okay.  So the only other hand movement

3    that I would describe, other than if you're moving

4    your body and talking, would be pulling his right arm

5    from the back of his waistband, pushing it forward

6    towards the direction of Officer Eldridge and I.

7          Q.    Okay.  And can you elaborate on what

8    Jake Sheeler was doing with his left hand or arm

9    prior to being shot?

10         A.    I can't elaborate on that.

11         Q.    With respect to your GLOCK, did you have

12   to pull the trigger each time for a bullet to be

13   expelled?

14         A.    Yes.

15         Q.    So did you pull your trigger five times?

16         A.    Yes.

17         Q.    Did you ever tell Jake that he was under

18   arrest?

19         A.    I don't recall.  I would have to watch

20   the body cam video.

21         Q.    Do you recall ever mentioning the word

22   "arrest" to Jake Sheeler before shooting at him?

23         A.    I don't recall.

24         MS. PORTER:  That might be it.

25              Got anything, Anna?

 1          MS. CHRISTIANSEN:  Nope.

 2          MS. PORTER:  That's it for me.

 3          MR. ANGELL:  Counsel, if you don't mind, I

 4    need to clarify one -- a couple of questions.

 5          MS. PORTER:  Sure.

 6                         EXAMINATION

 7    BY MR. ANGELL:

 8          Q.   Officer McArthur, if you can look at

 9    Exhibit 3 that Counsel marked earlier, this is the

10    aerial overhead.

11          A.   Okay.

12          Q.   I think your testimony was that this was

13    an approximation -- a general approximation of

14    locations.  I need to clarify with Saldana, but did

15    you have any idea where Saldana was?

16          A.   No.

17          Q.   Do you have any ability to place her on

18    an overhead like this of where her location was?

19          A.   No.

20          Q.   Okay.  And then when you said "a general

21    approximation," or whatever the term was you used,

22    can you -- do you have the ability to place the exact

23    points where you, Eldridge and Sheeler were at?

24          A.   No, not the exact points.

25          Q.   What did you mean by "general

1  approximation"?

2          A.    That this is a view of the golf course

3  and the treeline and -- showing that we were on the

4  golf course as a general approximation of yes, this

5  is the golf course, yes, this is the treeline, yes,

6  Eldridge, I, Sheeler were there.  I can't

7  specifically say the exact place that we were on the

8  golf course.

9          Q.    And then, of course, you were all moving

10  during this 30-second interval that Counsel has

11  referred to, right?

12          A.    Correct.

13          Q.    Okay.

14          MR. ANGELL:  That's all I have.

15          MS. PORTER:  I have a follow up.

16                    FURTHER EXAMINATION

17  BY MS. PORTER:

18          Q.    I think you said there's no way to

19  approximate or determine where you were.  Would you

20  agree that the location of your shell casings would

21  at least be somewhat informative?

22          A.    No, I'm not going to say that I agree.

23  I think that shell casings could be walked over,

24  kicked.  I mean -- so no, I don't agree with that.

25          Q.    Do you have some evidence that the shell

1    casings were moved after the shooting?

2          A.   No, but that is -- that could have --

3    could have happened.

4          Q.   Would that be consistent with Pocatello

5    Police Department handling of crime scenes?

6          A.   Walking over something?

7          Q.   And moving it?

8          A.   How would you know if you moved it if

9    you walked over it and it could have moved?  Do you

10   know everything that moves when you walk over it?

11         Q.   Well, I got to say I think most police

12   investigations try to avoid that happening by marking

13   things and preventing that from happening.

14         A.   You don't mark it until afterwards.  If

15   there's officers running towards you, they could have

16   ran over it and not seen it.

17         Q.   And do you have any evidence whatsoever

18   that that happened?

19         A.   No.  I don't know if it did or did not.

20         MS. PORTER:  Okay.  We're done.

21          (Deposition concluded at 11:08 a.m.)

22                  (Signature requested.)

23

24

25

```
1              CERTIFICATE OF BRIDGET MCARTHUR

2

3       I, BRIDGET MCARTHUR, being first duly sworn,

4   depose and say:

5       That I am the witness named in the foregoing

6   deposition; that I have read said deposition and know

7   the contents thereof; that the questions contained

8   therein were propounded to me; and that the answers

9   contained therein are true and correct, except for

10  any changes that I may have listed on the Errata

11  Sheet attached hereto.

12          DATED this _____day of _____20_____.

13

14          CHANGED ON ERRATA SHEET   YES___NO___

15

16  _____

17  BRIDGET MCARTHUR

18      SUBSCRIBED AND SWORN to before me this

19  _____day of _____20_____.

20

21

22

23  _____

24  NAME OF NOTARY PUBLIC
    RESIDING AT_____

25  MY COMMISSION EXPIRES_____
```

**ERRATA SHEET FOR BRIDGET MCARTHUR**

1

2  Page_____Line_____Reason for Change
_____
3  Reads
_____
4  Should Read
_____
5  Page_____Line_____Reason for Change
_____
6  Reads
_____
7  Should Read
_____
8  Page_____Line_____Reason for Change
_____
9  Reads
_____
10  Should Read
_____
11  Page_____Line_____Reason for Change
_____
12  Reads
_____
13  Should Read
_____
14  Page_____Line_____Reason for Change
_____
15  Reads
_____
16  Should Read
_____
17  Page_____Line_____Reason for Change
_____
18  Reads
_____
19  Should Read
_____
20  Page_____Line_____Reason for Change
_____
21  Reads
_____
22  Should Read
_____
23

24

25      SIGNATURE:_____

1                    REPORTER'S CERTIFICATE

2           I, Amber S. Williams, CSR NO. 1080,

3    Certified Shorthand Reporter, certify:

4           That the foregoing proceedings were taken

5    before me at the time and place therein set forth, at

6    which time the witness was put under oath by me.

7           That the testimony and all objections made

8    were recorded stenographically by me and transcribed

9    by me or under my direction.

10          That the foregoing is a true and correct

11   record of all testimony given, to the best of my

12   ability.

13          I further certify that I am not a relative

14   or employee of any attorney or party, nor am I

15   financially interested in the action.

16          IN WITNESS WHEREOF, I set my hand and seal

17   this 23rd day of February, 2023.

18

19

20   _____

21           AMBER S. WILLIAMS, CSR NO. 1080

22           Notary Public

23           Post Office Box 2636

24           Boise, Idaho  83701-2636

25   My commission expires June 1, 2027

# Exhibit 13

 Eastern Idaho Critical Incident Team

**Supplemental Report Form**

**Supplement Number:** 18

**Investigative Team:** DET. Z. GRAHAM (BCSO) and SGT. K. NOAH (BCSO)

**Case Number:** Bonneville County Sheriff's Office (BCSO 2020-37078)

**Associated Case Numbers:** Bannock County Sheriff's Office (20-B4159); Chubbuck Police Dept. (20-C5825); Idaho State Police (Z20000111, P20001004); Bingham County Sheriff's Office/Blackfoot PD (01-2020-05034); Power County Sheriff's Office (01-2020-02343); Pocatello Police Dept. (20-P19954, 20-P20018, 20-P20020)

**Date and Time Occurrence:** INTERVIEW of PPD Officer B. McArthur (Sept. 28, 2020)

**Location:** Racine and Olson Law Office, Pocatello, ID

**Supplement:**

6 pages of DET. Z. GRAHAM'S report are attached.

The audio recording of Officer McArthur's interview has been placed in on the disc labeled ATTACHMENTS 1.

Officer McArthur, Cpl. Eldridge, and Officer Saldana each completed a rough sketch (labeled Exhibit A-C, respectively) during their individual interviews. Copies of Exhibit A-C are attached to this report (3 pages). PDF copies of Exhibits A-C have been placed on the disc labeled ATTACHMENTS 1.



Revised 2019

DEFENDANTS 000162

BCSO Case 2020-37078
PPD OIS (09.25.20)
Detective Z. Graham
Date of Report: November 10, 2020

On September 28, 2020 at approximately 11am, I, Sgt. K. Noah (Bonneville County Sheriff's Office), Lt. B. Collins (Pocatello PD), and Sgt. E. Daniels (Pocatello PD) interviewed Pocatello Police Department (PPD) Officer Bridget McArthur. The interview was pre-arranged with Officer McArthur's attorney, Steve Muhonen. This interview was conducted in a conference room at the Racine Olson law firm in Pocatello, ID. Steve Muhonen was present for the entire interview of Officer McArthur.

I audio recorded this interview. Stephen Muhonen also audio recorded this interview with his own device. The PPD investigators present also likely audio recorded this interview. An unaltered copy of my original recording of this interview has been placed in the investigation binder. The information contained in this report is not a transcription of the entire interview. For specifics, refer to the audio recording. The time stamps noted in parentheses refer to the elapsed time in my recording that an item was discussed.

I identified myself to Officer McArthur. I told her the purpose of the interview was to conduct a criminal inquiry into the events of September 25, 2020. Officer McArthur told me that she understood the nature of the interview.

Officer McArthur volunteered the following information during her interview.

1. Officer McArthur holds a rank of 1st class patrolman; Officer McArthur's badge/call number is 5281. She is currently assigned to weekend swing shift (3pm—3am).
2. I initially asked Officer McArthur about the shift that she worked on Sept. 26, 2020. Steve Muhonen asked if I could confirm this date. Upon looking at an electronic calendar, I corrected the date to the shift that Officer McArthur worked to Sept. 25, 2020.
3. Officer McArthur told me that she was working on Sept. 25, 2020. Officer McArthur believed she was operating unit number 230 during her shift (Officer McArthur told us that she and other PPD officers share patrol cars). Officer McArthur did not have any passengers in her patrol car while she was working on September 25, 2020.
4. I asked Officer McArthur about the original call for law enforcement service that was associated with the event that led to her being interviewed.
5. Officer McArthur told me the original call came in around 4:30—5pm. Officer McArthur explained that a call had come in about a male who had broken into a residence and stolen firearms from a residence near E. Maple (a city of Pocatello street). Officer McArthur told us the theft suspect had pointed a firearm at the reporting party (of the

DEFENDANTS 000163

firearm theft) and other citizens in the area. Officer McArthur told us that she did not respond to the initial firearm theft call.

6. Officer McArthur told us that she was aware the firearm theft suspect had committed grand theft, burglary, and aggravated assault around the time of the initial call.

7. Officer McArthur told us that a photo and identification information for the firearm theft suspect was distributed to a Pocatello PD e-mail list. The suspect information was sent via e-mail to everyone on patrol. Specifically, the e-mail contained photographs of the suspect and the suspect's clothing. Officer McArthur stated that another e-mail was also sent that contained a photograph of the suspect's face.

8. Officer McArthur was not sure if the e-mails sent to patrol officers contained the suspect's name. Officer McArthur told us that the suspect's name was JAKE SHELLER (Sic) (SHEELER).

9. Officer McArthur told us that she had no interaction with the suspect JAKE SHEELER prior to this incident.

10. I asked Officer McArthur if she did any further research on SHEELER. Officer McArthur told us she looked SHEELER up in their reporting system (Spillman) after receiving the e-mails. Officer McArthur told us the pictures she located in Spillman were similar to the individual whose photograph had been sent out via e-mail.

11. Officer McArthur told us that while other officers were addressing the initial firearm theft call, she was taking other calls for service around the city of Pocatello.

12. Officer McArthur told us that at around 8pm, another call for service was dispatched in the area of Beth and Monte Vista (city of Pocatello streets). I asked Officer McArthur about the nature of this call. Officer McArthur told us that a male matching the theft suspect's (firearm theft) description was in the area and had attempted to sell the caller a firearm.

13. Officer McArthur told us she responded to the call near Beth and Monte Vista. Officer McArthur assisted with searching for the suspect. Officer McArthur said that she heard Cpl. Eldridge say over the air (law enforcement radio) that the suspect had run through a yard.

14. I asked Officer McArthur if the description of the suspect on the Beth call matched the description of the suspect from the earlier firearm theft call. Officer McArthur told us that Pocatello PD dispatch had done a reverse 911 call to residents in the area of the initial firearm theft call. The firearm the suspect attempted to sell near Beth matched the description of the firearm stolen from the area of E. Maple, Hyde (city of Pocatello streets).

15. Steve Muhonen asked Officer McArthur what the description of the male trying to sell the firearm was. Officer McArthur stated the male suspect was wearing a green-hooded jacket, dark pants, dark shoes and glasses—a white male who had dark hair.

16. I asked Officer McArthur what type firearm the suspect attempted to sell. Officer McArthur told us that she believed the firearm was a revolver.

17. Officer McArthur explained that she, Cpl. Eldridge and other PPD officers were searching the backyard of home near Beth and Monte Vista. The search was done at the request of the home owner.

DEFENDANTS 000164

18. Officer McArthur told us that while she and other officers were searching the aforementioned backyard, she heard an Idaho State Police trooper speaking on the Pocatello PD channel (law enforcement radio). The trooper stated that he observed a male matching the suspect's description behind the Red Lion (a hotel to the north of Officer McArthur's location). The trooper advised he was going to make contact with the male.

19. Officer McArthur told us there was a gate in the back yard where she and the other officers were searching; the officers went through the gate. Officer McArthur told us the gate led to an area with a hill that had sage brush on it. The Outback Golf Course was at the bottom of this hill. A tree line separated the Red Lion hotel from Outback Golf Course.

20. Officer McArthur told us that PPD Cpl. Miller and PPD Officer Smith continued along the fence line (at the top of the hill) while she and PPD Cpl. Eldridge moved down the hill toward the Outback Golf Course.

21. Officer McArthur explained that at the bottom of the hill (the golf course area) she and Cpl. Eldridge made a plan to check the tree line that separated the Red Lion from the Outback Golf Course. Officer McArthur was going to check the west side of the tree line while Cpl. Eldridge checked the east side of the tree line. Officer McArthur told us she and Cpl. Eldridge were then going to clear the tree line and meet in the middle.

22. Officer McArthur told us that she and Cpl. Eldridge "V-d" out: Cpl. Eldridge moving North-East while she moved North-West. As Officer McArthur and Cpl. Eldridge were moving their respective directions, Officer McArthur told us that she observed a subject wearing dark clothing running east toward Cpl. Eldridge.

23. Officer McArthur told us that she shined her light (flashlight) on the subject. Officer McArthur told us that upon shining her light on the subject, she observed the male to be the same individual she had observed in the earlier photos that were sent out (e-mailed photos). Officer McArthur and Cpl. Eldridge both proceeded to run toward the male.

24. Officer McAthur told us that both she and Cpl. Eldridge were both giving commands to the male. The male had his right arm tucked in the back of his waistband. Officer McArthur could not see the male's right hand. The male was not listening to the commands and continued to run East.

25. Officer McArthur stated the male subject told her that he had a gun several times. The male subject made these statements as he concealed his hand behind his back. The male subject told Officer McArthur, 'I will shoot you'.

26. Officer McArthur stated that she had her flashlight on the subject with her duty handgun also drawn on the subject.

27. Officer McArthur told us she continued giving commands to the subject. The subject refused to comply with commands. The subject was focused on Officer McArthur and Cpl. Eldridge. The subject did nothing to surrender, or make an attempt to surrender.

28. Officer McArthur told us that the subject pulled his right hand from the back of his waist band and "squared up" on Cpl. Eldridge. Officer McArthur described the subject as being in a "shooting stance" when he produced his arm from behind his back. Officer McArthur went on to describe that "shooting stance" meant the subject's legs were

DEFENDANTS 000165

shoulder width apart, his feet were parallel to each other and the subject's body was squared off to Cpl. Eldridge.

29. Officer McArthur told us the subject's hand came out from behind his back and "pushed forward" toward Cpl. Eldridge.

30. Officer McArthur told us that upon seeing the subject pushing his hands forward (toward Cpl. Eldridge), they both fired their duty weapons (handgun at the subject). Officer McArthur told us she and Cpl. Eldridge stopped firing their handguns when the subject was down and was no longer a threat.

31. I asked Officer McArthur about the commands that she gave to the subject. Officer McArthur told me that she ordered the male subject to show her his hands.

32. Officer McArthur did not recall if she identified herself as a law enforcement officer while giving commands (17:40). Officer McArthur told us Cpl. Eldridge was closer to the male subject than she was.

33. Officer McArthur confirmed that the male subject she and Cpl. Eldridge contacted was the same male subject that she had previously seen in photographs. Officer McArthur told me the clothing and face were consistent with what she had previously observed in the e-mailed photographs.

34. Officer McArthur told us the handgun she fired during this incident was a GLOCK 17 (9mm). Officer McArthur told us that her GLOCK 17 (department issued) was loaded with department-issued ammunition. Officer McArthur told us she has a weapon-mounted light on GLOCK 17. There are no other accessories on Officer McArthur's GLOCK 17 handgun.

35. Officer McArthur told us that she normally carries 17 cartridges in her magazine with one cartridge in the chamber (a total of 18 rounds).

36. Officer McArthur told us that she didn't have access to any other firearms at the time of this incident. Officer McArthur told us she does not carry a back up gun.

37. Officer McArthur told us she was wearing a law enforcement uniform at the time off this incident. Officer McArthur described the uniform as "dark BDU" with a badge on the left chest and Officer McArthur's name on the right chest area. There is patch on the left arm, and a flag on the right arm. Officer McArthur was wearing a duty belt at the time of this incident. Items on her duty belt include magazines (one magazine in the firearm and two extra magazines), firearm, TASER and baton. Officer McArthur told us that she did not deploy or utilize any of these items on her duty belt (firearm excepted) during this incident.

38. I asked Officer McArthur if the suspect (male subject) did anything to make her feel threatened.  Officer McArthur told us the suspect did make her feel threatened. Officer McArthur told us that the suspect threatened to shoot her and Cpl. Eldridge. Officer McArthur told us the suspect had committed multiple felonies earlier in the day and that it was probable the suspect was in possession of a firearm.

39. Officer McArthur told us she was in fear for her life, Cpl. Eldridge's life, other officers' lives. Officer McArthur was also concerned about the citizens who were in the area and worried that the suspect could have taken them hostage or hurt someone.

40. I asked Officer McArthur how many rounds she fired during this incident. Officer McArthur told me that she thought she had fired 3 rounds. Officer McArthur explained that after a round count was done, she learned she had fired 5 rounds.

41. Officer McArthur told me that she was about 20-30 feet southeast of Cpl. Eldridge at the time of the shooting. Cpl. Eldridge was in front of Officer McArthur at the time of the shooting. It should be noted that Cpl. Eldridge was not directly in front of Officer McArthur at the time of the shooting.

42. I showed Officer McArthur an aerial photograph of the shooting scene. Officer McArthur told us that she recognized the area depicted in the photograph.

43. I asked Officer McArthur to mark on the printed photograph her location and the suspect's location when she contacted the suspect. Steve Muhonen asked Officer McArthur to note the North direction on the map. This photograph was marked Exhibit A. Refer to the Exhibit A for specifics. It should be noted that the color printed aerial photograph did not have any scale markings.

44. Sgt. Noah asked Officer McArthur if there were any other officers present. Officer McArthur told us that she was only aware of Cpl. Miller, Officer Smith, and a state trooper in the area of the Red Lion. Officer McArthur said that (PPD) Officer Anderson was also on his way to the Red Lion. Officer McArthur indicated on the printed aerial photograph (Exhibit A) the fence line Cpl. Miller and Officer Smith were following.

45. I asked Officer McArthur if she did anything unintentionally or deliberately to alter the crime scene. Officer McArthur told us that she did not unintentionally or deliberately alter the crime scene.

46. I asked Officer McArthur about the lighting conditions in the area depicted in Exhibit A. Officer McArthur said it was dark, nighttime. Officer McArthur told us there were "a couple lights on the golf course . . .tall spotlights". Officer McArthur said that she could see "perfectly" once light was introduced. Officer McArthur told us she was using her patrol flashlight as a light source; the patrol flashlight was "lighting up the suspect".

47. Officer McArthur described the weather at the time of the shooting as clear, warm, "60-something degrees".

48. I asked Officer McArthur if the suspect had ample time to give up before this incident unfolded. Officer McArthur without hesitation stated the suspect did have ample time to take another course of action. Officer McArthur told us the suspect was committed.

49. Officer McArthur described the volume of voice with which she yelled commands at the suspect as a 10 (on a scale of 1-10 with 10 being the loudest she could yell).

50. Officer McArthur told us that it would be fair to say that she, Cpl. Eldridge and the other officers on scene were readily identifiable as law enforcement officers.

51. Officer McArthur told us that after the shooting, she handed supplies (a tourniquet and combat gauze) to other officers were who providing aid to the suspect.

52. Sgt. Noah asked the names of the officer who were providing aid to the suspect. Officer McArthur told us that she couldn't list all of them but believed Officer Fechen (PPD), Officer Anderson (PPD), Todd Orr (ISP), Cpl. Miller (PPD), and Officer Smith were rendering aid to the suspect.

DEFENDANTS 000167

53. Sgt. Noah asked Officer McArthur about the suspect's wounds. Officer McArthur told us that she was aware of one wound in the suspect's leg. Officer McArthur told us that she did not believe that she put her hands on the suspect after the shooting.

54. I asked Officer McArthur about her duty firearm's condition immediately after the shooting. Officer McArthur told me that she kept her firearm out until the suspect was secured by other officers. Officer McArthur told me that she placed her firearm back in her holster (while still at the scene of the shooting). Officer McArthur told us the next time her firearm was removed from her holster was when the round count was done and her firearm was seized. Officer McArthur told me that she didn't reload her firearm or otherwise manipulate it after the shooting.

55. I again asked Officer McArthur to reiterate her initial contact with the suspect and the sequence of events after contacting the suspect.

56. Officer McArthur again explained that the suspect concealed his right arm behind his back. The suspect told Officer McArthur that he had a gun and that he would shoot her. Officer McArthur described the suspect's demeanor as "committed, "focused" and "angry". The suspect was focused only on Cpl. Eldridge and Officer McArthur.

57. Officer McArthur told us that she heard commands from other officers such as "Stop" and "Get on the ground". Officer McArthur did not know exactly who said these commands.

58. Sgt. Noah asked Officer McArthur if she had anything to add. Officer McArthur stated she had never been in "so much fear" in her entire life as she was during this incident.

At the conclusion of the interview, I discontinued recording the interview. Steve Muhonen took a copy of Exhibit A and provided the original to me.

Sgt. Noah and I departed the conference room. Lt. Collins and Sgt. Daniels conducted their own administrative interview of Officer McArthur after Sgt. Noah and I had departed the premises.

Nothing further.

DEFENDANTS 000168

9/20



A

DEFENDANTS 000169



DEFENDANTS 000170



DEFENDANTS 000171

DEFENDANTS 000172

# Exhibit 14

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


JAKE SHEELER, an individual,          )

                 Plaintiff,          ) Case No.

vs.                                   ) 4:22-cv-00313-

BRIDGET MCARTHUR, an individual;      ) DCN

JEFFREY E. ELDRIDGE, an individual;   )

MARISA A. SALDANA, an individual;     )

ROGER SCHEI, an individual; and       )

CITY OF POCATELLO, a municipal        )

corporation;                          )

              Defendants.          )



DEPOSITION OF TROOPER DAVID NOYES

June 12, 2023




REPORTED BY:

AMBER S. WILLIAMS, C.S.R. No. 1080

Notary public

1           THE DEPOSITION OF TROOPER DAVID NOYES was

2    taken on behalf of the plaintiff Pocatello City Hall,

3    911 North Seventh Avenue, Pocatello, Idaho,

4    commencing at 11:36 a.m. on June 12, 2023, before

5    Amber S. Williams, Certified Shorthand Reporter and

6    Notary Public within and for the State of Idaho, in

7    the above-entitled matter.

8

9                    APPEARANCES:

10   For Plaintiff:

11        CHRISTENSEN & JENSEN, PC

12        BY:  ANNA P. CHRISTIANSEN

13        BY:  JONATHAN T. NISH

14        257 East 200 South, Suite 1100

15        Salt Lake City, Utah  84111

16        anna.christiansen@chrisjen.com

17        jonathan.nish@chrisjen.com

18   For Defendants:

19        HALL ANGELL & ASSOCIATES, LLP

20        BY:  SAM L. ANGELL

21        1075 South Utah Avenue, Suite 150

22        Idaho Falls, Idaho  83402

23        sla@hasattorneys.com

24

25

1   For Witness:

2        OFFICE OF ATTORNEY GENERAL

3        BY:  PATRICK DENTON

4        700 South Stratford Drive

5        Meridian, Idaho  83642

6        patrick.denton@isp.idaho.gov

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3    **TESTIMONY OF TROOPER DAVID NOYES**                    **Page**

4        Examination by Ms. Christiansen..............   5

5        Examination by Mr. Angell...................  70

6

7

8

9                          **EXHIBITS**

10   Exhibit 17.   CAD/Ti, Detailed History for.....  12

11                 Police Event #E20046705 as of

12                 04/07/23

13   Exhibit 18.   Idaho State Police reports of....  23

14                 Trooper David Noyes and

15                 Trooper Todd Orr,

16                 Bates Nos. DEFENDANTS 000098 -

17                 DEFENDANTS 000102

18   Exhibit 19.   Eastern Idaho Critical...........  25

19                 Incident Team supplemental

20                 report,

21                 Bates Nos. DEFENDANTS 000074 -

22                 DEFENDANTS 000077

23   Exhibit 20.   Audio Enhancement No. 2, ........  62

24                 Bates No. 32-10

25

```
 1                    TROOPER DAVID NOYES,
 2   first duly sworn to tell the truth relating to said
 3   cause, testified as follows:
 4                         EXAMINATION
 5   BY MS. CHRISTIANSEN:
 6          Q.   Would you please state your full name
 7   for the record.
 8          A.   David Lynn Noyes, N-o-y-e-s.
 9          Q.   And my name is Anna Christiansen.  Do
10   you mind if I -- how do you prefer that I address you
11   today?
12          A.   Trooper Noyes.
13          Q.   Trooper Noyes?
14          A.   Yep.
15          Q.   Okay.  You can call me Anna, should the
16   need arise.
17          A.   Okay.  Thank you.
18          Q.   Have you ever had your deposition taken
19   before?
20          A.   I have.
21          Q.   How many times would you say?
22          A.   Oh, only a couple of times over the
23   years.  In 20 years, maybe twice.
24          Q.   Have you given testimony in court
25   before?
```

```
1              A.    I have.
2              Q.    Can you give me some examples of the
3     types of cases that you have testified in?
4              A.    Yes.  Most of the cases are speeding
5     infraction citations.  The biggest case I had was a
6     trafficking case for marijuana, and that was several
7     hours.  And then another good case was a hearing on a
8     DUI that lasted a little while here in Pocatello.
9              Q.    Do you recall the nature of the cases
10    that you gave depositions in?  Were they criminal?
11             A.    Crashes.  They were involving crashes.
12             Q.    So it was civil in nature?
13             A.    Yes, I think so at that point.
14             MS. CHRISTIANSEN:  I guess they don't really
15    do depositions in criminal world, do they?
16             MR. NISH:  No, we don't.
17             MS. CHRISTIANSEN:  I should have known.
18             Q.    (BY MS. CHRISTIANSEN):  Has any of your
19    experience giving testimony been as an expert
20    witness?
21             A.    No.
22             Q.    Do you know what I mean when I say
23    "expert witness"?
24             A.    Yes.
25             Q.    But you've only been testifying to
```

```
 1   things that you have observed?
 2          A.    That's correct.
 3          Q.    Tell me your current employer, please.
 4          A.    Idaho State Police.
 5          Q.    And how long have you been with the
 6   Idaho State Police?
 7          A.    Twenty years, almost 20 and a half.
 8          Q.    When did you complete POST?
 9          A.    I went through POST at Idaho State
10   University in 2000.
11          Q.    Okay.  And I'm sorry, you said how many
12   years with ISP?
13          A.    Twenty and a half.
14          Q.    So did you go -- not directly?  You had
15   a brief span of time --
16          A.    That's correct.
17          Q.    What did you do in that span of time?
18          A.    I was a reserve officer for Preston City
19   Police.
20          Q.    For Preston?
21          A.    Yes.
22          Q.    What's your current rank?
23          A.    I'm a sergeant for the state police.
24          Q.    Okay.  And you were a sergeant on
25   September 25th, 2020?
```

```
 1              A.    That's correct.
 2              Q.    Do you have any particular specialties
 3  within your department?
 4              A.    Crash reconstruction.
 5              Q.    Any other specialties?
 6              A.    Nope.
 7              Q.    Do you hold any special certificates?
 8              A.    Above and beyond normal training?
 9              Q.    Related to your police officer -- I
10  don't care about, like, the -- I do care about the
11  welding certificate, but it's not relevant today.
12              A.    I realize that.
13              Q.    Do you have any related to your law
14  enforcement work?  Do you hold any special
15  certifications, qualifications, anything like that?
16              A.    Nothing super special out of the
17  ordinary.  I have my supervisor certificate through
18  POST, then all the -- you know, POST -- intermediate
19  advanced certificates through POST.  And all the
20  certificates I have are just for the normal training
21  for the police.  Everything special would be through
22  the crash reconstruction program.
23              Q.    So crash reconstruction, we're talking
24  about, like, vehicles -- car accidents?
25              A.    That's correct.
```

1          Q.    Okay.  Did you review any records in

2    preparation for today's deposition?

3          A.    I did.

4          Q.    Can you tell me what you reviewed,

5    please.

6          A.    I reviewed my -- our CAD logs that are

7    created during calls, and I reviewed my report, and I

8    reviewed the first 30 minutes of Sergeant Todd Orr's

9    video from his patrol car.

10          Q.    You were not wearing a body cam on

11    September 25th, 2020, correct?

12          A.    We do not have those, no.

13          Q.    You did not at the time?

14          A.    Still do not.

15          Q.    And still do not today?

16          A.    That's correct.

17          Q.    Or had a dash camera?

18          A.    I had them in my patrol car, and I had a

19    microphone for it but it was not turned on.

20          Q.    So did you also have a dash cam on your

21    car at that time?

22          A.    Not on, no.

23          Q.    Okay.

24          A.    But it was attached, yes.

25          Q.    It existed; it just wasn't --

```
 1            A.    That's correct.
 2            Q.    -- it was not operational?  Okay.
 3            I'm sorry.  Let's get back on track.
 4  You said you reviewed your CAD log, your report,
 5  Orr's dash camera?
 6            A.    That's correct.
 7            Q.    Was there anything else you reviewed in
 8  preparation for today?
 9            A.    No.
10            Q.    Now, I don't want to know any substance,
11  but did you speak with Mr. Denton in preparation for
12  today?
13            A.    Yes.
14            Q.    Did you speak with Mr.- --
15            MS. CHRISTIANSEN:  How do you pronounce your
16  last name?
17            MR. ANGELL:  Angell.
18            Q.    (BY MS. CHRISTIANSEN):  Did you speak
19  with Mr. Angell in preparation for today?
20            A.    I did not.
21            Q.    Have you ever spoken with Mr. Angell
22  prior to today?
23            A.    No, I have not.
24            Q.    Have you spoken with anybody from his
25  office prior to today?
```

1          A.    Probably.

2          Q.    Who do you believe that you have spoken

3    with?

4          A.    I don't know his name.  We met out at

5    the scene a couple of weeks ago and we went over some

6    distances and pointed out where we were at and kind

7    of the layout of things the night of the incident.

8          Q.    I'm going to pull this out.  Are you

9    talking about preparing -- this is what we've marked

10   as Exhibit 16.  Are you talking about the site visit

11   that you did on --

12         A.    That's correct.  And I also -- I have

13   that with me, and I have an attached aerial map --

14   or, photo where he put our locations where we were

15   standing.

16         Q.    Do you mind if I see your CAD logs?

17         A.    Absolutely.  Here's my CAD log and my

18   report.

19         Q.    And now, can I clarify with you, are

20   these Idaho State CAD logs?

21         A.    That's the state police one that our

22   dispatch center creates.

23         Q.    So these are not Pocatello's?

24         A.    Correct.

25         Q.    Can I keep these?

1          A.   I have no problem with that.

2          MR. DENTON:  I don't either so long as he's

3   able to access his narrative report to refresh his

4   recollection if need be.

5          MS. CHRISTIANSEN:  I have a report for his

6   exhibit, and we'll be using that today.

7          MR. ANGELL:  Counsel, why don't we attach

8   that as an exhibit to this deposition.

9          MS. CHRISTIANSEN:  Certainly.

10         MR. ANGELL:  We can probably have one of the

11  ladies make a copy while we're sitting here.

12         MS. CHRISTIANSEN:  Okay.  We're on Exhibit

13  17.  So we'll designate the ISP CAD log as 17.

14             (Exhibit 17 marked.)

15         Q.   (BY MS. CHRISTIANSEN):  Was there any

16  other document that you brought with you?  Was it

17  your report?

18         A.   It's behind that.

19         Q.   Oh, your report is behind -- oh, yes, it

20  is.  Okay.

21         MR. ANGELL:  Do you mind -- I can have them

22  make a copy of this real quick.

23         MS. CHRISTIANSEN:  We'll pause the record

24  until Sam comes back and I can gather my exhibits.

25             (A recess was taken from 11:45 a.m. to

1    11:47 a.m.)

2            Q.   (BY MS. CHRISTIANSEN):  Okay.  Getting

3    oriented again.  So you -- I'm sorry.  We've

4    established you viewed the CAD logs, your report, and

5    the Orr video.  You met with somebody from

6    Mr. Angell's office on April -- was it April 18th

7    that you met with someone from --

8            A.   I don't recall the date.

9            Q.   Let's reference Deposition Exhibit 16,

10   which I believe you should have in front of you.

11           A.   You want me to use this right here?  16?

12           Q.   Yes, please.

13           A.   Okay.  I have it.

14           Q.   And this is your declaration, correct?

15           A.   That's correct.  It was typed up and

16   e-mailed to me and I signed it.

17           Q.   So it was on April 18th that you met

18   with somebody from Mr. Angell's office?

19           A.   It would be, yes.

20           Q.   So according to the declaration, is

21   that -- to the best of your recollection, is that

22   correct?

23           A.   Yes, ma'am.

24           Q.   Had you spoken with that person prior to

25   meeting on April 18th?

1          A.    I don't believe so, other than just
2    e-mails to meet out there so we could go over the
3    scene.
4          Q.    Okay.  Did he contact you directly?  How
5    did that meeting come about?
6          A.    I think it was e-mails.  I don't think I
7    was contacted directly by anyone.
8          Q.    So did he -- I guess I'm a little
9    confused by the answer.  Did he e-mail you directly
10   or did he contact your attorney?
11         A.    Oh, no, I think it was -- he probably
12   e-mailed me directly.
13         Q.    Okay.  Can you tell me, did he ask you
14   to come to the scene, or what was the ask?
15         A.    To meet with him and the other officers
16   in the incident, go out to the scene so he could get
17   an idea of our distances from one another and
18   locations where we were standing when the shooting
19   occurred.
20         Q.    Other officers?  So what officers?
21         A.    There's myself, Trooper Orr, and then
22   three from Pocatello Police Department, maybe four.
23         Q.    Do you know who those officers were?
24         A.    I don't know their names very well.
25   They were the defendants.  It was Bridget McArthur,

1   Jeff Eldridge and Marisa Saldana.

2          Q.   So the -- these officers that are listed

3   on -- this is the Exhibit A that's Bates-numbered

4   5667?

5          A.   That's correct.  Anderson was also

6   there.

7          Q.   So those were the officers that you met

8   with on April 18th?

9          A.   That's correct.

10         Q.   When you went out to establish your

11  location, did you establish it in relation to what

12  those other officers said about their own location?

13         A.   No.  The attorney asked us where we were

14  standing, and I pointed out the location I was

15  standing when the incident occurred.

16         Q.   Okay.  Was there any discussion about

17  the events of September 25th, 2020 on that day when

18  you went out to establish location?

19         A.   No, other than what we had seen as far

20  as the suspect running through the trees.  I pointed

21  out where I had first seen him where he was running,

22  and we discussed the change in the land because

23  they've done a considerable amount of construction

24  back there and they've taken all the trees out, so

25  it's much more open and clear now than it was before

1    between the areas where the shooting occurred and to

2    where we were -- myself and the other three officers

3    were at when the shooting occurred.

4            Q.   Did you have any difficulty in

5    establishing your location because the treeline had

6    changed?

7            A.   A little bit, not really.  Because you

8    could still see the fence line -- where the fence was

9    originally, and we were at the fence attempting to

10   cross it when the shooting occurred.

11           Q.   Did you write up and prepare this

12   declaration?

13           A.   No.  I already stated that it was

14   prepared for me and I signed it.

15           Q.   Do you know who did prepare it?

16           A.   I would guess the attorney that sent it

17   to me.

18           Q.   Okay.  Did you make any changes to a

19   draft?

20           A.   I did not.

21           Q.   You were provided this draft and you put

22   your name on it?

23           A.   That's correct.

24           Q.   Did you have any understanding why you

25   were being asked?

1        A.    Yes.

2        Q.    What was your understanding about why

3   you were being asked to do this?

4        A.    The attorney wanted to know everyone's

5   locations because they were looking into getting a --

6   specialist isn't the right word -- an expert for

7   listening to cameras and determining who was talking

8   on the cameras.

9        Q.    Okay.

10       A.    Or at least on the videos that were

11  recorded around the scene, and so he wanted those

12  distances for that expert.

13       Q.    So did you go out and stand -- I guess

14  I'm confused about -- I want to understand how you

15  went out and established this pinpoint.  Did you go

16  out and stand there and have Google drop a pin in

17  your location to get your coordinates?  Or how did

18  you accomplish this as the right pin?

19       A.    Well, I didn't write that so I'm not

20  sure how he did that, but he's going off of his map.

21  And if you look at the map, we were coming across

22  behind this shed right here.  If you can see the map

23  where the X is with the circle --

24       Q.    Yes.

25       A.    -- that's where Sergeant Orr first

1    started making contact with Mr. Sheeler, and we

2    continued east.  And I say we continued a little bit

3    to the north kind of along that treeline and we

4    encountered the fence that was there.

5              Do you see this empty spot by the north

6    right here in the corner?

7         Q.   Do you mind if I lean over you while you

8    show me?

9         A.   Right here.  That's about where the

10   fence ended, and that's our approximate --

11        Q.   That -- kind of where the terrain

12   changes?  Is it, like, about that line where the

13   terrain changes?

14        A.   Well, he's got us here, but I think it's

15   probably right -- it's here somewhere.  All the trees

16   are gone now so it's very difficult to see.

17             But we were -- definitely the fence that

18   was right here, we were not further east than that

19   fence.

20        Q.   So you think you were maybe slightly to

21   the west of that -- northwest of that --

22        A.   No.

23        Q.   -- pin or --

24        A.   No.  Maybe directly north, if any.

25        Q.   Okay.  So you didn't drop this pin; it

1   was just a map that was provided to you that you

2   signed off on?

3           A.    That's correct.

4           Q.    Okay.  And this map places you in

5   exactly the same spot as Orr and Saldana?

6           A.    That's correct.  We were all right

7   there, that fence.  Sergeant Orr had crossed it, and

8   myself and Saldana were still on the west side of the

9   fence.  We were right in the process of climbing over

10  and getting over it.

11          Q.    Was there, like, a good spot for

12  climbing over the fence and you had all kind of

13  gathered at that access point?

14          A.    There was not.

15          Q.    But you were all -- you all were up in

16  approximately the same area --

17          A.    That's correct, yes.

18          Q.    -- at that time?  Okay.

19                Were you familiar with these officers

20  that you met on that day -- on April 18th?

21          A.    I've met all of them over the years from

22  one incident to another.  They stop on a traffic stop

23  with me or I stop out on traffic stops with them.

24  I'm terrible, so -- half of them -- even right now I

25  stop out and I recognize them but I don't necessarily

```
 1   know their names.
 2            Q.    "Hey you"?
 3            A.    Sometimes it's their numbers that we
 4   know.
 5            Q.    Were you familiar with them -- or, had
 6   you met these officers -- let's break it down more
 7   specifically.
 8                  To the extent that you recall these
 9   names, were you familiar with Officer Eldridge -- I
10   believe it was Corporal Eldridge -- on
11   September 25th, 2020?
12            A.    Other than seeing him at a few traffic
13   stops probably over the years, no.
14            Q.    What about McArthur?
15            A.    The same.  I've seen her, you know, in
16   court a few times just in hallways, out on the
17   streets.  A little more easy to recognize because
18   there's not as many female officers with the city as
19   male officers.
20            Q.    And just to be clear, I'm talking about
21   your familiarity with these officers on
22   September 25th, 2020, not as of the date of your
23   declaration or today.  I'm talking about at that
24   point in time.
25            A.    No, I'm talking at that point.
```

1          Q.    Then same context for Saldana.  Were you

2    familiar with Saldana on September 25th, 2020?

3          A.    Probably less so with her.  I think she

4    was relatively new to the department at that time.

5          Q.    Okay.  And your acquaintance with these

6    officers has not substantially changed since

7    September 25, 2020 to today?

8          A.    No.

9          Q.    Same level of interaction?  Sometimes --

10         A.    Some to none.

11         Q.    -- at a traffic stop -- okay.

12         A.    Yeah.

13         Q.    Aside from the statements in your

14   declaration, did you provide any other information to

15   the attorney or the officers that gathered on

16   April 18th, 2023?

17         A.    No.

18         Q.    Other than gathering on April 18th,

19   2023, have you otherwise given any statements or

20   information to Mr. Angell or the other attorney from

21   his office?

22         A.    No.  The only other contact I have had

23   was sometime after the incident -- I don't even have

24   a clue when -- an attorney contacted me and wanted to

25   know what type of night vision I had, and all I could

1  tell them is that it was old military issue that's

2  pretty crappy.

3          Q.   I was going to ask you the same question

4  today.

5          A.   There you have it.

6          Q.   Let's circle back to that issue.

7          A.   That's fine.

8          Q.   So you have -- let me try this again.

9               You were familiar with the shooting of

10  Jake Sheeler on September 25th, 2020?

11          A.   I was there, yes.

12          Q.   Were you one of the shooters?

13          A.   No, I was not.

14          Q.   Did you draw your firearm?

15          A.   I had my rifle around my neck.

16          Q.   Okay.

17          A.   So I was carrying it.

18          Q.   Was it in any kind of -- at the moment

19  of the shooting, was it in any kind of an aimed or

20  low-and-ready position?

21          A.   No.  It was just hanging pretty much

22  from my neck probably.  I may or may not have even

23  had a hand on it at that point.

24          Q.   Now, you prepared a report about the

25  September 25th, 2020 shooting, correct?

1        A.    That's correct.

2        Q.    And that is Exhibit 17 that you have

3    brought with you today, and I can give this back to

4    you.

5        A.    Yes, it is.

6        Q.    Okay.  Actually, can we reference -- I

7    have another -- I brought a copy that I think I would

8    like to -- I believe it's the same difference, but

9    just out of an abundance of caution, let's use what I

10   have brought.

11       MS. CHRISTIANSEN:  Does this take us up to

12   Exhibit 18?  Let's mark this as Exhibit 18, please.

13            (Exhibit 18 marked.)

14       Q.    (BY MS. CHRISTIANSEN):  Does that appear

15   to be your report and the report of Todd Orr?

16       A.    That does.

17       Q.    Okay.  And I'll -- when did you prepare

18   this report?

19       A.    Probably the following day.

20       Q.    Is there anything on this report that

21   tells you when you prepared it?

22       A.     I don't know if there is a reported

23   date.  I can tell you it was approved on the 30th,

24   but this record right here does not show when I

25   submitted it.  But there are records available that

1    shows every time I accessed it, yes.

2            Q.    Can you direct me to what would tell me

3    when you accessed it?

4            A.    In our computer system for ARS, it logs

5    when you get in and when I approve it.  So it would

6    have the log when I, owner, approved it, and then it

7    would have the log when it was supervisor approved.

8            Q.    So it's not on the report.  There's

9    nothing contained on the report --

10           A.    Nothing on here.

11           Q.    -- that indicates when?

12           A.    But it was approved by a supervisor by

13   the 30th, so that means I finished it before that.

14           Q.    Within five days you had drafted it,

15   provided it to a supervisor.  Does the supervisor

16   review it?

17           A.    I would hope he does.

18           Q.    What's your understanding about what

19   happens when it gets sent off for approval?

20           A.    They go through it and make sure that

21   everything's accurate, and they read through the

22   report and make sure it makes sense.  If they see

23   anything or think, "Okay, he's missing elements of a

24   crime," or anything like that, they'll return it to

25   me and say, "Hey, you need a little more here," or

1    they'll not.

2         Q.   Do you recall if anything like that

3    happened in this case?

4         A.   I do not.

5         Q.   Would that kind of a back and forth be

6    tracked in your computer system log that you're

7    talking about?

8         A.   Yes, it would.

9         Q.   Okay.  In any event, that was

10   completed -- that process was completed by

11   September 30th?

12        A.   That's correct.

13        Q.   So you provided this report, and then

14   you also gave an interview about this incident,

15   correct?

16        A.   Probably the night of.  I don't recall

17   anything formal.  Actually, just as we're talking

18   about it, I probably was interviewed by a detective

19   that was over the shooting itself.  It was probably

20   reviewed that night in one of their cars as I think

21   about it.

22        Q.   I'm going to ask you a little bit about

23   it.  I have a copy of a summary of the report that

24   you gave.

25                 (Exhibit 19 marked.)

1           Q.    (BY MS. CHRISTIANSEN):  Do you recall

2    giving an interview about the September 25th, 2020

3    shooting?

4           A.    I do.

5           Q.    Okay.  To your knowledge, was that

6    interview recorded?

7           A.    Yes.

8           Q.    Have you seen this summary before?

9           A.    I've never seen this summary before, no.

10          Q.    Do you mind taking a moment to read it

11   and see if it -- I just want you to verify if there's

12   anything that jumps out at you that you would change

13   today.

14          A.    Okay.  Can I mark this?

15          Q.    Here.

16          A.    Okay.  I've reviewed it.

17          Q.    Okay.  It looked like you made a few

18   markups.

19          A.    I did.

20          Q.    Will you walk me through the markups

21   that you made to that document?

22          A.    On page 2, the second paragraph down,

23   there's 50 yards on the second line.  There's no way

24   he was that far away from me.  I would have estimated

25   more like 50 feet in front of the patrol car.  He was

1   quite close to me in the back of the hotel parking

2   lot, walking through the weeds.

3          Q.    Okay.

4          A.    So either I misspoke or he mistyped, but

5   it was much closer to 50 feet.

6          Q.    Okay.  What's the next correction that

7   you made?

8          A.    The bottom of the fourth paragraph down.

9          Q.    Same page?

10         A.    Yeah, same page, second page, it says,

11  "David stated he wanted to use Sergeant Orr's patrol

12  vehicle to help prevent the male from getting to the

13  people in the Red Lion Hotel."  That's not the case.

14  I wanted to use it as cover in case he started

15  shooting.  I wanted to have something to stand behind

16  instead of walking out in the open.

17         Q.    I believe you stated that in your

18  report?

19         A.    I did.

20         Q.    Take me to your next markup.

21         A.    On page 3, six paragraphs down, the very

22  bottom of that seems a little bit confusing.  I

23  say -- it says, "He believed," meaning I believe,

24  "the ambient light increased the ability to use the

25  light."

1          Q.    Yeah.

2          A.    That should be "night vision."

3    Sometimes when there's a little ambient light, it

4    really makes it much brighter in the night vision and

5    it's a lot easier to see through, because, as I say,

6    they're not the highest quality.

7                And the final page, third paragraph down

8    says, "David was assisting the Pocatello Police

9    because early in the shift" -- oh, I read that wrong.

10   I thought it was saying I had assisted earlier in the

11   shift and that wasn't correct.  It was "because

12   earlier in the shift."

13         Q.    Okay.

14         A.    And then it says, "David did not see the

15   suspect and was unaware if the suspect had the

16   opportunity to surrender."  That's not correct.  I

17   could see him; I just couldn't -- wasn't close enough

18   to the interaction with him to know what he was doing

19   up close.  All I could see was him standing there,

20   like, 75 yards away through trees.

21         Q.    Okay.

22         A.    So I couldn't tell what that interaction

23   had been with those officers that actually had done

24   the firing from over on the other side of the trees.

25         Q.    I'm going to have you hang on to that.

1    I don't know if -- we may or may not be done with it
2    so let's hang on to it.
3          A.    Okay.
4          Q.    So with those clarifications, are you
5    otherwise -- do you otherwise find that that summary
6    of your interview is true and correct?
7          A.    Yes, I do.
8          Q.    Okay.  Your report, do you -- you said
9    you recently reviewed that?
10         A.    Yes, I did.
11         Q.    Were there any corrections or anything
12   else that you would change about your report?
13         A.    No.
14         Q.    So your report is true and correct?
15         A.    That's correct.
16         Q.    Okay.  I want to walk through some of
17   the statements you made in your report.
18         A.    Okay.
19         Q.    So I guess to start with, I'll just tell
20   you I'm very ignorant of how it works between
21   different departments working together.
22              How did you come to be helping Pocatello
23   that day?  How does that work when you show up to
24   help somebody?  Do you mind giving me a little
25   background on how that works?

1          A.    Yeah.  Well, there can be several

2    different reasons.  Do you want to just know how I

3    did it that day to keep it clean?

4          Q.    Yes, please.  Yeah, let's start with

5    that day, and then maybe if I want to know more about

6    standard operating procedure, I'll follow up and ask

7    you about it.

8          A.    In our patrol cars, we have every

9    departments' radio channels all into our radios.

10   When I'm working certain areas, I will typically scan

11   the departments in the area where I'm working so

12   that, if they have any emergencies or any issues that

13   I happen to be close to, I can respond and help them

14   out.  If you're not scanning like that, there's times

15   that there might be a crash a half a mile from you

16   and you're twiddling your thumbs in the meeting and

17   don't have a clue about it because you're not

18   scanning the other channels to hear what was going

19   on.

20          And this night I had heard that they

21   were looking for a subject that had been involved

22   in -- I believe it was multiple burglaries, he had

23   had firearms, they had been looking for him earlier

24   in the evening around 5:00, and I was hearing that

25   chatter throughout the shift as they were looking for

1    that individual.

2         Q.    What time did your shift start that day?

3         A.    I typically come in at 4 p.m., 16:00

4    hours.

5         Q.    So had you been monitoring the Pocatello

6    radio traffic throughout your shift?

7         A.    Not that entire time, because I was

8    making traffic stops and other things, and sometimes

9    you don't hear things going on because you're busy

10   doing your own thing.  But I had heard that that was

11   going on because it had happened -- one of the

12   incidents had happened close to one of our trooper's

13   houses and he had gotten home earlier in the shift.

14   And so I was aware that something had happened and

15   they were looking for this individual.

16        Q.    Okay.  So when you -- approximately what

17   time did you begin not just listening to the radio

18   but -- to Pocatello's radio traffic but you

19   elected -- was it an election to get involved?

20        A.    Uh-huh.  Yeah.

21        Q.    Were you asked?

22        A.    I was not asked.

23        Q.    At what point did you choose to come

24   help?

25        A.    Right around probably 8:00.

1              Q.   And what was the reason that you --

2              A.   I had made it up to Pocatello -- I was

3    actually in the Pocatello area working, and then I

4    had heard chatter on their radio that the suspect had

5    been last seen up in the area of Lucille and

6    Monte Vista.  And so I looked at my map -- because I

7    thought Lucille was up there as well -- so I looked

8    at my map and, as I looked at the map, I thought, you

9    know, if I were trying to escape the police, I think

10   I would be coming down the hill and towards the Red

11   Lion to get away from them because there's no easy

12   access for the vehicles to get down that way.

13             And so I knew they were up there looking

14   for him, and I think at that point they might have

15   been even going yard to yard up there because they

16   had new information or some incident where they were

17   freshly looking for him since it had been over a

18   four-hour period.  And so I went over behind the Red

19   Lion Hotel and picked that north -- southwest portion

20   of the parking lot because I thought I had a good

21   vantage point of that hill if he decided to come down

22   that way in an attempt to elude them.

23             Q.   Did you make Pocatello aware that you

24   were --

25             A.   I did not.

1          Q.    -- electing to come?  You came and
2    parked, took a look, and then did you let them know?
3    At what point did you begin communicating with
4    Pocatello?
5          A.    Once I saw him walking through the trees
6    in front of me.
7          Q.    Did you have any other means of -- aside
8    from your radio, did you have any other means of
9    receiving communications from Pocatello?
10         A.    No.  I could have but I did not.
11         Q.    What were those other means that --
12         A.    If we were to call or make phone
13   calls -- I had my cell phones with me, but typically
14   it's just by the radio.
15         Q.    And it was just by the radio that day?
16         A.    That's correct.
17         Q.    And so what you knew of the Pocatello
18   search was what you had heard while you had been
19   available to listen to the radio that day?
20         A.    That's correct.  Just bits and pieces.
21         Q.    Okay.  And at the point in time that you
22   stopped at the Red Lion, what was your understanding
23   of the person that you were looking for?
24         A.    It was my understanding that he had been
25   eluding the police for three to four hours.  There

1    had been multiple violations where he either entered

2    homes or pointed a gun at people.  The one that I

3    remember clearly is I think he was in people's

4    garages and he pointed a gun at a gentleman there.  I

5    think most recently, before I went down to the Red

6    Lion parking lot, I think he may have tried to sell

7    one of the firearms.  I'm not exactly sure, but that

8    was my recollection.  Firearms were involved and he

9    had been threatening people and been involved in

10   entering people's homes.

11          Q.   Did you have a description of the

12   suspect at the time that you pulled into the Red Lion

13   parking lot and began looking?

14          A.   I probably had prior in the shift, but I

15   think while I was there, I -- again, especially once

16   I saw him, I said, "Hey, what was that description,"

17   so that I could have a pretty good idea.  I mean, I

18   didn't want to call people off of their hunt, you

19   know, if somebody that wasn't even close to matching

20   was out there in the weeds, because it's not unheard

21   of to have transients or other people out there in

22   those weeds.

23          Q.   What was the description you received at

24   that time?

25          A.   I believe it was a hoodie, pants and a

1  backpack.

2          Q.    Okay.  A backpack?

3          A.    That's correct.

4          Q.    You received the description that there

5  was a backpack?

6          A.    That's what I thought, uh-huh.  That's

7  what I recollect.

8          Q.    And so when you announced that you

9  had -- on the radio that you had seen him on your

10  night vision, was that -- was it night vision or was

11  it thermal vision?

12          A.    Night vision.

13          Q.    Okay.  Was that the first contact you

14  made with Pocatello Police officers to let them know

15  you were assisting?

16          A.    To the best of my recollection, yes.

17          Q.    And this is where it gets to be I guess

18  a specific question and then a general question.  Did

19  you let them know that day, "I'm going to assist on

20  this"?  Like, what's the understanding when you

21  get -- when you communicate on the radio?  Are you

22  going to participate in this for a period of time or

23  was it --

24          A.    It would be more like I would notify my

25  dispatch, they contact Pocatello, "I think I have

1   their guy behind Red Lion."

2           Q.   Is that how you did it or did you

3   communicate directly to Pocatello?

4           A.   I may have got right on their frequency

5   and said, "Hey, I think I got your guy down here.

6   Send some units."  I don't remember which one it was.

7           Q.   Is there an assumption, then, that

8   you're going to hang out and help at that point, or

9   is it just that --

10          A.   Oh, no.  Absolutely help.

11          Q.   -- the information is the help and you

12  can --

13          A.   No, I would never do that.  I would stay

14  and help absolutely.

15          Q.   So from that point on when you had

16  communicated that you had seen him, would it be a

17  standard operating -- is "standard operating

18  procedure" too strong to say that they would assume

19  that you would help from that point on?

20          A.   I couldn't possibly say what they would

21  assume.

22          Q.   Okay.  Fair enough.  Is it standard

23  operating procedure that, once you chime in to assist

24  in the way that you did, that you would stay and

25  continue to assist?

1          A.   Not always.  Sometimes there's officers

2    out there that's like, "Hey, we see your guy," and

3    then they keep driving.  That's pretty irritating.

4          Q.   But it does happen?

5          A.   That they don't?

6          Q.   Yeah, that someone doesn't stop to

7    assist?

8          A.   That's correct, yes.

9          Q.   And -- okay.  Looking specifically at --

10   this is the page that's Bates-marked DEF 99, so -- I

11   think it's the second page of your exhibit there --

12   or, excuse me -- Defendants -- so that's

13   Defendants -- I'm sorry.  I'm abbreviating.

14         A.   Oh, okay.  Thank you.  I wasn't sure

15   what you were talking about.

16         Q.   So, Defendants 99.  So the first

17   sentence of this, "On September 25th, 2020 at

18   approximately 20:15 hours, I, Sergeant David Noyes,

19   was in the area of I-15 near Exit 71 when I heard

20   Pocatello Police units looking for an armed suspect

21   in the area of the 1700 block of Lucille Ave," is

22   that a true and correct statement?

23         A.   That would be, yes.

24         Q.   So you began --

25         A.   Yep.

1          Q.    -- assisting about 8:15 p.m.?

2          A.    That's correct.

3          Q.    And within -- so looking at the second

4    paragraph, "At approximately 20:21 hours, with the

5    use of my night vision goggles, I located the male

6    walking in the undeveloped area just south of the Red

7    Lion Hotel," is that a true and correct statement?

8          A.    I don't know if that's when I actually

9    saw him or when I got the goggles to start looking,

10   but it says I located him.  And if we looked at the

11   CAD log, I would have made mention when I saw him.

12         Q.    Okay.  You would have noted it on

13   your --

14         A.    No.  I would have --

15         Q.    On your CAD log?

16         A.    On this one?

17         Q.    Can you cross reference for me and tell

18   me what time you would have reported that you saw

19   him?

20         A.    20:25.

21         Q.    Okay.

22         A.    So that's when it started.

23         Q.    So 20:21 was when you started looking,

24   would you say?

25         A.    Approximately, uh-huh.

1        Q.   Okay.  So now is when I want you to tell

2    me about your night vision goggles.

3        A.   So they're stored in the back of the

4    patrol car.  They're -- I don't know if you're

5    familiar with the crappy Army kind from who knows how

6    long, but you look through and they have the two eye

7    pieces on the inside, and essentially you turn them

8    on and it lights up.  It kind of takes the ambient

9    light that's out there and it brightens what's out

10   there so you can see what's out there.  Essentially

11   they're useless if stuff isn't moving.  But when

12   things are moving, you can actually see that quite

13   well, especially if there's little ambient lights

14   from around the area to I guess be brought into

15   those -- the view finder.

16       Q.   Okay.  Do you recall anything about the

17   make, model?

18       A.   I don't.

19       Q.   Do you still have those night vision

20   goggles?

21       A.   I do.

22       Q.   Were they issued to you by your

23   department?

24       A.   Yes.

25       Q.   Have you had them for a number of years?

1          A.    Since I became sergeant I was issued

2   them.

3          Q.    So I believe -- wait.  Since you became

4   a sergeant?

5          A.    That's correct.

6          Q.    When did you become a sergeant?

7          A.    Probably almost six years ago.  So,

8   2017.  Yeah, probably 2017.

9          Q.    Were they new when you received the

10  night vision goggles?

11         A.    Oh, no.

12         Q.    They were used at that time?

13         A.    Yes.

14         Q.    Do they -- do the goggles only

15  facilitate night vision or do they also work as,

16  like, binoculars?

17         A.    No, just night vision.

18         Q.    It's just night vision?

19         A.    Uh-huh.

20         Q.    So what you see is only enhanced as to

21  the light?

22         A.    That's correct.

23         Q.    Okay.

24         A.    And it's black and white, so it kind of

25  takes out color, too.

1          Q.   Okay.  So when you were observing with

2     night vision goggles and you asked for the current

3     description of the suspect, you were -- you're not

4     able to verify the color of what he was wearing?

5          A.   That's correct.

6          Q.   Okay.  How were you able to verify that

7     this was in fact the person that they were looking

8     for?

9          A.   I had no idea it was the person they

10    were looking for.  I just suspected it was him, and

11    then -- that's why I told them, "I think I have your

12    guy."

13         Q.   And what was the basis for thinking you

14    had their guy?

15         A.   Time of night, the proximity to the

16    location where they were searching incoming from the

17    direction of where they were searching out there in

18    those weeds.  It was definitely somebody that needed

19    to be talked to.

20         Q.   Did you -- what do you recall about

21    seeing -- like, of what -- of Jake's appearance at

22    that time?

23         A.   Not much.  Just, you know, a male with a

24    backpack I believe just walking through the weeds in

25    front of me, and I hurried and called for units to

1    come assist.

2            Q.   You recall that he was wearing a

3    backpack?

4            A.   I think so, yeah.

5            Q.   How -- I guess if there's no color, how

6    do you tell a backpack?

7            A.   The shape.

8            Q.   The shape of --

9            A.   You know, a person is straight down or

10   something is on their back.

11           Q.   The bulk?  There was bulk on his back?

12           A.   I believe so, uh-huh.

13           Q.   Do you recall anything else about what

14   you observed of Jake at that time?

15           A.   No.

16           Q.   Do you recall if you observed his hands

17   at that time when you first saw him?

18           A.   I did not.

19           Q.   You don't recall?

20           A.   I do not recall seeing his hands.

21           Q.   Okay.  And when you reported to

22   Pocatello that you had spotted him, that was the

23   first time that you had made contact with Pocatello,

24   correct?  That you communicated to Pocatello?

25           A.   Uh-huh, that's correct.

1          Q.    Okay.  Did you remain on Pocatello's
2    frequency after you -- on their radiofrequency after
3    you called and asked for the description and told
4    them you thought you had their guy?
5          A.    I don't recall.  Probably not.  Because
6    if I did that, it would have been in my patrol car,
7    and then -- from that point on, I was out of my
8    patrol car on my handheld, and that would have been
9    on my frequency.
10         Q.    So your body-worn camera?
11         A.    Radio.
12         Q.    Or body-worn radio, thank you.
13         A.    That's correct.
14         Q.    I think I'm a little confused by that
15   answer.
16               So you would have been in your
17   vehicle -- were you in your vehicle while you were
18   using your night vision goggles?
19         A.    Yes.  Well, in and out.  I would sit in
20   it and look.  There's -- right when I first got them,
21   I stood out and looked around.  But yes, I was in the
22   vehicle.
23         Q.    So once you left your vehicle, did you
24   not have a means of communicating -- of radioing with
25   Pocatello?

```
 1              A.   I did, but I did not change my handheld
 2    over to that frequency.
 3              Q.   So if they had any radio communications
 4    going out, you weren't receiving them?
 5              A.   That's not true.  I could have been
 6    scanning and hearing.
 7              Q.   Do you recall if you did scan?
 8              A.   I do not.
 9              Q.   Do you recall if you changed your
10    body-worn radio to be on the Pocatello frequency?
11              A.   I did not.  I don't believe I did.
12              Q.   So you don't know one way or another?
13              A.   I believe I had it on my District 5
14    Idaho State Police frequency.
15              Q.   Okay.  You're -- you -- "it" being your
16    body-worn radio?
17              A.   That's correct.
18              Q.   Okay.  Prior to September 25th, 2020,
19    did you have any dealings with Jake Sheeler?
20              A.   Not that I am aware of, no.
21              Q.   Are you familiar with him at all prior
22    to September 25th, 2020?
23              A.   Nope.
24              Q.   Let's look at paragraph 3 of your
25    report.  "As I was waiting for backup, I watched
```

1    Sheeler walk out of my site into the trees next to

2    I-15."

3                    True and correct statement?

4          A.    Yes.

5          Q.    I believe throughout your report you

6    described Jake as walking.

7          A.    That's correct.

8          Q.    Do you ever recall seeing him run?

9          A.    No.

10         Q.    Your next sentence talks about -- oh, I

11   think it's two sentences -- you watched Sheeler

12   through the night vision, it appeared that he was

13   wearing a backpack and walking towards the rear

14   parking lot of the Red Lion Hotel.

15                   Did you communicate over the radio that

16   you observed Jake wearing a backpack?

17         A.    Not likely.

18         Q.    Okay.  Last sentence of that paragraph,

19   "I advised that I was going to have to make contact

20   on the south side of the hotel."

21                   Can you to the best of your recollection

22   tell me what you said on the radio to the Pocatello

23   Police unit?

24         A.    I had probably advised them that he was

25   headed back east, and then to the best of my

1    recollection, I was concerned that he was going to go

2    into the hotel because he was -- appeared to have a

3    little bit of an angle towards the hotel from where I

4    had seen him walking.  And I was probably still in my

5    patrol car at that time, and I advised, "Hey, I'm

6    going to have to make contact with him," and --

7    essentially because I didn't have backup there yet,

8    but I couldn't let him get to a hotel of people if he

9    was indeed the suspect that we were looking for.

10          Q.   Next paragraph, "As I was grabbing my

11    rifle, Sergeant Orr" -- excuse me -- "Sergeant Todd

12    Orr with the Idaho State Police arrived at my

13    location."

14               True and correct statement?

15          A.   Yes.

16          Q.   If you were anticipating close contact

17    with Jake, why did you grab your rifle?

18          A.   It's in a -- in extreme situations when

19    you got nerves going, it's much more accurate.

20    You've got a long -- it's longer, you got two hands

21    on it, you can steady it better.

22          Q.   Is it -- does your rifle have a scope on

23    it?

24          A.   No.

25          Q.   It does not?  Okay.  What kind of rifle

1  was it?

2          A.    It was a Colt M4, has a .223 round, and

3  it was equipped with a red-dot site.

4          Q.    Okay.  And then the paragraph 4, this is

5  where you talk about having Orr move his police car

6  and you used it as coverage.

7          A.    That's correct.

8          Q.    Can you describe for me kind of

9  directionally where you were moving through that

10 parking lot?

11         A.    Yes.  We were along the very back of the

12 parking lot and we were going straight east along

13 the -- essentially the end of the parking lot, grassy

14 area.

15         Q.    The "back" being the south side of the

16 parking lot?

17         A.    That's correct.  So we were on the south

18 side driving east, and I was walking along his door

19 looking over while he was using his spotlight moving

20 it around out in the trees looking for the suspect.

21         Q.    Did you see anything while you were

22 doing that?

23         A.    I did not.

24         Q.    Okay.  And then Orr exited his vehicle,

25 correct?

1         A.    Yes.

2         Q.    Did you guys make a plan at that point?

3         A.    Not really.  There was not much time to

4    make a plan.  Essentially it was -- he was driving

5    south, another officer -- I believe both officers

6    arrived, and we both got out and we started walking

7    east because we knew he was out there.  I heard some

8    noise out in the shrubs and the bushes and assumed

9    that was Sheeler, you know, running through the

10   bushes -- or, the suspect running through the bushes,

11   and so I directed everyone's attention that direction

12   and we started moving that way, continuing east on

13   foot.

14        Q.    How did you direct everyone's attention?

15        A.    "Hey, guys.  I just heard noise out in

16   the trees."

17        Q.    Okay.

18        A.    And pointed probably.

19        Q.    Okay.  Can you describe for me -- did

20   you guys all move?  Did you split up?  Did you stay

21   together?  How was that movement -- how did that

22   happen?

23        A.    I believe we just all stuck together and

24   in a line probably within 10 feet of each other I

25   would guess as we moved east.

1             Q.    And you said -- your report says, "As we
2    moved east toward the Outback Golf Park, Sergeant Orr
3    was in the lead and I was in the rear with two
4    Pocatello officers between us."
5             Is that a true and correct statement?
6        A.    Yes.
7        Q.    Do you know who the two officers were
8    that were with you at that time?
9        A.    I did not.
10       Q.    Can you describe them?
11       A.    The male was probably six-foot tall,
12   medium build, female had short black hair and she was
13   short.
14       Q.    Okay.
15       A.    Hispanic.
16       Q.    Okay.  Your next sentence says,
17   "Sergeant Orr arrived at a small shed in the
18   southeast corner of the Red Lion parking lot.  As he
19   walked past the shed, he began to yell and give
20   orders, advising that we were the police, saying 'Get
21   on the ground.'"
22            True and correct statement?
23       A.    Yes.
24       Q.    Do you recall anybody else giving orders
25   at that time?

1          A.   Yes.  I believe the female officer with

2   us was yelling as well.

3          Q.   Do you know what her command was?

4          A.   Word for word, I do not.

5          Q.   Do you recall the general gist of what

6   it was?

7          A.   Yeah, "Stop.  Get on the ground.

8   Police."

9          Q.   Did you actually hear her identify

10  herself as police?

11         A.   I couldn't say that, no.

12         Q.   Do you -- did you identify yourself as

13  police?

14         A.   I never saw him so I didn't say

15  anything.

16         Q.   But you -- your report says that Orr

17  identified himself as police?

18         A.   Yes.

19         Q.   You specifically recall Orr identifying

20  himself as police?

21         A.   Yes.

22         Q.   Did you hear any other commands?

23         A.   Not from our group.  It was quick.  They

24  were yelling, "Stop.  Police."  The suspect was

25  running east.  I still couldn't see him.  We ran as

1   far east as the fence line that stopped us, and as we

2   were running east, I could hear noise from officers

3   coming the opposite direction towards us -- that's

4   coming from the east towards the northwest.  I could

5   hear them start to yell.  I could just hear the noise

6   of their voices.

7           Q.   Okay.  And we'll break that down a

8   little bit.

9           A.   Yep.

10          Q.   First of all, you said you saw the

11  suspect running, and I think I asked you a moment ago

12  if you ever saw him running and you said no.

13          A.   I think I just told you I did not see

14  the officer run.

15          Q.   The suspect?  I'm --

16          A.   The suspect, yeah.  I said we were

17  running.

18          Q.   Did I misunderstand?  So you did not

19  see --

20          A.   I believe you did.  I did not see him.

21  That's why I did not make any orders.

22          Q.   So you never saw Jake running?

23          A.   I did not.

24          Q.   Okay.  And you -- I asked you about if

25  you heard any other commands, and you said not from

1    your group.  Did you hear any commands -- or, let's

2    open it up.  If there's anything other than a

3    command -- anything else that you understood to be

4    directed at Jake?

5            A.   I heard the noise and the yelling from

6    other officers.

7            Q.   It was yelling?

8            A.   I would assume so, yes.  It's fairly

9    loud.  They were quite a distance away, and I could

10   hear their commotion.

11           Q.   What were they saying?

12           A.   I don't know.

13           Q.   Could you understand what they were

14   saying?

15           A.   No.  We were 70-plus yards away, I would

16   guess.

17           Q.   Did you hear them identify themselves as

18   police?

19           A.   I could not understand what they were

20   saying.  I heard the noise as they were yelling.

21           Q.   Okay.  And I'm sorry, I may have already

22   asked this.  You did not give any command because you

23   did not see him?

24           A.   That's correct.

25           Q.   Did you hear Orr give commands multiple

1  times?

2         A.    Yes.

3         Q.    How many times, would you say?

4         A.    I don't know.

5         Q.    Did you hear the other -- any of the

6  other officers that were with you give commands?

7         A.    I believe it was the female, Saldana,

8  that was giving the commands.

9         Q.    Did you say that there was a male with

10 you six feet tall?

11        A.    I think it was his -- yes.  I don't know

12 how to describe him to you.  It's been three years.

13 It was a Pocatello Police officer.  Well, it was

14 Anderson now, but I didn't know his name at the time.

15        Q.    Did you hear Anderson give any commands

16 at the time?

17        A.    Not that I recall.

18        Q.    Did you hear him identify himself as

19 police?

20        A.    Not that I recall.

21        Q.    Did -- in this time did you hear any of

22 the officers communicate with each other?

23        A.    I did not.

24        Q.    Did anybody say anything other than

25 commands?

1          A.    Not that I recall.

2          Q.    Did you hear anybody warn about

3    crossfire?

4          A.    I warned about crossfire.

5          Q.    You did but you did not hear anybody

6    else warn about crossfire?

7          A.    No.

8          Q.    Okay.  Moving on to paragraph 5 of that

9    report, "As we ran east, we came to a wire fence

10   between the hotel and the Outback Golf Park.  As

11   Sergeant Orr began to climb over the fence, I paused

12   to look through the night vision goggles in an

13   attempt to locate Sheeler."

14          Are those true and correct statements?

15         A.    Yes.

16         Q.    Tell me, were you able to locate Jake

17   when you looked through your night vision goggles?

18         A.    I was not.

19         Q.    How long would you say you spent looking

20   through those goggles?

21         A.    A couple of seconds.

22         Q.    Did you see anything else other than

23   Jake?

24         A.    No.

25         Q.    Did you see the other officers?

1          A.    No.

2          Q.    Your next sentence, "I heard other

3    officers southeast of our location yelling and giving

4    orders to Sheeler."

5                Is that a true and correct statement?

6          A.    Yes.

7          Q.    But you said you couldn't understand

8    what they were saying?

9          A.    No.  I was too far away.

10          Q.    How do you know that they were giving

11    orders?

12          A.    I guess I assume that.  That's what

13    police do when they encounter subjects.

14          Q.    Okay.  Next sentence, "I lowered the

15    night vision goggles and looked towards the voices.

16    At the moment I located Sheeler, I noticed he was

17    standing out in the open and he was lit by the large

18    lights of the driving range."

19                Is that a true and correct statement?

20          A.    Yes.

21          Q.    So you -- at this time that you have

22    spotted him --

23          A.    That's correct.

24          Q.    -- you were just looking at him with

25    naked eyes?

1          A.    That's correct.

2          Q.    And he was standing?

3          A.    Yes.

4          Q.    Can you tell me -- well, let me -- your

5    next sentence says, "Sheeler was stopped facing two

6    uniformed Pocatello Police officers."

7          A.    That's correct.

8          Q.    Just to finish the sentence, "facing two

9    uniformed Pocatello Police officers who began firing

10   at him."  That's true and correct?

11         A.    That's correct.

12         Q.    Now, you said he was facing them?

13         A.    Yes.

14         Q.    Okay.  Can you give me an orientation,

15   or north, south, east, west?  Which direction was he

16   facing?

17         A.    South.

18         Q.    He was facing directly south?

19         A.    Approximately south.  I can't tell

20   you -- you know, I would say south and that would be

21   accurate, yes.

22         Q.    Okay.

23         A.    I mean, could it have been a couple of

24   degrees left or right of south?  Yes.

25         Q.    That's what I'm trying to clarify -- is

1  you believe he was facing south.  Was it a square

2  south?  Was he angled slightly one direction or

3  another?

4          A.    I couldn't tell you that.

5          Q.    You don't know?

6          A.    No.  I could tell you it was square with

7  them.

8          Q.    Well, can I draw your attention to the

9  declaration?  This is Exhibit 16.

10         A.    Yes.

11         Q.    Now, you've got two officers on here,

12 Eldridge and McArthur.  And would you agree that

13 McArthur is directly south and Eldridge is southeast?

14         A.    If you're looking at this, yes, I would

15 say one's south and one's southeast.

16         Q.    Was that not as you observed it?

17         A.    I did not observe in this detail that

18 night.  What I could see that night was the suspect

19 facing south towards the officers.  Again, I'm

20 70 yards away.  So that night, my depth to tell a

21 couple of feet from one being southeast and south is

22 a little hard to pick up through the trees and

23 whatnot.  All I could tell you is that Sheeler was

24 facing the two officers that were south of him.

25         Q.    At the time that you saw him, was he

1    moving at all?

2          A.    No.  He was standing still.

3          Q.    He was standing still.  Was he -- he was

4    walking or --

5          A.    No.  He was standing still.

6          Q.    Had he come to rest, or the whole time

7    that you saw him, he was standing and not moving?

8          A.    When I dropped my night vision and I

9    looked up, it all happened, like, the same second.

10   So as I look up, there he is standing straight

11   towards the officers as they're shooting at him.

12   There's no time here.  I mean, the report makes it

13   look like this long time but it's not.  It's all

14   instant, happening at the same time.

15         Q.    Okay.

16         A.    He was standing still, facing them, feet

17   planted.

18         Q.    Feet planted?

19         A.    That -- I -- that was my perception,

20   yes, that he was standing still.

21         Q.    Describe for me what you mean by "feet

22   planted."

23         A.    He was standing on his feet.

24         Q.    Do you mind demonstrating for me?

25         A.    Yes.

1          Q.    And describe for the record.
2          A.    Like, when I say a person's standing
3    still, they're just standing still on both feet.  If
4    he looked like he was walking or running or moving
5    his feet, I would say that.  But he was just standing
6    still like I'm standing right now with both feet on
7    the ground.  I'm planted here on the ground.  I'm not
8    moving them around.  I'm just standing still.
9          Q.    Okay.  Did you see -- I'm sorry.  Go
10   ahead and have a seat.
11          Could you see Jake's hands at all?
12          A.    I did not notice them, no.
13          Q.    You don't know where his hands were at?
14          A.    I would say to his sides.
15          Q.    Okay.  And that was -- you observed his
16   hands to his sides at the moment that he was shot?
17          A.    I did not observe his hands.  I observed
18   his arms to his sides.
19          Q.    I'm sorry.  His arms to his sides at the
20   moment he was shot?
21          A.    When I looked up and heard the gunfire,
22   yes, that's to my recollection.
23          Q.    Okay.  When you first heard the
24   gunshots, did you know who was shooting?
25          A.    Yes.

1          Q.    How did you know?

2          A.    I believe I could see the muzzle blasts

3    from the police that were facing him.

4          Q.    Did you have an understanding at the

5    moment that the shooting started as to why they were

6    shooting?

7          A.    I had no idea.

8          Q.    Okay.  In that moment when you saw Jake

9    being shot, were you able to see him clearly?

10         A.    I could see a person standing out there.

11   It's 70 yards away in the dark.  I mean, it was lit,

12   but -- depends what you mean "clearly."  He wasn't

13   covered by trees.  I -- so yes, I mean, I could see

14   him out in the clearing.  I could see him standing

15   there.

16         Q.    Okay.  Can you see the other officers

17   that were to the south of him?

18         A.    Not as well as I could see him because

19   they were further south and they were even kind of

20   somewhat obscured by the trees that were between us.

21         Q.    Okay.  At the moment of that shooting,

22   were you aware of any civilians in the immediate

23   vicinity?

24         A.    I don't know when I took note of them.

25   Probably right as the shooting was happening I took

 1   note of the golfers out on the driving range that
 2   were -- it appeared to me that they were essentially
 3   in the line of fire.
 4            Q.   Oh, they were behind Jake at the --
 5            A.   That's correct, at the north of --
 6            Q.   Okay.  Give me just a moment to go
 7   through my notes here.  At the moment that the shots
 8   were fired, did you know who was being shot at?
 9            A.   I guess I didn't -- I wasn't in their
10   minds to know who they were shooting at, but
11   obviously we would suspect the suspect.
12            Q.   You believe that the --
13            A.   I believed the officers were shooting
14   the suspect.
15            Q.   Okay.
16            A.   He went down immediately.
17            Q.   Did you have any warning before the
18   shooting started?
19            A.   No.
20            Q.   I'm going to play part of a clip for
21   you.  I'm just looking to identify someone's voice.
22   I'm wondering if you can help me identify if -- well,
23   maybe this is better left for Officer Orr.  I'm
24   looking to identify if it was -- if I'm hearing
25   Officer Orr's voice.

1              Would you recognize Trooper Orr's voice
2    if you heard it?
3          A.    Possibly.
4          Q.    Okay.  Let me see if I can find the
5    timestamp I'm looking for.
6          MS. CHRISTIANSEN:  Should we designate --
7    I'll say for the record this is Enhancement No. 2.
8    It is Bates numbered 32-10 and this is Exhibit 20.
9              (Exhibit 20 marked.)
10         MR. ANGELL:  So Counselor, are you going to
11   attach this to this deposition or are you just going
12   to reference it?  What's the Bates number?
13         MS. CHRISTIANSEN:  30- -- 32-10.  I figured
14   we could attach it.
15         MR. ANGELL:  30-32-10?
16         MS. CHRISTIANSEN:  No.  I'm sorry.  32-10.
17         MR. ANGELL:  Okay.
18         MS. CHRISTIANSEN:  Hang on.  I think I'm not
19   at the right spot.
20              (Audio played.)
21         Q.    (BY MS. CHRISTIANSEN):  So you heard
22   "Pocatello, clear the air," correct?
23         A.    Uh-huh.
24              (Audio played.)
25         Q.    (BY MS. CHRISTIANSEN):  "Show us your

```
 1   hands"?
 2           A.    That's what it's saying.
 3           Q.    Okay.  You were not able to understand
 4   that --
 5           A.    No.
 6           Q.    -- at the time that it was made?
 7           A.    No.
 8                 (Audio played.)
 9           Q.    (BY MS. CHRISTIANSEN):  Did you hear
10   someone say "Don't move"?
11           MR. ANGELL:  I'm just going to object to the
12   form.
13                 Go ahead.
14           THE WITNESS:  I'm not sure what that was --
15   if it was "Police" or "Don't move."
16           Q.    (BY MS. CHRISTIANSEN):  I'll jump back a
17   little bit and I guess you tell me what you hear
18   someone say.
19                 (Audio played.)
20           THE WITNESS:  Sounds to me like "Don't move."
21   That did not come from our group?
22           Q.    (BY MS. CHRISTIANSEN):  Do you recognize
23   that voice?
24           A.    No.
25                 (Audio played.)
```

1          Q.    (BY MS. CHRISTIANSEN):  Do you recognize

2    that voice?

3          A.    No.

4                (Audio played.)

5          Q.    (BY MS. CHRISTIANSEN):  What was the

6    command you just heard?

7          A.    Sometimes you've got to listen to these

8    multiple times.  What voice am I listening to here,

9    the female voice or the male voice?

10         Q.    The new -- there's a new voice that was

11   introduced there.

12               MR. ANGELL:  Counsel, I'm just -- if you're

13   okay with that, can I maintain a continuing objection

14   to his attempt at identification of the voices on

15   this or do you want me to stop and object on every

16   question?

17               MS. CHRISTIANSEN:  I mean, I'm only -- I'm

18   going to ask him to identify a voice, if he's able.

19               MR. ANGELL:  And I'm going to object.  So my

20   question is do you want me to object each time or is

21   it okay if I maintain a --

22               MS. CHRISTIANSEN:  You're objecting to him

23   identifying a voice that he recognizes?

24               MR. ANGELL:  I'm just entering an objection

25   to the question of having him identify a voice on

1  this audio that you're playing.  And my question for

2  you is do you want me object every time or do --

3          MS. CHRISTIANSEN:  I want to understand the

4  basis for the objection because I don't -- this to me

5  is not a proper objection.

6          MR. ANGELL:  I disagree.

7          MS. CHRISTIANSEN:  Okay.  What's the basis

8  for your objection?

9          MR. ANGELL:  I don't know that I have to hold

10  the argument with you here today.

11          MS. CHRISTIANSEN:  You've got to give me a

12  basis, right?

13          MR. ANGELL:  Speculation.  He's not listed as

14  an expert, he has not had an opportunity to review

15  the audio, and he has not identified that he

16  understands who is making these statements on the

17  video -- or, on the audio, so lack of foundation.

18          MS. CHRISTIANSEN:  Okay.  Well, the

19  foundation is, if he recognizes it, he's -- he's to

20  identify the person if he's able.

21          MR. ANGELL:  We'll just do it question by

22  question, but you will need to pause so that I can

23  enter the objection before you --

24          MS. CHRISTIANSEN:  We'll note a running

25  objection.

```
 1                    (Audio played.)
 2          Q.   (BY MS. CHRISTIANSEN):  There were two
 3  voices there, correct?
 4          A.   Sounded like it.
 5          Q.   Okay.  Did you hear two commands there?
 6          A.   Sounds like both were saying, "Show me
 7  your hands."
 8          Q.   Okay.
 9          A.   You would have to replay it.
10          Q.   Let me see if I can go back just a
11  couple of seconds.
12                    (Audio played.)
13          THE WITNESS:  There's a lot there.  Which
14  ones are you talking about?
15          Q.   (BY MS. CHRISTIANSEN):  Let's move on
16  because that's actually not the one that I'm really
17  particularly concerned about.  I'd like you to
18  identify -- there's a voice that's about to come on,
19  and I'm wondering if you can identify this voice --
20  if you recognize this as Trooper Orr's voice.
21                    (Audio played.)
22          Q.   (BY MS. CHRISTIANSEN):  Did you hear a
23  male voice?
24          A.   Yes.  It's -- did it say "Back it up"?
25  I'm not sure what it said.
```

1          Q.    Okay.  Do you recognize that voice?

2          A.    I didn't recognize that voice.

3          Q.    Okay.  Well, that's what I was looking

4    for, but if you don't recognize it, that's okay.

5    Okay.  We're done with that recording.

6                At the time that you arrived at the

7    Red Lion and started to get involved, did you have

8    any knowledge of who was in charge?

9          A.    No.

10         Q.    As you continued to be involved -- I

11   understand it was only a few minutes -- did you

12   develop an understanding of who was in charge?

13         A.    In charge of what?

14         Q.    The effort to arrest Jake.

15         A.    Pocatello Police Department.

16         Q.    Did you have any individual who you

17   understood to be in charge of that effort?

18         A.    No.

19         Q.    Did you do any planning with Pocatello

20   police regarding how you would arrest Jake?

21         A.    No.  I believe you asked that.  We met

22   in the parking lot, we were walking west, and that's

23   when Todd Orr found him.

24         Q.    I think you're right.  I think you --

25         A.    That's all the interaction we had.

1      Q.    When Jake was spotted and you heard
2  officers giving commands, do you recall how many
3  different voices -- not from the recording, just from
4  your own recollection -- do you recall how many
5  different voices you heard?
6      A.    No.  Just multiple.
7      Q.    Do you know which officer Jake was
8  supposed to obey?
9      MR. ANGELL:  Object to the form of the
10  question.
11      THE WITNESS:  And I answer it?  Okay.
12      The one he heard.
13      Q.    (BY MS. CHRISTIANSEN):  Do you know if
14  the officers were all giving the same command?
15      A.    I don't.  They're 70 yards away.  And
16  like I said, all I could hear was noise; I don't know
17  what words were being said.
18      Q.    But you would infer that Jake would
19  follow whatever command he heard?
20      A.    I don't know what he would do.
21      Q.    I guess that's what I was -- that's what
22  the question was -- is whose command was he supposed
23  to follow, and you said "Whoever he heard"?
24      A.    Yeah.  If he hears a command, I'd hope
25  that he would follow it.

1          Q.    Okay.

2          MS. CHRISTIANSEN:  Let's pause for a break,

3    please.

4               (A recess was taken from 1:05 p.m. to

5    1:26 p.m.)

6          Q.    (BY MS. CHRISTIANSEN):  Can you describe

7    for me how your -- like, your assignment.  Are you

8    assigned to a geographic area or how does that work?

9    What area do you monitor?

10         A.    Yeah.  District 5.  Idaho State Police

11   covers the southeast section of Idaho.  It covers

12   seven counties, and we can patrol wherever you please

13   during your shift.

14         Q.    So you can go where you would like to

15   go?

16         A.    Yeah.  If I wanted, I could go to Bear

17   Lake tonight and Blackfoot tomorrow, Malad the next

18   day, maybe visit all five of them in one shift, you

19   know, all seven counties if I wanted.

20         Q.    Okay.  And for, like, the radio traffic,

21   you just monitor the radio traffic within your

22   geographic region that you're assigned to?

23         A.    That's correct.  More focused on the

24   place that I'm working at the time.  I would never

25   get all seven counties.  That would just be too much.

1          Q.    So say you did elect to go to Bear Lake

2    one day.  You would just monitor the radio traffic in

3    that area?

4          A.    Yeah.  I probably couldn't even pick up

5    anywhere else.

6          MS. CHRISTIANSEN:  That's it.

7                         EXAMINATION

8    BY MR. ANGELL:

9          Q.    Sam Angell.  I represent the City of

10   Pocatello and the officers that are named as the

11   defendants.  I did want to just clarify a couple of

12   things.  I appreciate your time and I will try not to

13   keep you too long.

14               This is your CAD notes, Exhibit 17.  Can

15   you look at that one for me real quick?  I guess

16   they're not your CAD notes.

17         A.    Yes.

18         Q.    You said that you could tell that you

19   saw the suspect at 20:25.  I can't interpret the

20   notes.  What tells you that you saw the suspect at

21   20:25?

22         A.    I called for backup, and at 20:25, it

23   says, "Backer 535," that's Todd Orr being en route to

24   assist me.

25         Q.    So that's -- that's the note that tells

1   you that, by memory, you know, you called for back up

2   when you saw him?

3           A.    That's correct.

4           Q.    And then you see that the backer was

5   noted at 20:25:45?

6           A.    Yeah.  That means that he says, "I will

7   be en route to assist him."

8           Q.    Okay.  And from that moment to your --

9   is this your comment of "Shot fired by police not

10  ISP"?

11          A.    If it has a "651," yes, that's me.

12  That's my number.  That comment was made by me.  So

13  which time are you looking at?  20:32?  Yes.

14          Q.    That's your -- did you radio immediately

15  "Shot fired by police"?

16          A.    Yes.

17          Q.    Okay.  Thanks.  That helps us kind of

18  nail down a couple of times there.

19               A couple of other questions.  When you

20  say that you were at the fence line, you pulled up

21  the night vision goggles, then you set them down and

22  looked back and located the suspect, right?

23          A.    Yes.

24          Q.    And then the shots were fired almost

25  immediately?

1        A.   Yes.

2        Q.   Here goes the time estimate from me.

3   Can you tell me how long from when the night vision

4   goggles went down to when you heard the shots?

5        A.   It could have been -- it -- truthfully,

6   it could have been all at the same time.  Like, I'm

7   pulling them down, there he is, shots are being

8   fired, he's falling backwards onto the ground.  I

9   mean, just that fast.

10        Q.   Okay.  Thanks for that.  So it wasn't

11   one-thousand-one, one-thousand-two -- it wasn't

12   seconds elapsing, it was almost simultaneous?

13        A.   Not that I recall, yes.

14        Q.   When you had the night vision goggles

15   up, were you able the see him through those?

16        A.   No.  It's really hard to find stuff

17   through there, and I was looking -- and as I sit here

18   and tell you, I don't think I dropped them because I

19   heard shots; I'm pretty confident I dropped them and

20   looked and heard shots.  But it happened that close

21   together.  That -- it's possible that I pulled them

22   down because I heard the firing but I don't think so.

23   But it was all seconds apart.  I mean, literally all

24   that happened in one or two seconds.

25        Q.   But it was enough time for you to be

1    able to at least get a view of him facing officers

2    under that lighted area?

3          A.    That's correct.  The way the trees were

4    at the time, there were some big trees along a canal

5    of water and there was a perfect opening between the

6    trees.  It was almost like it framed him there.  So I

7    mean, it almost drew your attention that direction.

8    So as I say -- I mean, you can look up and see a lot

9    of things really fast, but it just happened so quick

10   right at that second, I couldn't say -- it's

11   literally I looked up and shots are going off and

12   he's going down.

13         Q.   So you wouldn't have the ability to say

14   what he was doing two or three or four seconds before

15   the shots were fired?

16         A.    No.  That was the first time I had eyes

17   on him:  As he was being shot.

18         Q.    And then the shots that were fired, can

19   you -- could you tell at the time which officers

20   fired them?

21         A.    I thought that the shots had come from

22   the officers over there.  And I couldn't tell you if

23   it was one officer or both officers, but I did hear

24   the volley of shots.  After the fact, Sergeant Todd

25   Orr asked me, "Who shot with us?"  And I'm like,

1    "What are you talking about?  Nobody shot with us.
2    That's ridiculous."
3                    And he's like, "No, I heard somebody
4    shoot in our group," and that's when we found out
5    that Officer Saldana, who was in our group, fired a
6    round.
7            Q.    But you didn't hear that?
8            A.    I did not.  I don't know if it was
9    the -- you know, you hear trainings -- I -- we hear
10   training -- we hear trainings, that, you know, it's
11   interesting what your brain takes in and things you
12   miss and things you see and things that your brain
13   will infer and -- you know, it's very interesting.
14                   But I was very surprised.  I did not
15   hear her fire her gun.  I was very surprised when
16   Todd Orr asked me who fired because I was like,
17   "Nobody."
18                   He was like, "No, somebody definitely
19   fired," so -- I did not hear it, no.
20           Q.    And back to the -- I don't know the
21   number -- it's the -- your affidavit with the map
22   behind it.
23           A.    Yes.
24           Q.    Can you find that one for me really
25   quick?

1          MS. CHRISTIANSEN:  Exhibit 16.

2          Q.   (BY MR. ANGELL):  16.  Flip back to the

3    page with the map.

4          A.   Yes.

5          Q.   I know -- I think it was my associate

6    attorney Justin Walter who met you out there.  Does

7    that name ring a bell?  It doesn't matter.

8          A.   Nope.

9          Q.   I guess what -- the concept with that

10   was an effort to have you place yourself to the best

11   of your ability where you were located at the time

12   that the shots were fired.

13              Do you believe that marker on the map

14   places you, to the best of your ability?

15         A.   As I say, if anything, we were further

16   north but not much.

17         Q.   Then what I would like you to do is to

18   take that pen -- if you need to move it -- I'm trying

19   to get the best representation from everyone that was

20   actually there as to where they were located.  If you

21   need to, I would like you to put an "N" for Noyes

22   where you think you were at, if you need to move

23   yourself.

24         A.   If I was any different, I'm right there

25   on that "N."

**Trooper David Noyes - June 12, 2023**                76

1          Q.    Okay.

2          A.    And it's just feet north of that.

3          Q.    A few feet up that fence line?

4          A.    That's correct.

5          MR. ANGELL:  Okay.  Thank you, Trooper.  I

6    think that's all I have.

7          MR. DENTON:  Yes r&s no copy send to

8    patrick.denton@isp.idaho.gov. **

9             (Deposition concluded at 1:35 p.m.)

10                 (Signature requested.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF TROOPER DAVID NOYES

 2

 3       I, TROOPER DAVID NOYES, being first duly sworn,

 4  depose and say:

 5       That I am the witness named in the foregoing

 6  deposition; that I have read said deposition and know

 7  the contents thereof; that the questions contained

 8  therein were propounded to me; and that the answers

 9  contained therein are true and correct, except for

10  any changes that I may have listed on the Errata

11  Sheet attached hereto.

12            DATED this _____day of _____20_____.

13

14            CHANGED ON ERRATA SHEET   YES___NO___

15

16       _____

17       TROOPER DAVID NOYES

18       SUBSCRIBED AND SWORN to before me this

19       _____day of _____20_____.

20

21

22

23       _____

24       NAME OF NOTARY PUBLIC
         RESIDING AT_____

25       MY COMMISSION EXPIRES_____
```

1    **ERRATA SHEET FOR TROOPER DAVID NOYES**

2    Page_____Line_____Reason for Change
     _____

3    Reads
     _____

4    Should Read
     _____

5    Page_____Line_____Reason for Change
     _____

6    Reads
     _____

7    Should Read
     _____

8    Page_____Line_____Reason for Change
     _____

9    Reads
     _____

10   Should Read
     _____

11   Page_____Line_____Reason for Change
     _____

12   Reads
     _____

13   Should Read
     _____

14   Page_____Line_____Reason for Change
     _____

15   Reads
     _____

16   Should Read
     _____

17   Page_____Line_____Reason for Change
     _____

18   Reads
     _____

19   Should Read
     _____

20   Page_____Line_____Reason for Change
     _____

21   Reads
     _____

22   Should Read
     _____

23

24

25        SIGNATURE:_____

```
1                    REPORTER'S CERTIFICATE

2              I, Amber S. Williams, CSR NO. 1080,

3    Certified Shorthand Reporter, certify:

4              That the foregoing proceedings were taken

5    before me at the time and place therein set forth, at

6    which time the witness was put under oath by me.

7              That the testimony and all objections made

8    were recorded stenographically by me and transcribed

9    by me or under my direction.

10             That the foregoing is a true and correct

11   record of all testimony given, to the best of my

12   ability.

13             I further certify that I am not a relative

14   or employee of any attorney or party, nor am I

15   financially interested in the action.

16             IN WITNESS WHEREOF, I set my hand and seal

17   this 19th day of June, 2023.

18

19

20   _____

21             AMBER S. WILLIAMS, CSR NO. 1080

22             Notary Public

23             Post Office Box 2636

24             Boise, Idaho  83701-2636

25   My commission expires June 1, 2027
```

# Exhibit 15

```
12/02/20                    Pocatello Police Department                        4011
07:05                       Detail Incident Report              Page:            1

Incident #: 20-P19954

LAW INCIDENT:
-------------

Nature: WEAPONS OFFENSE  Address: 284 HYDE AVE
Location:                         City: Pocatello        ST: ID  Zip: 83201

Offense Codes: ASFI   RFRE
Received By: WHITNAH,R        How Received: Telephone              Agency: PPD
Rspndg Officers: LACEY,A         MILLER,E         HIGBEE,T         AMOS,D
Rspnsbl Officer: OLSEN,R     Disposition: Clrd Adult Arrest   on 11/10/20
When Reported: 16:19:05 09/25/20
Occurred: Between 15:18:00 09/25/20   and 19:00:00 09/25/20

VICTIMS:
--------
```

NAME: HENDRICKS, MARY L.                           Name Number: 54417

NAME: HENDRICKS, KIRK K.                           Name Number: P0028286

NAME: HERNANDEZ, RICHARD A.                         Name Number: P0035372

```
WITNESSES:
----------
```

NAME: PRICE, ABIGAIL M.                            Name Number: 50795

NAME: RUFI, WHITTNEY A.                            Name Number: 115346

DEFENDANTS 000276



12/02/20                    Pocatello Police Department                    4011
07:05                       Detail Incident Report                  Page:    2

Incident #: 20-P19954

NAME: POPPE, TRAVIS L.                          Name Number: 116246

NAME: SCHROEDER, KARI M.                         Name Number: 141803

NAME: SAMUELS, PATRINA M.                        Name Number: 181824

                                                 HOME

NAME: WALTON, JASON L.                           Name Number: 185452

NAME: DOBSON, LOREN J.                           Name Number: 194441

NAME: DOBSON, DERRICK L.                         Name Number: 213234

NAME: DOBSON, AMANDA L.                          Name Number: 228603

NAME: TAM, AUSTIN L.                             Name Number: 258582

NAME: WALTON, TRISTEN H.                         Name Number: 307563

DEFENDANTS 000277

```
12/02/20                      Pocatello Police Department                    4011
07:05                         Detail Incident Report              Page:        3

Incident #: 20-P19954

NAME: WALTON, TONYA M.                          Name Number: 355764
```

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮:

```
NAME: PHILIPS, SKYLER M.                         Name Number: 355767
```

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

```
NAME: HULET, DALE R.                             Name Number: P0025574
```

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Phone: (    ) -

```
NAME: BARRUS, CHRISTOPHER A.                      Name Number: P0027484
```

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

```
SUSPECTS:
---------


NAME: SHEELER, JAKE L.                           Name Number: 349012
Race: W  Sex: M  DOB: 11/04/91   Height: 5'09"  Weight: 160  Hair: BRO  Eyes: BRO
                                 Pocatello, ID 83201
                                     Work Telephone: (    ) -

WANTED PERSONS:
----------------


NAME: SHEELER, JAKE L.                           Name Number: 349012
Race: W  Sex: M  DOB: 11/04/91   Height: 5'09"  Weight: 160  Hair: BRO  Eyes: BRO
                                 Pocatello, ID 83201
                                     Work Telephone: (    ) -
```

DEFENDANTS 000278

```
12/02/20                Pocatello Police Department              4011
07:05                    Detail Incident Report          Page:    4
```

Incident #: 20-P19954

NARRATIVE:
----------


OFFICER: OLSEN #5189   DICTATED: 09-26-2020 @ 1639 HOURS

INVESTIGATIVE TIME: 3 HOURS
LAW INCIDENT #: 20-P19954
STENO INITIALS: JBH #5899
DATE & TIME TRANSCRIBED: 09-26-2020 @ 1901 HOURS

BURGLARY INVESTIGATION:

- BRIEF SYNOPSIS OF INCIDENT:

On 09-25-2020, at approximately 1619 hours, Officers were dispatched to the area
of ████ East Maple Street in reference to a weapons offense. It was reported
that a male subject, who was later identified as JAKE SHEELER, committed a
burglary and multiple aggravated assaults by pointing a firearm at multiple
victims, and then fled the area. JAKE SHEELER stole a Taurus Judge and a Hi
point
45ACP from the victim.

- INCIDENT LOCATION:

The incident occurred at 284 Hyde Avenue.

- DATE AND TIME OCCURRED BETWEEN:

The incident occurred between approximately 1518 hours and 1900 hours on
09-25-2020.

- POINT OF ENTRY AND MODE OF ENTRY:

Entry was made through the west door on the shop that was on the east side of
the property at 284 Hyde Avenue. The door was left unlocked; therefore, there
was no damage to the property.

- DAMAGED PROPERTY:

No property was damaged as a result of this incident.

- DESCRIPTION AND VALUE(S) OF STOLEN ITEM(S):

One Taurus Judge valued at approximately $420 and one Hi Point 45ACP valued at
approximately $220 were stolen. The Taurus Judge was recovered at a later time.

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

Two pages of Detective notes, one National Crime Information Center entry form,
and a Pocatello Police Department Scene Evidence Inventory Log have been
submitted for attachment to the files section of this report. Two audio
recordings of my interview with the victims, KIRK HENDRICKS, and RICHARD
HERNANDEZ, have been attached to the files section of this report.

DEFENDANTS 000279

```
12/02/20                    Pocatello Police Department                    4011
07:05                        Detail Incident Report              Page:      5
```

Incident #: 20-P19954

- NARRATIVE:

On 09-25-2020, at approximately 1633 hours, I responded to the area of 1260 East Maple Street in reference to assisting with a burglary investigation that evolved into multiple aggravated assaults with the suspect still in the area on foot.

Upon my arrival, Patrol units had already set up a perimeter and were attempting to locate the suspect, who was later identified as JAKE SHEELER.

I was requested to make contact with the homeowner at 284 Hyde Avenue to take the initial report  I made contact with this individual, KIRK HENDRICKS. I told him as he was in the area of Fairmont Street and East Maple Street, I would respond to his residence to take the report. I requested him to meet me at that location.

At this time, a male subject, RICHARD HERNANDEZ, approached me to give a statement. I activated my digital audio recorder to record my conversation with RICHARD HERNANDEZ. He stated that he had been outside the front door of his residence, smoking, when he noticed there was a white pickup truck with a white camper shell on it that was being driven by what he believed to be a blonde female. RICHARD HERNANDEZ said the vehicle appeared to be suspicious in nature and he did not recognize it as being from the neighborhood. He said a male subject got out of the vehicle and went towards KIRK HENDRICKS' driveway. He believed the subject was supposed to be at KIRK HENDRICKS' residence, so RICHARD HERNANDEZ went back inside his residence.

RICHARD HERNANDEZ said approximately 30 minutes later he came back outside and heard KIRK HENDRICKS yelling, "Call 911!" He said he observed a male subject run behind his neighbor's driveway, believed to be 321 Hyde Avenue. RICHARD HERNANDEZ said he followed the subject behind the residence and confronted him with a piece of firewood. He said the male subject then pointed a firearm at him and told him to stop. RICHARD HERNANDEZ said he stopped and the male subject left the area and continued west through the yard, into the neighbor's yard. He said as the male was doing this, RICHARD HERNANDEZ threw the log at the subject, and then the subject left. Therefore, RICHARD HERNANDEZ left this area and went back to his residence. He said the male subject was wearing a green hoodie, had piercings in his lips, ears, and believed in his nose. He said he could not describe the male any further at this time.

I obtained RICHARD HERNANDEZ' address, ███████████████████████, and a telephone number to reach him, ███████████. I ended my conversation with him.

I responded to 284 Hyde Avenue to interview and take the report of the burglary from KIRK HENDRICKS. I made contact with KIRK HENDRICKS on the back side of his residence, on his back patio. He said after the incident occurred, he checked his surveillance camera and notice that at approximately 1518 hours, the camera that pointed towards the door to his garage, or shop, had been covered with what was later found to be a green piece of plastic. KIRK HENDRICKS said this obstructed much of the recordings that would have been made by his camera system.

KIRK HENDRICKS then told me what occurred. He said at approximately 1616 hours, he was going to leave to go on a walk, and he went to go into his shop/garage to

DEFENDANTS 000280

Incident #: 20-P19954

obtain some keys to his residence, and found the walk-through door locked. He said this was odd, as he often left it unlocked when he was at home. He said he returned to his residence and obtained a pistol. He said at approximately 1617 hours, he came back outside, unlocked the garage door, and went outside. KIRK HENDRICKS said he had his dog with him and as he went to get into the truck, to get his keys, and when he opened the passenger side door, he saw a face looking towards him, through the windows of the truck. He said at this time, his dog went around the truck and began barking at the male subject. KIRK HENDRICKS said he called his dog off, as he believed the subject in the garage was a neighborhood kid, with whom he was familiar. He said at this time the male subject came around the back side of the truck, and KIRK HENDRICKS realized this was not the individual he thought it was, and Kirk HENDRICKS went to approach the unknown male, preparing to punch the male subject. He said the male subject said, "Stop, Sir, I'll shoot," and pointed a handgun at KIRK HENDRICKS. He said several times after this the male subject repeatedly said, "I'm going to shoot you." He said he pulled out his phone and attempted to take a picture of the male subject, but the subject said, "Don't." KIRK HENDRICKS said the male then began moving toward the door to exit the garage. KIRK HENDRICKS said he removed his handgun from his waistband and pointed it at the male subject. He said the male told him, "I'm going to shoot you." KIRK HENDRICKS said he backed off and allowed the male to leave. He said the male left the garage and proceeded northwest across his driveway, across East Maple Street, and down Hyde Avenue. KIRK HENDRICKS said he began to follow the male and yelled for his neighbors to call the police, as the subject committed a burglary. He said he last saw the male subject going around the driveway side of a residence on Hyde Avenue, which was believed to be 321 Hyde Avenue.

KIRK HENDRICKS said the subject took a Taurus Judge with a three-inch mag that was loaded with 410 2 3/4-inch shotgun shells. I requested Pocatello Police Department (PPD)Detective BALLARD respond to my location to assist with processing the shop/garage. KIRK HENDRICKS said he had not gone back into the shop/garage to check on items. After he came out after the male subject. He said he had security camera footage; however, it was partially obstructed due to the plastic bag.

KIRK HENDRICKS pointed out to me that the fence on the south side of his property, between his shop/garage and house, appeared to have been bent, as though someone used it to get over the fence to go between his property and the neighbor's. He said he did not believe this damage was present prior to this incident.

A short time later, PPD Detective BALLARD arrived and we checked the inside of the shop/garage to ensure no one else was in it. After the shop/garage was checked, PPD Detective BALLARD began photographing the crime scene. We then allowed KIRK HENDRICKS to enter the shop to advise us what items had been taken, moved, or possibly touched. As he entered the shop, we went directly to the south, towards the south wall, on the west side of the shop/garage. He found that several items had been moved on his work benches. The first items he mentioned as having been moved were a green silencer and a silver silencer. There was also a cardboard box that had been moved. These items were subsequently packaged as evidence for processing for fingerprints. There were also several multi-tools that had been left on the floor in front of the south workbench. There was a white box that was on top of the tool box that had also been touched. As KIRK HENDRICKS went around to the east, on the south side of the shop/garage, he saw multiple boxes had been removed from the shelves on the

DEFENDANTS 000281

12/02/20                    Pocatello Police Department                      4011
07:05                        Detail Incident Report                Page:      7

Incident #: 20-P19954

east most side of the shop/garage, and had been placed on the floor. There were
multiple bags, gun cases, and ammo boxes that had been removed from the shelves
and were lying on the floor that should not have been there. He said he believed
the subject had entered his truck that was in the shop/garage, as the driver's
side door was open, as well as the extended cab door. He said it appeared the
subject had entered the bed area of the pickup that was covered with a camper
shell and went through things there as well. On the driver's side of the truck,
on the floor, were several rifles in soft cases, and several utility bags that
had been placed there by the male individual.

We escorted KIRK HENDRICKS back out of the shop/garage, and PPD Detective
BALLARD photographed the items that had been moved. We collected multiple items
to process for fingerprints. Those items were the green silencer, silver
silencer, and white box from the south workbench. KIRK HENDRICKS had also
pointed out that a Hi Point firearm had been taken, and it had been in the box
inside a Craftsman toolbox. That box was also taken for processing. Three
cardboard boxes that had bullets in them, a roll of plastic bags used for
cleaning up animal feces, a plastic first aid kit, and a plastic bag with some
fabric in it were also left on the floor by the suspect and taken and packaged
as evidence in an attempt to get fingerprintsffrom them.

PPD Detective BALLARD and I began fingerprinting multiple surfaces in an attempt
to gain fingerprints left by the suspect. We were able to locate several partial
prints. PPD Detective BALLARD began lifting these prints on fingerprint cards.
The cards were as follows:
#1 was located on the driver's side door of the truck, on the bottom right of
the window
#2 was just above where card #1 was lifted, on the borrow right of the window
#3 was taken from the passenger side door of the truck, in the lower left area
of the window
#4 was just above where #3 was taken from
#5 was taken from the white box on the toolbox in the southwest corner of the
shop/garage.
These fingerprint cards were submitted as evidence.

KIRK HENDRICKS began obtaining serial numbers for the firearms that had been
taken. The Taurus Judge's serial number was MC540157 and the Hi Point 45ACP had
the serial number X4120401.

PPD Detective BALLARD and I cleared the scene of the garage so KIRK HENDRICKS
could begin taking care of things. He contacted a locksmith to change the locks
on his residence and shop/garage, as he believed the male subject had taken his
set of house keys.

We checked the area of where the security camera was on KIRK HENDRICKS' property
and located the green plastic bag that had been used to cover the camera. PPD
Detective BALLARD photographed this and the bag was collected as evidence as
well.

It should be noted that KIRK HENDRICKS advised me that the time the incident was
occurring with the male subject in his shop/garage, as the male was pointing a
gun at KIRK HENDRICKS, he was in fear for his safety and his life. However, not
to the point that he felt he could or shoot the subject out of concern of taking
the life of or injuring another human being with a firearm.

DEFENDANTS 000282

Incident #: 20-P19954

We collected all items of evidence and placed it in my vehicle. PPD Officers
then cleared the residence. I left my business card with KIRK HENDRICKS and
returned to the PPD with all items of evidence, which was subsequently placed
into temporary evidence storage.

While at the PPD, I was called by KIRK HENDRICKS, who said he believed a Glock
semi-auto .45 caliber model 30 had been stolen. He provided me with the serial
number and other details pertaining to this firearm. I relayed this information
to other PPD Officers who were on duty so that they were aware if they came
across the individual.

For further information, see PPD Detective BALLARD'S supplemental report, as
well as other supplemental reports relating to this incident. There is nothing
further
at this time.

End of report.

Edited by JBH #5899 for name accuracy on 09-27-2020.
Edited by JBH #5899 for name accuracy and Officer agency distinguishing on
09-29-2020.
OFFICER: BALLARD #5233   DICTATED: 09-25-2020 @ 1938 HOURS

INVESTIGATIVE TIME: 3 HOURS
LAW INCIDENT #: 20-P19954
STENO INITIALS: JBH #5899
DATE & TIME TRANSCRIBED: 09-26-2020 @ 0618 HOURS

SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

A two-page statement from WHITNEY RUFI has been submitted for attachment to the
files section of this report.

- NARRATIVE:

On 09-25-2020, at approximately 1650 hours, I responded to 284 Hyde Avenue in
reference to assisting Pocatello Police Department (PPD) Detective OLSEN
processing the crime scene at that location.

Upon my arrival, I took numerous photographs of the residence and the garage
area, where the incident was reported to have happened. While processing the
scene, I observed the back fence behind the garage. While I was taking
photographs of the fence, I saw the next door neighbor at █████████████,
WHITNEY RUFI, was sitting in her back yard. She consented to allow me to take
photographs of her back yard. She said that the fence did not appear to have
been bent before this incident. She also said she believed the person that
jumped the fence was JAKE SHEELER, with whom she had been spending some time.
WHITNEY RUFI stated that SHEELER left a backpack on her front door step when he
left the area.

I responded to that location and took photographs of the front of WHITTNEY
RUFI'S residence and the backpack on the front porch. RUFI told me that she had

```
12/02/20                    Pocatello Police Department                    4011
07:05                        Detail Incident Report              Page:      9
```

Incident #: 20-P19954

been friends with JAKE SHEELER for a short period of time, and he moved from
California to Pocatello. She said he currently lived at 925 East Halliday Street
#4, in a basement apartment. She said the night before, he asked to borrow her
white Lexus. WHITTNEY RUFI said that JAKE SHEELER eventually took the Lexus from
her residence without her consent. She also said that on the prior evening, she
saw him in possession of a handgun that she described to have a wheel in the
center of it and shaped like a pistol. WHITTNEY RUFI also said that she was
aware JAKE SHEELER had been doing drugs.

WHITTNEY RUFI said that just prior to PPD Officers responding to the area, JAKE
SHEELER had been at her residence and was talking to someone out in the street,
when he disappeared. She said she was not paying attention at the time he left
the area.

I seized the backpack, which was later placed into evidence at the PPD.

I then went across the street and contacted the resident at 275 Hyde Avenue, who
was identified as LOREN DOBSON. He told me did have surveillance on the front of
his residence and he reviewed it. He said he observed the male subject left the
residence at 274 Hyde Avenue, climbed over a wood pile between the two
residences, 274 Hyde Avenue and 284 Hyde Avenue, then go into the back yard,
where the incident reportedly occurred. LOREN DOBSON later provided a DVD of
that video surveillance recording.

WHITTNEY RUFI also prepared a statement for me, which was later submitted for
attachment to the files section of this report.

I responded back to the residence at 284 Hyde Avenue to process the garage, PPD
Detective OLSEN and I located fingerprints on both door frames of the pickup
truck in the garage, as well as on a metal shelf with a lid in the southwest
corner of the garage. Photographs were taken of the interior of the garage and
multiple items were collected as items of evidence that the owner advised had
been moved. For further information in reference to this incident, see
additional supplemental reports. There is nothing further at this time.

End of report.

Edited by JBH #5899 for name accuracy on 09-27-2020.
Edited by JBH #5899 for name accuracy and Officer agency distinguishing on
09-29-2020.

OFFICER: AMOS #5284   DICTATED: 09-25-2020 @ 2245 HOURS

INVESTIGATIVE TIME: 3 HOURS
LAW INCIDENT #: 20-P19954
STENO INITIALS: JBH #5899
DATE & TIME TRANSCRIBED: 09-26-2020 @ 0632 HOURS

SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

No documents of evidence to be filed at this time.

DEFENDANTS 000284

12/02/20                    Pocatello Police Department                    4011
07:05                        Detail Incident Report                Page:    10

Incident #: 20-P19954

- NARRATIVE:

On 09-25-2020, at approximately 1622 hours, while I was transporting a
juvenile to the Juvenile Detention Center on an unrelated incident, I overheard a
call come in from Pocatello Dispatch regarding a robbery that occurred in the
1200 block of East Maple. I informed Pocatello Dispatch that I was clear from my
previous call and I was en route to the new call at approximately 1622 hours.

Upon leaving the Juvenile Detention Center, I traveled north on South 5th Avenue
and north on Yellowstone Avenue, until I got to Pine Street. I turned east on
Pine Street and crossed Jefferson Avenue. I set up at East Pine Street and
Filmore Avenue while other units were coming to the area and setting up a
perimeter.

Pocatello Police Department (PPD) Officer NAMOHALA asked for additional units to
come to his location. Based off my SWAT training and experience, I informed him
I would be en route to his location. PPD Officer NAMOHALA, PPD Corporal
ELDRIDGE, PPD Corporal MILLER, Officer T. HIGBEE, and I linked up and made an
Immediate Action Team. After speaking it over, I informed Pocatello Dispatch at
approximately 1643 hours to do a reverse 911 to the surrounding area to let
people know what was going on, to stay inside, and to lock their doors. After
doing this, the Immediate Action Team went to the area of East Maple Avenue and
Fairmont Street, where we were going to begin houses, proceeding north on
Fairmont, as that was the last known location of the suspect.

As PPD Officers began searching this area, the identification of the suspect
came in as JAKE SHEELER. A photograph was sent out to PPD Officers' phones of
the suspects that had been captured form a security camera at a residence that
he ran through. The Immediate Action Team began clearing houses, moving north on
Fairmont Street. We were then informed that JAKE SHEELER potentially jumped the
fence, going towards Filmore Avenue. We began to clear houses on Filmore Avenue.
While in this process, we were advised that a male wearing a mask, red hoodie,
and gray shorts was running north from the area of Filmore Avenue and East Pine
Street. PPD Officers then swarmed to the area and were informed someone saw the
same male in the area of East Poplar Street and Fairmont Avenue and Filmore
Avenue. PPD Officers checked this area and were unable to locate the male.

After searching for some time, I told Pocatello Dispatch that I was clear from
the call at approximately 1701 hours.

While I was at the PPD, completing reports, I heard PPD Corporal ELDRIDGE over
the radio, at approximately 2006 hours, that the male subject had been spotted
in the area of 950 Lucille Avenue. I informed Pocatello Dispatch I was back en
route.

I responded with my emergency lights and siren activated to the area of Lucille
Avenue and Monte Vista Drive, at approximately 2011 hours. I set up perimeter
there. While doing so, I overheard PPD Corporal ELDRIDGE say that the male was
running towards the golf course. I again activated my emergency lights and siren
as I responded to that area. I heard shots had been fired. I went west on Monte
Vista Drive, west on East Alameda Road, north on Jefferson Avenue, and east on
Pocatello Creek Road, until I got to the rear of Red Lion Hotel Pocatello. I saw
PPD Officers at Outback Golf Park. I jumped over a fence and ran to them. Upon
my arrival, they were performing life-saving measures on JAKE SHEELER. I saw a
PPD Officer apply a tourniquet to JAKE SHEELER'S leg. I relayed this information

DEFENDANTS 000285

```
12/02/20                    Pocatello Police Department                  4011
07:05                        Detail Incident Report            Page:      11
```

Incident #: 20-P19954

to Pocatello Dispatch via the radio.

I then went towards the middle of the golf course and began guiding other PPD Officers into the area. I then began to set up crime scene tape around the crime scene.

I was advised by PPD Detective OLSEN to protect a certain area of the crime scene. I stayed in that position until I was relieved by PPD Sergeant HANCOCK.

I then responded back to the PPD, downloaded my video, and completed my report. There is nothing further at this time.

End of report.
Edited by JBH #5899 for name accuracy and Officer agency distinguishing on 09-29-2020.

OFFICER: BUCK #5162  DICTATED: 09/28/2020 @ 0910 HOURS
INVESTIGATIVE TIME: 2 HOURS, 30 MINUTES
LAW INCIDENT #: 20-P19954
STENO INITIALS: MAB #5893
DATE & TIME TRANSCRIBED: 09/28/2020 @ 1107 HOURS

#2 - SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

A copy of my field notes, which I made while the search was being conducted in the 300 blocks of Franklin Avenue and Fairmont Avenue, were filed with Records to be scanned into the Files section of this report.

- NARRATIVE:

On 09/25/2020 at approximately 1630 hours, I was at the Pocatello Police Department when I heard over the police radio a report of a man with a gun running in the area of 1200 East Maple Street. I responded to the scene to assist Pocatello Police Department (PPD) Corporal MILLER, who was investigating the incident. He stated that the subject had been last seen running northwest from 1200 East Maple Street. I drove to the area of Jefferson Avenue and East Maple Street to begin to establish a perimeter.

At approximately 1645 hours, I was contacted by PPD Officer NAMOHALA, who had taken over command of the scene from the area of Fairmont Avenue and East Maple Street. He requested that I move to that location to begin to establish a command post. I moved to the area of Fairmont Avenue and East Maple Street.

Between approximately 1645 hours and 1700 hours, I received information that the firearm that had been taken was a Taurus brand Judge model that had been loaded with .410 shotgun rounds. I was also advised that the suspect was likely JACOB SHULER. As I was in contact with PPD Corporal MILLER and PPD Detective Sergeant B. MCCLURE, I looked up JACOB SHULER on my mobile data terminal (MDT).

The victim of the theft, KIRK HENDRICKS, was in the area and I showed him the picture of JACOB SHULER. KIRK HENDRICKS stated that the subject that had been involved in the burglary had more tattoos and longer hair than the subject in the picture that I had shown him. PPD Corporal MILLER told KIRK HENDRICKS that

DEFENDANTS 000286

Incident #: 20-P19954

piercings, tattoos, and hair length can change over time, but KIRK HENDRICKS
said he did not believe the picture on my mobile data terminal (MDT) was the
same person as the suspect from his garage.

It was only later that I learned that the suspect's actual name was JAKE
SHEELER. Around that time, I also learned that the suspect may be associated
with a green lifted truck and may have stolen a white Lexus from WHITTNEY RUFI
in the area of 300 Hyde Avenue or 200 Hyde Avenue.

As officers conducted yard-to-yard and house-to-house searches in the 300 blocks
of Franklin Avenue and Fairmont Avenue, I attempted to keep track of which
addresses had and had not been searched. My notes were later left to be filed in
Records.

At approximately 1720 hours, I received information from Pocatello Police
Dispatch that the homeowner at 343 Franklin Avenue could be contacted, as he had
video footage of the suspect. I directed officers to return to that address to
attempt to contact the homeowner.

At approximately 1800 hours, I was advised over police radio that PPD Corporal
ELDRIDGE and PPD Corporal MILLER were searching random houses in the area where
they had heard dogs barking. I contacted PPD Corporal ELDRIDGE and asked if I
needed to continue to maintain a perimeter greater than one block from his
location. He told me that he believed the perimeter units could clear.

At approximately 1805 hours, I advised PPD Officer MARTIN and PPD Officer CHRIST
that they could clear their perimeter units at East Pine Street and Filmore
Avenue and  at East Walnut Street and Jefferson Avenue respectively.

About three or four minutes later, I received information that the suspect was
moving north on Fairmont Avenue from East Pine Street. At about the same time, I
directed PPD Officer T. ANDERSON to move to the area of Franklin Avenue and East
Walnut Street in order to relieve one of the Idaho State Police (ISP) units that
was maintaining a perimeter. I then redirected PPD Officer T. ANDERSON, PPD
Officer FETCHEN, and PPD Officer SALDANA to get back into their patrol vehicles
and start moving north to attempt to establish a new perimeter in the area of
East Poplar Street.

At approximately 1820 hours, information was broadcast that the suspect was now
wearing a maroon hooded jacket and was still believed to be northbound in the
area of 400 Fairmont Avenue or 400 Euclid Avenue.

At approximately 1830 hours, I received information that the suspect had left in
a vehicle from ███ East Poplar Street. I was mobile in the area at that time
and responded to the Maverik convenience store at ███ East Alameda Road to
assist PPD Officer T. ANDERSON, who was out with a male subject who was chasing
another male. PPD Officer T. ANDERSON determined that the two subjects were not
involved in the initial complaint and I cleared from the area.

At approximately 1845 hours, I met with the officers that had been involved in
the foot search somewhere in the area of East Walnut Street and Filmore Avenue
or East Walnut Street and Fairmont Avenue. After getting accountability of the
officers who had been involved in the search, I directed them to contact PPD
Detective R. OLSEN and PPD Detective BALLARD at 284 Hyde Avenue.

DEFENDANTS 000287

```
12/02/20                    Pocatello Police Department                   4011
07:05                        Detail Incident Report              Page:    13
```

Incident #: 20-P19954

I then cleared from the scene and returned to the Pocatello Police Department.
No further action was taken at that time.

End of report.

Reviewed and corrected by J. Buck 9-28-20 at 1440.jb

OFFICER: CARD #5293  DICTATED: 09-26-2020 @ 0102 HOURS

INVESTIGATIVE TIME: 3 HOURS
LAW INCIDENT #: 20-P19954
STENO INITIALS: JBH #5899
DATE & TIME TRANSCRIBED: 09-26-2020 @ 0719 HOURS

SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

One audio recording has been attached to the files section of this report. It
has been labeled, "Audio 5293."

- NARRATIVE:

On 09-25-2020, at approximately 1952 hours, I heard radio traffic that Pocatello
Police Department (PPD) Corporal ELDRIDGE was headed to the area Monte Vista
Drive and Horizon Drive to look for a possible subject that was considered armed
and dangerous that PPD Officers had been searching for earlier in the shift
regarding a possible burglary and weapons offense that occurred in the area of
1260 East Maple street at approximately 1619 hours on 09-25-2020. PPD Corporal
ELDRIDGE asked for additional units to respond to the area to help set up a
perimeter.

While I was monitoring this radio traffic, I heard PPD Officers state that they
possibly had a sighting of the suspect and he ran through a back yard in the
area of Monte Vista Drive and Lucille Avenue, and was now possibly in the area
of Monte Vista Drive, Jean Avenue, and Lucille Avenue. Additional PPD Officers
were requested to respond to that area.

I responded to the area to assist with this investigation. At approximately 2012
hours, on 09-25-2020, I arrived in the area of Lucille Avenue and Monte Vista
Drive to set up a perimeter to help contain the possible suspect in this general
area. As I was in my patrol vehicle at this time, I verified that my camera was
working and I had my audio recorder in my pocket and it was turned on. I
deployed a patrol rifle and linked up with PPD Officer AMOS, who was also in the
general area so PPD Officers could have eyes on Monte Vista Drive and Lucille
Avenue in case the suspect were to show himself in this area.

I stood by with PPD Officer AMOS as a perimeter unit, as multiple other PPD
Officers continued to search the area, including back yards, on foot and PPD
Officers were mobile, searching in their vehicles. After some time had passed, I
overheard an Idaho State Police Trooper state that he had a male on thermal
imaging coming down the backside of Monte Vista Drive through a yard, walking

DEFENDANTS 000288

```
12/02/20                  Pocatello Police Department                      4011
07:05                      Detail Incident Report               Page:      14

Incident #: 20-P19954
```

down the sagebrush hill, towards Red Lion Hotel Pocatello, on the northeast side
of Monte Vista Drive. This general area was directly behind where I had been
standing, near the intersection of Lucille Avenue and Monte Vista Drive. I
approached a back yard at the address of 1756 Monte Vista Drive to see if I
could gain eyes on the suspect.

I received information from Pocatello Dispatch at that time that the suspect had
been identified by day shift PPD Officers and PPD Detectives as JAKE LEE SHEELER
(date of birth 11-09-1991). At this time, I pulled up a photograph from security
camera footage that had been emailed to verify his identity and what he looked
like on today's date. I began searching sagebrush in the back of the residences
in the 1700 block of Monte Vista Drive to see if I could observe the male,
possibly attempting to elude PPD Officers in that area. Initially, I did not see
anyone and responded back to my post with PPD Officer AMOS near the intersection
of Lucille Avenue and Monte Vista Drive, as PPD Officers were again searching
for said male, and could not locate him.

A few moments after responding back to the area of Lucille Avenue and Monte
Vista Drive, I heard more PPD Officers checking out in the area of Red Lion
Hotel Pocatello and getting out of their patrol vehicle, going on foot. I
decided to go back behind the residences in the 1700 block of Monte Vista Drive
a second time to see if I could observe anything. PPD Officer AMOS told me he
was ok to stay near the intersection of Lucille Avenue and Monte Vista Drive in
case the subject we were looking for was still in the area of Beth Street or
Jean Street, and the overall Monte Vista Drive area.

At this time, I began walking in the sagebrush behind the residences in the 1700
block of Monte Vista Drive. I could see Officers' flashlights, down to the
southwest of my location, closer to Jack in the Box and Red Lion Hotel
Pocatello. I observed a dark subject start to move out of a heavily wooded area
that was behind Red Lion Hotel Pocatello. I heard PPD Corporal ELDRIDGE clear
the air at that time, at approximately 2030 hours. I then began running down the
hill, as I believed the other PPD Officers were in a foot chase with the male
suspect.

As I was running down the hill, behind the residences in the 1700 block of Monte
Vista Drive, towards the PPD Officers I saw in the field, I heard a volley of
what I thought was two gunshots followed by another volley of approximately
three or four other gunshots. I got on the radio and stated that shots had been
fired. At the same time, PPD Corporal ELDRIDGE got on the radio and also said
shots had been fired and requested an Emergency Medical Service crew respond to
his location. I continued to run down the hill and entered Outback Golf Park's
driving range. I sprinted across the driving range and found the Officers on the
driving range of Outback Golf Park. I secured my rifle behind my back and
assisted in rendering medical aid.

At this time, I could tell the male had been shot in the lower portion of his
body, as well as his upper body. I assisted PPD Officer FETCHEN in removing the
subject's shoes, the first layer of black pants, and his second layer of gray
gym shorts, which were a fleece material. I assisted in applying a tourniquet to
the male's left thigh area. PPD Officer FETCHEN also applied a pressure bandage
to the wound. It appeared to be a "through and through" wound, as an entrance
and exit wound were both visible on his thigh.

After the tourniquet and the pressure bandage was applied, I searched the male's

DEFENDANTS 000289

12/02/20                    Pocatello Police Department                    4011
07:05                        Detail Incident Report              Page:    15

Incident #: 20-P19954

shoes, black pants, and his gray shorts for any weapons. I did not locate
anything. I looked around the immediate area and did not locate any firearms or
weapons of any kind in the general area.

I observed an Idaho State Police Sergeant, who stated that he had found another
sucking chest wound to the suspect's back. We found a piece of plastic to apply
and hold pressure on his back to stop the sucking chest wound. I assisted in
holding the male's arms and some of the plastic on his back until the Emergency
Medical Service (EMS) crew arrived on scene. Pocatello Fire Department EMS
Ambulance 1 was en route to our location at approximately 2033 hours. They
arrived on scene and took over medical care of the suspect at approximately 2039
hours on 09-25-2020.

Shortly after this time, I was directed by supervisors to go with the Ambulance
1 crew with the suspect. PPD Officer FETCHEN was also given the same directive,
to accompany the suspect to the hospital. PPD Officer FETCHEN and I accompanied
the Ambulance Crew 1 and Engine 3 to Portneuf Medical Center (PMC) to escort the
suspect.

PPD Officers and the EMS crew arrived at the hospital at approximately 2051
hours. Once at PMC, the medical care of the suspect was transferred to the
Emergency Room (ER) staff, where he was placed in ER room #18. PPD Officer
FETCHEN and I stood by as security for PMC.

After standing by as additional security at PMC with the suspect, he was taken
back to x-rays. PPD Officers accompanied the suspect into the x-ray room, where
we stood by with medical staff as the x-rays were performed. Once the x-rays
were completed, surgeons at PMC said there were bullet fragments near the
suspect's spine, and they could not operate on them at this time, and he would
be transported to the third floor of PMC, into the Intensive Care Unit (ICU)
until he was more stable.

PPD Officer FETCHEN and I then accompanied the suspect to the third floor of
PMC, in the ICU. Officers stood by at the ICU until relieved by Bannock County
Sheriff's Officer (BCSO) Deputies, who were sent to relieve PPD Officers.

At the completion of being relieved at PMC for suspect security, PPD Officer
FETCHEN and I were transported by BCSO Detective TAYSOM back to our patrol
vehicles, where we then checked in with PPD supervisors and were ultimately
cleared from the call without any further involvement. I had no further
involvement in this incident. Refer to the other supplemental reports and
information for further details. There is nothing further at this time.

End of report.

Edited by JBH #5899 for name accuracy and Officer agency distinguishing on
09-29-2020.

OFFICER: T. ANDERSON #5290  DICTATED: 09-26-2020 @ 0110 HOURS

INVESTIGATIVE TIME: 7 HOURS
LAW INCIDENT #: 20-P19954
STENO INITIALS: JBH #5899
DATE & TIME TRANSCRIBED: 09-26-2020 @ 0805 HOURS

DEFENDANTS 000290

12/02/20                    Pocatello Police Department                        4011
07:05                        Detail Incident Report              Page:     16

Incident #: 20-P19954

SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

No documents of evidence to be filed at this time.

- NARRATIVE:

On 09-25-2020, at approximately 1619 hours, a subject was reported having stolen
a handgun and running down the street from the area of 1260 East Maple Street. I
was at the Pocatello Police Department (PPD). PPD Officer NAMOHALA and I
responded from the PPD to the area of East Maple Street.

Upon my arrival in the area, PPD Officers discussed setting up a perimeter over
the radio. I originally set my position in the area of East Pine Street and
Fairmont Avenue. I stayed at this location for a while, and then determined that
I should head east of my original location, as there was more traffic and
information regarding the suspect possibly being in the 300 block of Franklin
Avenue. I moved my position near the area of Hyde Avenue and East Walnut Street.
I kept my position as a part of the perimeter at that location.

I was approached by a citizen, who provided me surveillance video from his
residence, 321 Hyde Avenue. I saw the suspect run through the driveway at 321
Hyde Avenue, carrying a handgun in his left hand. I observed the suspect was
wearing a green hoodie, black pants, gray shorts or another pair of pants under
his black pants, black shoes, and black gloves. The suspect had dark hair and
glasses. I observed the male running west through the driveway at 321 West Hyde
Avenue. This citizen informed me that the suspect was running through his
driveway at 1618 hours on 09-25-2020.

I passed this information on to PPD Corporal MILLER. I forwarded the still shots
of the surveillance video footage and emailed them to PPD Officer BLOXHAM, who
then dispersed the information and photos to the other PPD Officers on the call
via email. PPD Officer BLOXHAM identified the suspect as JAKE SHEELER.

More information was received by the search teams and the suspect was believed
to be on the west side of the 300 block of Franklin Avenue.

I was asked by PPD Sergeant BUCK to move my position to the area of Franklin
Avenue and E Walnut Street to relieve the Idaho State Police (ISP) Trooper who
was at that location. While at this location, search teams received further
information that the suspect could possibly be in the 400 block of Fairmont
Avenue or a subject that was suspicious in nature, as the suspect was described
as wearing a mask and a maroon hoodie. I moved my position from Franklin Avenue
and East Walnut Street to the area of East Pine Street and Franklin Ave. I did
not observe any subjects come through the 400 block of Franklin Avenue. Officers
then received further information that the suspect was seen in the 500 block of
Euclid Avenue. I ran back to my patrol vehicle that I left in the area of
Franklin Avenue and East Walnut Street. I drove to the area of East Poplar
Street and Fairmont Avenue.

I met up with PPD Officer NAMOHALA, PPD Corporal LACEY, PPD Officer AMOS, and
PPD Officer T. HIGBEE, who were speaking with subjects in the area. Citizens
informed PPD Officers that the male had possibly gotten into a vehicle and left

DEFENDANTS 000291

12/02/20                     Pocatello Police Department                          4011
07:05                         Detail Incident Report                    Page:      17

Incident #: 20-P19954

the area with a male that was identified as CHRISTIAN FRANCO.

I began searching the area in my patrol vehicle, in case JAKE SHEELER was still
in the area. We received a call that two males were seen running north on
Jefferson Avenue in the area of Jefferson Avenue and Redwood Street. One male
was chasing the other male with a knife. The subject that was chasing with a
knife, was described as wearing a long sleeve cream colored shirt and a bandana.
PPD Officer SALDANA and I responded to the area and were informed by Pocatello
Dispatch that the subjects were last seen walking into Maverik, 855 East Alameda
Road.

Upon my arrival, I observed the male in the cream colored shirt standing just
inside Maverik. I made contact with him and observed he was talking to a male
with a large backpack on. The male with the large backpack was wearing shorts
and a tshirt with white shoes. PPD Officer SALDANA arrived and I asked her to
speak with the male with the backpack, while I escorted the male with the
bandana outside. The male with the bandana identified himself via his Idaho
driver's license as PHILLIP CURZON. He informed me that he observed the male
with the backpack and believed that it was the suspect that PPD Officers were
looking for in the area of Walnut Street. He said he never pulled his knife out,
but he said he had his knife clipped onto his pocket, exposed, and he placed his
hand on it, just in case he needed to use it. PHILLIP CURZON again stated that
he never pulled or wielded his knife. He said he believed the male matched the
description of the subject that PPD Officers were looking for, and began
following the male, but said he never wielded his knife at the other male.

I made contact with the male with the backpack, who identified himself via his
Oklahoma identification card as PAUL NICHOLAS DYSINGER (date of birth
06-21-1993). PAUL DYSINGER was not wearing any of the clothes the male suspect
was last seen wearing. He said he had been at his friend's house. I informed
PAUL DYSINGER the reason PHILLIP CURZON had been following him; PPD Officers
were looking for a suspect in the same general area. I informed him that I would
tell PHILLIP CURZON that he was not the male PPD Officers were looking for, and
PHILLIP CURZON should leave the male alone and leave the area.

I went back outside and made contact with PHILLIP CURZON. I informed him that
PAUL DYSINGER was not the male PPD Officers were looking for, and he should not
chase down subjects with a knife, and he should call police. PPD Officers then
cleared and PHILLIP CURZON left the area. PAUL DYSINGER left soon thereafter.

I then went to the area of the 200 block of Hyde Avenue, where the original call
took place. I met up with PPD Detectives to share the information PPD Officers
received prior to PPD Detectives arriving on scene. While PPD Officers were
there, PPD Corporal ELDRIDGE, PPD Corporal MILLER, and I were dispatched to 342
Filmore Avenue to assist a male citizen, who requested PPD Officers search his
residence, as he left it unsecured during the time PPD Officers were looking for
the suspect in the area. PPD Officers cleared the residence, and then returned
to 284 Hyde Avenue to make contact with PPD Detectives again.

PPD Detective OLSEN informed me that I needed to attach the surveillance video
and complete a supplemental report of my action. I cleared the call and went to
the PPD to complete my report and attach the surveillance footage.

While I was at the PPD, multiple PPD Officers responded to the area of Beth
Street and Lucille Avenue. A reporting party stated that a subject matching JAKE

DEFENDANTS 000292

```
12/02/20                    Pocatello Police Department                    4011
07:05                        Detail Incident Report              Page:       18
```

Incident #: 20-P19954

SHEELER's description, from the incident near Maple Street, was trying to sell
the firearm that he had stolen. The suspect was described as wearing a green
hoodie, black pants, black shoes, and glasses. This suspect matched JAKE
SHEELER's description that I observed on the surveillance footage that I had
seen and been provided. While I was at the PPD, I was listening to radio traffic
and heard PPD Corporal ELDRIDGE state over the radio that he had eyes on the
suspect, and the suspect was running.

I responded with my emergency lights and siren activated to the area to assist.
Upon my arrival in the area, I parked my patrol vehicle in the area of 1733
Monte Vista Drive, watching for JAKE SHEELER to cross Monte Vista Drive, as PPD
Corporal MILLER had requested that the PPD Officers that were arriving on scene
remain mobile.

I began searching the area and was informed by a citizen that the suspect was
last seen running north through the yard of 1760 Jean Street. I continued to
search the area and heard an ISP Trooper state on the radio that he believed he
was out with JAKE SHEELER behind the Red Lion Hotel Pocatello, located at 1555
Pocatello Creek Road.

I responded to the area with PPD Officer SALDANA. Upon my arrival, I made
contact with the ISP Trooper, who informed me he observed the male making his
way on foot east through the trees that were south of Red Lion Hotel Pocatello.

Upon arriving at the scene, I deployed my rifle due to the fact that JAKE
SHEELER was reported to be in possession of multiple firearms, including a
shotgun, a loaded Glock handgun, and an additional handgun. PPD Officers began
to search the tree line. PPD Officer FETCHEN and PPD Officer SALDANA were making
their way east with ISP Troopers. I made my way west to ensure the male did not
double back. I requested Pocatello Dispatch send a PPD Officer to our location
with a thermal detector.

As soon as I requested this, I heard an ISP Trooper state they observed the
suspect east of our location. I began running east, towards the indicated
location, and I observed the male through the trees in a clearing located behind
Outback Golf Park's driving range, in the 1600 block of Pocatello Creek Road. As
I was running east, I heard PPD Corporal ELDRIDGE on the radio state, "Clear the
air," and something to the effect of, "We are out with him at the golf course."
I continued to run east and I could see the suspect upright who appeared to be
moving away from my location. I began to yell, "Stop! Police! Get on the
ground!" multiple times. I continued to run east but lost sight of JAKE SHEELER
as the terrain was not very flat. While continuing towards JAKE SHEELER, I heard
multiple shots being fired, just east of my location.

I was able to observe that JAKE SHEELER was no longer upright and was on the
ground after the shots had been fired and I informed Pocatello Dispatch over the
radio that shots had been fired, that an Emergency Medical Service crew needed
to respond to the Red Lion Hotel Pocatello in order to stage and that one male
was down.

I climbed over a fence and jumped across a creek in order to get to the scene of
the shooting. PPD Officers were finally able to meet up with other PPD Officers,
who were already on scene. PPD Corporal ELDRIDGE, PPD Corporal MILLER, and PPD
Officer MCARTHUR were already rendering aid to the suspect, JAKE SHEELER, who
had been shot multiple times.

DEFENDANTS 000293

12/02/20                     Pocatello Police Department                      4011
07:05                          Detail Incident Report                 Page:     19

Incident #: 20-P19954

I then gave Pocatello Dispatch information over the radio of where JAKE SHEELER
had been shot. I informed them that JAKE SHEELER had been shot in the left leg,
in the left side of his upper torso, just under his left armpit, and once on the
left side of his neck. It should be noted that I observed the male was wearing
the same clothing that I observed him wearing in the surveillance footage that
had been provided to me by the citizen from 321 Hyde Avenue; black pants, black
shoes, a hoodie, and I saw he had gray sweats under his black pants.

While PPD Officers continued to render aid, I gave directions for responding PPD
units and the ambulance crew to make contact with us at our location, behind the
driving range at Outback Golf Course. As PPD Officers had not been able to
locate a firearm at that time, PPD Corporal MILLER requested PPD Officer SMITH
and I begin searching the area for the firearm that JAKE SHEELER was observed
stealing.

I began searching the creek due to the fact that JAKE SHEELER'S feet were wet. I
assumed that the suspect ran through the creek that was south of Red Lion Hotel
Pocatello. I made my way west searching the creek for a handgun.

After searching for the firearm, PPD Officer BERGMANS arrived on scene and
assisted me. We were then informed over the radio by another PPD Officer that
the tree line was to be cleared, as it was a crime scene. PPD Officer BERGMANS,
PPD Corporal LACEY, and I began taping off the area. As I had been at the
location during the Officer involved shooting, I took the tape and began to tape
off the areas I believed needed to be secured due to the information that I had
at the time. I began taping off from the southeast corner of Red Lion Hotel
Pocatello, then I made my way west across the south end of the parking lot, and
then made my way farther south into the trees and forested area. I used all the
tape that I had and then responded back to the area of where JAKE SHEELER was
shot. I made contact with PPD Corporal SHUTES, who informed me that he did not
want anyone to enter the crime scene, where it was taped off, and if people were
to come to the crime scene, they needed to come to his location, which was
behind Outback Golf Park's driving range.

I returned to my patrol vehicle and set up my position as crime scene security
and parked in the area of the southwest corner of Red Lion Hotel Pocatello. I
stayed at this location for some time and decided to return back to the area of
the shooting to see if I could be used for any other tasks. While on my way, I
made contact with PPD Sergeant HANCOCK and PPD Detective OLSEN. I was requested
by PPD Sergeant HANCOCK to place more crime scene tape in the grassy area
located just west of Red Lion Hotel Pocatello. I put up the crime scene tape and
was then requested to stay at that location and not allow anyone south of the
tape that I had put up. I stayed at this location for some time, and was finally
relieved by PPD Officer HANDEL. I then cleared the location and responded back
to the PPD to complete a supplemental report to this incident and attach
surveillance photos and footage to this case. I have not had any further
involvement in this incident. There is nothing further at this time.

End of report.

Edited by JBH #5899 for name accuracy and Officer agency distinguishing on
09-29-2020.

OFFICER: FETCHEN #5272  DICTATED: 09-26-2020 @ 0233 HOURS

DEFENDANTS 000294

```
12/02/20                    Pocatello Police Department                    4011
07:05                        Detail Incident Report              Page:      20
```

Incident #: 20-P19954

INVESTIGATIVE TIME: 8 HOURS
LAW INCIDENT #: 20-P19954
STENO INITIALS: JBH #5899
DATE & TIME TRANSCRIBED: 09-26-2020 @ 0916 HOURS

SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

See attached video and photographs located in the files section of this report.

- NARRATIVE:

On 09-25-2020, at approximately 1627 hours, I responded to the area of 1200 East Maple Street for a report of a burglary and theft of a firearm that had just occurred. It was also reported that the male suspect had pointed the stolen firearm at people while he was fleeing the area.

Pocatello Police Department (PPD) Corporal MILLER was first on scene and requested units set up a perimeter. I responded to the area of 1000 East Walnut Street. After the perimeter had been set up, and action plans created, I offered to deploy my department issued drone to assist in locating the suspect.

Multiple descriptions of the male had been given, as a white male with blonde or brown hair that was wearing possibly green or gray hoodie, black pants and black shoes.

From the area of 1000 E Walnut Street, I deployed my department issued drone and began searching the 1100 block of East Walnut Street. Due to high winds, I had to ground the drone, as it was no longer safe conditions to fly. I checked most of the residences on the south side of 1100 East Walnut Street, as well as those directly to the south of that area.

I was then asked to go to the area of East Maple Street and Franklin Avenue. From this position, I maintained perimeter until I was later relieved from that location to follow up on leads that led PPD Officers north of our current location. I was asked to remain mobile in the area of East Poplar Street, Euclid Avenue, and East Pine Street. While near the intersection of East Pine Street and Euclid Avenue, I was flagged down by a male, who identified himself to me as DALE HULET. He said he had video of a male that had just gone through his back yard and fled north on Euclid Avenue.

I checked the area again for the male, who was described as now wearing a red sweatshirt and shorts.

I later returned to 1110 East Pine Street, to contact DALE HULET, where he showed me the surveillance footage of the male. He allowed me use my department cell phone to record his surveillance camera footage. I took a screen shot of the male suspect and sent an email out department-wide for PPD Patrol Officers and PPD Detectives.

Multiple times throughout this incident, it was believed that JAKE SHELLER was the suspect, which was later confirmed by PPD Detectives. Multiple reports came

DEFENDANTS 000295

```
12/02/20                    Pocatello Police Department              4011
07:05                       Detail Incident Report          Page:     21

Incident #: 20-P19954
```

in throughout the neighborhood regarding leads of where the male could be.

From the video DALE HULET showed me, the male was wearing an oversized red hoodie with the hood up, gray shorts, and black shoes. DALE HULET said once he noticed the male in the back yard, he asked the male what he was doing. He said the male claimed he was looking for his dog, but the male fled the area, which made DALE HULET believe this statement was false.

PPD Officers continued to check the area for an extensive amount of time. Information was received that the suspect, JAKE SHEELER, may have fled in a vehicle.

I responded to 284 Hyde Avenue to meet with PPD Detectives. PPD Detective OLSEN and PPD Detective BALLARD requested that I deploy my department issued drone to take overall photographs of the residence, and the adjoining residence where this initial incident occurred. I took several photographs from different angles of both properties, which have been attached to the files section of this report. I then cleared the call. There is nothing further at this time.

End of report.

Edited by JBH #5899 for name accuracy and Officer agency distinguishing on 09-29-2020.

OFFICER: NAMOHALA #5283   DICTATED: 09-26-2020 @ 0950 HOURS

INVESTIGATIVE TIME: 4 HOURS
LAW INCIDENT #: 20-P19954
STENO INITIALS: JBH #5899
DATE & TIME TRANSCRIBED: 09-26-2020 @ 1025 HOURS

SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

No documents of evidence to be filed at this time.

- NARRATIVE:

On 09-25-2020, at approximately 1620 hours, multiple PPD Officers responded to the area of 1260 East Maple Street for a report of a male who had just stolen a firearm. It was reported that the male was running west on Maple Street.

I responded to the area to assist in setting up a perimeter. I parked my patrol vehicle near the intersection of East Maple Street and Fairmont Avenue. I gathered a team of PPD Officers to search the back yards of multiple residences. After searching through multiple back yards, no one was to be found.

While walking through the neighborhood, in the 300 block of Fairmont Avenue, PPD Officers received multiple 911 calls of a male running on Fairmont Avenue, heading north towards East Poplar street. Multiple PPD Officers ran in that direction, but no one was to be found.

While in the area of Fairmont Avenue and East Poplar Street, I was flagged down

DEFENDANTS 000296

Incident #: 20-P19954

by a female, PATRINA SAMUELS, who advised me that a male came into her
residence, ███████████████████. She said she did not know who the male was,
but he entered her residence in a hurry and left with another male, FRANCO
(believed to be CHRISTIAN FRANCO), and they left in a vehicle. I asked PATRINA
SAMUELS for a description of the male. She could not provide me with one. I
asked her for a description of the vehicle that they left in. She also could not
provide that to me.

I then spoke with multiple PPD Detectives and provided them with the information
relayed to me by PATRINA SAMUELS.

After not being able to locate anyone in the area, I cleared.

On 09-25-2020, at approximately 2030 hours, I heard PPD Corporal ELDRIDGE check
out behind Red Lion Hotel Pocatello and Outback Golf Park, stating that they
located a subject that had been running. PPD Corporal ELDRIDGE then got on the
radio and yelled, "Shots fired!"

At this time, I activated my emergency lights and siren on my patrol vehicle and
responded towards the scene in an expedited fashion. I parked near the back of
Red Lion Hotel Pocatello. I observed multiple PPD Officers in a field. I grabbed
my medical bag and ran towards the area. Once on scene, multiple PPD Officers
were working to provide medical assistance to the male suspect, who was laying
on the ground.

I knew PPD Corporal ELDRIDGE, PPD Officer MCARTHUR, and PPD Officer SALDANA were
the first PPD Officers on scene. I gathered these PPD Officers and began
checking their persons to ensure they were ok and not injured.

PPD Sergeant HANCOCK responded and advised me to stay with one of the PPD
Officers involved in this incident and take them back to the PPD. I escorted
this PPD Officer back to the PPD, as directed. There is nothing further at this
time.

End of report.

Edited by JBH #5899 for name accuracy and Officer agency distinguishing on
09-29-2020.

Officer: T. Higbee 5279
Date Typed: Sat Sep 26 18:49:26 MDT 2020
Investigative Time: 3 Hours
LI: 20-P19954

Supplemental Narrative: On 9/25/2020 at 1621 hours Officers responded to the
area of 1200 E Maple for the report of a male that had stolen several handguns
and pointed the guns at the male that he stole the guns from. Several Officers
responded to the area and began setting up a perimeter. I set up initially at
Walnut and Filmore and deployed my patrol rifle. I held perimeter until I was
requested to respond to Fairmont and Maple to begin searching yard to yard. The
search team I was attached to began searching the West side of the 300 block of
Franklin. Officers did not locate the suspect, JAKE SHEELER. Officers were
informed a security camera at 343 Franklin caught the male go west bound on the
north side of that residence. Officers continued searching and moved to

```
12/02/20                    Pocatello Police Department                    4011
07:05                        Detail Incident Report              Page:      23
```

Incident #: 20-P19954

Fairmont. Neighbors updated on possible locations that Officers followed until a
last known location of Poplar and Euclid. At this time our search was cancelled
and I returned to my vehicle and have no further involvement. TH 5279

OFFICER: LACEY #5247  DICTATED: 09-26-2020 @ 1556 HOURS

INVESTIGATIVE TIME: 2 HOURS
LAW INCIDENT #: 20-P19954
STENO INITIALS: JBH #5899
DATE & TIME TRANSCRIBED: 09-26-2020 @ 2001 HOURS

SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

No documents of evidence to be filed at this time.

- NARRATIVE:

On 09-25-2020, at approximately 1619 hours, I responded to the area of 1260 East
Maple Street in reference to an armed robbery.

Upon my arrival, I responded to the area of East Poplar Street and Fairmont
Avenue, in order to set a perimeter in looking for a male subject that had just
robbed a male and was in possession of a stolen firearm.

During the course of the investigation, I was asked to respond to the area with
my K-9 Partner and assist PPD Officers as we searched back yards for the male
subject. We were unable to locate him.

After I assisted with searching various back yards for the suspect, I responded
back to the Pocatello Police Department (PPD) to see if there was anything else
I could assist with. At this time, a call came in stating that this suspect was
possibly in the area of Lucille Avenue and Monte Vista Drive.

I responded to that location in assist in searching for the suspect. I drove in
the neighborhood and was unable to locate the suspect. This was the end of my
shift, and I responded back to my residence.

Over the radio, I heard that PPD Officers may have located the suspect. At this
time, I responded back to the location I overheard on the radio. I heard that
shots had been fired and that aid was being rendered to the suspect. I responded
to Outback Golf Park, where I parked my patrol vehicle and led the ambulance
crew in to assist with life-saving measures for the suspect.

I was asked by PPD Detective Sergeant MCCLURE to make contact with several
subjects at Outback Golf Park in reference to witnesses to the incident. I
turned these names over to Idaho State Police (ISP) Detectives with the contact
information, as well as what I was told.

On 09-26-2020, upon returning to work, I was asked to obtain some surveillance
footage at 321 Hyde Avenue. I responded to that location at approximately 1130
hours and made contact with CHRISTOPHER BARRUS, who had surveillance footage of

DEFENDANTS 000298

```
12/02/20                    Pocatello Police Department                    4011
07:05                        Detail Incident Report            Page:       24
```

Incident #: 20-P19954

the male subject running with the gun in his hand, through his yard and over his
fence. In reviewing the footage, I also observed a male subject have a
confrontation with the suspect on the side of the house. Although the
altercation could not be seen, it could be heard. This other male subject was
identified as RICHARD HERNANDEZ. The suspect was identified as JAKE SHEELER.

I obtained five minutes of surveillance footage from three different cameras at
█████████ from CHRISTOPHER BARRUS. This footage was attached to the files
section of this report.

As I had observed the altercation on the surveillance footage, I responded to
1256 East Maple Street and made contact with RICHARD HERNANDEZ. I recorded my
conversation with RICHARD HERNANDEZ on my digital recorder. This recording has
also been attached to the files section of this report. RICHARD HERNANDEZ said
that he heard his neighbor yelling, "Call the police!" and, "Thief!" He said he
tried to follow the suspect, who he described as a "young kid." RICHARD
HERNANDEZ said he saw the suspect go through his neighbor's back yard, and when
RICHARD HERNANDEZ went that direction, he saw some wood. He picked up a piece of
wood to use in a confrontation with the male subject. He said the male, JAKE
SHEELER, pointed a gun at him. He believed the gun was in his left hand.

I asked RICHARD HERNANDEZ if he was scared. He said, "I was scared to get shot."
He said he did not want to give up his ground and did not want to show fear. He
said he looked at JAKE SHEELER'S hand saw that it was not shaking. RICHARD
HERNANDEZ thought that he could get shot. He then said JAKE SHEELER stepped back
and told him to go away. JAKE SHEELER jumped over the fence. He said JAKE
SHEELER put his foot in the trellis of the fence and jumped over the fence,
heading west from Hyde Avenue. RICHARD HERNANDEZ said that he threw a stick at
JAKE SHEELER and began to yell for someone to call the police.

I asked RICHARD HERNANDEZ how he felt. He said he believed they were both
scared. He said he was scared of being caught and the suspect was scared of
getting caught. I asked him how he was feeling. He said his heart was still
racing, and he still could not believe it happened. I asked RICHARD HERNANDEZ if
he could describe the gun. He said it had a silver barrel, but could not
describe the handle. He then retracted and said he was not sure if the gun was
in JAKE SHEELER'S left hand or not, but he believed it was.

I asked RICHARD HERNANDEZ If there was any other information he could provide me
in regard to the suspect and the interaction that occurred on the side of the
house. He said he could not. There is nothing further at this time.

End of report.

Edited by JBH #5899 for name accuracy and Officer agency distinguishing on
09-29-2020.

OFFICER: B. MCCLURE #5165   DICTATED: 09-26-2020 @ 1740 HOURS

INVESTIGATIVE TIME: 12 HOURS 30 MINUTES
LAW INCIDENT #: 20-P19954
STENO INITIALS: JBH #5899
DATE & TIME TRANSCRIBED: 09-26-2020 @ 2019 HOURS

DEFENDANTS 000299

```
12/02/20                    Pocatello Police Department                      4011
07:05                        Detail Incident Report                Page:      25
```

Incident #: 20-P19954

SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

No documents of evidence to be filed at this time.

- NARRATIVE:

On 09-25-2020, at approximately 1619 hours, I overheard radio traffic regarding possible theft of firearms occurring in the area of 1260 East Maple Street. The initial report indicated a subject stole firearms from a residence and was being chased from the residence by another individual.

As Pocatello Police Department (PPD) Officers arrived on scene and information was being broadcast and forwarded to me, at approximately 1633 hours, I decided a full PPD Detective response would be required due to the circumstances surrounding the incident.

I had been notified that an unknown Caucasian male had entered an enclosed and secured garage in the area of 248 East Hyde Avenue and the homeowner interrupted a suspected burglary in progress. At this time the unknown suspect displayed a stolen firearm from the garage and pointed it at the resident and threatened him with bodily injury or death. The suspect then fled the scene and was last seen attempting to conceal himself in neighborhood yards and areas.

I notified PPD Detective OLSEN and PPD Detective BALLARD that a full response was required to the residence to conduct an investigation.

Upon my arrival in the area, at approximately 1643 hours, I contacted the on scene Officer, PPD Corporal MILLER, who advised me that the victim on scene indicated that an unknown Caucasian male had been located in his garage and had stolen a Taurus Judge loaded with 410 ammunition and possible other items. When the victim confronted the suspect, the suspected pointed the weapon at the victim,
as the victim attempted to take a photograph of the suspect. It was reported that the unknown suspect made threats of harming and/or killing the victim if he attempted to take a photograph of the suspect. Subsequently, the suspect fled the scene and was chased by the victim into the adjoining residential area, where he lost sight of him, as the suspect entered private yards and went over fences.

Upon the arrival of PPD Detective OLSEN, I directed him to make contact and conduct an initial investigation with the victim at the residence at 284 Hyde Avenue and to begin to attempt to locate additional witnesses or victims.

Upon the arrival of PPD Detective BALLARD, I directed him to respond to 284 Hyde Avenue to assist PPD Detective OLSEN with processing the scene and conducting further investigation.

While PPD Detective OLSEN and PPD Detective BALLARD conducted the initial investigation into the burglary and aggravated assault that reportedly occurred, I maintained a position in the search area, providing security for PPD Uniformed Patrol Officers as they conducted a thorough yard to yard search for the suspect.

DEFENDANTS 000300

```
12/02/20                    Pocatello Police Department                     4011
07:05                        Detail Incident Report               Page:      26
```

Incident #: 20-P19954

After the yard to yard search for the suspect yielded no results, I returned to 284 Hyde Avenue, where I assisted PPD Detective OLSEN and PPD Detective BALLARD with the completion of the processing of the scene.

I also responded to 274 Hyde Avenue, where I picked up a written statement prepared by WHITTNEY RUFI, and responded to the DOBSON residence in the block of 200 Hyde Avenue and obtained a video that captured the suspect possibly climbing the side fence of the victim's residence.

At the completion of the crime scene investigation and initial investigation, I proceeded to the PPD, where I began to organize the incident and to prepare for further investigation. See additional supplemental reports from involved PPD Officers for additional information. There is nothing further at this time.

End of report.

Edited by JBH #5899 for name accuracy and Officer agency distinguishing on 09-29-2020.

OFFICER: BLOXHAM #5270  DICTATED: 09-26-2020 @ 1800 HOURS

INVESTIGATIVE TIME: 30 MINUTES
LAW INCIDENT #: 20-P19954
STENO INITIALS: JBH #5899
DATE & TIME TRANSCRIBED: 09-26-2020 @ 2035 HOURS

SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

Three images and one short video clip have been attached to the files section of this report.

"IMG_8784.mov" a video depicting the suspect, who was later identified as JAKE L. SHEELER (date of birth 11-04-1991), entering the property of the RUFI family at 274 Hyde Avenue.

"123_1.jpg" from video surveillance at 275 Hyde Avenue depicting a white passenger car.

"IMG_1556.jpg" a still shot from surveillance footage obtained by Pocatello Police Department (PPD) Officer T. ANDERSON #5290 of the suspect, JAKE SHEELER, fleeing the area of the initial crime.

"IMG_1555.jpg" is another angle of "IMG_1556.jpg" both of which depict JAKE SHEELER and were images that from which I was able to positively identify the suspect as JAKE SHEELER, from prior knowledge of him.

- NARRATIVE:

On 09-25-2020, at approximately 1640 hours, while this incident was unfolding, I was listening to associated radio traffic via my police radio. I overheard Pocatello Police Department (PPD) Officer T. ANDERSON #5290 announce that he was watching surveillance footage from a residence involved in or near the incident.

DEFENDANTS 000301

```
12/02/20                    Pocatello Police Department                    4011
07:05                        Detail Incident Report              Page:      27
```

Incident #: 20-P19954

I called PPD Officer T. ANDERSON on the telephone and asked him to send me a
screen shot or image from the surveillance footage in the event that I were able
to positively identify the male depicted in the footage. PPD Officer T. ANDERSON
e-mail two photos with me at about the same time that a female, WHITTNEY A. RUFI
(date of birth 06-24-1986), called the PPD to report that she allowed JAKE
SHEELER to borrow her vehicle. There was an entry line in the call details time
stamped 16:57:59 for that information.

As I had seen the name "JAKE SHEELER" entered onto the call screen, I looked at
the photo sent to me by PPD Officer T. ANDERSON and confirmed that the male in
the photo was the male that I recognized to be JAKE L. SHEELER from prior
knowledge of him.

I contacted an associate of mine, Detective L. DOBSON from the Blackfoot Police
Department (BFPD), who I knew to have also had knowledge of JAKE SHEELER. I
sent him the photos that PPD Officer T. ANDERSON had forwarded to me and asked
if he also thought the male depicted in the photos was JAKE SHEELER. BPD
Detective L. DOBSON informed me he was "99.9% sure, " that the male was, in
fact, JAKE SHEELER.

Using my police radio, I relayed this information to the other PPD Officers on
scene, while I was investigating an unrelated incident at 302 Yellowstone
Avenue. While I was investigating the unrelated incident, at approximately 1706
hours, BPD Detective L. DOBSON sent me a photo from his security system that he
received from his wife. The photo sent to me from BPD Detective L. DOBSON
depicted a white passenger car, later found to be a white 2002 Mazda Protégé'
bearing Idaho registration 1BBW803. This license plate was not actually observed
until the following date, 09-26-2020, while Officers were investigating
20-P20007, a suspicious circumstance at Portneuf Medical Center (PMC).

As I was conversing with BPD Detective L. DOBSON, he was receiving information
from his wife on the telephone or via text messages. According to BPD Detective
L. DOBSON, his wife informed him that the Mazda passenger car had stopped at 274
Hyde Avenue, whomever was in the vehicle was talking to WHITTNEY RUFI and then
car then left northbound on Hyde Avenue.

BPD Detective L. DOBSON put me in contact with his wife, AMANDA L. DOBSON (date
of birth 07-28-1988). During my brief conversation with AMANDA DOBSON, she sent
me a photo of the male suspect, JAKE SHEELER, in front of the RUFI residence,
274 Hyde Avenue. She then sent me a 22-second video clip of JAKE SHEELER
climbing over what appeared to be a wood pile or some rubbish, and proceed into
the RUFI residence, 274 Hyde Avenue. I asked AMANDA DOBSON what time the video
and screen shot took place real time, she initially said it was at 1529 hours;
however, I later learned that the time stamp on her surveillance footage was
ahead by 23 minutes. The images and video sent to me by AMANDA DOBSON were
attached to the files section of this report.

Due to the fact that I was receiving new information from BPD Detective L.
DOBSON and AMANDA, I responded to where PPD Sergeant BUCK (5162) had set up
incident command, at the intersection of East Maple Street and Fairmont
Avenue. I provided him with more details regarding the information I was
receiving.

I also sent the images I had received to the Patrol and Detective PPD e-mail

12/02/20                    Pocatello Police Department                  4011
07:05                        Detail Incident Report            Page:    28

Incident #: 20-P19954

groups, so that all PPD Officers on scene assisting with the investigation would
also have the images and video.

After relaying this information, I cleared from the incident command location
and returned to the PPD. I did not have any additional involvement with the
weapons offense reported under 20-P19954 on 09-25-2020.

I did, however, investigate a related vehicle burglary reported under 20-P20018,
on 09-26-2020. Please see that related law incident for my vehicle burglary
report. There is nothing further at this time.

End of report.

Edited by JBH #5899 for name accuracy and Officer agency distinguishing on
09-29-2020.

Reviewed and edited for accuracy on Wed Sep 30 07:28:08 MDT 2020. SB 5270.

OFFICER: MILLER #5252  DICTATED: 09-27-2020 @ 0112 HOURS

INVESTIGATIVE TIME: 11 HOURS
LAW INCIDENT #: 20-P19954
STENO INITIALS: JBH #5899
DATE & TIME TRANSCRIBED: 09-27-2020 @ 1329 HOURS

SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

Four pages of handwritten field notes have been submitted for attachment to the
files section of this report.

- NARRATIVE:

On 09-25-2020, at approximately 1619 hours, the Pocatello Police Department
(PPD) received a report of a handgun theft in the area of 1200 East Maple
Street. The PPD received several calls from various citizens reporting this
incident. At the time of call, I was in a marked patrol vehicle and driving in
the area of Jefferson Avenue and East Cedar Street. The information in the call
screen reported that a subject stole a handgun and was running down the street.

Without delay, I responded to the scene, but I did not respond my emergency
lights and siren activated. I arrived in the area at approximately 1623 hours.
On the 200 and 300 blocks of Hyde Avenue, I noticed an inordinate amount of
citizens outside their homes; approximately one dozen. They were standing
outside, looking west down East Maple Street. I was flagged down by an unknown
female in the 300 block of Hyde Avenue. I asked her about the location of the
suspect, she told me the male was last seen running west through yards in the
300 block of Hyde Avenue.

Near the intersection of Hyde Avenue and East Maple Street, I was flagged down
by a second female. This female was later identified as MARY L. HENDRICKS (date
of birth ████████ . She said her husband was chasing the suspect, she pointed
west on East Maple Street and gave me a clothing description of her husband.

DEFENDANTS 000303

12/02/20                   Pocatello Police Department                        4011
07:05                      Detail Incident Report              Page:    29

Incident #: 20-P19954

MARY HENDRICKS' husband was later identified as KIRK K. HENDRICKS (date of birth
███████████ ).

I drove west on East Maple Street to the area of Filmore Avenue, and contacted
KIRK HENDRICKS. He said he lost the suspect and did not know where he had gone.
He said the suspect was last seen running through yards and jumping fences in
the 300 block of Franklin Avenue, heading towards Fairmont Avenue. KIRK
HENDRICKS said he was attempting to parallel the suspect, but lost sight of him.

KIRK HENDRICKS described the suspect as being a white male in his 20s wearing a
green hooded sweatshirt and glasses.

With this information, I began to direct other PPD Officers responding to the
area to set up a perimeter around the 300 blocks of Franklin Avenue, Fairmont
Avenue, and Filmore Avenue. As the perimeter was being set up, I spoke with KIRK
HENDRICKS about what happened. During this conversation, he said he lived at ███
███████████ . He said he went into his shop, behind his house, and found a
suspect inside. He said he confronted the suspect about being inside the shop.
He said the suspect then produced a silver Taurus Judge and pointed the gun at
KIRK HENDRICKS. KIRK HENDRICKS said the suspect made threats to shoot him. He
said he recognized the gun as one he had in his collection. KIRK HENDRICKS said
he had the Taurus Judge in a backpack inside his shop, and was currently loaded
with 410 bird shot. KIRK HENDRICKS said the suspect's threat, while he was in
possession of the Taurus Judge, made KIRK HENDRICKS afraid for his life.

KIRK HENDRICKS described the Taurus Judge as being silver and had a black
handle. I provided this information to other responding PPD Officers.

As other PPD Officers arrived on scene and the perimeter was established, we set
up a command post on East Maple Street, near the intersection with Fairmont
Avenue. East Maple Street was shut down from Filmore Avenue to Hyde Avenue.

The arriving PPD Officers also included PPD Detective Sergeant MCCLURE and PPD
Detective OLSEN from the Investigation Division.

The interview of KIRK HENDRICKS and other witnesses were taken over by
Detectives.

As we put resources in place, several Officers were approached by citizens in
the area whose security cameras had caught images of the suspect fleeing. Still
images that depicted the suspect were sent department-wide. The still image
depicted a white male in his 20s with brown hair. The suspect was wearing an
olive green hoodie, saggy black pants, gray shorts or underwear under the black
pants, and glasses. The suspect was running in the still images and appeared to
be holding a gun, that matched the description of the Taurus Judge, in his left
hand.

PPD Officer AMOS requested a reverse 911 call be put out to area residents to
advise them of the situation and requested they stay in their homes while we
searched the neighborhood.

Around this same time, the PPD Dispatch Center advised that WHITTNEY RUFI called
and reported that her car had been stolen by JAKE L. SHEELER (date of birth
███████████ . JAKE SHEELER had an outstanding felony warrant for his arrest out
of Bannock County for illegally obtaining lottery tickets. A short time later, I

DEFENDANTS 000304

12/02/20                     Pocatello Police Department                    4011
07:05                         Detail Incident Report              Page:       30

Incident #: 20-P19954

heard PPD Officer BLOXHAM advise over the radio that the suspect in the still
image and JAKE SHEELER appeared to be one in the same.

At approximately 1654 hours, we began a slow, methodical search of the 300 block
of Fairmont Avenue and Franklin Avenue. This search team included PPD Officer T.
HIGBEE, PPD Officer AMOS, PPD Officer NAMOHALA, PPD Corporal ELDRIDGE, PPD
Corporal LACEY, PPD K-9 BART, and me. We did not locate anyone matching the
physical or clothing description of the suspect in this incident. During the
search, we received information from the investigating PPD Detectives that a
second gun was missing from ▇▇▇▇▇▇▇▇▇▇. This handgun was described as a Hi
Point 45.

At approximately 1810 hours, the search team was on the north end of the 300
block of Fairmont Avenue, when the PPD Dispatch Center advised a male matching
the physical description of the suspect was seen in the driveway at 465 Fairmont
Avenue. The resident at 465 Fairmont Avenue had called and reported a male
wearing a mask and a hoodie was standing in his driveway. Members of the search
team ran through the 400 block of Fairmont Avenue and ultimately, across East
Pine Street, after witnesses in the area said the male in the hoodie had
continued to the north.

PPD Corporal ELDRIDGE and I stopped at ▇▇▇▇▇▇▇▇▇▇▇▇ and spoke with the
resident, who was later identified as TRAVIS L. POPPE (date of birth
04-18-1988). During our conversation with TRAVIS POPPE, he said he saw a male in
his driveway that he thought was our suspect. TRAVIS POPPE said he saw the male
in his motion activated exterior security cameras. He brought out his laptop
computer to the front porch and pulled up the video his camera captured. There
were two, ten-second clips from the camera mounted on the north side of TRAVIS
POPPE'S house that looked over his car and driveway.

The first video was date and timestamped 2020-09-25 at 17:59:23. This video
depicted the suspect, JAKE SHEELER, walking into the driveway. He was no longer
wearing the green hoodie nor the black pants. In this video, he was wearing a
blue and white jersey, gray shorts, black shoes, and glasses. The gray shorts
appeared to be the same gray underclothing from the still image sent PPD
department-wide.

The second video was date and timestamped 2020-09-25 at 18:09:59. This video
depicted JAKE SHEELER wearing the same clothing previously described in the
first video, but he added a maroon hoodie, ball cap, and a plaid face covering.
JAKE SHEELER attempted to enter the residence at 465 Fairmont Avenue through the
door on the north side of the residence. His attempt was unsuccessful. In this
video, JAKE SHEELER got spooked by something in the area and he crouched down,
and appeared to hiding near the front of TRAVIS POPPE'S car.

We continued to get reports of JAKE SHEELER moving north on Fairmont Avenue
until he got to East Poplar Street. On East Poplar Street, we received
information that JAKE SHEELER got into a car and left the area.

At this time, the search team stopped receiving tips from the community and JAKE
SHEELER'S trail went cold.

I returned to 284 Hyde Avenue to follow up with PPD Detective OLSEN, Detective
BALLARD, and PPD Detective Sergeant MCCLURE. When they were finished processing
the original scene, at approximately 1932 hours, no further action was necessary

DEFENDANTS 000305

```
12/02/20                    Pocatello Police Department                   4011
07:05                        Detail Incident Report            Page:       31
```

Incident #: 20-P19954

at that time. We discussed who was writing what reports. At approximately 1936 hours, we cleared the scene.

At approximately 1938 hours, PPD Dispatch informed PPD Corporal ELDRIDGE and me that a male matching JAKE SHEELER'S description had approached a residence, 1625 Beth Street, and attempted to sell his neighbor a handgun. We were told the male was wearing glasses, a green hoodie, black pants, black shoes, and had a tattoo on his left hand, as well as gauged ears. The male was last seen walking up, east, on Beth Street.

At approximately 1940 hours, PPD Corporal ELDRIDGE and I were in the area of 1625 Beth Street, looking for JAKE SHEELER. A short time later, we were joined by other Officers from the Pocatello Police Department and Troopers from the Idaho State Police. This search ended in an Officer Involved Shooting that is being investigated by the Tri-County Task Force. I have provided a full statement to Detectives from the Bonneville County Sheriff's Office concerning those events.

At approximately 2028 hours, KARI M. SCHROEDER (date of birth 05-21-1980) called the Dispatch Center at the PPD and reported she found an unknown male in her garage. This male was asking for a ride. KARI SCHROEDER offered to let the male take one of the bicycles in her garage. The male told KARI SCHROEDER that he could not leave immediately, because he could not, "Find his gun."

At approximately 0145 hours on 09-26-2020, I returned to 960 Lucille Avenue to assist Detective SASSER from the Chubbuck Police Department (CPD). KARI SCHROEDER had re-called and reported finding a gun in her garage. In the garage, a Taurus Judge was recovered by CPD Detective SASSER. I was present with CPD Detective SASSER at the time of the recovery. This Taurus Judge matched the one reported stolen by KIRK HENDRICKS. For information concerning the serial number for the Taurus Judge that was recovered at 960 Lucille Avenue, please see the Tri-County Task Force's investigation for the Officer Involved Shooting.

On 09-26-2020, at approximately 1535 hours, I returned to 284 Hyde Avenue to conduct a follow up interview with KIRK HENDRICKS and MARY HENDRICKS. MARY HENDRICKS said on 09-25-2020, she and KIRK HENDRICKS were preparing to go for a walk and KIRK HENDRICKS went out to their shop and tried to go in, but the door was locked. MARY HENDRICKS said KIRK HENDRICKS returned to the residence and got the shop key. She said KIRK HENDRICKS unlocked the door and walked into the shop. MARY HENDRICKS said she followed him into the garage and noticed her dogs were barking and, "Going nuts." She said she saw a male standing behind their pickup truck parked in the shop, and she described him as, "Smiling." She said she saw the male point a gun at KIRK HENDRICKS. MARY HENDRICKS said she backed out of the shop and stood near the door. She said the male suspect from inside the garage came out carrying the gun. MARY HENDRICKS said the male suspect said something to the effect of, "Don't follow me. Don't follow me." She said she was in, "Shock," and afraid for her life as well as for KIRK HENDRICKS' life. She said she did not know if the male pointed the gun at her when he said, "Don't follow me. Don't follow me," but she was terrified. MARY HENDRICKS described the suspect as being a white male in his 20s. She said the male was wearing a green hoodie and glasses, but could not remember if he had any scars, marks, or tattoos. She said she was, "Pretty sure," that she saw this male before. MARY HENDRICKS said she had seen the male hanging around at the RUFI residence next door a couple of weeks prior.

DEFENDANTS 000306

```
12/02/20                    Pocatello Police Department                    4011
07:05                       Detail Incident Report              Page:      32
```

Incident #: 20-P19954

MARY HENDRICKS told me she found it suspicious that during the police search of
this surrounding area, WHITTNEY RUFI drove up while she was standing in the
front yard. She said WHITTNEY RUFI thanked her for some tomatoes that she had
given WHITTNEY RUFI. MARY HENDRICKS said that WHITTNEY RUFI did not say anything
about the police search of the area and did not seem worried about it. She said
WHITTNEY RUFI was in her white passenger car that was now parked in the driveway
next door to her residence.

During my interview with MARY HENDRICKS and KIRK HENDRICKS, KIRK HENDRICKS
provided me with the serial number to the Taurus Judge he was missing. This
serial number was MC540157. He also provided me with access to his Arlo security
camera system. He said after confronting the suspect in his garage, he checked
the camera that he had mounted on the east side of his house and discovered his
motion activated camera had been covered by what appeared to be a green plastic
bag. KIRK HENDRICKS suspected this bag had been placed over the camera by the
suspect. He said he had no way of downloading the footage from his security
camera, but provided me with a link to his Arlo account, which allowed me
temporary access to the camera footage for 24-hours.

Later, at the PPD, I played three videos that were each approximately ten to 15
seconds long, on a computer monitor and confirmed there was a green plastic bag
over the cameras. In one of the videos, a figure can be seen moving towards the
shop door, but detailed information about this figure was obscured by the
presence of the plastic bag. To collect this as evidence, I used the video
recording function on my department issued phone to record the footage. This
footage was later uploaded to the files section of this report.

At approximately 1930 hours, I went to ████████████ to speak with the
residents who had called and reported the possible suspect in the area the night
before. At the home, I contacted JASON L. WALTON (date of birth 02-02-1970),
TONYA M. WALTON (date of birth 11-27-1973), and their son, TRISTEN H. WALTON
(date of birth 10-16-1999). During my conversation with the WALTONS, they
confirmed they called the PPD on 06-25-2020, at approximately 1936 hours after
being approached in their front yard by a suspicious male. TONYA WALTON told me
she saw press releases and pictures on social media about the theft of a firearm
in the area.

JASON WALTON told me he was approached by a male wearing a face covering, green
hoodie, and a brown hat. JASON WALTON said the male that approached him
appeared, "Nervous," but he could not articulate why he through the male was
nervous. JASON WALTON, TONYA WALTON, and TRISTEN WALTON described the male as
having his bottom lip pierced and gauges in his ears. JASON said he remembered
the male having a tattoo of a name on the left side of his neck, but he could
not remember the name. JASON WALTON and TONYA WALTON both remembered the male
had a tattoo on his upper chest, which could be seen in the v-notch of the
hoodie. JASON WALTON mentioned seeing three circular tattoos on the male's right
hand and remembered his clothing was very baggy. JASON WALTON said the male was
in his 20s, had a darker skin completion, and sores on his face. JASON WALTON
and TONYA WALTON said the male asked for a ride to the area of Halliday Street
and Benton Street, near Albertsons. According to JASON WALTON and TONYA WALTON,
the male claimed his girlfriend had just been arrested and he needed to get home
to pick up their children. JASON WALTON and TRISTEN WALTON said they told the
suspect that they could not give him a ride because JASON WALTON had to drive
TRISTEN WALTON to work, and could not at this time. The WALTONS said that the
male was last seen walking up Beth Street; pointing to the east.

DEFENDANTS 000307

```
12/02/20                    Pocatello Police Department                    4011
07:05                        Detail Incident Report             Page:      33
```

Incident #: 20-P19954

JASON WALTON said after the male left they were approached by a neighbor, who
had also been in contact with this suspicious male. The neighbor said the male
had also asked him for a ride, but gave him a different story as to why he
needed a ride. JASON WALTON and TONYA WALTON also said the neighbor reported the
suspicious male tried to sell him a gun. They said they did not see a gun on the
suspicious male's person, but they believed they would recognize the male if
they saw him again. They then directed me to 947 Renee Avenue to speak with the
neighbor they had mentioned.

I went to 947 Renee Avenue and contacted SKYLER M. PHILLIPS (date of birth
12-19-1992). He confirmed he spoke with a suspicious male that tried to sell him
a gun. SKYLER PHILLIPS told me he was standing in front of the house, smoking a
cigarette, when he was approached by a white male in a dark gray hoodie. He said
the male offered to sell him a, "Judge," that he recently purchased. SKYLER
PHILLIPS said the male also requested a ride to the University area of
Pocatello. He said he asked the male if the gun was, "Clean or dirty."  He said
the suspicious male claimed the gun was clean, but he still found the
interaction suspicious. SKYLER PHILLIPS said the male never showed him the gun,
but he could see the outline of a gun in the male's pants. He said he thought
the gun was a revolver, because he could see the outline of the gun's hammer.
SKYLER PHILLIPS told me the suspicious male was wearing black pants, black
boots, and had a pierced bottom lip and white gauge in his ears. He said he
watched the male walk up the street to his neighbors and watched as they spoke
with the male. SKYLER PHILLIPS said when the male left his neighbor's house, he
walked up and talked to his neighbors. While I was speaking with SKYLER
PHILLIPS, he pointed out the WALTON'S house to me as the neighbors that also had
contact with the suspicious male.

SKYLER PHILLIPS said he and his neighbors talked about what happened, and
noticed the male told them two different stories as to why he needed a ride.
This, in conjunction with the fact that the male tried to sell him a gun, led
them to decide it would be necessary to call the PPD. SKYLER PHILLIPS said he
believed he would be able to identify the male if he saw him again.

This concludes my involvement in this investigation up to this point. There is
nothing further at this time.

End of report.

Edited by JBH #5899 for name accuracy and Officer agency distinguishing on
09-29-2020.

OFFICER: MILLER #5252  DICTATED: 09/27/2020 @ 1655 HOURS
INVESTIGATIVE TIME: 30 MINUTES
LAW INCIDENT #: 20-P19954
STENO INITIALS: MAB #5893
DATE & TIME TRANSCRIBED: 09/28/2020 @ 0815 HOURS

#2 — SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

Eight recordings and two photographs have been uploaded to the Files section of
this report.

DEFENDANTS 000308

12/02/20                    Pocatello Police Department                    4011
07:05                        Detail Incident Report              Page:    34

Incident #: 20-P19954

- NARRATIVE:

On 09/27/2020, I was contacted by Detective R. OLSEN in reference to this
incident. Pocatello Police Department (PPD) Detective R. OLSEN asked that I
returned to [REDACTED] to speak with BRAXTON BEASLEY (date of birth
09/11/1990) about security camera footage of this incident. PPD Detective R.
OLSEN explained to me that for unknown reasons, the video was not emailed over
to the Pocatello Police Department as previously requested.

On 09/27/2020 at approximately 1635 hours, I returned to [REDACTED] to
speak with BRAXTON BEASLEY. When I knocked at the door, I made contact with a
male, later identified as AUSTIN TAM (date of birth [REDACTED]). AUSTIN TAM told
me that BRAXTON BEASLEY was not home and had military obligations for the
weekend. TAM told me that he had emailed the security camera footage to one of
the dispatchers at the Pocatello Police Department and provided me with his
email address.

Through further investigation, we determined that the email sent by AUSTIN TAM
had been bounced to a trash folder and the security settings associated with the
City of Pocatello email would not allow the file to be downloaded. I asked
AUSTIN TAM if he would send the email directly to me. He sent me the email and I
viewed it on my work cell phone.

In reviewing the two videos that are approximately ten seconds long, I saw that
the suspect, JAKE SHEELER, approached the gate on the south side of 343 Franklin
Avenue with a gun in his left hand. JAKE SHEELER attempted to open the gate on
the vinyl fence, but was unsuccessful because it was locked form the inside. The
second video is from the north side of 343 Franklin Avenue. That video depicts
JAKE SHEELER as he walked around the north side of the house between 343
Franklin Avenue and 349 Franklin Avenue.

In both videos, JAKE SHEELER was still wearing the green hooded sweatshirt,
black pants, black shoes, and glasses. Both of the videos that I received from
AUSTIN TAM were uploaded to the Files section of this report and labeled as
"SECURITY CAMERA FOOTAGE FROM 343 FRANKLIN." There is nothing further at this
time.

End of report.

OFFICER: SMITH #5303  DICTATED: 09/27/2020 @ 2140 HOURS
INVESTIGATIVE TIME: 50 MINUTES
LAW INCIDENT #: 20-P19954
STENO INITIALS: MAB #5893
DATE & TIME TRANSCRIBED: 09/28/2020 @ 0854 HOURS

#2 - SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

None at this time.

- NARRATIVE:

DEFENDANTS 000309

12/02/20                        Pocatello Police Department                    4011
07:05                           Detail Incident Report           Page:         35

Incident #: 20-P19954

On 09/25/2020 at approximately 1941 hours, I was on patrol in the area of
Jefferson Avenue and East Pine Street when I heard radio traffic that the
suspect in this incident had been spotted at 1625 Beth Street. The information
provided by Pocatello Police Dispatch was that a male subject had attempted to
sell a revolver to the resident and then asked for a ride to Albertson's.
Pocatello Police Department (PPD) Corporal ELDRIDGE and PPD Corporal MILLER were
dispatched to that area. I was also nearby and responded to that location.

Upon my arrival, I was directed to assist in canvassing the area in my patrol
vehicle. I searched the areas of Beth Street, Jean Street, Monte Vista Drive,
Horizon Drive, Lucille Avenue, Ardella Drive, Northstar Drive, and Gail Drive. I
was unable to locate anyone matching the description of the suspect in those
areas.

At approximately 2005 hours, I observed PPD Corporal ELDRIDGE out of his patrol
vehicle speaking with someone at 1750 Beth Street. As I drove past, PPD Corporal
ELDRIDGE radioed for PPD Corporal MILLER to return to his location. I believed
that he had mistook my patrol vehicle for PPD Corporal MILLER'S, so I stopped
and exited my patrol vehicle. PPD Corporal ELDRIDGE yelled to me that the
suspect was on foot, leaving the area of 950 Lucille Avenue. PPD Corporal
ELDRIDGE began running in that direction and I ran with him to catch up. PPD
Corporal ELDRIDGE informed other units in the area via radio of this
information.

I stayed with PPD Corporal ELDRIDGE and we conducted foot patrol down Lucille
Avenue and onto Jean Street. The witness was in the roadway and motioning to a
residence, saying that the suspect "went that way," indicating toward Monte
Vista Drive. The residence had a yard with an opening to the next property, in a
direct line to Monte Vista Drive.

As we searched that area on foot, additional responding officers arrived in our
location. PPD Corporal MILLER, PPD Corporal ELDRIDGE, and I searched several
sheds and a garage in an attempt to locate the suspect, but were not successful.
PPD Officer MCARTHUR met up with us at that location as well and as a group, we
began working our way westward down Monte Vista Drive.

At some point, at approximately 2024 hours, we were informed by an Idaho State
Police Trooper that a male subject could be seen with thermal imaging moving
along the hillside behind the Red Lion Hotel, which was northwest of our
position on Monte Vista Drive. PPD Corporal MILLER, PPD Corporal ELDRIDGE, PPD
Officer MCARTHUR, and I made our way through a property on Monte Vista Drive and
onto the hillside overlooking the Outlet Golf Park driving range. PPD Officer T.
ANDERSON and PPD Officer SALDANA were in their patrol vehicles and responded to
the area of the Red Lion Hotel to make contact with the Idaho State Police
Trooper.

PPD Corporal MILLER and I stayed high on the hillside to walk the area near the
fence line while PPD Corporal ELDRIDGE and PPD Officer MCARTHUR went lower on
the hill. As we walked toward the Red Lion Hotel, the Idaho State Police Trooper
advised via radio that he would have to contact the subject, as they were
walking directly toward him. I continued along the hillside until I heard PPD
Corporal ELDRIDGE announce over the radio that he could see the suspect in the
trees.

The remaining portion of my report was dictated under case number 20-P20020. For

DEFENDANTS 000310

```
12/02/20                    Pocatello Police Department                     4011
07:05                        Detail Incident Report              Page:      36
```

Incident #: 20-P19954

additional information, refer to that report.

End of report.

```
OFFICER: FETCHEN #5272  DICTATED: 09/28/2020 @ 0522 HOURS
INVESTIGATIVE TIME: 15 MINUTES
LAW INCIDENT #: 20-P19954
STENO INITIALS: MAB #5893
DATE & TIME TRANSCRIBED: 09/28/2020 @ 0909 HOURS
```

#2 – SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

None at this time.

- NARRATIVE:

At the start of my shift on 09/27/2020, I was contacted by Pocatello Police Department (PPD) Detective R. OLSEN, who requested that I contact the residents of 1110 East Pine Street to get an original copy of the surveillance video. When I called, the phone was picked up by DALE HULET'S wife, DIANE HULET. I explained the need for the video and she told me that she would attempt to get it and email it to me that day.

After trying for an extensive period of time, DIANE HULET told me that she was unsuccessful in obtaining the video herself, but had contacted the surveillance video company and they were going to assist her on 09/28/2020. She told me that she would contact the Pocatello Police Department or me via email once she obtained the surveillance video.

DIANE HULET told me that the video that I had recorded using my department issued cell phone was all the video that they had. In the event that DIANE HULET is unable to get a copy of the surveillance video, it should be known that the video that I recorded is the full video. I told DIANE HULET that if she got a copy of the video and was unable to email it, she could contact the Pocatello Police Department to have an officer respond with a USB flash drive to assist her. There is nothing further at this time.

End of report.

OFFICER: B. MCCLURE #5165, Mon Sep 28 11:16:14 MDT 2020

NARRATIVE:

On 9/28/2020 at 1100 hrs I had delivered a case packet to Bannock County Deputy Prosecutor JaNiece Price, requesting felony warrants for Jake Lee Sheeler in regards to this investigation.

```
This investigation continues. BM5165
OFFICER: SAMPSON #5210  DICTATED: 09/28/2020 @ 1311 HOURS
INVESTIGATIVE TIME: 1 HOUR, 30 MINUTES
LAW INCIDENT #: 20-P19954
```

DEFENDANTS 000311

```
12/02/20                    Pocatello Police Department               4011
07:05                        Detail Incident Report          Page:     37
```

Incident #: 20-P19954

STENO INITIALS: MAB #5893
DATE & TIME TRANSCRIBED: 09/28/2020 @ 1415 HOURS

#2 - SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

I uploaded multiple items to the Files section of this report. The items labeled
Richard Hernandez lineup.pdf, Mary Hendricks lineup.pdf, and Kirk Hendricks
lineup.pdf are scans of the photo lineup paperwork. The originals for those
lineups were packaged and filed with Evidence. The recording labeled
200928_001.MP3 is the audio recording of my contact with KIRK HENDRICKS and MARY
HENDRICKS during the presentation of the photo lineup. The recording labeled
200928_001.MP3 is of my contact with RICHARD HERNANDEZ during his presentation
of the photo lineup and him walking me through the incident from his residence
to 321 Hyde Avenue. I also uploaded a diagram called 20-P19954 Richard Hernandez
statement map.pdf from EasyStreet Draw, which outlines the routes that RICHARD
HERNANDEZ described to me.

- NARRATIVE:

On 09/28/2020 at approximately 0815 hours, Pocatello Police Department (PPD)
Detective R. OLSEN contacted me and requested my assistance with this
investigation. He needed to have photo lineups presented to three witnesses,
identified as KIRK HENDRICKS and MARY HENDRICKS at ███████████, and RICHARD
HERNANDEZ at ███████.

I was asked to administer the photo lineups because I had not been involved in
the investigation, I was unaware of the details involving the suspect or the
incident itself, I had no prior knowledge of the incident, and had no other
involvement with the investigation. PPD Detective R. OLSEN had created the photo
lineups and provided me with the paperwork.

I made telephone contact with KIRK HENDRICKS and MARY HENDRICKS and arranged to
meet them at their residence at ███████████ at 1030 hours on 09/28/2020. I
also called RICHARD HERNANDEZ and coordinated to meet with him after I completed
my contact with KIRK HENDRICKS and MARY HENDRICKS.

At approximately 1025 hours, I responded to 284 Hyde Avenue and made contact
with KIRK HENDRICKS and MARY HENDRICKS. Prior to making contact with them, I
activated my audio recorder. As I spoke with them, I informed them that I needed
to present the photo lineups to them separately and would need one person to be
in another room while I spoke with the other. They agreed to allow KIRK
HENDRICKS to go first and MARY HENDRICKS stayed in a bedroom to the north while
KIRK HENDRICKS and I stayed in the living room near the front door.

I read through the Sequential Photo Display Form with KIRK HENDRICKS and then
presented him with the individual photos. As he went through the photos, he
looked at photo #1 and eventually said that was not the person. When the subject
in photo #2 was presented, he immediately said, "No," and pushed the photo to
the left. He said that the individuals shown in #3, #4, #5, and #6 were not the
subject.

I asked KIRK HENDRICKS if he wanted to go through the photos again. He made a
statement to the effect that the subject must be in the photos. I told him that

DEFENDANTS 000312

Incident #: 20-P19954

I was not familiar with the investigation and was unaware whether or not the
involved subject was present in the photo lineup. I went through the photos with
him once again.

As KIRK HENDRICKS looked at the male in photo #1, he said that that person
looked most familiar. Again when he saw photo #2, he said, "No," and pushed it
to the left. When he saw #3, he said, "No." When he saw #4, he said something to
the effect of, "This guy has a little mole." It should be noted that KIRK
HENDRICKS was making reference to the fact that he saw what he believed to be a
mole on the left cheek near the nose. When he saw photo #5, he said, "No." When
he saw photo #6, he pushed it toward me, after presenting it, and said, "No."

After completing the photo display for a second time, I had KIRK HENDRICKS
complete the witness section on page #1. He initialed next to the section that
said, "I am unable to select any photo as being the person(s) who," and wrote in
" threatened my life." After the fact, he said, "I think that it is the first
one." We concluded at approximately 1037 hours. At that time, he went outside
and I called out for MARY HENDRICKS to come to the front room.

I read the Sequential Photo Display Form to MARY HENDRICKS and presented the
photographs to her individually, #1 through #6. As I showed her photograph #1,
she said, "I don't think so. No." As I presented her with #2, she said, "Maybe
if the fellow had glasses on." When she saw #3, she said, "No, not at all." In
response to #4 she said, "No, not at all. I don't think so," and to #5 and #6
she said, "No, not at all."

MARY HENDRICKS only looked at the sequential lineup one time. She made the
statement, "It's hard to tell with the hoodie and the glasses." She signed page
one and initialed the section that said, "I am unable to select any photo as
being the person(s) who," and wrote in "threatened do not follow."

After completing my contact with KIRK HENDRICKS and MARY HENDRICKS, I responded
to 1256 East Maple Street and made contact with RICHARD HERNANDEZ. As I made
contact with RICHARD HERNANDEZ, I activated my digital recorder. I began the
Sequential Photo Display process at approximately 1057 hours.

I presented the photographs to RICHARD HERNANDEZ in sequential order, #1 through
#6. When he saw the subject in photo #1, he said, "The glasses are different."
When he looked at the subject in photo #2, he made mention that "the eyes
appeared to be the closest." When he saw the subjects in #3 and #4, he said,
"No." When he saw the subject in #5, he said, "Probably no," and when he saw #6,
he said, "No."

RICHARD HERNANDEZ also relayed that during the majority of the time that he was
in contact with the subject, he was looking at the gun that was pointed at his
face. He said that the subject pointed the gun at his face and he focused mostly
on the size of the barrel, which he said "looked big." He said that while the
subject was pointing the gun at his chest, he thought to himself that it was
"going to hurt."

RICHARD HERNANDEZ said he looked at the subject's eyes and thought that his eyes
were "crazy. He said he also noticed something on the subject's left cheek,
either a piercing, acne, or something to that effect. He said that he saw shiny
diamond earrings in the subject's ears. He also said that the subject had his
hair covered and had acne on his face. He also said that the subject had a thin

DEFENDANTS 000313

```
12/02/20                    Pocatello Police Department                    4011
07:05                       Detail Incident Report              Page:        39
```

Incident #: 20-P19954

face.

I asked RICHARD HERNANDEZ if he wanted to review the lineup a second time and he said that he did. When he saw the subject in photo #1, he said, "It looks a lot like him. Face is smaller, no piercing or acne." When I showed him photo #2 again, he said, "It doesn't have the earrings. Eyes are the closest." When he saw photos #3 and #4, he said, "No." When he saw photo #5 he said, "Didn't have that kind of weight," and for photo #6 he said, "The face was thinner."

After completing the two separate displays, I had RICHARD HERNANDEZ fill out the witness section on page #1. He initialed next to the section that said, "I am unable to select any photo as being the person(s) who," and wrote in "Glasses, green hoodie, earring left ear."

Following that portion of my contact with him, RICHARD HERNANDEZ walked me through the incident. He told me that on 09/25/2020 he was standing in his front yard talking to his next door neighbor about birds being in the chimneys or gutters of the residences when he heard KIRK HENDRICKS call out something to the effect of, "Call 911. Thief." He said that he saw a male subject running from 284 Hyde Avenue. He said that the subject who ran stayed on the east sidewalk and he ran parallel to the subject on the west sidewalk of the 300 block of Hyde Avenue.

RICHARD HERNANDEZ said that when they got to the area of 321 Hyde Avenue, the subject ran across the street and through the driveway of that property. He said he went around the corner and tried to follow the subject, but lost sight of him. RICHARD HERNANDEZ said he carefully made his way to the north side of the unattached garage on the west end of the property, where there was a small wooden box with some scrap wood in it. He pointed that box out to me as we walked through.

RICHARD HERNANDEZ said that he picked up a pine board that was approximately one-inch by two-inches and approximately two-feet long and made his way around the north side of the garage and toward the northwest corner. He said that when he got around the corner, he raised the board up in a defensive posture and made his way around the corner. He said that when he went around the corner, the male subject was pointing a gun directly at his face and said, "Don't." He said he did not remember the subject saying anything else.

RICHARD HERNANDEZ stated that as the subject pointed the gun at his face, he focused on the size of the barrel. He said the subject took a step back, at which point he took one step toward the subject and the subject pointed the gun at his chest. RICHARD HERNANDEZ said that he was afraid. I later asked him to further explain what kind of emotion he had been feeling. He told me that he felt fear, believed that he may be shot, and anticipated that it was going to hurt. He also said that he was afraid that he may have a heart attack.

RICHARD HERNANDEZ said that suspect then ran toward the power pole between the property on Hyde Avenue and the property on Franklin Avenue, jumped the fence, and continued to run west. RICHARD HERNANDEZ said he lost sight of the male when he ran to the northwest on Franklin Avenue. I completed a diagram on EasyStreet Draw, outlining the routes that RICHARD HERNANDEZ described to me and uploaded it to the Files section of this report under file name 20-P19954 Richard Hernandez statement map.pdf.

DEFENDANTS 000314

```
12/02/20                    Pocatello Police Department                    4011
07:05                       Detail Incident Report              Page:      40
```

Incident #: 20-P19954

Following my contact with RICHARD HERNANDEZ, I returned to the Pocatello Police
Department, where I made scanned copies of the Sequential Photo Display Form
paperwork and uploaded copies to the Files section of this report. I packaged
the original photo lineups and placed them into temporary evidence locker #10
under property numbers P223197 for KIRK HENDRICKS, P223198 for MARY HENDRICKS,
and P223199 for RICHARD HERNANDEZ. I also uploaded the audio recordings of my
contact with them to the Files section. There is nothing further at this time.

End of report.

OFFICER: SAMPSON #5210  DICTATED: 09/28/2020 @ 1619 HOURS
INVESTIGATIVE TIME: 15 MINUTES
LAW INCIDENT #: 20-P19954
STENO INITIALS: NAB #5893
DATE & TIME TRANSCRIBED: 09/28/2020 @ 1706 HOURS

#2 - SUPPLEMENTAL REPORT:

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

An audio recording of my contact with ABIGAIL PRICE has been uploaded to the
Files section of this report under file name 200928_004.MP3.

- NARRATIVE:

On 09/28/2020, I spoke with Pocatello Police Department (PPD) Detective R. OLSEN
regarding a potential witness at 348 Hyde Avenue. I asked him if anyone had
interviewed that subject and he told me that he was unaware of anyone having
interviewed that individual regarding this investigation.

I responded to that location at approximately 1530 hours and knocked on the
door, but I received no answer. I left my business card on the door, requesting
contact. At approximately 1608 hours, I received a notification that ABIGAL
PRICE, the resident at ███████████████, was on the phone. I activated my digital
recorder and answered the call on speaker phone in my office in order to record
my contact with her.

At that time, the female resident of 348 Hyde Avenue identified herself as
ABIGAIL PRICE (date of birth 10/09/1985). She informed me that on 09/25/2020,
sometime after 1600 hours, she arrived at her residence at 348 Hyde Avenue and
was in the process of getting her daughter out of her vehicle when she heard
someone yelling, "Call 911." PRICE said she left her daughter in the vehicle and
walked down toward the street, at which point she saw a male subject running up
the street.

PRICE described the subject as a younger male and said that he was holding a gun
in his right hand. She described the gun as being in a black holster and said
that he was holding up his pants with the same hand that he had the gun in.
PRICE said that because the male was being chased, she asked him if he was OK.
She said the male just looked at her and continued to run.

PRICE said he ran across the street and through the driveway at 321 Hyde Avenue.
She said that several subjects, including KIRK HENDRICKS and RICHARD HERNANDEZ,
told her to call 911. PRICE said she relayed information to the 911 dispatcher,

DEFENDANTS 000315

```
12/02/20                    Pocatello Police Department                    4011
07:05                       Detail Incident Report              Page:       41
```

Incident #: 20-P19954

specifically that the male was involved in a theft and had run and jumped a
fence. She also said that the male was wearing sunglasses and a hood over his
head, but she had not seen anything else that occurred. PRICE said she heard
comments from other neighbors about what they had seen and experienced in
regards to the situation.

I updated PRICE'S information in the Spillman database and attached her to the
incident. I also uploaded the audio recording of my contact with her to the
Files section of this report. There is nothing further at this time.

End of report.

Officer: VanderSchaaf
Date Typed: Thu Oct 01 17:00:22 MDT 2020
Investigative Time: 1 hour
LI: 20-P19954

Supplemental Narrative:

On 10/01/2020, I received the warrants from Bannock County and responded to the
hospital to serve them.  The warrants were served at 1634 hours and a copy was
left for SHEELER.
Officer: C. FETCHEN #5272
Date Typed: Fri Oct 02 18:13:18 MDT 2020
Investigative Time: 15 MINUTES
LI: 20-P19954

Supplemental Narrative:

On 10-02-2020 I attached surveillance video from 1110 E Pine St. This is an
original copy I downloaded from an email sent by the HULET'S.
Officer: HANCOCK #5192
Date Typed: Sat Oct 03 00:13:42 MDT 2020
Investigative Time: 1 Hour
LI: 20-P19954

Supplemental Narrative:

On 10-02-2020 at 2300 hours, I was requested by the Bannock County Prosecutors
office to complete the minute entry and affidavit of probable cause for this
case.  I completed the paperwork and submitted the paperwork to  Honorable Judge
AXLINE.  After review Judge AXLINE signed the forms and sent them back to me.  I
faxed the paperwork to the Bannock County Jail.

End of report.
OFFICER: OLSEN #5189  DICTATED: 10-02-2020 @ 1449 HOURS

INVESTIGATIVE TIME: NOT PROVIDED
LAW INCIDENT #: 20-P20-P19954
STENO INITIALS: JBH #5899
DATE & TIME TRANSCRIBED: 10-03-2020 @ 0950 HOURS

SUPPLEMENTAL REPORT:

DEFENDANTS 000316

12/02/20                    Pocatello Police Department                  4011
07:05                        Detail Incident Report            Page:    42

Incident #: 20-P19954

- DOCUMENTS OF EVIDENCE TO BE FILED IN RECORDS:

No documents of evidence to be filed at this time.

- NARRATIVE:

On 10-02-2020, at approximately 1439 hours, I was notified via email from a
Police Support Specialist, indicating that they had been contacted by the victim
in this incident, KIRK HENDRICKS. He informed the Police Support Specialist that
he did another check of his residence and found the Hi Point 45 firearm that was
believed to have been stolen, in a cabinet in his residence. KIRK apologized for
any inaccurate information at the time of the incident was reported. He was told
it was ok and that we were glad the firearm was not still missing.

I contacted Pocatello Dispatch to have the firearm removed from the National
Crime Information Center database as stolen and asked the Police Support
Specialist to update the property involvement of this firearm to reflect that it
had been recovered by the owner at this residence, and was no longer to be
listed as stolen. There is nothing further at this time.

End of report.

DEFENDANTS 000317

# Exhibit 16

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


JAKE SHEELER, an individual,          )

                    Plaintiff,          ) Case No.

vs.                                   ) 4:22-cv-00313-

BRIDGET MCARTHUR, an individual;      ) DCN

JEFFREY E. ELDRIDGE, an individual;   )

MARISA A. SALDANA, an individual;     )

ROGER SCHEI, an individual; and       )

CITY OF POCATELLO, a municipal        )

corporation;                          )

                  Defendants.          )



DEPOSITION OF TROOPER TODD ORR

June 12, 2023




REPORTED BY:

AMBER S. WILLIAMS, C.S.R. No. 1080

Notary public

1    THE DEPOSITION OF TROOPER TODD ORR was taken

2 on behalf of the plaintiff at Pocatello City Hall,

3 911 North Seventh Avenue, Pocatello, Idaho,

4 commencing at 2:25 p.m. on June 12, 2023, before

5 Amber S. Williams, Certified Shorthand Reporter and

6 Notary Public within and for the State of Idaho, in

7 the above-entitled matter.

8

9    APPEARANCES:

10 For Plaintiff:

11    CHRISTENSEN & JENSEN, PC

12    BY:  ANNA P. CHRISTIANSEN

13    BY:  JONATHAN T. NISH

14    257 East 200 South, Suite 1100

15    Salt Lake City, Utah  84111

16    anna.christiansen@chrisjen.com

17    jonathan.nish@chrisjen.com

18 For Defendants:

19    HALL ANGELL & ASSOCIATES, LLP

20    BY:  SAM L. ANGELL

21    1075 South Utah Avenue, Suite 150

22    Idaho Falls, Idaho  83402

23    sla@hasattorneys.com

24

25

1    For Witness:

2         OFFICE OF ATTORNEY GENERAL

3         BY:  PATRICK DENTON

4         700 South Stratford Drive

5         Meridian, Idaho  83642

6         patrick.denton@isp.idaho.gov

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                     **I N D E X**

2

3   **TESTIMONY OF TROOPER TODD ORR**                    Page

4       Examination by Ms. Christiansen..............   5

5       Examination by Mr. Angell...................  58

6       Examination by Ms. Christiansen.............  66

7

8

9

10                          **EXHIBITS**

11   Exhibit 21.   Eastern Idaho Critical Incident..  20

12                 Team supplemental report,

13                 Bates Nos. DEFENDANTS 000174 -

14                 DEFENDANTS 000175

15

16

17

18

19

20

21

22

23

24

25

```
 1                    TROOPER TODD ORR,
 2   first duly sworn to tell the truth relating to said
 3   cause, testified as follows:
 4                         EXAMINATION
 5   BY MS. CHRISTIANSEN:
 6          Q.    I'm Anna Christiansen.
 7          A.    I'm Todd.  Nice to meet you.
 8          Q.    Nice to meet you.  Would you please
 9   state your full name for the record.
10          A.    Yep, Todd Orr.  Yep.  O-r-r.
11          Q.    Do you have a middle name?
12          A.    Frederick.
13          Q.    Todd Frederick Or?
14          A.    Yep.
15          Q.    I am representing the plaintiff, Jake
16   Sheeler, in this matter.
17          A.    Okay.
18          Q.    Have you ever had your deposition taken
19   before?
20          A.    No.  Twenty years, first time for
21   everything.
22          Q.    Really?
23          A.    Yeah, it'll be fun.
24          Q.    Wow.  I -- welcome.
25          A.    Yeah.
```

1          Q.    Well, in light of the fact that you have

2    never had your deposition taken before, I will give

3    you a few of the general ground rules for a

4    deposition.

5          A.    Sure.

6          Q.    Everything we're doing is being

7    transcribed for a written record, and so we need to

8    do our best to make that record clear, and that means

9    that we try not to talk over each other.  I tend to

10   always do that.  I'm surprised I haven't gotten in

11   trouble yet today.

12          We need to try to avoid nonverbal

13   answers, anything that's an "uh-huh," "huh-uh,"

14   anything that's a physical gesture.

15          A.    Okay.

16          Q.    Things need to be able to be written

17   down so that we have a clear record.

18          If you don't understand a question,

19   you're welcome to ask me to clarify it.  If you do

20   answer the question, then I'll assume that you

21   understood what I was asking.

22          A.    That's fair.

23          Q.    Okay.  With that, I guess the next

24   question on my list is did you -- have you ever

25   testified in court before?

```
 1              A.   Oh, yeah.  Yep.
 2              Q.   Can you give me a general -- a short
 3    list of the types of cases that you have testified in
 4    court before?
 5              A.   Domestics, a lot of impaired driving,
 6    DUI stuff, breath testing.  So most of it is based
 7    around kind of the DUI side of things.  I worked for
 8    the city about six and a half years before, so some
 9    of the petty thefts and little stuff like that that
10    would come up for juvenile issues.
11              Q.   When you say "the city," who?
12              A.   The City of Chubbuck.
13              Q.   Okay.  So your current employer is Idaho
14    State Police; is that correct?
15              A.   Correct.
16              Q.   When did you complete POST?
17              A.   Well, let's see.  I went in 2003, so it
18    would have been 2003.  I would have to look at the
19    exact date.
20              Q.   Okay.  And you began working for the
21    City -- did you begin working for the City of
22    Chubbuck?
23              A.   Yes, City of Chubbuck.  Worked with the
24    City of Chubbuck until roughly March of 2010, and
25    then I came over to the state.
```

1          Q.    And then have you been working
2    continuously for ISP since 2010?
3          A.    Yes.  Yes, I have.
4          Q.    Do you have any specialties?
5          A.    I'm a drug recognition expert, a DRE
6    instructor, an SFST instructor, breath testing
7    specialist.  Most everything is over on the side of
8    impaired driving that I do as far as my specialties
9    go.
10         Q.    You said a drug recognition specialist?
11         A.    Drug recognition expert.  It deals with
12   impaired driving.  If you have a DUI that's not
13   alcohol based, then they call it drug recognition
14   expert, and we come in, we run somebody through a
15   whole bunch of physical tests, we check pupil
16   dilation, heart rates and pulse rates and all that
17   stuff, and we can actually make a determination on
18   what category of drugs they would be under the
19   influence of.
20         Q.    You listed a couple of other things
21   that -- I think there were some acronyms in there.
22         A.    Breath testing specialist, it's for
23   giving the breath test.  I just essentially sign guys
24   off that they know how to run the instruments
25   correctly.  And then a field sobriety test

1    instructor, the "Roadside Olympics," whatever you

2    want to call them, that's -- yes, I instruct that,

3    too.

4            Q.    I've never heard it called that.

5            A.    I've heard it called that a few times by

6    some of my folks, yep, so --

7            Q.    Criminal defense attorney.

8            A.    Oh, yeah.  Oh, you've heard of it, oh,

9    yeah.

10           Q.    That's funny.  Okay.  Did you review any

11   records in preparation for today's deposition?

12           A.    So I reviewed my report that I wrote,

13   and then a little while ago I looked at -- over the

14   video that I had, but I couldn't get the server to

15   pull it up this morning.  They're actually replacing

16   all of our computers today so I'm not sure if that

17   was the catch or user error.

18           Q.    Is this -- this is Exhibit 18.  This --

19   you'll need to flip through that.  Does that appear

20   to be your report that you reviewed?

21           A.    So that would be -- yep, Sergeant

22   Noyes -- yeah, because with ours, I'm the

23   supplemental report on it.  He had the original

24   report.  So yes, that looks to be the one that I

25   reviewed.  The color is just not as pretty so -- it

1  looks the same, but yes.  Yeah.

2         Q.   And I'm sorry.  You said you reviewed

3  your report?

4         A.   Yes.

5         Q.   The dash cam video?

6         A.   And that was a little while ago that I

7  looked at my dash cam.  I couldn't pull up the dash

8  cam today.

9         Q.   So did I miss a third thing or was that

10  it?

11         A.   No, just those.

12         Q.   Okay.  Did you -- when you reviewed your

13  report, was there anything that jumped out at you

14  that you would correct or change today?

15         A.   No, nothing that jumped out.  Huh-uh.

16  It's been a while ago, but yeah.

17         Q.   Aside from reviewing the report and the

18  video, did you do anything else to prepare for your

19  deposition today?

20         A.   Huh-uh.  No.

21         Q.   Did you at any time -- I guess not

22  necessarily in preparation for today's deposition,

23  but at any time before today, did you speak with

24  Mr. Angell or anybody from Mr. Angell's office?

25         A.   We went back out to the scene -- I would

1   have to look at the date -- and went through kind of

2   just more for where everybody was at the time.  A

3   Pocatello officer, myself, Sergeant Noyes -- we were

4   all out there just to get general placements from

5   kind of where everything happened in the area out

6   there.

7            Q.   Does April 18th sound about right?

8            A.   Yeah.  Yes.  It's been -- sometime in

9   the last couple of months, yeah.  I could pull up my

10  e-mail and tell you the exact day.

11           Q.   So there's -- somewhere in this stack,

12  there's --

13           A.   I have a signed statement that I sent.

14           Q.   Yes.  That's what we're going to dig

15  into.  So this is a bundle with you and Noyes.  I

16  think yours is underneath.

17           A.   Yep.  Yep.  Yep.  Well, let's see.

18  It's -- yep, April 18th, 2023.  That's when I went

19  back out with them.

20           Q.   Okay.

21           A.   I don't want to mess up your piles.

22           Q.   You're actually going to hang on to that

23  for just a moment.  We're going to chat about that.

24           A.   Perfect.  Okay.

25           Q.   Can you tell me how did that declaration

1    come about?

2         A.   So I assume it's an attorney that's

3    maybe representing the City of Pocatello.  They

4    reached out to us and just asked about going out to

5    the scene and try to get general locations.  The

6    attorney was trying to get a feel for kind of where

7    everybody was during the incident, so -- and then

8    they went through and said, "Hey, here's the

9    paperwork, here's what we got."

10              And it's like, "Yep, it looks accurate,"

11   so -- everything from what we saw that day, anyway.

12         Q.   Did you write this declaration?

13         A.   As far as -- no, I did not.

14         Q.   You did not?

15         A.   No.

16         Q.   Do you know who did write the

17   declaration?

18         A.   No.  I wasn't there when they did it.

19   It got e-mailed to me just for verification on it,

20   had me review it.

21         Q.   You just received a draft and -- did you

22   sign -- did you make any changes to a draft?

23         A.   I don't think so, huh-uh.

24         Q.   You just signed off on the version as it

25   was?

1          A.    Yeah.  I went through and -- I read

2    through it.  I don't recall -- I don't recall

3    anything that was off or different, no.

4          Q.    Okay.

5          A.    Pretty straightforward, quite honestly.

6          Q.    At the time that you -- on April 18th

7    when you went to the scene --

8          A.    Uh-huh.

9          Q.    -- were you given any other information

10   about, like, where people were at?

11         A.    Well, I mean, just in general

12   discussion.  People were kind of standing in

13   different spots.  We went back over to where we were

14   just because it's -- there's been construction since,

15   so it was trying to figure out which fence lines were

16   where and all that kind of stuff.  So it was just

17   general discussion that we were talking about.

18         Q.    Okay.  Were you -- so you were there

19   with other officers?

20         A.    Yes.

21         Q.    Do you know the names of the other

22   officers that were there?

23         A.    I know I was out with Jeff Eldridge,

24   Bridget, Noyes was out there, and -- there are so

25   many new officers in the City of Pocatello and I'm

1   terrible with names -- a big, tall guy.  He had a

2   baby, so that I remember.  And there was the other

3   female officer from Pocatello that was back to my

4   right during the incident -- back behind me.  I want

5   to say her name starts with an S but -- maybe an A.

6          Q.   I'll represent her name is Saldana.

7   Does that sound about right?

8          A.   Yeah.

9          Q.   So when you -- I'm interested in how

10  these placements came about.

11         A.   Okay.

12         Q.   So you're saying that, like, Saldana was

13  up and behind you?

14         A.   Yeah.  She -- we were all right --

15  there's this fence line, and we were all right in

16  this area.  Because after I saw him running, all of

17  us started moving towards the fence line kind of more

18  at an angle just to intercept due to the fact that he

19  was running.

20         Q.   I should note for the record that we're

21  looking at page Defendants 5667.

22              So at the -- what was the -- do you have

23  an understanding of what this pin drop is meant to

24  represent?

25         A.   Yeah.  Our approximate location.

1          Q.    At what point in time?

2          A.    At the shooting.

3          Q.    At the moment --

4          A.    Yep.  Yep.

5          Q.    -- that the shooting happened?

6          A.    Yeah.  That's my understanding --

7          Q.    Okay.

8          A.    Yeah.

9          Q.    You said Saldana was actually up behind

10   you?

11         A.    Yes.  Yeah.  She was off to my right,

12   yep, on the other side of the fence.  When the

13   shooting occurred, I was the only one that was on the

14   other side of the fence.  Everybody else was still

15   back behind it.

16         Q.    So I guess off to your right would

17   depend on which way you were facing at that moment?

18         A.    Yes.  Correct.  She would be off on

19   the -- so what?  South side?  No.  Okay.  Now I got

20   to spin it -- okay.  Yes.  South -- my south -- she

21   was off my right, so -- I'm going to have to draw

22   stuff.  She would be, yeah, back and to the side of

23   me.

24         Q.    Do you want to mark it to the best of

25   your recollection where she actually was?  Draw an

1   "S" for Saldana.

2          A.   You're going to be talking feet.  I

3   mean, it's not -- so if I'm, you know, right on the

4   other side of the fence here, she would be just off

5   to my -- on the other side of the fence right back

6   behind me.  So that would be what?

7          Q.   Would you please draw an "O" for you?

8          A.   Oh, yeah.  Yep.  If I had --

9          Q.   And maybe an "S" for Saldana.

10         A.   I'm trying to even see where that fence

11  line comes through there.  So she would be back, I

12  don't know, just maybe there.

13         Q.   Okay.

14         A.   Right about there just -- and separated

15  by that fence that went through us, so -- and to my

16  south -- I guess that would be southwest of me if you

17  were going off north and stuff, but...

18         Q.   Okay.  Aside from your physical location

19  at the moment -- actually, this is -- I don't know

20  that we need to keep talking about this.

21         A.   Okay.  No worries.

22         Q.   Aside from your physical location at the

23  moment of the shooting, did you give any other

24  information to the attorney for Pocatello at that

25  time?

1          A.   Yeah, nothing that comes to mind.  I

2  mean, we -- I can't remember if we talked about

3  anything said or not.  I know we talked about the

4  general location of the -- where the gentleman was

5  after the shooting, but nothing -- I don't think we

6  really went into anything else.

7          Q.   Did he ask you any other questions?

8          A.   No.  It was more just placement, kind of

9  where it was and stuff like that.  I just don't --

10  yeah, nothing really -- nothing jumps out.

11          Q.   Okay.

12          A.   It was cold.

13          Q.   You referred to -- when I asked you

14  about the other officers, you referred to Bridget by

15  her first name.  Are you familiar with

16  Bridget McArthur?

17          A.   Yeah.  Yep.

18          Q.   Have you worked with her?

19          A.    It's just kind of pretty rare with City

20  units because they have so many Pocatello officers.

21  It's not -- we won't deal with them that much.  Every

22  once in a while if they need us to take a DUI or help

23  with a crash or something, that's about it, so -- I

24  don't know.  Sum total of times I've worked with her

25  on scenes, I -- maybe on one hand.  Not very many at

 1  all, so -- just familiar with her.
 2          Q.   Have you -- I'm sorry.  You said you're
 3  just familiar with her?
 4          A.   Yeah, just got familiar with her.
 5          Q.   My next question was going to be do you
 6  have any kind of a social relationship with her
 7  outside of --
 8          A.   No.  One of my troopers used to know
 9  her, and that's I think how I know more.  Other than
10  that, no.
11          Q.   What about Eldridge?
12          A.   Yep, Jeff, I'm familiar.  I've worked
13  with him for a number of years.  I worked with him at
14  City of Chubbuck prior.  So I'm familiar with Jeff,
15  yeah.
16          Q.   You guys were formerly coworkers?
17          A.   Yes.  Yep.  Tried to get him to come to
18  the state, but he doesn't like traffic, so -- at
19  least not as much as I do, so...
20          Q.   So let's talk about September 25th,
21  2020.
22          A.   Okay.
23          Q.   You are familiar with the events of that
24  day?
25          A.   Yeah.

1        Q.    Prior to September 25th, 2020, did you
2   have any familiarity with Jake Sheeler?
3        A.    Huh-uh.
4        Q.    Did you have any prior dealings with
5   him?
6        A.    Nope.
7        Q.    Do you know him at all?
8        A.    Not that comes to mind.  If I -- I mean,
9   it's always possible I gave him a ticket or
10  something, but nothing that would come out.  I do
11  that all year long, so...
12       Q.    You did not fire your weapon on
13  September 25, 2020?
14       A.    Nope, I did not.
15       Q.    Did you draw your firearm that day?
16       A.    No.
17       Q.    Now, you prepared -- you did prepare a
18  report about --
19       A.    Yes.  Yep.
20       Q.    -- your observations that day?
21       A.    Yep.
22       Q.    And that is what we have marked as
23  Defendants Exhibit 18.  And so your report begins
24  on --
25       A.    Right there.

1              Q.    -- Defendants 101; is that correct?

2              A.    Looks like it, yep.

3              Q.    Okay.  And now you also gave an

4    interview after --

5              A.    Yes.

6              Q.    -- the events of that day, correct?

7              A.    Yes.

8              Q.    To your knowledge, was that interview

9    recorded?

10             A.    I don't know.  I would assume it would

11   be.  So I think it was with Chad Morgan, as I recall,

12   from up north there.

13             Q.    That's a good memory.

14             A.    Good guess.

15             Q.    Yes.  He is on --

16             A.    Yes.  No, we actually went and sat in --

17   I think it was his unmarked unit that was on scene.

18   So I'd assume he recorded it, but I don't know that

19   for sure.

20             Q.    Okay.

21                   (Exhibit 21 marked.)

22             Q.    (BY MS. CHRISTIANSEN):  I'll represent

23   that this is a written summary of the interview that

24   you gave.

25             A.    Sure.

1          Q.   Would you mind taking a moment to review

2     it and see if there's any statements that you would

3     change, correct, anything you would do to alter that

4     report?  And there's a pen if you need to mark it up.

5          A.   Okay.  Perfect.  "The first of four," I

6     guess that means it was my Monday.  Okay.  Yeah,

7     about the only other thing is that I was going to

8     help Bannock County with a subject up at the hospital

9     and I ended up diverting to go help Noyes, but

10    inconsequential, I suppose.

11          Okay.  So that should be southwest.

12    This -- yeah, right in here where -- parking lot of

13    the Red Lion Hotel where my patrol car was, it was

14    actually over on the south -- it was south -- well,

15    it'll be southwest of the actual -- if you were to --

16    well, I don't know.  Depends on how you want to look

17    at it.  The driving range, that golf course there, it

18    was off to the west of it.  But yeah, north or south,

19    depends on I guess where you want to call where the

20    shooting occurred, I guess.  But I think I was more

21    southwest, but...

22          Q.   Go ahead and mark --

23          A.   Okay.  I will just make a note on it.

24    Again, it depends on where you're going to -- where

25    you want to put the point that we're referencing,

1  so -- yeah, it's just confusing because in this one

2  it's referencing the parking lot and the other one it

3  references the golf course, so...

4            As far as the officers go, I heard

5  commands being given, so -- because in the end it

6  has, "Too far away to hear any words spoken by either

7  subject or officers," but I heard yelling.  So

8  specifically what they were saying would be

9  difficult, but I know there was commands being given,

10  so...

11        Q.   We will dive into that in a little more

12  detail.

13        A.   Okay.  Perfect.

14        Q.   But other than that, are there any other

15  changes you would make to that?

16        A.   No.  Nothing that jumps out, no.  Do you

17  want that one on your side or my side?

18        Q.   Hang on to it.  We may or may not come

19  back to it.

20        A.   Perfect.

21        Q.   Okay.  Let's start looking at your

22  report, Exhibit 18.

23        A.   Okay.  101.  Okay.

24        Q.   How did you initially come to be

25  involved with the events of September 25, 2020?

1          A.    I knew stuff was going on earlier in the

2    day but didn't really pay much attention to it, and I

3    was aware of it because one of our troopers -- there

4    was an incident involving a gentleman in a residence

5    right by where one of my troopers lives.  So that's

6    how we became a little bit familiar with what was

7    going on in general, but that was about it.

8              Other than that, I was actually going up

9    to the hospital to help Bannock County with an unruly

10   subject or something, and then when Sergeant Noyes

11   put stuff out on the radio, that's when I went down

12   there instead.  Bannock County said they'd deal with

13   their problems.  Okay.

14             Then I went down and found Dave back

15   there behind the Red Lion Inn in that back parking

16   lot there.

17       Q.    Okay.  Did Sergeant Noyes ask for

18   assistance?

19       A.    I can't remember.  It's one of those

20   with what was going on, I'm going if I can.  But we

21   don't -- we don't make people ask, so -- yeah, I

22   don't remember as far as if he specifically asked or

23   just seeing if it even has anything.  Disregard or it

24   consists of -- yeah, hear- -- I overheard radio

25   traffic -- Sergeant Noyes -- on the Pocatello Police

1    channel because we scan -- Red Lion parking lot,

2    possible located subject, units are trying to find --

3    okay.  So subject's been identified as Mr. Sheeler,

4    right?  That's how you say his name?

5           Q.   Yes.

6           A.   Perfect.  That earlier incident which I

7    was familiar with, and -- I believe to be armed and

8    dangerous, so -- yeah, that's why I went to that.

9           Q.   So was it sort of you elected to go?

10          A.   Oh, yeah.  Yeah.  I'm going to -- yeah,

11   if I have a guy out there, I'm going to go assist

12   him, you bet, yeah.

13          Q.   Okay.  So your report places you at

14   approximately 20:24, you said, on September 25th --

15   well, "09/25/2020 at approximately 20:24, I Sergeant

16   Todd Orr en route to assist Bannock County with an

17   arrest -- was en route to Bannock County with an

18   arrest at Portneuf Medical Center."

19               That's a true and correct statement?

20          A.   Yeah.

21          Q.   That's the point in time in which you

22   changed what you were doing and came to help --

23          A.   Yeah.  Yep.

24          Q.   -- David Noyes?

25          A.   Yes.

1          Q.   Did you have any communications from

2    Pocatello requesting assistance?

3          A.   No.  No.

4          Q.   Did you contact Pocatello to notify them

5    that you were going to be assisting them?

6          A.   I know when I got down I changed over to

7    their channel at some point, so...

8          Q.   Had you been scanning their channel that

9    day?

10         A.   We usually scan in general.  We have --

11   we scan for district cars.  District units, we tend

12   to scan Bannock County, Pocatello, Chubbuck and

13   Fort Hall, and depending, our northern units might

14   scan up in Bingham County and Blackfoot too, so --

15   yeah, we tend to scan just because all of our

16   agencies are so small, you never know when people

17   need help, including us.

18         Q.   Noyes described for us that he'll just

19   jump through the channels of the different agencies

20   to figure out what's going on and who needs help.

21   You do the same thing?

22         A.   Yeah.  I'll actually leave my handheld

23   on our primary station and I will turn off scan in my

24   in-car and turn it so it's not jumping around between

25   different agencies and I can actually hear what's

1    going on.  So I don't know if I did that here.  I

2    could see myself doing that.  That would be normal,

3    so...

4           Q.   You said "turn it off."  Does it

5    automatically scan?

6           A.   There's a scan cycle.  You just push the

7    button and it scans whatever I have programmed, and

8    if I want it to stop scanning, then I tell it to

9    stop, and then you can actually turn it manually to

10   whatever channel you want to listen to at the time

11   and it won't jump off that channel again.  Other than

12   that, it defaults back to my primary.

13          Q.   Do you always tend to leave your

14   body-worn radio on your ISP station?

15          A.   I do.  Some guys like scanning with that

16   and -- not me.  I like to hear what's going on.

17          Q.   Do you recall that day at what point you

18   turned your scanning function off and turned on to

19   the Pocatello radio?

20          A.   It -- if I did it, in the car.  That

21   would be -- I can't even -- that's normally what I

22   do, but I -- I don't know if that's exactly what I

23   did that day or not.  Might be able to hear it on my

24   in-car.  On the radio on the video, you might

25   actually be able to hear it if it's on scan or not,

1    because it would pick up that radio traffic.

2          Q.    Aside from the radio, did you have any

3    means of communicating with Pocatello -- with

4    Pocatello police?

5          A.    They showed up on scene.  So I had

6    Saldana.  She was by me.  So that would be the other

7    way to communicate with them.

8          Q.    So you spoke with her in person?

9          A.    She was -- I know she was behind me,

10   so...

11         Q.    Other than radio and in person, did you

12   have any other means that you were communicating with

13   Pocatello police?

14         A.    No.

15         Q.    Okay.  Do you use a Spillman system?

16         A.    I wish.  No, we don't.  No.

17         Q.    You don't have -- strike that.  Let me

18   try that again.

19               Do you have access to a Spillman system?

20         A.    We don't, no.

21         Q.    Okay.

22         A.    And even if you do have access to

23   Spillman, in general, you have to be logged in to the

24   agencies.

25         Q.    Do you circulate e-mails between the

1  agencies?

2          A.    Sometimes, but that usually actually

3  comes from our -- like, the intelligence.  What do

4  they call it?  I will remember.  Fusion Center.

5  Yeah, usually the Fusion Center out of Boise.  And so

6  we'll get e-mails that are sent, and that's kind of

7  how most of them work for, like, officer safety and

8  stuff.

9          Q.    Did you receive any e-mails in relation

10 to this case?

11         A.    Stuff from attorneys and scheduling and

12 everything else.

13         Q.    On September 25th, 2020, did you receive

14 any e-mails?

15         A.    That's a good question.  I don't -- I

16 don't think so, because I remember talking to Josh

17 about the thing back behind his house, but I don't

18 remember any e-mails, so -- I would have to look.

19         Q.    Is Josh the trooper whose house was

20 nearby the incident --

21         A.    One of the incidents, yeah.

22         Q.    -- that happened?

23         A.    So yeah, I don't -- I would have to go

24 through my e-mails.  I don't know why I would I guess

25 more than anything, but -- those e-mails usually

1    don't go out unless there's some pretty, you know,
2    good information that can actually help anybody --
3    everybody at the time.  But it's usually through
4    dispatch centers, the immediate ATLs and stuff like
5    that.  That's where that routes through.
6            Q.   Was Josh in the vicinity when the -- was
7    Josh, like, at home or in the area when these events
8    happened?
9            A.   No.  I think he was actually still at
10   work.  I think it happened before he got home, and
11   then he got home, and -- how it is when people know
12   there's cop in the neighborhood and everybody wants
13   to talk, so -- I don't know.  But that's what it
14   sounds like.  Something like that anyway.
15           Q.   When you elected to help Pocatello and
16   come on the scene, did you, like, radio in for more
17   information?  Did you --
18           A.   Noyes was there.
19           Q.   Okay.
20           A.   And I went and talked to him, and he
21   said that he had saw -- he was up on the ramp or
22   something and he had his NVGs, the night vision
23   goggles, and he had seen over in the bushes there in
24   the trees back behind on the south side of the
25   parking lot, and so -- just went down and we started

1  kind of looking through.  We're not going to go out

2  deep foraging in the bushes and the hills because

3  there's a lot of little dips and things like that, so

4  it was obviously tactical concerns about just rushing

5  out into the bushes.

6           So we just turned on a lot of

7  floodlights and started kind of walking the area and

8  just shining as we walked down the parking lot to the

9  east, so...

10         Q.   Did you have -- did you get a

11 description of the person you were looking for at

12 that time?

13         A.   Not that I remember.  It would be a male

14 subject.  Other than that, you're not going to be

15 able to see too much out there.

16         Q.   Do you recall any more about the person

17 you were looking for?

18         A.   Huh-uh.  I'm sure I had some information

19 on it because I had some information from contacts,

20 the -- like, people that had -- up on the hill and

21 stuff like that.  So there was descriptions given on

22 him; I just don't know if -- I can't remember what

23 was given to me at the time and what wasn't.  All I

24 know is I was looking for a male subject who was

25 hiding in the trees somewhere between me and --

1          Q.    So you showed up to look in the trees
2    basically?
3          A.    Well, yeah, to assist with an armed
4    individual right on the border of private property.
5          Q.    Okay.  And that information was given to
6    you by Noyes?
7          A.    Yeah.  That -- where -- what he had seen
8    and kind of the general area, yes.
9          Q.    Okay.  I want to take you through a
10   couple of lines of your report.  I actually think you
11   are going to be one of my shorter depositions today.
12         A.    That's unfortunate.
13         Q.    I know.  Okay.  So when you -- you
14   arrived on the scene -- I'm looking at paragraph 2.
15   You arrived on the scene in your vehicle and you
16   stayed in your vehicle for a moment and rolled
17   forward, correct?
18         A.    Yeah.  Just -- I have a -- on the patrol
19   cars, we have area flood.  So you basically push some
20   buttons and all your LED lights just turn white.  So
21   you got a pretty good visual of what's close to us
22   before I exited.
23         Q.    Were you able to see anybody in the
24   trees at that time?
25         A.    No.  Huh-uh.  No.

1          Q.    Tell me about the first time that you

2    spotted Jake.  When did you first see him?

3          A.    So we were walking down, and there's,

4    like, a little -- I don't know what it is --

5    outbuilding shed.  They probably keep lawn mowers or

6    something in it.  Right around there, that's when I

7    saw him running.  You could hear stuff, so -- you

8    could hear movement, but that's when you see him

9    actually running, because he had, like, the

10   floodlights and everything from the driving range.

11   So those floodlights flooded out enough past the

12   trees and everything to where you could actually see

13   him kind of take off from kind of the -- be it the

14   shadow or the edge of the trees, and just take off

15   running kind of at a, I don't know, northeast

16   direction, more towards I guess kind of where people

17   were golfing.  That's how I could see it anyway.

18         Q.    Was he in the trees at the time that you

19   saw him?

20         A.    So he was over on the far side so it

21   would be hard for me to say if he was actually in the

22   trees or in the dark.

23         Q.    Can we reference the map here?  I don't

24   know what you mean when you say "the far side."

25         A.    No, yeah, let's do --

1           Q.   So let's take it back to referencing --
2    this is Defendants 5667 --
3           A.   Yep.  Okay.  Perfect.  Let's look at it.
4           Q.   If you don't mind --
5           A.   Oh, yeah.  Yeah.  So we'll see if we can
6    just reference it so you can --
7           Q.   We can maybe use the pinpoints for
8    reference --
9           A.   Sure.
10           Q.   -- for the sake of the record.
11           A.   So as far as -- this is referenced right
12   now to where we are in this building.  North is that
13   way.  So essentially, when we're -- you're kind of
14   over here to where these lights and everything
15   actually start to light this area up, and that's when
16   all I can see is moving.  So be it that he was in the
17   edge of the trees or he was in the shadows and he
18   started running, came out of the shadows, his exact
19   location here, I don't know where he was at.  All I
20   know is I could see him when he came into the light,
21   be it out of the trees or just into the light, kind
22   of running towards that direction.
23              So that's when we went, because he was
24   kind of going this way.  So my thought is:  Well, I
25   don't like running so I'm going to go this way and

1    just meet everyone out here.

2              So that's kind of where that angle took

3    off, to finding the best point to get over a fence.

4         Q.   Okay.  And are you firm in your

5    observation that he was running, he was not walking?

6    He was not --

7         A.   Oh, yeah.  No, he -- he was moving

8    because I knew I had to move, yep, or I was flat

9    going to get outran, so...

10        Q.   So at the time that you saw -- that you

11   first saw him, did you say anything?  Did any other

12   officers say anything?  What --

13        A.   So I yelled one time.  I'm pretty sure I

14   yelled -- what? -- "Get on the ground" the one time.

15   But other than that, when I could hear the other

16   officers there and you knew there was more people in

17   contact -- that's something that we preach:  You only

18   give -- commands come from one place.  And if

19   somebody else is giving commands, let them give

20   commands.  Whoever's closest in contact, that's who

21   needs to be giving the commands.

22        Q.   So the first time that you saw him, you

23   gave a command?

24        A.   Single, yeah.  And that's on my video

25   too, and you hear me.  And just so -- this might help

 1   too in your video review of it.  When you listen to
 2   the video, you will kind of hear me talking a little
 3   bit and then you will hear running because all the
 4   stuff moving.  And about the time that the video --
 5   because we start getting out of range for the audio.
 6   About the time that it starts going out of range, you
 7   can hear the gunshots on that video, and that's
 8   roughly the time when I'm over the fence and
 9   everything else.
10             But right before that, you hear I guess
11   give one command.  You can hear it in the video and
12   you can hear the other commands being given kind of
13   in a distance.  And I don't know if you -- I'm sure
14   you can listen to that and get a little bit more on
15   it.
16        Q.    Did you hear any commands from anybody
17   else before you began giving a command?
18        A.    I didn't hear any, huh-uh.  So it's one
19   of those that I don't know if anybody else -- from
20   where I was, I was the only one in my group of folks
21   over here that had actually seen him at that point
22   and started running that way, and then everybody else
23   just kind of -- I can't remember what I said to let
24   everybody know that, "Hey, you know, running over
25   here," or something.

1          Q.    You said something to your group that
2    you were --
3          A.    Yeah.  I'm sure I would communicate
4    somehow.  I don't know what I said.  Like I said, you
5    would just have to listen to the video.  I'm sure I
6    told them something.
7          Q.    Did you get --
8          A.    "He's running.  He's moving."  I don't
9    know.
10         Q.    Did you get any response from the --
11         A.    I know that people were running with me,
12   and I remember that.
13         Q.    Who was with you?
14         A.    I know Saldana was there, Noyes was back
15   there and -- Anderson?  We had somebody in the trees
16   that was more off in the trees, back behind kind of
17   thing, somewhere over there.  But right by me was
18   more Saldana and Noyes that were right on -- at least
19   that I remember, so -- not that -- I don't think
20   anybody else was out there.
21         Q.    Did you hear any of the other officers
22   that you were with -- so you've said Anderson, Noyes
23   and Saldana?
24         A.    Right.
25         Q.    Did you hear any of them give commands?

1          A.   No, I didn't hear them say anything.  So
2    all I heard was the single gunshot.  But everything
3    was focused out because you could hear them giving
4    commands -- Jeff and Bridget over there.  So other
5    than that...
6          Q.   Other than giving commands, did you or
7    any of the officers say anything to each other or to
8    Jake?
9          A.   Not -- no.  Because if we would --
10   again, we don't like to confuse the situation.  We'll
11   communicate with us, but we were, I don't know,
12   60 yards away or something.  So even if we're
13   talking, that's not going to -- that's just going to
14   be communication that he's not even going to hear.
15         Q.   But do you recall that there was talking
16   at that time?
17         A.   Huh-uh, no.  It was more -- at that
18   point, you're running.
19         Q.   Do you recall hearing anybody saying
20   anything about crossfire?
21         A.   No, I don't remember anything of it.
22         Q.   If someone had made some kind of a
23   statement, would you have noted -- do you think you
24   would have noted any other commands or statements
25   like that in your report?

1          A.    If something jumped out that was, like,

2    super pertinent, yeah, sure.  But to me, it's one of

3    those -- I can only testify to what -- my stuff.  I

4    can't put hearsay in a report because that's -- so...

5          Q.    You could say what you heard, correct?

6          A.    Yeah.  Yeah.  I could put -- yeah, but

7    nothing -- yeah, I don't remember anything else.

8    Like I said, I think I actually put in there -- you

9    know, hold on.  Let me look at that actually.

10          Q.    Yeah, feel free to take a moment.

11          A.    Because I think I put the thing in

12    there.  Yeah, yelled "Get on the ground," yeah, "two

13    other officers chasing him on foot," yeah, "verbal

14    commands, 'Get on the ground.'"

15          So apparently that's what they were

16    yelling.  So as far as the other two officers, that

17    would be Jeff and Bridget, so -- right?  Yeah, two

18    officers chasing him.  Because they were the ones

19    that were there, so -- yeah, that would be about it

20    for -- on our side.  I don't -- besides local chatter

21    of -- like I said, if you watch that video, you

22    should get any other, like, small chatter talk, kind

23    of where it's like, "Hey, he's running," or something

24    like that.  But other than that --

25          Q.    So aside from the three officers that

1  you were with and that --

2          A.   Well, two because I didn't even know

3  Anderson was over in the trees because, I mean, it

4  was basically Saldana and Noyes were by me.

5          Q.   At the time you did not know Anderson

6  was over there?

7          A.   No.  I knew he was out because we had

8  more cars, but I had no idea where he was out there,

9  yeah.

10         Q.   Okay.  So I guess, aside from the two

11 officers that you were aware that you were with, did

12 you hear -- and those -- and your commands, did you

13 hear any other commands that you were able to

14 discern?

15         A.   Well, I guess that would be the -- you

16 know, Eldridge and McArthur over there just with

17 commands to get on the ground.  That would be about

18 it.

19         Q.   Were you able to hear and understand

20 those commands?

21         A.   Apparently, yeah, because it has them

22 there.  I put what they were saying, so yep.  I think

23 back at it now, I was like -- I don't know.  It was a

24 while ago, but -- and I would be curious to know if

25 you could -- because if they're giving commands, you

1    might actually be able to hear those on my video.

2    It's going to be faint because they're so far out,

3    but you very well might hear them over there giving

4    those commands.

5            Q.    Did you hear any commands other than

6    "Get on the ground"?

7            A.    Not that I can remember, no.

8            Q.    Did you hear anybody identify themselves

9    as police?

10           A.    No.  Nothing jumps out, so...

11           Q.    If you had heard officers identify

12   themselves as police, would you have noted that in

13   your report?

14           A.    Yeah, if it jumped out to me.  That's so

15   common a lot of times that we yell -- if we're not

16   doing -- if we're doing SWAT entries, room entries,

17   warrant services, it's very, very clear that we do

18   that.  Sometimes, you know, "Police.  Get on the

19   ground," or something like that, but nothing jumps

20   out, so -- I assume that would be a video or audio

21   somewhere.  That's why I love body camera.

22           Q.    So you were aware of yourself, two

23   officers and --

24           A.    Uh-huh.

25           Q.    And were you -- I guess in the moments

1    before the shooting --

2          A.    Sure.

3          Q.    -- were you aware that there were other

4    officers on the -- coming through the field?

5          A.    Not until it kind of all started folding

6    out all at once, because then -- when they're running

7    and we're going to intercept, then I can see them up

8    there.  Before that, I -- no, I wasn't sure who was

9    where, so...

10          Q.    How can you -- I'm going to ask a rough

11    question.

12          A.    You're okay.

13          Q.    Can you estimate how long before the

14    shooting before you became aware of the opposite --

15          A.    Oh, you're talking --

16          Q.    -- of Eldridge and McArthur?

17          A.    -- seconds probably.

18          Q.    Okay.

19          A.    I mean, yeah, some 10 seconds.  Because

20    it's one of those, when we start running, then that's

21    when we see them over there, so...

22          Q.    Okay.  I'm looking at the last page of

23    your report.

24          A.    Okay.

25          Q.    It's Bates-numbered Defendants 102 --

```
 1              A.    Okay.  Gotcha.

 2              Q.    -- paragraph 5.

 3              A.    Okay.

 4              Q.    -- and you're saying, "Across the fence

 5    by a large post and turned to start running towards

 6    Sheeler.  As I was turning, I observed Sheeler facing

 7    the two officers and the subsequent gunfire from the

 8    officers in the driving range."

 9              A.    Yes.

10              Q.    Is that a true and correct statement?

11              A.    Yep.

12              Q.    Could you see Jake clearly in those

13    moments when you say you observed him?

14              A.    You mean, like, facing them?

15              Q.    In the moments before -- in those final

16    moments when you're saying, "I observed Sheeler

17    facing the officers," did you see him clearly?

18              A.    Yeah.  Because I had to go over.  And

19    it's one of that's rickety fences, so climbing over

20    it I'm going to have the -- I'm going to say a second

21    between negotiating the fence, hitting the ground and

22    looking back up.  So there's obviously going to be a

23    very small time where I had -- no longer was staring

24    at him.

25                    But yeah, by the time I looked back up,
```

1    yeah, you could see.  There was no obstruction from

2    trees, at least the angle I had, to where you could

3    see him and the officers -- I remember just more

4    focusing on him than where the officers were at that

5    time, so...

6            Q.   Okay.  What do you recall about what you

7    observed of Jake in that moment?

8            A.   That it was just -- it seemed like an

9    abrupt turn from the time that he was running when I

10   saw where he had spun back around to and he was just

11   facing straight towards them, and that's about it.

12           Q.   So he had changed direction?

13           A.   Correct.

14           Q.   Okay.  So give me a little more

15   description where he was when you saw him running.

16   He was moving -- is this east?

17           A.   That would be.

18           Q.   Maybe a little northeast?

19           A.   Yeah, northeast, something.  Depending

20   on where the light and everything is.  You know,

21   you're just kind of running through this way.  So it

22   would be more of a -- I don't even know which way he

23   turned.  All I know is, when he turned, if they were

24   here, he was basically facing towards them.

25           Q.   So he was moving -- I'm sorry I'm

1   belaboring this.

2          A.   You're okay.

3          Q.   So he's moving maybe northeast or

4   somewhere along this line of trees --

5          A.   Yeah, just depending on if he --

6          Q.   -- moving toward the golf park --

7          A.   -- came out of the dark or if he was on

8   the treeline or --

9          Q.   You just don't know where he came out

10  of, but you know he was moving toward the golf park

11  along the front edge --

12         A.   Yeah.

13         Q.   -- of the line of trees?

14         A.   Yeah.  To me it's one of those all I

15  know is I need to be from here to here to intercept

16  him because that's where he's running.

17         Q.   And you said he changed directions.

18  What do you mean by that?

19         A.   He faced them.

20         Q.   He faced -- so who was he facing?

21         A.   He would have faced -- I don't know

22  exactly where they were.  But he basically turned and

23  faced -- well, Bridget and Jeff there -- Eldridge and

24  McArthur, however you --

25         Q.   So you were over here.  Were you seeing

 1   his side?

 2          A.   Yes.  When he turned, yeah, it would

 3   have been -- yeah, because it -- just when he

 4   turned -- because I don't know if it was a little bit

 5   angled.  He was just -- faced them.

 6          Q.   Did he just make one turn or did --

 7          A.   That would be the moments where I'm

 8   trying not to break myself jumping over a fence.

 9          Q.   Okay.

10          A.   So was it an immediate stop?  I -- it

11   seemed quick because he was running.  And then when

12   I'm over the fence, he's facing them, so I -- yeah,

13   how he pivoted around, I don't know.

14          Q.   So in the split second that you saw him,

15   he was facing -- is it fair to say he was facing

16   south?

17          A.   Sure.  Yeah, he was facing towards them

18   wherever they were in reference to where he was,

19   so...

20          Q.   Do you have any independent knowledge

21   about where McArthur and Eldridge were standing at

22   the moment of the shooting?

23          A.   No.  I was more concerned about the

24   suspect.  I wasn't concerned about anything else.

25          Q.   So you can't testify to their location?

1          A.    I -- I -- I don't think I could place
2    them, huh-uh.  Not within -- you can go back in your
3    head and say, "Well I think," but not -- no --
4          Q.    Okay.
5          A.    -- so...
6          Q.    Okay.  So you're -- but you're saying he
7    was facing them but you can't place them?
8          A.    Correct.
9          Q.    How do you know that he was facing them?
10         A.    Because I knew their general location.
11         Q.    Okay.
12         A.    Yep.  It's kind of like if you're
13   standing in front of Walmart, I can tell you if
14   you're generally facing Walmart or not just because
15   we know where the building is.  It's the same kind of
16   thing:  I knew where they in general were because I
17   had noted them running, and so I knew they were
18   somewhere between him and the hill.  So that I can
19   know.
20         Q.    So essentially he was facing the hill.
21   The orientation is this -- the hills, and he was
22   facing the hill?
23         A.    Well, yeah.  It depends on how you want
24   to look at it, I suppose.
25         Q.    Walmart is a big area, right?

```
1            A.    It is, yep.  So if we're going to go
2    with a Datsun in front of Walmart or something like
3    that, then it's one of those where they were versus
4    where he was spinning.  He was spinning towards their
5    direction within probably 30 degrees just where
6    they -- because they were chasing him down the hill,
7    they were running through that lit area, and again,
8    as I recall, I think Bridget had a body cam anyway,
9    so hopefully that would clear up any questions about
10   where they were versus where he was when he spun,
11   but --
12           Q.    Okay.
13           A.    -- yeah, facing their general direction,
14   I guess.  I don't -- yeah.  So...
15           Q.    Okay.  And that's where he was facing
16   when you initially heard gunshots?
17           A.    Yes.  Yeah.
18           Q.    Okay.  When you first heard the
19   gunshots, did you have any -- did you know who was
20   firing?
21           A.    Yeah.  Yep.
22           Q.    How did you know?
23           A.    Just the direction of the shots and from
24   where he was.  That's how I knew that there was
25   another shot that came over my right shoulder from
```

1   the -- basically the direction of the shots.

2           Q.    Okay.  Who did you understand to be

3   shooting?

4           A.    The two -- whoever they were.  Because I

5   don't even know who was chasing him at the time.  The

6   Pocatello guys that were off to his side that he had

7   turned towards, so -- whoever they were.

8                 And now we know that they were McArthur

9   and Eldridge there.

10          Q.    What was your understanding at that

11  moment as to why they were shooting?

12          A.    No idea.

13          Q.    You didn't know?

14          A.    No idea.

15          Q.    You just knew that they were shooting

16  at --

17          A.    Yep.  All I know is they were involved

18  in a shooting.  I didn't know anything about the

19  details just because I didn't have -- obviously, I

20  wasn't where they were so I don't know.

21          Q.    Did you hear any warning before they

22  fired?

23          A.    Nothing that comes out, huh-uh.  No.

24          Q.    Okay.

25          A.    I know that they -- he kept running

1    while they were -- he was being given commands.  He

2    didn't stop, so -- kept running.  Other than that,

3    nope, nothing.

4          Q.    In the moment that you saw Jake before

5    the shooting, could you see his hands?

6          A.    Nothing that comes out -- yeah, nothing

7    jumps outs, because it seems like -- it seems like I

8    remember seeing an elbow or something, but that was

9    about it.  I don't remember.  Yeah, I don't remember

10   hands out or down or -- it seems like -- just

11   thinking about it, seems like there was an elbow, but

12   that's not -- nothing jumps out, so...

13         Q.    So you may have seen an elbow.  You

14   don't recall anything else about his arms?

15         A.    Just when he was turning, no.  Huh-uh.

16   No.  And I -- yeah, no, nothing that -- nothing that

17   jumps out.  And even that, I'm like "What do you plug

18   into your head two and a half years later?"  I don't

19   know, so -- yeah, nothing that jumps out, though.

20         Q.    And in the moment you saw him, he was

21   standing?

22         A.    Yes.

23         Q.    He was not walking and he was not in

24   motion at this time?

25         A.    No.  Huh-uh.  Yeah, he was stationary.

1    So almost like you stopped and post up, so...

2           Q.    Stopped?  What do you mean by that,

3    "stopped and post up"?

4           A.    It's like sometimes when you turn,

5    there's turning and keeping your legs kind of

6    flexible and then there's turning and just, I don't

7    know, like you're ready to fight somebody.

8           Q.    Would you mind demonstrating for me how

9    you saw him standing?

10          A.    If there's a way for her to articulate

11   that in the thing.

12          Q.    If you would just I guess stand and

13   describe for us what you're doing as you do it.

14          A.    I made it out.

15          Q.    Sorry I made you stand.

16          A.    So -- no.  Just kind of turning to where

17   you have, you know, your feet kind of in line with

18   your shoulders and -- you know, and that would be

19   about it, so -- and that's when I say "post up."

20   Because a lot of times when people are still running

21   or still in motion and stuff, their legs will just be

22   in a different position, but -- so -- and that's --

23   to me, this is bad in law enforcement if somebody

24   does that to me, so -- that's all, but...

25          Q.    Okay.  Thank you.

1          A.    Yep.  Hopefully that helps and you can
2  translate that into...
3          Q.    At the time that you became involved in
4  the hunt for -- in the search for Jake, did you have
5  any understanding of who was in charge on the
6  Pocatello side of things?
7          A.    Like, incident command person or
8  something?
9          Q.    Yes.
10         A.    No.  It's usually just the senior
11  officer on scene for them.  That's normally what it
12  is.
13         Q.    Did you know who that was?
14         A.    No, nor do we ever usually.  That's not
15  a common thing for us to know if we're out running
16  through the bush looking for somebody on a whim kind
17  of a thing.  But that's -- yeah, no.  If I need it,
18  I'm sure if I got on the air and asked who was in
19  charge or incident command or somebody, they could
20  have said it.  But usually incident commands and
21  stuff are done when things tend to drag out into area
22  perimeters and stuff like that, and I don't think
23  they quite got there.
24         Q.    So to this day you don't know who was in
25  charge on the Pocatello side of things?

1          A.   It would have been their patrol sergeant

2    or patrol one probably --

3          Q.   Do you know who that was?

4          A.   No.  No.  No.  Nope.

5          Q.   Did you do any planning with the

6    Pocatello police regarding how you were going to

7    arrest Jake?

8          A.   No.  And it's one of those -- I think we

9    already covered that in the forefront of this.  You

10   know how I got there and how I got involved.  So this

11   was no -- this was not a warrant service at a house.

12   This was a dynamic situation, so -- there is a

13   difference, so...

14         Q.   Okay.  So the extent of your

15   communications with Pocatello Police officers -- I

16   think it was those officers that you saw on the

17   scene?

18         A.   Yes.  Yes, right by me.  That would be

19   my extent of the communication with them.

20         Q.   And that was Saldana, correct?  Because

21   you were not even aware that Anderson was there?

22         A.   Not that he was in the trees at the

23   time.  He may have swung by in that back parking lot

24   or something, yeah.  And even with -- that was more

25   we were just out looking at that point.  I know I was

1   on Pocatello frequency listening to their stuff.

2           Q.    That was when you were in your vehicle,

3   though, correct?

4           A.    No.   I believe it was when I was out.

5           Q.    Did you change your -- you said you left

6   your --

7           A.    Normally I do.   But if you get involved,

8   something where you're out of the car and you want to

9   be communicating with other officers, you will change

10  it over to Pocatello frequency.   But let me see what

11  it says on this -- and that is something that we do

12  do, particularly if I'm out with Noyes who was there,

13  and he's -- I think he might have switched over too.

14              "Gun shut," blah, blah, blah, nope,

15  nope, nope, "Get on the ground, exit patrol vehicle,

16  walking eastbound through the parking lot, visually

17  checking the wooded area with my flashlight.   As I

18  approached the outbuilding on the southeast corner of

19  the Red Lion parking lot, paused and changed my radio

20  to the Pocatello channel" -- because we're going to

21  be out with the Pocatello units in that area and

22  that's obviously -- you want to be with them because

23  you don't want to be mistaken for somebody you're

24  not.

25              Yeah.   And while doing so, I heard -- so

1    right then I had changed the radio over.  So prior to

2    or during that search, I wouldn't have had it over on

3    their frequency.

4              Q.    When you're saying, "I changed to the

5    Pocatello channel," are you talking about your

6    vehicle radio?

7              A.    Handheld.  Because I was out of my

8    vehicle, yep.  Yep.

9              Q.    Okay.

10             A.    And that's right -- I mean, right when

11   everything went sideways.  So there still wouldn't

12   have been any, like, communication with Pocatello

13   prior to or during the search, to hopefully clarify

14   your first question.

15             Q.    When you spotted Jake in those final

16   moments before the shooting, you heard different

17   officers giving him commands?

18             A.    Uh-huh.

19             Q.    And I think you said you didn't know how

20   many officers were giving him commands?

21             A.    You could hear the commands being given,

22   but no, I wouldn't -- at the time I wouldn't have

23   been able to probably pick up on that.  I knew it

24   wasn't the ones by me; it was the ones over in that

25   side over in the field, if you want to call it that,

1    the lighted area.

2         Q.    Could you hear and understand all of the

3    commands that were being given?

4         A.    Well, apparently I could understand

5    enough to get on the ground because I put that in my

6    report.  So I understood that was being said.

7         Q.    Did you hear any other commands?

8         A.    Apparently not.  Nothing that jumps out.

9    I would be curious to listen to the -- I assume you

10   guys already have -- so listen to my video and you

11   might be able to hear other ones, or if there's

12   further -- or, if they say "Police" or anything like

13   that.  So other than that, nothing that jumps out

14   that I put in the record, so...

15        Q.    Okay.  And then following up on your --

16   on the fifth paragraph of -- on the last page of your

17   report --

18        A.    Fifth paragraph.  Okay.

19        Q.    Defendants 102, "I observed a single

20   gunshot off my right shoulder and behind me."

21             Is that a true and correct statement?

22        A.    Uh-huh.  Yep.

23        Q.    So as you've marked it, it seems Saldana

24   was just a little bit -- would you say "feet" behind

25   you?

1          A.    It was really loud, so -- that I can

2    tell you.  And as far as a gunshot goes, it sounded

3    like a rifle to me and it was loud.  So to me, you're

4    like, "Holy crap."  So I -- yeah, I don't know, 5,

5    10 feet off.  I wouldn't think very far back.  It's

6    got to be right in my vicinity there, so -- but yeah.

7               And I think Noyes was behind her, and he

8    was pretty close up to the fence, too, by that point,

9    so...

10         Q.    Okay.  Did you hear Saldana give any

11   commands?

12         A.    Huh-huh.  Nope.  I don't remember any.

13   Yeah, I don't remember hearing any voices that were

14   that close to me.  It's possible, but it doesn't -- I

15   don't remember anything.

16         Q.    Is that the kind of thing you would note

17   in your report?

18         A.    Likely not.  You know, that's one of

19   those that I'd probably put in mine what I said and

20   what I heard on the other, but -- yeah, if she was --

21   if she was yelling something, it didn't stick out to

22   me enough to put it in there, because it probably

23   wouldn't have continued.  But she's not loud.

24         Q.    She's not loud?

25         A.    Or she wouldn't be loud.  I don't know.

1  Yeah, I don't recall anything, though, from her back

2  there.

3          Q.    Okay.

4          MS. CHRISTIANSEN:  Can we take a 10-minute

5  break, please.

6                  (A recess was taken from 3:25 p.m. to

7  3:35 p.m.)

8          Q.    (BY MS. CHRISTIANSEN):  I think I just

9  have one last question.  Famous last words, right?

10          A.    Hey, that's all right.

11          Q.    In the moments before you heard

12  gunfire --

13          A.    Okay.

14          Q.    -- did -- did you hear Jake say

15  anything?

16          A.    Huh-uh.

17          Q.    Okay.

18          A.    Yeah.

19          Q.    Fair enough.

20          MR. ANGELL:  Just going to clarify that.

21  That "huh-uh" was a "no"?

22          THE WITNESS:  "No," correct.  No.  Thank you.

23          MS. CHRISTIANSEN:  Thank you.

24          MR. ANGELL:  Maybe I will just ask a few

25  questions, Trooper Orr.

| | |
|---|---|
| 1 | EXAMINATION |
| 2 | BY MR. ANGELL: |
| 3 | Q.   My name is Sam Angell.  I represent the |
| 4 | City of Pocatello and the named defendants in the |
| 5 | lawsuit.  I don't want to cover what she's already |
| 6 | covered, but a couple of follow-up things. |
| 7 | Did you hear anyone yell "Back up" to |
| 8 | Jake Sheeler? |
| 9 | A.   No.  That doesn't come to mind at all. |
| 10 | Q.   You certainly did not yell that? |
| 11 | A.   No.  Huh-uh. |
| 12 | Q.   It's 100 percent "no"? |
| 13 | A.   Yeah.  I don't know why I would, yeah, |
| 14 | and that would be on my video. |
| 15 | Q.   Let's just set that video aside -- |
| 16 | A.   Okay. |
| 17 | Q.   -- because we're not going to listen to |
| 18 | that.  I want to go from memory. |
| 19 | A.   Yeah, no. |
| 20 | Q.   "No"?  That one's a "no"? |
| 21 | A.   I have no idea why I would yell that. |
| 22 | That makes no sense.  Nope. |
| 23 | Q.   Okay.  Counsel asked you a whole bunch |
| 24 | of questions about this business of whether you were |
| 25 | facing the officers -- excuse me -- whether Sheeler |

 1    was facing the officers.  I don't know if she ever

 2    asked you could you see the officers right at that

 3    moment that the gunfire started?

 4            A.   I knew their general location.  I think

 5    there were some in the bushes and stuff.  I had seen

 6    them come down off the hill so I knew they were right

 7    over there.  That's why I wouldn't be able to place

 8    them exactly, but I knew their general location.  If

 9    I had to fire a gun that way, I would be able to

10    safely do so because I knew enough where they were at

11    at the time to where it wouldn't have been an issue,

12    if that makes sense.

13            Q.   It does.  Just not to be too

14    nit-picky --

15            A.   No, please.

16            Q.   -- but at that moment that you saw

17    Sheeler when you -- I think the phrase you used was

18    he "posted up" a little bit, so freeze-frame that for

19    a minute for me.

20            A.   Okay.

21            Q.   In that freeze-frame in your mind, you

22    cannot see the officers, just Sheeler?

23            A.   Just because I'm staring at him.  I'm

24    not saying they're not peripheral or something like

25    that, but I knew where they were and -- yeah, I just

1    was focused on that.  Call it visual acuity, call it

2    what you want, but that was my focus at the time.

3            Q.    Let me move you forward to one other

4    area that I wanted to talk to you about --

5            A.    Yeah, sure.

6            Q.    -- that's on your written report.  If

7    you will, go to page 2 of your report.

8            A.    Okay.  Make sure I got the right one.

9    Okay.  2.  All right.  I think I'm messing up your

10   organization there.  Okay.  Page 2.  Gotcha.

11           Q.    So after the shooting, you ran up to

12   provide some medical assistance.

13           A.    Correct.

14           Q.    Do you remember that?

15           A.    Yep.

16           Q.    So I wanted to ask a few things about

17   that.

18           A.    Okay.

19           Q.    Paragraph 6 --

20           A.    Okay.

21           Q.    -- you state, "I had observed a gunshot

22   wound to the left neck of Sheeler which was not

23   bleeding heavily."

24                 Can you, like, point on your neck where

25   you saw it on him?  Do you remember?

1          A.    I don't.  Yeah, it would have been --
2    obviously left side is going to be somewhere over
3    here.  If I made mention about the carotid, it would
4    make sense that it was somewhere right in this area,
5    probably on the outside or something.  That would
6    be something to me probably more superficial because
7    I don't remember -- I don't remember any air or
8    anything coming out of it.  And I know if you get
9    shot in the neck muscles, a lot of the constriction
10   will keep it from bleeding, so...
11         Q.    Was that an entry wound that you saw on
12   his neck?
13         A.    Yeah.  It didn't look like an exit
14   wound, but -- depends on the ballistics of anybody's
15   rounds.
16         Q.    So let me move you down to paragraph 7.
17         A.    Okay.
18         Q.    The second sentence, it says, "I
19   observed a bullet wound to Sheeler's left chest area.
20   I applied a chest seal to the wound that was provided
21   to me by a Pocatello officer."
22         A.    Yep.
23         Q.    Same question:  Can you point where that
24   one was?  Do you remember enough to know?
25         A.    Yeah, I don't.  It seems like it was --

1   seems like it was kind of lower for -- especially

2   being concerned about getting a chest seal, I would

3   be concerned about, you know, pneumothorax, like a

4   chest wound.  So I assume it would have been more up

5   in this area.

6              Q.   And you're indicating lower left chest?

7              A.   Yeah.  If that's -- because what I had

8   was on the upper left, yeah.  Well, I don't

9   remember -- I don't.  I couldn't.

10             Q.   Well, I think you're just saying --

11             A.   Left side, yep.  In the report, I have

12  Sheeler's left chest area.  So it was somewhere

13  between here and here.  That -- at least when I

14  envision that being written.  It seems I wrote it --

15  I would think in this area, but --

16             Q.   Entry wound?

17             A.   I would assume, but I don't -- I don't

18  know because, even when we rolled him, the wound on

19  the back -- they all kind of looked roughly the same.

20  And to be fair, with triage, it's not like -- you

21  know, it's not like they're getting hit by 50 cals

22  where you're small entry wound and large exit wound

23  in the back.  But a lot of the 9mm and high-speed

24  rounds and ballistics that we have, sometimes it's

25  difficult for me to tell the difference.  I'm not --

```
 1   all I know is, through the training I've had, you
 2   patch the holes, and that's kind of where we were
 3   focused.
 4          Q.   I don't mean to turn you into a medical
 5   expert.
 6          A.   No, you're fine.
 7          Q.   I'm just going to ask this because, as
 8   surprising as it may seem, there is not a lot of good
 9   testimony in this case about whether they were entry
10   or exit wounds.  So can you tell me, from your
11   observation do you believe that it was an entry wound
12   in his left chest area?
13          MS. CHRISTIANSEN:  Objection.  Foundation,
14   calls for expert opinion.
15          Q.   (BY MR. ANGELL):  You can go ahead and
16   answer.
17          A.   So as far as the -- there wasn't
18   anything protruding outwards.  It was a very clean
19   wound, if that makes sense.  So again, depending on
20   ballistics, a bullet and any number of things, a lot
21   of times the entry wounds tend to be cleaner than the
22   exit wounds.  However, you know, that's about all I
23   can say.  It appeared to be a clean wound when I did
24   put the wrap stuff over it, but -- yeah.  Somebody --
25   I think it might have been McArthur -- somebody
```

1    watched the body cam at some point and they had

2    mentioned, "Hey, good job putting him back together."

3    So there's got to be some kind of good video I've

4    never seen.  I don't know, so...

5             Q.    Paragraph 8, you say, "Two Pocatello

6    officers applied two tourniquets to the upper left

7    leg area."

8             A.    Okay.

9             Q.    Excuse me.  I read that wrong.  "To the

10   left upper leg."

11            A.    Right.

12            Q.    And apparently, another wound there?

13            A.    Must be.  I never dealt with any leg

14   wounds.  I was just more upper torso.  That's kind of

15   where I focused.

16            Q.    Then in paragraph 9, I think you

17   mentioned this area again kind of there in the

18   middle.  You say, "As we continue to render aid and

19   check his person for any weapons, a second gunshot

20   wound was located on the left side of Sheeler's back.

21   It appeared to be an exit wound from the front entry

22   wound that I sealed earlier."

23            A.    So that would probably be because it was

24   torn open more.  It wasn't as clean.  That probably

25   would be why.

1          Q.   So was that entry on the left side, exit
2    on the left side back consistent with your
3    observation of the way he was standing at the time
4    you heard the gunfire?
5          MS. CHRISTIANSEN:   I'm going to object.
6          THE WITNESS:   Sure.   It would make sense,
7    yeah, if you had an impact up here and it came out
8    the back.   Sure.   Yep, that would totally make sense.
9          Q.   (BY MR. ANGELL):   You made a comment
10   about the way he was standing, that "post up."   You
11   said, "In law enforcement, this is bad."   I wrote
12   that down right.   Why?
13         A.   When people tend to stand towards us in
14   any position other than the casual conversation,
15   that's -- anything outside the normal is not normal
16   and we have to look at it differently.   So if you
17   have somebody who's just general conversation, just
18   hanging out, talking, great.   If somebody's spread
19   their feet apart, if somebody drops their leg back,
20   if somebody -- we see normal thousands of times a
21   day, and when somebody does something that's not
22   normal, we -- that tends to cue up to us.   We're like
23   okay, that's just -- people just don't normally do
24   that.   And that's all it is.   And that's when I said
25   it's kind of -- if somebody stands in a different

1    way -- I've had cowboys take their hat off dealing

2    with me and I've made them put it back on because

3    cowboys don't take their hats off unless they're

4    going to fight.  There's all kind of things that you

5    start to notice about people in general, and that's

6    not -- it's not -- people normally don't spin around

7    and stand -- I mean, that's -- it's a fighting

8    stance, it's a shooting stance.  Call it what you

9    want.  It's -- that's -- I mean, that's what I do

10   when I'm on the range, you know.  I -- it's a

11   different stance.  It's just different, so -- not

12   normal for people, that's all.

13          MR. ANGELL:  Thanks.  I don't have any other

14   questions.

15                    FURTHER EXAMINATION

16   BY MS. CHRISTIANSEN:

17          Q.   Do you have any training in -- any

18   specialized training in identifying entry and exit

19   wounds?

20          A.   So as far as entry/exit, I've just done

21   a lot of the triage military in the Marine Corps

22   stuff.  So it's -- have I seen a lot of pictures and

23   things on entry/exit wounds?  Sure.  Have I patched

24   up people who have tried to commit suicide and stuff

25   like that?  Yep.  Have I ever received any kind of

1    medical training?  Not really.  It's one of those --

2    a lot of it's been done by doctors and physicians.

3    We've seen a lot of videos.  So I have practical

4    experience in some of the -- you know, lack of better

5    term -- working knowledge to try to save people's

6    lives.  That's about it.

7            MS. CHRISTIANSEN:  Okay.  I think we're done.

8            (Deposition concluded at 3:46 p.m.)

9                    (Signature requested.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         CERTIFICATE OF TROOPER TODD ORR

2

3      I, TROOPER TODD ORR, being first duly sworn,

4  depose and say:

5      That I am the witness named in the foregoing

6  deposition; that I have read said deposition and know

7  the contents thereof; that the questions contained

8  therein were propounded to me; and that the answers

9  contained therein are true and correct, except for

10 any changes that I may have listed on the Errata

11 Sheet attached hereto.

12       DATED this _____day of _____20_____.

13

14        CHANGED ON ERRATA SHEET   YES___NO___

15

16     _____

17     TROOPER TODD ORR

18     SUBSCRIBED AND SWORN to before me this

19     _____day of _____20_____.

20

21

22

23     _____

24     NAME OF NOTARY PUBLIC
       RESIDING AT_____

25     MY COMMISSION EXPIRES_____

1    **ERRATA SHEET FOR TROOPER TODD ORR**

2    Page_____Line_____Reason for Change
_____
3    Reads
_____
4    Should Read
_____
5    Page_____Line_____Reason for Change
_____
6    Reads
_____
7    Should Read
_____
8    Page_____Line_____Reason for Change
_____
9    Reads
_____
10   Should Read
_____
11   Page_____Line_____Reason for Change
_____
12   Reads
_____
13   Should Read
_____
14   Page_____Line_____Reason for Change
_____
15   Reads
_____
16   Should Read
_____
17   Page_____Line_____Reason for Change
_____
18   Reads
_____
19   Should Read
_____
20   Page_____Line_____Reason for Change
_____
21   Reads
_____
22   Should Read
_____

23

24

25      SIGNATURE:_____

1                    REPORTER'S CERTIFICATE

2              I, Amber S. Williams, CSR NO. 1080,

3    Certified Shorthand Reporter, certify:

4              That the foregoing proceedings were taken

5    before me at the time and place therein set forth, at

6    which time the witness was put under oath by me.

7              That the testimony and all objections made

8    were recorded stenographically by me and transcribed

9    by me or under my direction.

10             That the foregoing is a true and correct

11   record of all testimony given, to the best of my

12   ability.

13             I further certify that I am not a relative

14   or employee of any attorney or party, nor am I

15   financially interested in the action.

16             IN WITNESS WHEREOF, I set my hand and seal

17   this 19th day of June, 2023.

18

19

20   _____

21             AMBER S. WILLIAMS, CSR NO. 1080

22             Notary Public

23             Post Office Box 2636

24             Boise, Idaho  83701-2636

25   My commission expires June 1, 2027

# Exhibit 17

1

# UNITED STATES DISTRICT COURT

## IN AND FOR THE STATE OF IDAHO

| | |
|---|---|
| JAKE SHEELER, an individual, | ) |
|                Plaintiff, | ) Case No. |
| vs. | ) 4:22-cv-00313- |
| BRIDGET MCARTHUR, an individual; | ) DCN |
| JEFFREY E. ELDRIDGE, an individual; | ) |
| MARISA A. SALDANA, an individual; | ) |
| ROGER SCHEI, an individual; and | ) |
| CITY OF POCATELLO, a municipal | ) |
| Corporation; | ) |
|                Defendants. | ) |

DEPOSITION OF MARISA A. SALDANA

February 16, 2023

REPORTED BY:

AMBER S. WILLIAMS, C.S.R. No. 1080

Notary public

1    THE DEPOSITION OF MARISA A. SALDANA was

2    taken on behalf of the plaintiff at the Holiday Inn

3    Express & Suites, 200 Via Venitio, Pocatello, Idaho,

4    commencing at 8:46 a.m. on February 16, 2023, before

5    Amber S. Williams, Certified Shorthand Reporter and

6    Notary Public within and for the State of Idaho, in

7    the above-entitled matter.

8

9                APPEARANCES:

10   For Plaintiff:

11       CHRISTENSEN & JENSEN, PC

12       BY:  KARRA J. PORTER

13       BY:  ANNA P. CHRISTIANSEN

14       257 East 200 South, Suite 1100

15       Salt Lake City, Utah  84111

16       karra.porter@chrisjen.com

17       anna.christiansen@chrisjen.com

18   For Defendants:

19       HALL ANGELL & ASSOCIATES, LLP

20       BY:  SAM L. ANGELL

21       1075 South Utah Avenue, Suite 150

22       Idaho Falls, Idaho  83402

23       sla@hasattorneys.com

24

25

1                         **I N D E X**

2

3    TESTIMONY OF MARISA A. SALDANA                    Page

4        Examination by Ms. Porter.................... 4

5

6

7

8

9                          EXHIBITS

10    Exhibit 2.    Eastern Idaho Critical Incident.. 35

11                  Team Supplemental Report

12                  Form 18, Bates Nos. DEFENDANTS

13                  000162 - DEFENDANTS 000172

14    Exhibit 3.    Aerial View of Scene............. 34

15    Exhibit 5.    Eastern Idaho Critical Incident.. 26

16                  Team Supplemental Report

17                  Form 34, Bates Nos. DEFENDANTS

18                  000348 - DEFENDANTS 000358

19    Exhibit 6.    Summary of interview of Marisa... 18

20                  Saldana, Bates Nos. DEFENDANTS

21                  000092 - DEFENDANTS 000096

22

23

24

25

```
 1                    MARISA A. SALDANA,
 2   first duly sworn to tell the truth relating to said
 3   cause, testified as follows:
 4                        EXAMINATION
 5   BY MS. PORTER:
 6          Q.   Could you please state and spell your
 7   name for the record.
 8          A.   Yes.  Last name Saldana S-a-l-d-a-n-a,
 9   Marisa M-a-r-i-s-a.
10          Q.   And we were introduced before the
11   deposition began so I'm just going to start right in
12   with my first line of questioning, okay?
13          A.   Okay.
14          Q.   What is your current occupation?
15          A.   I'm a patrol officer with the City of
16   Pocatello.
17          Q.   And how long have you worked for the
18   Pocatello Police Department?
19          A.   Since December 3rd, 2019.
20          Q.   What was the process that you followed
21   to get a job with Pocatello PD?
22          A.   I had to take a civil service exam
23   through the City of Pocatello.  Once that was
24   completed, I had to take a background, a polygraph,
25   psych exam, and I believe that was it.
```

1          Q.    Were you recruited to the position or

2     did you just apply on your own?

3          A.    I just applied on my own.

4          Q.    Can you just very generally describe for

5     me what the duties of a patrol officer are for PPD as

6     you understand it?

7          A.    So I am just a patrol officer.  So my

8     duties are to take regular service calls, whether

9     that be domestics, disturbances, DUIs, traffic

10    enforcement.

11         Q.    Have you ever had your deposition taken

12    before?

13         A.    No.

14         Q.    Have you ever testified in court before?

15         A.    Yes, ma'am.

16         Q.    Can you just give me some random

17    examples of the type of cases on which you've

18    testified in court before?

19         A.    Just DUIs, domestics, assaults.

20         Q.    That's good.

21         A.    That's kind of just the basis of what

22    I've done.

23         Q.    Understood.  In each of the times that

24    you testified in court, have you been testifying

25    about things that you observed as a fact witness or

1    did you understand that in any of those cases you
2    were testifying as an expert witness?
3            A.    I guess -- could you re-ask the
4    question?
5            Q.    Okay.  In each of the times that you
6    testified in court, was it regarding something that
7    you had participated in or seen?
8            A.    Yes, ma'am.
9            Q.    Have you ever been hired by someone to
10   give opinions about a case that you originally had
11   nothing to do with?
12           A.    No, ma'am.
13           Q.    Are there different categories of patrol
14   officers or classes or something like that?
15           A.    I mean, as far as patrolmen, there's
16   traffic enforcement officers and then you just have
17   your regular patrolmen, then you detectives and so
18   on.
19           Q.    I could easily be misremembering.  I
20   thought I saw something that referred to you as a
21   Third-Class Patrol Officer.
22           A.    Oh, that's correct.  At the time of the
23   incident, I was a third-class patrol officer.
24           Q.    Are there types of classes, then, for
25   patrol officers?

1          A.    So there's third-class, second-class and
2    first-class patrolmen.
3          Q.    And what is your understanding of the
4    differences between third class, second class, first
5    class?
6          A.    From what I understand, it's experience.
7    Years of service.
8          Q.    Okay.  And I guess what class are you
9    right now?
10          A.    I'm now a first-class patrolman.
11          Q.    Let me take you back to September of
12    2020, okay?
13          A.    That's fine.
14          Q.    And for reference, that is the month
15    during which Jake Sheeler was shot, okay?
16          A.    Yes, ma'am.
17          Q.    All right.  As of September of 2020,
18    tell me all of the means by which officers could
19    communicate with each other.
20          A.    I'm sorry.  Can you just rephrase the
21    question?  Repeat the question.
22          Q.    What was unclear about it?
23          A.    I just didn't hear the last part of --
24    I'm sorry, I'm a little hard of hearing.
25          Q.    Fair enough.  So am I.

1              Remember, my questions are as of

2    September 2020.

3         A.    Okay.

4         Q.    Tell me all of the means by which

5    officers could communicate with each other as of

6    September 2020?

7         A.    Like, total means or just, like, while

8    on patrol?

9         Q.    Any means by which patrol officers or

10   any other PPD officers could communicate with each

11   other.

12        A.    Radio traffic if you're out of your

13   patrol vehicle.  If you're in your patrol vehicle, we

14   have a computer, otherwise known as on CAD.  There's

15   an IM system in there, instant message system.  We

16   also have department e-mails as well as cell phone

17   text messages, phone calls.

18              Does that answer your question?

19        Q.    Yeah.  I'm just writing down the last

20   couple that you said.  Slow writer.

21        A.    Sure.  No problem.

22        Q.    You said you had department e-mails.

23   What came after that?

24        A.    Cell phone.

25        Q.    Cell phone.  As of September 2020, do

1    you know whether there was any sort of a

2    group-texting ability within the Pocatello Police

3    Department?

4              A.    Was there an ability?  Yes.

5              Q.    Do you know whether it was ever

6    implemented as of September 2020?

7              A.    As a policy?

8              Q.    No, just ever done.

9              A.    No.

10             Q.    Okay.  Was it -- prior to September

11   2020, was the group text ever done even once within

12   the Pocatello Police Department, to your knowledge?

13             A.    To my knowledge, no.

14             Q.    Let me ask you a little bit more about

15   the CAD that you mentioned.

16             A.    Sure.

17             Q.    And you used a couple of acronyms that I

18   suspect I know what they mean, but I'm going to need

19   to ask you to elaborate on those.

20                   Tell me what CAD stands for.

21             A.    Oh, the whole acronym, I'm not sure I

22   know what the -- the C stands for computer, but I'm

23   not sure what the whole definition is.

24             Q.    Okay.  IM?

25             A.    Instant message.

```
 1              Q.    Okay.  So tell me the process by which
 2   instant messages were conveyed as of September 2020.
 3              A.    When you say "conveyed" --
 4              Q.    You know, sent/received.
 5              A.    I mean, it's just like your regular
 6   e-mail instant message.  You can click on a name and
 7   a message can go out or you can click on a group and
 8   the message can go out to the group.
 9              Q.    And that was the case in September of
10   2020, correct?
11              A.    Yes, ma'am.
12              Q.    Did you say that the IM is available
13   when you're in your vehicle?
14              A.    Yes, ma'am.
15              Q.    Is it available any other -- as of
16   September 2020, was it available in any way when you
17   were outside your vehicle?
18              A.    No.
19              Q.    As of September 2020, tell me generally
20   how the radio-traffic mechanism worked.  In other
21   words, how could -- tell me the mechanism if you
22   wanted to get on and use radio traffic to send a
23   message to someone else.
24              A.    There's a mike that's on our lapel.  You
25   just click the mike and it hits the radiofrequency.
```

1   Pocatello, ISP, Chubbuck, we have our own

2   radiofrequencies.  So my radiofrequency's programmed

3   for Pocatello.  It's just a mike and you just click

4   the mike.

5        Q.   And by clicking the mike as you

6   described, would you be able to speak to anyone else

7   who was currently on that frequency, or that channel?

8        A.   Yes.

9        Q.   Let's go ahead and go to the night of

10  Jake Sheeler's shooting, okay?

11       A.   Okay.

12       Q.   Do you know whether you shot Jake

13  Sheeler?

14       A.   Yes.  Well, correction.  I know I fired

15  my handgun.  That's no question.

16       Q.   And do you know -- well, how many times

17  did you fire your handgun?

18       A.   At the conclusion of the investigation,

19  it was determined I only fired once.

20       Q.   And do you know whether your bullet

21  struck Jake Sheeler?

22       A.   I do not.

23       Q.   Have you ever asked anyone?

24       A.   No.

25       Q.   Why is that?

```
 1            A.    I just never asked.
 2            Q.    Do you care whether your bullet hit Jake
 3   Sheeler?
 4            A.    I guess what's the relevancy to that
 5   question?
 6            Q.    You have to answer it.  The judge can
 7   decide later if it's not relevant.
 8            A.    You asked if I cared if it hit him?
 9            Q.    I said, "Do you care if your bullet hit
10   Jake Sheeler?"
11            A.    Yes.
12            Q.    Okay.  But you don't care enough to ask
13   if it did?
14            MR. ANGELL:  Objection.  Argumentative.
15            Q.    (BY MS. PORTER):  Is that a fair
16   statement?
17            MR. ANGELL:  Objection.  Argumentative.
18            Q.    (BY MS. PORTER):  But you still have to
19   answer argumentative questions.
20            A.    Can you repeat your question?
21            Q.    (BY MS. PORTER):  Okay.  So you do care
22   whether your bullet hit Jake Sheeler but not enough
23   to ask anyone.  Is that a fair statement?
24            MR. ANGELL:  Same objection.
25            THE WITNESS:  I mean, it's just -- it was
```

```
 1   just never, like, a thought process for me to ask.
 2   It was never something that crossed my mind.
 3          Q.   (BY MS. PORTER):  Okay.  Did you give up
 4   your gun after you shot it that night?
 5          A.   Yes.
 6          Q.   To whom did you give that up?
 7          A.   The Critical Incident Team that arrived
 8   at the department.
 9          Q.   Did you get your gun back at some point?
10          A.   I did not.  I personally did not get
11   that firearm back.  I was issued a new one.
12          Q.   Do you know where that particular
13   firearm is to this day?
14          A.   It should be at Pocatello Police
15   Department.
16          Q.   And do you know whether there's any
17   particular division or department that you believe
18   should have possession of it?
19          A.   I'm not sure who would have it.
20          Q.   And why is it that you believe that PPD
21   probably has that?
22          A.   I was given the opportunity to have the
23   same firearm back, however I was issued a brand-new
24   model GLOCK 17.
25          Q.   Okay.  What kind of ammunition did you
```

1    have the night of Jake Sheeler's shooting?

2              A.    It was 9mm round.

3              Q.    Do you have any more information about

4    the type of ammunition?

5              A.    I can't remember off the top of my head.

6    During the incident I did, but I can't remember right

7    now.

8              Q.    All right.  What kind of ammunition do

9    you have now?

10             A.    The same -- the same ammunition as the

11   incident.

12             Q.    Do you have any more information about

13   the kind of ammunition you're currently using?

14             A.    I can't remember, no, ma'am.

15             Q.    When did you -- now, this is a "when."

16   Just a very narrow question.

17             When did you first contact an attorney

18   with respect to the shooting of Jake Sheeler?

19             MR. ANGELL:  So because that's close to the

20   attorney-client privilege, make sure that your answer

21   is only when and not any discussions you may have had

22   with an attorney.  Does that make sense?  You can go

23   ahead and answer that, if you can.

24             THE WITNESS:  You say when did I contact an

25   attorney?

1          Q.    (BY MS. PORTER):   Well, let me narrow

2    it.  And remember I'm not asking for any

3    communications at all, all right?

4          A.    Sure.

5          Q.    Just the date and fact of legal

6    representation, because those aren't covered by the

7    attorney-client privilege.  So all I'm asking is when

8    did you first become represented by an attorney in

9    connection with the Jake Sheeler shooting?

10         A.    That evening.

11         Q.    Okay.  And again, I don't want

12   communications.  But how did you come to be

13   represented by counsel.  I literally just mean

14   through -- via e-mail?  Via phone?  By someone

15   showing up -- as examples.

16         A.    By phone.

17         Q.    Okay.  And then -- again, no

18   communication -- a phone call placed by you or

19   received by you?

20         A.    I had someone contact my attorney.

21         Q.    Okay.  Let's stop there.  Who was the

22   person that you had contact the attorney?

23         A.    I don't recall.

24         Q.    Was it an attorney?

25         A.    No.

1          Q.    Okay.  Who was the person just
2    generally?
3          A.    I honestly don't recall.
4          Q.    Okay.  What did you tell that person?
5          A.    I did not have my phone, I don't
6    believe, and just asked them to contact the attorney
7    I had chosen.
8          Q.    When you say that you "had chosen," did
9    you have some sort of pre-choice or something or -- I
10   mean, what do you mean that you "had chosen"?
11         A.    Through FOP.  I was not familiar with
12   the process with that and was just explained how to
13   contact the attorney.
14         Q.    Okay.  So you called the Fraternal Order
15   of Police -- or, no.  Did you call the FOP or did you
16   have someone else call the FOP for you?
17         A.    Neither.
18         Q.    Okay.  I'm sorry.  Just go ahead and
19   tell me how you contacted or came into contact with
20   the FOP.
21         A.    So a member of the police department, I
22   don't remember who, informed me how the FOP process
23   worked, and -- an attorney that was represented by
24   the FOP, and -- that's how -- I just said, "Okay.
25   Call him."

1              Does that make sense?

2         Q.   I think so.  I just want to make sure I

3    get who the "hims" are.

4              A police officer told you -- no.  I'm

5    sorry.  I missed it.  Can you give it to me step by

6    step?  And instead of saying things like "him" or

7    "they," try to say, like, "the officer" or something

8    like that.

9         A.   So when the incident occurred, all I

10   could remember from my training pre-FTO when I was in

11   the Mini-Academy was any incidents you contact an FOP

12   attorney.  So being, you know, an officer who's never

13   been involved in this, I just told another officer,

14   "Hey, I need to contact an FOP attorney."

15             And they said, "Okay.  Who do you want

16   us to contact?"

17             And I said, "I don't know.  I've never

18   been involved in this situation."

19             And they said, "Okay.  Somebody's

20   contacted this attorney, this attorney.  What do you

21   want to do?"

22             I'm like, "Okay.  Contact that

23   attorney."

24        Q.   Okay.  I understand.  Okay.  How many

25   days after the shooting were you interviewed?  Oh,

1    wait.  Strike that.

2                  Do you believe that you were interviewed

3    on September 30th of 2020 at approximately 3:10 p.m.?

4          A.    It sounds right.

5          Q.    I'm going to have a few questions about

6    your interview, and -- there was a summary prepared,

7    and just out of fairness and to make this faster, I'm

8    going to be giving you a copy of that to look at too.

9                  (Exhibit 6 marked.)

10          Q.    (BY MS. PORTER):  First of all, let me

11   ask you to look at Exhibit 6 and tell me whether

12   you've seen it before.

13          A.    Yes, ma'am.

14          Q.    When's the last time you saw it?

15          A.    This morning.

16          Q.    Did you review it in anticipation of

17   this litigation -- I mean this deposition?

18          A.    Yes, ma'am.

19          Q.    And did you do so at least in part to

20   refresh your recollection?

21          A.    I tried, yes, ma'am.

22          Q.    Okay.  Now, what do you understand

23   Exhibit 6 -- well, let me just ask -- I don't think

24   it's disputed:  Do you understand that Exhibit 6 is a

25   summary prepared of an interview that you gave on

1  September 30, 2020?

2         A.   Yes, ma'am.

3         Q.   I notice that your name is misspelled on

4  this; is that correct?

5         A.   Yes, ma'am.

6         Q.   All right.  Do you know why you were not

7  interviewed in this -- or, strike that.

8              Do you know why you were not interviewed

9  with respect to the Sheeler shooting until some four

10  or five days later?

11        A.   From my understanding, they want you to

12  have a complete sleep cycle, so -- to properly

13  refresh your memory.  I don't know anything else

14  other than that.

15        Q.   There are a couple of terms in this

16  summary that I just need translated for me, if that's

17  okay.

18        A.   I will do my best.

19        Q.   All right.  You see the numbers at the

20  bottom of the document?  It says "Defendants 000092,"

21  for example?

22        A.   Yeah.

23        Q.   Okay.  So if we turn to the next page,

24  which is 93, second full paragraph, third line down,

25  there's a reference to a, quote, south shift.

1          A.    Okay.

2          Q.    What did that mean?

3          A.    So the City of Pocatello, our patrols

4    are done in what's called "beats" or north/south.  So

5    there's the south side of Pocatello and the north

6    side of Pocatello.  So you're either issued one beat

7    or the other.  Does that make sense?

8          Q.    Yes.  You recall where Jake Sheeler was

9    when he was shot, correct?

10          A.    That's correct.

11          Q.    And would that be in the south part, as

12    you've described it, or the north part?

13          A.    That would be the north side of town.

14          Q.    How did you end up on scene there at

15    that location?

16          A.    They just called for any available

17    officers, if that's -- if that makes sense.

18          Q.    And how did -- how did they do that?

19          A.    I believe it was in person.  I think I

20    was at the station just doing reports when the

21    incident showed up on screen.

22          Q.    When -- all right.  At the station on

23    screen, which one of the communication methods would

24    be showing up on screen at the station?

25          A.    So just because I'm not familiar, am I

1    allowed to ask a question?

2         Q.   You can ask for clarification.  If the

3    question doesn't make any sense, I'll try to fix it.

4         A.   Okay.  So I guess I'm just curious.  I

5    was involved in two incidents with Sheeler that day,

6    so I'm just curious if you're asking about the first

7    incident or the second.

8         Q.   I'm talking at this point -- this line

9    of questioning deals with the location where he was

10   shot, and so that's the incident that I'm talking

11   about.

12        A.   Okay.

13        Q.   But that is a helpful clarification.

14        A.   I just wanted to make sure.

15        Q.   Yeah.

16        A.   So would you ask your question again?

17   I'm sorry.

18        Q.   Yes.  Okay.  So we -- I think we were

19   talking about how you ended up at the location where

20   Jake Sheeler was shot.

21        A.   Okay.

22        Q.   And I believe you indicated it was

23   likely you were in the station and you said something

24   about it came on the screen.

25        A.   Sure.

1          Q.    And I just want to know what does that
2    mean?
3          A.    At the time when the incident started to
4    unfold towards the Red Lion, we had gotten -- and
5    when I say "we," I mean dispatch.  I don't remember
6    if it was a 911 or just a regular dispatch call
7    stating that a male was trying to sell a firearm in
8    the area of Monte Vista and Beth, which was just
9    south of where Mr. Sheeler was shot.
10         Officers were asked to respond to that
11   location to try to locate him, and that's how I ended
12   up in the general vicinity.
13         Q.    So you were one of the officers that
14   responded to that request?
15         A.    That's correct, yes, ma'am.
16         Q.    And what did you do in response to that?
17   And by the way -- let me back up.
18         That was the second incident now or is
19   this the first incident and then the shooting was the
20   second incident?
21         A.    So this is leading up to the Red Lion.
22   This is kind of around the same timeframe.
23         Q.    Okay.  Just so we have a clear record,
24   let me go back and just ask you what was the first
25   thing that you did on September 205th that in any way

1    related to Jake Sheeler or a suspect later determined

2    to be Jake Sheeler?

3         A.    I was dispatched to the area of Hyde

4    where a male had burglarized a home and had stolen a

5    number of handguns.  I was asked to assist on that

6    call.  I did not have any involvement in the actual

7    burglary.  I kind of just remained on perimeter.

8         Q.    Did -- you didn't interview any -- the

9    homeowner or anything like that?

10        A.    No, ma'am.

11        Q.    Now, you said that the suspect had

12   stolen a number of handguns.  It was later determined

13   that the homeowner had inaccurately reported the

14   number of handguns that had been stolen; is that

15   correct?

16        A.    I'm not sure.

17        Q.    You don't know one way or the other?

18        A.    No, ma'am.

19        Q.    Okay.  So obviously, you wouldn't know

20   when that corrected report came in, then?

21        A.    No, ma'am.

22        Q.    Okay.  So you did some perimeter, and

23   then what did you do next in your workday?

24        A.    I was cleared by a sergeant from the

25   perimeter and just continued on with my regular

1   patrol day.

2          Q.    Okay.   Let's go back to that page 93.

3   And you're always welcome to read any surrounding

4   text for context, okay?

5          A.    Okay.

6          Q.    But I will point you to the second full

7   paragraph, okay?  Seventh line down in the second

8   full paragraph, the "she" refers to you in that,

9   okay?

10          It says, "She did clear and drive the

11   area but was later relieved as they believed the

12   suspect had gotten into a vehicle and left the area."

13          Does that relate to when you say that

14   you were cleared to leave?  Just a few minutes ago

15   you said that you were cleared by a sergeant and you

16   left that area, correct?

17          A.    Yes, ma'am.

18          Q.    Okay.   And is that -- I'm just trying to

19   see if that's what's being described in this seventh

20   line down.

21          MR. ANGELL:  Do you see where she's at in the

22   report?

23          THE WITNESS:  Yes, I found it.

24          Yeah.  So when I -- when I was doing

25   perimeter, I was on foot.  I guess I should have

```
 1   mentioned that.  So when I cleared, I got back in my
 2   patrol vehicle, did a quick patrol and then continued
 3   on with my regular patrol day.
 4          Q.   (BY MS. PORTER):  Okay.  That's helpful.
 5   When you were I guess cleared to leave the area, what
 6   do you remember being said with respect to the
 7   suspect having gotten into a vehicle and leaving the
 8   area?
 9          A.   Do I remember what was said?
10          MS. PORTER:  Excuse me.  Let's go off the
11   record.
12              (A brief recess was taken for Ms. Porter
13   to get some water.)
14          Q.   (BY MS. PORTER):  I apologize if you
15   just answered this and I might have missed it.
16          A.   No, you're fine.
17          Q.   There's a reference in your interview to
18   someone having indicated that the suspect might have
19   gotten into a vehicle and left the area.
20              Do you remember anything more about
21   that?
22          A.   I don't.
23          Q.   Okay.  A little bit further down, five
24   lines below that, it states, "Marisa stated."
25              Do you see where I am?
```

1            A.   Yes, ma'am.

2            Q.   It states, "Marisa stated that officers

3    had been receiving screen shots of the suspect from

4    surrounding houses.  These were all sent by their

5    department's e-mail."

6                 Had you seen those e-mails?

7            A.   Yes, ma'am.

8            Q.   And did you understand that those

9    e-mails all depicted the same individual?  And I mean

10   did you understand prior to the shooting that all of

11   those images were the same -- were supposed to be the

12   same individual?

13                Do you want to see the e-mails?

14           A.   Actually, if you have them, that would

15   be lovely.

16           Q.   Yeah, they're right here.  I'm not

17   trying to --

18           A.   No, no.  You're fine.

19           Q.   Okay.  Yeah.  Just testing your memory.

20   None of these are case crackers.

21           A.   No, you're fine.

22           Q.   Let me show you what was previously

23   marked as Exhibit 5.  Feel free to take a look at

24   that and see if it helps your memory in any way.

25           A.   And just so -- I'm okay to look through

1    the whole thing, correct?

2            Q.    Sure.

3            A.    I've been yelled at for that before,

4    so...

5            Q.    No.   I'll let you know when I get to the

6    trick questions.   No, I'm kidding.

7            A.    Okay.   And now that I kind of see this,

8    can you repeat the question?

9            Q.    Yeah.   My question was:   Prior to the

10   shooting of Jake Sheeler, did you understand that the

11   images in these e-mails were thought to be the same

12   person?

13           A.    I believe so, yes.

14           Q.    Okay.   We're still in that second full

15   paragraph on page 93 of Exhibit 6.

16           A.    Okay.

17           Q.    A couple of lines below where we were,

18   there's a sentence that begins "When she arrived."

19                 Do you see that?

20           A.    Yes, ma'am.

21           Q.    For the record, I'll read that.

22                 "When she arrived on the scene, she had

23   received an instant message on her CAD system

24   describing the suspect as wearing that same outfit."

25                 Is that the instant message system that

1    you described earlier in this deposition?

2              A.    The instant message, yes.

3              Q.    What does an instant message look like

4    visually when it appears on the CAD system?

5              A.    It's a small box.  Officers have the

6    choice of they can have it colored however they want,

7    whatever makes it easier to see.  Just a small box.

8    It has a text line on the bottom, and then on the top

9    it has what was messaged from the other sender.

10             Q.    Okay.  Go ahead and describe for me now

11   what happened after you arrived in the general area

12   where Jake Sheeler ended up getting shot.  And I'm

13   talking about what happened with respect to you.

14             A.    Do you kind of just want me to go --

15             Q.    Yeah.  Just kind of...

16             A.    So like I had said, we were dispatched

17   to the area of Monte Vista and Beth -- which if

18   you're not familiar with the City of Pocatello is

19   just south of the Red Lion -- in regard to a male who

20   was matching the description of Mr. Sheeler -- or, I

21   guess the suspect from the burglary that had been

22   trying to sell a firearm to a random citizen.

23                  So I don't know which unit had arrived

24   first or last or whatnot, but I was just in the

25   general area patrolling in my vehicle when we were

1    informed that an Idaho State trooper was near the Red

2    Lion and he had, I think, infrared binoculars or

3    heat-vision binoculars.  I'm not sure which type he

4    had.

5            Q.    How were you informed of that?

6            A.    I can't remember whether it was radio

7    traffic or instant message.  I don't remember.

8            Q.    All right.

9            A.    And I can't remember if I put it in

10   my --

11           Q.    I don't think I saw it, but either way,

12   I just was curious.

13           A.    Sure.

14           Q.    Go ahead.

15           A.    When we heard that radio traffic, or

16   whatever traffic it was, I and some other officers

17   were asked, "Hey, go down to the Red Lion to assist

18   the trooper."

19               Okay.  So the only information, like I

20   said, that we got was that that trooper could see a

21   male coming down from the hill where other officers

22   were at.  So I drove down to the Red Lion, I parked

23   my patrol vehicle towards the back and just started

24   walking on foot.  I don't remember where I was at.

25   At one point I remember Officer Fetchen, who now goes

1    by Officer Clayter, and Officer Anderson were in the

2    general area as me.  My thought process at the time

3    was, "Well, hey, they're here.  I'm going to just

4    separate and go in a different direction."

5            So I started walking -- sorry, I'll try

6    to get my north/southeast/west here.  I think it was

7    east towards the golf course.  There's a driving

8    range/golf course that was in the general area.  I

9    started walking towards the golf course.

10           Q.   I'm sorry.  Did you say you started

11   walking towards the golf course?

12           A.   Yes, ma'am.  I apologize if I'm quiet.

13   Let me know.  I get like that sometimes.

14           Q.   No, it's good.

15           A.   When I started walking in that general

16   area, I could hear just a commotion I guess start,

17   where I heard officers start yelling, "Hey, I think

18   he's over here."

19           When I turned -- I apologize if -- when

20   I turned, I could see a male or, you know, an

21   individual that was inside the golf course, the

22   driving range.  When I saw the male, I just started

23   running his direction and just started giving him

24   commands.

25           MR. ANGELL:  Just stop and take a drink if

1   you need to.

2          THE WITNESS:  I'm fine.  I'm okay for a

3   minute.

4          Yeah, I just started giving commands.

5   From my angle, the best way to describe it is would

6   be kind of like an L from where I knew my other

7   officers were at versus where I was at.

8          I saw Mr. Sheeler have his hand behind

9   his back, and he put his arms forward in what I

10  believe is a shooting stance.  When he did that --

11  I'm sorry -- I heard a gunshot, or what sounded like

12  a gunshot, and he didn't move so I returned fire at

13  him till he fell.

14         Q.   So you thought he was shooting at you?

15         A.   No.  Sorry.  From my angle, the way I

16  saw Mr. Sheeler, was, if you were me, this is the

17  angle I saw from the suspect at the time of the

18  incident.

19         Q.   Okay.  Did you see Jake Sheeler square

20  up on Officer Eldridge?

21         A.   I saw him get in the shooter stance.  At

22  the time of the incident, I did not know who was in

23  front of him.  I knew there were other officers, but

24  I didn't know which ones.

25         Q.   Okay.  Did you see him square up at any

1    officer, even if you didn't know who it was?

2          A.    I saw him square up at someone.

3          Q.    And -- okay.  Now, you later learned

4    that he was unarmed, correct?

5          A.    After the investigation yes.

6          Q.    Has anyone ever told you that you may

7    not have even hit Jake Sheeler?

8          A.    Yes.

9          Q.    Okay.  Excluding any attorneys, because

10   I don't want to hear about that, who has told you

11   that you might not have even hit Jake Sheeler?

12         A.    I think it was just my attorney.

13         Q.    I don't want to hear about any

14   theoretical/hypothetical discussions with counsel,

15   so -- okay.  Would it make you feel better if tests

16   were run that said that you did not cause Jake

17   Sheeler's paralysis?

18         A.    I'd feel the same.

19         Q.    Okay.  Okay.  Now, you said you heard a

20   shot or a pop, something like that?

21         A.    Yes, ma'am.

22         Q.    Just one?

23         A.    I can't -- I don't recall how many.  I

24   just...

25         Q.    Okay.  I think -- let's go to your

```
 1   interview that you gave shortly afterwards.  Let me
 2   see if I can find that.
 3           A.   Sure.
 4           Q.   Okay.  So it's this first paragraph at
 5   the top.  It's not a complete paragraph.
 6           A.   Is it on 94?
 7           Q.   Yes, on 94.  And if we look at the
 8   eighth line -- and you can read anything -- but
 9   eighth line up from the bottom -- sorry.
10           A.   Oh, you're fine.
11           Q.   About midway through that line, it makes
12   a reference that says, "Marisa stated."  Do you see
13   that?  "She had heard a loud pop?
14           A.   Yes, ma'am.
15           Q.   Okay.
16           A.   Actually -- yes, ma'am, I found it.
17           Q.   Okay.  "Marisa stated she had heard a
18   loud pop or bang, at which time," et cetera, et
19   cetera.
20                So when you gave this interview, you
21   believed you had heard a loud pop or bang?
22           A.   Yes, ma'am.
23           Q.   Okay.  Did you -- you mentioned the L
24   shape.  Let me show you something that may or may not
25   be helpful to you, okay?  And I'll be transparent.
```

1  Officer McArthur said she would have moved her
2  position over to the left so don't assume that this
3  is definitive in any way, okay?  I am just showing
4  you Exhibit No. 3.
5          And I just want to know whether you
6  believe generally it approximates where you were
7  compared to the others.
8      A.   No.
9      Q.   Okay.  Where would put yourself -- you
10  do recognize this area, right?
11      A.   Yes, ma'am.
12      Q.   Okay.  Where would you put yourself?
13      A.   I mean, this is kind of like a cropped
14  photo and it's, like, an aerial photo.
15      Q.   Yeah.  It's Google Earth.
16      A.   Yeah.  I can give you a general but not
17  an exact.
18      Q.   Well, of course.  That's why I said
19  "approximate."
20      A.   Sorry.
21      Q.   No.
22      MS. PORTER:  Give me the thing that she
23  signed.
24      Q.   (BY MS. PORTER):  Here give me that
25  back.

```
 1            A.    Sure.
 2            Q.    Okay.  Here we go.  Let me show you this
 3   document that we were given by your folks.  It's
 4   previously marked as Exhibit No. 2, and I'm going to
 5   a page marked as "Defendants 171."
 6                  Do you recognize your signature on page
 7   171 in Exhibit 2?
 8            MR. ANGELL:  There's some writing here.
 9   We've had some difficulty reviewing these.
10            MS. PORTER:  This is what we got.  This is
11   what we were given.
12            THE WITNESS:  Yeah.  I mean, it's got my name
13   on it, obviously, yes.  It's hard to read, but yes.
14            Q.    (BY MS. PORTER):  I agree.  Maybe we'll
15   send a supplemental request since we weren't given
16   electronic copies of these.
17            MS. CHRISTIANSEN:  It can be easier to see
18   via a screen.  I think it's easier to see via the
19   screen.
20            MS. PORTER:  How do you think that's easier?
21            MS. CHRISTIANSEN:  I think the writing is
22   higher contrast via screen.
23            Q.    (BY MS. PORTER):  I'm happy to show you
24   a screen image of this in case you think it is easier
25   to read.  You do have younger eyes, and Anna might be
```

1    right.  You can use either the screen version you're

2    looking at or the hard version.

3              MS. PORTER:  All of your cat videos are going

4    to show up, Anna.

5              MS. CHRISTIANSEN:  I know.

6              THE WITNESS:  If you're asking if that's my

7    signature and my name, my initials, that's on the top

8    corner.

9              Q.   (BY MS. PORTER):  Yeah.  So the others

10   have been able to make some headway out of their

11   writing.  And there's some other things here, so let

12   me go through this with you.

13                  All right.  Here's some writing on the

14   right, and you can use either version.  Tell me what

15   the handwriting on the right says.

16             THE WITNESS:  Is there a way to like lock

17   that?  It just keeps rotating.  Sorry.

18             MS. CHRISTIANSEN:  Yeah, I can screen-lock

19   it.

20             THE WITNESS:  I mean, if it makes it easier,

21   I know the writing on the top says "Exhibit C."

22   There's a north arrow.  I don't know what that says,

23   but it says "Made by," and it has my "M. Saldana

24   09/30/20."

25             Q.   Okay.

1          A.    I'm not sure what the first one is.  I
2    can't -- I can't really see it, but --
3          Q.    I think it says "Marks made."
4          A.    Okay.
5          Q.    But take a look and see whether you
6    think that's what it says.
7          A.    I would agree with you, yes, ma'am.
8          Q.    Now, let me show you the mark -- or, the
9    marks, I should say.  They're tiny on this copy, but
10   again, this is what we were given.
11               Do you see the marks right there that
12   I'm pointing at?
13          A.    Yes, ma'am.
14          Q.    And what -- first of all, you did make
15   those marks, correct?
16          A.    I would assume so.  I can't remember.
17   The picture looks familiar, but -- yes.  I would say
18   yes.
19          Q.    All right.  So interpret for me the
20   marks that you made there in sort of the center of
21   the image.
22          A.    So I'm going to say that that center X
23   says "Suspect."  Again, it's kind of hard to see the
24   last word.  The X that's on the left side here, I
25   think that says "Me," and then this here poor drawing

1   of my patrol car is my patrol car.

2          Q.   Okay.  Was there anything impacting your

3   view between you and what you've marked as the

4   suspect?

5          A.   Impacting my view?

6          Q.   Yeah.  So you had a clear view, no

7   trees, no nothing?

8          A.   Where the suspect was I had a clear

9   view.

10         Q.   Did you have a clear view of the other

11  officers on scene?

12         A.   No.

13         Q.   Okay.  Did you know how many other

14  officers were on scene?  And I mean down by the

15  suspect.

16         A.   No.

17         Q.   Did you know what commands the other

18  officers were already giving the suspect?

19         A.   At the time of the incident, no.

20         Q.   Okay.  Did it occur to you that maybe

21  you shouldn't give him commands in case they were

22  inconsistent with the commands he was being given by

23  other officers?

24         A.   No.

25         Q.   You've listened to the body cam audio;

1    is that right?

2          A.    Yes, ma'am.

3          Q.    When's the last time you did that?

4          A.    It's been a while.  I think our last

5    meeting was the last time I had the opportunity to

6    watch it.

7          Q.    Do you remember hearing on the body cam

8    footage somebody yelling at the suspect to back up?

9          A.    No.

10         Q.    Did you hear that at the time?

11         A.    No.

12         Q.    Okay.  Would it have been possible for

13   someone to get on the ground and back up at the same

14   time if he was being given those simultaneous

15   commands?

16         MR. ANGELL:  Hang on.  Object to the form.

17   It's hypothetical.

18              Go ahead and answer, if you can.

19         THE WITNESS:  I guess -- I'm sorry.  When he

20   objected, the question just kind of...

21         Q.    (BY MS. PORTER):  Understood.  Okay.

22   You're yelling at the suspect to get down on the

23   ground?

24         A.    Yes, ma'am.

25         Q.    Assume that you can also hear other

1   officers, or at least one other officer in the audio

2   simultaneously telling the suspect to back up.  Would

3   that have been possible to comply with your command

4   as well as the officer's command?

5          MR. ANGELL:  Objection.  It misrepresents

6   facts and it's a hypothetical.

7              But go ahead and answer that, if you

8   can.

9          THE WITNESS:  I guess, are you asking is

10  it -- is someone capable to comply with multiple

11  commands?

12         Q.   (BY MS. PORTER):  No.  You were giving a

13  command, all right?  So I'm trying to determine how

14  the suspect could have complied with your command if

15  he was receiving another command that made it

16  impossible, okay?

17             So you're telling him to get on the

18  ground?

19         A.   Yes, ma'am.

20         Q.   All right.  Assume that another officer

21  is simultaneously yelling at him to back up.  How do

22  those -- how does the suspect comply with your

23  command and that of the other officer?

24         MR. ANGELL:  Same objection.  And I'll add

25  that it's argumentative.

1              But go ahead and answer that, if you

2    can.

3              THE WITNESS:  Another officer wouldn't give a

4    command to the suspect to back up.

5              Q.   (BY MS. PORTER):  And why do you say

6    that?

7              A.   Training.

8              Q.   You would find that what?  Odd?

9              A.   Yes.

10             Q.   Negligent or something?

11             A.   I would find it odd.

12             Q.   Okay.  So in other words, it would not

13   have occurred to you when you're giving your order

14   that someone might have given him an order to back

15   up?

16             A.   Yes.

17             Q.   Prior to arriving on the scene where

18   Jake was shot, did you participate in any sort of

19   planning or discussions about who would be in charge

20   of the scene if the suspect was located?

21             A.   No.

22             Q.   Prior to Jake being shot, did you

23   participate in any discussions or planning about how

24   to avoid giving inconsistent commands to -- if the

25   suspect was located?

```
 1            A.    No.
 2            Q.    Prior to Jake Sheeler being shot, did
 3    you participate in any planning activities of any
 4    kind related to what would happen if the suspect were
 5    located?
 6            A.    No.
 7            Q.    Are you aware of anyone who did?
 8            A.    I'm not aware.
 9            Q.    Okay.  You mentioned earlier that you
10    had heard that the suspect had stolen multiple guns,
11    correct?
12            A.    Yes.  From the earlier call.
13            Q.    From the earlier call, right?  And you
14    knew that there had been a physical injury in that
15    earlier call, correct?
16            A.    Yes, that's correct.
17            Q.    Did you -- strike that.
18                  Prior to Jake Sheeler being shot, were
19    you ever told that Jake Sheeler had run away when
20    confronted by a homeowner?
21            A.    No, I don't believe so.
22            Q.    Prior to Jake being shot, were you ever
23    told that, when a homeowner pulled a gun on Jake and
24    Jake had his own gun pointed, that Jake did not fire
25    and instead ran away?
```

1            MR. ANGELL:  Object to the form of the

2    question.

3                    But go ahead and answer that, if you

4    can.

5            THE WITNESS:  I don't recall.

6            Q.   (BY MS. PORTER):  Did you ever hear

7    anything about the suspect having run away?  And I

8    mean prior to Jake being shot.

9            A.    No.

10            Q.    Have you told us everything you can

11    remember about the suspect reportedly trying to sell

12    a gun?

13            MR. ANGELL:  I'm going to object to the form

14    of the question because it's pretty open-ended.

15                    But go ahead and answer that, if you

16    can.

17            THE WITNESS:  I believe so, yes.

18            Q.   (BY MS. PORTER):  And as I understand

19    it, that was a separate report that -- from the

20    earlier report of the stolen guns, correct?

21            A.    Yes, ma'am.

22            Q.    Okay.  So on this separate later call,

23    there was no report of any physical harm being done

24    to anyone, correct?

25            A.    That is correct.

```
 1              Q.   Were you able to see Jake Sheeler clear
 2    as day prior to the shooting?
 3              A.   Yes, ma'am.
 4              Q.   Did you ever see a gun?
 5              A.   No.
 6              Q.   How did you leave the scene of the
 7    shooting?
 8              A.   I was taken off the scene by a
 9    supervisor.
10              Q.   And you were with Officer McArthur at
11    that time, correct?
12              A.   Yes.
13              Q.   You were both transported together?
14              A.   That's correct.
15              Q.   And did you have any conversation?
16              A.   No.
17              Q.   Did you speak with any officers
18    following the shooting about the shooting?
19              A.   Not immediately after, no.
20              Q.   Okay.  When did you?
21              A.   Clear after the investigation was
22    completed.
23              Q.   And with whom did you speak?
24              A.   With Officer McArthur and, at the time,
25    Corporal Eldridge.
```

1          Q.   And how did that come to be, that

2     conversation?

3          A.   We were informed by senior staff that we

4     were allowed to talk to each other about the

5     investigation after a certain amount of time.  So

6     after -- just checking in on each other after

7     everything had been done, the investigation, the IA,

8     everything, we were allowed to speak just with each

9     other just to see how everyone was doing.

10         Q.   Any way to estimate when that took

11    place?

12         A.   It was weeks after the shooting.

13         Q.   Okay.  And tell me to the best of your

14    recollection what was said by each of you during that

15    discussion.

16         A.   It was more of just checking in on each

17    other.  It was not actually about the shooting.  Some

18    of us were a little more -- I guess PTSD kicked in

19    for a little more of us than others.  So by choice, a

20    lot of us didn't want to talk about it.  When I say

21    "a lot of us," I mean, between the three of us, two

22    of us didn't want to talk about it.

23         Q.   Well, let me just throw out subjects

24    just to see if they jog your memory, okay?

25              Was there any discussion of "I wonder

```
 1   which one or ones of us actually hit him"?

 2         A.    No.

 3         Q.    Was there anything about -- well, "He

 4   didn't have a gun"?

 5         A.    No.

 6         Q.    Was there anything about "I wonder how

 7   he is doing"?

 8         A.    No.

 9         Q.    Did you ever learn that Jake Sheeler was

10   paralyzed?

11         A.    No.

12         Q.    Was there any discussion about what

13   prompted the shooting?

14         A.    No.

15         Q.    Have you ever had any discussion with

16   any other officer about what led to the shooting?

17         A.    I guess what's the timeframe in that?

18         Q.    Ever.

19         A.    Well, my -- my wife's a police officer

20   with the City of Pocatello.

21         Q.    Okay.  I don't want any spousal

22   communications.  But in a non-spouse capacity, if

23   you're at the station, for example, or however that

24   works -- I don't know if you're on the same shift or

25   whatever -- then I do think that I would be entitled
```

1   to that.

2           A.   In great detail, no.

3           Q.   Well, I didn't ask about great detail.

4   So did you speak with your wife in a -- you know,

5   like at the station about the shooting?

6           A.   No.  She wasn't employed then.

7           Q.   Have you ever spoken with your wife at

8   the station about the shooting?

9           A.   No.

10          Q.   Okay.  When you were screaming your

11  commands -- well, first of all, do you agree that you

12  were screaming commands at Jake Sheeler?

13          MR. ANGELL:  Object to the form.

14          Q.   (BY MS. PORTER):  I agree.  Let me

15  rephrase it.

16               You were giving commands to Jake

17  Sheeler, correct?

18          A.   Yes, ma'am.

19          Q.   And the word you would use would be

20  "screaming" them, correct?

21          A.   Yes, ma'am.

22          Q.   10 out of 10 on the volume scale?

23          A.   Yes, ma'am.

24          Q.   Did you expect Jake Sheeler to comply

25  with your commands?

1        A.    I expect everyone to comply with any

2   commands.

3        Q.    So you expected Jake Sheeler to comply

4   with your commands plus any other commands he is

5   being given by other officers?

6        A.    Again, at the time of the incident, I

7   could not hear any other commands so I expected him

8   to comply with my commands.  I can't speak to whether

9   or not he was going to comply -- or, he heard any

10  other commands.  Again, I could only hear the

11  commands I was giving him so I could only expect him

12  to comply to my commands.

13       Q.    Did you expect him to comply with any

14  commands that were also given by other officers at

15  the scene?

16       A.    Yes.

17       Q.    Okay.  Just a couple of more

18  clarifications.  This is page 95 of Exhibit 6, and

19  it's the first full paragraph.

20       A.    Just to clarify, it's where it starts

21  with "I asked"?

22       Q.    Yes.

23       A.    Okay.

24       Q.    Okay.  Now, where I'm going to ask you

25  is -- starts on line 7.

```
 1           A.   With the word "suspect"?
 2           Q.   With -- yes.  There's a sentence that
 3      begins, "He was in a shooting stance."  But let me
 4      back up.  I think we need a little context, okay?
 5      Let me back you up about two lines.  At the end of
 6      the fifth line down, it starts "I asked" --
 7           MR. ANGELL:  Why don't you just review that
 8      paragraph for a minute, make sure you know what the
 9      context is.
10           THE WITNESS:  Ma'am, I'm sorry.  What was
11      your question?
12           Q.   (BY MS. PORTER):  I hadn't started my
13      question because --
14           A.   Oh, sorry.
15           Q.   -- your counsel wanted you to read the
16      whole paragraph which I think was a good idea.
17                Are you ready now?
18           A.   Yep.
19           Q.   Okay.  Fifth line down in that paragraph
20      toward the end, the sentence begins, "I asked."
21                Do you see that?
22           A.   After, "She said no," correct?
23           Q.   Yes.
24           A.   Okay.
25           Q.   Quote, "I asked Marisa to describe the
```

1   suspect's demeanor.  She stated that, as she was

2   yelling commands, the suspect was ignoring all of

3   them.  He was in a shooting stance and again

4   described how he was standing and pointing his arms

5   out."

6              Was he in a shooting stance the whole

7   time that you were yelling commands at him?

8        A.   Yes, ma'am.

9        Q.   You said he was ignoring all of your

10  commands, and what did you mean by that?  That he was

11  not getting on the ground?

12       A.   Yes, ma'am.

13       Q.   You mentioned that someone was near you

14  when you were, it says here, "trying to contact the

15  suspect, one of the ISP or deputies," and do you see

16  where you mentioned that he plugged his ear after you

17  shot?

18       A.   Yes, ma'am.

19       Q.   Did you give any warning that you were

20  about to shoot before you did shoot?

21       A.   No, ma'am.

22       Q.   You didn't give a warning to the guy

23  next to you or to Jake Sheeler, correct?

24       A.   No, ma'am.

25       Q.   Not correct?

1              A.    Oh, I'm sorry.  Can you say that
2       question again?
3              Q.    Okay.  You did not give any warning to
4       the officer next to you that you were about to shoot,
5       correct?
6              A.    I did not, no.
7              Q.    You did not give any warning to Jake
8       Sheeler that you were about to shoot, correct?
9              A.    I did not, no.
10             Q.    You did not give any warning to Jake
11      Sheeler that, if he did not get down on the ground,
12      you were going to shoot him, correct?
13             A.    No, ma'am.
14             Q.    You did give him a warning?
15             A.    I did not give a warning.
16             Q.    Okay.  Did you ever tell Jake Sheeler
17      that he was under arrest or that you intended to
18      arrest him?
19             A.    No.
20             Q.    The ISP trooper, or deputy, that was
21      near, did you -- did that person give any commands?
22             A.    No.  I -- I didn't even know who it was
23      at the time of the incident.
24             Q.    Did you hear Officer Anderson giving
25      commands?

```
 1              A.    No.
 2              Q.    Did you hear Officer Orr giving
 3    commands?
 4              A.    No.
 5              Q.    Do you believe they did not give
 6    commands or you simply did not hear it?
 7              A.    At the time I just -- I just didn't hear
 8    anything.  I didn't hear them speak, say anything.  I
 9    saw him started giving commands and that's where my
10    focus was.
11              Q.    Okay.  Did you see any civilians in the
12    vicinity of Jake Sheeler?
13              A.    No.
14              Q.    Were you concerned at all about
15    crossfire when you pulled the trigger?
16              A.    No.
17              Q.    And why is that?
18              A.    I knew where other officers were and I
19    was familiar with the area and knew my backdrop.
20              Q.    And you say you knew where the other
21    officers were.  Is that because you could see the
22    lights or something?
23              A.    No.  The radio traffic before
24    everything -- before the shooting happened.
25              Q.    Have you ever shot your gun at a person
```

1    in the line of duty other than Jake Sheeler?

2          A.   No, ma'am.

3          MS. PORTER:  If you want to take a

4    five-minute break or -- I think I may be done.

5          MR. ANGELL:  We'll do that.

6          MS. PORTER:  Okay.

7               (A recess was taken from 9:55 a.m. to

8    10:00 a.m.)

9          Q.   (BY MS. PORTER):  A couple of follow ups

10   here.

11              On the radio do you have the ability to

12   change the radio channel or frequency?

13         A.   On my mike that's on my lapel, no.  On

14   the actual radio system, on the bottom, yes.

15         Q.   To your knowledge, who was the highest

16   ranking officer on scene at the Jake Sheeler

17   shooting?

18         A.   Are you talking about overall or just

19   with the officers involved?

20         Q.   PPD.  I'm including you.  I'm

21   including -- well, let me ask you this:  Did you know

22   that Officer Anderson was in the vicinity?

23         A.   Yes.

24         Q.   And did you know that --

25         MS. PORTER:  Is it Trooper Orr?

1          MS. CHRISTIANSEN:  Uh-huh.

2          Q.   (BY MS. PORTER):  Trooper Orr.  Did you

3    know that he was there?

4          A.   At the conclusion of the investigation,

5    I found out Trooper Orr was one of the troopers

6    there.

7          Q.   Did you know that Officer Fetchen was

8    there?

9          A.   Yes.

10          Q.   And by the way, how did you know that

11    Officer Fetchen was there?

12          A.   I walked by her when she was talking to

13    just someone who was staying at the Red Lion.

14          Q.   Okay.  So of all the PPD folks that you

15    knew were in the vicinity where Jake Sheeler was

16    shot, who did you understand to be the highest

17    ranking?

18          A.   At the time, probably -- at the time,

19    Corporal Eldridge.  He's now a sergeant.  But

20    Corporal Eldridge.

21          Q.   Did you know that Corporal Eldridge was

22    one of the people down closer to Jake?

23          A.   I knew he was in the area but not

24    exactly his exact location at the time of the

25    incident.

1          Q.    You had seen some light from flashlights
2    near Jake; is that right?
3          A.    I saw Jake lit up.
4          Q.    So you knew he was being lit up by some
5    officer or officers using a lighting device?
6          A.    No.
7          Q.    Did you have any idea of how he was
8    being lit up?
9          A.    So I was familiar with that golf course,
10   and at the time I actually thought he was standing
11   under one of the lights that's at the driving range.
12         Q.    Okay.  So let me just ask you I guess
13   the broader question of:  Did you know that officers
14   were closer to Jake than you were?
15         A.    At the time of the incident?
16         Q.    Yeah.
17         A.    I knew officers were in the area.  I
18   don't know how far.  I don't know -- I knew which
19   direction they were at, the area, but I didn't know
20   exactly how far away they were from Sheeler.
21         Q.    You didn't mention in your interview on
22   September 30, 2020 that you saw Jake's hand behind
23   his back.  Do you know why you didn't mention that
24   during that earlier interview?
25              MR. ANGELL:  Do you need a moment to review

1   your report?

2          Q.   (BY MS. PORTER):  Feel free to, because

3   it's not in there, and -- point it out if you think

4   it is.

5          A.   You are correct, ma'am.  That is not in

6   my -- that statement.

7          Q.   All right.  It seems like kind of an

8   important thing that you would have mentioned.  Do

9   you know why you didn't?

10         MR. ANGELL:  Object to the form.

11         THE WITNESS:  I thought I did.

12         Q.   (BY MS. PORTER):  Was the idea put in

13  your head after the interview?

14         A.   No.

15         Q.   Okay.  What's the approximate dividing

16  line for the north and south beats?

17         A.    I guess it depends on the sergeant you

18  ask.  It's either Pocatello Avenue and Oak Street --

19  I'm not sure if you're familiar where that's at -- or

20  I guess more seasoned officers you could say that it

21  used to be the railroad tracks on Center Street going

22  south.

23         Q.   I know what you mean there.  Okay.

24              You mentioned that you and Officer

25  McArthur and then-Corporal Eldridge had sort of had

1    that discussion but that two of you did not want to

2    talk about that.  Was that you and Officer McArthur?

3          A.    I will speak for myself and say I was

4    the one who did not want to talk about that.

5          Q.    There's no privilege for that

6    conversation, so I need to know if one of the other

7    officers declined or stated that he or she did not

8    want to talk about it?

9          A.    Officer McArthur is one who also does

10   not like to talk about the shooting.

11         Q.    Did either of those officers indicate

12   who had first shot?

13         A.    No.

14         Q.    Do you know?

15         A.    No.

16         Q.    Have you ever spoken to the police chief

17   about the shooting?

18         A.    Yes.

19         Q.    Approximately how many times?

20         A.    In detail the shooting, none.

21         Q.    At all about the shooting?

22         A.    No.

23         Q.    Never?

24         A.    Just about how a deposition works in

25   regard to the shooting.

1          Q.    The police chief was talking to you

2    about that?

3          A.    I just asked him.  I was not familiar

4    with a deposition when it all began, so I just asked

5    him, "Hey, I'm not sure what a deposition is about or

6    how it works."

7          Q.    Understood.  Did you have any discussion

8    about any facts relating to the shooting?

9          A.    Not that I recall.

10         MS. PORTER:  I don't have anything further.

11         MR. ANGELL:  I don't have any questions

12    either.

13         MR. ANGELL:  Marisasaldana8@yahoo.com.

14          (Deposition concluded at 10:10 a.m.)

15               (Signature requested.)

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF MARISA A. SALDANA

 2

 3        I, MARISA A. SALDANA, being first duly sworn,

 4   depose and say:

 5        That I am the witness named in the foregoing

 6   deposition; that I have read said deposition and know

 7   the contents thereof; that the questions contained

 8   therein were propounded to me; and that the answers

 9   contained therein are true and correct, except for

10   any changes that I may have listed on the Errata

11   Sheet attached hereto.

12            DATED this _____day of _____20_____.

13

14            CHANGED ON ERRATA SHEET   YES___NO___

15

16       _____
         MARISA A. SALDANA
17

18       SUBSCRIBED AND SWORN to before me this

19       _____day of _____20_____.

20

21

22

23       _____
         NAME OF NOTARY PUBLIC
24       RESIDING AT_____

25       MY COMMISSION EXPIRES_____
```

1      **ERRATA SHEET FOR MARISA A. SALDANA**

2    Page_____Line_____Reason for Change
      _____
3    Reads
      _____
4    Should Read
      _____
5    Page_____Line_____Reason for Change
      _____
6    Reads
      _____
7    Should Read
      _____
8    Page_____Line_____Reason for Change
      _____
9    Reads
      _____
10   Should Read
      _____
11   Page_____Line_____Reason for Change
      _____
12   Reads
      _____
13   Should Read
      _____
14   Page_____Line_____Reason for Change
      _____
15   Reads
      _____
16   Should Read
      _____
17   Page_____Line_____Reason for Change
      _____
18   Reads
      _____
19   Should Read
      _____
20   Page_____Line_____Reason for Change
      _____
21   Reads
      _____
22   Should Read
      _____
23

24

25       SIGNATURE:_____

```
 1                 REPORTER'S CERTIFICATE

 2            I, Amber S. Williams, CSR NO. 1080,

 3    Certified Shorthand Reporter, certify:

 4            That the foregoing proceedings were taken

 5    before me at the time and place therein set forth, at

 6    which time the witness was put under oath by me.

 7            That the testimony and all objections made

 8    were recorded stenographically by me and transcribed

 9    by me or under my direction.

10            That the foregoing is a true and correct

11    record of all testimony given, to the best of my

12    ability.

13            I further certify that I am not a relative

14    or employee of any attorney or party, nor am I

15    financially interested in the action.

16            IN WITNESS WHEREOF, I set my hand and seal

17    this 23rd day of February, 2023.

18

19

20    _____

21            AMBER S. WILLIAMS, CSR NO. 1080

22            Notary Public

23            Post Office Box 2636

24            Boise, Idaho  83701-2636

25    My commission expires June 1, 2027
```

# Exhibit 18

On 09/30/20 at approximately 1510 hours, I, Detective Dobson conducted an Eastern Idaho Critical Incident Team interview with Pocatello Police Officer, Marissa Saldona badge# 5307. Marissa was involved in an Officer Involved shooting on 09/25/20, she had discharged her firearm during that incident. Detective Dalley and I met at 201 E. Center Street in Pocatello, Idaho which was Marissa's attorney's office, Steven Muhonen.

We were walked in the back of the office in a conference room, in the conference room myself, Detective Dalley, Detective Graham with the Bonneville County Sheriff's Office, Lt. Bill Collins with the Pocatello Police Department, Sgt. Derek Daniels with the Pocatello Police Department, Steven Muhonen who is Marissa's lawyer, and Marissa Saldona with the Pocatello Police Department.

I started out introducing myself and had everyone else introduce themselves, it should be noted that Lt. Bill Collins and Sgt. Derek Daniels was only there for the internal investigation and didn't ask any questions during my interview. I advised Marissa that this was a criminal investigation and asked if she was ok answering my questions today, Marissa said yes. I began the interview by asking for her full legal name, which she provided as Marissa Anna Saldona and a date of birth of, 11/24/1993. Marissa's date of hire was 12/02/2019 and is currently a 3rd class patrolman with the Pocatello Police Department. I asked Marissa what her law enforcement experience was, she stated that the only experience she had was through the Pocatello Police Department Mini – Academy, Peace Officer and Standards Training, and from her Field Training Program. I asked what her current assignment and shift schedule was like, Marissa advised that she was a patrol officer and her assigned shift is weekend swing B's, 1500 to 0300 hours and every other Thursday 1500 hours to 2300 hours. I asked Marissa what time she arrived for her shift on 09/25/20, she stated 1445 hours.

I asked if she was working her scheduled shift that day, Marissa said yes. I asked how many hours of sleep she received the night before the incident, she stated about 8 to 9 hours of sleep. I asked when she last ate before the incident, Marissa stated she ate around 1300 hours just before her shift. I asked what type of vehicle she was driving, Marissa stated it was a marked traffic unit with visor lights and not a light bar on the top. It was marked with "Police" on it, the unit number is 206, which is listed on the license plate of the vehicle as PPD206. I asked Marissa how busy her shift was, she explained that she had only been on for approximately an hour and only assisted in a "correction's call" where someone had found narcotics on a female. I asked if anything had happened out of the ordinary that day, before the incident, Marissa said no. I asked Marissa if she was upset at all that day, Marissa said no.

I asked Marissa to describe the male/model of her issued firearm. Marissa described it as being a black Glock 17 chambered in a 9mm with an issued mounted flashlight. I asked Marissa what type of ammunition was used for that firearm, Marissa stated she was issued 9mm spear gold dot jacketed hollow point, 17 in the magazine and 1 in the chamber. The ammo was a standard issue from her department. Marissa qualified with that firearm in June of 2020 to which she did pass. I asked Marissa what special training she had with her firearm, Marissa explained that all her training was through her firearms training from her department, Idaho Peace Officer and Standards (Police academy), and through a mini-academy held at the Pocatello Police



DEFENDANTS 000092

Department. I asked Marissa if she had access to any other firearms, she stated that she was issued an AR-15 rifle, but that it was still inside her patrol vehicle at the time of the actual shooting, which she had also taken a 3-day course and successfully passed that class.

I asked Marissa to describe her clothing she was wearing at the time of the incident, Marissa described her uniform as being her issued police uniform, and they were dark blue in color, short sleeve, pants and, an issued duty belt. On the sleeves, it had the Pocatello Police patch on the left sleeve and the American flag on the right sleeve just below the shoulder, a badge on the left side in the front. It also had her name on the right side in the front. I asked Marissa what she was doing when the call had come in, Marissa explained that there were multiple calls regarding the suspect to the shooting, and she asked what one I was asking about. I asked her what she was doing before the shooting incident had happened, Marissa advised that she was at the office typing a report.

I asked Marissa to describe the entire incident in detail, from the Hyde incident to the shooting incident. Marissa explained that on 09/25/20 she was driving back to the Pocatello Police Department, she was working the "south shift" that day, and a call had come upon her CAD explaining that a male had gone into a garage and possibly taken multiple firearms, she had been dispatched to the area of Filmore Ave and E. Maple to help with a perimeter set up, Marissa remained in that position until Officers were done checking the area of Franklin and Hyde Ave. She did clear and drive the area but was later relieved as they believed the suspect had gotten into a vehicle and left the area. I asked Marissa how long she was on that call, she stated approximately 1 ½ hours. She was then dispatched to the Pocatello Police Department to handle a civil dispute call, as she was clearing she was immediately dispatched to the area of Monte Vista and Beth for a male that was seen in the area trying to sell a firearm to one of the reporting parties. Marissa stated that officers had been receiving screenshots of the suspect from surrounding houses, these were all sent by their department's email. The last known information about the suspect was described as wearing a green hoodie, black pants, black shoes, and wearing glasses. When she arrived on the scene she had received an instant message on her CAD system describing the suspect as wearing that same outfit. She patrolled the area of Monte Vista and Beth for approximately 20 minutes at which time she had heard an officer checking the area of Red Lion Hotel and was asking for another unit to assist. Marissa responded and parked on the southeast corner of the Hotel, before parking she observed multiple flashlights in the area, Marissa got on her radio and asked if there were other units already on scene, to which she had heard an officer say yes. So she was able to confirm that the flashlights she saw were her fellow officers. Marissa exited her patrol vehicle and began to walk southwest, towards the rear of the Hotel. She met up with two other officers, she explained that she didn't know if they were with Bannock County Sheriff's Office or if they were with Idaho State Police. Marissa stated that she could see that Officer Anderson was searching the tree line and Officer Fetchen was talking with someone near the rear of the Hotel, who wasn't the suspect.

Marissa walked east of that area and noticed a barb-wired fence, following her was either an ISP trooper or a Sheriff's deputy, she wasn't sure. Marissa could hear someone yelling, "He's over

DEFENDANTS 000093

here!" and "That's him!" At which time she began to run towards that direction which was southeast of where her patrol vehicle was. As she got closer she could still hear people yelling, "He's over here!" at which time she could see a male matching the clothing description of the suspect she had received images of. Marissa stated she began yelling commands, "Police, get on the ground!" Marissa stated she yelled that multiple times, she could see the male standing in an aggressive shooting stance, which she described as being bladed feet with his arms locked out facing forwards and hands together as if he was holding a firearm. Marissa began to become emotional and was trying to hold back her tears, Marissa apologized for crying, she was reassured and she began describing what happened, she stated that prior to seeing the male she knew that there were officers in the driving range because of the radio, to which they were all currently at when contacting the suspect. Marissa stated that when she was giving her verbal commands, the suspect was ignoring them and when he got into the shooting stance, pointing his closed hands towards the officers at the south direction, Marissa stated she had heard a loud pop or bang at which time with all the information she had prior to the actual contact and his bladed stance she believed that her fellow officers were in imminent danger and feared for them that she fired her firearm until the threat was over and he fell to the ground. Marissa stated she holstered her firearm and ran towards the suspect, as she was jumping over a barbed-wire fence she didn't notice a ditch and fell in it, she got back up and assisted other officers in conducting life-saving measures. She was then asked to be removed from the scene and taken back to the Pocatello Police Department.

I asked Marissa how many times she yelled, "Police, get on the ground". Marissa stated approximately 5 to 6 times. I asked Marissa about how far she was away from the suspect before she fired her weapon, she stated approximately 35 to 45 yards. I asked Marissa if she was confident that the suspect she shot at was the same suspect they had been looking for. Marissa said yes as they look exactly the same as far as clothing and body build. I asked any of the other Detectives if they needed to ask her any other questions or confirm anything with her, Detective Z. Graham asked Marissa what the nature of the call was on Hyde Street, Marissa stated that the initial call was a male who had gotten into a garage and stolen some firearms, even at one time brandishing one of the firearms at the homeowner. Steven Muhonen asked Marissa what brandish means, Marissa explained it as the suspect pointing the firearm at the homeowner. Detective Z. Graham confirmed that she had only been assisting on that call on Hyde, she said yes. It was also confirmed that she received both an instant message and an e-mail with the suspect's description. Marissa said yes, it was an image from CCTV showing the suspect running through someone's yard. She received the e-mails first and then an instant message while she was responding to Monte Vista and Beth.

I asked Marissa to describe the lighting and if it affected the incident, Marissa stated that it was dark outside as it was night time. She stated that when she initially saw the suspect she thought he was underneath the dome lights in the shooting range but later on reviewed body camera and noticed that the lighting was actually from an officer's flashlights. Steven Muhonen asked if that's how she was able to positively identify the suspect, Marissa said yes. He was well lit up by lights and she could see clear as day. The night was clear and not windy at all. I asked Marissa who all the officers were that were on scene with her at the time of the incident. She named the following officers, Anderson, Fetchen, 2 unidentified state troopers, or county

DEFENDANTS 000094

deputies. After the shooting had happened she saw McAurther, Eldridge, Miller, and then another deputy or ISP trooper. She stated that Officer Card arrived on the scene afterward and Officer Smith. I asked if there was anyone else, she said she was escorted out of the scene and to Pocatello Police Department by Sgt. Handcock.

I asked Marissa what the physical appearance was of the suspect, she described him as being green hoodie, thin build, dark pants, and brownish type hair. She explained that she did receive two different images of the suspect, one of them was him in a maroon sweater and shorts. His back was facing the camera. She stated they then received a confirmed image of the suspect. I asked if that other image she received was confirmed to be the suspect, she said no. I asked Marissa to describe the suspect's demeanor, she stated that as she was yelling commands the suspect was ignoring all of them. He was in a shooting stance and again described how he was standing and pointing his arms out. She stated she didn't hear him say anything at the time of the shooting. I asked if his back was facing her at the time of the incident, she said no. She explained that his right side was facing Marissa. I asked Marissa if anyone was by her when she was trying to contact the suspect, she said one of the ISP or Deputies were by her on her left side and she knows this because when she fired her gun he plugged his ear and turned away from her. I asked Marissa that when she was giving them verbal commands, was she yelling or screaming? Marissa stated that she was screaming them. I asked her, between 1 and 10, 10 being the loudest and 1 being a whisper, how loud were you screaming the commands, she stated she was at a 10. I asked if they were understandable commands, she said yes.


I asked Marissa what acts did the suspects commit before the shooting incident occurred, Marissa stated that he had burglarized a garage and stolen two firearms, he had committed aggravated assault on that homeowner when confronted, and he had also tried selling the firearm. I asked Marissa how many times she thought she fired her gun, she stated she thought at least two times. I asked Marissa if the suspect could have given up prior to the use of force, Marissa said yes due to all the commands that were given to the suspect he had an opportunity to give up. I asked Marissa if she had done anything to deliberately alter the scene, Marissa said no. Detective Z. Graham provided a not to scale sky view of the scene, he asked that she mark where she was at when she fired her weapon and where the suspect was at. To which she did. This was marked as exhibit C, she signed it as well. While reviewing my notes, Detective Z. Graham asked if she knew where that other trooper or deputy went that was on the scene when you were arriving in your patrol vehicle, Marissa said she wasn't sure where he went. I asked if anyone else had any questions, no one did at that time. The interview was then concluded at 1600 hours.

Nothing further at this time.

- Detective L. Dobson #624

DEFENDANTS 000095

DEFENDANTS 000096

# Exhibit 19

UNITED STATES DISTRICT COURT

IN AND FOR THE STATE OF IDAHO

| | |
|---|---|
| JAKE SHEELER, an individual, | ) |
|        Plaintiff, | ) Case No. |
| vs. | ) 4:22-cv-00313- |
| BRIDGET MCARTHUR, an individual; | ) DCN |
| JEFFREY E. ELDRIDGE, an individual; | ) |
| MARISA A. SALDANA, an individual; | ) |
| ROGER SCHEI, an individual; and | ) |
| CITY OF POCATELLO, a municipal | ) |
| Corporation; | ) |
|        Defendants. | ) |



DEPOSITION OF ROGER SCHEI

February 16, 2023

REPORTED BY:

AMBER S. WILLIAMS, C.S.R. No. 1080

Notary public

1          THE DEPOSITION OF ROGER SCHEI was taken on

2    behalf of the plaintiff at the Holiday Inn Express &

3    Suites, 200 Via Venitio, Pocatello, Idaho, commencing

4    at 10:40 a.m. on February 16, 2023, before Amber S.

5    Williams, Certified Shorthand Reporter and Notary

6    Public within and for the State of Idaho, in the

7    above-entitled matter.

8

9                    APPEARANCES:

10   For Plaintiff:

11        CHRISTENSEN & JENSEN, PC

12        BY:  KARRA J. PORTER

13        BY:  ANNA P. CHRISTIANSEN

14        257 East 200 South, Suite 1100

15        Salt Lake City, Utah  84111

16        karra.porter@chrisjen.com

17        anna.christiansen@chrisjen.com

18   For Defendants:

19        HALL ANGELL & ASSOCIATES, LLP

20        BY:  SAM L. ANGELL

21        1075 South Utah Avenue, Suite 150

22        Idaho Falls, Idaho  83402

23        sla@hasattorneys.com

24

25

1                          **I N D E X**

2

3    **TESTIMONY OF ROGER SCHEI**                        **Page**

4        Examination by Ms. Porter....................  4

5

6

7

8

9                              **EXHIBITS**

10   **Exhibit 7.    Pocatello Police Department.......  19**

11                   **excerpt of policy manual, Bates**

12                   **Nos. DEFENDANTS 000565 –**

13                   **DEFENDANTS 000638**

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        ROGER SCHEI,
 2    first duly sworn to tell the truth relating to said
 3    cause, testified as follows:
 4                        EXAMINATION
 5    BY MS. PORTER:
 6            Q.   Would you please state and spell your
 7    name for the record.
 8            A.   My name is Roger Schei, R-o-g-e-r
 9    S-c-h-e-i.
10            Q.   And what is your current occupation?
11            A.   I work for the Pocatello Police
12    Department.
13            Q.   And what's your title?
14            A.   Chief of Police.
15            Q.   And how long have you been the chief of
16    police?
17            A.   Three and a half years.
18            Q.   Just generally what was the process by
19    which you became chief of police?
20            A.   Like, as the process, like, what do
21    you --
22            Q.   Like, did you apply for it?
23            A.   Yes.
24            Q.   Did they just --
25            A.   No, I applied for it.  I went through
```

1    two interviews -- several different interviews.
2    The -- two interviews with the City, interview with
3    the public, interview with several different groups,
4    and -- it wasn't just something that was given.  You
5    know, I had to compete for it.
6           Q.    During any of the interviews, were you
7    asked about police shootings?
8           A.    I don't remember.  There was -- there
9    was several interviews and probably 50 to 75
10   questions that they asked me.  I don't remember.  You
11   would have to go get with the community panel that
12   they provided and then the HR.  I don't remember what
13   the questions were.
14          Q.    Okay.  What community panel are you
15   talking about?
16          A.    So we had -- we had to present in front
17   of a group of community people that were there from
18   the community that were invited.  I don't know who or
19   how the process happened.  I was just told to be
20   there at a date and a time and these are some things
21   we would like you to present on, so I did.
22          Q.    Okay.  And who told you -- or, suggested
23   that you be there?
24          A.    Heather Buchanan, our HR director.
25          Q.    Did you answer any questions in writing

 1    as part of the application process?

 2            A.    I had to do a paper, yes.

 3            Q.    When you say "a paper," do you mean like

 4    a narrative thing?

 5            A.    They gave me an assignment, yes.

 6            Q.    Oh, that's interesting.  And do you

 7    remember generally what it was?

 8            A.    I don't.  I'd have to go back and look

 9    and see.  It was a problem and we had to present a

10    paper.  I had to fill out a resumé.  I had to do a

11    cover letter.  I had to do the -- like if it would

12    have been anybody else from the outside applying.  I

13    was treated the same way as an internal candidate.

14            Q.    What had your position been before that?

15            A.    I was the deputy chief.

16            Q.    And just generally what was the process

17    by which you had become deputy chief?

18            A.    So a vacancy came open, I applied for

19    the position, and the chief of police awarded me the

20    position.  There -- a brief interview from -- with

21    him on it.

22            Q.    Do you remember when you became deputy

23    chief?

24            A.    2018.

25            Q.    What had your position been before that?

1          A.    I was the Captain of Detectives.

2          Q.    Same question:  Just generally how had

3    you become captain of detectives?

4          A.    Prior to that I was captain of patrol,

5    and the detective captain had retired, and the

6    chief -- then-Chief Marchand had requested if any of

7    the existing captains would like to go to be the

8    detective captain, and I applied for the position.

9    And I don't know if there was any other captains that

10   applied for it, but I moved from patrol to

11   detectives.

12         Q.    What had your position been before you

13   were captain of patrol?

14         A.    I was a patrol lieutenant.

15         Q.    And how about before that?

16         A.    I was a training sergeant and a patrol

17   sergeant.

18         Q.    And before that?

19         A.    I was a -- I was a detective and -- a

20   detective, slash, corporal; so I worked both in the

21   detective division and the patrol division as a

22   corporal, slash, detective.

23         Q.    Eventually we're going get to your

24   lemonade stands.

25         A.    Sure.  No problem.

1          Q.    What were you before detective, slash,

2   corporal?

3          A.    I was a school resource officer for a

4   couple of years, and then I was a patrol officer

5   for -- I got hired in January 1995 with the Pocatello

6   Police Department, and while I was in patrol and

7   as -- throughout my career, I served in several

8   different capacities at the Pocatello Police

9   Department.  Different instructor positions,

10  different specialities, different assignments, so...

11         Q.    And your start date with PPD was 1995?

12         A.    Yes.

13         Q.    As of September of 2020, which is the

14  month when Jake Sheeler was shot, did PPD also cover

15  any other areas outside of Pocatello?  In other

16  words -- for example, in Utah we have -- like, the

17  Salt Lake County Sheriff's Office sometimes also

18  provides law enforcement, you know, to Taylorsville,

19  for example.

20               As of September 2020, was the Pocatello

21  Police Department's coverage limited to just the

22  boundaries of Pocatello?

23         A.    We -- that's the main -- yes, we have

24  MOUs with other agencies that, if they ask for

25  assistance, we go and provide assistance to them, but

1    our main focus is the City of Pocatello.

2          Q.    And when you say "provide assistance,"

3    I'm talking about something sort of as an ongoing,

4    long-term basis.  Do you have -- as of September

5    2020, did you have any MOUs by which the Pocatello

6    Police Department provided ongoing or long-term law

7    enforcement for areas outside the city limits?

8          A.    So the -- if I'm understanding your

9    question, is what you're saying is did we provide

10   police services for, like, Inkom, which is a small

11   town to the south of us?

12         Q.    Right.

13         A.    No.

14         Q.    Do you happen to know the general

15   population of Pocatello?

16         A.    It's between 58 and 60,000, depending on

17   who you ask.

18         Q.    And why you're asking probably.

19         A.    Sure.  That doesn't include, of course,

20   the students at Idaho State University that are here.

21   That is transient students that come in and out

22   during the school year.  So it's approximately 6,000,

23   from the last time I spoke with them, that adds to

24   our population.

25         Q.    You mentioned you've been chief of

1    police for about three and a half years.  Can you get

2    us closer to when you were appointed or when you got

3    that position?

4              A.    Sure.  Yeah.  June of 2019.

5              Q.    Since you became chief of police, how

6    many shootings by police officers of humans have

7    there been?

8              A.    Five.

9              Q.    Let's start with the most recent one.

10   Was that the one that happened last month?

11             A.    Yes.

12             Q.    So January 2023.  Who was the officer or

13   officers that were shooters in that case?

14             MR. ANGELL:  I'm going to --

15             THE WITNESS:  I'm not going to answer that.

16             MR. ANGELL:  Let me enter an objection.  The

17   formal objection for the record is it's irrelevant

18   and not likely to lead to the discovery of admissible

19   evidence.  That happened after this event.  It's also

20   under investigation, as I understand it, so it would

21   be improper for the police chief to disclose that in

22   connection with the deposition.

23             Q.    (BY MS. PORTER):  Have there been no

24   public statements about who the shooters are in this

25   case?

1          A.    No.  I don't release their names.

2          Q.    Okay.  What was the one before that?

3          A.    It was in May.

4          Q.    Of?

5          A.    Of 2021.

6          Q.    Is that one still under investigation?

7          A.    No.

8          Q.    So will you state who was involved in

9     that shooting?

10         MR. ANGELL:  Hang on one second.  I want to

11    object.  Similar objection:  It's irrelevant.  It's

12    not likely to lead to the discovery of admissible

13    evidence.  It happened after the event in question.

14    Also, to the extent that it involves disclosure of

15    the names of the officers involved, it would invade

16    personnel privacy, which the City of Pocatello takes

17    very seriously.  So at least, I think on that --

18    yeah, it's my objection.

19         MS. PORTER:  Are you instructing him not to

20    answer?

21         MR. ANGELL:  That's my objection.

22         MS. PORTER:  You know I need to know to tell

23    the judge whether you are instructing him not to

24    answer or whether he's choosing not to answer.

25         MR. ANGELL:  What's your question again?

1    What do you want to know about it?

2           MS. PORTER:  I wanted to know which officer

3    or officers were involved in the May 2021 shooting

4    which is no longer under investigation.

5           MR. ANGELL:  Yeah, I'm going to instruct him

6    not to answer that.  You will have to get court

7    permission for us to disclose that.

8           Q.   (BY MS. PORTER):  What was the shooting

9    before that?

10          A.   That would be the one we're talking

11   about today.

12          Q.   Okay.  Do you know whose bullets struck

13   Jake Sheeler?

14          A.   No.

15          Q.   Has Pocatello Police Department done

16   anything to determine that?

17          A.   We don't.  That's -- we turn that over

18   to the Eastern Idaho Critical Task Force to

19   determine -- to make those -- do those

20   investigations.  All we do is an internal

21   investigation on -- to see if there was policy

22   training or other issues that need to be taken care

23   of internally.  But we turned that investigation over

24   to the Eastern Idaho Critical Task Force, so you have

25   to ask them.

 1          Q.    So is that a "no"?
 2          A.    So could you repeat your question,
 3   please?
 4          Q.    I had asked if you knew --
 5          A.    No, no.
 6          Q.    So the answer was "no"?
 7          A.    Correct.
 8          Q.    All right.  Does Pocatello Police
 9   Department still have possession of the guns used in
10   the Jake Sheeler shooting?
11          A.    I believe so.  I'm not sure.
12          Q.    Who would know?
13          A.    I'd have to check with my firearms
14   instructors that keep those records.  I don't have
15   those records handy so I don't know.
16          Q.    What -- if I were to submit a request,
17   which I am going to, to get those, what terminology
18   would be used for such a request?
19          A.    I'm sure you could just go through the
20   FOIA process.
21          Q.    No, I know the process.
22          A.    Sure.
23          Q.    Because we're in litigation, I need to
24   know what words would enable you or the firearms
25   person to understand that they need to look and see

1    if those guns are there?

2         A.   I can go ask them.  I mean, that's -- I

3    don't -- I don't know.  I don't have that information

4    that's readily available to me.

5         Q.   And you mentioned there are some records

6    that could be checked, and I'm trying to figure out

7    what records you're referring to.

8         A.   So they do, like, an annual inspection

9    of guns and audits, and so if those -- if that serial

10   number was there, then they can -- they can

11   cross-reference that and I can see if it's till in

12   our inventory or not.

13              We rotate guns out every year.  So,

14   like, if -- we rotate them as far as we replace the

15   old guns with the new guns and after so many rounds

16   have been fired out of them.  We like to keep up with

17   the most current technology and the most current

18   up-to-date models of those firearms, so we rotate

19   those out.  We trade them out with Salt Lake

20   Wholesale.

21        Q.   But you don't really think that you got

22   rid of the guns used in the Jake Sheeler shooting, do

23   you?

24        A.   I don't know.

25        Q.   But you think that's a possibility that

1    your policies would have allowed?

2            MR. ANGELL:  Object to the form of the

3    question.

4                Go ahead and answer.

5            THE WITNESS:  I'm going to look into it.  I

6    didn't come prepared to answer that question in

7    particular today, and I would have to check with my

8    firearms instructors to see where they're at.  I

9    don't even know if they got turned back over to us

10   from the investigators that have them.  I'll have to

11   find out.

12           Q.   Okay.  The officers seem to know that,

13   but -- okay.  Understood.

14           A.   Okay.

15           Q.   Okay.  Great that's good to know.

16           A.   So those are things that, like -- you

17   know, like I said, I'll have to look into it.

18           Q.   That's okay.  There's a court process.

19           A.   Okay.

20           Q.   You can just -- if your counsel wants

21   you to, that's fine, but I will just go through your

22   counsel.

23           A.   Okay.

24           Q.   Now, the shooting before Jake Sheeler,

25   when was that?

```
 1              A.    I believe that one was February of 2020.
 2              Q.    Is that one still under investigation?
 3              A.    Nope.
 4              Q.    So which officer or officers were
 5     involved in that shooting?
 6              MR. ANGELL:  Hang on.  Objection.
 7     Irrelevant, not likely to lead to discovery of
 8     admissible evidence.  Also, it again invades the
 9     purview of the confidential personnel policies, so
10     I'm going to instruct him not to answer for purposes
11     of this deposition.
12              MS. PORTER:  You know that's relevant, Sam?
13     You know I got to know.
14                   Okay.  But that's your position?  You're
15     instructing him not to answer that information,
16     right?
17              MR. ANGELL:  Yes.
18              MS. PORTER:  On the record.  Okay.
19              Q.    (BY MS. PORTER):  Okay.  Now, we're just
20     still talking about the shootings -- police shootings
21     that have happened since you became chief of police,
22     right?
23              A.    Correct.
24              Q.    Okay.  So what's the one before that?
25              A.    January.  That was a multiagency event
```

1  there, so there was a lot of agencies that were

2  involved in that shooting.

3          Q.    January of 2020?

4          A.    Yes.

5          Q.    But did any Pocatello police officers

6  shoot during that incident?

7          A.    Yes.

8          Q.    Okay.  Who?

9          MR. ANGELL:  Same objection as before.  If

10  you need me to restate it, I will.

11          MS. PORTER:  I need you to restate the

12  instruction for him not to answer and the grounds for

13  it so that we can present the whole thing to the

14  judge.

15          MR. ANGELL:  Well, the objection is that it's

16  irrelevant to this case, it's not likely to lead to

17  the discovery of admissible evidence and that it

18  invades the confidential personnel matters which,

19  under Idaho code and under sections, we cannot just

20  disclose without court review and approval.

21              So that is the objection, and I'm going

22  to instruct him not to answer as he sits here today.

23              Frankly, Counsel, if you send me a

24  request for production on this, I can analyze that a

25  little better.  I don't know offhand which officers

1    are involved in those.  I know that it's not the ones

2    in this case.  That's why I can state that objection

3    for the record.  But I think a request for production

4    could be dealt with on those two instances and I

5    could look into that a little more carefully.

6            MS. PORTER:  Well, I don't just want

7    production of documents, though.  You and I can talk

8    about this.  But I also don't think that it helps

9    your case if it's not necessarily the same people

10   that shot here.  If you've got all your officers

11   shooting people, you know -- and obviously, I'm

12   overstating that, that can even be a bigger problem,

13   so -- but we can talk about that.

14           MR. ANGELL:  It's not an argument of what

15   helps my case; I'm trying to comply with Idaho law

16   and discovery rules, and under the discovery rules in

17   Idaho law, it's not, in my view, discoverable.

18           MS. PORTER:  Understood.

19           Q.   (BY MS. PORTER):  So you were not yet

20   chief of police when there was a police shooting in

21   May of 2019; is that correct?

22           A.   May of 2019?

23           Q.   Yeah.  May 13th, 2019.

24           A.   No.

25           Q.   You weren't police chief at that time?

 1              A.    No.
 2              Q.    Okay.  So describe generally for me --
 3      no, strike that.
 4                    I'll make it easier.
 5                    (Exhibit 7 marked.)
 6              Q.    (BY MS. PORTER):  With respect to the
 7      five police shootings that have happened since you've
 8      been chief of police, were any of those fatalities?
 9              A.    Yes.
10              Q.    Which ones?
11              A.    The one in February and the one most
12      recently.
13              Q.    To your knowledge, has the city been
14      sued with respect to any of the other shootings that
15      occurred since you became chief of police?
16              MR. ANGELL:  Object to the form.
17                    Go ahead and answer, if you know.
18              THE WITNESS:  I don't know.  I don't think --
19      I don't believe so.
20              Q.    (BY MS. PORTER):  Okay.  Let me ask you
21      to look at what has been marked Deposition Exhibit 7.
22      I'll represent to you that these are the first 74
23      pages of a document that was provided to us by your
24      lawyers.
25              A.    Okay.

1          Q.    Because the full document is, like,

2     hundreds of pages.  But please take a look at

3     Exhibit 7 and see if you recognize these first

4     74 pages.

5          A.    You want me to look at all 74 pages?

6          Q.    Just whatever you need to look at to

7     satisfy yourself that this is indeed the policy

8     manual that we requested and were given.  I mean the

9     first 74 pages of it, but I'm not going to ask you

10    about all 74 pages.

11         A.    This appears to be a version of our

12    policy manual.

13         Q.    What we requested was a copy of the

14    policy manual as it was in effect as of September

15    2020.  Can you tell my anything on this first page

16    that would confirm that it would have been in effect

17    as of September 2020?

18         A.    Are you asking me if there's a date on

19    the page?

20         Q.    Well, I'm assuming you're familiar with

21    this policy manual.

22         A.    Yeah.  Are you asking about the 04/21 of

23    2020 at the bottom "Copyright Lexipol"?

24         Q.    Yeah.  Do you know what that means?

25         A.    It's probably when it was that -- what

1   Lexipol puts on the bottom of a -- the -- in the

2   footnotes of when it's -- when it was last looked at

3   or updated.  I don't know.  I would have to ask

4   Lexipol how they mark that.  I don't know Lexipol's

5   policy and how they do things.  I know that when they

6   produce a document, I don't -- it says this is

7   "Copyright Lexipol, LLC."  That's their company, not

8   mine.  I don't know.

9          Q.   Who's Lexipol?

10         A.   Lexipol's our policy company.

11         Q.   So when I'm asking you a basic question

12  about what policy manual was in effect at the time of

13  the shooting in this case, you are referring me to

14  a -- some private third-party company.  Is that what

15  you're telling me?

16         A.   No.  What I'm saying is that you're --

17  if you're asking me if this looks familiar as the

18  policy that was in effect at the time of the

19  shooting, then yes.  I just misunderstood your

20  question.

21         Q.   Fair enough.  Okay.  Let me ask you to

22  turn to the page that says "576" in Exhibit 7.

23              All right.  And let me direct you to

24  Section 106.2.1.

25         A.   Correct.  Right.  I'm there.

1            Q.   It says, "Chief of Police."  I'm going
2    to read you the first sentence.
3                 "The Chief of Police shall be considered
4    the ultimate authority for the provisions of this
5    manual and shall continue to issue Interim Directives
6    which shall modify those provisions of the manual to
7    which they pertain."
8                 Is that consistent with your
9    understanding of your authority as of September 2020?
10           A.   Yes.
11           Q.   Okay.  Next page, 577, 106.3.
12           A.   Okay.
13           Q.   It says "Authority," and I'll quote,
14    "The Chief of Police shall be" --
15           MR. ANGELL:  Hang on.  Okay.  Go ahead.
16           Q.   (BY MS. PORTER):  Quote, "The Chief of
17    Police shall be considered the ultimate authority for
18    the content and adoption of the provisions of this
19    manual and shall ensure compliance with all
20    applicable federal, state and local law."
21                 Is that consistent with what -- how you
22    understood your authority as of September 2020?
23           A.   Yes.
24           Q.   As of September 2020, can you tell me
25    all of the means by which on-duty officers could

1    communicate with each other?

2         A.    So radio, phone, MDT, mobile data

3    terminals, verbally communicate, e-mail.

4         Q.    Any others?

5         A.    No.

6         Q.    What do you mean when you say "mobile

7    data terminals"?

8         A.    Like their laptops in their cars, they

9    have mobile data terminals.  There's an instant

10   messaging that goes back and forth, Attempt to

11   Locates.  Information is communicated out through our

12   Spillman computer system, our Spillman mobile.

13        Q.    And the CAD system would be included

14   under the MDT category; is that right?

15        A.    Yes.

16        Q.    As of September 2020, was there a

17   regular activity that occurred that is referred to as

18   a "patrol briefing"?

19        A.    Yes.

20        Q.    And as of September 2020, what did a

21   patrol briefing generally entail?

22        A.    So generally that's the sergeant or the

23   corporal or the lieutenant, whoever's running the

24   shift at that time, would go over events of the day,

25   of the week, any current information, any current

1    updates.  Sometimes they do squadron training in

2    there.  They pass on information back and forth.

3              Q.    And do patrol briefings occur regularly?

4              A.    Yes.

5              Q.    And was that also true in September

6    2020?

7              A.    Yes.

8              Q.    Was there a certain time of day or

9    something that -- during which a patrol briefing

10    would occur?

11              A.    Generally they happen at the beginning

12    of the shift.

13              Q.    Do you know whether there was a patrol

14    briefing on the day that Jake Sheeler ended up

15    getting shot?

16              A.    I don't know.

17              Q.    Is there a way that you would be able to

18    find that out?

19              A.    No.

20              Q.    No records are taken of them?

21              A.    No.

22              Q.    What records, if any, are maintained by

23    Pocatello Police Department with respect to

24    use-of-force training?

25              A.    So our training coordinator keeps all

1    those records.  Everything we do is entered into the
2    POST records-keeping system.  So it would be on their
3    POST training file about how many hours they took,
4    the topic of the course, the level of the course that
5    it was, and then there's a POST -- corresponding POST
6    form they fill out that would indicate that they
7    attended the course, who taught the course and the
8    duration of it.  And that's your standard POST
9    roster.
10          Q.   Are officers allowed to take
11   use-of-force training that isn't sponsored by POST?
12          A.   So if we go to a use-of-force training,
13   generally it will come back and you will submit to it
14   POST for POST credit.  So there may be a class, like,
15   let's say it's in Utah or Montana, that they come
16   back and there's a timeframe -- I believe they
17   changed it to 90 days -- within 90 days you have to
18   come back and submit that to Post.  It might have
19   changed to 30 days.  I will have to check with POST
20   policies.  I'm not sure.
21               What they'll do is they have to submit
22   the course, the table of contents, their certificate
23   of completion, and then POST will give that credit.
24          Q.   And can officers take use-of-force
25   training that doesn't ultimately result in POST

1  credit?

2          A.    Yes.

3          Q.    And does that count toward any

4  requirements within the department?

5          A.    Yes.  It goes into the -- what's called

6  the MTRS system, so -- POST generated that MTRS

7  system so that if there was something that was

8  internal department training or something that the

9  officer forget to turn that in within those

10  timeframes, they could still get credit for the

11  training, but -- it's not POST-certified, but it's

12  MT- -- it's called "MTRS" and it goes toward their

13  training.

14          Q.    As of September 2020, was there any sort

15  of minimum number of hours required for use-of-force

16  training?

17          A.    No.  By POST?

18          Q.    No.  By -- I'm sorry.  Good question.

19  As of September 2020, were there any minimum training

20  requirements for use of force imposed by Pocatello

21  Police Department?

22          A.    When you say "use of force," what are

23  you specifically talking about?

24          Q.    Well, there is a concept known as

25  "use-of-force training."

```
 1              A.    Correct.

 2              Q.    Right.  I'm talking about that.

 3              A.    But that use of force -- when you start

 4      talking about that, you're talking about firearms,

 5      defense tactics, Taser, ground tactics, you're

 6      talking about deescalation.  You're talking about a

 7      very broad spectrum of different elements of use of

 8      force.

 9              So we tend to -- we tend to do things a

10      little bit differently.  We don't just call it "use

11      of force."  If we're going to train that, we'll call

12      it "firearms" or "ARCON," which is our

13      defensive-tactics model, or "Taser" or "deescalation"

14      or "scenario-based training."

15              Now, if we do scenario-based training,

16      that would be under the use-of-force umbrella but

17      it's specific scenario-based training.  It's kind of

18      a broad spectrum that you're talking about so I'm

19      trying to understand the question.

20              Q.    All right.  And admittedly, I'm just

21      relying on the fact that -- for example, lawyers have

22      to do a certain amount of training in our state

23      anyway.

24              A.    Sure.

25              Q.    It has to include certain minimum hours
```

1    covering certain subjects.  So with -- so let me just

2    try to reword my question.

3          A.    Okay.

4          Q.    As of September 2020, did Pocatello

5    Police Department impose any minimum requirements on

6    its officers with respect to training?

7          A.    Yes.

8          Q.    What were those?

9          A.    So in your firearms portion, there's --

10   when you look at our policy, we do a minimum of two

11   qualifications a year biannually:  one low-light, one

12   during the daylight hours.  So that's -- that's a

13   minimum that's in there.  So if that's what you're

14   asking, then yes, there are some minimum standards.

15         Q.    And please tell me what the other

16   minimum standards are with respect to training as of

17   September 2020.

18         A.    I'd have to look at the policy -- I'd

19   have to look at exactly what the policy says for any

20   others.  I know we do a -- we do our defensive

21   tactics yearly.  That's a yearly thing that we do.

22   Our Taser is a -- and we follow the requirements of

23   Taser.  I'm not a Taser instructor.  I know we just

24   got done doing Taser training.  I would have to go

25   back.  I don't carry a Taser so I'm not -- I don't

1    know the -- if -- what the current Taser requirements

2    are.  I'd have to ask one of my Taser instructors,

3    but I know we're all current with the training on

4    Taser.  I -- but -- I believe that's annual, but I'd

5    have to verify that.

6            Q.    When you mentioned that you would have

7    to check the manual --

8            A.    Yeah.

9            Q.    -- are you referring to the Pocatello

10   Police Department Policy Manual?

11           A.    Correct.

12           Q.    So any other minimum training

13   requirements, you would expect to be somewhere in

14   that manual?

15           A.    Correct.

16           Q.    Okay.  Off the top of your head, do you

17   remember whether there were any minimum requirements

18   as of September 2020 for deescalation training?

19           A.    I don't remember.

20           Q.    Do you know whether there are now?

21           A.    No, there's not any mandatory minimums.

22   It's something that we work -- we actually work in

23   deescalation training into a lot of our different

24   aspects.  We work it into our firearm training, we

25   work it into our ARCON training, we work it into our

1    scenario-based training, we work -- we've had all of

2    our officers go through some form of crisis

3    deescalation.  We have several of our officers that

4    have attended our CIT training academy that's a

5    40-hour course.  But we work that into all of our

6    training in one aspect or another, whether it's on

7    the range or whether it's talked about or acted out

8    or -- so we work it in.  It's in the fiber of all of

9    our -- that's probably the first one of -- the first

10   two or three pages of our ARCON manual talks about

11   crisis deescalation.

12        Q.   Let me refer you back to Exhibit 7, and

13   I'll direct you to page 609.  Let me direct you to

14   section -- oh, sorry.  Let me direct you to

15   Section 300.11.  And why don't you read that to

16   yourself and let me know when you're ready.

17        A.   Okay.

18        Q.   Okay.  So Section 300.11 is titled "Use

19   of Force Analysis," and the first sentence states,

20   "At least annually, the Patrol Division Commander

21   should prepare an analysis report on use-of-force

22   incidents."

23             Has that been done while you've been

24   chief of police?

25        A.   Yeah.  We do it -- actually, we review

1    every use of force that happens, and we -- we analyze

2    every use of force that -- then we go through to

3    identify all of these things on every -- every use of

4    force.

5            Q.   Is there any sort of annual compilation

6    of -- that produces an analysis report?

7            A.   We do a Training Needs -- it's called a

8    "Training Needs Assessment," and that identifies what

9    we need to do.  We have some things that are

10   automatic that are on the Training Needs Assessment,

11   like firearms training, ARCON, which is our defensive

12   tactics training.  Taser I believe is on there.  So

13   we have some things that are regularly done every

14   year, and we do this at -- more than annually.

15           Q.   Okay.  So is there a title to this

16   report?  I mean, it says the patrol division

17   commander should prepare an analysis report on use of

18   force incidents.  So assuming a person is trying to

19   locate these analysis reports prepared by the patrol

20   division commander, what title or phrase would be

21   used?

22           A.   Yeah, I don't know if we generated what

23   you would consider like a yearend type of report on

24   use of force, because we analyze each one on an

25   individual case-by-case basis, and we actually --

1    we're -- we do more than what's in here.

2           Q.    Okay.  Can -- is there any document that

3    you could produce to show compliance with

4    Section 300.11?

5           A.    Yes.  We could pull a report that would

6    show you all of the uses of force for a year.  Yes,

7    we could do that.

8           Q.    And what's the title of that report?  I

9    assumed it was going to be "Use of Force Analysis

10   Report."

11          A.    Yeah.  That's what we would call it,

12   yes.

13          Q.    Are you saying that you would prepare

14   one or were you saying that you got one?

15          A.    So what I'm telling you is that we do

16   more than what that policy says.

17          Q.    Or one could say -- okay.  Okay.  So you

18   do have some kind of a report that is out there that

19   redacts the names of officers, suspects and case

20   numbers and includes A, B, C and D?

21          A.    That redacts?

22          Q.    Yeah.  It says here, "The report should

23   not contain the names of officers, suspects or case

24   numbers."  So those are redacted, meaning they're not

25   in there, they're blacked out or they're removed?

1          A.    Yeah.    The reports that I have seen have

2    their -- I review have their information in it.

3          Q.    So it doesn't sound like there's a

4    document out there that would actually be consistent

5    with 300.11, is there?

6          A.    Are you asking is there a document

7    that's released to the public, or internally?

8          Q.    No.    I'm asking for any document that

9    actually complies with Section 300.11 of your policy

10   manual.

11         A.    Yes.    We have use of -- every use of

12   force is documented.    Every use of force is reviewed

13   up the chain of command.    In that we do what is like

14   A, B, C and D.    We do not release -- we have not

15   released a report to the public that doesn't have the

16   officer's names or suspect, case numbers or that, no.

17         Q.    Yeah.    And I don't know why you keep

18   saying "released to the public," because that's not

19   part of my question, okay?

20         A.    Sure.

21         Q.    So let's stick to my question.    I am

22   asking for something internally that's been prepared

23   by the patrol division commander that is an analysis

24   report on use-of-force incidents that is submitted to

25   you that does not contain the names of officers,

1    suspects or case numbers and addresses Elements A

2    through D.  Does anything like that exist?

3              A.    Parts of it do, yes.

4              Q.    What parts exist?

5              A.    The reports exist, but we don't

6    redact -- the information that comes to me does

7    not -- it has their names, it has the case numbers,

8    and it has the suspect information in it.

9              Q.    So basically, all you're telling me is

10   that you just look at the individual reports for each

11   use of force and there is no sort of summary report

12   prepared by the patrol division commander; is that

13   right?

14             A.    Correct.

15             Q.    Okay.  Pursuant to Section 300.11, do

16   you have any reports that have previously been

17   prepared that identify any trends in the use of force

18   by members?

19             A.    No.

20             Q.    Do you have any report that identifies

21   training needs recommendations?

22             A.    We do a yearly Training Needs

23   Assessment, yes.

24             Q.    Okay.  Now, is there some kind of a

25   report that's generated for that?

1          A.    It's like an Excel document, yes, that's

2   prepared, yes.

3          Q.    And is it specific to use of force

4   such -- per Section 300.11?

5          A.    Yes.

6          Q.    Okay.   What is that Excel spreadsheet

7   called internally?

8          A.    "Training Needs Assessment."

9          Q.    And who prepares that?

10         A.    The division commander prepares that,

11  and then we work that into our budget and -- and then

12  it's broken down into what topics are to be taught,

13  and then there's a training schedule that corresponds

14  with that.

15         Q.    And does Pocatello Police Department

16  still have prior Training Needs Assessments?

17         A.    I don't know.   I'd have to go look.

18         Q.    Well, rather than you do anything, who

19  would you -- is there somebody you would normally ask

20  or a place you would normally go to inquire?

21         A.    Yes.

22         Q.    And who is that or where is that?

23         A.    I would check with either my deputy

24  chief or I would check with the training coordinator.

25         Q.    Just so you understand the distinction

1   I'm drawing, I don't have the authority to ask you to

2   do anything.  That's why I keep saying "How would

3   somebody else do it?"

4           A.    Sure.

5           Q.    Okay.  Now, we're still talking about

6   Section 300.11.  Are there currently any reports that

7   has been prepared per Section 300.11 that include

8   equipment needs recommendations?

9           A.    Yes.  We do in fact.  There's some

10  paper -- there's some reports that I'm still waiting

11  on for this year from last year from some of the

12  division commanders.  I have some documents on my

13  desk right now that I'm currently reviewing.

14          Q.    And those reports relate to equipment

15  needs recommendations in the context of use of force?

16          A.    Correct.

17          Q.    Okay.  What are those referred to

18  internally?

19          A.    That's part of our budget build.  So it

20  would be -- we just call it "equipment needs."  I'm

21  not sure -- can you be a little more specific on what

22  you're asking for?

23          Q.    Well, I don't know what documents you've

24  got.  I'm trying to figure out how I can ask your

25  lawyer to get me copies of documents that at least

1   partially comply with Section 300.11, so I'm trying

2   to just explore that.

3           A.    Yeah.  We do a yearly -- a yearly budget

4   build -- it's within our budget build on what we need

5   in our budget.  So the division commanders send it

6   out to the lieutenant and ask "What are your needs?"

7   and that branches out to "What do we need for our

8   instructors for equipment?  What do we need

9   ammunitionwise?  What do we need weaponswise?  What

10  do we need bulletproof vestwise?  What do we need --

11  and so then that information gets compiled as we do

12  our needs assessment for the year.

13          Q.    And you would just sort of refer to that

14  as "Equipment Needs" --

15          A.    -- "Assessment," yes.

16          Q.    -- "Assessment"?

17          A.    Yes.

18          Q.    All right.  We're almost done with

19  Section 300.11.  Are there currently any reports that

20  exist relating to use or force that include policy

21  revision recommendations, oh, and that were prepared

22  by the patrol division commander?

23          A.    Can you repeat that question?

24          Q.    Let me just state it better.  I switched

25  halfway through.

1            Okay.  Are there any reports that you

2    know of that have been prepared by the patrol

3    division commander relating to use or force that

4    include policy revision recommendations?

5        A.    No.

6        Q.    With respect to the Training Needs

7    Assessment that you mentioned?

8        A.    Yes.

9        Q.    Is that something that is prepared by

10   the patrol division commander?

11       A.    So the Training Needs Assessment comes

12   from all the divisions, because -- we have three

13   different divisions which includes our dispatch

14   center; so it's a wide gambit of training needs and

15   we have multiple facets of the police department.  We

16   have ordinance enforcement now.  We've got different

17   training needs that are established.  So it's

18   prepared by -- it's prepared by all the division

19   commanders, and all that information goes to the

20   deputy chief and then they -- we discuss it in staff

21   meeting.

22       Q.    Is there some contribution to this by

23   the patrol division commander?

24       A.    Yes.

25       Q.    And that would be one of the inputs that

1    you described?

2              A.    Correct.

3              Q.    Okay.  Same question with respect to the

4    equipment needs assessment:  Is that prepared by the

5    patrol division commander?

6              A.    Not by himself alone, no.  It's -- once

7    again, he -- he contributes, but the other division

8    commanders provide needs for their divisions as well.

9              Q.    Okay.  While you've been chief of police

10   or deputy chief of police, have you requested any

11   assessments of how Pocatello stacks up against other

12   cities in connection to the number of police

13   shootings?

14             A.    So we discuss this at our ICOPA events a

15   lot with the other chiefs of police, so -- that's

16   Idaho Chiefs of Police Association.  Several

17   discussions with Chief Huff, Chief Allen.  I talk to

18   Chief Johnson quite a bit about things and events and

19   trends that are happening in their cities.

20                   So yes, we talk about those things and

21   look at trends.

22             Q.    Have you ever done anything to ascertain

23   how Pocatello compares to other cities statistically

24   with respect to the number of police shootings?

25             A.    What are you -- as far as what?

1          Q.    Well, for example, Salt Lake City

2    regularly reports how many police shootings they've

3    had in a particular year and they also report the

4    population that their law enforcement covers.  So you

5    can kind of say, "Okay, for every 100,000 people,

6    there's this many police shootings in Salt Lake

7    City."  I mean, that's a regular thing that they

8    publish every year.

9          A.    Okay.

10          Q.    Have you ever tried to ascertain that

11    kind of data for Pocatello?

12          A.    So are you -- we turn over information

13    that was from NIBRS; so that includes any time

14    there's an officer-involved shooting.  So we look at

15    the NIBRS.  I think that's kind of what you're

16    asking.  We turn in our information and look at those

17    annual reports -- those reports of how they -- the

18    FBI statistics -- the FBI crime statistics --

19          Q.    I know all of that, yeah.

20          A.    Well, is that what you're asking?

21          Q.    No.  I'm asking what you have done to

22    educate yourself about the final result of how

23    Pocatello stacks up to other communities.

24          A.    Yes.  I talk to the chiefs regularly

25    about that.

1          Q.    And that's it?  That's what you've done?

2          A.    Yeah.  I talk.

3          Q.    How does Pocatello stack up against

4    other cities in the United States with respect to the

5    frequency of police shootings?

6          A.    I would say that it depends on -- like,

7    we -- the chief and I from Idaho Falls have had these

8    conversations about we'll go a year and we have one

9    or none and then Idaho Falls will have two or three,

10   and then it's just -- we talked trends that are going

11   on with fentanyl, with what's going on in the

12   country, what's going on with -- I mean, you're

13   talking about something that's more of a bigger topic

14   than just a shooting.  You're talking about something

15   that is the totality of the circumstances.  And like,

16   when I talk to Chief Johnson -- I mean, I know

17   they've had a couple up there, and I talk to him

18   about the circumstances that are surrounding that.

19              But if you're asking if I've gone from

20   city to city and looked at statistics of how we

21   compare to like Layton or Ogden, no, I haven't.

22         Q.    Have you compared the number of police

23   shootings in Pocatello to that of any other city?

24         A.    Like on paper?  Like --

25         Q.    Yeah.

```
 1          A.    No.

 2          Q.    How about in your head?

 3          A.    Yes.

 4          Q.    Okay.  How does Pocatello stack up

 5   against any other city that you can name?

 6          A.    I would say we're -- lately we've

 7   been -- you know, in comparison, we've been pretty

 8   equal to what's been going on in our area.

 9          Q.    Tell me which other areas -- which other

10   police agencies you believe are comparable to

11   Pocatello with respect to per capita frequency of

12   police shootings.

13          A.    Look at Bingham County and what's going

14   on in Bingham County.  There was -- Bingham County

15   had one just prior to us that we investigated.  Idaho

16   Falls Police Department, Nampa Police Department

17   to -- to -- where we look at, like, comparisons of

18   things.  Those are agencies that we look at and --

19   frequency.  We're also considered a -- what's called

20   a "high-intensity drug-trafficking area."  In that --

21   when you look at high areas, those are things that I

22   look at and take into consideration.

23                We have a lot of -- you talked about the

24   shooting back where in the very -- the very first one

25   was in January of 2020 where there was several other
```

1    agencies that were involved, as I earlier testified

2    to.  That was in conjunction with what was called a

3    "HIDTA investigation," and there was several other

4    agencies that were involved in that.

5                And when you see those incidents of high

6    drug-trafficking areas going on and involvement with

7    other areas, then that's -- you're going to see those

8    type of events unfortunately.

9          Q.    Okay.  So is it your testimony that you

10   believe that statistically Pocatello is similar to

11   Idaho Falls, Nampa and Bingham County with respect to

12   the frequency of police shootings?

13         A.    Yes.

14         Q.    So -- and you've had five in the last

15   three and a half years with a population of about

16   roughly 58,000 people?

17         A.    Permanent, yeah.  Our -- our transient

18   population is higher than that, so -- yes.

19         Q.    Were any of the transient population

20   involved with any of those five shootings?

21         A.    I would have to look and see where they

22   resided, like, where their permanent residence was at

23   to answer that question.

24         Q.    Is there any paperwork that you can

25   point to where any sort of analysis has been done

1    about the frequency of police shootings in Pocatello?

2         A.    I'd have to look at our NIBRS.

3         Q.    Okay.  Other than that, you can't think

4    of anything, right?

5         A.    And your use-of-force reports.

6         Q.    And are those different from what you

7    described earlier?

8         A.    No.

9         Q.    Are the use-of-force reports kept in a

10   way that you can actually retrieve all use-of-force

11   reports for a certain period?

12        A.    Yes.

13        Q.    And how do you do that?  Is that

14   electronically or what?

15        A.    Yeah.  You have to go pull the data out

16   and put it onto a spreadsheet, yes.

17        Q.    So is there some sort a of code that is

18   used on a report -- an electronic code that you can

19   sort by?

20        A.    No.

21        Q.    All right.  So let's say you wanted to

22   go look at your use-of-force report for 2021.  Let's

23   say -- and you said you could lift the data?

24        A.    Uh-huh.

25        Q.    How would it know what -- if there's no

1    particular code that's used, how do you know which

2    cases involved use of force?

3          A.    I think you're -- you're asking me a

4    technical question, like a software question.

5          Q.    No.  I'm asking you as a chief of

6    police.  Let's say that you actually want to look at

7    a use-of-force report.  Do you just go tell someone

8    "I want to see all the use-of-force reports from

9    2020" and they'll figure it out?

10         A.    Yes, I can have somebody that would -- I

11   would assign that.  They could look at that or I

12   could work on that myself where I pulled up, you

13   know, the response to force and it'll pull all the

14   ones for that year.

15         Q.    Okay.  And so that's kind of what I was

16   wondering --

17         A.    Yes.

18         Q.    -- is if there is some kind of

19   electronic code or phrase or something that would

20   pull everything up for a year.

21         A.    Yes.

22         Q.    Did you say response to force --

23         A.    I believe that's how it's listed in

24   there.  I would have to go into the system and see

25   exactly how it's titled.

1        Q.    Something like that?

2        A.    Correct.

3        Q.    And that's in which computer system?  Is

4    that in your Spillman?

5        A.    So we have two different systems.  We

6    were transitioning from what was called AiM to

7    SmartForce.  So we're -- we were looking for better

8    software to -- which we're actually looking for a

9    different software now called IAPro.  We're looking

10   into that.  But where all the use of forces for 2020

11   would exist are in the AiM system.

12       Q.    I have some familiarity with AiM

13   unfortunately.

14       A.    Yes.  This is why we're switching.

15       Q.    I get you on that.  AiM does have

16   certain initials and certain categories and things

17   like that.

18       A.    Yes.

19       Q.    All right.  So one of those categories

20   is in some way going to be labeled something like

21   "response to force"?

22       A.    Correct.

23       Q.    Okay.  I get it.  Because in AiM, for

24   example, we can just sort by "These are all the

25   subpoenas," et cetera.

1          A.    Yes.   So that -- that goes to some of

2    the problems that we've talked about earlier.   It's

3    like -- AiM is not exactly user friendly sometimes,

4    so -- to pull some data out of it.   That's why we've

5    elected to look at them on a more-specific basis, and

6    the annual report has been difficult sometimes to

7    pull.

8          Q.    I mean, my secretary can pull stuff up

9    from AiM in about 10 seconds.   I just can't.

10         A.    Yes.   Yes.

11         Q.    You have people in Pocatello Police

12   Department that can pull that stuff up pretty

13   quickly, right?

14         A.    Sometimes, yes.   AiM is -- depends on --

15   it depends on the program.   AiM has been very

16   difficult to work with lately.   And that's a

17   "software" thing; it's not an "us" thing.

18         Q.    I mean, I get that we.   Use AiM, and so

19   I'm just telling you to --

20         A.    Is it through the same company?   Because

21   I know there's a few different AiMs that are out

22   there.

23         Q.    I suspect that it is.   What you've been

24   describing is very familiar to me.

25         A.    Okay.

1          Q.   I personally don't find it intuitive but

2    my secretary loves it.

3          A.   Gotcha.

4          Q.   Okay.  Anyway, let me ask you to go --

5          MR. ANGELL:  Counsel, can we take a break off

6    the record real quick?

7          MS. PORTER:  Of course.

8               (A recess was taken from 11:37 a.m. to

9    11:46 a.m.)

10         Q.   (BY MS. PORTER):  Please turn to

11   page 631 of Exhibit 7.  This is just a terminology

12   question.

13              In the second line of Section 310.5.1,

14   there's just a phrase "Officer in Charge."

15              Do you see that?

16         A.   Yes.

17         Q.   What does that phrase mean?

18         A.   Let me read the rest of the policy here,

19   get some context here.  So that, it would be the

20   first officer that's not involved in the shooting or

21   involved in the incident, they will take charge and

22   assume responsibilities until a supervisor shows up

23   and they're relieved.

24         Q.   Yeah.  I understand what the policy

25   says.  I was just wondering if the term "Officer in

1    Charge" has any particular meaning outside of its use
2    in this policy.  I mean, is that a thing?
3            A.   So, like, are you asking if a patrolman
4    shows up?  I don't understand.
5            Q.   No.  Let me ask you this:  Suppose I was
6    at a dinner party with you and I said, "Have you ever
7    heard the phrase 'Officer in Charge?'"  Is that a
8    thing?
9            A.   Yes.
10           Q.   Okay.  That's --
11           A.   Yes.  Yes.
12           Q.   Okay.  Tell me what generically the
13   phrase "Officer in Charge" means.
14           A.   So that would be they would take
15   control, they would start making decisions.
16           Q.   All right.  Now, is the
17   officer-in-charge concept limited to officer-involved
18   shootings or does that concept apply to other
19   situations?
20           A.   It applies to a lot of situations.
21           Q.   Okay.  So, for example, the Jake Sheeler
22   situation.
23           A.   Okay.
24           Q.   As you know, there were at least five or
25   six Pocatello police officers on scene.

1          A.    Yes.

2          Q.    Okay.  Was there an officer in charge?

3    I'm talking about before the shooting.

4          A.    Before the shooting?

5          Q.    Yeah.

6          A.    I don't know.  I would have to go back

7    and look and see who was taking -- who -- the person

8    who would have been in charge is generally the first

9    person that shows up at the scene.  After that, if a

10   corporal shows up, then -- or a sergeant, then they

11   would assume command at that scene.  But I don't know

12   who took control of that scene or who was in charge

13   of that scene.

14         Q.    And how would it have been conveyed to

15   the other officers on site?

16         A.    They get on scene and they start -- they

17   will make that determination on scene.  The thing you

18   got to understand with us is it's very fluid.  So,

19   like, if I show up, it could be the newest patrol

20   officer that's on scene that's in charge, and I go up

21   and go, "I see that that officer is doing the job.

22   What do you need me to do?"

23               "Hey, I need you to go interview those

24   people."

25               "Okay."

1              So -- unless we start to see -- it's

2     called "contact and cover."  It's a concept that we

3     use very frequently with patrols, taught at the basic

4     level of the academy, that, a lot of times, it's the

5     first officer that arrives on scene and that starts

6     directing resources and manpower.

7              But then as -- as somebody with a little

8     more experience shows up -- I don't know if Corporal

9     Eldridge assumed the officer in charge there or if

10    there was -- I know later on there was a sergeant

11    that assumed control after the scene -- after the

12    incident happened and then a lieutenant.

13             But at that moment in time, you're

14    talking prior to the shooting, I don't know -- I

15    don't know who assumed control.  That would be a

16    question that you would want to ask one of the

17    officers that was there.

18        Q.   You are assuming that somebody took

19    control of that scene, correct?

20        A.   Correct.  Yes.

21        Q.   Because that's what you would expect,

22    right?

23        A.   Yes.

24        Q.   And I'm asking you how is that conveyed

25    to the other officers?

1            A.    Over the radio usually.

2            Q.    Okay.  As of the time of Jake Sheeler's

3    shooting, what policy, if any, was in place that

4    would prevent multiple officers at a scene from

5    giving inconsistent commands?

6            A.    Would you repeat your question?

7                 (Ms. Porter indicated the record be read

8    and the record was read.)

9            THE WITNESS:  I don't know if there was any

10   policy that talks about that.  I would have to look.

11   I --

12            Q.    (BY MS. PORTER):  How about any

13   practices?

14            A.    As far as giving inconsistent commands?

15            Q.    No.  I'm asking as of September 2020

16   what practices were in place with Pocatello PD

17   intended to prevent multiple officers from giving

18   conflicting commands.

19            A.    So like I said, it's a fluid situation.

20   I don't -- we don't restrict our officers to say --

21   when you go to a call, only one person can say

22   something because there's another officer that might

23   see something and provide a command to somebody that

24   that other officer doesn't see or sense in some way.

25                 So there's no policy that says that --

1    because we understand things are tense, uncertain and

2    rapidly evolving and are ever changing -- that we

3    give a specific set of commands, like "Under these

4    set of circumstances, this is who says what and then

5    this person says this and then this person says

6    this."

7                So we don't have nor do we have a

8    practice that says you're not allowed to say this

9    and -- because that officer may see or sense

10    something that will have to -- that would have to

11    tell somebody to do something that that other officer

12    may not see or sense.

13           Q.    And you all had no such practices in

14    place as of September 2020, correct?

15           A.    Correct.

16           Q.    So your officers are on scene and

17    there's a subject who's being given commands, okay?

18           A.    Okay.

19           Q.    As of September 2020.

20           A.    Okay.

21           Q.    Do you expect that that subject will

22    obey the commands given by each officer?

23           MR. ANGELL:  Hang on.  Object to the form.

24    It's a hypothetical.

25                Go ahead and answer that, if you can.

1          THE WITNESS:  It's hard for me to answer that
2     because I'm not there and I'm not the person -- I
3     don't -- I can tell you this:  I've been involved in
4     hundreds of, if not thousands of high-risk situations
5     throughout my career where I have heard officers
6     provide different commands, and the ones I have been
7     involved in, those people have complied.
8          Q.   (BY MS. PORTER):  Okay.  What if there
9     are conflicting commands?  And I'll give you an
10     example.  What if the subject is simultaneously told
11     to get on the ground and also to back up?
12          MR. ANGELL:  Hang on.  Objection.  As it is
13     pertaining to this case, it misstates facts.  It's
14     also hypothetical.
15               But go ahead and answer, if you can.
16          THE WITNESS:  I've been in circumstances
17     where people have been given different commands and
18     they've complied.
19          Q.   (BY MS. PORTER):  What about
20     inconsistent commands?  Have you been on --
21          A.   Would you be -- could you give me an
22     example of inconsistent commands?
23          Q.   One person telling someone not to move
24     and another person simultaneously telling them to
25     back up.  Those two things are not physically

1    possible at the same time.

2         A.    Sure.  But they've com- -- it's been my

3    experience that they've complied somehow with one of

4    those -- with one of those commands.

5         Q.    But they're violating the other command,

6    right?

7         A.    They could be.

8         Q.    Okay.  So was there any kind of practice

9    or policy in place in September of 2020 to at least

10   ensure that commands were consistent?

11        A.    No.

12        Q.    Did you have any involvement -- pardon.

13   Strike that.

14              Did you have any personal participation

15   with respect to the search for the suspect on

16   September 25, 2020?

17        A.    No.

18        Q.    Did you have any personal participation

19   with respect to planning the arrest of the suspect or

20   anything like that?

21        A.    No.

22        Q.    Do you know whether there was any effort

23   to make plans for the arrest of the suspect if he was

24   located?

25        A.    No.

1          Q.   Do you believe that there were and you

2    just don't know about them, or do you believe that

3    there are not?

4          MR. ANGELL:  Objection.  It calls for

5    speculation.

6               So to the extent you can answer that, go

7    ahead.

8          THE WITNESS:  From what I heard on the radio,

9    you know, I could hear them communicating with each

10   other and coordinating with each other as it was

11   rapidly evolving, and they were trying to coordinate

12   the best they could with the terrain.  The terrain

13   was an issue so they were coordinating on the radio.

14              So I've been involved in several

15   situations like that that are rapidly evolving and

16   you have to make, essentially, plans as things are

17   unfolding.

18          Q.   (BY MS. PORTER):  What was rapidly

19   evolving?  What specifically was rapidly evolving?

20          A.   They had a subject who was running

21   and -- running down a hill that they had identified

22   as a suspect involved in -- coming from the area, and

23   they were trying to get some type of containment

24   because of the Outback Golf Course that was occupied

25   with people, several hotels in the area, convenience

1   stores, a main street right there, restaurants that
2   are in the area, and their concern was for the public
3   safety as well, too, of that area -- of keeping them
4   safe.
5           Q.   Okay.  Now, you mentioned "rapidly
6   evolving."
7           A.   Correct.
8           Q.   And then I asked you what was rapidly
9   evolving since you mentioned it three or four times.
10          A.   Yes.
11          Q.   And you said he was running.
12          A.   Yes.
13          Q.   What else was rapidly evolving?
14          A.   Well, you had a suspect that had pointed
15  a gun at a citizen, had ran through several
16  neighborhoods.  We had reports of him being up in
17  that area and was trying to sell a gun and was in
18  somebody's garage and was running from house to house
19  in that area and, as the officers were getting there,
20  they were getting information and relaying that over
21  the radio.
22              And then they -- from reading the
23  reports, they picked somebody up on night vision that
24  was running down from that area down a hill which is
25  covered in sagebrush and towards another populated

1    area, so that's what I mean by "rapidly evolving":
2    Things changing and not staying stagnant.
3            Q.    What was rapidly evolving with respect
4    to the shooting?  I mean, I'm not talking about prior
5    stuff with homeowners and all that.  What was rapidly
6    evolving, as you understand it, with respect to the
7    circumstances of the shooting?
8            A.    So they -- from watching the video, they
9    contacted this person, they gave him commands, he
10   didn't follow the commands, and things -- it was
11   continuing to -- to progress towards the golf course
12   area, that -- that populated area.  And that's --
13   that's a rapidly evolving situation:  You have
14   somebody on foot that's not secured in a location.
15   So there's a lot of things that the officers know
16   that could have happened.  He could have ran, he
17   could have done a lot of different things, they don't
18   know, so that's how it's rapidly evolving.
19           Q.    Okay.  You mentioned earlier that he had
20   pointed a gun at someone?
21           A.    Correct.
22           Q.    And you knew that he had not fired the
23   gun, correct?
24           A.    Correct.
25           Q.    And you knew that one of the homeowners

1    had actually whipped out his own gun and the suspect

2    had still not fired the gun, correct?

3            A.    Correct.

4            Q.    And you knew that instead the suspect

5    had been chased away, right?

6            A.    Correct.  I believe he pointed a gun,

7    too, at another resident that was in the area, from

8    reading the reports.

9            Q.    And then ran away again, right?

10           A.    Correct.

11           Q.    So this guy wasn't even standing up to

12   your average Joe in the garage, right?  That's what

13   you knew?

14           MR. ANGELL:  Object -- hang on.  Object to

15   the form.

16               Go ahead and answer.

17           MS. PORTER:  Well he volunteered, so --

18           THE WITNESS:  Well, I'm --

19           Q.   (BY MS. PORTER):  You knew that even a

20   homeowner scared this guy?

21           MR. ANGELL:  Object to the form.  Calls for

22   speculation.

23           THE WITNESS:  I don't know that.  I don't

24   know that.

25           Q.   (BY MS. PORTER):  Even a homeowner

1   without a gun scared this guy.  Do you know that?

2           MR. ANGELL:  Hang on.  Don't answer that.

3               Object to the form, calls for

4   speculation.

5               Go ahead and answer, if you know.

6           THE WITNESS:  I don't know.

7           Q.   (BY MS. PORTER):  Let me ask you to look

8   at page 630 of Exhibit 7.  And I'll direct you to

9   Section 310.2, if you want to read that to yourself.

10          A.   Okay.

11          Q.   For the record, I'll read it.  "The

12  policy of the Pocatello Police Department is to

13  ensure that officer-involved shootings and deaths are

14  investigated in a thorough, fair and impartial

15  manner."

16              Does the thorough investigation include

17  determining who shot?

18          A.   Yes.

19          Q.   Does the thorough investigation include

20  determining which officer's bullet or bullets

21  impacted the person?

22          A.   That could be part of the investigation,

23  yes.

24          Q.   Okay.  Under what circumstances would it

25  not be part of a thorough investigation to determine

1   which officer actually shot the person?

2        A.   If you can -- if you can -- if you can

3   recover the bullet, if you can match that up with the

4   gun that fired, if you can -- if you can do that

5   stuff, then yes, that was very critical to that.  If

6   you have rounds that are not found or -- then you

7   cannot do that.  If you can't find the actual rounds

8   itself, then it's going to be hard to determine which

9   bullet struck.  Or if it's fragmented, it's going to

10  be hard to tell which bullet struck that individual.

11       Q.   And you know that the bullets were

12  recoverable and were recovered from Jake Sheeler,

13  correct?

14       A.   From what I believe, some of them were,

15  yes.

16       Q.   Okay.

17       A.   That were fired, yes.

18       Q.   So as part of Pocatello Police

19  Department's thorough investigation, was that

20  comparison made that you described earlier between

21  the bullets that struck Jake Sheeler and the guns?

22       A.   That's not part of our internal

23  investigation.  That's part of the Eastern Idaho

24  Critical Task Force.

25       Q.   And do you know whether it was done?

1          A.    I don't know.

2          Q.    Okay.  Now, you -- in this policy manual

3    it stated that officer-involved shootings and deaths

4    are investigated in an impartial manner.

5          A.    Correct.

6          Q.    What is meant by that?

7          A.    That's why we call that Eastern Idaho

8    Critical Task Force.  That's made up of several

9    different agencies from several different parts of

10   our region.  They come in and investigate it.  They

11   make the determinations.  They're the ones that run

12   it, and then after that, they compile the information

13   and then it gets sent to a prosecutor to review

14   that's generally outside the area.  And I know that

15   happened in this case where Prosecutor Herzog sent it

16   to an outside area prosecutor to get that review.

17         Q.    As the person responsible for these

18   policy provisions, what do you mean by the word

19   "impartial"?

20         A.    Fair.

21         Q.    "Fair" is already in there so it's got

22   to be something different.

23         A.    It's fair and it's not biassed.  I think

24   if we investigated it, it would be shown as we would

25   have a bias towards -- if that would be the outside

1    looking in, they would say, "Why are you

2    investigating your own shooting?  That has a bias.

3    You have a bias towards your own officers."  And in

4    order for it to get an impartial, unbiased view,

5    that's why we send it out to other law enforcement

6    agencies.

7          Q.    Is it your understanding that the

8    investigations conducted of officer-involved

9    shootings treats those officers similarly to how

10   criminal suspects are treated?

11         A.    Can you ask the question again?

12         Q.    Yeah.  I can give you a specific

13   example.

14         A.    Okay.

15         Q.    Each of the officers had indicated that,

16   per policy, they are permitted, or even required, to

17   have sleep cycles before they're questioned, okay?

18   And other things in this manual say that they can

19   watch the body cam and things like that.

20              Are similar advantages given to criminal

21   suspects in investigations?

22         MR. ANGELL:  Hang on.  Just -- objection.

23   It's irrelevant, so I'll object to the form.

24         Q.    (BY MS. PORTER):  Go ahead.

25         A.    I don't -- I don't -- I don't think

1   there's advantages.  I mean, you're trying to say

2   that -- I don't understand what you're trying to say.

3   Is that we're, like, given privileged information?

4           Q.   No.  I'm saying you're giving

5   preferential treatment to officers, and therefore,

6   it's not impartial, since you asked me.

7           A.   I don't --

8           MR. ANGELL:  Object to the form of the

9   question.

10               But go ahead and answer.

11          THE WITNESS:  I don't -- I don't direct that.

12  That's not up to me.  That's the Eastern Idaho

13  Critical Task Force that -- that -- that does that.

14  That's not my job to do that.  I -- and it -- I don't

15  get involved in how they do things because then it

16  wouldn't be impartial if I -- if I directed them.

17  They don't work for me.

18          Q.   (BY MS. PORTER):  Okay.  You are aware,

19  aren't you, that the Eastern Idaho Task Force does

20  not conduct interviews of officers in

21  officer-involved shootings until they've had sleep

22  cycles, correct?  You are aware of that?

23          A.   Yes.

24          Q.   And do you have any understanding of why

25  that is?

1          A.   So the officers can have a better

2    recollection of what occurred.

3          Q.   So do you offer your Pocatello Police

4    Department -- in order to get a better recollection

5    of what has occurred, do you offer that same thing to

6    criminal suspects?

7          MR. ANGELL:  Object.  It's irrelevant.  It's

8    very unlikely to lead to the discovery of admissible

9    evidence.  It's already been asked once.  I'll go

10   ahead and let him answer, but this is the second and

11   final time that he will answer this one.

12         THE WITNESS:  Repeat the question again

13   please.

14         Q.   (BY MS. PORTER):  Okay.  You mentioned

15   that the reason why officers get a sleep cycle is to

16   get a better recollection in the interview, right?

17         A.   Uh-huh.

18         Q.   And so I am asking:  When your

19   detectives are working on a criminal case, in other

20   words, to get a better recollection, do they give

21   sleep cycles to suspects before interviewing them?

22         A.   I think that it's -- we're talking about

23   apples and oranges here.

24         Q.   So is that a "no"?

25         A.   I would say it depends on the

1    circumstance.  It's -- I can't tell you that this is
2    how we do everything.  It's based on the
3    circumstances.  Sometimes people get an attorney and
4    say, "Well, I would like my client -- my client can
5    come in in two days to be interviewed," and we comply
6    with that.  Sometimes it takes us a couple of days to
7    identify who's been involved in the shooting and
8    they've already had those couple or three days to go
9    through that.
10           Very rarely do we have a homicide that
11   happens and we catch that person immediately.
12   Generally there's an investigation that occurs, and
13   it's two or three days later where we either are
14   interviewing them -- so that kind of does happen, but
15   it's not -- very rarely do we -- there's a shooting
16   and a homicide or -- and we catch the person
17   immediately.  It does happen every once in a while,
18   but...
19           Q.   And when it has happened, have you said,
20   "I'm not going to interview you until you've had a
21   sleep cycle"?
22           A.   No.
23           Q.   To your knowledge, has Pocatello Police
24   Department ever offered a criminal suspect access to
25   a license psychotherapist before interviewing them?

1            MR. ANGELL:  Same objection I stated earlier.

2            THE WITNESS:  I don't know.

3            Q.   (BY MS. PORTER):  At some point did you

4    learn that Jake Sheeler did not have a gun when he

5    was shot?

6            A.   Yes.

7            Q.   When did you learn that?

8            A.   I believe it was either the next day or

9    the day after.  It might have been two days after.

10           Q.   Do you know why it was two days later?

11           A.   Well, I know -- like I said, it might

12   have been the next day or the day after that.

13   Because it -- it happened at nighttime, and then --

14   so I know that they recovered one of the guns, and I

15   know that the homeowner said we -- he found his other

16   gun, but I don't -- I don't know if that was within

17   24 hours or 48.  I don't know.  I don't know.

18               I know that we recovered the one gun in

19   the garage early in the morning hours the next day

20   and then we later learned that they -- he found his

21   other gun.  I don't know the timeframe of that, so --

22   it was within that timeframe, and -- and I know they

23   were searching the area for -- if there was another

24   firearm in that area and I know that that search

25   continued on to the next day and they couldn't find

```
 1   anything.
 2              So within -- that's the timeframe that
 3   I'm referring to.
 4         Q.   Okay.  So with respect to where Jake
 5   Sheeler was when he was shot?
 6         A.   Correct.
 7         Q.   Okay.  When were you first notified
 8   about the shooting?
 9         A.   Probably right after it happened.
10         Q.   Were you told how many times he had been
11   shot?
12         A.   No.
13         Q.   Were you told at least a -- some number
14   of wounds?
15         A.   No.
16         Q.   With respect to having a gun on him,
17   when did you learn that he did not have a gun on him
18   when he was shot?
19         A.   Pretty early on.  I don't know the
20   timeframe.  They were -- I know they were still out
21   there looking and investigating the area, looking at
22   the terrain.  I don't know.  It was -- it was within
23   that night -- we're talking that night into the early
24   morning hours.
25         Q.   I mean, there's --
```

```
 1            A.   On his -- on his physical person, yes.
 2            Q.   Or -- I mean, you knew that he hadn't
 3     gotten up and run off and put the gun somewhere after
 4     he was shot, right?
 5            A.   After he was shot.  But he had been
 6     moving through some area that they were continuing to
 7     search and were going to go back during the daylight
 8     to look.  So I knew that.
 9            Q.   Now, did any of your officers tell you
10     that they shot him because they saw a gun?
11            A.   I didn't ask them any questions about
12     what happened that night, no.
13            Q.   Have you ever asked any of the officers
14     what happened that night?
15            A.   No, I've never asked them what happened
16     that night.  I read the reports.  I -- I went on
17     debriefs and I never asked them tell me about what
18     happened.
19            Q.   Okay.  You knew pretty quickly after the
20     shooting that they hadn't found any weapons in the
21     immediate vicinity of Jake Sheeler, correct?
22            A.   Correct.
23            Q.   You were asked that, I believe -- I
24     think the next morning by the media.  I'm not sure
25     when it was.
```

1          MS. PORTER:  Do you remember when it was?

2          MS. CHRISTIANSEN:  I thought it was actually

3     at 11:30 p.m., the evening.

4          Q.   (BY MS. PORTER):  All right.  So at some

5     point you were asked the question of whether he was

6     unarmed.

7          Do you remember that?

8          A.   Yes.

9          Q.   And you did know at that point that they

10    had found no weapon anywhere in his immediate

11    vicinity, correct?

12         MR. ANGELL:  Hold -- hold.  I'll object to

13    the form of the question.

14              Answer that, if you can.

15         THE WITNESS:  At the time of the press

16    conference, I was not one hundred percent sure.  No,

17    I was not sure.

18         Q.   (BY MS. PORTER):  You said you weren't

19    one hundred percent sure.  What efforts did you make

20    to ascertain that before you went to the press

21    conference?

22         A.   I asked questions from the investigators

23    that were on scene and they said they were still

24    searching, they were still looking.

25         Q.   But they also said, "We haven't found

 1    one," right?

 2            A.    Yes.  But they were still looking, they

 3    were still searching, they didn't know.

 4            Q.    Well, I mean, how far could it have been

 5    from a guy that can't move?

 6            MR. ANGELL:  Hang on.  Object to the form.

 7    Calls for speculation.

 8                  You can answer.

 9            THE WITNESS:  I don't know.  I don't know.  I

10    wasn't out there.

11            Q.    (BY MS. PORTER):  All right.  But as far

12    as in the vicinity of him, you knew at that point

13    that there had been no gun located, correct?

14            MR. ANGELL:  Object to the form.

15                  Go ahead and answer, if you can.

16            THE WITNESS:  Same answer.  I didn't -- I

17    still don't know.  I didn't know at that moment in

18    time.

19            Q.    (BY MS. PORTER):  Do you know whether

20    any of the officers involved in the shooting were

21    asked to provide a blood sample or alcohol or drug

22    screening?

23            A.    I don't know.  You would have to ask --

24    that's part of the Eastern Idaho Critical Task Force,

25    and they were there.

1          Q.    So do your internal investigations not

2    include finding out whether your officers who had

3    shot at someone might have something in their system?

4          A.    We don't -- we don't do that.  Our

5    internal investigators don't request that, no.

6          Q.    Okay.  I'm just seeing if I can skip

7    some of these questions, so -- I'm not delaying.

8          A.    Sure.

9          MS. PORTER:  Do you want to just give us a

10   couple of minutes and we'll see if we have anything

11   left?

12         MR. ANGELL:  Sure.

13              (A recess was taken from 12:14 p.m. to

14   12:20 p.m.)

15         Q.    (BY MS. PORTER):  We were talking

16   earlier that firearms instructors might have the

17   records of where the firearms are currently that were

18   used in the Sheeler shooting.

19         A.    Correct.

20         Q.    And who are the firearms instructors

21   that you're referring to?

22         A.    It's probably going to be Corporal

23   Gunter/Detective Gunter, same rank, that would have

24   that information.  Captain Bill Collins.

25         Q.    And that's some sort of annual inventory

1    or audit or something?

2            A.   Yes.

3            Q.   If a person were to ask for that annual

4    inventory, do you believe they would understand that

5    that's what we're asking for?

6            A.   That you're asking for where are those

7    guns at now?

8            Q.   Where are those guns.

9            A.   Yes.

10           Q.   I mean, we're not allowed to just ask

11   them "Where are those guns?"  We just have to figure

12   out the right wording.  That's why I'm asking.

13           A.   Okay.

14           Q.   Okay.  We talked about the annual

15   Training Needs Assessment, and we're not clear

16   whether I asked what is the input or the basis by

17   which that annual Training Needs Assessment is

18   prepared.

19           A.   We get input from everyone from the

20   entire department on that.

21           Q.   In some sort of written form?

22           A.   Yes.  They -- they provide the

23   information that can -- or it could be verbal, too,

24   because the sergeants will talk about it in squad

25   meeting.  They compile that information.  We ask from

1    the very basic of line staff all the way up the chain

2    of command of trainings in furtherance of the

3    mission, and they provide that input.  And sometimes

4    the line staff has a better idea than the sergeants

5    or the lieutenant or even me, and we will look at

6    that and assess it and see if it is something that's

7    in furtherance of the mission and we will add that to

8    the Training Needs Assessment or identify that as a

9    training need.

10            Q.   And what kind of paperwork is retained

11    with respect to that process you just described?

12            A.   There's probably an Excel spreadsheet

13    that exists for that.  I don't know if there was one

14    retained from 2020 or not.  I don't know.

15                 But then that information goes into our

16    budget.  So if we identify those needs and we go,

17    "Okay, this is how much money we need for training

18    and then this is how much money we need to" -- so we

19    have a registration budget and then we have a travel

20    and training budget which, if you go to a class in

21    Utah, you just can't register for the school and go.

22    You've got to get down there, you've got to have

23    food, you've got to stay at a hotel, you've got to

24    drive back, so you've got to have per diem and a

25    hotel.

1                    So we have two budget line items:  One's

2    registration, which is our 4012 line item, and the

3    other ones are travel, which is our 6301 line item.

4    That covers those things.

5                    So we identify those needs:  How much of

6    this training can we do inside house?  How much can

7    we -- how much do we need to get outside the house?

8    And then how do we set the budget?

9         Q.    Roughly six months or so after the

10   shooting of Jake Sheeler there was a Notice of Claim

11   submitted with respect to that shooting.

12                   Are you aware of that?

13        A.    I believe I might have seen an e-mail

14   that came from --

15        Q.    If it came from an attorney, I don't

16   want to hear it.  I just want to know whether you

17   became aware that a Notice of Claim had been

18   submitted with respect to the Jake Sheeler shooting.

19        A.    I believe I was told that there was --

20   there was a -- there was some type of paperwork that

21   had been filed.

22        Q.    Did you issue any sort of directive

23   within the police department telling people not to

24   delete e-mails or communications, things like that?

25        A.    No.

1              Q.    Do you know whether any sort of

2    communications or e-mails had been deleted that could

3    relate to the Jake Sheeler shooting?

4              A.    No.

5              Q.    You don't know one way or the other?

6              A.    I don't know.

7              Q.    Are you familiar with the phrase

8    "preservation of evidence"?

9              A.    Yes.

10             Q.    Okay.  Did you take any steps after

11   receiving or hearing about the Notice of Claim to

12   preserve evidence?

13             A.    No.  I did- -- no.  Because I -- at that

14   point I was under the impression that our IT had

15   saved all of our e-mails and all of our records.  But

16   we don't -- yeah, no.  I didn't make any.

17             Q.    So -- but as far as you know, any

18   e-mails relating to Jake Sheeler you believe are

19   still preserved?

20             A.    Absolutely.

21             Q.    And any CAD entries are still preserved?

22             A.    Yes.  Yes.  Yes.

23             Q.    And instant messages?

24             A.    Yes, to my knowledge, but I'm not a

25   computer guy so I don't know what.

1          Q.    And you didn't do anything to make sure
2    that that -- that those were preserved.  Is that what
3    you're telling me?
4          A.    No.  I was under the impression that our
5    IT was saving all of those -- has saved all of the
6    e-mails based off some previous directives that
7    they -- that we had given on -- that they were
8    supposed to save e-mails.  And then everything in CAD
9    and Spillman, you can't -- there's -- I don't know
10   how to -- you would delete that.  That's -- that's --
11         Q.    So you're saying --
12         A.    -- saved.
13         Q.    Sorry.  So what you're telling me is you
14   didn't do anything in particular to preserve evidence
15   but you believed that the evidence would be preserved
16   pursuant to your normal policies?
17         A.    Correct.
18         Q.    And is that also true with respect to
19   the guns?  Did you do anything to make sure the guns
20   were preserved?
21         A.    Me, no.
22         Q.    Okay.  Do you know whether anyone within
23   Pocatello Police Department did anything to make sure
24   that the guns at issue in this case were preserved?
25         A.    I don't know.

1          Q.   But it was -- it wasn't you, right?

2          A.   Correct.

3          Q.   Okay.  Remember that press conference

4     that we mentioned a little bit ago?

5          A.   Somewhat, yes.

6          Q.   During that press conference, you stated

7     that police have had prior dealings with the suspect.

8               Do you remember that?

9          A.   Vaguely, yes.

10         Q.   What did you know, if anything, by the

11    time of the press conference about what police had

12    had prior dealings with Jake?

13         A.   I don't remember what I specifically

14    reviewed, but I believe I looked at his -- our

15    previous contacts with him, probably in Spillman, and

16    then -- and then what I was referring to is the

17    previous contacts within that day, too.  So it was

18    the totality of the circumstances.

19         Q.   Oh, so when you said "previous

20    dealings," you meant earlier that day?

21         A.   That was included in that as well as --

22    as well as the other incidents, yes.

23         Q.   Did Pocatello PD have other incidents

24    with Jake?

25         A.   I don't know.  I'd have to go look.

1          Q.   Okay.  Were you -- is that what you were

2     intending to convey, though, was that Pocatello had

3     had prior incidents?

4          A.   I don't -- I don't remember.  When

5     you're asking that question, I -- I don't remember

6     what specifically I saw.  I don't remember that.

7          Q.   Okay.  Okay.  You mentioned earlier

8     that -- well, strike that.

9               You mentioned that the Eastern Idaho

10    Task Force handled the criminal investigation, right?

11         A.   Correct.

12         Q.   Okay.  What happens with the evidence

13    once East Idaho determines that there's no criminal

14    responsibility?

15         A.   They give it back to us.

16         Q.   Okay.  So did East Idaho give back the

17    evidence relating to the Jake Sheeler shooting?

18         A.   I'd have to see what exactly they gave

19    back to us.  I don't know.

20         Q.   But normally you would expect that they

21    did, correct?

22         A.   Correct.

23         Q.   Is there some sort of a paper trail that

24    follows the delivery of evidence from the East Idaho

25    Task Force to Pocatello PD?

1           A.    They should have a chain of custody

2    within their report, yes.

3           MS. PORTER:  I don't think I have anything

4    else.

5           MR. ANGELL:  I don't have any questions.

6           (Deposition concluded at 12:29 p.m.)

7               (Signature requested.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF ROGER SCHEI

 2

 3       I, ROGER SCHEI, being first duly sworn, depose

 4  and say:

 5       That I am the witness named in the foregoing

 6  deposition; that I have read said deposition and know

 7  the contents thereof; that the questions contained

 8  therein were propounded to me; and that the answers

 9  contained therein are true and correct, except for

10  any changes that I may have listed on the Errata

11  Sheet attached hereto.

12           DATED this _____day of _____20_____.

13

14           CHANGED ON ERRATA SHEET   YES___NO___

15

16       _____
            ROGER SCHEI
17

18       SUBSCRIBED AND SWORN to before me this

19       _____day of _____20_____.

20

21

22

23       _____
            NAME OF NOTARY PUBLIC
24          RESIDING AT_____

25          MY COMMISSION EXPIRES_____
```

1          **ERRATA SHEET FOR ROGER SCHEI**

2    Page_____Line_____Reason for Change
    _____
3    Reads
    _____
4    Should Read
    _____
5    Page_____Line_____Reason for Change
    _____
6    Reads
    _____
7    Should Read
    _____
8    Page_____Line_____Reason for Change
    _____
9    Reads
    _____
10   Should Read
    _____
11   Page_____Line_____Reason for Change
    _____
12   Reads
    _____
13   Should Read
    _____
14   Page_____Line_____Reason for Change
    _____
15   Reads
    _____
16   Should Read
    _____
17   Page_____Line_____Reason for Change
    _____
18   Reads
    _____
19   Should Read
    _____
20   Page_____Line_____Reason for Change
    _____
21   Reads
    _____
22   Should Read
    _____

23

24

25        SIGNATURE:_____

1                    REPORTER'S CERTIFICATE

2              I, Amber S. Williams, CSR NO. 1080,

3    Certified Shorthand Reporter, certify:

4              That the foregoing proceedings were taken

5    before me at the time and place therein set forth, at

6    which time the witness was put under oath by me.

7              That the testimony and all objections made

8    were recorded stenographically by me and transcribed

9    by me or under my direction.

10             That the foregoing is a true and correct

11   record of all testimony given, to the best of my

12   ability.

13             I further certify that I am not a relative

14   or employee of any attorney or party, nor am I

15   financially interested in the action.

16             IN WITNESS WHEREOF, I set my hand and seal

17   this 23rd day of February, 2023.

18

19                    _Amber S. Williams_

20             _____

21             AMBER S. WILLIAMS, CSR NO. 1080

22             Notary Public

23             Post Office Box 2636

24             Boise, Idaho  83701-2636

25   My commission expires June 1, 2027

# Exhibit 20

90

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAKE SHEELER, an individual, | ) |
|           Plaintiff, | ) Case No. |
| vs. | ) 4:22-cv-00313- |
| BRIDGET MCARTHUR, an individual; | ) DCN |
| JEFFREY E. ELDRIDGE, an individual; | ) |
| MARISA A. SALDANA, an individual; | ) |
| ROGER SCHEI, an individual; and | ) |
| CITY OF POCATELLO, a municipal | ) |
| corporation; | ) |
|           Defendants. | ) |

DEPOSITION OF JAKE SHEELER

VOLUME II

February 17, 2023

REPORTED BY:

AMBER S. WILLIAMS, C.S.R. No. 1080

Notary public

1          THE DEPOSITION OF JAKE SHEELER was taken on

2    behalf of the defendants at the Holiday Inn Express &

3    Suites, 200 Via Venitio, Pocatello, Idaho, commencing

4    at 8:40 a.m. on February 17, 2023, before Amber S.

5    Williams, Certified Shorthand Reporter and Notary

6    Public within and for the State of Idaho, in the

7    above-entitled matter.

8

9                        APPEARANCES:

10   For Plaintiff:

11        CHRISTENSEN & JENSEN, PC

12        BY:  KARRA J. PORTER

13        BY:  ANNA P. CHRISTIANSEN

14        257 East 200 South, Suite 1100

15        Salt Lake City, Utah  84111

16        karra.porter@chrisjen.com

17        anna.christiansen@chrisjen.com

18   For Defendants:

19        HALL ANGELL & ASSOCIATES, LLP

20        BY:  SAM L. ANGELL

21        1075 South Utah Avenue, Suite 150

22        Idaho Falls, Idaho  83402

23        sla@hasattorneys.com

24

25

1                           **I N D E X**

2

3    TESTIMONY OF JAKE SHEELER                      Page

4        Examination by Mr. Angell.................... 93

5

6

7

8

9                           EXHIBITS

10    Exhibit 3.     Aerial View of Scene............. 94

11    Exhibit 8.     Drawing by Jake Sheeler.......... 124

12    Exhibit 9.     Plaintiff's Answers to........... 146

13                   Defendants' First and Second

14                   Sets of Interrogatories and

15                   Responses to Requests for

16                   Admission and Production of

17                   Documents

18    Exhibit 10.    Report of Z. Graham, 12/07/20,... 159

19                   with pictures

20    Exhibit 11.    Excerpt from Complaint filed by.. 162

21                   Plaintiff

22    Exhibit 12.    Aerial view of path of travel.... 171

23    Exhibit 13.    Idaho Repository printout of..... 176

24                   Jake Sheeler

25

```
 1                    JAKE SHEELER,
 2   first duly sworn to tell the truth relating to said
 3   cause, testified as follows:
 4                    EXAMINATION
 5   BY MR. ANGELL:
 6          Q.   Okay.  We're back on the record.
 7   Mr. Sheeler, I want to review a few things that we
 8   went over yesterday.
 9               First of all, just because it is another
10   day, are you under the influence of any substances
11   that will affect your ability to give testimony
12   today?
13          A.   No.
14          Q.   Are you having any memory difficulties
15   today?
16          A.   No.
17          Q.   Have you had a chance to review any
18   additional information prior to beginning the
19   deposition this morning?
20          A.   Yes.
21          Q.   What else have you had a chance to look
22   at since yesterday?
23          MS. PORTER:  Are you referring to a document
24   or are you referring to, you know, his communications
25   with counsel?
```

1          Q.    (BY MR. ANGELL):  Well, I don't want to

2    ask you about your communications with counsel.  I

3    said "information," but maybe documents or videos or

4    evidence.

5          A.    The only thing I had the chance to look

6    at was the map of where officers were standing at the

7    time of the shooting.

8          Q.    Okay.  Was that the one that was

9    prepared by your counsel?

10          A.    Yes.

11          Q.    Okay.

12          MS. PORTER:  Exhibit 2 or 3, something like

13    that.

14          Q.    (BY MR. ANGELL):  We have previously

15    marked Exhibit 3.  I'll hand that to you,

16    Mr. Sheeler.

17                Is that what you had a chance to look at

18    last night?

19          A.    Correct, yes.

20          Q.    Okay.  Anything else that you looked at

21    yesterday in terms of documents or video or other

22    information?

23          A.    No.

24          Q.    Okay.  I wanted to get back -- a couple

25    of final thoughts on some of your criminal history.

1    One point that I wanted to clarify -- I know I asked

2    a few questions that were similar to this.  I want to

3    make sure I've -- some people are pretty clever in

4    how they answer questions.  I want to make sure I've

5    covered this right.

6                    Have you ever entered -- prior to

7    September 25th -- because we'll get to

8    September 25th.  But prior to September 25th of 2020,

9    had you ever entered a building or residence with the

10   purpose of stealing something besides what you've

11   already told me about?

12           MS. PORTER:  I'm just going to object to the

13   opening portion of that question which talked about

14   people being clever and answering questions.

15                    Would you mind just asking the clean

16   question without that part in case we have to quote

17   it to the judge later?

18           MR. ANGELL:  I'll try again.

19           Q.   (BY MR. ANGELL):  Have you ever -- prior

20   to September 25th, 2020, have you ever entered a

21   building or residence with the intent or purpose of

22   stealing something other than what you've already

23   told me about?

24           A.   No.

25           Q.   Okay.  I want to take you back, then, to

1  September 25th of 2020.  Tell me what you did that

2  day beginning in the morning, to the best of your

3  recollection.

4          A.   I woke up, made breakfast, did my normal

5  routine, which was take my dog out, I don't know,

6  called my mom, told her how everything was going

7  on -- or, how my day was going and what my plans were

8  for the day.  And my plans were -- that day were to

9  meet up with Whitney and go to their house and help

10  do some yard work for her mom.

11          So I hung up the phone and I called

12  Luke, asked him for -- or, asked him for a ride to

13  Whitney's, and he picked me up and dropped me off.

14          When I got to Whitney's house, I started

15  off by saying hello to her and her mom, and Whitney's

16  daughter happened to be there at that time.  And me

17  and Whitney were in the back room and we were just

18  chilling, watching TV, and, you know, in that time

19  period, I saw the interaction between Whitney's

20  daughter and what it's like being a parent which I've

21  seen before but I've never gotten to meet Whitney's

22  daughter and gotten to see how Whitney was as a

23  parent.  And it turned out that she was a really

24  solid parent.

25          And, you know, it started to dawn on me

1    that I wasn't going to have the best start in

2    fatherhood with my son due to the circumstances that

3    he was in.  So I started to really kind of get in my

4    feelings, meaning depressed, emotional, sad.  And,

5    you know, Whitney would try to talk good and say,

6    "Hey, you know, just because he's not here with you

7    now doesn't mean that you can't take the next

8    necessary steps to help yourself and your mother of

9    your child -- the mother of your child to get in the

10   right direction to get him back and do the necessary

11   means that it takes to do the steps of DCF case."

12           But, you know, even in those moments, in

13   those encouraging words, it still was a pretty dark,

14   depressing moment.  But as Whitney's told me, you

15   know, all you got to do is the necessary means, and

16   you'll find out what those means are when court comes

17   and when you get to hear what the judge is going to

18   ask of you to do in order to get visitation and start

19   the necessary process of being able to see him.

20           From there I started doing some yard

21   work, pulling some weeds, and started realizing that,

22   you know, I was short on money and behind on -- you

23   know, rent was coming up and I was behind on some

24   bills, and so I was trying to think of a way that I

25   could make some money, you know, maybe a side job,

1    maybe I can ask Whitney for some money for doing some

2    yard work which is something I've never done before.

3    I didn't really need it at the time.

4              I noticed a garage door open right next

5    to me -- or, right next to Whitney's house and, I

6    don't know, part of me just got curious, I guess you

7    could say.  I guess a part of me kind of went back to

8    my old ways that I've done before in the past when I

9    was high on drugs or just not in the right state of

10   mind and thought maybe -- thought maybe there was

11   something I could take in there to sell.

12             So I, you know, continued about the

13   hours of just kind of observing, you know, the house

14   next door, see if anyone's coming in and out, what

15   they might have been, you know, just kind of doing,

16   just scouting it out, I guess you could say.

17             And I had noticed something in there

18   that -- you know, I was like, "Oh, man.  That might

19   be a good $300 right there that could maybe pay my

20   rent."  So I waited for the right moment and went.

21        Q.   What was it you saw?

22        A.   I saw a rifle.  I saw a rifle -- well, I

23   saw a rifle bag, I should say.  Something, you know,

24   hunters put their rifles in.  It was a Camo bag.  And

25   I started thinking to myself, like, man, who can I

1  really sell a gun to?  I never really even thought

2  of -- I've never stolen a gun, never sold a gun,

3  never bought a gun, never met anyone in Idaho who had

4  a gun, but I know that Idaho kind of -- you know,

5  people love their guns in Idaho.

6              So I waited for the right moment, and I

7  just walked in there like I owned the place.  You

8  know, fake it till you make it kind of mentality.

9  Started snooping around, and I saw that there's a

10  garage -- a car -- not a car, but a truck in the

11  garage, So I thought, well, maybe there's some cash

12  in the glove box or something or center console or

13  some change that I can collect.  Maybe it doesn't

14  have to be that I have to take something like a gun

15  or something like that, something that's big.  Maybe

16  I can just find 20 or 40 bucks or something and it'll

17  be a start.

18              So I opened the car door and saw two

19  handguns, and I was like, "All right.  Well, now I'm

20  back to the gun idea."  And this is, you know, a

21  little bit probably easier to put in my pocket and

22  walk out.

23              And in that moment when I had the gun in

24  my hand, the -- so I went through the big garage

25  door.  The side door that was more towards where the

1  house was opened up and I -- you know, I was like,

2  "Shit.  Busted."  And the homeowner came out pointing

3  a gun at me, asking what am I doing, who I am, you

4  know, all these kinds of questions.  And in that

5  moment -- I've never had a gun pointed at me, and,

6  you know, I wasn't -- just my adrenaline is pumping.

7  Like, more adrenaline than I've ever had in my entire

8  life, you know.  I can pretty much see the barrel and

9  everything.

10              And just in that instant, second, you

11 know, the gun was in my hand and -- and he asked --

12 he asked who I was and I'm just holding the gun and

13 I'm in shock and I'm standing still and I just said,

14 you know, "Please don't shoot.  Just let me run out

15 of here.  Let me walk away.  Let me just leave."

16              And in that moment I just booked it and

17 ran out of his garage gun in my -- you know, trying

18 to cover up the gun in my pocket and just, you know,

19 put it in my pocket and just start running and

20 running.

21              And I heard another voice that came from

22 behind me as well, and I don't know who it was,

23 really where it was kind of coming from because I was

24 running out the garage.  And I just ran, ran and ran

25 as fast as I could to get out of there and just kept

1    running.  You know, I didn't really look back, kind

2    of maybe glanced real quick and saw that maybe

3    someone was trying to run after me.  And I just ran,

4    ran and ran and ran and ran.  And I don't know how

5    long I kept running and where I went, you know.

6              I hopped a fence trying to maybe -- hop

7    a fence and go to the right, hop a fence and go to

8    left and just kept -- I just kept running and -- I

9    don't know.

10             Some time had passed.  I don't know how

11   long had passed by.  I don't remember where I was,

12   what my game plan was, how can I get back to

13   Whitney's without him seeing me or being seen by

14   anybody that -- that saw me running out of there, if

15   anyone else even saw me and -- I don't know.  I don't

16   know where I was, how long had passed by.

17             But then I just started thinking about

18   how shit had hit the fan, how I made a really poor

19   decision, how this action is going to even take me

20   further away from being able to see my son.

21             So I thought to myself, you know, I

22   don't even have a wallet on me, no one knows who I

23   am, I'm not even from here, I got to find a way to

24   get back home, not to my apartment, to California.

25             And I don't know.  Like I said, I don't

1   know how long I was running from or -- or -- or

2   anything.  I just remember my adrenaline pumping.  I

3   don't know.  And then just -- I don't know where I

4   found another garage opened -- well, not opened.  I

5   went around and tried a side door because I needed to

6   catch my breath and I needed, like I said, to figure

7   out the game plan.

8                So I walked in a garage and just sat in

9   the corner, and I don't know how long I was even in

10  the garage.  And next thing you know, the garage door

11  started opening, and I remember in that moment taking

12  the gun out of my pocket and sticking it on a shelf.

13  And the car pulls in and it's a lady and I'm thinking

14  her daughter and a gentleman that's either her

15  daughter's boyfriend, her son, maybe her boyfriend.

16  I don't know.

17                And I started to explain to them that I

18  was in some kind of trouble, that the police were

19  looking for me, that I had done something but it

20  wasn't what it seems and I needed -- I needed help

21  and I needed a ride to get out of there.

22                And at first she was like, "Well, I can

23  offer you a bike."

24                And in that moment, I was like, "No, a

25  bike's not going to work."

1          Q.   That was the lady that offered you the

2    bike?

3          A.   Yeah.  I said, "The bike's not going to

4    work.  I need to be in a car leaving faster than a

5    bike and able to not be seen in the car."

6               And the son, I don't remember what he

7    had said to me, but -- I don't remember what he said

8    to me.  I couldn't -- I don't even remember if he had

9    said that.  Yeah, I thought he said he would give me

10   a ride, but then he decided not to give me a ride or

11   something.  But all I noticed was that he started

12   walked out of the garage up towards the top of the

13   street and started running that direction.  And in

14   that moment, I was like, "Oh, shit."  Like, he's

15   going to go, you know, tell the police or he's

16   running away to tell someone and ask for help.  So I

17   took off running again.

18               And I don't know where I was and I don't

19   know -- it was, you know, kind of getting dark,

20   probably already kind of dark already, and what I

21   remember was kind of, like, walking, like, in a dry

22   creek bed kind of like a -- like, it wasn't like a

23   dried, like, a big creek bed that had runoff water

24   from the mountains or something, but it just might

25   have been like a gutter system or something where

1  snow melts, kind of like in Florida where they have,

2  like, these -- these ponds that fill up because it

3  rains so much.  But it was like a dried creek bed,

4  crevice kind of action.

5             And I just remember walking through

6  there and it was pretty dark.  I just remember some

7  commotion going on behind me and I remember someone

8  telling me to freeze, stop, put your hands up.  And

9  in the moment, I knew that the jig was up.  I knew

10  that that was police, they found me, there ain't no

11  running.

12             You know, I've been to jail.  I've --

13  I've -- I've seen what a dog bite can do to a person

14  and what a dog bite could turn into, meaning, like,

15  MRSA and shit from being in county jail because it's

16  not the cleanest place and they don't really take

17  care of you.  So I knew the jig was up.

18             So like I said, I put my hands up and I

19  heard a command of "Walk back towards me," and I had

20  my hands up and I was walking back towards them, and

21  that's all I remember.

22             Q.   When you say that's all you remember,

23  that's just literally the end of your memory?

24             A.   Oh, yeah.  Woke up in a hospital I don't

25  know how long later.

1          Q.    Is there anything else that you remember
2     about what happened from the moment that you
3     recognized the police were there?
4          A.    Anything that I remember?
5          Q.    Well, I -- I mean, you've told me that.
6     I want to make sure I give you a chance to describe
7     everything you can remember about especially that
8     last interaction with the police.
9               Is there anything else in that series of
10    events that you described that you've -- anything
11    else that you can add to it?
12         A.    No.
13         Q.    Okay.
14         A.    I don't know if you heard me.  I said
15    no.  Sorry.
16         Q.    I have a few questions about that day.
17    Let me work through those.
18               You say you were at Whitney's house with
19    Whitney's mom, Whitney and Whitney's daughter.
20               Is that a "yes"?
21         A.    Yes.  Sorry.
22         Q.    How old is Whitney's daughter?
23         A.    I believe she was seven at the time.
24         Q.    How much time did you spend kind of
25    hanging out watching TV before you started to do the

1   yard work?

2           A.    Thirty minutes to an hour.

3           Q.    When you started doing yard work, were

4   you working together with Whitney and her mom and her

5   daughter, or how did that go?

6           A.    It was more just me and Whitney.  We

7   were -- started out in the backyard going to the

8   front.  She has a pretty decent-sized front yard.  It

9   goes around and turns.  It's not like we're doing --

10  it's not like I'm mowing the lawn and all this kind

11  of stuff.  I'm literally just raking up a couple of

12  leaves, pulling some weeds in the flower pot area,

13  cleaning up trash.

14          Q.    And was Whitney's mom with you when you

15  were outside working on the yard?

16          A.    No.  She was inside.

17          Q.    What was she doing?

18          A.    I believe she was sitting at the coffee

19  table drinking.  She was a -- she likes to drink, so

20  she will start early.

21          Q.    Had you guys been drinking that morning,

22  the group of you?

23          A.    Group, no.  Whitney didn't drink.  I had

24  a -- you know, a little mixed drink myself.

25          Q.    Just one drink?

1          A.    Yeah.   One -- one, maybe two.   Nothing
2    that really would make me be drunk and, you know,
3    stumbling and things like that.   Nothing that made me
4    slur my words, but there was definitely alcohol
5    running through me.
6          Q.    What kind of drink was it?   What mixed
7    drink was it?
8          A.    It was a -- like a Jameson and Coke.
9          Q.    And can you estimate how much alcohol
10   was in the drink?   Did you mix it?
11         A.    It was a shot, just like what a
12   bartender would give you.
13         Q.    And is that what Whitney's mom was
14   drinking also?
15         A.    Yes.
16         Q.    But Whitney didn't have any?
17         A.    No.   She's not a drinker.
18         Q.    And are you sure you didn't have more
19   than two?
20         A.    No, I didn't have more than two.
21         Q.    So at some point you're doing yard work
22   and you said you started to realize you were short on
23   money.   You started thinking about being short on
24   money?
25         A.    Well, I mean, just thinking about bills

1  and -- I mean, you know how that is, thinking about

2  bills and, you know, what are you going to -- well, I

3  mean, I guess maybe since you got a job, you don't

4  really stress about it too much.  I know people think

5  about bills, job or not.

6             So I was just thinking about bills and

7  thinking about my son, thinking about my next move.

8        Q.   Were you working next to Whitney in the

9  yard?  Was she close by or was she out of sight at

10 this point?

11       A.   Me personally thinking that to myself?

12       Q.   Yes.

13       A.   She was within arm's reach, maybe two --

14 two arms' length.

15       Q.   Were you having conversations with her

16 about bills and money or were you just thinking that?

17       A.   We had already talked about that in the

18 room.  When I was thinking about that again, it

19 wasn't -- it was to myself.  I wasn't really

20 mentioning it again to her.  So we were just kind of

21 goof-balling around.  I couldn't really tell you

22 exactly word for word what we were talking about.

23       Q.   At some point you said you noticed the

24 garage door was open at the house next to Whitney's

25 house?

1          A.    Yes.  Correct.

2          Q.    Was it on the same side of the street?

3          A.    Yes.

4          Q.    Right next door?

5          A.    Right next door.

6          Q.    And when you said the garage door was

7     open, you mean the big door that the cars drive

8     through?

9          A.    Correct.

10          Q.    And there was a truck parked in there?

11          A.    Yes.

12          Q.    Was Whitney by you when you started to

13     notice and look in the garage door?

14          A.    At that moment I hadn't looked in the

15     garage door.  I could just see from afar.  So I would

16     say no.

17          Q.    Whitney was not by you?

18          A.    No, not right next to me.

19          Q.    Did she go back in the house or keep

20     doing yard work?  What was she doing?

21          A.    In that moment that I had seen from

22     afar?  I don't know.  She could have been around the

23     corner, but I didn't make entry at that point.  When

24     I had made entry, she was definitely not around.

25          Q.    So the next thing you said is you saw a

1    rifle bag or a bag that looks like a rifle might have

2    been in it in the garage?

3              A.    Correct.

4              Q.    Where was that at in the garage?

5              A.    All the way to the very back, like -- so

6    the garage was like this.  It had a workbench --

7    like, a worktable on one side, and then all the way

8    towards the back, there was like a shelving -- wooden

9    shelving.  So it was just kind of leaned up in the

10   back towards the wooden shelving.

11             Q.    To be able to see that, did you have to

12   kind of get yourself out to the street to look in?

13   Were you moving and snooping at that point?

14             A.    At that point, the way her driveway goes

15   is like here's the main chunk of the yard but then

16   there's a little strip of grass that goes along the

17   fence.  And at that point I was along the fence on

18   that strip picking up trash off the street, so I had

19   a pretty good angle of where that -- of what I was

20   looking at.

21             Q.    How long did you -- I think you used the

22   term "snooped around" -- well, hang on.  Not yet.

23             Then you said you walked in like you

24   owned the place?

25             A.    That was after snooping, yeah.

1          Q.    Okay.  So how long did you kind of watch

2    the house before you decided "I'm going to walk in

3    there"?

4          A.    Ten minutes.  And it wasn't necessarily

5    watching the house.  I'm not standing there watching,

6    making it look obvious, you know.  I'm continuing to

7    do my work of picking up trash and raking leaves.

8    But it wasn't very long.  It wasn't like I was there

9    for hours.

10          Q.    So minutes, not hours, kind of keeping a

11    side eye on the house.  Is that fair?

12          A.    Fair.

13          Q.    Ten minutes you think, or was it longer

14    than that?

15          A.    Probably 10 minutes.  I knew if I was

16    going to do this, it was going to have to be a smash

17    and grab.

18          Q.    Why do you say that?

19          A.    Because it's the middle of the day.  You

20    can't be in someone else's garage for 30 minutes

21    snooping around.  Most likely someone's going to

22    probably walk in in that time, so grab it and go.

23          Q.    And then in the time that you were

24    outside, you didn't see anybody from the neighbor's

25    house walk in and out of that garage?

1         A.   No.  In that 10 minute, 15-minute time
2    period, no.
3         Q.   What was Whitney doing during this 10 or
4    15 minutes?  Was she still outside doing yard work?
5         A.   Actually she wasn't.  She had gone
6    inside and we were pretty much done by then.  Pretty
7    much in that 10 minutes of me doing the whole
8    snooping and scoping we had finished everything up,
9    and by then we probably just threw the bags at the
10   end of the street in the trash bags and -- I don't
11   know.  She just wasn't outside any longer, and that's
12   when I made my move.
13        Q.   It seems odd to me that you would just
14   sort of still be outside in the yard while she went
15   back in without you guys having communicated
16   something.  Did you talk and say, "Hey, I'm going
17   back in" -- or, did she say, "Hey, I'm going back
18   in"?
19        A.   I can't recall that -- if she had said
20   that to me or not.  But like I said, it's not the
21   first time that I had been over there doing yard
22   work.  So for us to not communicate like that wasn't
23   odd -- wasn't unusual is what I should say.
24        Q.   Were you worried about Whitney all of a
25   sudden coming around the corner and seeing you in the

1    neighbor's garage?

2          A.    No.

3          Q.    Did Whitney know you might run into the

4    neighbor's garage?

5          A.    No.

6          Q.    Did you just not think about Whitney

7    coming around and seeing you?

8          A.    I knew that Whitney wouldn't say

9    anything if she did see me.

10         Q.    Why did you know that?

11         A.    Because Whitney has her own past.

12         Q.    Meaning?

13         A.    Criminal record, I should say -- her own

14   past of having a criminal record.  So she's not one

15   to be like, "Oh, hey, Jake, get out of there.  I'm

16   going to go tell."

17         Q.    So after you were done, I think you used

18   the word kind of "scoping" or "snooping the place."

19   You said it was a smash and grab?

20         A.    Well, I said I knew it was going to have

21   to be a smash and grab.

22         Q.    What's the smash part of smash and grab?

23         A.    Smash, like -- well, smash and grab can

24   be a phrase used for multiple things.  I would think

25   that you can either just smash something, break

1    something and take it, or smash and grab and run.  I

2    don't know.  It's just a phrase.

3           Q.   So you walked into the garage and you

4    walked up to the rifle bag first?

5           A.   Yes.

6           Q.   Did you try to get the rifle out of the

7    bag at all?

8           A.   I wasn't going to do anything like that

9    because I can't be walking down the street with a

10   gun, so I actually -- like I had said, I picked the

11   bag up and knew that there was a rifle in there.  But

12   like I told you, I wanted to check the truck first

13   and see if maybe there was some -- as far as cash or

14   maybe even an electronic device maybe to take that's

15   smaller and a little easier to walk away with.

16          Q.   So did you set the rifle back down?

17          A.   Yes.

18          Q.   And you opened the truck door?

19          A.   Yes.

20          Q.   What truck door did you open?  Which

21   door?

22          A.   The passenger side.

23          Q.   The passenger side.  Was it a four-door

24   truck or two?

25          A.   Two door.

1          Q.    What kind of truck was it?

2          A.    I believe it was a Chevy and it was

3    parked backwards.

4          Q.    Okay.  So it was parked with the front

5    end facing out?

6          A.    Yes.

7          Q.    And which side of the vehicle was toward

8    the house -- the door that goes to the house?

9          A.    What do you mean?  Rephrase that.

10          Q.    Well, most garages -- I guess I'm making

11    an assumption there.  Most garages, when you pull in

12    and park, there's going to be a door that goes into

13    the house from the garage.

14          A.    This garage was detached from the house

15    so the house was, technically, further back.  And the

16    garage was like this, and the door that the homeowner

17    came in from was back here and there's a walkway

18    leading to the house.

19          Q.    Okay.  So the door that went into the

20    garage that led to the walkway, which side of the

21    truck was that on?  Driver or passenger?

22          A.    That was on the driver side, that door.

23    I had opened the door from the passenger side.

24          Q.    So you opened the door, you're in the

25    truck and you see two guns?

1       A.    Yes.

2       Q.    Can you describe the guns?

3       A.    One was a black bulky gun.  I don't

4  know.

5       Q.    Do you know guns?

6       A.    I remember it was a -- it had said

7  something like Hi-Point on it.  And then the second

8  one was -- I remember it had said "Judge" on the

9  bottom, and it looked pretty damn cool, to be honest

10  with you, and I believe it was a five shot.  But it

11  took, like, bullets, like, this long.

12       Q.    How long is that?  You're estimating a

13  length there with your fingers.

14       A.    An inch and a half, would you say?

15       MS. PORTER:  Got anything -- can we compare

16  it to a credit or something?  Oh, here's a hotel key.

17  We used that before.

18       THE WITNESS:  I don't want to move.

19       MS. PORTER:  Well, I -- okay.  Well, you are

20  moving, but okay.

21       THE WITNESS:  I would say about just like

22  that.

23       MS. PORTER:  So just under --

24       Q.    (BY MR. ANGELL):  Just under the length

25  of a hotel key lengthwise?

1          A.    Correct.

2          Q.    About the size of the length of a credit

3    card maybe?

4          A.    Correct.

5          Q.    Had you ever seen one of those before?

6          A.    I haven't seen many guns before.  But a

7    gun like that, no.

8          Q.    Was it loaded?

9          A.    It was.  You can see in the -- like I

10   said, I believe it was a five chamber.  You could see

11   a bullet casing sticking out from the side of the --

12   the round chamber.

13         Q.    I think you're describing a revolver.

14   Is that the -- do you know if that's the term for it?

15         A.    I believe so, yes.

16         Q.    So how did -- which gun did you pick up?

17   You said you picked one of them up.  Or did you pick

18   both up?

19         A.    I took the Judge.

20         Q.    How did you pick it up?

21         A.    From the -- the handle -- from the

22   handle.

23         Q.    So you picked it up like you would

24   normally hold a gun if you were going to shoot it?

25         A.    Finger not on the trigger.

1          Q.    But your hand was on the handgrip of the

2    gun?

3          A.    Correct.

4          Q.    And had you picked the other one up?

5          A.    Yes.  I had picked that one up first and

6    looked at it first and saw that the Judge was there,

7    set that black gun down and picked the Judge up, and

8    after having the Judge in my hand, the door opened.

9          Q.    And when the door opened, describe for

10   me where the individual was facing when you saw him

11   or kind of how you were in relation to him when you

12   saw him?

13         A.    So that door, like I had told you, was

14   in the back.  When that door opened up, I had slowly

15   but quickly shut the car door, didn't close it all

16   the way because I didn't know if he knew I was there

17   or if he could hear me and kind of ducked.  But I

18   could see his feet clearly under the truck, and when

19   he got to the point of the headlight and turned and

20   stopped, I knew that he was waiting for me.

21               So I had stood up from crouching and

22   made eye contact with him after two steps and kind of

23   turning my body toward him.

24         Q.    Were you holding the Taurus Judge?

25         A.    I had it in my right hand, down facing

1    the floor, I believe.  I just remember -- I believe I

2    had -- I knew I had the gun in my hand.  I can't

3    remember if it was -- if it was down or in my pocket

4    or halfway in my pocket or -- I was trying to be --

5    you know, I can't really say this word -- spicuous.

6            Q.    Conspicuous?

7            A.    Conspicuous.  I don't even know if

8    that's the right word I'm trying to use.  I'm trying

9    not to be suspicious with it.

10           Q.    And what was he doing when you saw him?

11           A.    He was pointing the gun at me, asking

12   what I was doing, who am I.

13           Q.    What did you say exactly?

14           A.    I said, "Please let me leave" and ran.

15   I said, "Don't shoot.  Please let me leave" and ran.

16           Q.    Which way did you run?

17           A.    Straight out the garage door.

18           Q.    The big one that was open?

19           A.    The big one that was open.

20           Q.    What did he say to you as near as you

21   recall?  When you stood up from behind the truck,

22   what were the words that he said to you?

23           A.    "Who are you?  What are you doing here?"

24           Q.    Anything else?

25           A.    No.  That cut him off probably -- maybe

1   if he was trying to say anything more.

2          Q.   Did he have the gun pointed at you?

3          A.    Correct.

4          Q.   Did you have your gun pointed at him?

5          A.    I don't recall.

6          Q.   It's possible, though, that you had the

7   gun out in front of you pointed at him?

8          A.    I don't recall.

9          Q.   "I don't recall" is a tricky phrase for

10  lawyers, so I don't mean to beat this a little bit,

11  but I need to make sure I understand what that means

12  in your mind.

13               I take that to mean that you were

14  looking at his eyeballs, and you told me you were

15  looking at the barrel of the gun and you just simply

16  don't know where that gun was you were holding?

17         A.    Correct.  Correct.

18         Q.   In fact, I think you said that your

19  adrenaline was pumping like you'd never felt it

20  before?

21         A.    Yes.

22         Q.   And that you saw the barrel of the gun?

23         A.    Well, I saw his eyes, I saw the barrel

24  of the gun.  I just -- just -- I mean, in that

25  moment, you're kind of just going up and down, like,

1  looking to see what he might be trying to think or --
2  you know, trying to figure out if he's going to shoot
3  you or not.
4          Q.   And then you ran?
5          A.   Just gone.  I asked him if I could
6  leave, and before he could even answer, gone.
7          Q.   Ran with the gun in your hand?
8          A.   Yes.  And I'm not a fast runner.
9          Q.   Did -- you then said that you ran with
10  the gun and you heard another voice behind you?
11          A.   Yeah, someone had shouted at me.
12          Q.   And it sounded like a different voice
13  than the man who confronted you in his garage?
14          A.   Correct.
15          Q.   Was it male or female?
16          A.   A male.
17          Q.   Could you tell the direction that that
18  shout came from?
19          A.   It had come from -- if I'm running away,
20  from this shoulder -- my back shoulder.
21          Q.   Right -- back right shoulder?
22          A.   Yeah.  Back right -- right back
23  shoulder, yes.
24          Q.   And what did that shout -- can you make
25  out what the shout was?

```
 1              A.   I believe he said something like, "Hey,
 2    stop."
 3              Q.   And you did not stop?
 4              A.   Correct.
 5              Q.   And you just ran?
 6              A.   Correct.
 7              Q.   Do you know if that individual that
 8    entered the garage and pointed the gun at you was a
 9    police officer?
10              A.   I knew he wasn't a cop.
11              Q.   How did you know that?
12              A.   Because he was old.  He could have been
13    a retired police officer, but he definitely didn't
14    identify himself as an officer of the law.
15              Q.   And from your glance at his clothing and
16    appearance, you didn't identify him as a police
17    officer?
18              A.   No, not at all.
19              Q.   Have you ever ran from police before?
20              A.   No.
21              Q.   You have never been in a situation where
22    you were chased by police?
23              A.   No.
24              Q.   And to be -- I want to make sure I'm
25    clear.  You did not take the other black Hi-Point gun
```

1   with you out of the garage?

2          A.   I did not.

3          Q.   Can you give me an idea of about what

4   time of day it was that you made this -- that you ran

5   away with the gun from the neighbor's house?

6          A.   2:00.  2:00 in the afternoon.

7          Q.   As you ran away, did you happen to

8   notice if Whitney or her mom were out in their yard?

9          A.   No.

10         Q.   You didn't look back that direction?

11         A.   No.

12         Q.   Did you run back by their house when you

13  ran?

14         A.   No.

15         Q.   Did you run the opposite direction?

16         A.   Yes.

17         Q.   I'm going to have you make a little

18  drawing.  I would like you to draw the street that

19  you were on with a -- draw the house where Whitney

20  lives and the house where this gentleman was with his

21  garage and then kind of the street and give me an

22  idea of where you ran if you can do that.

23         MS. PORTER:  While he's drawing, I'm just

24  going to --

25         MR. ANGELL:  Let's take a break off the

 1    record since she's out of the room.

 2                  (A recess was taken from 9:25 a.m. to

 3    9:28 a.m.)

 4                  (Exhibit 8 marked.)

 5          Q.    (BY MR. ANGELL):  While we were on the

 6    break, you drew a drawing of the street we've now

 7    marked as Exhibit 8.  I would like to have you just

 8    describe a couple of things for me.

 9                  First, you've written "Whitney's" on a

10    house.  Is that Whitney's house where you were at?

11          A.    Correct.

12          Q.    And then next door to kind of the left

13    as you're facing Whitney's house there's a house and

14    then a garage closer to the road?

15          A.    Correct.

16          Q.    Can you just -- using that purple marker

17    that you have now, can you mark your path as you left

18    that garage when you ran out of the house?  You can

19    put an arrow the way you went, if that's okay.  Okay.

20                  And would it be okay if you take that

21    purple marker also and mark where the door is on the

22    garage that the gentleman came in through.  Okay.  So

23    you got a little box there on the side.  Thank you.

24                  Now, you said --

25          MS. PORTER:  Do you mind if we add on there

1  where is the big open garage door?

2          MR. ANGELL:  That's fair.

3          Q.  (BY MR. ANGELL):  Why don't you mark

4  that there as well, if you can, on the front.

5          A.   This would be part -- this is where the

6  bench was for the table and his tools.  The door's

7  right here.  And this is where the -- the shelving

8  was in the back, and this would just be where the

9  door was.

10          Q.   And he had his truck backed in there,

11  facing the street basically?

12          A.   Correct.

13          Q.   So you came in on the passenger side,

14  you were away from the door that he walked through?

15          A.   Correct.

16          Q.   Thank you.  As you ran, do you have --

17  can you give me an idea of how far you think you ran

18  while you said you were just running and turning

19  right and left, hopping fences?

20          A.   How far?

21          Q.   Yes.

22          A.   Far.  Far enough.  I mean, just far.  I

23  mean, I can't give you miles, kilometers.  I can't do

24  that.  I just know that -- I mean, this street goes

25  way, way, way -- continues on.  I just know I just

 1    kept running.

 2              Q.    Can you give an idea of how long you ran

 3    for?

 4              A.    Twenty minutes.  Twenty minutes

 5    probably.  Like I said, I'm not a fast runner, and I

 6    smoked cigarettes at the time so I probably sprinted

 7    50 feet and, after that, jogged, and then, you know,

 8    realized that this street goes forever, so I'm going

 9    to have to change my direction to throw people off if

10    there was someone chasing me.

11              Q.    And as part of that, you hopped some

12    fences and ran through some backyards?

13              A.    Correct.

14              Q.    What were you wearing when you were at

15    Whitney's house that morning?

16              A.    I was wearing black pants, skateboard

17    jeans.  So they weren't baggy, they weren't loose.

18    They were more like skinny jeans so they were tight

19    along my legs.  And a green -- a dark green -- like,

20    a moss green Diesel Brothers sweatshirt.

21              Q.    Was it a hoodie-style sweatshirt?

22              A.    Yes.

23              Q.    You're wearing a hat today.  Did you

24    have a hat on?

25              A.    Yes.

1          Q.    You're wearing glasses today also.  Did

2    you have glasses on?

3          A.    Yes.

4          Q.    Do you always wear corrective lenses?

5          A.    Yes.

6          Q.    So what color of hat was it; do you

7    remember?

8          A.    It was black.

9          Q.    So it wasn't that one, was it?

10          A.    No.

11          Q.    Black hat, corrective glasses, green

12    hoodie, black pants.  I notice you're wearing gloves

13    today.  Do you wear gloves a lot?

14          A.    No.  I wear gloves in order to push

15    myself in my wheelchair.

16          Q.    Oh, okay.  So were you wearing gloves

17    then?

18          A.    No.

19          Q.    Did you have any kind of, I don't know,

20    backpack or anything?

21          A.    No.

22          Q.    Did you have the hoodie pulled up over

23    your head or was it just kind of hanging on your

24    back?

25          A.    I believe I had my hat on with the

1    hoodie over my head, correct.

2          Q.    And is that how you were dressed as you

3    were doing the yard work at Whitney's house?

4          A.    Yes.

5          Q.    What was the temperature like that day?

6          A.    Well, it was in September so it wasn't

7    necessarily humid or hot.  60s.

8          Q.    Did you have anything in your pockets as

9    you were running?

10          A.    No.

11          Q.    Where did you put the gun as you left?

12          A.    I had put the gun in my hoodie pocket.

13    So pullover hoodies have those big pockets in the

14    middle so I had put the gun in there.

15          Q.    How heavy was the gun?

16          A.    Two pounds maybe.

17          Q.    As you were running, did you have your

18    hand on it to keep it from jiggling around?

19          A.    Yes.

20          Q.    Hand on the handle?

21          A.    No.  Hand on the whole pocket itself.

22    So hand outside the pocket but enough to grab and

23    kind of run.

24          Q.    Did you -- you say you ran for you think

25    maybe 20 minutes as you were doing the escape?

1          A.    Yes.

2          Q.    How many backyards do you think you ran

3     through?

4          A.    Two, maybe three.   It's pretty hard to

5     hop the fence after running all that -- so many

6     fences after running all that.

7          Q.    Two, maybe three backyards.   And then

8     you stopped in someone's garage?

9          A.    From what I remember -- like I said, I

10    don't know how long it had been.   I know that it was

11    not necessarily -- I knew -- I knew that when I had

12    gotten to that garage, that some time had gone by.

13    Like, maybe hours had -- had gone by.   But in that

14    process of me going in that garage, my point of going

15    in that garage was to stop and -- and -- and catch my

16    breath and wait for things to kind of blow over.

17         Q.    So I need to know your best estimate.

18    You say some time had gone by.   More than the

19    20 minutes?

20         A.    Yes.

21         Q.    Were you running for that time or did

22    you stop and hide somewhere else?

23         A.    That whole 20 minutes was more of, like,

24    a light jog after my sprints and a couple fence

25    hopping, but I knew that I was trying to stay away

1    from streets.  So I'm sure I probably took a break or

2    two and needed to catch my breath or something.

3          Q.    When you stop to take breaks, where were

4    you stopping and hiding -- or, stopping?  I shouldn't

5    say hiding.  Where were you stopping to take breaks?

6          A.    I don't remember.

7          Q.    Did you find places to get out of view

8    of the street?

9          A.    Other than maybe hopping the backyards,

10   no, not that I remember.

11         Q.    There's quite a gap in time from when

12   your estimate of around 2:00 in the afternoon doing

13   the yard work until the shooting happened I think

14   after 8:00 at night down by the golf course -- or,

15   the golf driving range.  That's quite a few hours in

16   there.

17               Is that -- am I messing that timeframe

18   up, or did it feel like quite a few hours to you?

19         A.    No, you're correct.  It felt like a

20   couple of hours.  But like I said, I just don't

21   remember my exact moves or anything like that in

22   those hours that had gone by.  I just can't remember.

23         Q.    At one point you told me you were having

24   thoughts that you needed to get back to Whitney's.  I

25   wrote that down.

1          A.    Well, I wanted to get back to Whitney's
2    if I could because my phone and my wallet and things
3    like that were at her house.
4          Q.    Did you start to make your way back that
5    direction?
6          A.    Not that I recall, no.
7          Q.    Were you lost?
8          A.    At that point, I believe so.
9          Q.    Help me with "I believe so."  I mean --
10          A.    Like I said, I really don't remember too
11    much.  I had my adrenaline pumping.  I had -- I knew
12    that there was probably cops looking for me.  I just
13    don't -- I just don't remember.  I just remember that
14    moment of the gun being pointed at me, me running
15    away, hopping a couple of fences, staying off the
16    streets, and I remember having a thought that I
17    should get -- that I need to get back to Whitney's.
18                But, you know, I'm not from here.  I'm
19    not really good with the area that I was at, and
20    after hopping a couple of fences, my direction and --
21    and -- and where I was just was not -- I didn't know
22    where I was.
23          Q.    You didn't know how to get back to
24    Whitney's either?
25          A.    Yeah.  Correct.

1          Q.    What else had you taken that day?  Had
2    you taken that -- any drugs that day?
3          A.    No.
4          Q.    What about the Suboxone that we talked
5    about earlier that you were taking?
6          A.    Yes.
7          Q.    You had taken those?
8          A.    Yes.
9          Q.    How many?
10         A.    I just take one.
11         Q.    So you had one Suboxone and two shots?
12         A.    Of the Jameson mixed drink.
13         Q.    Had you smoked any cigarettes?
14         A.    No, I didn't have any.
15         Q.    Any other substance in your body at that
16   time?
17         A.    Nope.
18         Q.    And so you decided -- at some point you
19   said that you knew the shit had hit the fan and you
20   were going to try to get back to California.
21         A.    Correct.
22         Q.    This is while you were running?
23         A.    This was when I was in that garage.
24         Q.    Okay.  So let me try to figure out how
25   long did -- do you think you ran before you entered

1   that garage?

2            A.    A long time.

3            Q.    More than an hour?

4            A.    More than an hour, yeah.

5            Q.    How did you enter the garage that you

6   entered?

7            A.    Side door.

8            Q.    How long do you think you were in that

9   garage total time?

10            A.    I don't know.  I can't -- I can't -- I

11   couldn't tell you.

12            Q.    More than a few minutes?

13            A.    I believe -- I believe so, yes.

14            Q.    More than a couple of hours?

15            A.    I believe -- I would believe so.

16            Q.    You could have been in there for two or

17   three hours maybe?

18            A.    Yes.

19            Q.    Just sitting in the corner?

20            A.    Yeah.

21            Q.    You still had the Judge with you?

22            A.    Correct.

23            Q.    Did you take anything out of the garage

24   that you were sitting in?

25            A.    No.

1          Q.    Did you look around to see if there was

2    something you wanted to take?

3          A.    No.

4          Q.    Did you do anything in that garage

5    besides sit there?

6          A.    No, not that I remember.

7          Q.    Did you change any clothing while you

8    were running?

9          A.    No.

10          Q.    Did you discard the hoodie?

11          A.    No.

12          Q.    So your testimony is that the entire

13    time from when you left Whitney's house to when you

14    were shot by the police officers you were wearing the

15    exact same clothes?

16          A.    Yes.

17          Q.    You never changed cloths?

18          A.    No.

19          Q.    Didn't put anything on?

20          A.    No.

21          Q.    Or take anything off?

22          A.    No.

23          Q.    And it was while you were sitting in the

24    corner of that garage that you were thinking you got

25    to find a way back to California?

1          A.   Yes.

2          Q.   What was your plan at that point?

3          A.   Didn't really have one.  Like I said,

4    I'm not from here, don't know a lot of people.  I

5    just knew that I took the Greyhound bus here and that

6    would probably be my best bet probably.

7          Q.   How long were you going to sit in that

8    garage?

9          A.   At least until dark.

10          Q.   You were waiting in the garage until it

11    got dark?

12          A.   I was.

13          Q.   Was it dark by the time you left the

14    garage?

15          A.   It was fairly dark, still enough to

16    where you can kind of make out, you know, maybe

17    300 feet in front of you.

18          Q.   So as you're sitting there, the next

19    thing you told me is that the garage door started

20    opening?

21          A.   Correct.

22          Q.   And that's the big door that the car

23    drives in?

24          A.   Correct.

25          Q.   Were the headlights on?

1          A.    Yes.

2          Q.    You said then that you took the gun out

3    and stuck it on a shelf?

4          A.    Correct.

5          Q.    Did you do that before the car got in

6    the garage?

7          A.    No.

8          Q.    So it was after the car got in the

9    garage that you took the gun out?

10          A.    It was while that garage door started

11    opening.  The moment I heard the motor kick on is

12    when I did that.

13          Q.    Was the garage door partly up when you

14    took the gun out?

15          A.    The garage door had been up maybe

16    4 inches by the time that gun was on that shelf.  No

17    one could see that I had put anything on there.

18          Q.    Did you stand up?

19          A.    Yes.

20          Q.    And then you said the car pulled in, a

21    lady, her daughter and possibly a daughter's

22    boyfriend got out of car?

23          A.    Well, there was definitely three people.

24    What I meant by "possibly the daughter's boyfriend,"

25    I'm saying, like, it could have been the daughter's

1   boyfriend or her --

2           Q.   Son maybe?

3           A.   -- son or the mother's boyfriend.  I

4   mean, I can't recall what their ages were.

5           Q.   A woman, a daughter and a man?

6           A.   Yeah.

7           Q.   How old was the man?

8           A.   I'm -- the man, like I said, was more

9   close to the daughter's age, and the daughter was

10  definitely at least 16 or older.

11          Q.   So maybe a late teenager?

12          A.   Yes, early 20s.

13          Q.   Who said what as soon as the people

14  started to get out of the car?

15          A.   I started explaining myself immediately

16  to them.

17          Q.   What were you saying?

18          A.   Something along the lines of, "I'm in

19  trouble and need help.  The police are looking for

20  me."  That's what I remember, I believe.  Yeah,

21  that's what I remember.

22          Q.   Did you tell them you were trying to get

23  to California?

24          A.   No.

25          Q.   Did you -- I think you talked about --

1  you said needing a ride out of here?

2          A.   Yes.

3          Q.   You asked them for a ride?

4          A.   Yes.

5          Q.   What did they say?

6          A.   That she couldn't give me a ride in her

7  car but that she would give me a bike.

8          Q.   And you turned the bike down?

9          A.   Yes.

10          Q.   What did you say?

11          A.   I said, "Well, you know, I can't ride

12  the bike out of here.  That wouldn't work."

13          Q.   And then the boy started to say

14  something to you.  What did he start to say?

15          MS. PORTER:  I'm going to object to use of

16  the word "boy."  That's inconsistent with his

17  testimony.

18          MR. ANGELL:  What word would you like me to

19  use for that person?

20          MS. PORTER:  Well, you said "man" earlier.

21          MR. ANGELL:  Then I thought I determined he

22  was a teenager.  So can I call him a teenager?

23          MS. PORTER:  He said "or early 20s."  Did you

24  not hear that part?

25          MR. ANGELL:  No, I didn't.

1          Q.   (BY MR. ANGELL):  How old was the young

2   man that you were speaking with?

3          A.   Like I said, teenager to early 20s.

4   Late teens, early 20s.

5          Q.   So what did the person that was late

6   teens, early 20s say to you?

7          A.   I couldn't recall if he had said that he

8   would give me a ride -- or, would he give me a ride.

9   I just know that in that moment he had turned around

10  and started walking away from the garage and the

11  house towards the street, and he was making his way

12  up the street.

13         Q.   Were the two women still in the garage?

14         A.   They were still standing and talking to

15  me, yes.

16         Q.   Close to the car?

17         A.   Yes.

18         Q.   Did they both get out of car?

19         A.   Yes.

20         Q.   Did you see if the teenage/20s man was

21  on a phone or anything?

22         A.   I don't believe he was.

23         Q.   And he walked out the garage down to the

24  driveway and turned and headed up the street?

25         A.   Correct.  Started running when he got

1    out.  When he walked down the driveway and hit the

2    street, he started running.

3            Q.    Did either the lady or the girl try to

4    run away from you?

5            A.    No.  They didn't seem threatened by me.

6            Q.    Did you think that the teenage/20s man

7    was threatened by you?

8            A.    I don't think he was threatened by me,

9    but when he started running up the street, I figured

10   he was going to go try to, I don't know, make a phone

11   call, maybe get to his car or go to the top of the

12   street.  Maybe there was a cop sitting up there or

13   something.

14           Q.    So what did you do?

15           A.    I took off running.

16           Q.    Just ran out the garage door?

17           A.    Yes.

18           Q.    The next thing you described is that you

19   were moving through a -- walking in a creek bed -- a

20   dry kind of creek bed area?

21           A.    Correct.

22           Q.    How long had it been from the time that

23   you left the lady's garage to the time that you found

24   yourself in that creek bed?

25           A.    I couldn't give you an exact time, but

1    I'm going to say 20 -- 20 minutes tops.
2              Q.    You don't remember doing anything else
3    in the meantime?
4              A.    I didn't do anything else but run.
5              Q.    And then you say, as you were walking
6    through that creek bed, you heard a commotion behind
7    you?
8              A.    Correct.
9              Q.    And if I got your words right, you heard
10   "Freeze.  Stop and put your hands up"?
11             A.    Correct.
12             Q.    And you recognized these commands to
13   have come from police officers?
14             A.    Correct.
15             Q.    Could you see their flashlights on you?
16             A.    I mean --
17             MS. PORTER:  I'm going to object that it
18   assumes facts not in evidence.
19             MR. ANGELL:  I'm asking him questions.
20             MS. PORTER:  You know what?  You probably
21   made that same objection ten times a couple of days,
22   so -- and you did assume the fact.  You assumed that
23   the words he was hearing came from the people holding
24   flashlights.  That is an assumed fact.
25             MR. ANGELL:  The proper objections are object

1   to the form of the question.  You can state the basis

2   for that if you want, but I don't want you to coach

3   him on what the answers are.

4          MS. PORTER:  I'm not.  You questioned why I

5   was objecting on assuming facts not in evidence, so I

6   thought we were having a dialogue.

7          MR. ANGELL:  I would prefer not to have one.

8          Q.   (BY MR. ANGELL):  Did you see lights

9   shining on you?

10         A.   No.

11         Q.   Did you know that it was police officers

12  speaking to you?

13         A.   Yes.

14         Q.   How did you know that?

15         A.   Because if -- I've had a past with

16  run-ins of the police and know some of what their

17  commands and things like that are.

18         Q.   You did not stop moving, though, did

19  you?

20         A.   I did.

21         Q.   You didn't?

22         A.   I did.

23         Q.   You believe you stopped moving?

24         A.   Yes.

25         Q.   You did not put your hands up, did you?

1          A.    I did.   I put my hands straight up in
2     the air.
3          Q.    You believe you put your hands in the
4     air?
5          A.    I know I did.
6          Q.    You started to tell me that you've been
7     to jail, you've seen a dog bite, you've seen what
8     MRSA can do and that the jig was up.  You used those
9     phrases.
10         A.    Correct.
11         Q.    Why did you tell me that stuff?  Why
12    were you thinking that right then?
13         A.    I was thinking that right then because I
14    knew that the jig was up.
15         Q.    What do you mean by that?
16         A.    That my plan of continuing to run away
17    was -- it was over with, I had been caught, that
18    these were police officers behind me and they were
19    giving me verbal directions to put my hands up.  And
20    I had told you that I have seen what a dog bite can
21    do.  I didn't know if they had dogs behind me.  I
22    didn't know what -- what they had.  But I knew that
23    there was police officers apprehending me, they were
24    telling me to put my hands up and to walk back
25    towards them.  So I stopped, put my hands straight up

```
1   in the air and started walking backwards.
2           Q.   Why did you tell the officers that "I've
3   got a gun"?
4           A.   I didn't.
5           Q.   Do you have a memory of saying that or
6   are you saying you did not say that?
7           A.   I never said anything like that.
8           Q.   You didn't say that three or four times?
9           A.   No.
10          Q.   You claim to have heard the command,
11  quote, "Walk back towards me," end quote?
12          A.   Correct.
13          Q.   You claim that that was from a police
14  officer?
15          A.   Correct.
16          Q.   And then you said, "That's the last
17  thing I remember," by my note anyway.  Is that the
18  last thing you remember hearing?
19          A.   Correct.
20          Q.   Did you hear gun fire?
21          A.   I don't remember.
22          Q.   You don't remember?  Did you hear a
23  police officer say, "If you draw your gun, I will
24  shoot you"?
25          A.   No.
```

1          Q.    Did you hear a police officer say,
2     quote, "Show me your hands," end quote?
3          A.    No.
4          Q.    Did you hear a police officer say,
5     quote, "Get on the ground," end quote?
6          A.    No.
7          Q.    And you do not remember a flashlight
8     shining right on you?
9          A.    No.
10          Q.    How many police officers did you see?
11          A.    I didn't see any.
12          Q.    You never saw a police officer?
13          A.    No.
14          Q.    Did you see any people?
15          A.    No.
16          Q.    So you claim to have heard the words
17     that you described to me but you never saw any
18     people?
19          A.    Correct.
20          Q.    Did you see the other people on the
21     driving range?
22          A.    I didn't even know I was on the driving
23     range.
24          Q.    Did you see the Red Lion Hotel -- the
25     hotel next to you?

1          A.    No.

2          Q.    Were you out on the flat grass at the

3    time you had your last memory, or was -- maybe I

4    should rephrase that.

5               Were you still in the dry creek bed at

6    the time you heard the last command?

7          A.    I don't know.

8          Q.    Do you remember hearing the command,

9    "Don't move," end quote -- quote, "Don't move," end

10   quote?

11         A.    No.

12         THE WITNESS:  I would like to take a break so

13   I could go use the restroom.

14         MR. ANGELL:  That's fine.

15              (A recess was taken from 9:55 a.m. to

16   10:19 a.m.)

17              (Exhibit 9 marked.)

18         Q.   (BY MR. ANGELL):  Mr. Sheeler, I've

19   handed you what we've marked on the break as

20   deposition Exhibit No. 9.

21              Do you see that?

22         A.    Oh, yes.

23         Q.    Okay.  So I'll represent to you that

24   this is a document I know that was drafted -- it's a

25   response to discovery that was drafted by your

1   attorneys.  I see on the back page -- can you turn to

2   the very last page?  That page there, you'll see a

3   verification on the top.  It has your slash-S

4   signature on it.

5               Do you remember you signed -- reviewed

6   and authorized your signature on this?

7         A.    Yes.

8         Q.    Okay.  So now -- there are page numbers

9   on the bottom.  I want you to turn to page 16.  Can

10  you turn to 16 with me?  Actually, I take that back.

11  Turn to -- well, yes, 16.

12              On page 16, there is a Request for

13  Admission No. 3.  Do you see that one?

14        A.    Yes.

15        Q.    It says, "Please admit that, upon being

16  confronted by Kirk Hendricks, Plaintiff pointed the

17  Judge at Kirk Hendricks and stated that he would

18  shoot him."

19              Your lawyer drafted a response that I

20  can't make heads or tails out of, but one of the

21  quotes in there -- if you got a -- you can read the

22  answer if you would like, the response that was

23  drafted by your lawyers.

24        A.    Okay.

25        Q.    So there's a quote in there:  "Plaintiff

1  stated, quote, 'Stop, sir.  I will shoot,' end

2  quote."

3            Do you see that?

4       A.   Yes.

5       Q.   You said that to Mr. Hendricks?

6       A.   I don't recall.

7       Q.   Then why is that quoted in there?

8       MS. PORTER:  Object.  Speculation.

9       Q.   (BY MR. ANGELL):  Go ahead and answer.

10      A.   I -- I don't recall.

11      Q.   Well, when you verified this, you

12  verified that these responses were correct.

13      MS. PORTER:  Objection.  You don't verify

14  responses to request for admission.

15      MR. ANGELL:  That's not a proper objection.

16  What's your objection?

17      MS. PORTER:  You just misstated something to

18  him and I'm correcting it to you.  You falsely stated

19  to him that he verified the response to request for

20  admission, and I'm simply responding to your legal

21  statement.  You verify the answers to

22  interrogatories.

23      MR. ANGELL:  So there are proper objections

24  during the deposition under Federal Rules of Civil

25  Procedure and that is not one of them.  The proper

1    objection is:  Object to the form of the question.

2              At times, a court will allow you to

3    state a one or two-word clarification, like

4    speculation or hearsay, but otherwise, when you give

5    those audible, argumentative objections, I view that

6    as you coaching the witness on how to respond.

7         MS. PORTER:  I'm not coaching the witness.  I

8    don't expect the witness to say, "Here's what I

9    verified or not" because I don't expect the witness

10   to know what the rules of civil procedure are.  But I

11   am objecting to the assuming facts and law that are

12   incorrect.

13        Q.   (BY MR. ANGELL):  Turn to the last page

14   again, Mr. Sheeler.  Sorry I have to do this.  We

15   looked at it once, we'll do it again.

16             Will you read the paragraph -- the two

17   paragraphs under "Verification" out loud for the

18   court reporter?

19        A.   "Jake Sheeler says that he is the

20   plaintiff in the above-entitled manner; that he has

21   read the foregoing Plaintiff Answers to

22   Interrogatories; that he knows and understands the

23   contents therefore; and that the same are true to the

24   best of his knowledge, information and belief.  I

25   declare or clarify, verify or state under criminal

1   penalty of the State of Utah that the foregoing is

2   true and correct.  Executed on day of January 23."

3         Q.   Okay.  So when you signed this, did you

4   understand that you were declaring or certifying or

5   verifying or stating under criminal penalty that the

6   forgoing responses were true and correct?

7         MS. PORTER:  You just misstated his

8   testimony.  Objection to the form.

9         Q.   (BY MR. ANGELL):  Did you read that

10  sentence before you authorized your signature?

11        MS. PORTER:  Did you see plaintiff's answers

12  to interrogatories in bold?

13        MR. ANGELL:  Counsel, you continue to try to

14  argue with me and instruct the witness on how to

15  answer a question.

16        MS. PORTER:  No.  I don't expect him to know

17  what he verified except for what it says.  You're

18  deliberately trying to mislead him and I'm

19  disappointed in that.  You know that you changed

20  answers to interrogatories to responses and that's

21  practically unheard of in my experience.

22        Q.   (BY MR. ANGELL):  Okay.  I didn't

23  change -- I didn't mean to change anything,

24  Mr. Sheeler.  I had you read the language in the

25  verification and I just wanted to make sure that you

1    understood -- what it is you understood that you were

2    doing when you signed this.

3                    Can you tell me what you understood you

4    were doing when you signed this?

5           A.    That I was stating the things that I --

6    I was agreeing with what was being put here.

7           Q.    Okay.  Thank you.  So now let's turn

8    back to page 17, and it says -- and I just have to

9    know where the quote, "Stop, sir.  I will shoot," end

10   quote -- where that came from.  And I understood that

11   to be a direct quote from you when it says "Plaintiff

12   stated."

13                   Is that correct?

14          A.    I don't recall saying those things.  But

15   you're trying to say that, since I signed off on

16   this, that I agreed that I said this.

17          Q.    That's what I understood.  I'm trying to

18   clarify that now.

19          MS. PORTER:  There's no question pending.

20          Q.    (BY MR. ANGELL):  So is that your

21   testimony that you stated to Mr. Hendricks, "Stop,

22   sir.  I will shoot you," end quote?

23          A.    Yes.

24          Q.    Okay.  And then it says in the last

25   sentence, "Plaintiff can neither admit nor deny

1   whether he, quote, 'pointed the Judge at Kirk

2   Hendricks,' end quote, because plaintiff does not

3   recall."

4              And is that still your testimony today

5   that you simply cannot recall if you pointed the

6   Judge at Mr. Hendricks?

7          MS. PORTER:  Object to the form.  Misstates.

8          Q.   (BY MR. ANGELL):  Go ahead and answer.

9          A.   As I had mentioned in my testimony

10  earlier, I do not recall pointing a gun specifically

11  at Mr. Hendricks.  It was in my hand.

12         Q.   Yeah.  I think in -- and I think that's

13  what you're saying there.  I just want to make sure I

14  understand.  You're saying that you cannot admit or

15  deny because you do not remember it?

16         A.   Correct.

17         Q.   Now, if you will go down to Request for

18  Admission No. 6 for me, do you see that?

19         A.   Yes.

20         Q.   It says, "Please admit that, as he fled

21  Hyde Street, plaintiff pointed the Taurus Judge at

22  Richard Hernandez."

23              Can you take a minute and read the

24  response to that to yourself?

25         A.   Question.

1          Q.    Sure.

2          A.    "RFA3," that's Request for Admission 3?

3          Q.    Yes.

4          A.    So that means that I can go back and

5     read this to myself as well?

6          Q.    Yes, you can do that.

7          A.    And your question is?

8          Q.    Okay.  So having reviewed that, I just

9     needed to clarify the bit about the last sentence in

10     that response to Request for Admission No. 6 where it

11     says, "Plaintiff can neither admit nor deny whether

12     he, quote, 'Pointed the Taurus Judge at Richard

13     Hernandez,' end quote, because plaintiff does not

14     recall," period.

15          A.    That's correct.  I do not recall.

16          Q.    So the reason I ask you that -- I know

17     what it says.  I don't mean to bother you with it.  I

18     just don't remember you telling me about a Richard

19     Hernandez during your explanation of what happened.

20     Does that help jog your memory?  Was there another

21     individual out there?

22          A.    I'm assuming that Mr. Richard Hernandez

23     is the voice that I heard over my right shoulder.

24          Q.    Did you turn around and point a gun at

25     him?

1          A.    I do not recall.

2          Q.    Okay.  Next on Request for Admission

3  No. 7, there's an allegation that you stole a maroon

4  sweatshirt from a residence at 457 Fairmont Ave in

5  Pocatello, Idaho.

6               And your response to Request for

7  Admission No. 7, "Plaintiff can neither admit nor

8  deny whether, quote, 'On September 25th, 2020, he

9  stole a maroon sweatshirt from a residence,' end

10 quote, because plaintiff does not recall?"

11              Is that still your testimony today that

12 you simply do not recall whether or not you stole a

13 maroon sweatshirt?

14         A.    Yes.

15         Q.    I want to skip to No. 9.  Request for

16 Admission No. 9 on page 18 states, "Please admit that

17 on September 25th, 2020, plaintiff contacted a

18 resident of Beth Street and informed this individual

19 that plaintiff could sell him a handgun," period.

20              Your response, "Plaintiff admits that a

21 resident of Beth Street reported to police that

22 plaintiff contacted the resident and informed the

23 individual that plaintiff could sell him a handgun,"

24 period.  "Plaintiff can neither admit or deny Request

25 for Admission 9 because plaintiff does not recall."

1               Is that still your testimony today?

2          A.   Yes.

3          Q.   And again, the reason I bring that up is

4   I don't remember you mentioning to me during your

5   narrative of what happened any sort of an encounter

6   where you attempted to sell a handgun to a resident

7   in Pocatello.

8               Do you just have no memory of doing

9   that?

10         A.   I have no memory at all.

11         Q.   And no ability to deny that you did it?

12         A.   No ability to deny because I do not

13  recall.

14         Q.   I always struggle as a lawyer with the

15  "I don't recall," and I want to make sure I

16  understand what your testimony is.  So if the

17  resident on Beth Street were to come in to court and

18  testify "Yes, I recognize Mr. Sheeler and he tried to

19  sell me a handgun," would you have any ability to

20  dispute that?

21         A.   My dispute would be that I have no

22  recollection of doing that.

23         Q.   Did the thought enter your mind as you

24  were running that day that you were going to stop

25  residents and see if you could sell that handgun to

1  them?

2        A.   I can't recall what my thought was, but

3  me as a person, I know that that's not something I

4  would do.

5        Q.   You would not have stopped random

6  residents and tried to sell them a handgun?

7        A.   No.  Who in their right mind would want

8  to buy a gun off a stranger?

9        Q.   Describe for me your history, if any,

10  with depression or anxiety.

11        A.   I was diagnosed at 14 -- or, let's just

12  say 16, to have depression, but those tests or

13  results are inconclusive because I was using drugs at

14  the time.

15        Q.   Since that age, mid-teenage years, have

16  you had any other diagnosis of depression?

17        A.   No.

18        Q.   Do you believe you suffer from

19  depression?

20        A.   No.

21        Q.   And during this timeframe of March to

22  September of 2020, did you believe that you were

23  suffering from depression?

24        A.   No.

25        Q.   Did you have any other mental health

1  diagnosis?

2       A.   No.  ADD, is that considered a mental

3  health diagnosis?

4       Q.   I mean, I personally wouldn't consider

5  it that.  But do -- have you been diagnosed with ADD?

6       A.   Or ADHD.  I'm sorry.  Hyper attention

7  disorder where I can't pay attention to things.  I've

8  been diagnosed with that as a child.

9       Q.   Have you received any treatment for that

10 after high school?

11      A.   No.

12      Q.   Have you been to any medical providers

13 or psychiatric providers for depression or ADHD after

14 high school?

15      A.   No.

16      Q.   Are you on -- I already asked that.

17           Turn to page 22 with me real quick.  On

18 Request for Admission No. 23, the request was,

19 "Please admit that on September 25th, 2020, Plaintiff

20 was suffering from a psychiatric or mental health

21 condition during his encounter with the Defendant

22 officers."

23           Your response has a reference to an

24 objection which you can read if you would like.  But

25 the last sentence says, "Plaintiff admits that he had

1  been experiencing mental health challenges prior to

2  this date but is uncertain whether he had been

3  experiencing -- what he had been experiencing would

4  constitute suffering from a psychiatric or mental

5  health condition as contemplated in the Request for

6  Admission and therefore denies."

7              Can you describe for me what the mental

8  health challenges prior to this date were?

9         A.    Yeah.  The mental health challenges that

10 I was having was the fact that, like I had mentioned,

11 my son was taken by CPS and I knew that there was

12 going to be a big hurdle in order to get him back.

13 And there was a timeframe where I wasn't talking to

14 my baby's mom because -- or, I should say

15 "girlfriend," because of the fact that she was in

16 that rehabilitation program.

17              So I was kind of just experiencing a

18 little bit of -- like I mentioned, I was sad and --

19 and -- and worried and knew that this was going to be

20 a hurdle, and it had me in a down -- down, you know,

21 mood as far as that goes.

22              And I'd like to state that, you know,

23 thanks to the fact that I have fight in me and my

24 future wife has fight in her, that we were able to

25 pull out on top.

1           Q.   And by that -- and you showed me a

2    picture of you and your future wife and your son.

3                Is that who that is?

4           A.   Yes, all as a family.

5           Q.   Very beautiful-looking boy.

6           A.   Thank you.

7           Q.   Are you all together now?

8           A.   Yes.

9           Q.   Okay.  Let me ask you -- well, let me

10   hand you what we've marked as -- it's actually going

11   to be No. 10 -- Deposition Exhibit No. 10.

12                (Exhibit 10 marked.)

13           Q.   (BY MR. ANGELL):  I don't need you to

14   look at the words on the front page, but I want to

15   ask you questions about the photographs in this.  So

16   if you flip to the second page of Exhibit 10 --

17           A.   Yes.

18           Q.   -- have you seen that photograph before?

19   Kind of turn the page sideways.

20           A.   Yes.

21           Q.   Is that you?

22           A.   Correct.

23           Q.   Okay.  Can you turn to the next page?

24   They're not numbered for whatever reason.  I

25   apologize for that, but --

 1           MS. PORTER:  Wait a sec.  I'm sorry.  Is
 2    Exhibit 10 the same as -- one sec.  Sorry.  Am I
 3    hallucinating or is Exhibit 10 the same as --
 4           MS. CHRISTIANSEN:  Exhibit 5.
 5           MS. PORTER:  Yeah.  I just want to make sure
 6    I'm not being crazy.  Oh, it's not.  It's got some
 7    stuff omitted.  Never mind.  Blah, blah.  Go on.
 8    Sorry.
 9           Q.   (BY MR. ANGELL):  So this is now page 3
10    of Exhibit 10.  Is that you in the photograph?
11           A.   Correct.
12           Q.   Now, you've got to flip a page to page 5
13    of Exhibit 10.  Is that you in the photograph?
14           A.   Correct.
15           Q.   Do you know when that picture was taken,
16    by the way?
17           A.   I believe this is a booking picture of
18    me from Bannock County on March 6th.
19           Q.   Okay.  Thank you.  Then you will have to
20    skip another page, and there's a photograph of a
21    white car.
22           Do you know what this picture is
23    showing?
24           A.   It's showing a white car, trash cans,
25    the street and a -- back of a basketball hoop.

1          Q.    Does it mean anything to you?

2          A.    No.

3          Q.    Do you recognize that white car, street,

4    backstop?

5          A.    No.

6          Q.    Skip another page.  On the last page of

7    Exhibit 10, it's a color photograph.  Is this you in

8    the photograph?

9          A.    No.

10         Q.    Why do you say that?

11         A.    Because he's wearing shorts.  I wasn't.

12         Q.    What color shoes were you wearing?

13         MS. PORTER:  Sorry.  Could I hear the

14   question again?

15         Q.    (BY MR. ANGELL):  What color of shoes

16   were you wearing on September 25th?

17         A.    Dark gray.

18         Q.    You believe to the best of your

19   information this is not you because this individual

20   is wearing shorts?

21         A.    Correct.

22         Q.    Does that yard configuration look

23   familiar to you?

24         A.    No.

25         Q.    I'm going to hand you what we've marked

1   as Deposition Exhibit No. 11.

2                  (Exhibit 11 marked.)

3             Q.   (BY MR. ANGELL):   Okay.   I'm going to

4   hand you what we've marked as Deposition Exhibit

5   No. 11.  And I'll represent to you, Mr. Sheeler, that

6   this is two pages that I -- three, excuse me -- three

7   pages that I took out of your complaint that you

8   filed in this matter.   I just want to look at the

9   pictures for now.

10                  Under paragraph 60 on the first page of

11  Exhibit 11, there's an image.   Do you recognize that

12  image?

13            A.   No.   I can't even see anything in it.

14            Q.   Do you know what that image shows?

15            A.   No.   But if I had to guess, it looks

16  like a person standing with their arms out.

17            Q.   Okay.   So obviously -- well, let me ask

18  a couple more things about it.   Did you crop out this

19  image to put in the complaint?

20            A.   I didn't crop this image out.   I don't

21  know.

22            Q.   You didn't?

23            A.   I don't know where this image came from.

24            MS. PORTER:   You mean him personally?

25            MR. ANGELL:   Yes.

 1            MS. PORTER:  Okay.

 2            Q.   (BY MR. ANGELL):  Can you identify

 3    yourself in this image on the first page of

 4    Exhibit 11?

 5            A.   No.  I mean -- no.

 6            Q.   Okay.  The title to the paragraph is,

 7    "Jake put his hand in the air," period.

 8                 And then you see this image below it,

 9    correct?

10            A.   Correct.

11            Q.   Do you have the ability as you sit here

12    to tell if that image shows you putting your hands in

13    the air?

14            A.   Yes.

15            Q.   Explain to me how you can tell that.

16            A.   I can tell based on these two black dots

17    that that is someone standing.  I could tell that --

18    based on from the two black dots, I'm going to say

19    that those are shoes.  Going up from there are dark

20    pants, and the color change would be the sweater.  It

21    appears that I have my hood -- hoodie of my -- the

22    hood of my sweater over my head.  And like I said, it

23    looks like someone with their hand out like a

24    scarecrow.  Would you like me to --

25            Q.   You're demonstrating --

1          A.    Yeah.

2          Q.    -- with your hands out to the side by

3    the shoulders?

4          A.    Correct.

5          Q.    Well, I can see this white area.  Is

6    that what you're saying is one hand?

7          A.    That's one arm, correct.

8          Q.    Where's the other one?

9          A.    Just a little less faded right there.

10         Q.    Down here to the side by the hip?

11         A.    Not down by the side.  A little further

12   up.  So it looks like -- if I take your pen --

13         Q.    Draw your arms in there on Exhibit 11.

14   Hang on one second.  That pen is just not going to

15   write well on this.  I know that about it.  So why

16   don't you take your purple one you had there?  Or do

17   you want a different color?

18         A.    I'm looking for a fine point like that

19   burgundy one.  Second favorite color.

20         Q.    Why don't you draw what you see as your

21   body in this image.  If you can just outline it,

22   we'll check your artistic ability.

23         A.    These are shoes, this is my waistline,

24   my pants.  Okay.  And being that my hands are up by

25   my head -- kind of go up like this.  Okay.  This is

1   my hood, this right here is where my shoulders would

2   go, and being that my sweater was like this and that

3   there's this little tiny bit of a crop that my hand

4   would go up.

5           Q.   Can you fill in the other side of your

6   body as well?

7           A.   Yeah, I was doing that just know.

8           Q.   Thank you.  Okay.  I appreciate that.

9   And let's look at it.

10          Okay.  I'm going to have you -- excuse

11  me.  Turn to page 2 of Exhibit 11.  There are two

12  screen shots on page 2 of Exhibit 11.

13          Can you tell me, first of all, did you

14  create the screen shot that is used in this

15  complaint?

16          A.   Me personally, no.

17          Q.   Okay.  Either one of them?

18          A.   No.

19          Q.   Can you tell me what the -- do you

20  recognize what the top one shows?

21          A.   The top one?  The top one, I can't.  I

22  can't even really see.  There's a flash.

23          Q.   Can you identify yourself in the top

24  photograph?

25          A.   I can identify a body which I'm going to

1  say is me.  Shall I mark it?

2       Q.  Yeah.  I'm fine if you want to just

3  outline your body like you did in the last

4  photograph.  If you can see where it's at, do that.

5  I don't want you to speculate, obviously, if you

6  can't tell.

7            What about the bottom photograph of the

8  two?

9       A.  I can see a better image of myself in

10  this.

11       Q.  Do you mind trying to outline yourself

12  in that to the extent that you can identify yourself?

13       A.  I would also like to state for the

14  record that this is my back.

15       Q.  You believe that that is your back?

16       A.  I believe in the second photo that that

17  is my back where --

18       Q.  Why do you think that?

19       A.  Because of the fact that, when I heard

20  voices and commands, it was coming from behind.  I

21  believe, in the first photo, being that I'm further

22  away, I'm following the commands of "Walk back

23  towards me."

24            And in the -- the Figure 4, the second

25  photo, as I'm closer to the arresting officer, that's

1    me walking backwards.

2            Q.   And -- okay.  But you never saw that

3    officer that is shown in this picture, correct?

4            A.   Correct.

5            Q.   Let me turn you to the final page in

6    this exhibit.  Do you recognize those two pictures?

7            A.   Yes.

8            Q.   And who is depicted in those two

9    pictures?

10           A.   Me.

11           Q.   Do you know who took those pictures?

12           A.   This is body cam footage on the first

13   one.  The second one I believe is either a hospital

14   photo or a personal photo that was taken of me.

15           Q.   Do you know where you were shot?  I can

16   take that back.

17           A.   Yeah, I know exactly where I was shot.

18           Q.   Can you describe that for me?

19           A.   I was shot all five times in the

20   chest -- in the back, starting with one that went

21   through and through right here in my neck area on my

22   left side, and then I was shot once in the -- the

23   right -- left-side leg, and then I was shot three

24   times in the back.

25           Q.   Where -- where do you claim the entry

1    wounds are exactly?

2            A.   All coming from the back.

3            Q.   Using words the best you can as you sit

4    here -- I realize that's difficult -- can you

5    describe in words where each entry wound is on your

6    body -- where you believe they are?

7            A.   Can I show you?

8            Q.   Yeah.  I just -- the reason I say "use

9    words" is because I need to have the court reporter

10   take that down as well as she can.  So try to use as

11   many words as you can to describe that.

12           A.   So the one in my left leg would be close

13   to my femur bone.  Correct?  That's the biggest?

14           Q.   The one connecting your knee to your

15   hip?

16           A.   Yes.  The one for my neck, you would

17   consider that your trap.  And the three in my back, I

18   would have one that is a little lower towards my

19   pelvis, near my pelvis.  I got another one that are

20   pretty much in the same area but on different sides

21   of my spine in my midback area.

22           Q.   And you understand that you have five

23   entry wounds?

24           A.   Correct.

25           Q.   Do you have five exit wounds as well?

1          A.    No.

2          Q.    How many exit wounds do you have?

3          A.    I have one exit wound and that's my

4    neck.

5          Q.    And where's the exit wound at?

6          A.    It was a through and through.  So it

7    was -- exit wound's right here in the front, entry

8    point is top of my back.

9          Q.    So top of your back and then kind of out

10   above your collar bone?

11         A.    Way above.  I mean, I know you can see

12   the hole.

13         Q.    Yeah.  I can see the mark there right

14   next to the tattoo that you've got there.

15         A.    Yes.

16         Q.    Which bullet entry is it that injured

17   your spine?

18         A.    Well, it wasn't that a bullet had hit my

19   spine; it was the fragments of the bullet.  So when

20   the bullet made entry into me from behind, it

21   exploded and fragments flew all over inside my body,

22   and the damage was that it -- it hit, you know, most

23   of my nerves all along my spine and my spinal cord.

24   That's what made me have -- that's what made me

25   paralyzed.

1              The other bullet, again, never left my

2    body.  It actually got stuck in my lung, and there

3    was a hole in my lung, and they had to go back six

4    weeks later and pull that bullet -- the whole bullet

5    itself out of my lung.

6              Q.   What does the tattoo say that's on the

7    chest area in your neck?

8              A.   It says "Inland Empire."

9              Q.   Inland Empire, what does that mean?

10             A.   It's a -- where I'm from in California,

11   the Inland Empire.

12             Q.   Is that, like, a gang name?

13             A.   No, not at all.

14             Q.   Is it a town or city?

15             A.   It's considered a city, yeah.

16             Q.   What other tattoos do you have on your

17   body?

18             MS. PORTER:  I'll object to relevance.  Not

19   even reasonably calculable.

20             You can go ahead and answer.

21             THE WITNESS:  I have a Koi fish, my mom's

22   initials, a rose on my hand, a dragon because there's

23   a myth between a Koi fish and when it swims upstream

24   for 300 centuries, it dies and turns into a dragon.

25   It's in a Japanese myth.  I also have another girl's

1    name on my neck and I have lightening bolts.

2          Q.   (BY MR. ANGELL):  What's on your forearm

3    right here?

4          A.   That's the Koi fish with my mom's

5    initials.

6               (Exhibit 12 marked.)

7          Q.   (BY MR. ANGELL):  I want to hand you

8    what we've marked as Exhibit 12.  I want you to use

9    that -- do you recognize that, first of all?

10         A.   This is an aerial view of an area.

11         Q.   Do you have the ability to look at this

12   and mark where you might have traveled that night on

13   September 25th?

14         A.   Oh, no.  Oh, no.

15         Q.   Not at all?

16         A.   Not at all.  I mean, I don't know

17   which -- what this patch of grass is.  I don't know

18   where this school is.  I don't know what this -- I

19   mean, I don't know.

20         Q.   I just wanted to ask if you could -- I

21   mean, I'll represent to you that I understand that's

22   close to the area where the shooting -- that that

23   shows the area where the shooting occurred.

24         A.   Okay.

25         Q.   However, I don't want you to mark on it

1    if you cannot place yourself or your path of travel.

2    If you can, I would like you to place your path of

3    travel on it.

4          A.    Yeah, I can't do that.  I can't place my

5    path of travel.

6          Q.    Do you have any ability to place the

7    point where you were shot?

8          A.    In this aerial view?

9          Q.    Yes.

10         A.    No.

11         Q.    Do you have any ability to place where

12   any of the officers would have been?

13         A.    No.

14         Q.    Okay.  Then let's just leave that one

15   blank.  Thank you.

16               Where there any other witnesses that you

17   know of to the shooting besides you and the police

18   officers?

19         A.    No.

20         Q.    Did you see any people -- let's give you

21   Exhibit 12 back.  I'll represent to you that there is

22   a golf driving range in this area where it says

23   "Pocatello Creek."  Did you see if there were people

24   out there as you were walking that night?

25         A.    No.

1          Q.   Did you see any other citizens as you

2    were walking that night just before you were shot?

3          A.   No.

4          Q.   Do you have any memory -- sorry.  Let me

5    reference you a time.  Just a couple of more

6    questions about the moments before you were shot,

7    those last memories that you have.

8               Do you have any memory of you carrying

9    your hand behind -- your right hand kind of behind

10   your right hip?

11         A.   At what point?

12         Q.   Any moments before you were shot.

13         A.   No.  My hands were straight up in the

14   air.

15         Q.   At any point as you were walking along

16   the creek bottom were you carrying your right hand

17   kind of by your right hip or slightly behind your

18   back?

19         A.   Before or after I was being apprehended?

20         Q.   At any time in there.

21         A.   No.

22         Q.   Do you have any memory before you were

23   shot of thrusting your right hand out toward police

24   officers?

25         A.   No.  I was following commands of having

1    my hands in the air.

2          Q.   So you have no memory of doing that?

3          A.   I know I didn't do that.

4          Q.   Do you have any memory of the officers

5    administering first aid to you?

6          A.   No.

7          Q.   Do you have any memory of being

8    transported to the hospital?

9          A.   No.

10         Q.   Your next memory is waking up in a

11   hospital?

12         A.   Correct.

13         Q.   What charges did you plead guilty to as

14   a result of this interaction on September 25th with

15   the various homeowners?

16         A.   With the various homeowners?  So

17   Hendricks?  Is what you're asking?

18         Q.   Yeah.  So maybe I should word that

19   better.  Were you charged with some criminal charges

20   from September 25th, 2020?

21         A.   With -- the encounterment with

22   Mr. Hendricks, yes.

23         Q.   What were you charged with?

24         A.   You know, honestly, I don't even really

25   remember, but you can look it up and, you know, find

1   out easily.  I'm sure you could.

2          Q.   Yeah.  I have, yes.

3          A.   Why don't you refresh my memory, please.

4          Q.   I just wondered what you knew about it.

5   I guess I -- you don't know what charges you were

6   charged with?

7          A.   What charges I was charged with?  No.

8   Because at the time of those charges being charged, I

9   was in the hospital fighting for my life, so -- I

10  just know that I went to court, and I can't recall

11  right now at this exact moment what I pled guilty to,

12  but I'd like for you to refresh my memory.

13         Q.   Sure, I will.  I will let you look at

14  that.  A couple of things first:  Did you have an

15  attorney representing you?

16         A.   Correct.

17         Q.   Do you remember who this was?

18         A.   Jonathan.  His name was Jonathan.  I'm

19  trying to remember his last name.  I can't.

20         Q.   And you remember going to court over the

21  charges?

22         A.   Yes.  I flew out here to Pocatello and

23  went to court.

24         Q.   You remember, like, going through a

25  sentencing, for example?

1          A.    Correct.  I got to speak with the judge,

2    and Mr. Hendricks got to tell me how he felt about

3    the interaction and that was it.

4              (Exhibit 13 marked.)

5          Q.    (BY MR. ANGELL):  I'll just represent to

6    you that, at least as I understand, that's the Idaho

7    repository print out.  The repository in Idaho is

8    what we call the court records.

9              If you look at the first page, it shows

10   that -- excuse me.  Are you on the second page there?

11         A.    Yeah.  Sorry.  Sorry.

12         Q.    Does that help refresh your memory of

13   what you pled guilty to?

14         A.    I didn't plead guilty to these charges.

15   These are just charges that they were stacking onto

16   me --

17         Q.    Turn to the second page.

18         A.    -- at the time.

19         Q.    And at least in Idaho, one of the ways

20   that we keep track of that is we have a line there

21   that shows the charges that you pled guilty to.

22         A.    Yes.

23         Q.    The first one is assault aggravated, and

24   it says you pled guilty to that.

25         A.    Correct.

1          Q.    Does that refresh your memory?

2          A.    It does.

3          Q.    What did you do that caused you to plead

4    guilty to aggravated assault?

5          A.    What did I do to plead guilty?

6          Q.    What facts -- what did you do?

7          A.    Yes.  That made me plead guilty to

8    aggravated assault?

9          Q.    Yes.

10         A.    I can't recall.  I just remember that I

11   pled guilty to these charges because I was going to

12   get --

13         MS. PORTER:  Objection.  I mean, not

14   objection.

15              Just answer his question.  I think

16   you're probably straying into attorney-client

17   communication.  That's why I'm --

18         Q.    (BY MR. ANGELL):  I -- let me -- so

19   she's coaching a little bit on how to answer this,

20   but --

21         MS. PORTER:  I'm using the language I learned

22   over the last two days from opposing counsel.

23         MR. ANGELL:  I would strongly disagree with

24   that.

25         Q.    (BY MR. ANGELL):  I would say this:  I

1  don't want to ask about any conversations you had

2  between you and your attorney.  That, of course, is

3  confidential.  What I'm asking you is what facts or

4  what conduct did you do that caused you to be willing

5  to plead guilty to aggravated assault?

6          A.   I don't remember.

7          Q.   Was that the pointing the gun at

8  Mr. Hendricks?

9          A.   I don't remember.  I just know it was a

10  plea deal.

11          Q.   Then the second charge you pled guilty

12  to was burglary.  Do you see that one?

13          A.   Yes.

14          Q.   Does that help refresh your memory that

15  you pled guilty to burglary?

16          A.   Yes.  I'm guessing it's because I went

17  into the garage.

18          Q.   Do you have a memory of what it is that

19  you actually did that caused you to plead guilty to

20  burglary?

21          A.   I do not.  Like I said, it was part of a

22  plea deal.

23          Q.   The final charge is unlawful weapon

24  possession by convicted felon; is that right?

25          A.   Correct.

1          Q.    Does that refresh your memory that you
2    also pled guilty to that one?
3          A.    Correct.
4          Q.    And what is it that you did that caused
5    you to be guilty of that charge?
6          A.    I'm a convicted felon before all this
7    happened and I possessed the stolen Judge.
8          Q.    Were you sentenced to any jail time
9    associated with that plea agreement?
10          A.    No.
11          Q.    What was the sentence you received
12    roughly?
13          A.    Seven years probation.
14          Q.    So you would currently still be on
15    probation, then?
16          A.    Correct.
17          Q.    Has your probation been transferred --
18    supervision of your probation been transferred to
19    California?
20          A.    Correct.
21          Q.    And do you still check in with a
22    probation officer?
23          A.    Correct.
24          Q.    Do you -- have you had any probation
25    violations since your plea agreement in 2020?

1          A.    No.

2          Q.    Have you had any other criminal charges

3    since this incident on September 25th, 2020?

4          A.    No.

5          Q.    Have you had any other probation

6    violations?

7          A.    No.

8          Q.    Can you describe for me in terms of your

9    damages what the extent is of the paralysis that you

10    have suffered?

11          A.    So you're asking what it is that has

12    changed?

13          Q.    Yeah.  I mean, maybe that was poorly

14    worded.  At least in my understanding, people who are

15    paralyzed suffer different levels of paralysis

16    affecting different parts of their body.

17                Can you just describe for me how it

18    affects you?

19          A.    I'm a T4 paraplegic, so that means that

20    from my nipples down I have no feeling, no ability to

21    move a muscle.  I have no ability to feel if my

22    bladder is full, able to empty my bladder, feel when

23    I have to go poop, able to empty my poop without

24    physically having to do it the way they taught me.  I

25    can't move my legs, can't feel my legs.  I'm numb

1    from the nipples down.

2            Q.    But obviously, your arms work okay?

3            A.    Correct.

4            Q.    Any restrictions with your arms?

5            A.    Just my hands.  So since I was shot in

6    the neck -- what happens is most of your nerves that

7    control your hands and your feet are all here at the

8    base -- the very bottom base of your neck that go

9    out.  And based on the fact that I was shot on this

10   side -- when I first got out of the hospital, I

11   couldn't open my hand at all, couldn't use it.  My

12   arm was significantly smaller than my right arm.  I

13   lost all muscle memory and everything, all muscle.

14            It took -- and still taking physical

15   therapy to be able to get my hand to 100 percent

16   which it'll never be able to get to 100 percent.

17           Q.    That's your left hand you're showing me?

18           A.    Left hand, yes.

19           Q.    How about your right hand?  Does it work

20   okay?

21           A.    It has its own difficulties.  Like --

22   like, I should be able to open my hand all the way up

23   like how you can, like this, so...

24           Q.    It doesn't want to open all the way?

25           A.    All the way, correct.

 1          Q.    Pull back?

 2          A.    Yes.  Yes.

 3          Q.    Any other ways that the paralysis

 4   affects you?

 5          A.    It affects my everyday life.  It affects

 6   me being the father that I thought I could be.  It

 7   affects me going to the restroom.  It affects my

 8   family.  It affects my son.  It affects my wife --

 9   future wife.  It affects my everyday -- affects me

10   every day, every minute.

11              You know, I got to be in a wheelchair,

12   got to have someone help me get dressed.  I got to

13   have someone help me put my shoes on.  I have to have

14   someone help me get in my chair, get out of my chair,

15   make -- you know, I have to have someone help make my

16   bed, make my food.

17              In the early stages, I had to have

18   someone help me take a shower, you know, put a finger

19   in my behind and do digital stimulation for me to

20   have a bowel movement.  It affects driving, me being

21   able to work, me being able to go to school, to

22   baseball practice.  You know, all these things that

23   are coming up in the future with my son, it's

24   affecting all that.

25              I'll always need some kind of caretaker

1    to help me do everyday-living things that people who

2    aren't in a wheelchair and can walk and clean and

3    cook and all that stuff.

4              I have to have someone that helps me do

5    all of that, you know.  I mean, I have to have

6    someone help me shave.  You name it.  Every little

7    thing in the day, I got to have someone almost

8    99 percent of the time help me or do it for me.

9         Q.   Who does that?  Who is helping you with

10   that now?

11        A.   As of right now, my mother, who is my

12   IHSS caretaker as well, my girlfriend, my mom's

13   husband, who I call dad that you had the opportunity

14   to see earlier today, my sister when she's around.  I

15   mean, it -- there's always someone around.  I can't

16   live on my own, you know.  You know -- and my son's

17   getting older, about to be three this year, so -- you

18   know, he loves to try to push me around and help me,

19   so, you know, eventually I'm sure it'll be somewhat

20   of a burden on him to always have to consider me in

21   things.

22        Q.   What -- what's your current relationship

23   status with your girlfriend?

24        A.   Girlfriend?

25        Q.   When you say "future wife," do you have

1    engagement plans or marriage plans?

2              A.    Yes.

3              Q.    When are those?

4              A.    When?

5              Q.    Yeah.

6              A.    There's no set time for that.  We're

7    just focusing on every day getting by and learning.

8    Because every day I'm learning something new about

9    myself and my abilities.

10             Q.    Where does she live right now?

11             A.    She -- since she had a DCF case, she had

12   to do all these things, got my son back.  And since

13   she did all these things and got him back, the state

14   helps with a lot of things, like housing.  So she has

15   her own apartment that I can't go to because I can't

16   go up the stairs.  So she has her own apartment.  My

17   son lives with her, obviously.  She works in recovery

18   herself.  She's a caseworker for a recovery center.

19             But yeah, she has her own place.  The

20   state helps her with that and she has her job.  I

21   don't live with her.  I live with my mom because I

22   can't walk up the stairs.

23             Q.    How often do you see her and your son?

24             A.    I see -- every day on FaceTime,

25   obviously, but we do -- every Tuesday and Thursday

1   they come over.  She comes over after work and picks
2   my son up from daycare and we have dinner at my
3   mom's.  My mom and her husband will leave and give us
4   the -- her apartment to ourselves, call it "family
5   time."
6                So Tuesdays and Thursdays, we do that.
7   And every Friday night they sleep over till Saturday,
8   and then Saturday we'll do something.  We just went
9   to Monster Jam last Sunday.
10               Q.   How close is her apartment to where
11  you're living right now?
12               A.   It's a seven-minute drive.
13               Q.   Same town, then?
14               A.   Yeah.  Well, it's next city over.
15               Q.   Are you -- have you been able to work
16  since this incident?
17               A.   No, not at all.
18               Q.   Have you looked into any employment that
19  you could do with your disability?
20               A.   No.  I won't be able to work every day.
21               Q.   You don't intend to try to get a job
22  anywhere?
23               A.   I intend to start a foundation --
24  nonprofit foundation.
25               Q.   What would that foundation be for?

1          A.   Well, it's called "ROW."  It's called

2     "Reform on Wheels," and it's to help reform police

3     practice on how to apprehend someone.  Many things.

4     Many things.  You could reform almost anything.

5          Q.   Is that foundation started now?  Does it

6     exist?

7          A.   Yes.

8          Q.   And does it have any funding?

9          A.   No, no funding.

10          Q.   Not yet?

11          A.   Not yet.

12          Q.   Have you done anything with the

13     foundation yet?

14          A.   No, not yet.  Still fresh.

15          Q.   Back to the employment.  I mean, there

16     are certain things that folks that are paralyzed are

17     able to do employmentwise.  Have you looked into

18     that?  Do you have any intention of doing that?

19          A.   Well, as of right now, my recovery is

20     still going and it's so early in my incident that I

21     haven't had that chance to consider anything like

22     that.

23          Q.   Have you obtained any additional

24     education?  Maybe gone back to college, anything like

25     that?

```
 1          A.    No.

 2          Q.    Technical school, trade school?

 3          A.    No.

 4          Q.    Do you collect -- describe the benefits

 5  that you get right now.

 6          A.    I get food stamps for myself and I get

 7  SSDI.

 8          Q.    How much in value per month are the food

 9  stamps?

10          A.    $198.

11          Q.    And then what about the SSDI?  What

12  value do you get per month?

13          A.    829.  829.06.

14          Q.    Any other benefits that you receive?

15          A.    No.

16          Q.    Unemployment?

17          A.    No.  Oh, I also get Medi-Cal, but being

18  as it's been almost two years, it should turn over to

19  Medicaid and it'll be a dual coverage.

20          Q.    I was going to ask you about that.

21  Thanks for reminding me.  And that covers your health

22  insurance, medical needs?

23          A.    Yes.

24          Q.    Are all --

25          A.    Only as far as my PT -- my -- my --
```

Jake Sheeler - Vol. II - February 17, 2023          188

1          Q.    Physical therapy?

2          A.    Yeah, physical therapy and my

3    medications.  But specialty doctors and things like

4    that it wouldn't cover it.

5          Q.    Have you had any drug use --

6    illegal-drug use since the incident?

7          A.    No.

8          Q.    You've been absolutely clean since then?

9          A.    Clean and sober.

10          Q.    Good for you.  Any alcohol use since

11    then?

12          A.    No.

13          Q.    Completely stopped alcohol use?

14          A.    Clean and sober.  I had a second chance.

15          Q.    Tobacco use even?

16          A.    I vape.

17          Q.    Stuff's nasty.  You should not do that.

18          A.    Thanks.

19          Q.    But you can sit here -- as you sit here

20    today, you've been completely clean and sober since

21    this incident?

22          A.    Correct.

23          Q.    How has that affected your life?

24          A.    For the better.  If you do the time, my

25    son was born literally a month and two days before I

1  was shot, so -- I was able to pull through.  And if

2  you view my medical records and everything that

3  happened from day one of the hospital till me being

4  discharged, if you sat and read through all of that,

5  you will see that I -- lucky that I'm even here right

6  now.

7            And I took that upon myself to show that

8  my son deserves for me to be here and he deserves to

9  have a really good chance of having, you know, a good

10  dad and things like that.  In order for me to be a

11  good dad, sobriety is number one.

12            Q.   Do you have any state-provided

13  caretakers?

14            A.   Yes, my mother.  She's my IHSS worker.

15            Q.   Any others that come in to provide care

16  that are state assistance or federal assistance

17  maybe?

18            A.   When I've -- so I've been septic three

19  times, and when I've been septic three times, I've

20  always had a state nurse come for about three weeks

21  at a time and put antibiotics into the -- my vein

22  that I have.  I forget what they call it.  It's like

23  a little tube that hangs out.  And so when I get

24  sick, they definitely have a nurse come out and take

25  care of me.

1          Q.    You list in some disclosures various

2     witnesses that will testify in this case.  I wanted

3     to ask you some questions about a couple of them.

4                One is Whitney Rufi.  If you were to

5     call her as a witness to testify in this case, what

6     would you ask her to testify about?

7          MS. PORTER:  Objection.  Calls for

8     speculation.

9          Q.    (BY MR. ANGELL):  Go ahead and answer.

10         A.    So I'm putting her on the stand?

11         Q.    Yeah.

12         A.    I'm the lawyer asking her questions?

13         Q.    Well, I don't necessarily need you to do

14    it that way.  It's really more factfinding for me.

15    In my mind I'm wondering what facts or information

16    she would be able to provide as testimony in this

17    case.

18         A.    She would tell you that I was at her

19    house the day that I took her neighbor's guns and she

20    would tell you that she didn't even know where I

21    went, that I just was gone, she didn't see me do it,

22    she didn't know that I was doing it and she didn't

23    even know what was going on until probably she heard

24    that I was shot.

25         Q.    Have you spoken with her since the

1  incident?

2          A.   I have not.

3          Q.   Never communicated with her again?

4          A.   I left Idaho behind me after all of

5  this.  That includes the people here.

6          Q.   So I was about to ask the list of names

7  we've gone through earlier, but you haven't

8  communicated with anybody in Idaho again?

9          A.   No.

10          Q.   Including Katie?

11          A.   Including Katie.

12          Q.   Do you know if your girlfriend has

13  communicated with them?

14          A.   They're family so I'm sure that she has

15  talked to Katie, at least.

16          Q.   Do you know what Katie has said or

17  thought about this incident through your girlfriend?

18          A.   That it's sad and that she hopes that,

19  you know, I would pull through and be there for her

20  and Forrest.

21          MR. ANGELL:  Let's take a break off the

22  record real quick.

23             (A recess was taken from 11:22 a.m. to

24  11:39 a.m.)

25          Q.   (BY MR. ANGELL):  So we are back from a

1    break where you've had a chance to confer with your

2    attorney.  She tells me that you need to clarify one

3    of your answers.  Would you like to clarify that now?

4              A.   Yes.

5              Q.   Go ahead.

6              A.   You had asked if I had gotten back onto

7    using drugs.  I hadn't got back onto using drugs, but

8    there was one instance where I was in pain and my

9    pain meds at the time weren't doing the job so I had

10   done a thing of fentanyl -- a little bit of fentanyl,

11   and I had also in the same exact motion had a seizure

12   and was septic and had a UTI so it caused me to --

13   all that caused me to go to the hospital.  And my mom

14   had no knowledge of me doing the fentanyl, but she

15   had thought that I had maybe smoked one of my pain

16   pills and made a comment to the doctors about that

17   and had given me Narcan as a standard procedure, and

18   then they had realized that I was septic after all

19   that.

20             Q.   Where did you get the fentanyl?

21             A.   Fentanyl I had gotten from a person that

22   I knew from way back in the day from my old times.

23             Q.   Is that the only time you've had a

24   relapse on illegal drugs since the accident?

25             A.   Yes, that's the only time.

1          Q.   I want to get back to the bullet entry

2    wounds.  I know we went through that, but I think you

3    told me you were shot five times.

4          A.   Yes.

5          Q.   I think we only identified four entry

6    wounds, at least.  I couldn't remember a fifth.  So

7    could you one more time walk through the five with

8    me, tell me where they entered you at?

9          A.   So where they entered me at was three in

10   the back, one in the leg and one in the neck through

11   and through.  And that is what doctors had told me.

12   I can't physically identify the bullets because I

13   can't see on my back.

14         Q.   Okay.  And this one that you showed me

15   on the front of your neck --

16         A.   Right here?

17         Q.   Yeah. -- you claim that that's an exit

18   wound?

19         A.   Yeah.  It's a through-and-through exit

20   wound.

21         Q.   In the back out the front or in the

22   front out the back?

23         A.   In the back out the front.

24         Q.   And then the one on the leg, did that

25   bullet go through?

1          A.   That one is in my leg.

2          Q.   Still in there?

3          A.   Yes.  They didn't remove any bullets

4    from my body other than the one that was stuck in my

5    lung.

6          Q.   Removed one from your lung.  There's

7    some fragments from one that fragmented; is that

8    right?

9          A.   Several fragments.  I can never go

10   through an MRI.

11         Q.   So one in your leg still, there was a

12   through and through.  So that one came out in your

13   trap area, correct?

14         A.   Correct.

15         Q.   And then you claim there -- is there

16   another one still in you somewhere?

17         A.   Yes.  I'm guessing it's also fragmented

18   as well.  So it's not the -- they can't personally

19   place the one bullet in a certain area because, like

20   I had said, it had exploded inside of me and it turns

21   into all different fragments.

22         Q.   Have you fired -- filed any other prior

23   civil lawsuits?

24         A.   In my time?

25         Q.   Yes.

1          A.    Never.

2          Q.    In terms of your damages, I looked at --

3    your attorneys provided me with a medical damages

4    summary.  It's well over a million dollars.  What is

5    the status of those medical bills currently?

6          A.    Owed.

7          Q.    Do you have insurance that has covered

8    those?

9          A.    At the time the insurance wouldn't cover

10   it because I wasn't insured.

11         Q.    Are -- has your insurance covered any

12   part of it since then?

13         A.    No.

14         Q.    Have you paid anything out of pocket

15   toward your medical expenses?

16         A.    Yes.

17         Q.    How much; do you know?

18         A.    Not my pocket, my mother's pocket.  And

19   I couldn't give you a number on that.

20         Q.    So let's stick with "you" for now.  I'll

21   talk to her in a minute.  But you personally, have

22   you paid anything out of pocket towards your medical

23   expenses?

24         A.    No.

25         Q.    And are there any current collection

1  actions or efforts taken against you to collect these

2  debts?

3          A.    Not as of right now that I know of.

4          Q.    And your current insurance through the

5  State of California is covering your rehabilitation,

6  PT and your medication?

7          A.    Yes.

8          Q.    Do you receive any rent or housing

9  assistance through the state?

10         A.    No.

11         Q.    Another line item of damage that you

12 list is attorneys fees and expenses recoverable under

13 42 U.S.C. Section 1988, and then it lists out some

14 rates for your attorney and her associates.

15             What is your agreement with your

16 attorney on how your attorney is going to be paid?

17         A.    My agreement with her I think is win and

18 get -- win and she would be compensated for her time

19 and work that she's put in.

20         Q.    Is it on an hourly rate agreement or is

21 it on a percentage of the recovery agreement?

22         A.    I would believe hourly.

23         Q.    Do you have a written agreement with

24 her?

25         A.    My mom might.

1          Q.    You don't recall if you do personally?

2          A.    I believe when we -- when I say "we," it

3     means my mom.  When my mom reached out, I was in the

4     hospital.  She's my power of attorney.

5          Q.    So you think your mom as power of

6     attorney may have worked out the agreement with your

7     attorney?

8          A.    Correct.

9          Q.    You don't have any personal knowledge of

10    what that agreement is?

11         A.    No.

12         Q.    For example, who's going to pay the

13    costs of, like, this deposition?  Is that something

14    that you have to pay personally or is that something

15    your attorneys cover for you?

16         A.    I wouldn't know.

17         Q.    Don't know?  Okay.  Fair enough.

18               Have you spoken with anybody at the City

19    of Pocatello since this incident?

20         A.    As in who?

21         Q.    Police officers, any person employed by

22    the City of Pocatello.

23         A.    No.  Does my judge count?  When I was --

24    well, that was for the different -- that's not civil,

25    so no.

1           Q.    Correct.    No, I wouldn't consider the

2     criminal proceedings to be part of this case

3     necessarily.    That's a good question, though.

4                 I'm more referring to if you've spoken

5     to anyone else at the City of Pocatello maybe about

6     the actual shooting itself or what happened leading

7     up to it?

8           A.    No.

9           Q.    Do you know if there are any other

10    eyewitnesss to any of the events that you have not

11    identified through your attorneys?

12          A.    No.

13          MR. ANGELL:    I think that's all I have.

14                Do you have questions for him?

15          MS. PORTER:    Nope.

16           (Deposition concluded at 11:48 a.m.)

17                    (Signature requested.)

18

19

20

21

22

23

24

25

1        CERTIFICATE OF JAKE SHEELER

2

3        I, JAKE SHEELER, being first duly sworn, depose

4    and say:

5        That I am the witness named in the foregoing

6    deposition; that I have read said deposition and know

7    the contents thereof; that the questions contained

8    therein were propounded to me; and that the answers

9    contained therein are true and correct, except for

10   any changes that I may have listed on the Errata

11   Sheet attached hereto.

12            DATED this _____day of _____20_____.

13

14            CHANGED ON ERRATA SHEET   YES____NO____

15

16       _____

17       JAKE SHEELER

18       SUBSCRIBED AND SWORN to before me this

19       _____day of _____20_____.

20

21

22

23       _____

24       NAME OF NOTARY PUBLIC
         RESIDING AT_____

25       MY COMMISSION EXPIRES_____

1    **ERRATA SHEET FOR JAKE SHEELER**

2    Page_____Line_____Reason for Change
     _____
3    Reads
     _____
4    Should Read
     _____
5    Page_____Line_____Reason for Change
     _____
6    Reads
     _____
7    Should Read
     _____
8    Page_____Line_____Reason for Change
     _____
9    Reads
     _____
10   Should Read
     _____
11   Page_____Line_____Reason for Change
     _____
12   Reads
     _____
13   Should Read
     _____
14   Page_____Line_____Reason for Change
     _____
15   Reads
     _____
16   Should Read
     _____
17   Page_____Line_____Reason for Change
     _____
18   Reads
     _____
19   Should Read
     _____
20   Page_____Line_____Reason for Change
     _____
21   Reads
     _____
22   Should Read
     _____
23

24

25       SIGNATURE:_____

1                    REPORTER'S CERTIFICATE

2            I, Amber S. Williams, CSR NO. 1080,

3    Certified Shorthand Reporter, certify:

4            That the foregoing proceedings were taken

5    before me at the time and place therein set forth, at

6    which time the witness was put under oath by me.

7            That the testimony and all objections made

8    were recorded stenographically by me and transcribed

9    by me or under my direction.

10           That the foregoing is a true and correct

11   record of all testimony given, to the best of my

12   ability.

13           I further certify that I am not a relative

14   or employee of any attorney or party, nor am I

15   financially interested in the action.

16           IN WITNESS WHEREOF, I set my hand and seal

17   this 23rd day of February, 2023.

18

19                    _Amber S. Williams_

20           _____

21           AMBER S. WILLIAMS, CSR NO. 1080

22           Notary Public

23           Post Office Box 2636

24           Boise, Idaho  83701-2636

25   My commission expires June 1, 2027

# Exhibit 21

BCSO Case 2020-37078
PPD OIS (09.25.20)
Detective Z. Graham
Date of Report: December 7, 2020

On Sept. 209, 2020, I received a forwarded e-mail from Sgt. Karl Noah. The e-mail Sgt. Noah forwarded to me was from Lt. Bill Collins. Attached to the e-mail were 5 individual Microsoft Outlook ".msg" files.

Four of the five e-mails were from Pocatello Police Dept. Officer SHANNON BLOXHAM. A summary of the contents of each message is below.

1. Ofc. BLOXHAM sent an e-mail to Pocatello PD Patrol and Detective distribution lists at 4:54pm on Sept. 25, 2020. The subject line of this e-mail was 'Fw: Supsect' and contained one image of a person (SHEELER) running.
2. Ofc. BLOXHAM sent e-mail to Pocatello PD Patrol and Detective Distribution lists on Sept. 25, 2020 at 4:54pm (a second e-mail) with the subject line "Fwd: Suspect". This e-mail contained a different image of the suspect (SHEELER) running through what appeared to be a driveway.
3. Ofc. BLOXHAM sent an e-mail to Pocatello PD Patrol and Detectives distribution lists on Sept. 25, 2020 at 5:03pm. The subject line of this e-mail was 'Suspect'. Attached to this message was a close-up photograph of SHEELER (presumably a booking photograph of some kind).
4. Ofc. BLOXHAM sent an e-mail to Pocatello PD Patrol and Detectives distribution lists on Sept., 25, 2020 at 5:09pm with the subject line 'Suspicious vehicle'. Attached to this e-mail was a photograph of a white sedan.

One of the five e-mails I received was sent by Pocatello PD Officer CHEYENNE FETCHEN. This e-mail was sent to Pocatello PD Patrol and Detectives distribution lists at 6:38pm on Sept. 25, 2020. The subject line of the e-mail was 'Suspect'. Attached to this e-mail was a photograph of some sort of security monitor depicting and individual in a maroon-colored hooded sweat shirt and gray shorts.

I printed the e-mails that were attached to the electronic mail message Lt. Collins sent to Sgt. Noah. When I printed the messages, a header containing my name was placed at the top of each page. The header appeared because I opened the ".msg" files in the Outlook software platform on my BCSO Workstation.

There was a total of 8 pages (included the messages themselves and attachments) when I printed the contents of all of the ".msg" files. I have attached the print-outs to this report.

I placed the original ".msg" file that I received from Sgt. Noah and the individual copies (of the .msg files) for the e-mail messages sent by Ofc. BLOXHAM and Ofc. FETCHEN on the disc labeled ATTACHMENTS 1.

Nothing further.

DEFENDANTS 000349

## Zeb Graham

| | |
|---|---|
| **From:** | Bloxham, Shannon <sbloxham@pocatello.us> |
| **Sent:** | Friday, September 25, 2020 4:54 PM |
| **To:** | Patrol; Detectives |
| **Subject:** | Fwd: Suspect |

Sent from my iPhone

Begin forwarded message:

> **From:** "Anderson, Tyler" <tanderson@pocatello.us>
> **Date:** September 25, 2020 at 16:51:39 MDT
> **To:** "Bloxham, Shannon" <sbloxham@pocatello.us>
> **Subject: Suspect**



Sent from my iPhone

DEFENDANTS 000350

## Zeb Graham

**From:**         Bloxham, Shannon <sbloxham@pocatello.us>
**Sent:**         Friday, September 25, 2020 4:54 PM
**To:**           Patrol; Detectives
**Subject:**      Fwd: Suspect

Sent from my iPhone

Begin forwarded message:

> **From:** "Anderson, Tyler" <tanderson@pocatello.us>
> **Date:** September 25, 2020 at 16:52:44 MDT
> **To:** "Bloxham, Shannon" <sbloxham@pocatello.us>
> **Subject:** Suspect



Sent from my iPhone

1

DEFENDANTS 000351

## Zeb Graham

| | |
|---|---|
| **From:** | Bloxham, Shannon <sbloxham@pocatello.us> |
| **Sent:** | Friday, September 25, 2020 5:03 PM |
| **To:** | Patrol; Detectives |
| **Subject:** | Suspect |
| **Attachments:** | image001.png; ATT00001.txt |

DEFENDANTS 000352



DEFENDANTS 000353

## Zeb Graham

| | |
|---|---|
| From: | Bloxham, Shannon <sbloxham@pocatello.us> |
| Sent: | Friday, September 25, 2020 5:09 PM |
| To: | Patrol; Detectives |
| Subject: | Suspicious vehicle |
| Attachments: | 123_1.jpeg; ATT00001.txt |

All on weapons offense,

This vehicle keeps driving through 200 block hyde.

Unknown if it's the "stolen"

Received from Blackfoot Officer Dobson

SB

DEFENDANTS 000354



DEFENDANTS 000355

## Zeb Graham

| | |
|---|---|
| From: | Fetchen, Cheyenne <cfetchen@pocatello.us> |
| Sent: | Friday, September 25, 2020 6:38 PM |
| To: | Patrol; Detectives |
| Subject: | Suspect |
| Attachments: | Screenshot_20200925-183721_Video Player.jpg |

Sent from my Verizon, Samsung Galaxy smartphone

1

DEFENDANTS 000356



DEFENDANTS 000357

# Exhibit 22

## (Flash drive containing video mailed to Court)

# Exhibit 23

# Pocatello Police Department
Pocatello PD ID Policy Manual

## PREFACE TO POLICY MANUAL

The mission of the Pocatello Police Department is to enhance the quality of life in the City of Pocatello by working cooperatively with the community and within the framework of the U.S. Constitution to equally enforce the law, preserve the peace, reduce fear and provide for a safe community environment. As a "values" driven agency the members of the Pocatello Police Department are dedicated to addressing the numerous challenges facing our community. We strive to provide the finest professional service to the citizens and visitors of Pocatello.

Therefore, this general policy and procedure manual is designed to provide a working guideline for the department. Being a paramilitary organization the nature and environment of law enforcement requires that all personnel be given specific and consistent instruction in executing their duties and responsibilities, as well as being accountable for their actions. These policies, rules and procedures reflect basic departmental policy and procedures dealing with major operational and administrative functions, thereby assisting in the attainment of departmental goals and objectives.

The policies, rules and procedures are designed to provide a clear understanding of the constraints under which we work and expectations that should be fulfilled. This manual is a tool to be used to supplement individual training and experience, and is not intended to discourage employee initiative nor does it address all situations that may be encountered. The judicious exercise of discretion may be required.

All personnel will thoroughly familiarize themselves with this manual and if necessary, seek guidance and clarification from their supervisor. The manual should be considered a "living document" and all personnel are encouraged to submit recommendations for constructive change to ensure relevancy and accuracy. The Pocatello Police Department endeavors to instill "Community Commitment" in its personnel and strives for "Professionalism through Excellence."

DISCLAIMER: Rules, regulations, policies and procedures stated in this manual are for Departmental use only and do not apply in any criminal or civil proceeding. They shall not be construed as creating a higher legal standard of care or safety in an evidentiary sense with respect to third party claims. Violations thereof will only form the basis for Departmental administrative sanctions. The contents of this manual will periodically be amended to reflect changes in law and other pertinent information to meet personnel and department needs.

Scott Marchand

Chief of Police



Exh. No. 7
Date 2.16.23
Name Schei
M & M Court Reporting

DEFENDANTS 000565

# Pocatello Police Department
Pocatello PD ID Policy Manual

## LAW ENFORCEMENT CODE OF ETHICS

As a law enforcement officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the constitutional rights of all men to liberty, equality and justice.

I will keep my private life unsullied as an example to all; and will behave in a manner that does not bring discredit to me or to my agency. I will maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed both in my personal and official life, I will be exemplary in obeying the law and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, political beliefs, aspirations, animosities, or friendships to influence my decisions. With no compromise for crime and the relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of law enforcement. I will never engage in acts of corruption or bribery, nor will I condone such acts by other law enforcement officers. I will cooperate with all legally authorized agencies and their representatives in the pursuit of justice.

I know that I alone am responsible for my own standard of professional performance and will take every reasonable opportunity to enhance and improve my level of knowledge and competence.

I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession . . . law enforcement.

DEFENDANTS 000566

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

## Pocatello Police Department
Pocatello PD ID Policy Manual

## MISSION STATEMENT AND VALUES
MISSION STATEMENT

The mission of the Pocatello Police Department is to enhance the quality of life in the City of Pocatello by working cooperatively with the community and within the framework of the U.S. Constitution to equally enforce the law, preserve the peace, reduce fear and provide for a safe community environment.

VALUES

Human Life: We value human life and dignity above all. We will be sensitive to the needs and feelings of others and to the cultural diversity of our community.

Professional and Personal Excellence: We engage in behavior that is beyond reproach and remain committed to the highest standards in our professional and personal lives.

Integrity: We exemplify honest and moral principles that earn the trust of the community and we live by the laws we enforce.

Loyalty: We are loyal to our families, the Constitution, our community, the law, our department and each other.

Courage: We act with good judgment in the face of adversity and accept accountability for our actions and those of our department.

DEFENDANTS 000567

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

# Table of Contents

PREFACE TO POLICY MANUAL . . . . . . . . . . . . . . . . . . 1

LAW ENFORCEMENT CODE OF ETHICS . . . . . . . . . . . . . . . 2

MISSION STATEMENT AND VALUES . . . . . . . . . . . . . . . . 3

**Chapter 1 - Law Enforcement Role and Authority** . . . . . . . . . . **8**
    100 - Law Enforcement Authority . . . . . . . . . . . . . . . 9
    102 - POST Certification . . . . . . . . . . . . . . . . . 11
    106 - Policy Manual . . . . . . . . . . . . . . . . . . 12

**Chapter 2 - Organization and Administration** . . . . . . . . . . . **17**
    200 - Organizational Structure and Responsibility . . . . . . . . 18
    204 - Interim Directive . . . . . . . . . . . . . . . . . 23
    206 - Emergency Management Plan . . . . . . . . . . . . . . 24
    208 - Training . . . . . . . . . . . . . . . . . . . . 28
    212 - Electronic Mail . . . . . . . . . . . . . . . . . . 30
    214 - Administrative and Intra-departmental Communications . . . . . 32

**Chapter 3 - General Operations** . . . . . . . . . . . . . . . **35**
    300 - Use of Force . . . . . . . . . . . . . . . . . . . 36
    301 - Arrests . . . . . . . . . . . . . . . . . . . . 46
    306 - Handcuffing and Restraints . . . . . . . . . . . . . . 48
    308 - Control Devices and Techniques . . . . . . . . . . . . 53
    309 - TASER™ Guidelines . . . . . . . . . . . . . . . . 59
    310 - Officer-Involved Shootings and Deaths . . . . . . . . . . 66
    312 - Firearms . . . . . . . . . . . . . . . . . . . . 75
    313 - LINE-OF-DUTY DEATHS . . . . . . . . . . . . . . . 90
    314 - Vehicle Pursuits . . . . . . . . . . . . . . . . . . 95
    316 - Officer Response to Calls . . . . . . . . . . . . . . 108
    317 - Assigning Felony Calls . . . . . . . . . . . . . . . 112
    318 - Canines . . . . . . . . . . . . . . . . . . . . 114
    320 - Domestic Violence . . . . . . . . . . . . . . . . . 125
    321 - DEPARTMENT MEMBER DOMESTIC VIOLENCE . . . . . . . . 132
    322 - Search and Seizure . . . . . . . . . . . . . . . . . 141
    324 - Temporary Custody of Juveniles . . . . . . . . . . . . 144
    326 - Adult Abuse . . . . . . . . . . . . . . . . . . . 153
    328 - Discriminatory Harassment . . . . . . . . . . . . . . 159
    330 - Child Abuse . . . . . . . . . . . . . . . . . . . 164
    332 - Missing Persons . . . . . . . . . . . . . . . . . . 171
    334 - Public Alerts . . . . . . . . . . . . . . . . . . . 182
    336 - Victim and Witness Assistance . . . . . . . . . . . . . 186
    338 - Malicious Harassment . . . . . . . . . . . . . . . . 192
    340 - Standards of Conduct . . . . . . . . . . . . . . . . 195

DEFENDANTS 000568

# Pocatello Police Department
Pocatello PD ID Policy Manual

342 - Information Technology Use . . . . . . . . . . . 205
344 - Report Preparation . . . . . . . . . . . . 209
346 - News Media Relations . . . . . . . . . . . 215
348 - Subpoenas and Court Appearances . . . . . . . 221
352 - Outside Agency Assistance . . . . . . . . . . 225
356 - Registered Offender Information . . . . . . . . . 227
358 - Major Incident Notification . . . . . . . . . . 229
360 - Death Investigation . . . . . . . . . . . . 233
362 - Identity Theft . . . . . . . . . . . . . 235
364 - Private Persons Arrests . . . . . . . . . . . 236
368 - Limited English Proficiency Services . . . . . . . 239
370 - Communications with Persons with Disabilities . . . . . 245
374 - Biological Samples . . . . . . . . . . . . 255
380 - Child and Vulnerable Adult Safety . . . . . . . . 257
382 - Service Animals . . . . . . . . . . . . 261
383 - PATROL AREA AND TEMPORARY HOLDING ROOMS . . . . 264
384 - Volunteer Program . . . . . . . . . . . . 266
385 - DEPARTMENT BUILDING SECURITY . . . . . . . . 271
386 - Off-Duty Law Enforcement Actions . . . . . . . . 274
387 - Department Use of Social Media . . . . . . . . . 277
388 - Community Relations . . . . . . . . . . . 280

**Chapter 4 - Patrol Operations** . . . . . . . . . **285**
400 - Patrol Function . . . . . . . . . . . . . 286
402 - Bias-Based Policing . . . . . . . . . . . . 288
406 - Crime and Disaster Scene Integrity . . . . . . . . 290
408 - Immediate Response Unit . . . . . . . . . . 292
410 - Ride-Along Policy . . . . . . . . . . . . 302
412 - Hazardous Material Response . . . . . . . . . 305
414 - Hostages and Barricade Incidents . . . . . . . . 307
416 - Response to Bomb Calls . . . . . . . . . . . 312
418 - Mental Illness / Civil Commitments . . . . . . . . 317
419 - CRISIS INTERVENTION TEAM . . . . . . . . . 321
422 - Foreign Diplomatic and Consular Representatives . . . . . 323
424 - Rapid Response and Deployment . . . . . . . . . 327
428 - Immigration Violations . . . . . . . . . . . 330
430 - Emergency Utility Service . . . . . . . . . . 333
434 - Aircraft Accidents . . . . . . . . . . . . 334
436 - Field Training Officer Program . . . . . . . . . 338
438 - Obtaining Air Support . . . . . . . . . . . 342
440 - Contacts and Temporary Detentions . . . . . . . . 343
442 - Criminal Street Gangs . . . . . . . . . . . 347
444 - Shift Commanders . . . . . . . . . . . . 351
446 - Mobile Audio Video . . . . . . . . . . . . 352
448 - Mobile Data Terminal Use . . . . . . . . . . 358
450 - Portable Audio/Video Recorders . . . . . . . . . 361
454 - Bicycle Patrol Unit . . . . . . . . . . . . 366

DEFENDANTS 000569

456 - Foot Pursuits . . . . . . . . . . . . . . . 369
464 - Homeless Persons . . . . . . . . . . . . . 374
465 - Crisis Intervention Incidents . . . . . . . . . 376
466 - Public Recording of Law Enforcement Activity . . . . 381
467 - Civil Disputes . . . . . . . . . . . . . . 384
468 - First Amendment Assemblies . . . . . . . . . 386
469 - Medical Aid and Response . . . . . . . . . . 392
470 - Suspicious Activity Reporting . . . . . . . . . 396

**Chapter 5 - Traffic Operations** . . . . . . . . . . **398**
500 - Traffic Function and Responsibility . . . . . . . 399
502 - Traffic Collision Reporting . . . . . . . . . . 403
510 - Vehicle Towing Policy . . . . . . . . . . . 406
512 - Vehicle Impound Hearings . . . . . . . . . . 410
514 - Impaired Driving . . . . . . . . . . . . . 412
515 - Phlebotomy Protocols and Procedures . . . . . . 418
516 - Traffic Citations . . . . . . . . . . . . . 423
520 - Disabled Vehicles . . . . . . . . . . . . . 426
524 - Parked and Abandoned Vehicle Violations . . . . . 427

**Chapter 6 - Investigation Operations** . . . . . . . . **430**
600 - Investigation and Prosecution . . . . . . . . . 431
606 - Asset Forfeiture . . . . . . . . . . . . . 436
608 - Informants . . . . . . . . . . . . . . . 442
609 - Call Out Procedures for Detectives and Evidence Techs . 448
610 - Eyewitness Identification . . . . . . . . . . . 449
611 - Investigative Task Forces . . . . . . . . . . 453
612 - Brady Material Disclosure . . . . . . . . . . 455
613 - Operations Planning and Deconfliction . . . . . . 458
614 - Warrant Service . . . . . . . . . . . . . 464

**Chapter 7 - Equipment** . . . . . . . . . . . . . **468**
700 - Police Department Owned and Personal Property . . . 469
702 - Personal Communication Devices . . . . . . . . 472
704 - Vehicle Maintenance . . . . . . . . . . . . 475
705 - Unmanned Aerial System (UAS) Operations . . . . 477
706 - Vehicle Use . . . . . . . . . . . . . . . 481
707 - SPECIAL USE VEHICLES . . . . . . . . . . 488
708 - Cash Handling, Security and Management . . . . . 489
709 - Personal Protective Equipment . . . . . . . . . 491

**Chapter 8 - Support Services** . . . . . . . . . . . **496**
800 - Crime Analysis . . . . . . . . . . . . . . 497
802 - Communications Center . . . . . . . . . . . 498
803 - Department Property and Assets . . . . . . . . 502
804 - Property and Evidence Section . . . . . . . . . 504
805 - Tactical Dispatch . . . . . . . . . . . . . 511

DEFENDANTS 000570

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
### Pocatello PD ID Policy Manual

806 - Records Section . . . . . . . . . . . . 516
810 - Records Maintenance and Release . . . . . . . . . 519
812 - Criminal History Record Information (CHRI) . . . . . . . 524

**Chapter 9 - Custody .** . . . . . . . . . . . **529**

900 - Custodial Searches . . . . . . . . . . . 530
901 - Temporary Holding Rooms . . . . . . . . . . 534
903 - TRANSPORTING PRISONERS . . . . . . . . . 536

**Chapter 10 - Personnel .** . . . . . . . . . . **538**

1000 - Recruitment and Selection . . . . . . . . . 539
1002 - Evaluation of Employees . . . . . . . . . . 550
1004 - Promotional and Transfer Policy . . . . . . . . 560
1006 - Grievance Procedure . . . . . . . . . . . 561
1010 - Reporting of Employee Charges and Convictions . . . . . 562
1012 - Alcohol and Drug Use . . . . . . . . . . 563
1014 - Sick Leave Reporting . . . . . . . . . . 567
1016 - Communicable Diseases . . . . . . . . . . 568
1018 - Smoking and Tobacco Use . . . . . . . . . 573
1020 - Personnel Complaints . . . . . . . . . . 574
1022 - Seat Belts . . . . . . . . . . . . 584
1024 - Body Armor and Safety Equipment . . . . . . . . 586
1026 - Peace Officer Personnel Files . . . . . . . . . 590
1028 - Special Assignments and Change of Assignment . . . . . 591
1029 - MILITARY LIASON OFFICER/RETURNING VETERANS . . . . 593
1030 - Commendations and Awards . . . . . . . . . 595
1032 - Fitness for Duty . . . . . . . . . . . 599
1034 - Meal Periods and Breaks . . . . . . . . . 603
1035 - Lactation Break Policy . . . . . . . . . . 604
1036 - Payroll Records . . . . . . . . . . . 606
1037 - Use of Comp-Time and Holiday Hours . . . . . . . 608
1040 - Outside Employment . . . . . . . . . . 609
1042 - Occupational Disease and Work-Related Injury Reporting . . . . 614
1044 - Personal Appearance Standards . . . . . . . . 615
1046 - Uniform Regulations . . . . . . . . . . 618
1050 - Nepotism and Conflicting Relationships . . . . . . . 627
1052 - Police Department Badges . . . . . . . . . 628
1054 - Modified Duty Assignments . . . . . . . . . 630
1056 - Performance History Audits . . . . . . . . . 634
1058 - Employee Speech, Expression and Social Networking . . . . 637
1059 - Traumatic Incident Corps . . . . . . . . . 644
1060 - Line-of-Duty Deaths . . . . . . . . . . 647

**Attachments .** . . . . . . . . . . . . .

DEFENDANTS 000571

# Chapter 1 - Law Enforcement Role and Authority

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department



**Policy**
**100**

# Pocatello Police Department
Pocatello PD ID Policy Manual

# Law Enforcement Authority

## 100.1  PURPOSE AND SCOPE
The purpose of this policy is to affirm the authority of the members of the Pocatello Police Department to perform their functions based on established legal authority.

## 100.2  PEACE OFFICER AUTHORITY
The authority of certified full-time peace officers of the Pocatello Police Department whose duties include and primarily consist of the prevention, investigation and detection of crime have the same authority when performing their assigned functions and duties outside the City when any of the following exist (Idaho Code 67-2337):

    (a)    When a request for law enforcement assistance is made by another law enforcement agency.

    (b)    When the officer has probable cause to believe a crime is occurring involving a felony or an immediate threat of serious bodily injury or death to any person.

    (c)    When the officer is in fresh pursuit as defined in and pursuant to Chapter 7, Title 19, Idaho Code.

    (d)    As authorized by this department pursuant to an existing mutual assistance compact with an outside jurisdiction.

Officers of this department will not routinely perform law enforcement duties outside of the City limits except as approved by the Division Commander.

### 100.2.1  PEACE OFFICER POWERS OF ARREST
An officer may make an arrest in obedience to a warrant, or may, without a warrant, make an arrest under any of the following circumstances (Idaho Code 19-603):

    (a)    For a misdemeanor or felony committed or attempted in his/her presence.

    (b)    When probable cause exists to believe that a person has committed a felony not in his/her presence.

## 100.3  CONSTITUTIONAL REQUIREMENTS
All members shall observe and comply with every person's clearly established rights under the United States and Idaho Constitutions.

## 100.4  POLICY
It is the policy of the Pocatello Police Department to limit its members to only exercise the authority granted to them by law.

While this department recognizes the power of peace officers to make arrests and take other enforcement action, officers are encouraged to use sound discretion in the enforcement of the law. This department does not tolerate abuse of law enforcement authority.

DEFENDANTS 000573

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Law Enforcement Authority*

DEFENDANTS 000574



**Pocatello Police Department**
Pocatello PD ID Policy Manual

# POST Certification

### 102.1  PURPOSE AND SCOPE
The Idaho Peace Officer Standards and Training Council (POST) mandates that all peace officers employed within the State of Idaho shall receive certification by POST within the prescribed time periods (Idaho Code 19-5109).

DEFENDANTS 000575



**Policy**
**106**

**Pocatello Police Department**
Pocatello PD ID Policy Manual

# Policy Manual

## 106.1  PURPOSE AND SCOPE

The manual of the Pocatello Police Department is hereby established and shall be referred to as the Policy Manual or the manual. The manual is a statement of the current policies, rules and guidelines of this department. All members are to conform to the provisions of this manual.

All prior and existing manuals, orders and regulations that are in conflict with this manual are rescinded, except to the extent that portions of existing manuals, procedures, orders and other regulations that have not been included herein shall remain in effect, provided that they do not conflict with the provisions of this manual.

### 106.1.1  DISCLAIMER

The provisions contained in this Policy Manual are not intended to create an employment contract, nor any employment rights or entitlements. The policies contained within this manual are for the internal use of the Pocatello Police Department and shall not be construed to create a higher standard or duty of care for civil or criminal liability against the City, its officials or employees. Violations of any provision of any policy contained within this manual shall only form the basis for departmental administrative action, training or discipline. The Pocatello Police Department reserves the right to revise any policy content, in whole or in part.

## 106.2  POLICY

Except where otherwise expressly stated, the provisions of this manual shall be considered as guidelines. It is recognized that the work of law enforcement is not always predictable and circumstances may arise which warrant departure from these guidelines. It is the intent of this manual to be viewed from an objective standard, taking into consideration the sound discretion entrusted to members of this department under the circumstances reasonably available at the time of any incident.

### 106.2.1  CHIEF OF POLICE

The Chief of Police shall be considered the ultimate authority for the provisions of this manual and shall continue to issue Interim Directives which shall modify those provisions of the manual to which they pertain. Interim Dirsectives shall remain in effect until such time as they may be permanently incorporated into the manual.

### 106.2.2  SENIOR STAFF

The Senior Staff shall review all recommendations regarding proposed changes to the manual at staff meetings.

### 106.2.3  OTHER PERSONNEL

All employees of this department suggesting revision of the contents of the Policy Manual shall forward their suggestion, in writing, to their Division Commander who will consider the recommendation and forward it to staff.

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

DEFENDANTS 000576

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Policy Manual*

### 106.2.4   ADOPTION OF MANUAL BY CITY COUNCIL AND REVIEW BY LEGAL DEPARTMENT

The Policy Manual was adopted by the Pocatello City Council on January 19, 2012 by Resolution 2012-02. The resolution adopts the semi-annual revisions to the Policy Manual once they are approved by the Chief of Police. Prior to publication of the revised Policy Manual a summary of revisions will be sent to the Legal Department for review. A copy of the revised Policy Manual shall also be sent to the Legal Department.

### 106.3  AUTHORITY

The Chief of Police shall be considered the ultimate authority for the content and adoption of the provisions of this manual and shall ensure compliance with all applicable federal, state and local laws. The Chief of Police or the authorized designee is authorized to issue Interim Directives, which shall modify those provisions of the manual to which they pertain. Interim Directives shall remain in effect until such time as they may be permanently incorporated into the manual.

### 106.3.1   ACCEPTABLE ABBREVIATIONS
The following abbreviations are acceptable substitutions in the manual:

- Interim Directives may be abbreviated as "ID"

- Policy Manual sections may be abbreviated as "Section 106.X" or "§ 106.X"

- The Pocatello Police Department may be abbreviated as "PPD".

- Community Oriented Policing may be abbreviated as "COP"

### 106.3.2   DEFINITIONS

The following words and terms shall have these assigned meanings throughout the Policy Manual, unless it is apparent from the content that they have a different meaning:

Adult - Any person 18 years of age or older.

CFR - Code of Federal Regulations.

City - The City of Pocatello.

Civilian - Employees and volunteers who are not sworn peace officers.

Department/PPD - The Pocatello Police Department.

Employee/personnel - Any person employed by the Department.

IDAPA - Idaho Administrative Procedure Act (Example: IDAPA 16.02.24.110).

ITD - The Idaho Transportation Department.

Juvenile - Any person under the age of 18 years.

Manual - The Pocatello Police Department Policy Manual.

May - Indicates a permissive, discretionary or conditional action.

DEFENDANTS 000577

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Policy Manual*

Member - Any person employed or appointed by the Pocatello Police Department, including:

- Full- and part-time employees
- Sworn peace officers
- Reserve, auxiliary officers
- Civilian employees
- Volunteers

Officer - Those employees, regardless of rank, who are sworn peace officers of the Pocatello Police Department.

On-duty - A member's status during the period when he/she is actually engaged in the performance of his/her assigned duties.

Order - A written or verbal instruction issued by a superior.

POST - The Idaho Peace Officer Standards and Training Council.

Rank - The title of the classification held by an officer.

Shall or will - Indicates a mandatory action.

Should - Indicates a generally required or expected action, absent a rational basis for failing to conform.

Supervisor - A person in a position of authority that may include responsibility for hiring, transfer, suspension, promotion, discharge, assignment, reward or discipline of other department members, directing the work of other members or having the authority to adjust grievances. The supervisory exercise of authority may not be merely routine or clerical in nature but requires the use of independent judgment.

The term "supervisor" may also include any person (e.g., officer-in-charge, lead or senior worker) given responsibility for the direction of the work of others without regard to a formal job title, rank or compensation.

When there is only one department member on-duty, that person may also be the supervisor, except when circumstances reasonably require the notification or involvement of the member's off-duty supervisor or an on-call supervisor.

USC - United States Code.

## 106.3.3  DISTRIBUTION OF MANUAL
Copies of the Policy Manual shall be distributed to the following:

- Chief of Police
- Deputy Chief

DEFENDANTS 000578

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Policy Manual*

- Division Commanders
- Human Resources Department
- Training Section
- Shift Commander's Office
- Legal Department

A computerized version of the Policy Manual will be made available on the network operated by this department for access by all employees. The computerized version will be limited to viewing and printing of specific sections. No changes shall be made to the electronic version without authorization from Staff.

## 106.4  POLICY MANUAL ACCEPTANCE
As a condition of employment all employees are required to read and obtain necessary clarification of this department's policies. All employees shall sign a statement of receipt acknowledging that they have received a copy or have been provided access to the Policy Manual and that they acknowledge they must comply with the contents of the manual.

### 106.4.1  POLICY REVISIONS
The Pocatello Police Policy Manual, by Resolution 2012-02, been adopted by the City Council. Semi-annual revisions to the manual are adopted by that same resolution. Prior to becoming effective the revised policy manual shall be forwarded to the City Legal Department with a list of revisions. The Legal Department shall review and approve the revisions.

All employees are responsible for keeping abreast of all Policy Manual revisions. All changes to the Policy Manual will be posted on the PD Common folder on the computer network J: drive under the title Recent Policy Manual Revisions. The Assistant to the Chief or a Division Commander will forward revisions to Policy Manual as needed to all personnel via the department's DMS system. Each employee shall review the revisions and seek clarification as needed. The DMS system will provide an acknowledgment signature for the employee.

Each unit commander/manager will ensure that employees under his/her command are aware of changes to the Policy Manual in a timely manner.

## 106.5  ISSUING THE POLICY MANUAL
An electronic version of the Policy Manual will be made available to all members on the department network for viewing and printing. No changes shall be made to the manual without authorization from the Chief of Police or the authorized designee.

Each member shall acknowledge that he/she has been provided access to, and has had the opportunity to review the Policy Manual and Interim Directives. Members shall seek clarification as needed from an appropriate supervisor for any provisions that they do not fully understand.

DEFENDANTS 000579

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Policy Manual*

## 106.6  PERIODIC REVIEW OF THE POLICY MANUAL
The Chief of Police will ensure that the Policy Manual is periodically reviewed and updated as necessary.

## 106.7  REVISIONS TO POLICIES
All revisions to the Policy Manual will be provided to each member on or before the date the policy becomes effective. Each member will be required to acknowledge that he/she has reviewed the revisions and shall seek clarification from an appropriate supervisor as needed.

Members are responsible for keeping abreast of all Policy Manual revisions.

Each Division Commander will ensure that members under his/her command are aware of any Policy Manual revision.

All department members suggesting revision of the contents of the Policy Manual shall forward their written suggestions to their Division Commanders, who will consider the recommendations and forward them to the command staff as appropriate.

DEFENDANTS 000580

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

Pocatello Police Department
Pocatello PD ID Policy Manual

# Chapter 2 - Organization and Administration

DEFENDANTS 000581

# Organizational Structure and Responsibility

### 200.1  PURPOSE AND SCOPE
This policy establishes the organizational structure of the department and defines general responsibilities of department members.

### 200.2  DIVISION
The Chief of Police is responsible for administering and managing the Pocatello Police Department. There are three divisions in the department as follows:

- Support Services Division
- Patrol Division
- Investigation Division

### 200.2.1  SUPPORT SERVICES DIVISION
The Support Services Division is commanded by a Captain whose primary responsibility is to provide general management direction and control for the Support Services Division. The Support Services Division consists of the Training function, Juvenile function, SRO/DARE , Communications Center, Records Section, Crime Prevention function, Code Enforcement Section, Licensing function, and other support functions.

The Support Services Lieutenant is the second in command of the Support Services Division and will report and be responsible to the Support Services Captain. The Support Services Lieutenant will be responsible for duties assigned by the Support Services Captain and shall function as the Department's PIO. Two sergeants will be assigned to the Support Services Division and shall report and be responsible to the Support Services Lieutenant.

The Youth Services Sergeant is responsible for juvenile operations, including the school based programs. The Youth Service Sergeant will report and be responsible to the Support Services Lieutenant. The School Resource Officers, D.A.R.E. Officer and the Youth Services Police Support Specialist will report and be responsible to the Youth Services Sergeant.

The Training Sergeant is responsible for the department training function and will report and be responsible to the Support Services Lieutenant. The Training Sergeant is responsible for , Code Enforcement Section, and the Licensing Specialist.

The Community Services Specialist is responsible for crime prevention and safety education functions and will report and be responsible to the Support Services Lieutenant or in his/her absence the Support Services Captain.

The Communications Center shall be supervised by the Dispatch Supervisor who reports directly to the Support Services Lieutenant.

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

DEFENDANTS 000582

# Pocatello Police Department
Pocatello PD ID Policy Manual

## *Organizational Structure and Responsibility*

The Records Section shall be supervised by the Records Supervisor who reports directly to the Support Services Lieutenant. This position is the Spillman System Assistant Administrator, responsible for the operations and maintenance of the department's computer-based records system and reports.

The Code Enforcement Section personnel and the Licensing Specialist will be supervised by the Training Sergeant or in his/her absence the Support Services Lieutenant.

### 200.2.2   PATROL DIVISION
The Patrol Division is commanded by a Captain whose primary responsibility is to provide general management direction and control for that Division. The Patrol Division is to provide protection and first responder service to the citizens of Pocatello twenty-four hours a day, seven days a week.

(a)   Lieutenants will be assigned as Shift Commanders to supervise the operations of a patrol shift.

1.   When the Chief and Staff are off duty the Shift Commander is in command of the department.

2.   Shift Commanders are charged with making decisions and communicating in a manner consistent with the policies, procedures, practices, functions and objectives of this department.

3.   Shift Commanders will report and are responsible to the Patrol Division Commander.

4.   When a Lieutenant is unavailable for duty as Shift Commander, in most instances the senior qualified sergeant shall be designated as acting Shift Commander. This policy does not preclude designating a less senior supervisor as an acting Shift Commander when operational needs require.

(b)   Sergeants will be assigned to manage and supervise a shift of patrol officers.

1.   Patrol sergeants will function as street supervisors.

2.   Patrol Sergeants will report and be responsible to the Shift Commanders.

3.   When a patrol sergeant is unavailable the senior corporal shall be designated as acting Patrol Sergeant. This policy does not preclude designating a less senior corporal or a senior officer as an acting Patrol Sergeant when operational needs require.

(c)   Corporals will be assigned to assist the sergeant and act as secondary supervisors.

1.   Corporals will assist the sergeants in managing and supervising a shift.

2.   Corporals will function as uniformed investigators.

3.   Corporals will report and be responsible to the Patrol Sergeant.

DEFENDANTS 000583

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Organizational Structure and Responsibility*

### 200.2.3  INVESTIGATIONS DIVISION
The Investigations Division is commanded by a Captain whose primary responsibility is to provide general management direction and control for the Investigations Division. The Investigations Division is responsible for criminal investigations, intelligence and related functions. The Investigations Division includes the Crime Analyst position, the Property and Evidence Section, and the Police Support Specialists.

Investigations Sergeants will be assigned to the Investigations Division to supervise elements of the division as assigned by the Division Commander. The Investigations Sergeants will report and be responsible to the Investigations Lieutenant.

The Detectives will report and be responsible to the Investigations Sergeants.

The Police Support Specialists assigned to the Investigations Division shall be supervised by a Lead Support Specialist who will report and be responsible to the Investigations Lieutenant.

The Crime Analyst will report and be responsible to the Investigations Lieutenant.

The Evidence Technicians will report and be responsible to the Investigations Lieutenant.

The Victim/Witness Coordinator will be assigned to the Investigation Division and will report to the Division Commanderfor further assignment.

### 200.3  COMMAND PROTOCOL

### 200.3.1  UNITY OF COMMAND
The principles of unity of command ensure efficient supervision and control within the Department. Generally, each employee shall be accountable to one supervisor at any time for a given assignment or responsibility. Except where specifically delegated authority may exist by policy or special assignment (e.g., K-9, SWAT), any supervisor may temporarily direct any subordinate if an operational necessity exists.

### 200.3.2  AUTHORITY AND ACCOUNTABILITY
Every employee, at every level of the department, has been delegated the authority to make crucial decisions allowing them to execute their responsibilities. Employees will be held accountable for the use or failure to use this authority and for the decisions made by the employee.

### 200.4  DEPUTY CHIEF
The Chief of Police shall appoint a Deputy Chief and second in command of the Department from existing Senior Staff members who hold the rank of Captain. The Chief of Police will make the appointment based on a review of personnel records, and performance, with concurrence of the Chief Executive Officer of the City. The Deputy Chief will have the rank of Major. In the absence of the Chief of Police the Deputy Chief shall assume the responsibilities of the Chief of Police.

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Organizational Structure and Responsibility*

The Deputy Chief will provide oversight and direction to each Division Commander as well as the Quartermaster and Vehicle Electronics Technician/Fleet Manager, and will be responsible for professional standards compliance, audits and inspections, internal affairs investigations, risk management and other duties as assigned by the Chief of Police.

## 200.5  ASSISTANT TO THE CHIEF OF POLICE
The Assistant to the Chief, a civilian position, reports directly to the Chief of Police and is responsible for facilitating the efficient operation of the Police Chief's office and all divisions of the Police Department by providing administrative support to the Chief and Senior Staff.

## 200.6  GOALS AND OBJECTIVES
The Chief of Police and Senior Staff are responsible for developing goals and objectives for the Department. The Chief and Senior Staff shall conduct an annual review of the goals and objectives and the assess progress made toward them.

## 200.7  PERSONNEL ALLOCATION
At least annually the Chief of Police and Senior Staff shall assess the allocation and distribution of department personnel. This assessment shall be based on a workload analysis.

## 200.8  COMMUNITY ORIENTED POLICING
The Pocatello Police Department is committed to direct and effective communication and involvement with the community. To that end the department has embraced a philosophy of Community Oriented Policing (COP). The Patrol Division Commander is responsible for developing a Community Oriented Policing plan which will include training, implementation and evaluation components. Every department member is responsible for and expected to be involved in COP activities. The department's COP philosophy includes:

- Effective and constant communication with the community
- Geographic assignment of officers
- Problem solving
- Innovative uses of technology and analysis
- Crime prevention
- Community partnerships

## 200.9  POLICY
The Pocatello Police Department will implement and maintain an organizational structure that provides clear and identifiable roles for command, control, and guidance of the department. Each position and assignment should have clearly identified responsibilities and a defined chain of command.

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Organizational Structure and Responsibility*

## 200.10   AUTHORITY AND RESPONSIBILITIES

Each member will be assigned duties and responsibilities. Each member is delegated the authority necessary to effectively execute those responsibilities. Each member will also be held accountable for the appropriate application of that delegated authority.

DEFENDANTS 000586

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

| Policy 204 | Pocatello Police Department |
|---|---|
| | Pocatello PD ID Policy Manual |

# Interim Directive

### 204.1  PURPOSE AND SCOPE

Interim Directives establish an interdepartmental communication that may be used by the Chief of Police to make immediate changes topolicy and procedure. Interim Directives will immediately modify and supersede sections of this manual to which they pertain.

### 204.1.1  INTERIM DIRECTIVE PROTOCOL

Any Interim Directives issued after publication of the manual shall be numbered consecutively starting with the last two digits of the year. For example, 09-01 signifies the first Interim Directive for the year 2009. Interim Directives will become effective on the date issued unless otherwise stated.

The Deputy Chief will ensure that all Interim Directives have been reviewed and incorporated into the draft Policy Manual for the semi-annual publication of the active Policy Manual (January 1 and July 1).

### 204.2  RESPONSIBILITIES

### 204.2.1  STAFF

Interim Directives will be developed based on specific needs and circumstances. As applicable, a Division Commander will prepare the Interim Directive for staff review. The Assistant to the Chief will maintain the Interim Directives in the yearly memo and directive manual pending incorporation into the Policy Manual.

### 204.2.2  CHIEF OF POLICE

The Chief of Police shall direct and approve the issuance of all Interim Directives.

### 204.3  ACCEPTANCE OF INTERIM DIRECTIVES

All employees are required to read and obtain any necessary clarification of all Interim Directives. All employees are required to acknowledge in writing the receipt and review of any new Interim Directive. Signed acknowledgement forms and/or e-mail receipts showing an employee's acknowledgement will be maintained by the Training Sergeant.

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department



**Policy**
**206**

**Pocatello Police Department**
Pocatello PD ID Policy Manual

# Emergency Management Plan

### 206.1  PURPOSE AND SCOPE
This policy clarifies the role of the Pocatello Police Department and responsibilities of its members pertaining to large scale emergencies and the City of Pocatello Emergency Operations Plan (EOP).

### 206.2  POLICY
The Pocatello Police Department will prepare for large scale emergencies within and outside its jurisdiction through planning and mutual cooperation with other agencies.

The City Emergency Operations Plan complies with IDEOP (Idaho Code 46-1006; Idaho Code 46-1009). This plan provides guidance for City emergency operations within and outside its borders, as may be required.

#### 206.2.1  RECALL OF PERSONNEL
In the event that the Emergency Management Plan is activated, all employees of the Pocatello Police Department are subject to immediate recall. Employees may also be subject to recall during extraordinary circumstances as deemed necessary by the Chief of Police or the authorized designee.

Failure to promptly respond to an order to report for duty may result in discipline.

### 206.3  ACTIVATING THE EMERGENCY OPERATIONS PLAN
The Emergency Operations Plan can be activated in a number of ways. For the Pocatello Police Department, the Chief of Police or the highest ranking on-duty supervisor may activate the Emergency Operations Plan in response to a major emergency.

Upon activation of the plan, the Chief of Police or the authorized designee should contact the Idaho Office of Emergency Management to assist with mutual aid response from local, state and federal law enforcement agencies.

This department shall operate under the National Incident Management System (NIMS) and the Incident Command System (ICS).

#### 206.3.1  RECALL OF PERSONNEL
In the event that the Emergency Operations Plan is activated, all employees of the Pocatello Police Department are subject to immediate recall to service. Employees may also be subject to recall during extraordinary circumstances as deemed necessary by the Chief of Police or the highest ranking on-duty supervisor.

Failure to promptly respond to an order to report for duty may result in discipline.

DEFENDANTS 000588

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Emergency Management Plan*

## 206.4 LOCATION OF THE EMERGENCY OPERATIONS PLAN
Copies of the Emergency Operations Plan are available in Support Services, the Shift Commander's office and the Communications Center. All supervisors should familiarize themselves with the Emergency Operations Plan and the roles members will play when the plan is implemented. The Support Services Division Commander should ensure that department members are familiar with the roles they will play when the plan is implemented.

## 206.5 EMERGENCY OPERATIONS PLAN REVIEW
The Chief of Police or the authorized designee shall review the Emergency Operations Plan at least annually and ensure that the plan conforms to any NIMS revisions. The Chief of Police or the authorized designee should appropriately address any needed revisions.

## 206.6 POLICE DEPARTMENT DISASTER MANAGEMENT PLAN
The purpose of this Standard Operating Procedure is to provide guidelines for all employees to follow in the event a disaster overwhelms the normal capacity to provide routine service.

### 206.6.1 DEPARTMENT MOBILIZATION PLAN
All police employees should have a Disaster Kit on hand that will provide for their family for at least three days. A Disaster Kit should include, but not be limited to: food, water, needed medications, personal toiletries, portable radio, light sources, extra batteries, first aid kit supplies, heat and cooking sources with fuel, extra clothing and blankets. Once the employee's family has been provided for, each employee will contact the Department by the fastest means possible.

When necessary, those members who have not reported in will be contacted and mobilized by whatever means necessary. Once during every shift rotation, supervisors will confirm that addresses and contact numbers in the Spillman system are correct for all their subordinates. Memos confirming this has been done will be forwarded to Division Commanders.

Upon the declaration of an emergency by the Chief of Police or his designee, all employees will move to a 12-hour-shift. All leave time, including days off, will cease until the emergency is over. Employees shall report to the Police Department unless instructed otherwise. In the event that the Police Department headquarters is inoperable, employees shall report to one of the Fire Stations, and contact the Police Department to receive assignment(s). The Fire Stations and the Police Department Sub-station(s) may also serve as field command posts. When directed, the Patrol Division will be mobilized into a dayshift platoon (Alpha) and a night shift platoon (Bravo). Unless commanded otherwise, the platoons will be formed by moving the Swing Shift A Team to the Alpha platoon and the Swing Shift B Team to the Bravo platoon. Other officers and employees will be assigned as needed.

Employees shall report with all necessary assigned equipment such as uniforms, firearms, and radios. Employees will report to a staging area, as designated by the Incident Commander. Employees will remain in the staging area until receiving an assignment.

DEFENDANTS 000589

# Pocatello Police Department
Pocatello PD ID Policy Manual

## Emergency Management Plan

If a special unit such as the Immediate Response Unit is activated, the officers shall pass to the command of their special unit. Otherwise, they shall function in the Incident Command System (ICS).

The Incident Commander (IC) or an appointed unit will be responsible for the demobilization process, including ongoing duties and an After Action report.

In the event that a situation is developing that may require a department mobilization, personnel may be assigned to notify department members to stand by and be ready for mobilization. Officers will be asked to then monitor their department radios.

Department mobilization should be included in table tops and/or exercises and included in the training plan.

### 206.6.2  DISASTER MANAGEMENT PROCEDURES
In the event of a disaster, the Chain of Command in place at the time will provide leadership. The Chief of Police and Senior Staff members will be notified immediately, and respond accordingly. The Incident Command System (ICS) shall be the organization model for the department. An Incident Commander (IC) will be responsible for department operations in the disaster until the city's Emergency Operations Center (EOC) is opened, and/or the IC is relieved by the city's Disaster Management Coordinator.

The IC shall establish those elements of the ICS necessary to carry out the Incident Action Plan, and maintain a manageable span of control. A Staging Area, and a Staging Manager should be early considerations.

The department Quartermaster shall generally be assigned to the Logistics Section and be responsible for the distribution of equipment, control of transportation, and other logistic functions.

The IC is responsible for the release of information and coordinating with other agencies. The IC should consider appointing a Public Information Officer (PIO), and a Liaison Officer to assist in those functions.

A representative of the city's Legal Department, and/or the county prosecutor's office should be contacted to assist with risk management and other legal questions.

The Fire Department Duty Chief should be contacted to coordinate the fire and EMS response to the emergency.

The Department Communications Center and radio system will be the main communications system in any emergency. The IC must ensure that the Communications Center is fully staffed. In the event that the Communications Center is not operable, Communications personnel will report to and resume duties at the Communications Center at the Bannock County Sheriff's Office.

Incident Command forms and equipment will be maintained in the patrol sergeant's vehicles and in the Training Room, which is designated as the City's Emergency Operations Center.

DEFENDANTS 000590

# Pocatello Police Department
Pocatello PD ID Policy Manual

## Emergency Management Plan

If the Police Department is functional, the Emergency Operations Center (EOC) will be opened there upon the request of the Incident Commander (IC), the Emergency Services Coordinator (ESC) or the Mayor. Department personnel who are assigned to positions in the EOC will report there as soon as possible. The Shift Commander, or his designee, will be responsible for setting up the EOC upon notification of the activation of the EOC.

A list of vulnerable targets will be maintained in the Shift Commander's Office. These targets will be checked as soon as is practical, depending upon the nature of the emergency or disaster. The list of vulnerable targets will prepared by the Emergency Response Coordinator and reviewed by the Major at least annually.

Security for vulnerable targets and public facilities will generally be a duty assigned to the department. Continued law enforcement and public safety duties will remain within the department.

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department



**Pocatello Police Department**
Pocatello PD ID Policy Manual

# Training

## 208.1  PURPOSE AND SCOPE

It is the policy of this department to administer a training program that will provide for the professional growth and continued development of its personnel. By doing so, this department will ensure its personnel possess the knowledge and skills necessary to provide a professional level of service that meets the needs of the community.

## 208.2  PHILOSOPHY

The Pocatello Police Department seeks to provide ongoing training and encourages all personnel to participate in advanced training and formal education on a continual basis. Training is provided within the confines of funding, requirements of a given assignment, staffing levels, and legal mandates. Whenever possible, this department will use courses certified by the Peace Officer Standards and Training Council (POST).

## 208.3  OBJECTIVES

The objectives of the Training Program are to:

    (a)    Enhance the level of law enforcement service to the public.

    (b)    Increase the technical expertise and overall effectiveness of our personnel.

    (c)    Provide for continued professional development of personnel in this department.

## 208.4  TRAINING PLAN

A training plan will be developed and maintained by the Training Sergeant. It is the responsibility of the Training Sergeant to maintain, review and update the training plan on an annual basis. The plan will address the following areas:

- Legislative changes

- State-mandated training

- Critical issues training

## 208.5  TRAINING NEEDS ASSESSMENT

The Training Section will conduct an annual training-needs assessment of this department. The needs assessment will be presented to the Senior Staff no later than March 15th, prior to the beginning of the fiscal year. Upon review and approval by the Senior Staff, the needs assessment will form the basis for the training plan for the fiscal year.

### 208.5.1  STATE-MANDATED TRAINING AND CERTIFICATION

An officer must successfully complete the POST Basic Training Academy within one year of employment, unless granted a waiver under IDAPA 11.11.01.072 (IDAPA 11.11.01.071).

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

## Training

Unless exempted, an officer must be certified by POST within one year after being first appointed (IDAPA 11.11.01.097).

### 208.6   TRAINING PROCEDURES

(a)   All employees assigned to attend training shall attend unless previously excused by their immediate supervisor. Excused absences from mandatory training should be limited to:

    1.   Court appearances

    2.   First choice vacation

    3.   Sick leave

    4.   Physical limitations preventing the employee's participation

    5.   Emergency situations

(b)   When an employee is unable to attend mandatory training, that employee shall:

    1.   Notify his/her supervisor as soon as possible, but no later than at least one hour prior to the start of training.

    2.   Document his/her absence in a memorandum to his/her supervisor.

    3.   Make arrangements through his/her supervisor and the Training Sergeant to attend an alternate date.

DEFENDANTS 000593

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

| Policy **212** | Pocatello Police Department |
|---|---|
| | Pocatello PD ID Policy Manual |

# Electronic Mail

## 212.1  PURPOSE AND SCOPE

This policy does not supersede City of Pocatello's Electronic Media Policy, which governs the use of all electronic media. The purpose of this policy is to establish guidelines for employees' proper use and application of the electronic mail (e-mail) system operated by the city. E-mail is a communication tool available to employees to enhance efficiency in the performance of job duties and is to be used in accordance with generally accepted business practices and current law (e.g., Idaho Public Records Act). The e-mail system is provided for the use of City employees for City business-related purposes. They may not be used for inappropriate (sexually suggestive, explicit, obscene, in any way sexual, off-color or offensive) or excessive personal purposes. This prohibition applies at all times, whether the employee is on working time or not.

## 212.2  EMAIL RIGHT OF PRIVACY

All email messages, including any attachments, that are transmitted over department networks are considered department records and therefore are the property of the department. The Pocatello Police Department reserves the right to access, audit or disclose for any lawful reason, any message, including any attachment, that is transmitted over its email system or that is stored on any department system.

The email system is not a confidential system and therefore is not appropriate for confidential communications. If a communication must be confidential, an alternative method to communicate the message should be used instead of email. Employees using the department email system shall have no expectation of privacy concerning communications transmitted over the system.

Employees should not use personal accounts to exchange email or other information that is related to the official business of the Department.

## 212.3  PROHIBITED USE OF E-MAIL

Sending derogatory, defamatory, obscene, disrespectful, sexually suggestive, and harassing or any other inappropriate messages on the e-mail system is prohibited and will not be tolerated and may result in discipline.

E-mail messages addressed throughout the entire department are only to be used for official business related items that are of particular interest to all users and must be approved by the Chief of Police or a Division Commander. Personal advertisements are not acceptable in the email system but can be placed on the City's Intranet system.

It is a violation of this policy to transmit a message under another user's name. Users are strongly encouraged to log off or lock the computer when it is unattended. This added security measure would minimize the misuse of an individual's e-mail, name and/or password by others.

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

---

*Electronic Mail*

---

## 212.4  MANAGEMENT OF E-MAIL

Because the e-mail system is not designed for long-term retention of messages, e-mail that the employee desires to save or that becomes part of an official record should be printed and/or stored in another database. Users of e-mail are solely responsible for the management of their local mailboxes and local mailboxes should be purged manually by the user at least once per week.

E-mail messages that contain information about Department business and records in other formats, are subject to audit, public records requests, and to legal processes such as discovery and subpoena. Business-related e-mails are government records and must be retained and managed for as long as they are needed for administrative, fiscal, legal or historical requirements.

Classification, retention and destruction of all business-related e-mail sent or received by employees of the Pocatello Police Department shall follow the guidelines set forth in the State of Idaho Records Management Guide, Appendix 7 and related state statutes (Idaho Code 50-907 or Idaho Code 31-871). The Records Supervisor shall be responsible for ensuring that e-mail classification, retention and destruction conforms to all pertinent guidelines and statutes.

DEFENDANTS 000595

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department



Policy
**214**

**Pocatello Police Department**
Pocatello PD ID Policy Manual

# Administrative and Intra-departmental Communications

### 214.1 PURPOSE AND SCOPE
Administrative communications of this department and intra-departmental communication and information sharing are governed by the following policies.

### 214.2 PERSONNEL ORDER
Personnel Order may be issued periodically by the Chief of Police to announce and document all promotions, transfers, hiring of new personnel, separations, personnel and group commendations, or other changes in status.

### 214.3 CORRESPONDENCE
In order to ensure that the letterhead and name of this department are not misused, all external correspondence shall be on Pocatello Police Department letterhead. All Pocatello Police Department letterhead shall bear the signature element of the Chief of Police. Personnel should use Pocatello Police Department letterhead only for official business and with approval of their supervisor. All correspondence shall contain the name and position of the sender. A copy of all out going correspondence will be retained in the appropriate case or business file.

### 214.4 SURVEYS
All surveys made in the name of this department shall be authorized by the Chief of Police or a Division Commander. Copies of surveys shall be retained by the appropriate Division Commander and/or the Office of the Chief of Police.

### 214.5 INTERIM DIRECTIVES
Interim Directives shall be used to make immediate changes to policy and procedures. See Section 204.

### 214.6 INTER-DEPARTMENTAL MEMOS
Inter-departmental Memos shall be used to issue directives that do not alter policy or procedure or to forward information. Emails may be used to issue directives in the same manner as Inter-departmental memos.

### 214.7 INTRA-DEPARTMENTAL COMMUNICATION AND COOPERATION
The following guidelines are intended to develop and maintain intra-department cooperation and information flow between the various divisions of the Pocatello Police Department.

DEFENDANTS 000596

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Administrative and Intra-departmental Communications*

## 214.8  PATROL BRIEFINGS

Patrol Sergeants are responsible for holding patrol briefings at the beginning of the officer's shift. Supervisors, detectives, and personnel from other divisions are encouraged to attend patrol briefing and share information as much as possible. Briefings provide an opportunity for important exchanges between employees and supervisors. A supervisor generally will conduct briefings; however supervisors may delegate this responsibility to a subordinate officer in his or her absence or for training purposes. Briefings should accomplish, at a minimum, the following basic tasks:

    (a)    Briefing officers with information regarding daily patrol activity, with particular attention given to unusual situations and changes in the status of wanted persons, stolen vehicles, and major investigations.

    (b)    Briefing officers on information generated in the Spillman Intelligence report.

    (c)    Notifying officers of changes in schedules and assignments.

    (d)    Notifying officers of new Interim Directives or changes in Interim Directives.

    (e)    Reviewing recent incidents for training purposes.

    (f)    Providing training on a variety of subjects.

The supervisors conducting briefings are responsible for preparation of the materials necessary for a constructive briefing. Supervisors may delegate this responsibility to a subordinate officer in his or her absence or for training purposes.

## 214.8.1  BRIEFING BOARDS

Several clipboards will be maintained as briefing boards to be reviewed by the supervisor during patrol briefings. The briefing boards will be available for review by officers from all divisions within this department.

Newly issued Interim Directives, Personnel Orders and other department communications will be placed on the briefing boards and will be discussed at briefings.

The Investigations Captain and the Crime Analyst may place intelligence and analysis information on the briefing boards. Other members of the department may also place pertinent information on the briefing boards. Members may also use the intelligence report on the Spillman system to disseminate intelligence information.

## 214.8.2  BULLETIN BOARDS

Bulletin boards will be maintained in the patrol briefing room for display of law enforcement intelligence fliers, wanted posters, missing persons, etc. Bulletin boards will be maintained as needed in each division to display department communications such as schedules and meeting notices. A bulletin board will be maintained by the Training Sergeant to announce and post department training.

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

## *Administrative and Intra-departmental Communications*

### 214.8.3   CITY EMAIL SYSTEM
Various city and department communications will be transmitted using the city email system. All department members are required to check their email for messages at least at the beginning and end of each day worked.

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Chapter 3 - General Operations

DEFENDANTS 000599

| Policy **300** | **Pocatello Police Department** |
| --- | --- |
| | Pocatello PD ID Policy Manual |

# Use of Force

### 300.1  PURPOSE AND SCOPE
This policy provides guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of this department is expected to use these guidelines to make such decisions in a professional, impartial and reasonable manner.

### 300.1.1  DEFINITIONS
Definitions related to this policy include:

**Deadly force** - Force reasonably anticipated and intended to create a substantial likelihood of causing death or very serious injury.

**Force** - The application of physical techniques or tactics, chemical agents or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed or restrained.

### 300.2  POLICY
The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. Officers are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties.

Officers must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties.

The Department recognizes and respects the value of all human life and dignity without prejudice to anyone. Vesting officers with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation and a careful balancing of all interests.

### 300.2.1  DUTY TO INTERCEDE
Any officer present and observing another officer using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intercede to prevent the use of unreasonable force. An officer who observes another employee use force that exceeds the degree of force permitted by law should promptly report these observations to a supervisor.

### 300.3  USE OF FORCE
Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.

The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably

DEFENDANTS 000600

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Use of Force*

appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.

It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.

### 300.3.1   USE OF FORCE TO EFFECT AN ARREST
Officers executing a warrant or who have probable cause to believe that a person has committed an offense may use reasonable force to effect the arrest if the person either attempts to flee or forcibly resists the arrest. The arresting officer should make clear his/her intent to arrest the person before using force (Idaho Code 19-610).

### 300.3.2   FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE
When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit. These factors include, but are not limited to:

    (a)    Immediacy and severity of the threat to officers or others.

    (b)    The conduct of the individual being confronted, as reasonably perceived by the officer at the time.

    (c)    Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects).

    (d)    The effects of drugs or alcohol.

    (e)    Subject's mental state or capacity.

    (f)    Proximity of weapons or dangerous improvised devices.

    (g)    The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

    (h)    The availability of other options and their possible effectiveness.

    (i)    Seriousness of the suspected offense or reason for contact with the individual.

DEFENDANTS 000601

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Use of Force*

---

(j)    Training and experience of the officer.

(k)    Potential for injury to officers, suspects and others.

(l)    Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the officer.

(m)    The risk and reasonably foreseeable consequences of escape.

(n)    The apparent need for immediate control of the subject or a prompt resolution of the situation.

(o)    Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.

(p)    Prior contacts with the subject or awareness of any propensity for violence.

(q)    Any other exigent circumstances.

## 300.3.3  PAIN COMPLIANCE TECHNIQUES
Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:

(a)    The degree to which the application of the technique may be controlled given the level of resistance.

(b)    Whether the person can comply with the direction or orders of the officer.

(c)    Whether the person has been given sufficient opportunity to comply.

The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.

## 300.3.4  CAROTID CONTROL HOLD
The proper application of the carotid control hold may be effective in restraining a violent or combative individual. However, due to the potential for injury, the use of the carotid control hold is subject to the following:

(a)    The officer shall have successfully completed department-approved training in the use and application of the carotid control hold.

(b)    The carotid control hold may only be used when circumstances perceived by the officer at the time indicate that such application reasonably appears necessary to control a person in any of the following circumstances:

1.    The subject is violent or physically resisting.

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

DEFENDANTS 000602

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Use of Force*

---

2. The subject, by words or actions, has demonstrated an intention to be violent and reasonably appears to have the potential to harm officers, him/herself or others.

(c) The application of a carotid control hold on the following individuals should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective, or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the individual outweighs the risk of applying a carotid control hold:

1. Females who are known to be pregnant

2. Elderly individuals

3. Obvious juveniles

4. Individuals who appear to have Down syndrome or who appear to have obvious neck deformities or malformations, or visible neck injuries

(d) Any individual who has had the carotid control hold applied, regardless of whether he/she was rendered unconscious, shall be promptly examined by paramedics or other qualified medical personnel and should be monitored until examined by paramedics or other appropriate medical personnel.

(e) The officer shall inform any person receiving custody, or any person placed in a position of providing care, that the individual has been subjected to the carotid control hold and whether the subject lost consciousness as a result.

(f) Any officer attempting or applying the carotid control hold shall promptly notify a supervisor of the use or attempted use of such hold.

(g) The use or attempted use of the carotid control hold shall be thoroughly documented by the officer in any related reports.

### 300.3.5   USE OF FORCE TO SEIZE EVIDENCE
In general, officers may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. However, officers are discouraged from using force solely to prevent a person from swallowing evidence or contraband. In the instance when force is used, officers should not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted. Officers are encouraged to use techniques and methods taught by the Pocatello Police Department for this specific purpose.

### 300.4   DEADLY FORCE APPLICATIONS
Use of deadly force is justified in the following circumstances:

(a) An officer may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury.

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

DEFENDANTS 000603

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Use of Force*

(b) An officer may use deadly force to stop a fleeing subject when the officer has probable cause to believe that the person has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and the officer reasonably believes that there is an imminent risk of serious bodily injury or death to any other person if the subject is not immediately apprehended. Under such circumstances, a verbal warning should precede the use of deadly force, where feasible.

Imminent does not mean immediate or instantaneous. An imminent danger may exist even if the suspect is not at that very moment pointing a weapon at someone. For example, an imminent danger may exist if an officer reasonably believes any of the following:

1. The person has a weapon or is attempting to access one and it is reasonable to believe the person intends to use it against the officer or another.

2. The person is capable of causing serious bodily injury or death without a weapon and it is reasonable to believe the person intends to do so.

### 300.4.1  SHOOTING AT OR FROM MOVING VEHICLES
Shots fired at or from a moving vehicle are rarely effective. Officers should move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.

Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle.

### 300.5  REPORTING THE USE OF FORCE
Any use of force by a member of this department shall be documented promptly, completely and accurately in an appropriate report, depending on the nature of the incident. The officer should articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances. To collect data for purposes of training, resource allocation, analysis and related purposes, the Department may require the completion of additional report forms, as specified in department policy, procedure or law.

### 300.5.1  NOTIFICATION TO SUPERVISORS
Supervisory notification shall be made as soon as practicable following the application of force in any of the following circumstances:

(a) The application caused a visible injury.

(b) The application would lead a reasonable officer to conclude that the individual may have experienced more than momentary discomfort.

(c) The individual subjected to the force complained of injury or continuing pain.

(d) The individual indicates intent to pursue litigation.

DEFENDANTS 000604

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Use of Force*

---

    (e)     Any application of an EMDT device or control device.

    (f)     Any application of a restraint device other than handcuffs, shackles or belly chains.

    (g)    The individual subjected to the force was rendered unconscious.

    (h)    An individual was struck or kicked.

    (i)     An individual alleges any of the above has occurred.

### 300.6  MEDICAL CONSIDERATIONS

Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.

Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.

The on-scene supervisor or, if the on-scene supervisor is not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.

### 300.7  SUPERVISOR RESPONSIBILITIES

When a supervisor is able to respond to an incident in which there has been a reported application of force, the supervisor is expected to:

    (a)    Obtain the basic facts from the involved officers. Absent an allegation of misconduct or excessive force, this will be considered a routine contact in the normal course of duties.

    (b)    Ensure that any injured parties are examined and treated.

DEFENDANTS 000605

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Use of Force*

---

(c) When possible, separately obtain a recorded interview with the subject upon whom force was applied. If this interview is conducted without the person having voluntarily waived his/her *Miranda* rights, the following shall apply:

1. The content of the interview should not be summarized or included in any related criminal charges.

2. The fact that a recorded interview was conducted should be documented in a property or other report.

3. The recording of the interview should be distinctly marked for retention until all potential for civil litigation has expired.

(d) Once any initial medical assessment has been completed or first aid has been rendered, ensure that photographs have been taken of any areas involving visible injury or complaint of pain, as well as overall photographs of uninjured areas. These photographs should be retained until all potential for civil litigation has expired.

(e) Identify any witnesses not already included in related reports.

(f) Review and approve all related reports.

(g) Determine if there is any indication that the subject may pursue civil litigation.

1. If there is an indication of potential civil litigation, the supervisor should complete and route a notification of a potential claim through the appropriate channels

(h) Evaluate the circumstances surrounding the incident and initiate an administrative investigation if there is a question of policy non-compliance or if for any reason further investigation may be appropriate.

In the event that a supervisor is unable to respond to the scene of an incident involving the reported application of force, the supervisor is still expected to complete as many of the above items as circumstances permit.

### 300.7.1  SHIFT COMMANDER RESPONSIBILITY
The Shift Commander shall review each use of force by any personnel within his/her command to ensure compliance with this policy and to address any training issues.

### 300.8  IN CUSTODY DEATH PRECAUTIONS
Sudden In-Custody Death (SICD) does not have a formal medical definition. Generally the term refers to rapid, unexpected death during detention of individuals by law enforcement personnel. SICD has been attributed primarily to Excited Delirium (ED) and Positional Asphyxia.

Excited Delirium (ED) is a term used interchangeably with "agitated chaotic event" to describe any individual who is exhibiting the specific array of signs and/or behaviors described below. The term was first used to describe the acute behavioral changes associated the use of stimulant drugs like methamphetamine, PCP, and cocaine.

DEFENDANTS 000606

# Pocatello Police Department
Pocatello PD ID Policy Manual

## Use of Force

(a)  Usual Phases of Agitated Chaotic Events

   1.  Drug or alcohol intoxicated subject behaves in a bizarre or frenzied manner.

   2.  Subject engages officers in violent struggle requiring officer to employ some type of restraint technique.

   3.  During or immediately after the struggle, the subject becomes unresponsive and dies.

(b)  Signs and behaviors of a person going through an Agitated Chaotic Event

   1.  Recognizing general signs and behaviors of an agitated chaotic event.

   2.  Physical Signs; some or all may be present:

   3.  Unusual agitation or excitement

   4.  Profuse sweating

   5.  High body temperature

   6.  Skin discoloration

   7.  Foaming at the mouth

   8.  Uncontrollable shaking

   9.  Respiratory distress

(c)  Behaviors; some or all may be present:

   1.  Intense paranoia

   2.  Extreme agitation

   3.  Hallucinating

   4.  Delusional screaming for no apparent reason

   5.  Aggression toward inanimate objects

   6.  Naked or partially disrobed

   7.  Violent resistance

   8.  Diminished sense of pain

(d)  Procedure for Handling Suspects going through an Agitated Chaotic Event

   1.  Summon medical help immediately

   2.  Get multiple officers and a supervisor on scene as soon as possible.

DEFENDANTS 000607

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Use of Force*

3. Avoid pain compliance techniques, including a drive-stun Taser, as pain compliance techniques (OC, Taser drive-stun mode, etc.) will likely be ineffective.

4. Once the subject has been restrained place him/her into a recovery position lying on his/her side or seated upright.

5. Do not leave a subject in restraints lying on his/her back or stomach or seated leaning forward with hands and legs restrained together.

6. Do not put pressure or weight on the subject's back for a prolonged period.

7. Allow EMS personnel to provide medical attention as soon as possible.

8. Monitor the subject's breathing and condition during transport.

## 300.9  USE OF FORCE TRAINING

The Chief of Police shall appoint a Use of Force Training Coordinator who shall be responsible with the Training Sergeant for implementing defensive tactics training and testing programs, including:

(a) Classroom instruction on use of force policy and law

(b) Practical training on tactics and techniques

(c) Practical scenario based training

(d) Remedial training

All sworn members of the department shall attend periodic training on defensive tactics to include arrest/control tactics, impact weapons, ground control, weapons retention, vascular neck restrain, use of force and scenario based training. Training shall be conducted and monitored by certified instructors. Proficiency in defensive tactics shall be monitored and documented in the officer's training file.

Remedial Training:

(a) Members who fail to show proficiency in defensive tactics or knowledge of the department's use of force policy will be provided with remedial training.

(b) Once in remedial training the officer will have the opportunity to re-test. If the officer is unable to then complete the testing in a proficient manner the officer will be placed on station duty.

(c) Within the next two working days the officer will train with a defensive tactics instructor for one-on-one training.

(d) After that training the officer will again attempt to test and show proficiency. If the officer passes they will return to duty.

(e) The officer will be required to attend additional training with a Department Defensive Tactics Instructor for the next 3 months.

DEFENDANTS 000608

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Use of Force*

---

    (f)    The officer will have a total of 5 opportunities to pass any required testing. The testing must be completed within two weeks after the officer failure to pass.

    (g)    Any officer unable to pass, after the above avenues or retraining have been exhausted, will be removed from enforcement duties pending a review of their training and abilities.

## 300.10   TRAINING
Officers will receive periodic training on this policy and demonstrate their knowledge and understanding.

## 300.11   USE OF FORCE ANALYSIS
At least annually, the Patrol Division Commander should prepare an analysis report on use of force incidents. The report should be submitted to the Chief of Police. The report should not contain the names of officers, suspects or case numbers, and should include:

    (a)    The identification of any trends in the use of force by members.

    (b)    Training needs recommendations.

    (c)    Equipment needs recommendations.

    (d)    Policy revision recommendations.

DEFENDANTS 000609

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

| Policy<br>**301** | **Pocatello Police Department**<br>Pocatello PD ID Policy Manual |
|---|---|

# Arrests

### 301.1 PURPOSE AND SCOPE
The purpose of this policy is to establish department policies concerning the use of arrest powers by employees.

### 301.2 AUTHORITY TO ARREST
An arrest can generally be defined as taking a person into custody so they may be brought forth to be prosecuted for a crime. Idaho Code §19-601.

An arrest is made by the restraint of a person or their submission to custody. Idaho Code §19-602.

A law enforcement officer may arrest with or without a warrant. Idaho Code §19-603

The officer making the arrest must inform the person to be arrested of the officer's intention to make the arrest, the cause of the arrest, and the authority to make the arrest. This can be accomplished by identify oneself as an officer and stating that the person is under arrest for a charge. Idaho Code §19-608.

#### 301.2.1 ARREST WITH A WARRANT
If the offense charged is a felony, the arrest may be made on any day, and at any time of the day or night. If the offense charged is a misdemeanor, the arrest shall not be made inside a person's residence between 8:00 p.m. and 8:00 a.m., unless upon the direction of the magistrate, as endorsed upon the warrant, or where consent was given to enter the residence by a person with real or apparent authority. Idaho Code §19-607

Officers shall not make an arrest on a warrant unless the officer reasonably believes a valid warrant exists and that the person described in the warrant is before the officer. Warrants not in the immediate possession of the arresting officer must be confirmed before an arrest is made. The person arrested shall be informed of the charge and shown a copy of the warrant as soon as practical.

#### 301.2.2 ARREST WITHOUT A WARRANT
Officers may arrest for a felony with out a warrant when the offense occurs in the officer's presence, or when the officer has probable cause to believe that a felony has occurred and the person to be arrested committed the felony. Idaho Code §19-603:

Officers may arrest for a misdemeanor without a warrant when the offense occurs in the officer's presence; with the following exceptions:

    (a)    When upon immediate response to a report of a crime and there is probable cause to believe that the person to be arrested has committed one of the following offenses listed in Idaho Code §19-603:

        1.   assault

        2.   battery

DEFENDANTS 000610

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.<br>Published with permission by Pocatello Police Department

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Arrests*

    3.    domestic assault or battery

    4.    stalking

    5.    violation of a protection order

    6.    violation of a no contact order

(b)    The authority to arrest is the same as for a felony for the following offenses listed in Idaho Code §49-1405:

    1.    negligent homicide

    2.    DUI

    3.    leaving the scene of an accident

    4.    reckless driving

    5.    eluding an officer

Officers may arrest for traffic misdemeanors not listed in Idaho Code §49-1405 when the misdemeanor occurs in the officer's presence and the officer has reasonable grounds to believe that the person will fail to appear on a citation.

Officers will lose the authority to arrest for a misdemeanor that occurs in their presence if they make unnecessary or unreasonable delay in making the arrest.

DEFENDANTS 000611

| Policy | Pocatello Police Department |
|---|---|
| **306** | Pocatello PD ID Policy Manual |

# Handcuffing and Restraints

## 306.1  PURPOSE AND SCOPE
This policy provides guidelines for the use of handcuffs and other restraints during detentions and arrests.

## 306.2  POLICY
The Pocatello Police Department authorizes the use of restraint devices in accordance with this policy, the Use of Force Policy and department training. Restraint devices shall not be used to punish, to display authority or as a show of force.

## 306.3  USE OF RESTRAINTS
Only members who have successfully completed department-approved training on the use of restraint devices described in this policy are authorized to use these devices.

When deciding whether to use any restraint, officers should carefully balance officer safety concerns with factors that include, but are not limited to:

- The circumstances or crime leading to the arrest.
- The demeanor and behavior of the arrested person.
- The age and health of the person.
- Whether the person is known to be pregnant.
- Whether the person has a hearing or speaking disability. In such cases, consideration should be given, safety permitting, to handcuffing to the front in order to allow the person to sign or write notes.
- Whether the person has any other apparent disability.

### 306.3.1  RESTRAINT OF DETAINEES
Situations may arise where it may be reasonable to restrain an individual who may, after brief investigation, be released without arrest. Unless arrested, the use of restraints on detainees should continue only for as long as is reasonably necessary to assure the safety of officers and others. When deciding whether to remove restraints from a detainee, officers should continuously weigh the safety interests at hand against the continuing intrusion upon the detainee.

### 306.3.2  RESTRAINT OF PREGNANT PERSONS
Persons who are known to be pregnant should be restrained in the least restrictive manner that is effective for officer safety. Leg irons, waist chains, or handcuffs behind the body should not be used unless the officer has a reasonable suspicion that the person may resist, attempt escape, injure self or others, or damage property.

No person who is in labor, delivery, or recovery after delivery shall be handcuffed or restrained except in extraordinary circumstances and only when a supervisor makes an individualized

DEFENDANTS 000612

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Handcuffing and Restraints*

determination that such restraints are necessary for the safety of the arrestee, officers, or others. No leg or waist restraints may be used. If a person in labor must be restrained, the supervisor shall ensure that a written report is completed within 10 days documenting the extraordinary circumstances that required the use of restraints (Idaho Code 20-902).

## 306.3.3   RESTRAINT OF JUVENILES
A juvenile under 14 years of age should not be restrained unless he/she is suspected of a dangerous felony or when the officer has a reasonable suspicion that the juvenile may resist, attempt escape, injure him/herself, injure the officer or damage property.  Officers should use discretion and evaluate the totality of the circumstances when handcuffing juveniles.

## 306.3.4   NOTIFICATIONS
Whenever an officer transports a person with the use of restraints other than handcuffs, the officer shall inform the jail staff upon arrival at the jail that restraints were used. This notification should include information regarding any other circumstances the officer reasonably believes would be potential safety concerns or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration) that may have occurred prior to, or during transportation to the jail.

## 306.4   APPLICATION OF HANDCUFFS OR PLASTIC CUFFS
Handcuffs, including temporary nylon or plastic cuffs, may be used only to restrain a person's hands to ensure officer safety.

Although recommended for most arrest situations, handcuffing is discretionary and not an absolute requirement of the Department. Officers should consider handcuffing any person they reasonably believe warrants that degree of restraint. However, officers should not conclude that in order to avoid risk every person should be handcuffed, regardless of the circumstances.

In most situations handcuffs should be applied with the hands behind the person's back. When feasible, handcuffs should be double-locked to prevent tightening, which may cause undue discomfort or injury to the hands or wrists.

In situations where one pair of handcuffs does not appear sufficient to restrain the individual or may cause unreasonable discomfort due to the person's size, officers should consider alternatives, such as using an additional set of handcuffs or multiple plastic cuffs.

Handcuffs should be removed as soon as it is reasonable or after the person has been searched and is safely confined within a detention facility.

## 306.5   APPLICATION OF SPIT HOODS/MASKS/SOCKS
Spit hoods/masks/socks are temporary protective devices designed to prevent the wearer from biting and/or transferring or transmitting fluids (saliva and mucous) to others.

Spit hoods may be placed upon persons in custody when the officer reasonably believes the person will bite or spit, either on a person or in an inappropriate place. They are generally used during application of a physical restraint, while the person is restrained, or during or after transport.

DEFENDANTS 000613

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

Officers utilizing spit hoods should ensure that the spit hood is fastened properly to allow for adequate ventilation and that the restrained person can breathe normally. Officers should provide assistance during the movement of restrained individuals due to the potential for impaired or distorted vision on the part of the individual. Officers should avoid comingling individuals wearing spit hoods with other detainees.

Spit hoods should not be used in situations where the restrained person is bleeding profusely from the area around the mouth or nose, or if there are indications that the person has a medical condition, such as difficulty breathing or vomiting. In such cases, prompt medical care should be obtained. If the person vomits while wearing a spit hood, the spit hood should be promptly removed and discarded. Persons who have been sprayed with oleoresin capsicum (OC) spray should be thoroughly decontaminated including hair, head and clothing prior to application of a spit hood.

Those who have been placed in a spit hood should be continually monitored and shall not be left unattended until the spit hood is removed. Spit hoods shall be discarded after each use.

### 306.6  APPLICATION OF AUXILIARY RESTRAINT DEVICES
Auxiliary restraint devices include transport belts, waist or belly chains, transportation chains, leg irons and other similar devices. Auxiliary restraint devices are intended for use during long-term restraint or transportation. They provide additional security and safety without impeding breathing, while permitting adequate movement, comfort and mobility.

Only department-authorized devices may be used. Any person in auxiliary restraints should be monitored as reasonably appears necessary.

### 306.7  APPLICATION OF LEG RESTRAINT DEVICES
Leg restraints may be used to restrain the legs of a violent or potentially violent person when it is reasonable to do so during the course of detention, arrest or transportation. Only restraint devices approved by the Department shall be used.

In determining whether to use the leg restraint, officers should consider:

(a)   Whether the officer or others could be exposed to injury due to the assaultive or resistant behavior of a suspect.

(b)   Whether it is reasonably necessary to protect the suspect from his/her own actions (e.g., hitting his/her head against the interior of the patrol unit, running away from the arresting officer while handcuffed, kicking at objects or officers).

(c)   Whether it is reasonably necessary to avoid damage to property (e.g., kicking at windows of the patrol unit).

### 306.7.1  GUIDELINES FOR USE OF LEG RESTRAINTS
When applying leg restraints the following guidelines should be followed:

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Handcuffing and Restraints*

(a)  If practicable, officers should notify a supervisor of the intent to apply the leg restraint device. In all cases, a supervisor shall be notified as soon as practicable after the application of the leg restraint device.

(b)  Once applied, absent a medical or other emergency, restraints should remain in place until the officer arrives at the jail or other facility or the person no longer reasonably appears to pose a threat.

(c)  Once secured, the person should be placed in a seated or upright position, secured with a seat belt, and shall not be placed on his/her stomach for an extended period, as this could reduce the person's ability to breathe.

(d)  The restrained person should be continually monitored by an officer while in the leg restraint. The officer should ensure that the person does not roll onto and remain on his/her stomach.

(e)  The officer should look for signs of labored breathing and take appropriate steps to relieve and minimize any obvious factors contributing to this condition.

(f)  When transported by ambulance/paramedic unit, the restrained person should be accompanied by an officer when requested by medical personnel. The transporting officer should describe to medical personnel any unusual behaviors or other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

## 306.8  REQUIRED DOCUMENTATION
If a person is restrained and released without an arrest, the officer shall document the details of the detention and the need for handcuffs or other restraints.

If a person is arrested, the use of handcuffs or other restraints shall be documented in the related report. Officers should document the following information in reports, as appropriate, when restraints other than handcuffs are used on a person:

(a)  The factors that led to the decision to use restraints.

(b)  Supervisor notification and approval of restraint use.

(c)  The types of restraint used.

(d)  The amount of time the person was restrained.

(e)  How the person was transported and the position of the person during transport.

(f)  Observations of the person's behavior and any signs of physiological problems.

(g)  Any known or suspected drug use or other medical problems.

## 306.9  TRAINING
Subject to available resources, the Training Sergeant should ensure that officers receive periodic training on the proper use of handcuffs and other restraints, including:

DEFENDANTS 000615

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

## *Handcuffing and Restraints*

(a)  Proper placement and fit of handcuffs and other restraint devices approved for use by the Department.

(b)  Response to complaints of pain by restrained persons.

(c)  Options for restraining those who may be pregnant without the use of leg irons, waist chains, or handcuffs behind the body.

(d)  Options for restraining amputees or those with medical conditions or other physical conditions that may be aggravated by being restrained.

DEFENDANTS 000616

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department



Policy

**308**

**Pocatello Police Department**
Pocatello PD ID Policy Manual

# Control Devices and Techniques

## 308.1  PURPOSE AND SCOPE
This policy provides guidelines for the use and maintenance of control devices that are described in this policy.

## 308.2  POLICY
In order to control subjects who are violent or who demonstrate the intent to be violent, the Pocatello Police Department authorizes officers to use control devices in accordance with the guidelines in this policy and the Use of Force Policy.

## 308.3  ISSUING, CARRYING AND USING CONTROL DEVICES
Control devices described in this policy may be carried and used by members of this department only if the device has been issued by the Department or approved by the Chief of Police or the authorized designee.

Only officers who have successfully completed department-approved training in the use of any control device are authorized to carry and use the device.  Officers  in uniform will be required to either carry their baton or OC Spray in addition to the TASER, which is mandatory to carry.
  Officers can carry all three contol devices, however if only two are carried the third needs to be available for their use.

Control devices may be used when a decision has been made to control, restrain or arrest a subject who is violent or who demonstrates the intent to be violent and the use of the device appears reasonable under the circumstances. When reasonable, a verbal warning and opportunity to comply should precede the use of these devices.

When using control devices, officers should carefully consider potential impact areas in order to minimize injuries and unintentional targets.

All sworn personnel will be required to attend training set forth by the Training Sergeant in reference to control devices.

## 308.4  RESPONSIBILITIES

### 308.4.1  SHIFT COMMANDER RESPONSIBILITIES
The Shift Commander may authorize the use of a control device by selected personnel or members of specialized units who have successfully completed the required training.

### 308.4.2  FIREARMS SUPERVISOR RESPONSIBILITIES
The Firearms Supervisor, in cooperation with the Quartermaster, shall control the inventory and issuance of all control devices and shall ensure that all damaged, inoperative, outdated or expended control devices or munitions are properly disposed of, repaired or replaced.

DEFENDANTS 000617

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Control Devices and Techniques*

Every control device will be periodically inspected by the Firearms Supervisor or the designated instructor for a particular control device. The inspection shall be documented.

### 308.4.3  USER RESPONSIBILITIES
All normal maintenance, charging or cleaning shall remain the responsibility of personnel using the various devices.

Any damaged, inoperative, outdated or expended control devices or munitions shall be returned to the Quartermaster for disposition. A memo shall be forwarded through the chain of command to the Division Commander explaining the cause of any damage.

### 308.5  BATON GUIDELINES
When using the department issued baton or any other impact weapon such as a flashlight officers need to use the reasonable amount of force based on the totality of the circumstances. Officers should use anatomically targeting by focusing on Primary, Secondary and Tertiary areas. However if the use of deadly force is justified the baton/impact weapon could be used.

Primary Targets: Those targets, when struck with an impact weapon, that are likely to cause pain or even motion disruption, but least likely to cause serious injury or disability. Examples: Hands and forearms, upper arms and upper and lower legs. Large muscle groups on torso, front and back excluding the spine and kidneys.

Secondary Targets: Those targets, when struck with an impact weapon, that are more likely to cause serious injury and permanent damage. They may cause a higher level of pain and could effectively disable the extremity or portion of the body struck. Examples: Joints such as elbows, knees; clavicle, xyphoid process, groin, kidneys.

Tertiary Targets: Those targets, when struck with an impact weapon, that are most likely to cause permanent disability and/or death. Examples: Neck and head from shoulders up, both front and back, and the spine.

When carrying a baton, uniformed personnel shall carry the baton in its authorized holder on the equipment belt. Plainclothes and non-field personnel may carry the baton as authorized and in accordance with the needs of their assignment or at the direction of their supervisor.

### 308.5.1  MEDICAL ATTENTION
When a member uses the baton for strikes, medical attention must be given as soon as practical to evaluate any injuries that may have occurred. Alcohol or drugs may diminish or mask the pain that an offender feels.

### 308.6  TEAR GAS GUIDELINES
Tear gas may be used for crowd control, crowd dispersal or against barricaded suspects based on the circumstances. Only the Shift Commander, Incident Commander or Crisis Response Unit Commander may authorize the delivery and use of tear gas, and only after evaluating all conditions known at the time and determining that such force reasonably appears justified and necessary.

DEFENDANTS 000618

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Control Devices and Techniques*

When practicable, fire personnel should be alerted or summoned to the scene prior to the deployment of tear gas to control any fires and to assist in providing medical aid or gas evacuation if needed.

### 308.7   OLEORESIN CAPSICUM (OC) GUIDELINES

As with other control devices, oleoresin capsicum (OC) spray and pepper projectiles may be considered for use to bring under control an individual or groups of individuals who are engaging in, or are about to engage in violent behavior. Pepper projectiles and OC spray should not, however, be used against individuals or groups who merely fail to disperse or do not reasonably appear to present a risk to the safety of officers or the public.

### 308.7.1   OC SPRAY

Uniformed personnel carrying OC spray shall carry the device in its holster on the equipment belt. Plainclothes and non-field personnel may carry OC spray as authorized, in accordance with the needs of their assignment or at the direction of their supervisor.

### 308.7.2   PEPPER PROJECTILE SYSTEMS

Pepper projectiles are plastic spheres that are filled with a derivative of OC powder. Because the compressed gas launcher delivers the projectiles with enough force to burst the projectiles on impact and release the OC powder, the potential exists for the projectiles to inflict injury if they strike the head, neck, spine or groin. Therefore, personnel using a pepper projectile system should not intentionally target those areas, except when the officer reasonably believes the suspect poses an imminent threat of serious bodily injury or death to the officer or others.

Officers encountering a situation that warrants the use of a pepper projectile system shall notify a supervisor as soon as practicable. A supervisor shall respond to all pepper projectile system incidents where the suspect has been hit or exposed to the chemical agent. The supervisor shall ensure that all notifications and reports are completed as required by the Use of Force Policy.

Each deployment of a pepper projectile system shall be documented. This includes situations where the launcher was directed toward the suspect, whether or not the launcher was used. Unintentional discharges shall be promptly reported to a supervisor and documented on the appropriate report form. Only non-incident use of a pepper projectile system, such as training and product demonstrations, are exempt from the reporting requirement.

### 308.7.3   TREATMENT FOR OC SPRAY EXPOSURE

Persons who have been sprayed with or otherwise affected by the use of OC should be promptly provided with clean water to cleanse the affected areas. Those persons who complain of further severe effects shall be examined by appropriate medical personnel.

### 308.8   POST-APPLICATION NOTICE

Whenever tear gas or OC has been introduced into a residence, building interior, vehicle or other enclosed area, officers should provide the owners or available occupants with notice of the possible presence of residue that could result in irritation or injury if the area is not properly

DEFENDANTS 000619

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Control Devices and Techniques*

cleaned. Such notice should include advisement that clean up will be at the owner's expense. Information regarding the method of notice and the individuals notified should be included in related reports.

**308.9   KINETIC ENERGY PROJECTILE GUIDELINES**
This department is committed to reducing the potential for violent confrontations. Kinetic energy projectiles, when used properly, are less likely to result in death or serious physical injury and can be used in an attempt to de-escalate a potentially deadly situation.

308.9.1   DEPLOYMENT AND USE
Only department-approved kinetic energy munitions shall be carried and deployed. Approved munitions may be used to compel an individual to cease his/her actions when such munitions present a reasonable option.

Officers are not required or compelled to use approved munitions in lieu of other reasonable tactics if the involved officer determines that deployment of these munitions cannot be done safely. The safety of hostages, innocent persons and officer takes priority over the safety of subjects engaged in criminal or suicidal behavior.

Circumstances appropriate for deployment include, but are not limited to, situations in which:

(a)   The suspect is armed with a weapon and the tactical circumstances allow for the safe application of approved munitions.

(b)   The suspect has made credible threats to harm him/herself or others.

(c)   The suspect is engaged in riotous behavior or is throwing rocks, bottles or other dangerous projectiles at people and/or officers.

(d)   There is probable cause to believe that the suspect has already committed a crime of violence and is refusing to comply with lawful orders.

308.9.2   DEPLOYMENT CONSIDERATIONS
Before discharging projectiles, the officer should consider such factors as:

(a)   Distance and angle to target.

(b)   Type of munitions employed.

(c)   Type and thickness of subject's clothing.

(d)   The subject's proximity to others.

(e)   The location of the subject.

(f)   Whether the subject's actions dictate the need for an immediate response and the use of control devices appears appropriate.

A verbal warning of the intended use of the device should precede its application, unless it would otherwise endanger the safety of officers or when it is not practicable due to the circumstances.

DEFENDANTS 000620

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Control Devices and Techniques*

The purpose of the warning is to give the individual a reasonable opportunity to voluntarily comply and to warn other officers and individuals that the device is being deployed.

Officers should keep in mind the manufacturer's recommendations and their training regarding effective distances and target areas. However, officers are not restricted solely to use according to manufacturer recommendations. Each situation must be evaluated on the totality of circumstances at the time of deployment.

The need to immediately incapacitate the subject must be weighed against the risk of causing serious injury or death. The head and neck should not be intentionally targeted, except when the officer reasonably believes the suspect poses an imminent threat of serious bodily injury or death to the officer or others.

### 308.9.3   SAFETY PROCEDURES
Shotguns specifically designated for use with kinetic energy projectiles will be specially marked in a manner that makes them readily identifiable as such.

Officers will inspect the shotgun and projectiles at the beginning of each shift to ensure that the shotgun is in proper working order and the projectiles are of the approved type and appear to be free from defects.

When it is not deployed, the shotgun will be unloaded and properly and securely stored in the vehicle. When deploying the kinetic energy projectile shotgun, the officer shall visually inspect the kinetic energy projectiles to ensure that conventional ammunition is not being loaded into the shotgun.

Absent compelling circumstances, officers who must transition from conventional ammunition to kinetic energy projectiles will employ the two-person rule for loading. The two-person rule is a safety measure in which a second officer watches the unloading and loading process to ensure that the weapon is completely emptied of conventional ammunition.

### 308.10   TRAINING FOR CONTROL DEVICES
The Training Sergeant shall ensure that all personnel who are authorized to carry a control device have been properly trained and certified to carry the specific control device and are retrained or recertified as necessary.

(a)   Proficiency training shall be monitored and documented by a certified, control-device weapons or tactics instructor.

(b)   All training and proficiency for control devices will be documented in the officer's training file.

(c)   Officers who fail to demonstrate proficiency with the control device or knowledge of this agency's Use of Force Policy will be provided remedial training. If An officer cannot demonstrate proficiency with a control device or knowledge of this agency's Use of Force Policy after remedial training, the officer will be restricted from carrying the control device and may be subject to discipline.

DEFENDANTS 000621

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Control Devices and Techniques*

**308.11   REPORTING USE OF CONTROL DEVICES AND TECHNIQUES**
Any application of a control device or technique listed in this policy shall be documented in the related incident report and reported pursuant to the Use of Force Policy.

DEFENDANTS 000622

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department



**Policy**
**309**

**Pocatello Police Department**
Pocatello PD ID Policy Manual

# TASER™ Guidelines

## 309.1 PURPOSE AND SCOPE
This policy provides guidelines for the issuance and use of the TASER™ device.

## 309.2 POLICY
The EMDT device is intended to control a violent or potentially violent individual, while minimizing the risk of serious injury. The appropriate use of such a device should result in fewer serious injuries to officers and suspects.

## 309.3 ISSUANCE AND CARRYING THE TASER
Only members who have successfully completed department approved training may be issued and carry the Taser

EMDT devices shall be issued to all sworn personnel below the rank of Captain. The Chief of Police may determine that certain assignments do not require the member to carry a TASER. Members serving in such an assignment may be required to return the device to the Department's inventory.

Officers shall only use the EMDT device and cartridges that have been issued by the Department. Uniformed officers who have been issued the EMDT device shall wear the device in an approved holster on their person. Non-uniformed officers may secure the EMDT device in the driver's compartment of their vehicle, but in any case non-uniformed officers shall have the EMDT device available for use at all times while on duty.

Members carrying the EMDT device should perform a spark test on the unit prior to every shift.

When carried while in uniform, officers shall carry the EMDT device in a weak-side holster on the side opposite the duty weapon.

    (a) All EMDT devices shall be clearly and distinctly marked to differentiate them from the duty weapon and any other device.

    (b) Whenever practicable, officers should carry two or more cartridges on their person when carrying the EMDT device.

    (c) Officers shall be responsible for ensuring that their issued EMDT device is properly maintained and in good working order.

    (d) Officers should not hold both a firearm and the EMDT device in a firing grip at the same time.

## 309.4 VERBAL AND VISUAL WARNINGS
A verbal warning of the intended use of the EMDT device should precede its application, unless it would otherwise endanger the safety of officers or when it is not practicable due to the circumstances. The purpose of the warning is to:

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

DEFENDANTS 000623

## Pocatello Police Department
Pocatello PD ID Policy Manual

*TASER™ Guidelines*

     (a)    Provide the individual with a reasonable opportunity to voluntarily comply.

     (b)    Provide other officers and individuals with a warning that the EMDT device may be deployed.

If, after a verbal warning, an individual is unwilling to voluntarily comply with an officer's lawful orders and it appears both reasonable and feasible under the circumstances, the officer may, but is not required to, display the electrical arc (provided that a cartridge has not been loaded into the device), or the laser in a further attempt to gain compliance prior to the application of the EMDT device. The aiming laser should never be intentionally directed into the eyes of another as it may permanently impair his/her vision.

The fact that a verbal or other warning was given or the reasons it was not given shall be documented by the officer deploying the EMDT device in the related report.

### 309.5   USE OF THE EMDT DEVICE
The EMDT device has limitations and restrictions requiring consideration before its use. The EMDT device should only be used when its operator can safely approach the subject within the operational range of the device. Although the EMDT device is generally effective in controlling most individuals, officers should be aware that the device may not achieve the intended results and be prepared with other options.

309.5.1   APPLICATION OF THE EMDT DEVICE
The EMDT device may be used in any of the following circumstances, when the circumstances perceived by the officer at the time indicate that such application is reasonably necessary to control a person:

     (a)    The subject is violent or is physically resisting.

     (b)    The subject has demonstrated, by words or action, an intention to be violent or to physically resist, and reasonably appears to present the potential to harm officers, him/herself or others.

Mere flight from a pursuing officer, without other known circumstances or factors, is not good cause for the use of the EMDT device to apprehend an individual.

309.5.2   SPECIAL DEPLOYMENT CONSIDERATIONS
The use of the EMDT device on certain individuals should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the individual outweighs the risk of using the device. This includes:

     (a)    Individuals who are known to be pregnant.

     (b)    Elderly individuals or obvious juveniles.

     (c)    Individuals with obviously low body mass.

DEFENDANTS 000624

# Pocatello Police Department
Pocatello PD ID Policy Manual

*TASER™ Guidelines*

---

    (d)    Individuals who are handcuffed or otherwise restrained.

    (e)    Individuals who have been recently sprayed with a flammable chemical agent or who are otherwise in close proximity to any known combustible vapor or flammable material, including alcohol-based oleoresin capsicum (OC) spray.

    (f)    Individuals whose position or activity may result in collateral injury (e.g., falls from height, operating vehicles).

Because the application of the EMDT device in the drive-stun mode (i.e., direct contact without probes) relies primarily on pain compliance, the use of the drive-stun mode generally should be limited to supplementing the probe-mode to complete the circuit, or as a distraction technique to gain separation between officers and the subject, thereby giving officers time and distance to consider other force options or actions.

The EMDT device shall not be used to psychologically torment, elicit statements or to punish any individual.

## 309.5.3   TARGETING CONSIDERATIONS
Reasonable efforts should be made to target lower center mass and avoid the head, neck, chest and groin. If the dynamics of a situation or officer safety do not permit the officer to limit the application of the EMDT device probes to a precise target area, officers should monitor the condition of the subject if one or more probes strikes the head, neck, chest or groin until the subject is examined by paramedics or other medical personnel.

## 309.5.4   MULTIPLE APPLICATIONS OF THE EMDT DEVICE
Officers should apply the EMDT device for only one standard cycle and then evaluate the situation before applying any subsequent cycles. Multiple applications of the EMDT device against a single individual are generally not recommended and should be avoided unless the officer reasonably believes that the need to control the individual outweighs the potentially increased risk posed by multiple applications.

If the first application of the EMDT device appears to be ineffective in gaining control of an individual, the officer should consider certain factors before additional applications of the EMDT device, including:

    (a)    Whether the probes are making proper contact.

    (b)    Whether the individual has the ability and has been given a reasonable opportunity to comply.

    (c)    Whether verbal commands, other options or tactics may be more effective.

Officers should generally not intentionally apply more than one EMDT device at a time against a single subject.

---

DEFENDANTS 000625

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

## Pocatello Police Department
Pocatello PD ID Policy Manual

*TASER™ Guidelines*

---

### 309.5.5  ACTIONS FOLLOWING DEPLOYMENTS
Officers shall notify a supervisor of all Taser discharges. AFID tags should be collected when possible and the expended cartridge, along with both probes and wire, should be submitted into evidence. The wire should not be wrapped around the cartridge nor should additional wire be pulled from the cartridge. The cartridge serial number should be noted and documented on the evidence paperwork. The evidence packaging should be marked "Biohazard" if the probes penetrated the subject's skin.

### 309.5.6  DANGEROUS ANIMALS
The EMDT device may be deployed against an animal as part of a plan to deal with a potentially dangerous animal, such as a dog, if the animal reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective.

### 309.5.7  OFF-DUTY CONSIDERATIONS
Officers are not authorized to carry department EMDT devices while off-duty.

Officers shall ensure that EMDT devices are secured while in their homes, vehicles or any other area under their control, in a manner that will keep the device inaccessible to others.

### 309.6  DOCUMENTATION
Officers shall document all EMDT device discharges in the related arrest/crime report and the EMDT device report form. Notification shall also be made to a supervisor in compliance with the Use of Force Policy. Unintentional discharges, pointing the device at a person, laser activation and arcing the device will also be documented on the report form.

### 309.6.1  EMDT DEVICE FORM
Items that shall be included in the EMDT device report form are:

(a)   The type and brand of EMDT device and cartridge and cartridge serial number.

(b)   Date, time and location of the incident.

(c)   Whether any display, laser or arc deterred a subject and gained compliance.

(d)   The number of EMDT device activations, the duration of each cycle, the duration between activations, and (as best as can be determined) the duration that the subject received applications.

(e)   The range at which the EMDT device was used.

(f)   The type of mode used (probe or drive-stun).

(g)   Location of any probe impact.

(h)   Location of contact in drive-stun mode.

(i)   Description of where missed probes went.

(j)   Whether medical care was provided to the subject.

DEFENDANTS 000626

# Pocatello Police Department
Pocatello PD ID Policy Manual

*TASER™ Guidelines*

---

    (k)    Whether the subject sustained any injuries.

    (l)    Whether any officers sustained any injuries.

The Training Sergeant should periodically analyze the report forms to identify trends, including deterrence and effectiveness. The Training Sergeant should also conduct audits of data downloads and reconcile EMDT device report forms with recorded activations. EMDT device information and statistics, with identifying information removed, should periodically be made available to the public.

## 309.6.2   REPORTS
The officer should include the following in the arrest/crime report:

    (a)    Identification of all personnel firing EMDT devices

    (b)    Identification of all witnesses

    (c)    Medical care provided to the subject

    (d)    Observations of the subject's physical and physiological actions

    (e)    Any known or suspected drug use, intoxication or other medical problems

## 309.7   MEDICAL TREATMENT
Unless the EMDT device darts are located in a sensitive area officers trained to carry the EMDT device may remove the darts from a person's body. If the EMDT device darts are located in a sensitive area or other circumstances suggest that removal will be difficult, qualified medical personnel, including certified paramedics, should be called to remove the darts. Used EMDT device darts shall be considered a sharp bio-hazard, similar to a used hypodermic needle, and universal precautions should be taken accordingly.

All persons who have been struck by EMDT device probes or who have been subjected to the electric discharge of the device shall be medically assessed prior to booking. Additionally, any such individual who falls under any of the following categories should, as soon as practicable, be examined by paramedics or other qualified medical personnel:

    (a)    The person is suspected of being under the influence of controlled substances and/or alcohol.

    (b)    The person may be pregnant.

    (c)    The person reasonably appears to be in need of medical attention.

    (d)    The EMDT device probes are lodged in a sensitive area (e.g., groin, female breast, head, face, neck).

    (e)    The person requests medical treatment.

Any individual exhibiting signs of distress or who is exposed to multiple or prolonged applications (i.e., more than 15 seconds) shall be transported to a medical facility for examination or medically evaluated prior to booking. If any individual refuses medical attention, such a refusal should be

DEFENDANTS 000627

# Pocatello Police Department
Pocatello PD ID Policy Manual

*TASER™ Guidelines*

witnessed by another officer and/or medical personnel and shall be fully documented in related reports. If an audio recording is made of the contact or an interview with the individual, any refusal should be included, if possible.

The transporting officer shall inform any person providing medical care or receiving custody that the individual has been subjected to the application of the EMDT device.

## 309.8 SUPERVISOR RESPONSIBILITIES
When possible, supervisors should respond to calls when they reasonably believe there is a likelihood the EMDT device may be used. A supervisor should respond to all incidents where the EMDT device was activated.

A supervisor should review each incident where a person has been exposed to an activation of the EMDT device. The device's onboard memory should be downloaded through the data port by a TASER Instructor and saved with the related arrest/crime report. Photographs of probe sites should be taken and witnesses interviewed.

## 309.9 TRAINING
Personnel who are authorized to carry the EMDT device shall be permitted to do so only after successfully completing the initial department-approved training. Any personnel who have not carried the EMDT device as a part of their assignment for a period of six months or more shall be recertified by a department-approved EMDT device instructor prior to again carrying or using the device.

Proficiency training for personnel who have been issued EMDT devices should occur every year. A reassessment of an officer's knowledge and/or practical skill may be required at any time if deemed appropriate by the Training Sergeant. All training and proficiency for EMDT devices will be documented in the officer's training file.

Command staff, supervisors and investigators should receive EMDT device training as appropriate for the investigations they conduct and review.

Officers who do not carry EMDT devices should receive training that is sufficient to familiarize them with the device and with working with officers who use the device.

The Training Sergeant is responsible for ensuring that all members who carry EMDT devices have received initial and annual proficiency training. Periodic audits should be used for verification.

Application of EMDT devices during training could result in injury to personnel and should not be mandatory for certification.

The Training Sergeant should ensure that all training includes:

    (a)    A review of this policy.

    (b)    A review of the Use of Force Policy.

DEFENDANTS 000628

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
### Pocatello PD ID Policy Manual

*TASER™ Guidelines*

---

    (c)    Performing weak-hand draws or cross-draws to reduce the possibility of unintentionally drawing and firing a firearm.

    (d)    Target area considerations, to include techniques or options to reduce the unintentional application of probes near the head, neck, chest and groin.

    (e)    Handcuffing a subject during the application of the EMDT device and transitioning to other force options.

    (f)    De-escalation techniques.

    (g)    Restraint techniques that do not impair respiration following the application of the EMDT device.

DEFENDANTS 000629

| Policy **310** | **Pocatello Police Department**<br>Pocatello PD ID Policy Manual |
|---|---|

# Officer-Involved Shootings and Deaths

### 310.1  PURPOSE AND SCOPE
The purpose of this policy is to establish policy and procedures for the investigation of an incident in which a person is injured as the result of an officer-involved shooting or dies as a result of other action of an officer.

In other incidents not covered by this policy, the Chief of Police may decide that the investigation will follow the process provided in this policy.

### 310.2  POLICY
The policy of the Pocatello Police Department is to ensure that officer-involved shootings and deaths are investigated in a thorough, fair and impartial manner.

### 310.3  TYPES OF INVESTIGATIONS
Officer-involved shootings involve several separate investigations. The investigations may include:

   (a)   A criminal investigation of the suspect's actions.

   (b)   A criminal investigation of the involved officer 's actions.

   (c)   An administrative investigation as to policy compliance by involved officers.

   (d)   A civil investigation to determine potential liability.

### 310.4  CONTROL OF INVESTIGATIONS
This department conforms to the Critical Incident Task Force (CITF) Protocol for investigating officer-involved shootings and deaths. The following scenarios outline the jurisdictional responsibilities for investigating officer-involved shootings and deaths.

#### 310.4.1  CRIMINAL INVESTIGATIONS
The CITF is responsible for the criminal investigation of the suspect's actions and of the officer's actions. The criminal investigation will be reviewed by an outside prosecuting attorney's office or the Office of the Attorney General.

Under the CITF Protocol, the criminal investigation is generally referred to one or more outside agencies with a lead agency being ultimately responsible for the investigation.

#### 310.4.2  ADMINISTRATIVE AND CIVIL INVESTIGATION
Regardless of where the incident occurs, the administrative and civil investigation of each involved officer is controlled by the respective employing agency.

### 310.5  INVESTIGATION PROCESS
The following procedures are guidelines used in the investigation of an officer-involved shooting or death.

DEFENDANTS 000630

# Pocatello Police Department
Pocatello PD ID Policy Manual

## Officer-Involved Shootings and Deaths

### 310.5.1  UNINVOLVED OFFICER RESPONSIBILITIES
Upon arrival at the scene of an officer-involved shooting or death, the first uninvolved PPD officer will be the officer-in-charge and will assume the responsibilities of a supervisor until properly relieved. This officer should, as appropriate

    (a)    Secure the scene and identify and eliminate hazards for all those involved.

    (b)    Take reasonable steps to obtain emergency medical attention for injured individuals.

    (c)    Request additional resources from the Department or other agencies.

    (d)    Coordinate a perimeter or pursuit of suspects.

    (e)    Check for injured persons and evacuate as needed.

    (f)    Brief the supervisor upon arrival.

### 310.5.2  SHIFT COMMANDER DUTIES
Upon learning of an officer-involved shooting, the Shift Commander shall be responsible for coordinating all aspects of the incident until relieved by the Chief of Police or a Division Commander.

### 310.5.3  NOTIFICATIONS

The following persons shall be notified as soon as practicable:

- Chief of Police
- Deputy Chief
- Involved member's Division Commander
- Investigations Division Commander
- OIS protocol rollout team
- Prosecuting Attorney
- Internal Affairs Unit supervisor
- City Risk Managers/Attorneys
- Traumatic Incident Corp supervisor
- Coroner (if necessary)
- Officer representative (if requested)
- Public Information Officer

All outside inquiries about the incident shall be directed to the Investigations Division Commander.

DEFENDANTS 000631

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Officer-Involved Shootings and Deaths*

### 310.5.4  INVOLVED OFFICERS
Once the involved officer(s) have arrived at a neutral location, the Shift Commander or a supervisor should admonish each officer that the incident shall not be discussed except with authorized personnel or representatives. The following shall be considered for the involved officer(s):

(a) Any request for department or legal representation will be accommodated. However, no involved officer shall be permitted to meet collectively or in a group with an attorney or any representative prior to providing a formal interview or report.

(b) Discussions with licensed attorneys will be considered privileged as attorney-client communication.

(c) Discussions with department representatives (e.g., employee association) will be privileged only as to the discussion of non-criminal information.

(d) If requested by an involved officer, contact with a psychotherapist shall be arranged by the department.

　　1. Interviews with a licensed psychotherapist will be considered privileged and will not be disclosed except to the extent that the officer is or is not fit for return to duty.

　　2. An interview or session with a licensed psychotherapist may take place prior to the involved officer providing a formal interview or report, but the involved officers shall not be permitted to consult or meet collectively or in a group with a licensed psychotherapist prior to providing a formal interview or report.

　　3. A separate fitness-for-duty exam may also be required (see the Fitness for Duty Policy).

(e) Although the department will honor the sensitivity of communications with peer counselors, there is no legal privilege to such communications. Peer counselors are cautioned against discussing the facts of any incident with an involved or witness officer.

Care should be taken to preserve the integrity of any physical evidence present on the officer, equipment or clothing (e.g., blood, fingerprints) until investigators or lab personnel can properly retrieve it.

Detectives shall make reasonable accommodations to the officer's physical and emotional needs.

Each involved officer shall be given reasonable paid administrative leave following an officer-involved shooting or death. It shall be the responsibility of the Shift Commander to make schedule adjustments to accommodate such leave.

DEFENDANTS 000632

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Officer-Involved Shootings and Deaths*

310.5.5  SUPERVISOR RESPONSIBILITIES
Upon arrival at the scene, the first uninvolved PPD supervisor should ensure completion of the duties as outlined above, plus:

(a)  Attempt to obtain a brief overview of the situation from any uninvolved officers.

1.  In the event that there are no uninvolved officers who can supply adequate overview, the supervisor should attempt to obtain a brief voluntary overview from one involved officer.

(b)  If necessary, the supervisor may administratively order any PPD officer to immediately provide public safety information necessary to secure the scene, identify injured parties and pursue suspects.

1.  Public safety information shall be limited to such things as outstanding suspect information, number and direction of any shots fired, perimeter of the incident scene, identity of known or potential witnesses and any other pertinent information.

2.  The initial on-scene supervisor should not attempt to order any involved officer to provide any information other than public safety information.

(c)  Provide all available information to the Shift Commander and the Communications Center. If feasible, sensitive information should be communicated over secure networks.

(d)  Take command of and secure the incident scene with additional PPD members until properly relieved by another supervisor or other assigned personnel or investigator.

(e)  As soon as practicable, ensure that involved officers are transported (separately, if feasible) to a suitable location for further direction.

1.  Each involved PPD officer should be given an administrative order not to discuss the incident with other involved officers or PPD members pending further direction from a supervisor.

2.  When an involved officer's weapon is taken or left at the scene for other than officer-safety reasons (e.g., evidence), ensure that he/she is provided with a comparable replacement weapon or transported by other officers.

**310.6  CRIMINAL INVESTIGATION**
The CITF is responsible for the criminal investigation into the circumstances of any officer-involved shooting or death.

If available, CITF personnel from this department may be assigned to partner with investigators from outside agencies to avoid duplicating efforts in related criminal investigations.

Once public safety issues have been addressed, CITF investigators should be given the opportunity to obtain a voluntary statement from involved officers and to complete their interviews. The following shall be considered for the involved officer:

DEFENDANTS 000633

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Officer-Involved Shootings and Deaths*

(a)    PPD supervisors and Internal Affairs Unit personnel should not participate directly in any voluntary interview of PPD officers. This will not prohibit such personnel from monitoring interviews or providing the criminal investigators with topics for inquiry.

(b)    If requested, any involved officer will be afforded the opportunity to consult individually with a representative of his/her choosing or an attorney prior to speaking with criminal investigators. However, in order to maintain the integrity of each involved officer's statement, involved officers shall not consult or meet with a representative or an attorney collectively or in groups prior to being interviewed.

(c)    If any involved officer is physically, emotionally or otherwise not in a position to provide a voluntary statement when interviewed by criminal investigators, consideration should be given to allowing a reasonable period for the officer to schedule an alternate time for the interview.

(d)    Any voluntary statement provided by an involved officer will be made available for inclusion in any related investigation, including administrative investigations. However, no administratively coerced statement will be provided to any criminal investigators unless the officer consents.

### 310.6.1   REPORTS BY INVOLVED OFFICERS
In the event that suspects remain outstanding or subject to prosecution for related offenses, this department shall retain the authority to require involved officers to provide sufficient information for related criminal reports to facilitate the apprehension and prosecution of those individuals.

While the involved officer may write the report, it is generally recommended that such reports be completed by assigned investigators who should interview involved officers as victims/witnesses. Since the purpose of these reports will be to facilitate criminal prosecution, statements of involved officers should focus on evidence to establish the elements of criminal activities by involved suspects. Care should be taken not to duplicate information provided by involved officers in other reports.

Nothing in this section shall be construed to deprive an involved officer of the right to consult with legal counsel prior to completing any such criminal report.

Reports related to the prosecution of criminal suspects will be processed according to normal procedures, but should also be included for reference in the investigation of the officer-involved shooting.

### 310.6.2   WITNESS IDENTIFICATION AND INTERVIEWS
Because potential witnesses to an officer-involved shooting or death may become unavailable or the integrity of their statements compromised with the passage of time, a supervisor should take reasonable steps to promptly coordinate with criminal investigators to utilize available personnel for the following:

(a)    Identify all persons present at the scene and in the immediate area.

DEFENDANTS 000634

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Officer-Involved Shootings and Deaths*

1. When feasible, a recorded statement should be obtained from those persons who claim not to have witnessed the incident but who were present at the time it occurred.

2. Any potential witness who is unwilling or unable to remain available for a formal interview should not be detained absent reasonable suspicion to detain or probable cause to arrest. Without detaining the individual for the sole purpose of identification, attempts to identify the witness prior to his/her departure should be made whenever feasible.

(b) Witnesses who are willing to provide a formal interview should be asked to meet at a suitable location where criminal investigators may obtain a recorded statement. Such witnesses, if willing, may be transported by a member of the Department.

1. A written, verbal or recorded statement of consent should be obtained prior to transporting a witness. When the witness is a minor, consent should be obtained from the parent or guardian, if available, prior to transportation.

(c) Promptly contacting the suspect's family and associates to obtain any available and untainted background information about the suspect's activities and state of mind prior to contact with the officers about the incident.

### 310.6.3   INVESTIGATIVE PERSONNEL
Once notified of an officer-involved shooting or death, it shall be the responsibility of the designated Investigation Division supervisor to assign appropriate investigative personnel to form the CITF to handle the investigation of related crimes. Department investigators will be assigned to work with investigators from the CITF and may be assigned to separately handle the investigation of any related crimes not being investigated by CITF.

All related CITF reports, except administrative and/or privileged reports, will be forwarded to the designated CITF supervisor for approval. Privileged reports shall be maintained exclusively by members who are authorized such access. Administrative reports will be forwarded to the appropriate Division Commander.

### 310.7   ADMINISTRATIVE INVESTIGATION
In addition to all other investigations associated with an officer-involved shooting or death, this department will conduct an internal administrative investigation of involved PPD officers to determine conformance with department policy. This investigation will be conducted under the supervision of the Internal Affairs Unit and will be considered a confidential officer personnel file.

Interviews of members shall be subject to department policies and applicable laws.

(a) Any officer involved in a shooting or death may be requested or administratively compelled to provide a blood sample for alcohol/drug screening. Absent consent from the officer, such compelled samples and the results of any such testing shall not be disclosed to any criminal investigative agency.

DEFENDANTS 000635

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

# Pocatello Police Department
Pocatello PD ID Policy Manual

*Officer-Involved Shootings and Deaths*

(b)   If any officer has voluntarily elected to provide a statement to criminal investigators, the assigned administrative investigator should review that statement before proceeding with any further interview of that involved officer.

1.   If a further interview of the officer is deemed necessary to determine policy compliance, care should be taken to limit the inquiry to new areas with minimal, if any, duplication of questions addressed in the voluntary statement. The involved officer shall be provided with a copy of his or her prior statement before proceeding with any subsequent interview(s).

(c)   In the event that an involved officer has elected to not provide criminal investigators with a voluntary statement, the assigned administrative investigator shall conduct an administrative interview to determine all relevant information.

1.   Although this interview should not be unreasonably delayed, care should be taken to ensure that the officer's physical and psychological needs have been addressed before commencing the interview.

2.   If requested, the officer shall have the opportunity to select an uninvolved representative to be present during the interview. However, in order to maintain the integrity of each individual officer's statement, involved officers shall not consult or meet with a representative or attorney collectively or in groups prior to being interviewed.

3.   Administrative interviews should be recorded by the investigator. The officer may also record the interview.

4.   The officer shall be informed of the nature of the investigation. If an officer refuses to answer questions, he/she should be given his/her *Garrity* rights and ordered to provide full and truthful answers to all questions. The officer shall be informed that the interview will be for administrative purposes only and that the statement cannot be used criminally.

5.   The Internal Affairs Unit shall compile all relevant information and reports necessary for this department to determine compliance with applicable policies.

6.   Indications of potential policy violations shall be determined in accordance with standard disciplinary procedures.

## 310.8  AUDIO AND VIDEO RECORDINGS

Any officer  involved in a shooting or death may be permitted to review available Mobile Audio/ Video (MAV), body-worn video, or other video or audio recordings prior to providing a recorded statement or completing reports.

Upon request, non-law enforcement witnesses who are able to verify their presence and their ability to contemporaneously perceive events at the scene of an incident may also be permitted

DEFENDANTS 000636

Copyright Lexipol, LLC 2020/04/21, All Rights Reserved.
Published with permission by Pocatello Police Department

## Pocatello Police Department
Pocatello PD ID Policy Manual

*Officer-Involved Shootings and Deaths*

to review available MAV, body-worn video, or other video or audio recordings with approval of assigned investigators or a supervisor.

Any MAV, body-worn and other known video or audio recordings of an incident should not be publicly released during an ongoing investigation without consulting the prosecuting attorney or City Attorney's Office as appropriate.

### 310.9  CIVIL LIABILITY RESPONSE
A member of this department may be assigned to work exclusively under the direction of the legal counsel for the Department to assist in the preparation of materials deemed necessary in anticipation of potential civil litigation.

All materials generated in this capacity shall be considered attorney work product and may not be used for any other purpose. The civil liability response is not intended to interfere with any other investigation but shall be given reasonable access to all other investigations.

### 310.10  MEDIA RELATIONS
Any media release shall be prepared with input and concurrence from the supervisor and department representative responsible for each phase of the investigation. Releases will be available to the Shift Commander, Investigation Division Commander and Public Information Officer in the event of inquiries from the media.

No involved PPD officer shall make any comment to the media unless he/she is authorized by the Chief of Police or a Division Commander.

Department members receiving inquiries regarding officer-involved shootings or deaths occurring in other jurisdictions shall refrain from public comment and will direct those inquiries to the agency having jurisdiction and primary responsibility for the investigation.

### 310.11  DEBRIEFING
Following an officer-involved shooting or death, the Pocatello Police Department should conduct both a critical incident/stress debriefing and a tactical debriefing.

#### 310.11.1  CRITICAL INCIDENT/STRESS DEBRIEFING
A critical incident/stress debriefing should occur as soon as practicable. The Support Services Division Commander is responsible for organizing the debriefing. Notes and recorded statements should not be taken because the sole purpose of the debriefing is to help mitigate the stress-related effects of a traumatic event.

The debriefing is not part of any investigative process. Care should be taken not to release or repeat any communication made during a debriefing unless otherwise authorized by policy, law or a valid court order.

Attendance at the debriefing shall only include those members of the Department directly involved in the incident, which can include support personnel (e.g., dispatchers, other civilian). Family

DEFENDANTS 000637

# Pocatello Police Department
Pocatello PD ID Policy Manual

## Officer-Involved Shootings and Deaths

or other support personnel may attend with the concurrence of those involved in the incident. The debriefing shall be closed to the public and should be closed to all other members of the Department, including supervisory and Internal Affairs Unit personnel.

### 310.11.2   TACTICAL DEBRIEFING
A tactical debriefing should take place to identify any training or areas of policy that need improvement. The Chief of Police should identify the appropriate participants. This debriefing should not be conducted until all involved members have provided recorded or formal statements to criminal and/or administrative investigators.

DEFENDANTS 000638