UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAKE L. SHEELER, an individual,<br><br>     Plaintiff,<br><br>     v.<br><br>JEFFREY E. ELDRIDGE, an individual;<br>BRIDGET MCARTHUR, an individual;<br>MARISA A. SALDANA, an individual;<br>ROGER SCHEI, an individual; and CITY<br>OF POCATELLO, a municipal corporation,<br><br>     Defendants. | Case No. 4:22-cv-00313-AKB<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

Pending before the Court is Defendants' Motion for Summary Judgment and Plaintiff's Motion to Exclude or Limit Durand R. Begault, Ph.D., as an Expert Witness for Defendants (Dkts. 37, 39). The Court heard oral argument on the motions on May 29, 2024. For the reasons set forth below, the Court grants in part and denies in part Defendants' summary judgment motion and denies Plaintiff's motion to exclude.

## I.  BACKGROUND

This case concerns the use of deadly force against Plaintiff Jake Sheeler by three law enforcement officers employed by the Pocatello Police Department. The relevant events began on the afternoon of September 25, 2020, at approximately 4:19 p.m., when Sheeler was burglarizing the garage of a Pocatello residence and stealing a handgun. (Dkt. 37-2, ¶ 1). Hendricks, the owner of the residence, interrupted Sheeler's burglary when Hendricks entered the garage and discovered Sheeler inside. (*Id.*, ¶¶ 2-3). Upon finding Sheeler in his garage, Hendricks initially tried to apprehend him, but Sheeler pointed the stolen handgun at Hendricks and warned, "Stop, sir. I will

shoot you." (*Id.*, ¶ 4; Dkt. 38-1, ¶ 2). Sheeler continued to point the gun at Hendricks until Sheeler fled the garage with the handgun in his possession. (Dkt. 37-2, ¶¶ 5-6). Hendricks ran after Sheeler and Hendricks's neighbor, Hernandez, joined in the pursuit. (*Id.*, ¶ 8). At one point, Hernandez came face-to-face with Sheeler, who pointed the gun at Hernandez and told him, "Don't." In response, Hernandez froze, and Sheeler fled the scene. (*Id.*, ¶¶ 8-9).

Law enforcement officers with the PPD, including Officers Eldridge and Saldana, responded to incident. (Dkt. 37-3, ¶ 4; Dkt. 37-4 ¶ 4). Upon arriving in Hendricks's neighborhood, law enforcement separately interviewed both Hendricks and Hernandez.[1] (Dkt. 38-2, Ex. 15 at pp. 4-9). Collectively, they reported a male suspect had threatened them with a handgun, stolen two firearms from Hendricks's garage, and fled on foot.[2] (*Id.*) Based on this information, the officers believed the suspect had committed several felonies including burglary, grand theft, and aggravated assault. (Dkt. 37-4, ¶ 12). Law enforcement searched the neighborhood for the suspect, who they believed was Sheeler based on video surveillance and witness reports. (*Id.*, ¶ 10). After several hours, the officers were unable to locate Sheeler and believed he had left the area in a vehicle. (*Id.*, ¶ 13; Dkt. 37-3; ¶ 6). Officers Saldana and Eldridge were then cleared from the search, and Officer Saldana temporarily returned to other law enforcement activities. (Dkt. 37-3, ¶ 6; Dkt. 37-4, ¶ 13). During this time, emails were sent to PPD officers identifying Sheeler as the suspect in question and providing a picture of his clothing. (Dkt. 37-3, ¶ 7; Dkt. 37-6, ¶ 9).

---

[1]    Sheeler asserts Hernandez's testimony cannot be considered because Defendants have not identified what Hernandez reported to police before shooting. (Dkt. 38-1, ¶ 3). The record indicates, however, that Hernandez told law enforcement immediately after the burglary that Sheeler had threatened him with a gun. (Dkt. 38-2, Ex. 15 at p. 5; Dkt. 37-4, ¶ 7).

[2]    Hendricks initially believed Sheeler stole two handguns from his garage and reported the same to law enforcement. (Dkt. 38-2, Ex. 15 at p. 4). Later that evening, Hendricks also reported Sheeler may have even stolen a third gun. (*Id.*, Ex. 15 at p. 8; Dkt. 37-4, ¶ 21).

At approximately 7:38 p.m., dispatch received a call about a man who had offered to sell a gun to an individual in a neighborhood adjacent to Hendricks's neighborhood. (Dkt. 37-2, ¶ 16). Believing the man might be Sheeler, several PPD officers, including Officers Eldridge and McArthur, went to the neighborhood to resume looking for Sheeler. By the time the officers arrived, the sun had set, and it was dark outside. (Dkt. 37-6, ¶ 12). During their search, Officer Eldridge spoke with a resident of the neighborhood, Schroeder, who told Officer Eldridge a man had been in her garage and had gone north. (Dkt. 37-4, ¶ 15).

Sometime after speaking with Officer Eldridge, Schroeder called dispatch to report the encounter with the man in her garage, who was later confirmed to be Sheeler. (Dkt. 37-5, Ex. B). Schroeder reported that Sheeler had told her he may have left a gun in her garage and that she had not conveyed this information to the officer with whom she had spoken earlier. (*Id.* at 0:01:16-0:01:35). After speaking with Schroeder, the officers continued to search the neighborhood for Sheeler until they learned a male suspect had been seen among the trees near a golf course driving range. (*Id.*, ¶ 19; Dkt. 37-6, ¶ 19). Officers Eldridge and McArthur, who were on foot, left the neighborhood and entered the driving range from the south. Several additional police officers, including Officer Saldana, were west of the driving range and began searching the trees in that area. (Dkt. 37-3, ¶¶ 13, 14).

As Officers Eldridge and McArthur were walking across the driving range, Officer McArthur saw another individual walking east across the driving range. (Dkt. 37-6, ¶ 20). Upon spotting the individual, Officer McArthur said, "Hey, who's that?" (*Id.*, Ex. A. at 0:23:33). Officers McArthur and Eldridge then both shined their flashlights on the individual and identified him as Sheeler based on the earlier descriptions of him. (Dkt. 37-4, ¶ 28; Dkt. 37-6, ¶ 21). Both officers immediately ran towards Sheeler from the south with their weapons drawn and yelling commands.

(Dkt. 37-4, ¶ 29; Dkt. 37-6, ¶ 22). Around this time, Officer Saldana and other police officers also identified Sheeler and began running towards him from the west. (Dkt. 37-3, ¶ 15).

As the officers converged on Sheeler, the parties offer differing accounts of what followed. According to Defendants, Officers McArthur, Eldridge, and Saldana gave the following conflicting commands: "Show me your hands!" (McArthur), "Police, don't move!" (Eldridge), and "Police, get on the ground!" (Saldana). (Dkt 37-3, ¶ 15; Dkt. 37-4, ¶ 29; Dkt. 37-6, ¶ 22). Sheeler apparently did not comply with these commands and instead continued moving east away from the officers. (Dkt 37-3, ¶¶ 16, 17; Dkt. 37-4, ¶ 31; Dkt. 37-6, ¶ 24). Defendants also claim Sheeler told the officers he had a gun. (Dkt. 37-4, ¶ 32; Dkt. 37-6, ¶ 25). In response, Officer Eldridge told Sheeler, "If you draw your gun, I will shoot you!" (Dkt. 37-4, ¶ 32).

According to Officers Eldridge, McArthur, and Saldana, Sheeler then "squared up" to Officer Eldridge and took a "shooting stance" by facing his body and shoulders towards Officer Eldridge, quickly moving his right hand from behind his back, and pushing it out towards the officers. (Dkt. 37-3, ¶ 17; Dkt. 37-4, ¶¶ 34-36; Dkt. 37-6, ¶¶ 27-29). At that moment, fearing for their lives and the lives of the other officers, Officer McArthur and then Officer Eldridge began shooting at Sheeler. (Dkt. 37-4, ¶¶ 36, 38; Dkt. 37-6, ¶¶ 29, 31). Hearing the gunshots, Officer Saldana believed Sheeler had shot at the officers, and she responded by firing her gun at Sheeler. (Dkt. 37-3, ¶¶ 19, 21).

In contrast to Defendants' version of the incident, Sheeler testified he only remembers hearing the commands to "freeze," "put your hands up," and "walk backwards towards me." (Dkt. 37-2, ¶ 26; Dkt. 38-1, ¶ 15). Upon hearing these commands, Sheeler knew police had found him and that "the jig was up." (Dkt. 38-1, ¶ 15). According to Sheeler, he put his hands up and began to walk backwards in response to the commands. (Dkt. 37-2, ¶ 26). Sheeler denies telling

the officers he had a gun. (*Id.*, ¶ 37). Sheeler testified that after he began walking backwards with his hands up, his next memory is waking up in a hospital bed. (*Id.*, ¶ 26).

The sole video evidence of the incident is the footage from Officer McArthur's bodycam. (Dkt. 37-6, Ex. A). The footage, however, is blurry and dark, and at the same time, portions of it are obscured by the glare of the officers' flashlights and the driving range lights. The footage only confirms some of the details the parties provide. For example, the footage shows Officers McArthur and Eldridge spotting Sheeler, shining their flashlights on him, running towards him, and stopping some distance away from him as he walked east through the driving range. (Dkt. 37-6, Ex. A at 0:23:33-0:23:50). Further, the footage shows both Officers McArthur and Eldridge taking aim at Sheeler with their guns. (*Id.* at 0:23:48-0:23:58). On the footage, Officer McArthur can be heard repeatedly yelling, "Show me your hands!" while other officers can be also heard in the distance yelling commands.

Much of the yelling on the footage is unclear, and the parties dispute what was said and who said it. (*Id.* at 0:23:50-0:24:02). For example, Defendants claim some statements are Sheeler's saying "back up" to the officers and "I've got a gun." (Dkt. 37-2, ¶ 31). Meanwhile, Sheeler denies saying anything about a gun and contends the statement to "back up" was a command of one the officers. (Dkt. 38-1, ¶¶ 16, 24). The footage does reveal, however, that Officer McArthur gave Sheeler one final command to "Get on the ground!" before immediately firing her gun at him. (*Id.* at 0:24:05).

After Officer McArthur began shooting at Sheeler, it is undisputed Officers Eldridge and Saldana also began shooting at him. In total, the officers fired fifteen rounds with Officer McArthur firing five rounds, Officer Eldridge firing nine rounds, and Officer Saldana firing one round. (Dkt. 37-3, ¶ 21; Dkt. 37-4, ¶ 38; Dkt. 37-6, ¶ 31). Five shots hit Sheeler in his left side and back.

(Dkt. 38-1, ¶ 23). As a result, Sheeler was hospitalized for several months, has a permanent spinal cord injury, and is paralyzed from the T4 vertebra down. (Dkt. 5, ¶¶ 120-124). Whose shots hit Sheeler has never been determined.

At the time of the shooting, Sheeler was unarmed, and law enforcement never located a gun at the scene of the incident. (Dkt. 38-1, ¶ 28). The handgun Sheeler stole from Hendricks's garage was later found in Schroeder's garage, and the other guns Hendricks reported stolen were later found in Hendricks's garage. (Dkt. 37-7, Ex. G. at 52:5-8). As a result of Sheeler's conduct that day, Sheeler was charged in state court and pleaded guilty to charges for aggravated assault, burglary, and unlawful possession of a firearm.

Sheeler initiated this lawsuit against Defendants. (Dkt. 5). Count One alleges a claim under 42 U.S.C. § 1983 against Officers Eldridge, McArthur, and Saldana for using excessive force in violation of the Fourth Amendment. Count Two alleges a § 1983 claim against the City of Pocatello and the PPD Chief of Police Roger Schei, averring that the policies, practices, and actions of the City and the PPD caused the officers' excessive use of force against Sheeler. Count Three alleges a negligence claim against all Defendants under state law. Following discovery, Defendants moved for summary judgment on all Sheeler's claims. In support, they submit, among other things, the declaration, the expert report, and the deposition transcript of their expert, Durant Begault, Ph.D. (Dkts. 37-8, 38-2, Ex. 2). Sheeler opposes Defendants' summary judgment motion and moves to exclude Dr. Begault's testimony.

## II.  LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the

case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence is insufficient. *Id.* at 252. Rather, "there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.*

In deciding whether there is a genuine dispute of material fact, the court must view the facts in the light most favorable to the nonmoving party. *Id.* at 255; *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001). The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014). If, some of the events were videotaped, however, the court "view[s] the facts in the light depicted by the videotape." *Smith v. Agdeppa*, 81 F.4th 994, 997 (9th Cir. 2023) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

Under Rule 56(c)(1)(A), the nonmoving party asserting a fact is genuinely disputed must support that assertion by particularly citing to materials in the record. The opposing party, however, may object to the cited material if it "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). That a court may only consider admissible evidence in ruling on a summary judgment motion is well established. *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181-82 (9th Cir. 1988). But the court should sparingly grant motions in limine and only in those instances where the evidence is plainly inadmissible on all potential grounds. *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1218-19 (D. Kan. 2007).

In resolving a claim of qualified immunity, the court must construe disputed factual and credibility issues in favor of the nonmoving party. "[S]ummary judgment [for the defendant] is improper if, resolving all disputes of fact and credibility in favor of the party asserting the injury, (1) the facts adduced show that the officer's conduct violated a constitutional right, and (2) that

right was 'clearly established' at the time of the violation." *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The plaintiff bears the burden of showing the rights allegedly violated were clearly established. *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017).

Qualified immunity is a question of law, not a question of fact. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008). "Immunity ordinarily should be decided by the court." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Only when "historical facts material to the qualified immunity determination are in dispute" should the district court submit the factual dispute to a jury. *Torres*, 548 F.3d at 1211. "When there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity. The issue can then be raised in a Rule 50(a) motion at the close of evidence." *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017) (quoting *Ninth Circuit Model Civil Jury Instruction* 9.34 (2017)).

If, however, the only material dispute concerns what inferences properly may be drawn from the historical facts, a district court should decide the issue of qualified immunity. *Conner v. Heiman*, 672 F.3d 1126, 1131 n.2 (9th Cir. 2012) ("[W]hile determining the facts is the jury's job (where the facts are in dispute), determining what objectively reasonable inferences may be drawn from such facts may be determined by the court as a matter of logic and law."). Only the judge can decide whether a particular constitutional right was "clearly established" once any factual issues are resolved by a fact finder. *See Morales*, 873 F.3d at 823.

## III.  ANALYSIS

### A.      Motion to Exclude

Sheeler moves to exclude Begault's declaration, expert report, and deposition testimony. (Dkt. 39). Begault is an expert in "audio-video media authentication, voice identification, enhancement of audio-video media, audibility of speech and warning signals, recorded gunshot analysis, and forensic musicology." (Dkt. 37-8 at p. 8). Defendants retained him to enhance and interpret the footage from Officer McArthur's bodycam and to respond to the report of Sheeler's expert witness, Matthew Mecham, who performed an "independent biomechanical reconstruction analysis of the subject incident" based the footage.[3] (Dkt. 38-5 at p. 6). Sheeler argues Begault's testimony fails to satisfy the requirements of Rule 702 of the Federal Rules of Evidence.

Rule 702 governs the admissibility of expert testimony and limits the admissibility of expert testimony in two ways. First, it only permits witnesses with special "knowledge, skill, experience, training, or education," to testify as experts. Second, it limits a qualified expert's testimony to that which "will help the trier of fact to understand the evidence or to determine a fact in issue," is based on "sufficient facts or data," is "the product of reliable principles and methods," and is "reliably applied" to the facts of the case. Fed. R. Evid. 702(a)-(d).

The district court's role in applying Rule 702 is to be a gatekeeper. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). In that role, the court considers both the relevance and reliability of the proffered evidence. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the

---

[3]      For example, Begault attempts to refute Mecham's interpretation of the footage from McArthur's bodycam, stating that "contrary to Plaintiff's expert Mr. Mecham, an analysis of the bodycam video, including the exhibit I made from the bodycam video, demonstrates that Plaintiff changed direction several times as he walked eastbound." (Dkt. 37-8 at ¶ 6).

knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation omitted); *accord Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022). "To carry out its gatekeeping role, a district court must find that an expert's testimony is reliable—an inquiry that focuses not on 'what the experts say,' or their qualifications, 'but what basis they have for saying it.'" *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (quoting *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1316 (9th Cir. 1995)), *cert. denied*, 143 S. Ct. 2509 (2023). District courts have broad discretion in determining whether expert testimony is reliable. *Kumho*, 526 U.S. at 142.

Sheeler raises four challenges to Begault. First, Sheeler argues Begault's audio enhancement is not reliable. In support, he notes Begault "did not disclose metadata nor hash values of the recordings" or "the software, equipment, or import settings, features or expert setting used to create and export the video." (Dkt. 39-1 at p. 3). Sheeler contends that, without this information, Begault's results cannot be replicated, verified, or shown to be reliable. In support, Sheeler cites the deposition testimony of his rebuttal expert, Jonathan Broyles, who reports he cannot duplicate Begault's results without the missing information. (*Id.*; *see generally* Dkt. 38-4). Although Begault offered at his deposition on January 3, 2024, to provide Sheeler with the information, Sheeler responds that offer came after the expert disclosure deadlines. (Dkt. 39-1 at p. 3 n.2).

Sheeler, however, cites no legal authority in support of his assertion that an expert's work is inherently unreliable if it cannot be verified through duplication. Moreover, Begault's expert report is dated September 18, 2023 (Dkt. 37-8), and presumably, Defendants timely disclosed the report at least by October 2, the deadline for Defendants' expert disclosures. (Dkt. 26). Sheeler's rebuttal deadline was not until October 16. Based on this timeline, Sheeler could have requested

the information his rebuttal expert needed for purposes of attempting to duplicate Begault's work before the rebuttal deadline. For these reasons, the Court declines to exclude Begault's video enhancement because Broyles claims he could not duplicate it.

Sheeler's second challenge relates to Begault's opinion that Sheeler, not an officer, can be heard saying "back up" on the bodycam footage.  Sheeler claims this opinion "depends solely upon distances of the various officers at the time of the shooting" and "Begault did not perform any measurements [but rather] relied on estimates provided by Defendants' counsel." (Dkt. 39-1). That Begault did not himself perform the measurements and relied on counsel to provide him that information is not a basis to exclude his opinions. Basically, Begault assumed the accuracy of the measurements counsel provided him. An expert may rely on assumptions when formulating his opinions. Fed. R. Evid. 702, advisory committee notes to 2000 amendments ("The language 'facts or data' is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence."); *see also Unknown Party v. Arizona Bd. of Regents*, 641 F. Supp. 3d 702, 727 (D. Ariz. 2022). Generally, a disagreement with an expert's assumptions does not provide a basis for excluding his testimony. *Id.* Rather, Sheeler's recourse is to challenge Begault's assumptions on rebuttal. *Pinterest, Inc., v. Pintrips*, 2015 WL 2268498 at *1 (N.D. Cal. May 14, 2015) ("[C]hallenging the assumptions of an expert witness' report is a permissible topic of rebuttal testimony."). To this end, Sheeler can discover the facts, data, and assumptions on which Begault relies. *See* Fed. R. Civ. P. 26(b)(4)(C)(ii)-(iii). Likewise, Sheeler may discover any nonprivileged information regarding how Defendants estimated the distances, such as by deposing the individuals who participated in measuring the distances Begault used. The Court will not, however, exclude Begault's testimony simply because he relied on assumptions Defendants' counsel provided.

Sheeler's third and fourth challenges relate to Begault's opinions about what can be heard on the enhanced audio of the bodycam footage. Sheeler claims Begault admits "he has no greater ability than the jury to listen to the enhanced audio," admits "he made no attempt to decipher *any* commands given to Sheeler," and yet offers an opinion that "Sheeler did not comply with commands." (Dkt. 39-1 at pp. 3, 5). Begault's opinions about what can be heard on the video, however, appear to be—at least in part—responsive to Mecham's contrary opinions. For example, Begault opines the footage reveals Sheeler says "back up"; meanwhile, Mecham opines the officers can be heard yelling "walk backwards." (*Compare* Dkt. 37-8 at p. 3, ¶ 10 *with* Dkt. 38-5 at p. 8). Without a more detailed analysis of the specific opinions Sheeler seeks to exclude, whether those opinions are responsive to the opinions of Sheeler's experts and citation to applicable legal authorities, the Court declines, at this time, to exclude Begault's opinions regarding what the footage reveals. For purposes of summary judgment, it is enough to note the parties have presented competing opinions about both the footage's audio and its visual contents. The Court denies without prejudice Sheeler's motion to exclude Begault's opinions.

### B.    Motion for Summary Judgment

#### 1.   Excessive Force

Sheeler alleges a § 1983 claim against Officers Eldridge, McArthur, and Saldana for using excessive force in violation of the Fourth Amendment. Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). In determining whether the use of force was reasonable, the court balances the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest in justifying the intrusion. *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). The relevant factors under this inquiry include: (1) the severity of the crime at issue,

(2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the arrestee was actively resisting or attempting to evade arrest. *Graham*, 490 U.S. at 396. These *Graham* factors are not exhaustive, however. *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017). Rather, the court must consider the totality of circumstances, including other factors that may be appropriate in a particular case. *Id.* Other relevant factors may include, for example, "the availability of less intrusive force" and whether the officer gave "proper warnings." *Id.* Whether the suspect posed an *immediate* threat to the officers or others, however, is the most important consideration. *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1075 (9th Cir. 2017) (citing *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)).

The court performs this analysis using an objective standard. *Lombardo v. City of St. Louis*, 594 U.S. 464, 466 n.2 (2021). An officer's subjective intent or motivation is not relevant to the reasonableness inquiry in an excessive force claim. *Shafer*, 868 F.3d at 1116. Rather, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Nevertheless, given the fact-intensive nature of excessive force cases, summary judgment should be granted sparingly. *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014).

### a. Fourth Amendment Violation

Deadly force is the most severe intrusion on Fourth Amendment interests because it infringes on an individual's fundamental right to life. *See Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022). A police officer may use deadly force only when it is necessary

to prevent the escape of a felony suspect and the officer has probable cause to believe that the suspect poses a threat of serious harm, either to the officer or others. *Garner*, 471 U.S. at 3. "[I]f the suspect threatens the officer with a weapon or there is probable cause to believe [the suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape." *Id.* at 11-12. Whether the use of deadly force was necessary turns on whether a reasonable, nondeadly alternative for apprehending the suspect existed. *Id.* (quoting *Brower v. Cnty. of Inyo*, 884 F.2d 1316, 1318 (9th Cir. 1989).

Also, when using deadly force, an officer must give the suspect a warning whenever practicable and must allow the suspect an opportunity to comply. *Gonzalez*, 747 F.3d at 794 (requiring warning where practicable); *C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1256 (9th Cir. 2016) (finding use of deadly force objectively unreasonable where suspect given no warning or time to comply). When officers initially give conflicting commands, a person becomes noncompliant only after an "unequivocal" command is given and the person does not comply. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1094 n.7 (9th Cir. 2013); *see also Calonge v. City of San Jose*, No. 22-16495, 2024 WL 2873371, at *5 (9th Cir. June 7, 2024) (same). Three seconds of noncompliance—absent some other threat—does not justify deadly force. *Estate of Lopez*, 871 F.3d at 1007, 1010-11; *Calonge*, 2024 WL 2873371, at *5 (same).

Here, Defendants do not dispute they used deadly force when shooting Sheeler. *See Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) ("With regard to the force used, pointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force."). Rather, Defendants argue an analysis of *Graham* factors shows Officers Eldridge, McArthur, and Saldana did not use excessive force against Sheeler. They argue Sheeler's crimes of aggravated assault with a deadly weapon, burglary, and grand theft were serious felonies.

(Dkt. 37-1 at p. 6). Further, they argue Sheeler posed an immediate threat to the officers and others because he told Officers Eldridge and McArthur he had a gun; did not follow commands; and was threatening officers by "squar[ing] up" on the officers, moving "his right arm from the back of his waistband," "pushing it forward towards" the officers, and taking a "shooting stance." (*Id.* at pp. 7- 11). Finally, Defendants argue Sheeler was resisting arrest and attempting to escape because he "spent the afternoon and evening . . . fleeing from the police." (*Id.* at p. 11).

In opposition, Sheeler criticizes Defendants' summary judgment arguments as "hing[ing] on Defendants' version of events" rather than showing the absence of genuine issues of material fact warranting summary judgment in their favor. (Dkt. 38 at p. 2). Offering another interpretation of the evidence, Sheeler argues his testimony and a review of the bodycam footage shows that officers were giving him conflicting commands, including "don't move" and "get on the ground"; he did not say he had a gun, which would have been inconsistent with the fact that he, indeed, did not have a gun; an officer told him to "walk backwards" or "backup"; he was walking backwards in response; his hands were up and visibly empty; he was "manifesting an intent to surrender"; he "was not actively resisting arrest"; no officer gave him a warning;[4] and his gunshot wounds were on his left and backside, which is inconsistent with being shot while taking a shooting stance towards Officer Eldridge. (*See generally* Dkts. 38, 38-1).

The Court concludes numerous genuine issues of material fact are disputed and preclude summary judgment for Defendants. The bodycam footage raises many of these issues. For example, one of the most important factual questions is whether the officers reasonably perceived Sheeler took a shooting stance towards them. *See, e.g.*, *Longoria v. Pinal Cnty.*, 873 F.3d 699, 706

---

[4]     Sheeler acknowledges Officer Eldridge warned him, "*If you draw your gun* I will shoot you," but asserts he was not warned officers would shoot even if he did not draw a gun. (Dkt. 38 at p. 12).

**MEMORANDUM DECISION AND ORDER - 15**

(9th Cir. 2017) (noting "most important question" is whether officer reasonably perceived suspect assumed a threatening or shooter's stance); *Estate of Smith by Smith v. Holslag*, No. 21-55073, 2022 WL 1224001, at *1 (9th Cir. Apr. 26, 2022) (noting key disputed issue whether officer reasonably perceived suspect reached towards his waistline or pockets); *N.E.M. v. City of Salinas*, 761 Fed. App'x 698, 700 (9th Cir. 2019) ("[O]fficers may not use deadly force against a person who is armed but cannot reasonably be perceived to be taking any furtive, harrowing, or threatening actions"); *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078-79 (9th Cir. 2014) ("[I]f the suspect doesn't reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him after he stopped his vehicle and opened the door.").

Whether Sheeler took a shooting stance, however, is disputed. The officers attest Sheeler took a shooting stance. (Dkts. 37-3 at ¶ 17; 37-4 at ¶ 34; Dkt. 37-6 at ¶ 27). Meanwhile, Sheeler denies he did. (Dkt. 38-1 at ¶ 27). Instead, he contends his hands were up and he was walking backwards. (*Id.* at ¶ 25). The expert witnesses' opinions support their respective parties' testimony and are contradictory. (*See, e.g.*, Dkt. 38-5 at p. 12 (opinion Sheeler was walking backwards before he was shot); Dkt. 37-8 at ¶ 7 (stating "[i]t is ambiguous whether [Sheeler] ever 'walked backward'")). If Sheeler did take a shooting stance, the officers were entitled to shoot him. (*See* Dkt. 40)*.* If, alternatively, Sheeler's hands were up and visibly empty, a jury could conclude the officers did not reasonably perceive Sheeler was an immediate threat.

The Court has reviewed the bodycam footage numerous times in an attempt to determine what it definitely shows. The footage, however, is unclear.[5] Both the footage's audio and the visual

---

[5]    Defendants suggest the Court may discount Sheeler's version of the facts because the bodycam footage contradicts his testimony. (Dkt. 40 at pp. 3-4) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court disagrees. Video evidence must "quite clearly contradict" Sheeler's account of the incident to override the default standard of viewing the evidence in the light most favorable to Sheeler. *Id.* Here, Officer McArthur's bodycam is not clear regarding Sheeler's

are subject to differing interpretations, as indicated by the fact that the parties have disclosed competing expert witnesses to opine on what can be heard and seen on the footage. This lack of clarity also bears on other disputed factual issues such as whether Sheeler told the officers he had a gun; whether Sheeler was walking backwards with his hands in air manifesting an intent to surrender; whether he was actively resisting arrest; whether shooting Sheeler was necessary to prevent his escape; and whether the officers had probable cause to believe Sheeler posed a threat of serious harm to the officers or others. The unclear footage, conflicting testimony, and contradictory expert opinions give rise to many genuine issues of material fact precluding summary judgment.

The Ninth Circuit's decision in *Forrett v. Richardson*, 112 F.3d 416 (9th Cir. 1997), *superseded by Chroma Lighting v. GTE Products Corp*, 127 F.3d 1136 (9th Cir. 1997), does not dictate otherwise. In *Forrett*, the Ninth Circuit ruled the officers did not use excessive force when they shot Forrett while he was fleeing. Defendants contend *Forrett* is factually similar to this case. Several important distinctions exist between the cases, however. In that case, Forrett committed "a violent residential burglary" during which he "tied up three victims," "shot one of the victims in the neck at point blank range," and "shot at another using a .38 caliber revolver." *Id.* at 418. After fleeing the scene, officers within minutes located Forrett, who "fled into the residential area on foot." *Id.* "Forrett eluded capture for almost an hour by running across yards and streets, and jumping fences." *Id.* Eventually, the officers "approached to within 20-30 feet and shouted at Forrett to stop and surrender." *Id.* Forrett testified that he was aware the police were after him; he was trying to get away; and he heard officers shouting but could not discern what they were saying.

_____

movements in the moments before the shooting or what was being said by whom. Thus, the Court cannot disregard Sheeler's testimony.

*Id.* Officers then "fired seven or eight shots at him but did not hit him." *Id.* Forrett ignored the shots, ran to a fence, and began climbing it while officers continued shooting at him and finally hit him after he had scaled the fence. *Id.*

Unlike *Forrett*, the officers in this case were not in hot pursuit of Sheeler, at least in the sense that they were directly pursuing him on foot while he was fleeing. Rather, they encountered him many hours after the reports of his criminal conduct while he was walking through a golf course. Sheeler did not physically injure anyone or discharge a gun despite possessing one, and he did not testify he was trying to get away from the officers. Rather, he testified he was surrendering. For these reasons, *Forrett* is factually distinguishable and does not require summary judgment in Defendants' favor.

In summary, viewing the facts in a light most favorable to Sheeler, a reasonable jury could conclude that Sheeler was walking backwards with his hands up in response to conflicting commands in an attempt to surrender and that, as a result, he did not pose an immediate, significant threat of death or serious injury to the officers or others to justify using deadly force. Accordingly, the Court cannot, as a matter of law, conclude the officers' use of force was reasonable.

### b. Qualified Immunity

Defendants argue Sheeler's excessive force claim fails because the officers are entitled to qualified immunity. Under the doctrine of qualified immunity, "courts may not award damages against a government official in his personal capacity unless the official violated a statutory or constitutional right, and the right was clearly established at the time of the challenged conduct." *Lane v. Franks*, 573 U.S. 228, 243 (2014). The qualified immunity analysis consists of two prongs: (1) whether there is a violation of a constitutional right; and (2) whether that right was clearly established at the time the defendant acted. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1066

(9th Cir. 2016) (en banc); *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020). Defendants argue Officers Eldridge, McArthur, and Saldana are entitled to qualified immunity because (1) their use of force was constitutionally reasonable, and (2) even assuming it was not, the officers did not violate clearly established law at the time of the incident.

Having determined a reasonable jury could conclude the officers used excessive force, the Court considers whether the officers are nevertheless entitled to qualified immunity because Sheeler's right to be free from the officers' use of force was not clearly established at the time of the incident. Whether a right is clearly established turns on whether it is "sufficiently definite that any reasonable official in the defendant's shoes would have understood he was violating it." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 695 (9th Cir. 2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 105 (2018)). In analyzing whether a right is clearly established, the inquiry begins by "defining the law at issue in a concrete, particularized manner." *Shafer*, 868 F.3d at 1117. To show a right was clearly established at the time of the violation, the plaintiff must demonstrate the law gave the officer fair warning the relevant conduct was unconstitutional. *See Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022).

In the Ninth Circuit, to determine whether a right was clearly established, the court looks to binding precedent, i.e, whether Supreme Court or Ninth Circuit decisional authority clearly established the right. *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004). "[I]n the absence of binding precedent, [the court looks] to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." *Id.* (quotation omitted). Generally, a plaintiff need not find "a case directly on point," but existing precedent must have placed the statutory or constitutional question beyond debate. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "In other words, immunity

protects all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. 73, 79 (2017). "The longstanding principle is that 'clearly established law' should not be defined 'at a high level of generality.'" *Id.* (quotation omitted). Rather, "the clearly established law must be 'particularized' to the facts of the case." *Id.*

Showing, however, that the contours of a right are sufficiently clear that every reasonable official would have understood what he was doing violated the plaintiff's right is enough. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 784 (9th Cir. 2022). In other words, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has not previously been held unlawful.'" *United States v. Lanier*, 520 U.S. 259, 271 (1997) (brackets omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Officials can still be on notice that their conduct violates the law in cases involving the application of well-settled law to a new factual permutation. *Eng v. Cooley*, 552 F.3d 1062, 1076 (9th Cir. 2009).

Here, when viewing the facts in the light most favorable to Sheeler, the Court concludes the officers violated clearly established law. The Ninth Circuit has routinely denied qualified immunity when police use deadly force against suspects who do not pose a significant threat of death or serious physical injury to the officers or others. *Estate of Lopez*, 871 F.3d at 1018; *Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011). More specifically, in 2020 when Sheeler was shot, the law was clearly established that, absent immediately threatening behavior, gun possession alone does not justify the use of deadly force. *See Estate of Lopez*, 871 F.3d at 1013 (reasoning "mere possession of a weapon is insufficient to justify the use of deadly force"); *Banks-Reed v. Mateau*, No. 19-17444, 2022 WL 486607, at *2 (9th Cir. Feb. 17, 2022) (citations omitted) (finding it was clearly established in 2018 that "mere possession of a gun does not justify lethal

force"); *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (denying qualified immunity because police officers "could not reasonably have believed the use of deadly force was lawful because [the suspect] did not point the gun at the officers and apparently was not facing them when they shot him"); *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (concluding deadly force was inappropriate assuming suspect did not "turn[] and point[] his gun at" the police or take "other actions that would have been objectively threatening").

Instead, to use deadly force against an armed suspect, clearly established law required a suspect to manifest some threatening behavior, such as "a furtive movement, harrowing gesture, or serious verbal threat[.]" *Villegas*, 823 F.3d at 1256 (quoting *George*, 736 F.3d at 838); *see also Cruz*, 765 F.3d at 1078-79 (reasoning that "if the suspect doesn't reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him after he stopped his vehicle and opened the door"); *Estate of Smith*, 2022 WL 1224001, at *1 (same). Further, clearly established law provided a suspect is not considered noncompliant when he fails to obey conflicting commands; rather, a suspect is only considered noncompliant after he fails to comply with an unequivocal command. *Gravelet-Blondin*, 728 F.3d at 1094 n.7; *Calonge*, 2024 WL 2873371, at *7 (same).

In summary, numerous genuine issues of material fact exist regarding whether Sheeler posed a significant threat of death or serious injury to the officers or others, including whether he took a shooting stance or was walking backwards with his hands up. Construing the factual issues in Sheeler's favor, the evidence establishes that, although Sheeler was a felon, a fugitive, and reasonably believed to be armed, he was also walking backwards with hands raised in an apparent move to surrender. Clearly established law in 2020 provided fair notice to Officers Eldridge, McArthur, and Saldana that shooting Sheeler under these circumstances would be an

unconstitutional use of deadly force because he posed no significant threat to the officers or others. Accordingly, Officers Eldridge, McArthur, and Saldana are not entitled to qualified immunity at this stage of the proceedings.

### 2. *Monell C*laim

Defendant has also moved for summary judgment on Sheeler's *Monell* claim against the City of Pocatello and Chief Schei. Under *Monell*, a municipality or other local government may be liable under § 1983 only if the governmental body itself violates a person's rights. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978). Municipalities "are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citation omitted). Rather, a plaintiff who seeks to impose liability on a local government under § 1983 must prove that an action under an official municipal policy caused his injury. *Id*. A *Monell* claim against a municipality may be stated under three theories of liability: (1) when an official policy or established custom inflicts a constitutional injury; (2) when acts or omissions amount to a policy of deliberate indifference to a constitutional right; or (3) when an official with final policy-making authority ratifies a subordinate's unconstitutional conduct. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010), *overruled in part on other grounds by Castro*, 833 F.3d at 1070.

Here, Sheeler argues the City and Chief Schei are liable under *Monell* for two reasons. First, Sheeler argues that before he was shot, the PPD had a widespread practice of failing to comply with its written policies regarding the use of deadly force. Second, he argues Chief Schei ratified the unconstitutional acts of the officers and generally created a culture emboldening PPD officers to use force. According to Sheeler, both of these actions created a "*de facto* policy or practice of permitting officers to shoot civilians without ramification, which caused or contributed

to the shooting of Jake Sheeler." (Dkt. 38 at p. 19). The evidence Sheeler offers in support of these arguments, however, fails to substantiate his *Monell* claim.

First, Sheeler notes Pocatello "experienced a police shooting on average every 3-4 months" before he was shot. (Dkt. 38 at p. 18). Even if this were true,[6] it does not prove the PPD had a policy or practice encouraging unconstitutional uses of deadly force. Indeed, Sheeler has no evidence these other police shootings were unjustified, and implying they were without evidence is mere conjecture.

Next, Sheeler contends Chief Schei ignored PPD policies intended to moderate the use of force by police officers, which created a "culture" leading officers to "feel free to shoot an unarmed man." (Dkt. 38 at pp. 18-19). The only evidence Sheeler offers that Chief Schei did not comply with PPD policy, however, is Chief Schei's testimony that the PPD has not published annual reports analyzing use of force incidents. (Dkt. 38-2, Ex. 19 at 34:9-19). This act of noncompliance, however, could not have reasonably contributed to Sheeler's injury. Further, because Chief Schei became police chief in June 2019, (*Id.* at 10:1-4), he would have only failed to commission a *single* use of force report by September 2020 when Sheeler was shot. Moreover, even with this singular act of noncompliance with PPD policy, Chief Schei testified the PPD still reviewed use of force incidences individually, even if the PPD did not compile an annual report of them. (*Id.* at 34:9-19).

---

[6]      Chief Schei's testimony does not establish a police shooting occurred in Pocatello every "3-4 months" before Sheeler was shot. Nor does it establish the shooting of Sheeler was "the PPD's fourth police shooting since Defendant Schei became chief 15 months earlier." (Dkt. 38-1, ¶ 29). Instead, Chief Schei's testimony in February 2023 establishes there had been five total police shootings during his tenure to date as PPD chief of police. (Dkt. 38-2, Ex. 19 at 10:5-8). Two of these occurred after September 2020, and one was the incident in this case. (*Id.* at 10:9-12, 11:2-5, 12:8-11). Thus, in the fifteen months before the shooting of Sheeler, there were two other police shootings while Chief Schei was police chief.

MEMORANDUM DECISION AND ORDER - 23

Finally, Sheeler argues Chief Schei "protected" Officers McArthur, Eldridge, and Saldana after the shooting by "refusing to disclose the circumstances or the officers involved, giving them days to 'process' their memories before being interviewed, and not doing reviews of the shooting." (Dkt. 38 at p. 18). The only evidence Sheeler offers in support of his assertion that this conduct ratified the Officers' allegedly unlawful conduct relates to Chief Schei's lack of involvement in investigating the incident. (Dkt. 38-1 at ¶¶ 29-30). Sheeler cites no legal authority, however, that this lack of involvement constitutes ratification. Moreover, the record shows an outside task force investigated the shooting, and Sheeler does not take issue with that investigation. (Dkt. 38-2 at p. 12). Accordingly, Sheeler has failed to establish Chief Shei ratified the alleged use of excessive force or that the City's policies, practices, or customs contributed to Sheeler's alleged constitutional injury.

### 3. Negligence

Lastly, Defendants have moved for summary judgment on Sheeler's state-law negligence claim. "[A] cause of action in negligence requires the breach of a duty which is the proximate cause of the plaintiff's injury." *Doe v. Durtschi*, 716 P.2d 1238, 1243 (Idaho 1986) (citation omitted). "The elements of a common law negligence claim are (1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *Haight v. Idaho Dep't of Trans.*, 414 P.3d 205, 212 (Idaho 2018) (internal quotation marks and citation omitted).

Under Idaho law, law enforcement officers have a duty not to "subject the person being arrested to any more force or restraint than is necessary." *Kessler v. Barowsky*, 931 P.2d 641, 648 (Idaho 1997). And, it "necessarily follows that in planning an arrest, a police officer has the duty

to plan to use no more force than is necessary." *Id.* Thus, when police officers use excessive force to effectuate an arrest, they may be liable for negligent planning or execution of the arrest. *Id.* at 648-49. Likewise, "those who had the duty to supervise" the arresting officers may also be liable for negligent supervision if it was "reasonably anticipated that those subject to their supervision would commit [a compensable tort]." *Hill v. Cnty. of Benewah*, No: 2:18-cv-00320-DCN, 2020 WL 1049905, at * 7 (D. Idaho Mar. 4, 2020) (quoting *Kessler*, 931 P.2d at 648).

Here, Sheeler's complaint alleges Officers Eldridge, McArthur, and Saldana were negligent in the planning and execution of his arrest and that Chief Schei failed to properly train and supervise the three officers. Defendants argue Sheeler's negligence claim fails for two reasons. First, Defendants argue Officers Eldridge, McArthur, and Saldana were not negligent in planning or executing Sheeler's arrest because they did not use excessive force or, alternatively because Sheeler's own actions justified the officers in using deadly force. Second, Defendants contend there is no evidence in the record suggesting the City and Chief Schei were negligent in training or supervising the officers.

With respect to Officers Eldridge, McArthur, and Saldana, the Court concludes genuine issues of material fact exist regarding whether the officers negligently planned and executed Sheeler's arrest. As already explained, the record contains conflicting evidence regarding whether the officers used excessive force. Meanwhile, no evidence in the record shows the officers formulated a plan to apprehend Sheeler. *See Kessler*, 931 P.2d at 648 (ruling officers have duty to "use" or "plan to use" no "more force or restraint than is necessary"). For this reason, the Court denies Officers Eldridge, McArthur, and Saldana summary judgment on Sheeler's negligence claim.

Regarding the City and Chief Schei, however, no evidence suggests they could have reasonably anticipated the officers would use excessive force in apprehending Sheeler. Indeed, the only evidence in the record indicates the officers were POST certified and instructed to use deadly force only under the circumstances outlined by PPD policy, which is not contrary to the law governing the use of excessive force. (Dkt. 37-5, ¶¶ 6-11). Thus, there is no evidence the City or Chief was negligent in training or supervising the officers. Accordingly, the Court will grant Defendants' motion for summary judgment in favor of the City of Pocatello and Chief Schei on Sheeler's negligence claim.

## IV.  ORDER

**IT IS ORDERED that:**

1.      Defendants' Motion for Summary Judgment (Dkt. 37) is **GRANTED in part** and **DENIED in part**. The Court denies summary judgment for Defendants Eldridge, McArthur, and Saldana as to Sheeler's first claim for relief (Excessive Force) and third claim for relief (Negligence). The Court grants summary judgment for Defendants the City of Pocatello and Chief Schei as to Sheeler's second claim for relief (*Monell* claim) and third claim for relief (Negligence).

2.      Plaintiff's Motion to Exclude or Limit Durand R. Begault, Ph.D. as an Expert Witness for Defendants (Dkt. 39) is **DENIED** without prejudice.

DATED: June 12, 2024

Amanda K. Brailsford
U.S. District Court Judge